IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | *  CRIMINAL NO. 23-cr-257 (TSC) |
| | * |
| DONALD J. TRUMP, | * |
| | * |
| Defendant. | * |
| | * |

**GOVERNMENT'S REPLY TO DEFENDANT'S RESPONSE
IN OPPOSITION TO GOVERNMENT'S PROPOSED TRIAL CALENDAR**

The Government submits this reply to aid the Court in setting a fair and prompt trial schedule. In service of a proposed trial date in 2026 that would deny the public its right to a speedy trial, the defendant cites inapposite statistics and cases, overstates the amount of new and non-duplicative discovery, and exaggerates the challenge of reviewing it effectively. For the reasons below, neither the discovery nor any other factor raised by the defense impedes a fair trial on the schedule proposed by the Government.

Comparisons to the Schedule of Other Cases

The defendant's references to Section 371 statistics and January 6th cases overlook important underlying facts and context. *See* ECF No. 30 at 12. First, the defendant cites the median time from commencement to termination for jury trials of Section 371 charges—29.4 months—without explaining that this median time runs through the completion of sentencing, not the beginning of trial. That means that it includes the time required for jury selection, trial, verdict, and several months (or more) afterward before sentencing and final judgment. *See* https://www.uscourts.gov/sites/default/files/data_tables/jb_d10_0930.2022.pdf. The question here is when it is appropriate to start trial in this case, and statistics regarding the length of time from indictment to sentencing in other Section 371 cases have no bearing on that decision.

Second, the data cited by the defendant spans October 2021 through September 2022, when federal courts were pulling out of a backlog caused by COVID-19 closures. During that period, only 22 cases went to trial nationwide. This small and skewed sample provides no help to the Court in deciding an appropriate trial date.

The defendant's listed January 6th cases also omit important details and context. He fails to mention, for instance, that in one case he cites, disposition was delayed because of, among other reasons, litigation over pre-trial detention, a superseding indictment, and plea negotiations. *See United States v. Foy*, 21-cr-108, ECF No. 55, Superseding Indictment (11/10/21); 2/7/22 Minute Entry (setting jury trial for 9/19/22); ECF No. 67, Defendant's Unopposed Motion to Vacate Trial Date (for, among other reasons, plea negotiations). All of the defendant's other cited cases included multiple co-defendants—as many as seventeen. *See United States v. Crowl, et al.*, 21-cr-28 at ECF No. 328, Fifth Superseding Indictment. The Court should set these inapposite comparisons aside when weighing the individual factors here under the Speedy Trial Act.

<u>Volume and Review of Discovery</u>

The Government respects the defendant's need to review discovery and prepare for trial, but his characterizations of the volume of discovery miss important facts. The majority, or roughly sixty-five percent, of the Government's first discovery production—in which the Government front-loaded the most important materials—consists of materials to which the defendant has functionally had access, are duplicative, or do not constitute Rule 16 discovery. Approximately three million pages of the discovery—25% of the first production—come from entities associated with the defendant.[1] Hundreds of thousands of other pages came from the

---

[1] On August 19, 2023, the Government made a smaller, second discovery production, consisting of approximately 615,000 pages or files. Approximately 20% of this production's volume was again generated by records from an entity associated with the defendant.

National Archives—meaning that the defendant or his representatives reviewed them before the Government received them—or are publicly available, including the defendant's tweets, Truth Social posts, campaign statements, and court papers involving challenges to the 2020 election by the defendant or his allies. Nearly one million more pages came from the House Select Committee to Investigate the January 6th Attack on the United States Capitol, including hundreds of transcripts of interviews or depositions, a majority of which are already public in redacted form. *See* https://www.govinfo.gov/collection/january-6th-committee-final-report?path=/gpo/January%206th%20Committee%20Final%20Report%20and%20Supporting%20Materials%20Collection/Supporting%20Materials%20-%20Transcribed%20Interviews%20and%20Depositions/%7B%22pageSize%22%3A%2250%22%2C%22offset%22%3A%220%22%7D.

The first discovery production also included more than 100,000 pages of duplicative material because the Government sought to produce it in an exceptionally organized, clear, and user-friendly fashion. For example, if the Government obtained a record and then showed it to a witness during an interview, the record would appear twice in discovery—first clearly linked to the source from which the Government obtained it, and second in a clearly-marked witness interview folder. In addition, the Government took on the task of providing the defense a set of key, organized documents that the Government views as some of the most pertinent to its case-in-chief. These include certain key grand jury transcripts and other exhibits cited in the indictment.

