UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> v. <br><br> **DONALD J. TRUMP**, <br><br> Defendant. | Criminal Action No. 23-257 (TSC) |

**MEMORANDUM OPINION AND ORDER**

Before the court is Defendant's Motion for Recusal of District Judge Pursuant to 28 U.S.C. § 455(a). ECF No. 50 ("Motion"). For the reasons set forth below, recusal is not warranted in this case and the court will DENY the Motion.

I.     BACKGROUND

Defendant's Motion relies on statements the court made during the sentencing hearings of two individuals convicted for their conduct on January 6, 2021. On that day, as the D.C. Circuit has described, "a mob professing support for then-President Trump violently attacked the United States Capitol in an effort to prevent a Joint Session of Congress from certifying the electoral college votes designating Joseph R. Biden the 46th President of the United States." *Trump v. Thompson*, 20 F.4th 10, 15 (D.C. Cir. 2021), *cert. denied,* 142 S. Ct. 1350 (2022). "The rampage left multiple people dead, injured more than 140 people, and inflicted millions of dollars in damage to the Capitol. Then-Vice President Pence, Senators, and Representatives were all forced to halt their constitutional duties and flee the House and Senate chambers for safety." *Id.* at 15–16 (footnote omitted).

Over one thousand people have been charged in this district with crimes related to their participation in the January 6 attack. *Capitol Breach Cases*, U.S. ATTORNEY'S OFFICE, DISTRICT

OF COLUMBIA, U.S. DEP'T OF JUST. (accessed September 15, 2023), https://perma.cc/AL2A-WVDG.  While many of those cases are ongoing, hundreds have resulted in misdemeanor or felony convictions, with sentences ranging from probation to years of incarceration.  *Sentences Handed Down in Capitol Breach Cases (Friday, August 25, 2023)*, U.S. ATTORNEY'S OFFICE, DISTRICT OF COLUMBIA, U.S. DEP'T OF JUST. (accessed September 15, 2023), https://perma.cc/J2XC-8ZW9.  Dozens of January 6 Defendants have appeared before and been sentenced by this court.  *See id.* (case numbers ending in "-TSC").  Defendant's Motion refers to two of them.

A.  <u>United States v. Palmer</u>

Robert Scott Palmer pled guilty to, and was convicted of, assaulting, resisting, or impeding certain officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a) and (b).  *United States v. Palmer*, Case No. 21-cr-328, ECF No. 33 at 2–3 ("Palmer Sentencing Tr.").  On January 6, 2021, Palmer attended a rally held by then-President Trump and then joined the crowd marching toward the U.S. Capitol.  *Id.* at 22.  Once there, he made his way to the front lines of the mob seeking to enter the Capitol, where he repeatedly and violently assaulted the U.S. Capitol Police and Metropolitan Police Department officers who were trying to defend the building.  First, he hurled a wooden plank at the officers.  *Id.*, ECF No. 23 ¶ 8 (Statement of Offense).  Next, he "sprayed the contents of a fire extinguisher at the officers until it was empty," and flung that at them.  *Id.* ¶ 9.  Then, while searching for more makeshift projectiles, Palmer was pepper sprayed by law enforcement, but that only briefly deterred him.  *Id.*, ECF No. 30 at 1–2 (Gov't Sentencing Memo.).  He soon returned "with a 4-5 foot pole," which he threw "like a spear at the officers."  *Id.* at 2.  Palmer eventually retreated after being struck in the abdomen by a non-lethal projectile fired by one of the officers.  *Id.*

In his sentencing memorandum, Palmer argued that he was a relatively minor participant in the events of January 6, and therefore it would be unfair for him to receive a significant sentence when the people whom he saw as its instigators would probably never be charged or convicted for their roles. He contended that he "went to the Capitol at the behest of the former president," convinced by "the many figures who falsely but persistently claimed that the election had been stolen," including "the then-president himself," that he "must take action to stop the transition of the presidency." *Id.*, ECF No. 31 at 8 ("Palmer Sentencing Memo."). He emphasized that he "committed his offense while swept up in the furor of the crowd of protestors at the Capitol." *Id.* at 2. And he argued that in deciding his sentence, the court should "consider that the riot almost surely would not have occurred but for the financing and organization that was conducted by persons unconnected to Mr. Palmer who will likely never be held responsible for their relevant conduct." *Id*. at 9.