In an abundance of caution and transparency, the Government also produced voluminous materials that are not likely to fall under Rule 16, *Brady*, or *Giglio*, and which should not require substantial time or attention from the defense team. For instance, the Government received from the United States Secret Service approximately 3.1 million pages of material, including all emails in a given time period for a number of custodians, generating a large number of irrelevant and

duplicative records.  The Government provided these materials in load-ready files so that the defense can review them quickly in the same manner as the Government did—through targeted keyword searches and electronic sorting.

Indeed, the Government provided the discovery in organized, load-ready files for importation to a searchable electronic database, with the understanding that the defense, consistent with modern standard practice, will review discovery electronically rather than manually.  The defendant's filing confirms that he intends to use a "document review database."  ECF No. 30 at 5.  The defendant's proposed trial date, however, rests on the faulty assertion that it is necessary for a lawyer to conduct a page-by-page review of discovery for a defendant to receive a fair trial.  But the defendant can, should, and apparently will adopt the benefits of electronic review to reduce the volume of material needed to be searched and manually reviewed.  These methods include efficient keyword searching and relevancy tagging by multiple simultaneous users, as well as date filtering, deduplication, and threading—all of which services, and more, are offered by the defendant's e-discovery vendor, according to its own website, and are tools that courts appropriately expect legal professionals to use.  *See, e.g.*, Department of Justice and Administrative Office of the U.S. Courts Joint Working Group on Electronic Technology in the Criminal Justice System, Recommendations for Electronically Stored Information Discovery Production in Federal Criminal Cases (Feb. 2012) at 4 ("[T]he volume of [electronically stored information] in many cases may make it impossible for counsel to personally review every potentially discoverable item, and, as a consequence, the parties increasingly will employ software tools for discovery review . . . ."); Federal Judicial Center, Criminal e-Discovery: A Pocket Guide for Judges (2015) at 11-12 (discussing the "critical" need in "any sizeable e-discovery case" for

defense counsel to find "appropriately skilled expert assistance," including for "strategically collecting, processing, organizing, reviewing, analyzing, and presenting data").

The defendant also contends that the existence of classified discovery necessitates delay. But this is not a case about classified information and the Government does not anticipate introducing classified material in its case-in-chief.  As the Government will explain during the August 28 hearing under Section 2 of the Classified Information Procedures Act ("CIPA"), there is no reason that the CIPA discovery process in this case cannot proceed quickly and in parallel with the schedule proposed by the Government.

In cases such as this one, the burden of reviewing discovery cannot be measured by page count alone, and comparisons to the height of the Washington Monument and the length of a Tolstoy novel are neither helpful nor insightful; in fact, comparisons such as those are a distraction from the issue at hand—which is determining what is required to prepare for trial.  To accomplish that, the discovery should instead be measured by its relevance, organization, accessibility, searchability, and reviewability.  Here, the Government has organized and produced materials in a manner designed to ease and expedite the defendant's review and search, which allows for trial to proceed as the Government has proposed.

<u>Scheduling</u>

The defendant contends that the Government's proposed trial schedule conflicts with other cases in which he is a civil or criminal defendant.  The Government is confident that the Court can and will, in this case as in any other, consider the parties' proposals and its own calendar and navigate around true conflicts.  For example, the defense points out that the Government's proposal to start jury selection on December 11, 2023, conflicts with a motions hearing in his criminal case in the Southern District of Florida.  Such true conflicts are easily addressed—the

Government now proposes instead that jury selection begin later during the week of December 11 to accommodate the hearing date in the Florida case.

In addition, setting a schedule in this case with deadlines for various disclosures can address many of the defendant's other purported concerns. For instance, the Government agrees with the defense suggestion, *see* ECF No. 30 at 8-9 n.7, that the Court may order the Government to identify the exhibits sought to be introduced in its case-in-chief well in advance of trial. The Government is prepared to do just that—and to comply with any other advanced deadline imposed by the Court—to ensure that this case moves forward expeditiously and fairly. Through reasoned, discretionary scheduling orders like these, the Court can fairly administer the prompt disposition of this case.

        Respectfully submitted,

        JACK SMITH
        Special Counsel

By:    /s/Molly Gaston
        Molly Gaston
        Thomas P. Windom
        Senior Assistant Special Counsels
        950 Pennsylvania Avenue NW
        Room B-206
        Washington, D.C. 20530