At Palmer's sentencing hearing on December 17, 2021, the court acknowledged Palmer's argument:

> Mr. Palmer argues that his presence at the Capitol on January 6 was the result of his desire to act patriotically and for the good of the nation; this mindset and the, quote, "crowd mob effect" caused him to assault the Capitol Police that day. He also offers that while he accepts and regrets his actions, it is relevant to consider that any purported architects of the January 6 riots have not been charged with any criminal offense and that it would be an imbalance to sentence him to an extended prison term while those actors remain free.

Palmer Sentencing Tr. at 18–19.

But the court also explained why it did not accept that argument. The portions of that explanation cited by the defense in its Motion have been italicized.

> *And it is true, Mr. Palmer -- you have made a very good point, one that has been made before -- that the people who exhorted you and encouraged you and rallied you to go and take action and to fight have not been charged.*

>That is not this court's position. I don't charge anybody. I don't negotiate plea offers. I don't make charging decisions. I sentence people who have pleaded guilty or have been convicted.
>
>*The issue of who has or has not been charged is not before me. I don't have any influence on that. I have my opinions, but they are not relevant.* And you're correct in that no one who was encouraging everybody to take the Capitol has been charged as of yet, but I don't think that fact means that you should get a lower sentence.
>
>The fact is that there are lots of people who agreed with you, who didn't like the results of the election, who perhaps thought the election was stolen in some way. They stayed home. You decided, of your own free will, to leave Florida and come to Washington and go to the rally.
>
>That's your right. You're not being sentenced for your political views. When you left that rally and went to the Capitol and saw what was going on and engaged in combat with those law enforcement officers, that's what you're being punished for. *So you have a point, that the people who may be the people who planned this and funded it and encouraged it haven't been charged*, but that's not a reason for you to get a lower sentence.

*Id.* at 21–22. The court sentenced Palmer to sixty-three months of incarceration, which was the sentence sought by the government and recommended by the U.S. Probation Office, and at the lower end of the applicable Sentencing Guideline Range. *Id.* at 24, 46.

### B. *United States v. Priola*

Christine Priola pled guilty to, and was convicted of, obstructing an official proceeding in violation of 18 U.S.C. § 1512(c)(2). *United States v. Priola*, Case No. 22-cr-242, ECF No. 66 at 2 ("Priola Sentencing Tr."). She admitted that on January 6, 2021, she traveled by bus to Washington, D.C., and joined the crowd headed for the U.S. Capitol. *Id.*, ECF No. 65 ¶ 8 (Statement of Offense). Priola carried a large sign reading "THE PEOPLE TAKE BACK OUR COUNTRY" on one side and "THE CHILDREN CRY OUT FOR JUSTICE" on the other, *id.*, and wore pants emblazoned with the phrase "MAKE AMERICA GREAT AGAIN," *id.*, ECF No. 56 at 13, 16 (Gov't Sentencing Memo.).

Once at the Capitol grounds, Priola "lined up behind the security barriers and facing U.S. Capitol Police officers," "joined the front lines of the riot, and climbed the steps to the Capitol building" as people in the crowd yelled, among other things, "Stop the Steal" and "Who's our President? Trump!" *Id.*, ECF No. 65 ¶ 9. "[S]oon after the first protesters overcame U.S. Capitol Police officers guarding [the East Rotunda] entrance," Priola entered the Capitol, where she made her way to the Senate floor. *Id.* ¶¶ 10–11. During her approximately thirty minutes inside the building, Priola displayed her sign, gave a false name to an individual who was filming, took photos and videos, and made phone calls—including a call to an associate telling him that she had made it to the Senate chamber and that he needed to come inside. *Id.* After leaving the building, she reported having been pepper sprayed. *Id.* ¶ 12. Days later, Priola resigned from her job and deleted from her cell phone all "photos, videos, chats, and messages from approximately January 4 through January 7, 2021." *Id.* ¶¶ 13–14.

Priola's sentencing memorandum to the court echoed many of the themes expressed by Palmer. She explained: "After the presidential election, Donald Trump . . . and his inner circle began spreading the word that the election was 'stolen' from him by Democrats and others," with claims "made on media sources, as well as by the President himself, that the election system had been corrupted and that the integrity of the election should be questioned." *Id.*, ECF No. 57 at 3 ("Priola Sentencing Memo."). At the sentencing hearing, Priola acknowledged that she had believed those claims on January 6. Priola Sentencing Tr. at 26; *id.* at 25–27. But she sought a lower sentence because, although she had gotten "wrapped up" in the broader efforts and emotions of the mob, *id.* at 26, she "had nothing to do with organizing, planning, directing or leading" it, *id.*, ECF No. 57 at 14. "Even breaking it down to people that have been charged with a crime," Priola argued, "she played no role of importance that day." *Id.*

During Priola's sentencing hearing on October 28, 2022, the court responded to her arguments for a lower sentence with the following comments. The portion upon which the defense relies for its motion is italicized.

> And so while [your attorney] is correct in that your background didn't involve any criminal activity, the events of that day and the seriousness of those events cannot be understated. This was nothing less than an attempt to violently overthrow the government, the legally, lawfully, peacefully elected government by individuals who were mad that their guy lost.
>
> *I see the videotapes. I see the footage of the flags and the signs that people were carrying and the hats they were wearing and the garb. And the people who mobbed that Capitol were there in fealty, in loyalty, to one man -- not to the Constitution, of which most of the people who come before me seem woefully ignorant; not to the ideals of this country; and not to the principles of democracy. It's a blind loyalty to one person who, by the way, remains free to this day.*
>
> There is no mob without the members of the mob, as I've said before. So [your attorney] made a point in his sentencing memorandum, that if we were to take your participation out of that group, that everything would have still happened; your actions did not materially contribute.
>
> But they did, because you were there. And people act in ways that they would never act alone when they're with a group, or when they're with a mob, and when emotions are involved.

Priola Sentencing Tr. at 29–30. The court sentenced Priola to fifteen months of incarceration, three months fewer than the government had sought. *Id.* at 18, 37.

## II.  LEGAL STANDARD

A "judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). As Defendant has done here, a litigant may move for a judge's recusal under that provision. *See S.E.C. v. Loving Spirit Found. Inc.*, 392 F.3d 486, 493 (D.C. Cir. 2004). "[T]he moving party must demonstrate by clear and convincing evidence that a judge has conducted himself in a manner supporting disqualification." *United States v. Nixon*, 267 F. Supp. 3d 140, 147 (D.D.C. 2017).

Recusal requirements serve vital purposes. "Unbiased, impartial adjudicators are the cornerstone of any system of justice worthy of the label." *In re Al-Nashiri*, 921 F.3d 224, 233–34 (D.C. Cir. 2019). "And because '[d]eference to the judgments and rulings of courts depends upon public confidence in the integrity and independence of judges,' jurists must avoid even the appearance of partiality." *Id.* at 234 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 115 (D.C. Cir. 2001) (en banc) (per curiam)). As the Supreme Court has stated, "to perform its high function in the best way 'justice must satisfy the appearance of justice.'" *In re Murchison*, 349 U.S. 133, 136 (1955) (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954)).

But justice also demands that judges not recuse without cause. "In the wrong hands, a disqualification motion is a procedural weapon to harass opponents and delay proceedings. If supported only by rumor, speculation, or innuendo, it is also a means to tarnish the reputation of a federal judge." *Microsoft Corp.*, 253 F.3d at 108. Motions for recusal could also be wrongfully deployed as a form of "judge shopping," *Alberti v. Gen. Motors Corp.*, 600 F. Supp. 1024, 1025 (D.D.C. 1984), permitting "litigants or third parties to exercise a negative veto over the assignment of judges," *In re United States*, 666 F.2d 690, 694 (1st Cir. 1981). There is, accordingly, as much "obligation upon a judge not to recuse himself when there is no occasion as there is for him to do so when there is." *United States v. Mitchell*, 377 F. Supp. 1312, 1325 (D.D.C. 1974) (quotation omitted), *aff'd sub nom. United States v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976) (en banc), *cert. denied sub nom. Ehrlichman v. U.S.,* 431 U.S. 933, 97 (1977), *reh'g denied sub nom. Mitchell v. United States,* 433 U.S. 916 (1977).

For these reasons, the D.C. Circuit has stated that the "extraordinary" relief of recusal should not be "lightly granted." *United States v. Pollard*, 959 F.2d 1011, 1023 (D.C. Cir. 1992). In evaluating a motion for disqualification, courts in this district begin with the presumption that

judges are impartial, then consider whether the movant's asserted grounds for recusal meet the statutory requirements. *See, e.g.*, *Nixon*, 267 F. Supp. 3d at 147; *S.E.C. v. Bilzerian*, 729 F. Supp. 2d 19, 22 (D.D.C. 2010); *Cobell v. Norton*, 237 F. Supp. 2d 71, 78 (D.D.C. 2003). "The standard for disqualification under § 455(a) is an objective one. The question is whether a reasonable and informed observer would question the judge's impartiality." *Microsoft Corp.*, 253 F.3d at 114. "This standard requires that [the court] take the perspective of a fully informed third-party observer who understands all the relevant facts and has examined the record and the law." *United States v. Cordova*, 806 F.3d 1085, 1092 (D.C. Cir. 2015) (cleaned up).

The Supreme Court has held that a judge's statements made in a judicial setting and reflecting "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). That is because such statements often reflect information that the judge "properly and necessarily acquired in the course of the proceedings" and that was "necessary to the completion of the judge's task." *Id.* at 551. After all, if a court "did not form judgments" about the issues in a case, then it "could never render decisions." *Id.* (quotation omitted). Consequently, statements originating from such "intrajudicial" rather than "extrajudicial" sources require recusal only "in the rarest circumstances." *Id.* at 555, 557.

### III.   DISCUSSION

**A. <u>Source of statements</u>**

The statements at issue here were based on intrajudicial sources. They arose not, as the defense speculates, from watching the news, Reply in Supp. of Mot. for Recusal, ECF No. 58 at 4 ("Reply"), but from the sentencing proceedings in *United States v. Palmer* and *United States v.*

*Priola*.  The statements directly reflected facts proffered and arguments made by those defendants.  And the court specifically identified the intrajudicial sources that informed its statements.

A review of the law governing the court's sentencing obligations provides some context to explain why its statements derived from knowledge that it "properly and necessarily acquired in the course of the proceedings."  *Liteky*, 510 U.S. at 551.  In sentencing a defendant, the court must consider seven factors set forth by Congress:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for [the offense in the U.S. Sentencing Guidelines and other laws] . . . ;
>
> (5) any pertinent policy statement [from the U.S. Sentencing Commission] . . . ;
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  Each time a court imposes a sentence, it "must make an individualized assessment based on the facts presented" under each factor. *Gall v. United States*, 552 U.S. 38, 50 (2007).

When the court considers the proper severity of a sentence, the defendant's relative culpability for the criminal activity may be a potential mitigating factor. *See, e.g.*, U.S. Sent'g Guidelines Manual § 3B1.2 (U.S. Sent'g Comm'n 2021) (decreasing an offense level if the defendant was a "minimal" or "minor" participant in the criminal activity). "The fact that there is only one defendant who has been charged in the case does not necessarily mean that there was only one participant for purposes of this analysis." *United States v. Coates*, 295 F. Supp. 2d 11, 20 (D.D.C. 2003). "The Court is to examine the defendant's culpability relative to others in the context of the relevant conduct that is being considered." *Id.* (citing *United States v. Graham*, 317 F.3d 262, 272 (D.C. Cir. 2003)). Likewise, when imposing a sentence, courts routinely assess whether the defendant's actions were affected or influenced by other people. *See* U.S. Sent'g Comm'n, Results of Survey of United States District Judges January 2010 through March 2010 at tbl. 13 (2010), https://perma.cc/LR6N-FFZS (reporting that sixty-eight percent of surveyed judges considered undue influence related to affection, relationship, or fear of other offenders relevant to departures or variances from sentencing guidelines).

Both Palmer and Priola urged the court to consider the nature and circumstances of their offenses in light of other individuals' involvement in the events of January 6. Rather than arguing for a Guidelines adjustment under § 3B1.2 or a Guidelines departure, both defendants sought a downward variance based, in part, on their relative culpability. Specifically, they argued that their culpability for participating in the January 6 riot was minor relative to the people they viewed as the riot's instigators, who had not been prosecuted for their conduct. *See* Palmer Sentencing Memo. at 9 (defense sentencing memorandum stating that "the riot almost surely would not have occurred but for the financing and organization that was conducted by persons unconnected to Mr. Palmer who will likely never be held responsible for their relevant

conduct"); Priola Sentencing Memo. at 14 (defense sentencing memorandum contrasting the people who were "organizing, planning, directing or leading" the "protest" with the "people that have been charged with a crime"). In addition, both defendants claimed that their purpose in coming to Washington, D.C. that day was to support then-President Trump. *See* Palmer Sentencing Memo. at 8; Priola Sentencing Tr. at 26.

The court's statements from each sentencing hearing reflect the information and arguments presented by the defense in each case. In *Palmer*, the court specifically cited the defendant's arguments for the "good point"—an undisputed fact in that case—that the "purported architects of the January 6 riots," the "people who exhorted you and encouraged you and rallied you . . . have not been charged." Palmer Sentencing Tr. at 18, 21; *see* Palmer Sentencing Memo. at 8–9. Similarly, in *Priola*, the court's statement that the defendant had entered the Capitol in "loyalty to one person who, by the way, remains free to this day," Priola Sentencing Tr. at 30, reflected Priola's (1) admission that she had come to Washington, D.C., to join a protest on behalf of then-President Trump, *id.* at 26; and (2) mitigation argument based on her view that the organizers, planners, or leaders of that protest had not been charged with a crime, Priola Sentencing Memo. at 14. The court also expressly based its statements in Priola's sentencing on the video evidence presented earlier in the hearing. Priola Sentencing Tr. at 11–14, 29.

In sum, the statements underlying Defendant's Motion were based on "what the [court] learned from [its] participation in [each] case." *Liteky*, 510 U.S. at 545 n.1 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)). The court's "knowledge and the opinion it produced" with respect to who had and had not been prosecuted for crimes related to January 6 was "properly and necessarily acquired in the course of the proceedings" in *Palmer* and *Priola*,

where the defendants argued that they were less culpable than those who had not been prosecuted. *Id.* at 551. Indeed, the court's consideration of that information and those arguments was "necessary to [the] completion of [its] task," *id.*, because of the court's obligation to consider each of the sentencing factors set forth in § 3553(a), including the nature and circumstances of the offenses, along with any relevant Sentencing Guidelines and the defendants' requests for downward variances. The court's statements therefore derived from intrajudicial sources.

**B. Question of impartiality**

Even if the statements at issue lacked an intrajudicial foundation, however, they would not provide a reasonable basis to question the court's impartiality from "the perspective of a fully informed third-party observer who understands all the relevant facts and has examined the record and the law." *Cordova*, 806 F.3d at 1092 (internal quotation marks omitted). And the statements certainly do not manifest a deep-seated prejudice that would make fair judgment impossible—the standard for recusal based on statements with intrajudicial origins.

At the outset, it bears noting that the court has never taken the position the defense ascribes to it: that former "President Trump should be prosecuted and imprisoned." Motion at 1. And the defense does not cite any instance of the court ever uttering those words or anything similar. Instead, the defense interprets the court's verbal reiteration of Palmer and Priola's arguments about their relative culpability as "suggest[ing]" a secret "core view" about Defendant's criminality. *Id.* at 7; *see id.* at 6 (the "statement that '[i]t's a blind loyalty to one person who, by the way, remains free to this day' . . . suggests that President Trump has culpability for the events of that day and should not be free"); *id.* at 7 (the court's reference to Palmer's argument "that the people who exhorted you and encouraged you and rallied you . . . have not been charged" is "a suggestion that President Trump may and should be prosecuted

based on those facts"). That inferential leap is not reasonable in light of the relevant facts, record, and law.

To begin, the court's statements reflect its obligation to acknowledge Palmer and Priola's mitigation arguments on the record. As already noted, both defendants sought a lower sentence on the grounds that their culpability for the January 6 attack was lesser than that of others whom they considered to be the attack's instigators, and so it would be unfair for them to receive a full sentence while those other people were not prosecuted. *See supra* Section III.A. The court was legally bound to not only privately consider those arguments, but also to publicly assess them. By statute, every judge must "state in open court the reasons for its imposition of the particular sentence." 28 U.S.C. § 3553(c). For every sentence, the court must demonstrate that it "has considered the parties' arguments," *Rita v. United States*, 551 U.S. 338, 356 (2007), including a defendant's arguments that their case involves mitigating factors that should result in a lower sentence, *United States v. Pyles*, 862 F.3d 82, 88 (D.C. Cir. 2017). That is what the court did in those two cases. A reasonable person—aware of the statutory requirement that the court address the defendant's arguments and state its reasons for its sentence—would understand that in making the statements contested here, the court was not issuing vague declarations about third parties' potential guilt in a hypothetical future case; instead, it was fulfilling its duty to expressly evaluate the defendants' arguments that their sentences should be reduced because other individuals whom they believed were associated with the events of January 6 had not been prosecuted.

Even on their face, the court's statements fall short of manifesting "clear and convincing evidence" that the court has conducted itself "in a manner supporting disqualification." *Nixon*, 267 F. Supp. 3d at 147. Start with the *Palmer* sentencing. The defense here focuses on the

court's comments that Palmer made a "very good point" about other people not being charged or not, and that "I have my opinions" about the "issue of who has or has not been charged." Motion at 2, 7. But the court expressly declined to state who, if anyone, it thought should still face charges. It is the defense, not the court, who has assumed that the Defendant belongs in that undefined group. Likewise, for the sentencing hearing in *Priola*, the defense purports to detect an "inescapable" message in what the court did not say: that "President Trump is free, *but should not be*." *Id.* at 2 (emphasis added). The court did state that the former President was free at the time of Priola's sentence—an undisputed fact upon which Priola had relied for her mitigation argument—but it went no further. To extrapolate an announcement of Defendant's guilt from the court's silence is to adopt a "hypersensitive, cynical, and suspicious" perspective rather than a reasonable one. *Nixon*, 267 F. Supp. 3d at 148.

The defense's interpretation of the court's statements is further weakened when those statements are considered in light of the rest of the sentencing proceedings. A "reasonable observer who is informed of all the surrounding facts and circumstances" would not consider "only certain sentiments expressed . . . while disregarding others." *United States v. Ciavarella*, 716 F.3d 705, 723 (3d Cir. 2013). While the court discussed Palmer and Priola's arguments that they should receive a lower sentence because other people had not been prosecuted, it ultimately rejected those arguments—declining to assign culpability to anyone else. Palmer Sentencing Tr. at 21–22; Priola Sentencing Tr. at 29–30. Those decisions undercut any notion that the court, in carrying out its sentencing duties with regard to Palmer and Priola, was pre-judging the Defendant's guilt in this case. *Contra* Motion at 2–3. Moreover, the court took care to clarify that any personal opinions about the issue of who had been prosecuted or not would not affect its decisions. Palmer Sentencing Tr. at 21; *see, e.g.*, *Ciavarella*, 716 F.3d at 723 (holding that a

judge's statement "that my personal beliefs cannot guide my responsibility and judgments" negated inference that the judge would act partially in accordance with his stated personal beliefs). The record "as a whole" does not support a reasonable question as to the court's impartiality. *Ciavarella*, 716 F.3d at 723.

Legal precedent also counsels against recusal in this case. The D.C. Circuit's en banc decision in *United States v. Haldeman* is particularly instructive. 559 F.2d 31. In that case, the Circuit reviewed a recusal motion against District Judge Sirica, filed by defendants who were being prosecuted for their participation in the Watergate conspiracy. *Id.* at 129–31. The motion relied, in relevant part, on statements made by Judge Sirica in prior cases involving other Watergate defendants. *Id.* at 131–32. In particular, Judge Sirica had, during those earlier proceedings, "expressed a belief that criminal liability extended beyond the seven persons there charged," and had even "suggested persons whom the prosecutors might consider calling before the grand jury investigating 'Watergate.'" *Id.* at 131 n.293. The Circuit affirmed Judge Sirica's decision not to recuse, holding that his statements did not "reflect a disqualifying state of mind" and observing that no "disabling prejudice [can] be extracted from dignified though persistent judicial efforts to bring everyone responsible for Watergate to book." *Id.* at 133–34. This court said even less in *Palmer* and *Priola* than Judge Sirica had in the prior Watergate matters. It specifically withheld judgment on whether other people should be charged for conduct related to January 6, and it did not recommend that the government investigate or charge any other individuals. Thus, there is even less reason for this court to recuse.

Other decisions from the Courts of Appeals confirm that conclusion. The D.C. Circuit recently held, for instance, that disqualification was not warranted where the District Judge told the defendant, "Arguably, you sold your country out. . . . I'm not hiding my disgust, my disdain

for this criminal offense." *In re Flynn*, 973 F.3d 74, 83 (D.C. Cir. 2020) (en banc) (per curiam). The Fifth Circuit did not require a District Judge to recuse from a civil tax case even after he had directed the government to bring criminal contempt charges against defendants, stating that they were "now in criminal contempt as far as [he was] concerned." *United States v. Allen*, 587 F.3d 246, 252 (5th Cir. 2009) (per curiam). And the Tenth Circuit affirmed a District Judge's denial of a motion to disqualify even after the judge had said it was "obvious" that the defendant was "going to get convicted." *United States v. Young*, 45 F.3d 1405, 1414 (10th Cir. 1995). Each of those cases involved judicial comments far more directly targeted at the respective defendants and their culpability than the statements at issue here.

The defense cites only two cases where a judge's prior statements were considered disqualifying, and neither applies to this case. First, in *United States v. Microsoft*, the D.C. Circuit considered a District Judge's "deliberate, repeated, egregious, and flagrant" statements about a case pending before him, which he had made during both public speeches and undisclosed private interviews with reporters. 253 F.3d at 107. The Circuit found that in those statements, the judge had (among other things) made "crude characterizations" and "frequent denigrations" of one party, opined on the merits of the issue "at the heart of the case," "offered his contemporaneous impressions of testimony" and witness credibility, and "secretly divulged . . . his views on the remedy for Microsoft's antitrust violations." *Id.* at 109, 111–12, 115. Those statements had crossed the line, the Circuit held, and "would lead a reasonable, informed observer to question the District Judge's impartiality." *Id.* at 115. But all the disqualifying features of those statements contrast with rather than compare to this case: Here, the court's statements were made in the course of prior judicial proceedings, did not pertain to Defendant's

case, and contained nothing akin to the explicit and often disparaging expressions of opinion at issue in *Microsoft*. The case thus undermines rather than bolsters Defendant's Motion.

The defense's analogy to *In re Mohammad*, 866 F.3d 473 (D.C. Cir. 2017), does not withstand scrutiny either. In that case, the D.C. Circuit required the recusal of a judge serving on the U.S. Court of Military Commission Review, who, before joining the bench, had made comments to the press about the defendant in the case before him. *Id.* at 476. In those comments, he had "expressed an opinion that [the defendant was] guilty of the very crimes of which he [was] accused" in the case over which he eventually presided—identifying the defendant, by name, as one of "the major conspirators in the 9/11 attacks" and referring to "the magnitude of what they did." *Id.* at 475–76. But that case differs from this one in both law and fact. There, the D.C. Circuit applied not the "reasonable person, knowing the relevant facts" standard for § 455 recusal motions, but rather a "stricter provision" in the Rules for Military Commissions, which specified "mandatory disqualification under its enumerated circumstances" and was "not so accommodating" as to consider whether "a reasonable person" would nonetheless retain confidence in the judge's impartiality. *Id.* at 477 (quotation omitted). The Circuit also noted that, unlike in this case, the statements "were not made in the performance of duties as [a] . . . judge but before he was ever appointed." *Id.* at 476 (quotation omitted). More importantly, however, this court has never labeled Defendant a "major conspirator" in any crime, much less the ones with which he is charged in this case, nor has it ever identified "what [he] did." *Id.* at 475–76. As a result, *In re Mohammad* does not support recusal here.

The defense's remaining citations illustrate a few more examples of what can give rise to the appearance of partiality, but all involved significant conflicts of interest. In brief: It was reasonable to question the impartiality of a judge who served as a trustee for a university with a

financial interest in the litigation before him, *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988); a military judge who secretly applied for employment with the Department of Justice while presiding over a case in which it was a party, *In re Al-Nashiri*, 921 F.3d 224 (D.C. Cir. 2019); a judge who credited in his summary judgment opinion a law clerk whose father was a senior partner at the firm representing the defendants, *Parker v. Connors Steel Co.*, 855 F.2d 1510 (11th Cir. 1988); a judge who hired consultants with a potential interest in related litigation, *In re Kensington Int'l Ltd.*, 353 F.3d 211 (3d Cir. 2003); a magistrate judge whose law clerk was a member of the plaintiff class, *Hall v. Small Bus. Admin.*, 695 F.2d 175 (5th Cir. 1983); and a judge who did business with and was separately represented by the lead counsel in a case before him, *Potashnick v. Port City Constr. Co.*, 609 F.2d 1101 (5th Cir. 1980). No such conflicts, or anything comparable to them, are present in this case. Even under the reasonable person standard, therefore, the court cannot conclude that the "extraordinary" measure of recusal is appropriate here. *Pollard*, 959 F.2d at 1023.

Disqualifying *intrajudicial* statements bear even less comparison to the comments at issue here. Examples of judges expressing such "deep-seated favoritism or antagonism that would make fair judgment impossible," *Liteky*, 510 U.S. at 555, "are thankfully, not easy to find," *Belue v. Leventhal*, 640 F.3d 567, 573 (4th Cir. 2011). An example of those "rarest circumstances" identified by the Supreme Court in *Liteky*, 510 U.S. at 555, is the statement attributed to the District Judge in *Berger v. United States*, 255 U.S. 22, 41 (1921), a World War I espionage case with German-American defendants. The judge had remarked, among other things, that "[o]ne must have a very judicial mind, indeed, not to be prejudiced against the German-Americans in this country. Their hearts are reeking with disloyalty. . . . [A] friend of

mine . . . was a bank robber for nine years . . . , and as between him and this defendant, I prefer [the bank robber]." *Berger*, 255 U.S. at 28–29.

Other instances have similarly involved "singular and startling facts." *Belue*, 640 F.3d at 573. The Eighth Circuit required recusal after the District Judge had, "[i]n the course of numerous in-person and telephone conferences and hearings, . . . directed profanities at Plaintiffs or Plaintiffs' counsel over fifteen times," then "denied Plaintiffs a meaningful opportunity to respond" at a sanctions hearing while "misconstru[ing] the language of its own discovery orders and dismiss[ing] Plaintiffs' attempt to explain those orders." *Sentis Grp., Inc., Coral Grp., Inc. v. Shell Oil Co.*, 559 F.3d 888, 904–05 (8th Cir. 2009). And in *United States v. Antar*, the Third Circuit found a District Judge disqualified after he stated in a sentencing hearing that "[m]y object in this case from day one has always been to get back to the public that which was taken from it as a result of the fraudulent activities of this defendant and others." 53 F.3d 568, 573 (3d Cir. 1995), *overruled on other grounds by Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001). In other words, the judge had, "in stark, plain and unambiguous language, told the parties that his goal in the criminal case, from the beginning, was something other than what it should have been and, indeed, was improper." *Id.* at 576.

By contrast, this court has from the beginning repeated its commitment "to ensure the orderly administration of justice in this case as [in] any other case." August 11, 2023 Hr'g Tr., ECF No. 29 at 72. That commitment echoes the court's solemn oath to "administer justice without respect to persons," to "do equal right to the poor and to the rich," and to "faithfully and impartially discharge and perform all the duties . . . under the Constitution and laws of the United States." 28 U.S.C. § 453. Based on its review of the law, facts, and record, the court concludes that a reasonable observer would not doubt its ability to uphold that promise in this case.

## IV. CONCLUSION

For these reasons, Defendant's Motion for Recusal of District Judge Pursuant to 28 U.S.C. § 455(a), ECF No. 50, is hereby DENIED.

Date: September 27, 2023

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge