## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>  v.<br><br>DONALD J. TRUMP,<br><br>    *Defendant*. | Case No. 1:23-cr-00257-TSC |

## MOTION TO DISMISS INDICTMENT
## <u>BASED ON PRESIDENTIAL IMMUNITY</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

President Trump moves to dismiss the indictment in this matter, with prejudice, based on Presential immunity. In support, President Trump states as follows. ............................................. 1

INTRODUCTION ........................................................................................................ 1

LEGAL STANDARD .................................................................................................. 2

ALLEGATIONS IN THE INDICTMENT ...................................................................... 2

    A.   Public Statements and Tweets About the Federal Election and Certification. ................... 3

    B.   Communications with the U.S. Department of Justice About Investigating Election Crimes and Possibly Appointing a New Acting Attorney General. ............................................ 4

    C.   Communications with State Officials About the Federal Election and the Exercise of Their Official Duties with Respect to the Election. ................................................. 6

    D.   Communications with the Vice President and Members of Congress About the Exercise of Their Official Duties in the Election-Certification Proceedings. ............................................ 6

    E.   Organizing Slates of Electors as Part of the Attempt to Convince Legislators Not to Certify the Election Against Defendant. ..................................................... 7

ARGUMENT .................................................................................................. 8

    I.   The President Has Absolute Immunity from Criminal Prosecution for Actions Performed Within the "Outer Perimeter" of His Official Responsibility. ..................................... 8

        A.   The Doctrine of Separation of Powers and the President's Unique Role in Our Constitutional Structure Require Immunity from Criminal Prosecution. ............................. 8

        B.   Impeachment and Conviction by the Senate Provide the Exclusive Method of Proceeding Against a President for Crimes in Office. ................................................ 11

        C.   Early Authorities Support Presidential Immunity from Criminal Prosecution. ............. 13

        D.   Two Hundred Thirty-Four Years of History and Tradition Support Presidential Immunity from Criminal Prosecution. .................................................. 15

        E.   Analogous Immunity Doctrines Support Presidential Immunity from Criminal Prosecution. ....................................................................... 16

        F.   Concerns of Public Policy Favor the President's Immunity from Prosecution. ............. 18

    II.   The Indictment Alleges Only Acts Committed Within the Outer Perimeter of the President's Official Responsibilities, Which Are Shielded by Absolute Immunity. ................ 21

        A.   The Scope of Criminal Immunity Includes All Actions That Fall Within the "Outer Perimeter" of the President's Official Duties. ...................................... 21

B.   The Nature of the Act, Not the Manner in Which It Is Conducted or Its Alleged Purpose, Determines Whether It Falls Within the Scope of Immunity. ............................... 23

D.   Every Act Alleged in the Indictment Falls Within the Outer Perimeter of the President's Official Duties and Is Immune from Criminal Prosecution. .................................................. 27

CONCLUSION .................................................................................................................... 45

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ............................................................. 36

*Barr v. Matteo*, 360 U.S. 564 (1959) ............................................. 1, 8, 19, 20, 23, 24, 28, 33

*Barrett v. Harrington*, 130 F.3d 246 (6th Cir.1997) ................................................. 23

*Bernard v. Cnty. of Suffolk*, 356 F.3d 495 (2d Cir. 2004) ........................................ 23

*Buckley v. Valeo*, 424 U.S. 1 (1976) ......................................................................... 32

*Burroughs v. United States*, 290 U.S. 534 (1934) ................................................ 36, 43

*Butz v. Economou*, 438 U.S. 478 (1978) ................................................................ 16, 20

*Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367 (2004) ............................................. 20

*Clinton v. Jones*, 520 U.S. 681 (1997) ........................................... 12, 22, 23, 28, 37

*Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949) ............................... 8

*Cunningham v. Neagle*, 135 U.S. 1 (1890) ........................................... 35, 36, 38, 43

*Dorman v. Higgins*, 821 F.2d 133 (2d Cir. 1987) ..................................................... 25

*Ferri v. Ackerman*, 444 U.S. 193 (1979) .................................................................... 9

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010) .............. 16, 22, 37

*Gregoire v. Biddle*, 177 F.2d 579 (2d Cir. 1949) ................................................ 19, 24

*Guzman–Rivera v. Rivera–Cruz*, 55 F.3d 26 (1st Cir. 1995) ...................................... 44

*In re Global Crossing, Ltd. Sec. Litig.*, 314 F. Supp. 2d 172 (S.D.N.Y. 2003) ............. 24

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997) ................................................... 34

*Ireland v. Tunis*, 113 F.3d 1435 (6th Cir. 1997) ..................................................... 44

*Klayman v. Obama*, 125 F. Supp. 3d 67 (D.D.C. 2015) ....................................... 23, 33

*Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019) .............. 30

*Lynch v. President of the U.S.*, 2009 WL 2949776 (N.D. Tex. Sept. 14, 2009) ............... 30

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) ........................................... 13, 14

*Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827) ....................................................... 15

*Matal v. Tam*, 582 U.S. 218 (2017) ......................................................................... 30

*Michigan Welfare Rts. Org. v. Trump*, No. CV 20-3388 (EGS), 2022 WL 17249218 (D.D.C.
Nov. 28, 2022) ........................................................................................................ 31

*Midland Asphalt Corp. v. United States*, 489 U.S. 794 (1989) ................................... 2

*Moore v. Trump*, No. 22-CV-00010 (APM), 2022 WL 3904320 (D.D.C. Aug. 2, 2022) ........... 31

*Morrison v. Olson*, 487 U.S. 654 (1988) ................................................................. 11

*Myers v. United States*, 272 U.S. 52 (1926) .............................................................. 34

*NFIB v. OSHA*, 142 S. Ct. 661 (2022) .................................................................... 15

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982) 1, 8, 9, 10, 13, 15, 16, 17, 18, 19, 21, 22, 24, 25, 26, 33,
44

*Novoselsky v. Brown*, 822 F.3d 342 (7th Cir. 2016) ................................................. 24

*Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484 (10th Cir. 1991) ........................... 45

*Pierson v. Ray*, 386 U.S. 547 (1967) ............................................... 9, 17, 24, 33

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) ............................................. 30

*Ponzi v. Fessenden*, 258 U.S. 254 (1922) ................................................................ 34

iv

*Prince v. Hicks*, 198 F.3d 607 (6th Cir. 1999) .................................................................... 44

*Printz v. United States*, 521 U.S. 898 (1997) ..................................................................... 16

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) ............................................................. 16

*Snell v. Tunnell*, 920 F.2d 673 (10th Cir. 1990) ............................................................... 45

*Spalding v. Vilas*, 161 U.S. 483 (1896) ................................................... 17, 19, 20, 24, 33

*Stump v. Sparkman*, 435 U.S. 349 (1978) .................................................................. 18, 25

*Tenney v. Brandhove*, 341 U.S. 367 (1951) ....................................................... 15, 16, 25, 33

*Thompson v. Trump*, 590 F. Supp. 3d 46 (D.D.C. 2022) .................... 28, 30, 31, 32, 34, 38, 39

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018) ........................................................................ 28

*Trump v. Vance*, 140 S. Ct. 2412 (2020) ................................................ 12, 19, 20, 21, 22

U.S. CONST. art. II, § 3 ....................................................................... 1, 22, 33, 40

*United States v. Chaplin*, 54 F. Supp. 926 (S.D. Cal. 1944) ............................................. 17

*United States v. Chrestman*, 525 F. Supp. 3d 14 (D.D.C. 2021) ........................................ 31

*United States v. Nixon*, 418 U.S. 683 (1974) .............................................................. 10, 11

*United States v. Saylor*, 322 U.S. 385 (1944) .................................................................. 36

*United States v. Sunia*, 643 F. Supp. 2d 51 (D.D.C. 2009) ............................................... 2

*United States v. Weeks*, 636 F. Supp. 3d 117 (D.D.C. 2022) ............................................. 2

*Yates v. Lansing*, 5 Johns. 282 (N.Y. 1810) ..................................................................... 17

## Statutes

18 U.S.C. § 1015 ............................................................................................................... 33

18 U.S.C. § 241 ................................................................................................................. 33

18 U.S.C. § 242 ................................................................................................................. 33

18 U.S.C. § 611 ................................................................................................................. 33

18 U.S.C. § 911 ................................................................................................................. 33

52 U.S.C. § 10307 ............................................................................................................. 33

52 U.S.C. § 20511 ............................................................................................................. 33

52 U.S.C. § 30120 ............................................................................................................. 33

52 U.S.C. § 30124 ............................................................................................................. 33

## Other Authorities

1 ANNALS OF CONGRESS 481 (1789) ................................................................................. 34

2 J. ELLIOT, DEBATES ON THE FEDERAL CONSTITUTION 480 (2d ed. 1863) ................................. 12

28 THE PAPERS OF ULYSSES S. GRANT (ed. John Y. Simon 2005) ...................................... 42

3 J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES ch. 37, § 1563 (1833) ............................................................................................................................... 14

6 W. HOLDSWORTH, A HISTORY OF ENGLISH LAW (2d ed. 1937) .............................................. 17

77 Eng. Rep. 1307 .............................................................................................................. 17

Clinton Rossiter, *The American Presidency* (2d rev. ed. 1960) ........................................... 41

H. RES. 24 (117th Cong. 1st Sess.) .................................................................................... 13

H.R. Rep. No. 81-3138 ....................................................................................................... 41

J. Randolph Block, *Stump v. Sparkman and the History of Judicial Immunity*, 1980 DUKE L.J. 879 ..................................................................................................................................... 17

Lawrence H. Chamberlain, *The President, Congress and Legislation* (1946) ........................... 41

*Legislative Activities of Executive Agencies: Hearings Before the H. Select Comm. on Lobbying Activities*, 81st Cong., pt. 10 (1950) ........................................................................... 40

*Lobbying by Executive Branch Personnel*, U.S. Op. O.L.C. Supp. 240 (1961) ................... 40, 41

*Office & Duties of Attorney General*, 6 U.S. Op. Atty. Gen. 326 (1854) .................................. 34

*Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 U.S. Op. O.L.C. 101 (1984) .................................................. 34

SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, § 10 (2012) ......... 12

THE FEDERALIST No. 43 (J. Madison) ....................................................................................... 12

THE FEDERALIST No. 65 (A. Hamilton) ..................................................................................... 12

THE FEDERALIST No. 69 (C. Rossiter ed. 1961) ....................................................................... 12

THE FEDERALIST No. 77 (A. Hamilton) ..................................................................................... 12

Thomas J. Norton, *The Constitution of the United States: Its Sources and Its Application* (special ed. 1940, 8th printing 1943) ............................................................................................... 41

U.S. Dep't of Justice, *Election Crimes Branch* ..................................................................... 33, 37

U.S. Dep't of Justice, *Federal Prosecution of Election Offenses* (8th ed. 2017) ...................... 33

## Constitutional Provisions

U.S. CONST. art. I, § 3, cl. 7 ........................................................................................ 11, 12, 13

U.S. CONST. art. II, § 1 ...................................................................................................... 9, 22

U.S. CONST. art. II, § 2, cl. 2 ................................................................................................. 34

U.S. CONST. art. II, §1, cl. 2 ................................................................................................. 43

President Trump moves to dismiss the indictment in this matter, with prejudice, based on Presidential immunity. In support, President Trump states as follows.

## INTRODUCTION

The President of the United States sits at the heart of our system of government. He is our Nation's leader, our head of state, and our head of government. As such, the founders tasked the President—and the President alone—with the sacred obligation of "tak[ing] Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3.

To ensure the President may serve unhesitatingly, without fear that his political opponents may one day prosecute him for decisions they dislike, the law provides absolute immunity "for acts within the 'outer perimeter' of [the President's] official responsibility." *Nixon v. Fitzgerald* 457 U.S. 731, 756 (1982) (quoting *Barr v. Matteo*, 360 U.S. 564, 575 (1959) (plurality opinion)).

Breaking 234 years of precedent, the incumbent administration has charged President Trump for acts that lie not just within the "outer perimeter," but at the heart of his official responsibilities as President. In doing so, the prosecution does not, and cannot, argue that President Trump's efforts to ensure election integrity, and to advocate for the same, were outside the scope of his duties. Instead, the prosecution falsely claims that President Trump's motives were impure— that he purportedly "knew" that the widespread reports of fraud and election irregularities were untrue but sought to address them anyway. But as the Constitution, the Supreme Court, and hundreds of years of history and tradition all make clear, the President's motivations are not for the prosecution or this Court to decide. Rather, where, as here, the President's actions are within the ambit of his office, he is absolutely immune from prosecution. *Spalding v. Vilas*, 161 U.S. 483, 494, 949 (1896) ("The 'allegation of malicious or corrupt motives' does not affect a public official's immunity and "[t]he motive that impelled [the official] to do that of which the plaintiff

1

complains is … wholly immaterial.”). Therefore, the Court should dismiss the indictment, with prejudice. *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 801 (1989) (“Dismissal of the indictment is the proper sanction when a defendant has been granted immunity from prosecution…”) (citation omitted).

## LEGAL STANDARD

“In ruling on a motion to dismiss for failure to state an offense, a district court is” typically “limited to reviewing the face of the indictment and, more specifically, the language used to charge the crimes.” *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009) (emphasis omitted). “When considering a motion to dismiss, the court must review the face of the indictment,” and “the indictment must be viewed as a whole and the allegations must be accepted as true at this stage of the proceedings.” *United States v. Weeks*, 636 F. Supp. 3d 117, 120 (D.D.C. 2022).

## ALLEGATIONS IN THE INDICTMENT

President Trump (the incumbent administration's leading opponent in the upcoming Presidential election) emphatically denies the truth of any allegations in the indictment. Rather, this memorandum sets forth the facts alleged in the indictment so that their legal sufficiency may be assessed for a motion to dismiss. *Id.* Moreover, the Supreme Court has “repeatedly … stressed the importance of resolving immunity questions at the earliest possible stage in litigation.” *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Davis v. Scherer*, 468 U.S. 183, 195 (1984); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Anderson v. Creighton*, 483 U.S. 635, 646, n.6 (1987)); and *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Accordingly, this motion addresses only the question of Presidential immunity. Other fatal deficiencies in the indictment will be addressed in future motion(s) and proceeding(s).

The indictment alleges that President Trump took a series of actions that form the basis of its charges. These acts fall into five basic categories. The indictment alleges that President Trump, while he was still President: (1) made public statements about the administration of the federal election, and posted Tweets about the administration of the federal election; (2) communicated with senior Department of Justice ("DOJ") officials about investigating election fraud and about choosing the leadership of DOJ; (3) communicated with state officials about the administration of the federal election and their exercise of official duties with respect to it; (4) communicated with the Vice President, in his legislative capacity as President of the Senate, and with other Members of Congress about the exercise of their official duties regarding the election certification; and (5) authorized or directed others to organize contingent slates of electors in furtherance of his attempts to convince the Vice President to exercise his official authority in a manner advocated for by President Trump.[1]

## A.    Public Statements and Tweets About the Federal Election and Certification.

First, the indictment alleges that President Trump, while he was still President, made public statements about the administration of the 2020 federal election. *See* Doc. 1, ¶ 2 (alleging public statements claiming fraud in the administration of the federal election); *id.* ¶¶ 11-12 (alleging a series of public statements claiming fraud in the federal election); *id.* ¶ 19 (public statement about election fraud in Arizona); *id.* ¶ 32 (public statement regarding Georgia's election administration); *id.* ¶ 33 (public statement about fraudulent voting in Georgia); *id.* ¶ 34 (public statement suggesting fraudulent voting in Detroit); *id.* ¶ 37 (public statement about suspected election fraud in Michigan); *id.* ¶ 41 (public statement about election fraud in Michigan); *id.* ¶ 42 (public statement

---

[1] In certain cases, the indictment does not specify whether President Trump had direct involvement in many of these actions or even knew they were occurring; but even assuming that he did, the acts alleged are all still of a public character.

disputing a Pennsylvania local official's public statement about the absence of fraud in Philadelphia); *id.* ¶ 46 (public statement claiming election fraud in Pennsylvania); *id.* ¶ 52 (public statement about election fraud in Wisconsin); *id.* ¶ 99 (public statement about the scope of the Vice President's authority on January 6); *id.* ¶ 102 (public statement in speech about the scope of the Vice President's authority on January 6); *id.* ¶ 104 (statements in public speech on January 6 about election fraud, the scope of the Vice President's authority, the authority of state officials, and the certification proceedings).

Closely related to the allegations of public statements, the indictment alleges that President Trump posted a series of Tweets about the administration of the federal election and its certification. *Id.* ¶¶ 22, 28 (Tweet addressing evidence of election fraud in Georgia); *id.* ¶ 44 (Tweet criticizing Pennsylvania legislators' claim about slates of electors); *id.* ¶ 50 (Tweet addressing election fraud in Wisconsin); *id.* ¶¶ 87, 90(c) (Tweets urging Americans to protest fraud in the federal election); *id.* ¶ 88 (Tweet regarding the Vice President's authority regarding election-certification proceedings); *id.* ¶ 96(a)-(b) (Tweets regarding the Vice President's election-certification authority and encouraging Americans to protest election fraud); *id.* ¶ 96(c) (Tweet announcing public speech about the election); *id.* ¶ 100(a)-(b) (Tweets about the Vice President's authority); *id.* ¶ 111 (Tweet about the scope of the Vice President's authority); *id.* ¶114 (Tweets urging protestors to "Stay peaceful!" and "to remain peaceful. No violence!"); *id.* ¶ 116 (Tweet of a video claiming fraud in the federal election); *id.* ¶ 118 (Tweet claiming fraud in the election).

**B.   Communications with the U.S. Department of Justice About Investigating Election Crimes and Possibly Appointing a New Acting Attorney General.**

The indictment alleges that President Trump attempted to "use the power and authority of the Justice Department to conduct … election crime investigations," and "to send a letter to the targeted states" from the Justice Department that "claimed that the Justice Department had

identified significant concerns that may have impacted the election outcome." Doc. 1, ¶ 10(c). The indictment alleges a series of meetings and communications between President Trump and others, including senior officials in the U.S. Department of Justice, relating to the investigation of federal election fraud and possibly appointing a new Acting Attorney General of the United States (which, as the indictment states, President Trump ultimately did not do). *Id.* ¶ 27 (alleging a meeting with the incoming Acting Attorney General and Acting Deputy Attorney General "to discuss allegations of election fraud"); *id.* ¶ 29 (phone call with Acting Attorney General and Acting Deputy Attorney General to urge them to investigate election fraud); *id.* ¶ 36 (communication with the Attorney General about election fraud in Michigan); *id.* ¶ 45 (two communications with the Acting Attorney General and Acting Deputy Attorney General to urge them to investigate fraud in Pennsylvania); *id.* ¶ 51 (communication urging the Acting Attorney General and Acting Deputy Attorney General to investigate fraud in Wisconsin); *id.* ¶¶ 70-85 (meetings and communications with Department of Justice officials about investigating election fraud and/or selecting an Acting Attorney General who was willing to investigate election fraud); *id.* ¶ 70 (attempt to convince the Department of Justice to send a letter to state officials expressing concerns about election fraud); *id.* ¶¶ 71-73 (communications with a DOJ official about election fraud); *id.* ¶ 74 (phone call with the Acting Attorney General and Acting Deputy Attorney General about changing the leadership at the Department of Justice); *id.* ¶ 77 (Oval Office meeting with the Acting Attorney General, the Acting Deputy Attorney General, and "other advisors" about election fraud and possibly changing the leadership of DOJ); *id.* ¶ 80 (meeting with DOJ official at the White House and allegedly offering him the role of Acting Attorney General); *id.* ¶ 84 (meeting with the Acting Attorney General, the Acting Deputy Attorney General, the Assistant Attorney General for the Office of Legal Counsel,

the White House Counsel, the Deputy White House Counsel, and a Senior Advisor about changing the leadership of the Department of Justice, which the President decided not to do).

C.    **Communications with State Officials About the Federal Election and the Exercise of Their Official Duties with Respect to the Election.**

The indictment alleges a series of communications—some by President Trump, and some by other unnamed individuals—with state officials about the administration of the federal election and the exercise of their official duties with respect to the federal election. Doc. 1, ¶ 10(a); *id.* ¶¶ 15-18 (communications with the Speaker of Arizona House of Representatives about certifying Arizona's Presidential electors); *id.* ¶¶ 21 (communications with Members of the Georgia Senate about certifying Georgia's Presidential electors); ¶ 24 (phone call with the Georgia Attorney General); ¶ 26 (communications with members of the Georgia House of Representatives); ¶ 31 (phone call with the Georgia Secretary of State regarding the validity of Georgia's Presidential electors); ¶ 35 (meeting with the Speaker of the Michigan House of Representatives and the Majority Leader of the Michigan Senate about the administration of the election in Michigan); ¶¶ 38-39 (communications with Michigan legislative leaders urging them to take legislative action recognizing that the election results are in dispute); ¶ 43 (meeting with Pennsylvania state legislators about the administration of the federal election in Pennsylvania).

D.    **Communications with the Vice President and Members of Congress About the Exercise of Their Official Duties in the Election-Certification Proceedings.**

The indictment charges that President Trump attempted to "enlist the Vice President to use his ceremonial role at the January 6 certification proceeding to … alter the election results," by "attempt[ing] to convince the Vice President" to rely on contingent slates of electors submitted by the President's alleged allies. Doc. 1, ¶ 10(d). Here, the indictment alleges that President Trump and others on his official staff made a series of communications with the Vice President—in his

legislative capacity as President of the Senate—about the exercise of his official duties in the January 6 election-certification proceedings. *Id.* ¶¶ 86-95; *id.* ¶ 90(a)-(d) (alleging "several private phone calls" in December 2020 and January 2021 between the Defendant and the Vice President, in which the Defendant allegedly urged the Vice President "to use his ceremonial role at the certification proceeding on January 6 to … overturn the results of the election"); *id.* ¶¶ 92-93 (meeting with the Vice President, the Vice President's Chief of Staff, and the Vice President's Counsel regarding the Vice President's exercise of his authority as President of the Senate); *id.* ¶ 95 (meeting with the Vice President's Chief of Staff and the Vice President's Counsel on the same topic); *id.* ¶ 97 (alleging a private meeting with the Vice President on the same topic); *id.* ¶ 101 (communication asking a United States Senator to hand-deliver documents to the Vice President regarding the contingent slates of electors); *id.* ¶ 102 (phone call with the Vice President urging him to exercise his authority as President of the Senate in the President's favor); *id.* ¶ 122 (urging Vice President to exercise his official duties with respect to the certification).

In addition to communications with the Vice President, the indictment alleges a handful of communications and attempted communications with Members of Congress regarding their official authority in Congress with respect to the election-certification proceedings. *Id.* ¶ 115 (phone call with the Minority Leader of the U.S. House of Representatives); *id.* ¶ 119(a) (attempts to communicate with two U.S. Senators regarding the certification); *id.* ¶ 119(b) (calls with five U.S. Senators and one U.S. Representative about the certification); ¶ 119(c)-(e) (attempts to contact six U.S. Senators about the certification).

### E. Organizing Slates of Electors as Part of the Attempt to Convince Legislators Not to Certify the Election Against Defendant.

Closely related to these communications with the Vice President and Members of Congress, the indictment alleges that other individuals organized slates of contingent electors from

several States to provide a justification for the Vice President to exercise his official duties in the manner favored by President Trump. Doc. 1, ¶¶ 53-69. According to the indictment, these contingent slates of electors allowed President Trump, in his communications with the Vice President, to justify the exercise of the Vice President's authority to certify the election in President Trump's favor or delay its certification. *Id.* ¶¶ 10(b), 53. The indictment alleges that President Trump knew of these actions organizing the slates of electors and directed them to continue, but it does not allege that President Trump took any particular action in organizing them. *Id.* ¶¶ 54, 56.

## ARGUMENT

### I.    The President Has Absolute Immunity from Criminal Prosecution for Actions Performed Within the "Outer Perimeter" of His Official Responsibility.

"In view of the special nature of the President's constitutional office and functions," a current or former President has "absolute Presidential immunity from [civil] damages liability for acts within the 'outer perimeter' of his official responsibility." *Fitzgerald*, 457 U.S. at 756 (quoting *Barr*, 360 U.S. at 575). No court has addressed whether such Presidential immunity includes immunity from criminal prosecution for the President's official act. The question remains a "'serious and unsettled question' of law." *See id.* at 743 (citation omitted) (holding "[i]n light of the special solicitude due to claims alleging a threatened breach of essential Presidential prerogatives under the separation of powers," issues of Presidential immunity were "serious and unsettled"). In addressing this question, the Court should consider the Constitution's text, structure, and original meaning, historical practice, the Court's precedents and immunity doctrines, and considerations of public policy. *See id.* at 747.

### A.    The Doctrine of Separation of Powers and the President's Unique Role in Our Constitutional Structure Require Immunity from Criminal Prosecution.

"The President occupies a unique position in the constitutional scheme." *Fitzgerald*, 457 U.S. at 749. "Article II, § 1, of the Constitution provides that '[t]he executive Power shall be vested

in a President of the United States....' This grant of authority establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity." *Id*. at 749-50.

Due to this "unique status" in our constitutional structure of separated powers, which "distinguishes him from other executive officials," the Supreme Court held in *Fitzgerald* that the President is, and must be, "absolute[ly] immun[e] from damages liability predicated on his official acts." *Id*. 749–50 ("We consider this immunity a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history."); *see also id*. at 748 (the "policies and principles [mandating immunity] may be considered implicit in the nature of the President's office in a system structured to achieve effective government under a constitutionally mandated separation of powers").

In reaching this conclusion, the Supreme Court held that subjecting a President to personal liability for his official actions would improperly "diver[t] [the President's] energies" and "raise unique risks to the effective functioning of government," especially given "the singular importance of the President's duties." *Id.* at 751.

Chief among these risks is the chilling effect personal liability would have on the President's decision-making, particularly in "matters likely to 'arouse the most intense feelings.'" *Id.* at 752 (quoting *Pierson v. Ray*, 386 U.S. 547, 554 (1967)). "[I]t is in precisely such cases that there exists the greatest public interest in providing an official 'the maximum ability to deal fearlessly and impartially with' the duties of his office." *Id.* (quoting *Ferri v. Ackerman*, 444 U.S. 193, 203 (1979)). "This concern is compelling where the officeholder must make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system." *Id.*

"Nor can the sheer prominence of the President's office be ignored." *Id.* at 752-53. "In view of the visibility of his office and the effect of his actions on countless people, the President would be an easily identifiable target for" prosecution in countless federal, state, and local jurisdictions across the country. *Id.* at 753. "Cognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Id.*

Although *Fitzgerald* concerned civil liability, the exact same, if not more elevated, concerns apply to potential criminal prosecutions, mandating the same absolute immunity. Vertical and horizontal separation of powers simply cannot permit local, state, or subsequent federal officials to constrain the President's exercise of executive judgment through threats of criminal prosecution. To hold otherwise would be to allow the President's political opponents to usurp his or her constitutional role, fundamentally impairing our system of government. For this very reason, *Fitzgerald* recognized that Presidential immunity is not just a creature of common law but also "rooted in the separation of powers under the Constitution." *Id.* at 753 (quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974)). [2]

---

[2] To be sure, *Fitzgerald* did not decide whether Presidential immunity extends to criminal prosecution, and it acknowledged that "there is a lesser public interest in actions for civil damages than … in criminal prosecutions." 457 U.S. at 754 n.37. But the fact that the doctrine of Presidential immunity is rooted in the separation of powers dictates that immunity must extend to criminal prosecution as well as civil liability. While the "public interest … in criminal prosecutions" may be important, *id.*, it is not important enough to justify abrogating the separation of powers, the most fundamental structural feature of our constitutional system. Further, exposure to criminal prosecution poses a far greater threat than the prospect of civil lawsuits to the President's "maximum ability to deal fearlessly and impartially with the duties of his office," and thus it raises even greater "risks to the effective functioning of government." *Fitzgerald*, 457 U.S. at 753 (citation and quotation marks omitted). *Fitzgerald*'s reasoning, therefore, entails that Presidential immunity include immunity from both civil suit and criminal prosecution.

"Nothing is so politically effective as the ability to charge that one's opponent and his associates are not merely wrongheaded, naive, ineffective, but, in all probability, 'crooks.' And nothing so effectively gives an appearance of validity to such charges as a Justice Department investigation and, even better, prosecution." *Morrison v. Olson*, 487 U.S. 654, 713 (1988) (Scalia, J., dissenting). "The present [indictment] provides ample means for that sort of attack, assuring that massive and lengthy investigations" and prosecutions "will occur," bedeviling every future Presidential administration and ushering in a new era of political recrimination and division. *Id.*

(Analogically, the executive privilege protecting Presidential communications is also designed to protect the President's ability to function in his role to the maximum extent, and "is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Nixon*, 418 U.S. at 708.)

**B.      Impeachment and Conviction by the Senate Provide the Exclusive Method of Proceeding Against a President for Crimes in Office.**

Presidential immunity from criminal prosecution for official acts is also rooted in the text of the Constitution. The Impeachment Clauses provide that the President may be charged by indictment only in cases where the President has been impeached and convicted by trial in the Senate. Here, President Trump was *acquitted* by the Senate for the same course of conduct.

The Impeachment Clause of Article I provides that "Judgment in Cases of Impeachment shall not extend further than to removal from Office … but *the Party convicted* shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." U.S. CONST. art. I, § 3, cl. 7 (emphasis added). Because the Constitution specifies that only "the Party *convicted*" by trial in the Senate may be "liable and subject to Indictment, Trial, Judgment and Punishment," *id.*, it presupposes that a President who is *not* convicted may *not* be subject to criminal prosecution. As Justice Alito recently noted, "[t]he plain implication" of this Clause "is

that criminal prosecution, like removal from the Presidency and disqualification from other offices, is a consequence that can come about only after the Senate's judgment, not during or prior to the Senate trial." *Trump v. Vance*, 140 S. Ct. 2412, 2444 (2020) (Alito, J., dissenting). "This was how Hamilton explained the impeachment provisions in the Federalist Papers. He wrote that a President may 'be impeached, tried, and, upon conviction ... would afterwards be liable to prosecution and punishment in the ordinary course of law.'" *Id.* (quoting THE FEDERALIST No. 69, p. 416 (C. Rossiter ed. 1961)); *see also* THE FEDERALIST No. 77, p. 464 (A. Hamilton) (a President is "at all times liable to impeachment, trial, [and] dismission from office," but any other punishment must come only "by subsequent prosecution in the common course of law"). *See also* SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, § 10, at 107 (2012) ("When a car dealer promises a low financing rate to 'purchasers with good credit,' it is entirely clear that the rate is *not* available to purchasers with spotty credit.").

"James Wilson—who had participated in the Philadelphia Convention at which the document was drafted—explained that … the President … 'is amenable to [the laws] in his private character as a citizen, and in his public character by impeachment.'" *Clinton v. Jones*, 520 U.S. 681, 696 (1997) (quoting 2 J. ELLIOT, DEBATES ON THE FEDERAL CONSTITUTION 480 (2d ed. 1863)) (cleaned up). "With respect to acts taken in his 'public character'—that is, official acts—the President may be disciplined principally by impeachment, not by private lawsuits for damages. But he is otherwise subject to the laws for his purely private acts." *Id.*; *see also* THE FEDERALIST No. 43 (J. Madison); THE FEDERALIST No. 65 (A. Hamilton).

*Fitzgerald* reinforced this conclusion:

> A rule of absolute immunity for the President will not leave the Nation without sufficient protection against misconduct on the part of the Chief Executive. There remains the constitutional remedy of impeachment. In addition, there are formal and informal checks on

> Presidential action…. The President is subjected to constant scrutiny
> by the press. Vigilant oversight by Congress also may serve to deter
> Presidential abuses of office, as well as to make credible the threat
> of impeachment. Other incentives to avoid misconduct may include
> a desire to earn reelection, the need to maintain prestige as an
> element of Presidential influence, and a President's traditional
> concern for his historical stature.

*Fitzgerald*, 457 U.S. at 757. Notably absent from *Fitzgerald*'s list of "formal and informal checks"

on the President for "abuses of office," *id.*, is any mention of criminal prosecution.

Here, President Trump is not a "Party convicted" in an impeachment trial by the Senate.

U.S. CONST. art. I, § 3, cl. 7. In January 2021, he was impeached on charges arising from the same

course of conduct at issue in the indictment. H. RES. 24 (117th Cong. 1st Sess.), *available at*

https://www.congress.gov/bill/117th-congress/house-resolution/24/text.   President Trump was

acquitted of these charges after trial in the Senate, and he thus remains immune from prosecution.

The Special Counsel cannot second-guess the judgment of the duly elected United States Senate.

### C.   Early Authorities Support Presidential Immunity from Criminal Prosecution.

In *Marbury v. Madison*, Charles Lee—Attorney General of the United States under

Presidents George Washington and John Adams—"declare[d] it to be my opinion, grounded on a

comprehensive view of the subject, that the President is not amenable to *any court of judicature*

*for the exercise of his high functions*, but is responsible only in the mode pointed out in the

constitution." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 149 (1803) (emphasis added). In his

opinion for the Court, Chief Justice Marshall endorsed this view: "[b]y the constitution of the

United States, the President is invested with certain important political powers, in the exercise of

which he is to use his own discretion, and is accountable only to his country in his political

character, and to his own conscience." *Id.* at 165–66. In cases involving the President's official

duties, "whatever opinion may be entertained of the manner in which executive discretion may be

used, still there exists, and can exist, no power to control that discretion. The subjects are political.

They respect the nation, not individual rights, and being entrusted to the executive, the decision of

the executive is conclusive." *Id.* at 166. "The acts of such an officer, as an officer, *can never be*

*examinable by the courts.*" *Id.* (emphasis added). When the President "act[s] in cases in which the

executive possesses a constitutional or legal discretion, nothing can be more perfectly clear than

that their acts are only politically examinable." *Id.* If the President "acts in a case, in which

executive discretion is to be exercised … any application to a court to control, in any respect, his

conduct, would be rejected without hesitation." *Id.* at 170–71.

Justice Story cited *Marbury v. Madison* for this point in his oft-cited 1833 treatise:

> There are other incidental powers, belonging to the executive
> department, which are necessarily implied from the nature of the
> functions, which are confided to it. Among these, must necessarily
> be included the power to perform them, without any obstruction or
> impediment whatsoever. The president cannot, therefore, be liable
> to arrest, imprisonment, or detention, while he is in the discharge of
> the duties of his office; and for this purpose his person must be
> deemed, in civil cases at least, to possess an official inviolability. *In*
> *the exercise of his political powers he is to use his own discretion,*
> *and is accountable only to his country, and to his own conscience.*
> *His decision, in relation to these powers, is subject to no control;*
> *and his discretion, when exercised, is conclusive.*

3 J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES ch. 37, § 1563 (1833),

*available at* https://lonang.com/library/reference/story-commentaries-us-constitution/sto-337/

(visited August 14, 2023) (emphasis added).

Likewise, *Martin v. Mott* held that, "[w]hen the President exercises an authority confided

to him by law," his conduct cannot be second-guessed by a jury: "If the fact of the existence of the

exigency were averred, it would be traversable, and of course might be passed upon by a jury; and

thus the legality of the orders of the President would depend, not on his own judgment of the facts,

but upon the finding of those facts upon the proofs submitted to a jury." 25 U.S. (12 Wheat.) 19,

32-33 (1827); *see also Tenney v. Brandhove*, 341 U.S. 367, 377 (1951) (holding that the immunity of Members of Congress "would be of little value if they could be subjected to … the hazard of a judgment against them based upon a jury's speculation as to motives").

> **D. Two Hundred Thirty-Four Years of History and Tradition Support Presidential Immunity from Criminal Prosecution.**

In *Nixon v. Fitzgerald*, the Supreme Court emphasized that "the presuppositions of our political history," including "tradition[s] so well grounded in history and reason," help to define the scope of Presidential immunity. 457 U.S. at 745 (citation and quotation marks omitted); *see also Tenney*, 341 U.S. at 372.

Here, 234 years of unbroken historical practice—from 1789 until 2023—provide compelling evidence that the power to indict a former President for his official acts does not exist. No prosecutor, whether state, local, or federal, has this authority; and none has sought to exercise it until now. American history teems with situations where the opposing party passionately *contended* that the President and his closest advisors were guilty of criminal behavior in carrying out their official duties—John Quincy Adams' "corrupt bargain" with Henry Clay provides a notable example. In every such case, the outraged opposing party eventually took power, yet none ever brought criminal charges against the former President based on his exercise of official duties. Nor did *any* state or local prosecutor of the thousands of such officials throughout the history and tradition of United States attempt a similar maneuver.

A strong historical practice of *not* exercising a supposed power—especially when there has been ample incentive and opportunity to do so—undercuts the sudden discovery of the newly minted power. *See, e.g., NFIB v. OSHA*, 595 U.S. 109, 119 (2022) (per curiam) ("It is telling that OSHA, in its half century of existence, has never before adopted a broad public health regulation of this kind…. [t]his 'lack of historical precedent' … is a 'telling indication' that the mandate

extends beyond the agency's legitimate reach.") (citation omitted); *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2201 (2020) (same); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010) (same); *Printz v. United States*, 521 U.S. 898, 916 (1997) ("To complete the historical record, we must note that there is not only an absence of executive-commandeering statutes in the early Congresses, but there is an absence of them in our later history as well, at least until very recent years."). "The constitutional practice . . . tends to negate the existence of the…power asserted here." *Printz*, 521 U.S. at 918.

### E.   Analogous Immunity Doctrines Support Presidential Immunity from Criminal Prosecution.

Analogous immunity doctrines strongly favor the conclusion that absolute Presidential immunity extends to immunity from criminal prosecution.

#### 1.   Presidential immunity from civil suits.

First, *Nixon v. Fitzgerald* holds the President is absolutely immune from personal liability for conduct within the "outer perimeter" of his official duties. 457 U.S. at 756. The inference that such immunity should include both civil and criminal liability is compelling.

In their common law origins, immunity doctrines extended to both civil and criminal liability, because "[t]he immunity of federal executive officials began as a means of protecting them in the execution of their federal statutory duties from criminal or civil actions based on state law." *Butz v. Economou*, 438 U.S. 478, 489 (1978). Common-law immunity doctrines, therefore, encompass the "privilege … to be free from arrest or civil process," *i.e.*, criminal, and civil proceedings alike. *Tenney*, 341 U.S. at 372. In fact, immunity from criminal prosecution is *more* fundamental to the concept of official immunity than immunity from mere suits for civil damages, as such doctrines arose primarily to avoid potential retribution via criminal charges brought by government officials. *See Butz v. Economou*, 438 U.S. at 489.

### 2.      Absolute judicial immunity.

Like absolute executive immunity, absolute judicial immunity protects state and federal judges from criminal prosecution, as well as civil suits, based on their official judicial acts. In *Spalding v. Vilas*, the Supreme Court noted that the doctrine of judicial immunity extends to both "civil suit" and "indictment." 161 U.S. 483, 494 (1896) (quoting *Yates v. Lansing*, 5 Johns. 282, 291 (N.Y. 1810) (Kent, C.J.)). In *Pierson*, likewise, the Supreme Court held that "[t]his immunity applies even when the judge is accused of acting maliciously and corruptly." *Pierson*, 386 U.S. at 554; *see also Fitzgerald*, 457 U.S. at 745-46.

At common law, judicial immunity included immunity from criminal prosecution. "In the case of courts of record … it was held, certainly as early as [the 14th century], that a litigant could not go behind the record, in order to make a judge civilly *or criminally* liable for an abuse of his jurisdiction." J. Randolph Block, *Stump v. Sparkman and the History of Judicial Immunity*, 1980 DUKE L.J. 879, 884 (emphasis added) (quoting 6 W. HOLDSWORTH, A HISTORY OF ENGLISH LAW 235-36 (2d ed. 1937)); *see also id.* at 887 n.39 (quoting 77 Eng. Rep. at 1307).

In accordance with this long common law tradition, our courts have universally rejected criminal charges against judges for their judicial acts. In *United States v. Chaplin*, for instance, the Court held that judicial immunity barred the criminal prosecution of a judge who was "acting in his judicial capacity and within his jurisdiction in imposing sentence and probation upon a person charged with an offense in his court to which the defendant ha[d] pleaded guilty." 54 F. Supp. 926, 928 (S.D. Cal. 1944). In reaching this conclusion, the *Chaplin* Court extensively reviewed historic authorities and, like those authorities, determined criminal prosecution of judges for judicial acts "would … destroy the independence of the judiciary and mark the beginning of the end of an independent and fearless judiciary." *Id*. at 934; *see also id*. ("The rich tradition, the long line of

17

decisions, the confidence of our people in the state and federal judiciary, the experience of over a century and a half expressed in our legal lore, co-extensive with our national existence, cannot be ignored in deciding this issue."). The same reasoning applies to the President here.

      **F.    Concerns of Public Policy Favor the President's Immunity from Prosecution.**

      In considering Presidential immunity, the Supreme Court "has weighed concerns of public policy, especially as illuminated by our history and the structure of our government." *Fitzgerald*, 457 U.S. at 747–48. Here, public policy overwhelmingly supports the finding of immunity.

      **1.    The Presidency involves "especially sensitive duties."**

      First, the Supreme Court emphasizes the necessity of robust immunity for officials who have "especially sensitive duties," such as prosecutors and judges. *Fitzgerald*, 457 U.S. at 746 (citing *Imbler*, 424 U.S. 409 and *Stump v. Sparkman*, 435 U.S. 349 (1978)). No one exercises more sensitive duties than the President: "Under the Constitution and laws of the United States the President has discretionary responsibilities in a broad variety of areas, many of them highly sensitive." *Id.* at 756. As the government recently explained, "immunity reaches all of the President's conduct within the vast ambit of his Office, including its 'innumerable' constitutional, statutory, and historical dimensions. . . . In all contexts, questions of Presidential immunity must be approached with the greatest sensitivity to the unremitting demands of the Presidency." Brief for United States as Amicus Curiae *in Blassingame v. Trump*, Nos. 22-5069, 22-7030, 22-7031, at 1–2 (D.C. Cir. filed March 2, 2023) (hereafter "*Blassingame* Amicus Br.," attached as Exhibit A) (citing *Fitzgerald*, 457 U.S. at 750, 756).

      **2.    The Presidency requires "bold and unhesitating action."**

      Second, the Supreme Court reasons that immunity is most appropriate for officials from whom "bold and unhesitating action" is required. *Id.* at 745; *see also Imbler*, 424 U.S. at 423-24,

427-28 (holding that prosecutors must enjoy absolute immunity to ensure "the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system").

"[T]o submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties," and subject them "to the constant dread of retaliation." *Barr*, 360 U.S. at 571–72 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Hand, J.)). In *Vance*, the Supreme Court noted this concern was central to its adoption of absolute immunity for the President, holding that *Fitzgerald* "conclud[ed] that a President … must 'deal fearlessly and impartially with the duties of his office'—not be made 'unduly cautious in the discharge of [those] duties' by the prospect of civil liability for official acts.'" *Vance*, 140 S. Ct. at 2426; *accord Blassingame* Amicus Br. at 9 ("[A]s the Supreme Court has emphasized, it is precisely in such circumstances that there is "the greatest public interest in providing" the President with "the maximum ability to deal fearlessly and impartially with the duties of his office." (quoting *Fitzgerald* 457 U.S. at 752–53)).

For that reason, the Supreme Court emphasizes that, "[i]n exercising the functions of his office, the head of an Executive Department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry in a civil suit for damages. It would *seriously cripple the proper and effective administration of public affairs* as entrusted to the executive branch of the government, if he were subjected to any such restraint." *Fitzgerald*, 457 U.S. at 745 (quoting *Spalding*, 161 U.S. at 498) (emphasis added); *see also Barr*, 360 U.S. at 573 (holding that official immunity is "designed to aid in the effective functioning of government").

19

"Frequently acting under serious constraints of time and even information," a President inevitably makes many important decisions, and "[d]efending these decisions, often years after they were made, could impose unique and intolerable burdens…." *Imbler*, 424 U.S. at 425–26; *see also Barr*, 360 U.S. at 571 (expressing concern that suits would "inhibit the fearless, vigorous, and effective administration of policies of government").

The President's "focus should not be blurred by even the subconscious knowledge" of the risk of future prosecution. *Imbler*, 424 U.S. at 427. The threat of criminal prosecution poses a greater risk of deterring bold and unhesitating action than the threat of civil suit, and, therefore, requires at least the same immunity to ensure the President maintains the "maximum ability to deal fearlessly and impartially with the duties of his office." *Fitzgerald*, 457 U.S. at 751 (citation and quotation marks omitted); *see also Vance*, 140 S. Ct. at 2452 (Alito, J., dissenting) ("There is no question that a criminal prosecution holds far greater potential for distracting a President and diminishing his ability to carry out his responsibilities than does the average civil suit.").

### 3. Without Immunity the President would be "harassed by vexatious actions."

Another key purpose of immunity for officials is to "prevent them being harassed by vexatious actions." *Spalding*, 161 U.S. at 495 (quotation omitted). In *Imbler*, the Supreme Court held that the common-law immunity of prosecutors rests on the "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." 424 U.S. at 423; *see also Butz*, 438 U.S. at 512. The President, as the most high-profile government official in the country, is most likely to draw politically motivated ire, and most likely to be targeted for harassment by vexatious actions. *See Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 369 (2004) ("[R]ecognizing the paramount

necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties.").[3]

## II.   The Indictment Alleges Only Acts Committed Within the Core of the President's Official Responsibilities, Which Are Shielded by Absolute Immunity.

The indictment is based entirely on alleged actions within the heartland of President Trump's official duties, or at the very least, within the "outer perimeter" of his official duties. As President Trump is absolutely immune from criminal prosecution for such acts, the Court should dismiss the indictment.

### A.   The Scope of Criminal Immunity Includes All Actions That Fall Within the "Outer Perimeter" of the President's Official Duties.

The Supreme Court adopted the expansive "outer perimeter" test for immunity precisely because any "functional" test would be inconsistent with the broad scope of Presidential duties. *Id.* at 756; *accord Blasingame* Amicus Br. at 9 ("This immunity, the Supreme Court has explained, may not be curtailed by attempting to parse discrete Presidential 'functions,' or through allegations that official acts were taken with improper motives. Because the President has 'discretionary responsibilities in a broad variety of areas, . . . [i]n many cases it would be difficult to determine which of the President's innumerable 'functions' encompassed a particular action.'" (quoting *Fitzgerald*, 457 U.S. at 756)).

In other words, the "outer perimeter" of Presidential duties—and thus the scope of Presidential immunity—encircles a vast swath of territory, because the scope of the President's

---

[3] *Vance* held that the need to avoid vexatious litigation was not, standing alone, sufficient to shield the President from a criminal subpoena for private records, 140 S. Ct. at 2426. However, criminal prosecutions for official acts raise numerous additional practical and prudential concerns that do not apply in the subpoena context. It is these additional factors, *in combination with the risk of vexatious litigation*, that compels executive immunity—as *Fitzgerald*, *Spalding*, *Butz*, *Imbler*, and similar cases held.

duty and authority in our constitutional system is uniquely and extraordinarily broad. "Article II 'makes a single President responsible for the actions of the Executive Branch,'" *Free Enter. Fund*, 561 U.S. at 496-97 (quoting *Clinton*, 520 U.S. at 712-13 (Breyer, J., concurring in judgment)), and the President is "the only person who alone composes a branch of government," *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020).

Among these Article II duties, perhaps the most fundamental are the framers' dual mandates that he hold "the executive Power," and with it, the duty to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, §§ 1, 3. To this end, the President must assume "supervisory and policy responsibilities of utmost discretion and sensitivity," which "include[s] the enforcement of federal law." *Fitzgerald*, 457 U.S. at 750; *see also Vance*, 140 S. Ct. at 2425 (The President's "duties, which range from faithfully executing the laws to commanding the Armed Forces, are of unrivaled gravity and breadth," and "[q]uite appropriately, those duties come with protections that safeguard the President's ability to perform his vital functions.").

Additionally, "[t]he public looks to the President, as the leader of the Nation, for guidance and reassurance even on matters over which the Executive Branch—or the federal government as a whole—has no direct control. From the actions of Congress and the Judiciary, to the policies of state and local governments, to the conduct of private corporations and individuals, the President can and must engage with the public on matters of public concern." *Blassingame* Amicus Br. at 12. Thus, even where a President's actions are "directed toward the constitutional responsibilities of another Branch of government," or concern "matters for which the President himself bears" no direct constitutional or statutory responsibility, *id*. at 11–12, his actions are often still within the "outer perimeter" of his official duties, *see Fitzgerald* 457 U.S. at 756.

Without question, the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties." *Clinton*, 520 U.S. at 697.

As the Supreme Court held, "the higher the post, the broader the range of responsibilities and duties, and the wider the scope of discretion, it entails." *Barr*, 360 U.S. at 573. As the highest of all posts, the Presidency warrants the broadest possible immunity, *id.*, and acts must fall within its "outer perimeter" unless clearly established as beyond his duties. *See Klayman v. Obama*, 125 F. Supp. 3d 67, 86 (D.D.C. 2015) ("Absolute immunity is extended to few officers, and it is denied only if the officer acts '*without any colorable claim of authority*.'" (quoting *Bernard v. Cnty. of Suffolk*, 356 F.3d 495, 504 (2d Cir. 2004) (emphasis added)).

### B.     The Nature of the Act, Not the Manner in Which It Is Conducted or Its Alleged Purpose, Determines Whether It Falls Within the Scope of Immunity.

In deciding what conduct falls within the scope of official duties, courts apply an objective test based on the *nature of the act*—not the manner in which it was conducted, or any allegedly malicious purpose.

Thus, "[i]mmunity is not overcome by 'allegations of bad faith or malice.' Nor is immunity defeated by an allegation that the President acted illegally." *Klayman*, 125 F. Supp. 3d at 86 (citations omitted) (quoting *Barrett v. Harrington*, 130 F.3d 246, 254–55 (6th Cir.1997)); *accord Blassingame* Amicus Br. at 9–10 ("[A]n inquiry into the President's motives" to determine whether a particular action was done in furtherance of a legitimate function or for nefarious reasons would "be highly intrusive" and would impermissibly "subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose." (quoting *Fitzgerald*, 457 U.S. at 756)).

The Supreme Court has repeatedly emphasized this point. *See, e.g., Fitzgerald*, 457 U.S. at 745 46; *Fisher*, 80 U.S. at 354 ("The allegation of malicious or corrupt motives could always be made, and if the motives could be inquired into judges would be subjected to the same vexatious litigation upon such allegations, whether the motives had or had not any real existence."); *Spalding*, 161 U.S. at 494, 498; *Pierson*, 386 U.S. at 554; *Barr*, 360 U.S. at 575 (holding that immunity applied "despite the allegations of malice in the complaint").

As Judge Learned Hand's often-cited analysis of this question states:

> The [immunity] decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. *A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine.* What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him.

*Gregoire*, 177 F.2d at 581 (Hand, J.) (emphasis added); *see also, e.g., Novoselsky v. Brown*, 822 F.3d 342, 351–52 (7th Cir. 2016) ("An 'unworthy purpose' behind the communication 'does not destroy the privilege,' for immunity would be of little use if it could be defeated by 'a jury's speculation as to motives.'") (quoting *Barr*, 360 U.S. at 575); *In re Global Crossing, Ltd. Sec. Litig.*, 314 F. Supp. 2d 172, 174-75 (S.D.N.Y. 2003) ("The 'outer perimeter' of the President's 'official responsibility' would shrink to nothing if a plaintiff, merely by reciting that official acts were part of an unlawful conspiracy, could have them treated by the courts as 'unofficial conduct.'") (citation omitted).

Nor does a mere allegation that an act was unlawful or otherwise inconsistent with a particular statutory scheme place it beyond the "outer perimeter" of the President's official

responsibility. For example, in *Fitzgerald*, the plaintiff, a federal employee working for the Air Force, argued that President Nixon exceeded his official responsibilities in unlawfully causing the plaintiff's dismissal without adherence to certain statutory processes and protections: "[b]ecause Congress has granted this legislative protection . . . no federal official could, within the outer perimeter of his duties of office, cause Fitzgerald to be dismissed without satisfying this standard in prescribed statutory proceedings." 457 U.S. at 756.

The Supreme Court rejected this argument, holding President Nixon's general constitutional and statutory authority to oversee the Air Force placed the nature of his acts comfortably within the "outer perimeter" of his official conduct, and therefore entitled to absolute immunity, even if allegedly unlawful. *Id.* at 756–57 To hold otherwise, the Supreme Court determined, "would subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose" and therefore "deprive absolute immunity of its intended effect." *Id.*; *see also Stump v. Sparkman*, 435 U.S. at 362 ("[T]he factors determining whether an act by a judge is a 'judicial' one relate to *the nature of the act itself*, *i.e.*, whether it is a function normally performed by a judge….") (emphasis added); *Tenney*, 341 U.S. at 378.

For the same reasons, alleging that immune acts were part of a conspiracy does not defeat immunity: "since absolute immunity spares the official any scrutiny of his motives, an allegation that an act was done pursuant to a conspiracy has no greater effect than an allegation that it was done in bad faith or with malice, neither of which defeats a claim of absolute immunity." *Dorman v. Higgins*, 821 F.2d 133, 139 (2d Cir. 1987) (collecting cases).[4]

---

[4] *See also Ashelman v. Pope*, 793 F.2d 1072, 1078 (9th Cir. 1986) (en banc). "[A]llegations that a conspiracy produced a certain decision should no more pierce the actor's immunity than allegations of bad faith, personal interest or outright malevolence." *Holloway v. Walker*, 765 F.2d 517, 522 (5th Cir. 1985) ("It is a well established rule that where a judge's absolute immunity

Importantly, this recognition of absolute immunity, regardless of internal motivation, does "not place the President 'above the law,'" but instead simply clarifies that the remedy for alleged official misconduct lies, as the Constitution requires, with Congress through impeachment, and through other informal means. *Fitzgerald,* 457 U.S. at 757.

### C.      Presidential Conduct With Both Official and Private Character Is Immune.

Because of the unique nature of the Presidency, the President's exercise of his official responsibilities may have personal ramifications, and vice versa. Indeed, as the Supreme Court has recognized, it is commonplace for a President's speech and conduct to have dual roles—both an official and personal character. "The President is the only person who alone composes a branch of government. As a result, there is not always a clear line between his personal and official affairs." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020). Thus, "for any President the line between official and personal can be both elusive and difficult to discern." *In re Lindsey*, 158 F.3d 1263, 1286 (D.C. Cir. 1998) (Tatel, J., concurring in part and dissenting in part). "Because the Presidency is tied so tightly to the persona of its occupant, … official matters … often have personal implications for a President." *Id.*

The government recently agreed with this point before the D.C. Circuit: "a 'first-term President is, in a sense, always a candidate for office,' and it is 'not the least bit unusual for first-term Presidents to comment on public policy or foreign affairs at campaign events, or, in this day, to announce policy changes by tweet during an election year.'" *Blassingame* Amicus Br. at 13 (citation omitted).

---

would protect him from liability for the performance of particular acts, mere allegations that he performed those acts pursuant to a … conspiracy will not be sufficient to avoid the immunity.").

For example, "The announcement of a Presidential policy decision at a political rally, or remarks on foreign policy delivered at a campaign event, cannot categorically be excluded from the scope of the President's Office merely because of the context in which they are made." *Id.* at 13-14. "And other statements at such events may be understood by members of the public and domestic and foreign leaders as reflecting the official views of the President, not just the remarks of a political candidate." *Id.* at 14.

For this very reason, it is not "appropriate to frame the immunity question … in terms of whether the challenged conduct of the President was undertaken with a purpose 'to secure or perpetuate incumbency.'" *Id.* (citation omitted). "The Supreme Court in *Nixon* [*v. Fitzgerald*] emphatically rejected an argument that otherwise-official acts lose immunity if they are motivated by an impermissible purpose. That logic applies with even greater force to the suggestion that the President should be subject to suit for his official acts whenever those acts are—or are plausibly alleged to have been—motivated by electoral or political considerations." *Id.* at 14-15 (citation omitted).

Thus, even if the President's speech or conduct appears to have a dual character—*i.e.*, both official and personal (including campaign-related) at the same time—that conduct still lies within the "outer perimeter" of his official responsibilities and is immune from prosecution.

### D.    Every Act Alleged in the Indictment Falls Within the Outer Perimeter of the President's Official Duties and Is Immune from Criminal Prosecution.

Applying this objective test, every action of the Defendant alleged in the indictment falls within the "outer perimeter" of President Trump's official duties. As an initial matter, every action of the Defendant charged in the indictment occurred while he was still in office as President of the United States, and, according to the prosecution, all concerned a federal government function. Doc. 1. Given the all-consuming nature of the Presidency, these facts alone strongly support the

notion that the indictment is based solely on President Trump's official acts. *See Clinton*, 520 U.S. at 697 (recognizing that the Presidency carries "powers and responsibilities so vast and important" that they demand "undivided time and attention to … public duties").

> **1.   Making public statements, including Tweets, about matters of national concern is an official action that lies at the heart of Presidential duties.**

First, making public statements on matters of public concern—especially where they relate to a core federal function such as the administration of a federal election—unquestionably falls within the scope of the President's official duties. "The President of the United States possesses an extraordinary power to speak to his fellow citizens and on their behalf." *Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018). "[S]peech is unquestionably a critical function of the presidency." *Thompson v. Trump*, 590 F. Supp. 3d 46, 79 (D.D.C. 2022). As one scholar of the Presidency has explained, "Presidents have a duty constantly to defend themselves publicly, to promote policy initiatives nationwide, and to inspirit the population. And for many, this Presidential 'function' is not one duty among many, but rather the heart of the presidency—its essential task." JEFFREY K. TULIS, THE RHETORICAL PRESIDENCY 4 (2017).

In *Barr*, the Supreme Court held that communicating with the public about matters of public interest is standard government practice and well within the scope of official duties:

> The issuance of press releases was standard agency practice, as it has become with many governmental agencies in these times. We think that under these circumstances a publicly expressed statement of the position of the agency head … was an appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively. It would be an unduly restrictive view of the scope of the duties of a policy-making executive official to hold that a public statement of agency policy in respect to matters of wide public interest and concern is not action in the line of duty.

*Barr*, 360 U.S. at 574-75. Notably, immunity lies even if the official's public statements are false and "actuated by malice," which, of course, President Trump denies. *Id.* at 568.

28

This conclusion applies even more strongly to the President. The tradition of Presidents making public statements on matters of national concern arose in the first days of the Presidency and encompasses some of the most historic Presidential actions in American History, including George Washington's Farewell Address and Abraham Lincoln's Gettysburg Address. President Theodore Roosevelt described the Presidency as a "bully pulpit" for advancing policy views on matters of public concern. When a President speaks to the public on matters of public concern— especially issues of uniquely *federal* concern, like federal elections—those statements fall in the heartland of his or her official duties.

Still today, the government recognizes the statements from the bully pulpit as a fundamentally Presidential act, entitled to the immunity recognized in *Fitzgerald*: "The traditional 'bully pulpit' of the Presidency … is not limited to speech concerning matters for which the President bears constitutional or statutory responsibility," but includes "matters over which the Executive Branch—or the federal government as a whole—has no direct control." *Id.* at 12. "Such speech is an important traditional function of the Presidency, and it would offend the constitutional separation-of-powers principles recognized in *Nixon* [*v. Fitzgerald*] for courts to superintend the President's speech to his constituents and to other officeholders…." *Id.* The government has taken the same position in other matters as well. *See, e.g.,* Government's Application for Stay of Injunction, *Murthy v. Missouri*, No. 23A243 (U.S.) (filed Sept. 14, 2023) (U.S. Solicitor General arguing that "[a] central dimension of Presidential power is the use of the Office's bully pulpit to seek to persuade Americans . . . to act in ways that the President believes would advance the public interest" and "[o]ne of the central duties and prerogatives of the President … is to speak to the public on matters of public concern, and [he] must have the latitude to do so forcefully at times").

Moreover, the Supreme Court emphasizes that "[a] government entity has the right to speak for itself. It is entitled to say what it wishes, and to select the views that it wants to express." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467-68 (2009) (alterations, citations, and quotation omitted) (citing numerous cases). "[T]he First Amendment does not say that Congress and other government entities must abridge their own ability to speak freely." *Matal v. Tam*, 582 U.S. 218, 234 (2017); *see also, e.g., Lynch v. President of the U.S.*, 2009 WL 2949776, at *1 (N.D. Tex. Sept. 14, 2009) ("Televised publication of the President's views on various topical items is within the outer perimeter of his official duties."). This doctrine applies all the more to the Presidency.

For the same reasons, posting Tweets on matters of public concern that relate to the administration of a federal election falls within the heartland of the President's official duties. A Tweet is a public statement in a different (and more accessible) forum. The fact that President Trump most often communicated with the public through Twitter, rather than press releases or public speeches, is merely a difference of medium, not of function.[5]

Although, addressing a different set of allegations, this Court recently concluded that some of President Trump's Tweets and public statements relating to the January 6 certification process did not fall within the outer perimeter of his official duties. *Thompson*, 590 F. Supp. 3d at 79-84.

---

[5] In fact, the Second Circuit recently held that President Trump's Twitter account during his Presidency was a government-run public forum for speech, and that "the factors pointing to the public, non–private nature of the Account and its interactive features are overwhelming." *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 236 (2d Cir. 2019*), cert. granted, judgment vacated as moot sub nom. Biden v. Knight First Amend. Inst. At Columbia Univ.*, 141 S. Ct. 1220 (2021). The Second Circuit stated that President Trump "has stipulated that he … uses the Account frequently 'to announce, describe, and defend his policies; to promote his Administration's legislative agenda; to announce official decisions; to engage with foreign political leaders; to publicize state visits; [and] to challenge media organizations whose coverage of his Administration he believes to be unfair.' In June 2017, then–White House Press Secretary Sean Spicer stated at a press conference that President Trump's tweets should be considered 'official statements by the President of the United States.'" *Id.* at 231. The Second Circuit "conclude[d] that the evidence of the official nature of the Account is overwhelming." *Id.* at 234.

However, *Thompson* addressed a different set of allegations, and is therefore distinguishable from this case. Regardless, *Thompson*'s analysis is non-binding and unpersuasive.[6] First, *Thompson* acknowledged that President Trump's "pre-January 6th Tweets and the January 6 Rally Speech addressed matters of public concern: the outcome of the 2020 Presidential Election and election integrity. Whatever one thinks of the President's views on those subjects, they plainly were matters of public concern." *Id.* at 79.

The analysis should have ended there, as speaking to the public on matters of public concern—especially uniquely *federal* concerns, like a federal election—is not only a straightforward and long-established Presidential function, but *itself* "a critical function of the Presidency." *Id.* at 79. Yet the Court, puzzlingly, went on to analyze whether those Tweets "were spoken in furtherance" of another, entirely separate, Presidential function. *Id.* at 81.

*Thompson*'s artificially cramped formulation of the President's authority to speak contradicts the much broader historic tradition of Presidential communications on all matters that affect the Nation. Adopting *Thompson*'s analysis, for example, would place President Biden's recent criticism of the Supreme Court's opinion in *Dobbs*, or his regular criticism of Congress and certain state governments, outside the "outer perimeter" of official duties. This cannot be the case.

Second, *Thompson* misapplied its own "furtherance of a Presidential function" test. *Thompson* acknowledged that the investigation and enforcement of fraud in federal elections is a core Executive function. Conceding that "enforcing election laws through litigation strikes at the

---

[6] Other recent district court decisions coming to similar conclusions in the context of President Trump's claims of civil immunity are largely consistent with *Thompson*. *See Moore v. Trump*, No. 22-CV-00010 (APM), 2022 WL 3904320, at *1 (D.D.C. Aug. 2, 2022); *Michigan Welfare Rts. Org. v. Trump*, No. CV 20-3388 (EGS), 2022 WL 17249218, at *4–5 (D.D.C. Nov. 28, 2022); *United States v. Chrestman*, 525 F. Supp. 3d 14, 33 (D.D.C. 2021). For ease of reference, this memorandum discusses *Thompson*, but its analysis applies to those other decisions as well.

core of the executive branch's duty to faithfully execute the law," *Thompson* held that "[t]he President can enforce election laws through litigation initiated by the Department of Justice or the Federal Election Commission, agencies over which he has appointment authority." *Id.* at 78. "A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'" *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 138 (1976) (per curiam)).

Here, President Trump's alleged Tweets and public statements about fraud in the election and the role of the Vice President in the certification process were directly related to his contentions that: (1) the Presidential election's outcome was tainted by fraud and other procedural irregularities, and (2) the U.S. Department of Justice and certain state governments had failed to adequately investigate and prosecute fraud and irregularities in the election. By *Thompson*'s own logic, therefore, President Trump's Tweets and public statements *were* "in furtherance of [a] Presidential function" under the Take Care Clause—namely, assuring adequate investigation and enforcement of federal election laws and protecting the integrity of federal elections.

In reaching its conclusion, *Thompson* repeatedly and erroneously focused on what it deemed the "purpose" of President Trump's public statements. *Id.* at 83. *Thompon* stated, for instance, that President Trump's Tweets were "*directed at* securing incumbency," that this was "the *purpose* of the January 6 Rally," that "[t]he clear *purpose*" of his public statements was "to help him 'win,'" and that the January 6 speech "reflect[s] an electoral *purpose*…." *Id.* at 82-83 (emphases added).

But, as explained above, separate from the fact that the allegations regarding intent are untrue, an allegedly improper *purpose* for an official act does not rob the act of its official character—indeed, there is hardly an immunity case without such an allegation. "The claim of an

unworthy *purpose* does not destroy the privilege." *Tenney*, 341 U.S. at 377 (emphasis added). "The motive that impelled him to do that of which the plaintiff complains is therefore wholly immaterial." *Spalding*, 161 U.S. at 499; *see also, e.g., Fitzgerald*, 457 U.S. at 745-46; *Fisher*, 80 U.S. at 350-51; *Pierson*, 386 U.S. at 554; *Barr*, 360 U.S. at 575; *Klayman*, 125 F. Supp. 3d at 87.

### 2. Communicating with the U.S. Department of Justice about the investigation of election fraud and considering replacing the Acting Attorney General lie at the heart of the President's official duties.

The President's alleged meetings and communications with officials at the U.S. Department of Justice also lie at the heart of his constitutional duties. Article II provides that the President shall "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. The laws of the United States include prohibitions against election fraud and other election crimes, which the Attorney General of the United States—who is appointed by and reports to the President—is charged with enforcing. *See, e.g.,* 18 U.S.C. §§ 241, 242, 611, 911, 1015(f); 52 U.S.C. §§ 10307(c), 10307(e), 20511(1), 20511(2)(A), 20511(2)(B), 30120, 30124. The Department of Justice publishes a lengthy manual on the prosecution of federal election crimes, U.S. Dep't of Justice, *Federal Prosecution of Election Offenses* (8th ed. 2017), *at* https://www.justice.gov/criminal/file/1029066/download (visited August 21, 2023), which provides that "[f]ederal jurisdiction over election fraud is easily established in elections when a federal candidate is on the ballot." *Id.* at 6. The Department of Justice has an entire "Election Crimes Branch" within the Public Integrity Section that was created in 1980 "to oversee the Justice Department's nationwide response to election crimes." U.S. Dep't of Justice, *Election Crimes Branch*, *at* https://www.justice.gov/criminal-pin/election-crimes-branch (visited August 21, 2023). The Election Crimes Branch also "consult[s] and support[s] … [state and local] prosecutors and investigators around the nation." *Id.*

In short, it is indisputable that "[t]he President can enforce election laws through litigation initiated by the Department of Justice or the Federal Election Commission, agencies over which he has appointment authority." *Thompson*, 590 F. Supp. 3d at 78.

Urging his own Department of Justice to do more to enforce the laws that it is charged with enforcing is unquestionably an official act of the President. "[T]he President may undoubtedly, in the performance of his constitutional duty, instruct the Attorney General to give his direct personal attention to legal concerns of the United States elsewhere, when the interests of the Government seem to the President to require this." *Office & Duties of Attorney General*, 6 U.S. Op. Atty. Gen. 326, 335 (1854). "The Attorney General … is the hand of the President in taking care that the laws of the United States in protection of the interests of the United States in legal proceedings and in the prosecution of offenses be faithfully executed." *Ponzi v. Fessenden*, 258 U.S. 254, 262 (1922).

Deliberating about whether to replace the Acting Attorney General of the United States is also a core Presidential function. The Appointments Clause of Article II provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States…." U.S. CONST. art. II, § 2, cl. 2. This clause also encompasses the removal power. *Myers v. United States*, 272 U.S. 52, 122 (1926).

"During the first Congress, James Madison stated that 'if any power whatsoever is in its nature executive, it is the power of appointing, overseeing, and controlling those who execute the laws.'" *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 U.S. Op. O.L.C. 101, 113 (1984) (quoting 1 ANNALS OF CONGRESS 481 (1789)); *see also In re Sealed Case*, 121 F.3d 729, 752–53 (D.C. Cir. 1997) (holding Presidential deliberations about replacing the head of the Department of Agriculture

34

constituted a core Presidential function: "In this case the documents in question were generated in the course of advising the President in the exercise of his appointment and removal power, a quintessential and nondelegable Presidential power. . . . "the President himself must directly exercise the Presidential power of appointment or removal.").

Although, mirroring *Fitzgerald*, the prosecution incorrectly alleges that an improper purpose motivated President Trump's thinking regarding the Department of Justice's staffing, and its approach to election fraud and irregularities, a President's purpose or motive is once again irrelevant to whether his acts fall within the "outer perimeter" of his responsibilities. *Fitzgerald*, 457 U.S. at 756.

### 3. Meeting with state officials about the administration of a federal election lies at the heart of the President's official duties.

Next, meeting with state officials about the administration of a federal election in their States, and urging them to exercise their official duties with respect to the federal election in a certain way, constitutes another core exercise of Presidential responsibility.

The Supreme Court long ago rejected the notion that the President's Take Care duty is "limited to the enforcement of acts of congress or of treaties of the United States according to their express terms," and held that this duty "include[s] the rights, duties, and obligations growing out of the constitution itself, our international relations, and all the protection implied by the nature of the government under the constitution." *Cunningham v. Neagle*, 135 U.S. 1, 64 (1890).

Ensuring the integrity of federal elections and urging state officials to take steps to ensure the fairness and integrity of federal elections fall within "the rights, duties, and obligations growing out of the constitution itself … and all the protection implied by the nature of the government under the constitution." *Id. Fitzgerald*, likewise, rejected the notion that the "outer perimeter" of the President's official responsibilities should be identified by parsing specific "functions" of the

Presidency, holding that "[i]n many cases it would be difficult to determine which of the President's innumerable 'functions' encompassed a particular action," and that the "functional" approach "could be highly intrusive." 457 U.S. at 756.

Ensuring the integrity of federal elections falls within the President's official duty. "While Presidential electors are not officers or agents of the federal government, they exercise federal functions under, and discharge duties in virtue of authority conferred by, the Constitution of the United States." *Burroughs v. United States*, 290 U.S. 534, 545 (1934); *see also Anderson v. Celebrezze*, 460 U.S. 780, 794-95 (1983) (discussing the "uniquely important national interest" in Presidential elections). Recognizing the strong federal interest in elections, the current Administration has issued a sweeping executive order directing all federal agencies to interface with state and local officials to promote election integrity and ballot access.  Exec. Order 14019, *Promoting Access to Voting*, 86 Fed. Reg. 13623-27.

Similarly, taking steps to ensure that fraud and other irregularities do not vitiate the outcome of a federal election also falls within the President's responsibility. For example, federal election law criminalizes preparing "false ballots, plac[ing] them in the box, and return[ing] them" because that prevents "an honest count ... of the votes lawfully cast." *United States v. Saylor*, 322 U.S. 385, 389 (1944). The Constitution also guarantees equal treatment of voters in federal elections and protects them from arbitrary interference with their voting rights. *Bush v. Gore*, 531 U.S. 98, 104–05 (2000). Communicating with state officials to ensure "an honest count … of the votes lawfully cast" in a federal election, *Saylor*, 322 U.S. at 389, thus effectuates federal rights and flows directly from the President's Take Care power, *see Neagle*, 135 U.S. at 59.

Further, the indictment alleges that the President communicated with state officials, argued that election fraud occurred, urged them to conduct their own investigations of election fraud and

irregularities, and to take steps to address those issues. Those are just the sorts of communications that one would expect the Department of Justice to make if it had investigated and concluded that there was election fraud in the relevant States. As noted above, the Election Crimes Branch of DOJ "consult[s] and support[s] … prosecutors and investigators around the nation." U.S. Dep't of Justice, *Election Crimes Branch*, *supra*. DOJ's authority is not greater than the President's here; Article II "makes a single President responsible for the actions of the Executive Branch." *Free Enter. Fund*, 561 U.S. at 496-97 (quoting *Clinton*, 520 U.S. at 712-13 (Breyer, J., concurring in judgment)). The President thus has the authority and obligation to communicate his concerns about alleged fraud in federal elections to the relevant state authorities—a function at the heart of the President's constitutional role.

Again, the Department of Justice has recently come to the same conclusion—concluding that communicating with state officials about their exercise of official duties with respect to a federal election falls within the scope of the President's official duties: "Such speech is an important traditional function of the Presidency, and it would offend the constitutional separation-of-powers principles recognized in *Nixon* [*v. Fitzgerald*] for courts to superintend the President's speech to his constituents and *to other officeholders* … merely because it concerns the conduct of a coordinate Branch *or an entity outside the federal government*." *Blassingame* Amicus Br. 12 (citing *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 665 (D.C. Cir. 2006)) (emphases added).

Aware that, as a general matter, a President may communicate with federal election officials regarding election integrity concerns, the prosecution here attempts to side-step the issue by falsely alleging President Trump did not really *believe* there were outcome-determinative issues with the election. However, probing President Trump's internal beliefs, again, are questions of

motive or purpose that cannot defeat immunity, elsewise the President would be "subject . . . to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose." *Fitzgerald*, 457 U.S. at 756.

Last, although *Thompson* came to a different conclusion about the scope of the Take Care responsibility, 590 F. Supp. 3d at 77-78, its analysis is unpersuasive. *Thompson* reasoned that "a sitting President has no expressly identified duty to faithfully execute the laws surrounding the Certification of the Electoral College." 590 F. Supp. 3d at 78. This is wrong for several reasons. First, by requiring the President to show an "*expressly* identified duty," *id.* (emphasis added), *Thompson* adopted the very standard that the Supreme Court rejected in *Neagle*, *i.e.*, as "limited to the enforcement of acts of congress or of treaties of the United States according to their *express* terms." 135 U.S. at 64 (emphasis added).

On the contrary, the President's Take Care role "include[s] the rights, duties, and obligations growing out of the constitution itself … and all the protection implied by the nature of the government under the constitution." *Id.* This includes taking steps to prevent the certification of a federal election tainted by fraud—even if those steps are limited to encouraging other state and federal officials to exercise their responsibilities a certain way where the President allegedly has no direct role. *Thompson* likewise contravened the Supreme Court's guidance in *Fitzgerald* that the scope of Presidential immunity should not be determined by parsing the specific "functions" of the President and demanding that immunity be closely linked to a specific function.

Second, even if the Take Care duty were limited to the "express terms" of federal statutes, *Thompson* overlooked the direct connection between the President's duty to enforce federal statutes that safeguard the integrity of federal elections, and his communications with state officials about that very issue. If the President or DOJ concludes that significant fraud occurred in the

38

administration of a federal election, the Take Care Clause does not require them to keep that information to themselves. Rather, it authorizes them to report that conclusion to state (and other federal) officials and to urge them to act accordingly. *Thompson* concluded that "merely exhorting non-Executive Branch officials to act in a certain way" is not "a responsibility within the scope of the Take Care Clause." 590 F. Supp. 3d at 78. That is wrong. But even if that were so, when "exhorting non-Executive Branch officials to act in a certain way" addresses core federal interests and effectuates and protects rights conferred by federal statutes, it falls within the President's responsibilities.

Third, *Thompson*'s conclusion that "[t]he President's Take Care Clause duty … does *not* extend to government officials over whom he has no power or control," *id.* at 78, proves far too much. That formulation entails that the President's urging the Supreme Court to rule a certain way in a case to which the United States is not a party—for example, in an amicus brief filed by the Solicitor General—is a purely private action outside the "outer perimeter" of Executive responsibility, simply because the President has "no power or control" over Article III judges. *Id.* That is illogical. Rather, the Take Care duty must extend to exhorting other officials to exercise their responsibilities in a manner consistent with the President's view of the public good— *especially* when the issue affects the civil rights of millions of federal voters and addresses a "bedrock function of the United States federal government." Doc. 1, at 2.

### 4. Communicating with the President of the Senate and other Members of Congress about the exercise of their official duties regarding federal election certification lies at the heart of the President's official duties.

President Trump's communications with the Vice President in his legislative role as President of the Senate and with other Members of Congress about the exercise of their official duties with respect to the election certification also fall at the heart of the President's official

responsibility. Presidents routinely communicate with Congress to provide information and urge them to act, and this conduct is among the most deeply rooted traditions of Presidential authority.

First, President Trump's direct communications with the Vice President—in his legislative role as "President of the Senate," Doc. 1, ¶¶ 9, 53—were central to his official responsibilities. The Constitution assigns the President extensive roles in the legislative process. Article I, § 7, clause 2 confers on the President the veto power over bills. Clause 3 of the same section confers on the President the veto power over joint resolutions. Article II provides that the President "shall from time to time give to the Congress Information of the State of the Union, and *recommend to their Consideration such Measures as he shall judge necessary and expedient*." U.S. CONST. art. II, § 3 (emphasis added). Article II, § 3 also provides that the President "may, on extraordinary Occasions, convene both Houses, or either of them, and in Case of Disagreement between them, with Respect to the Time of Adjournment, he may adjourn them to such Time as he shall think proper…." *Id.*

Particularly relevant here, the President's authority to "recommend to [Congress's] Consideration such Measures as he shall judge necessary and expedient," *id.*, encompasses the President's authority to provide information to legislators and urge them to take specific actions:

> It is equally necessary for the executive branch of Government to be able to make its views known to Congress on all matters in which it has responsibilities, duties, and opinions. The executive agencies have a definite requirement to express views to Congress, to make suggestions, to request needed legislation, to draft proposed bills or amendments, and so on…. [E]xecutive agencies have the right and responsibility to seek to 'influence, encourage, promote or retard legislation' in many clear and proper—and often extremely effective—respects….

*Legislative Activities of Executive Agencies: Hearings Before the H. Select Comm. On Lobbying Activities*, 81st Cong., pt. 10, at 2 (1950), *quoted in Lobbying by Executive Branch Personnel*, U.S.

40

Op. O.L.C. Supp. 240, 243-44 (1961), *at* https://www.justice.gov/d9/olc/opinions/1961/10/31/op-olc-supp-v001-p0240_0.pdf (visited August 22, 2023) ("1961 O.L.C. Op."). "[I]n furtherance of basic responsibilities[,] the executive branch and particularly the Chief Executive and his official family of departmental and agency heads" are authorized to "inform and consult with the Congress on legislative considerations, draft bills and urge in messages, speeches, reports, committee testimony and by direct contact the passage or defeat of various measures." H.R. Rep. No. 81-3138, at 52 (quoted in 1961 O.L.C. Op. at 244).

The Executive Branch endorsed these statements in 1961: "the participation of the President in the legislative function is based on the Constitution." 1961 O.L.C. Op. at 245. "It was the intention of the Fathers of the Republic that the President should be an active power in legislation .... He is made by the Constitution an important part of the legislative mechanism of our government." *Id.* (square brackets omitted) (quoting Thomas J. Norton, *The Constitution of the United States: Its Sources and Its Application* 123 (special ed. 1940, 8th printing 1943)).

"The President's right, even duty, to propose detailed legislation to Congress touching every problem of American society, and then to speed its passage down the legislative transmission belt, is now an accepted usage of our constitutional system." *Id.* (quoting Clinton Rossiter, *The American Presidency* 108 (2d rev. ed. 1960)). "This constitutionally established role in the legislative process has become so vital through the years that the President has been aptly termed the Chief Legislator." *Id.* (citing, *inter alia*, Lawrence H. Chamberlain, *The President, Congress and Legislation* 14 (1946)).

Here, the indictment alleges that President Trump urged both the Vice President—in his legislative capacity as President of the Senate—and Members of Congress to exercise their authority in the election-certification proceedings consistent with what President Trump urged was

the public good. This conduct is manifestly part of the President's responsibilities in our constitutional tradition, and the question whether the President has a formal role in the election-certification process makes no difference. As the Department of Justice recently put it, "a President acts within the scope of his office when he urges Members of Congress to act in a particular way with respect to a given legislative matter—even a matter, such as a congressional investigation, *in which the President has no constitutional role*." *Blassingame* Amicus Br. 11 (emphasis added).

In fact, there is direct historical precedent for a sitting President communicating with Members of Congress about alleged election fraud relating to the certification of a disputed election involving rival slates of electors. In the wake of the 1876 election, President Grant discussed the electoral count and claims of fraud with a member of the U.S. House. See 28 THE PAPERS OF ULYSSES S. GRANT 80–81 (ed. John Y. Simon 2005), *at* https://scholarsjunction.msstate.edu/usg-volumes/27/ (visited August 22, 2023). Likewise, President Grant transmitted to Congress a letter he received from an observer (a U.S. Senator) whom he had requested to go to New Orleans and witness the counting of votes. *Id.* at 75-78. President Grant also dispatched federal troops to Louisiana and Florida to prevent violence while Republican-controlled election boards counted votes, and he instructed the federal troops to report fraud in the election. *See id.* at 19-20. These acts, just like President Trump's, were Presidential.

### 5. Allegedly organizing contingent slates of electors falls within the President's official duties.

The indictment alleges that President Trump directed or approved other individuals to organize contingent slates of electors in disputed States. Doc. 1, ¶¶ 53-69. The indictment clearly alleges that these actions were part and parcel of President Trump's alleged attempts to convince the Vice President and Members of Congress to exercise their official authority in his favor on January 6. *Id.* ¶ 10(b) (alleging that the contingent electors were "to transmit their false certificates

to the Vice President and other government officials to be counted at the certification proceeding on January 6"); *id.* ¶ 53 (alleging that "the submission of these fraudulent slates [of electors] would create a fake controversy at the certification proceeding and position the Vice President—presiding on January 6 as the President of the Senate—to supplant legitimate electors with the Defendant's fake electors and certify the Defendant as President"). The contingent electors' role, the indictment alleges, was to allow President Trump to convince the Vice President and other Members of Congress to reject or delay the certification of certain electoral votes. *See id.* ¶ 86 (alleging that President Trump attempted "to convince the Vice President to accept the Defendant's [supposedly] fraudulent electors, reject legitimate electoral votes, or send legitimate electoral votes to state legislatures for review rather than count them"); *see also id.* ¶¶ 88, 89, 90, 91, 92, 93, 95, 101, 103 (repeatedly alleging that the slates of electors were used to attempt to convince the Vice President to reject or delay the certification).

These actions fall within the President's official responsibilities for at least two reasons. First, as noted above, the "outer perimeter" of the President's official responsibilities "include[s] the rights, duties, and obligations growing out of the constitution itself … and all the protection implied by the nature of the government under the constitution." *Neagle*, 135 U.S. at 64. The Constitution explicitly provides for Presidential electors and delineates their role. U.S. CONST. art. II, §1, cl. 2. "While Presidential electors are not officers or agents of the federal government, they exercise federal functions under, and discharge duties in virtue of authority conferred by, the Constitution of the United States." *Burroughs*, 290 U.S. at 545. Indeed, the indictment itself describes the selection of Presidential electors as an integral part of "a bedrock function of the United States federal government: the nation's process of collecting, counting, and certifying the results of the Presidential election." Doc. 1, ¶ 4 (indictment); *see also id.* ¶ 9.

Organizing slates of electors, therefore, relates directly to "the rights, duties, and obligations growing out of the constitution itself," *Neagle*, 135 U.S. at 64, and thus to the President's responsibilities. Without contingent slates of electors, there would be no alternative option for the Vice President to certify, rendering futile the President's entirely legitimate efforts to urge Congress and the states to reconsider evidence of fraud and irregularities. Organization of the slates of electors, in other words, advances two core Presidential functions—protecting the integrity of federal elections, and urging Members of Congress to act in a manner consistent with the President's view of the public good. Thus, these actions clearly lie within the "outer perimeter" of the President's "official responsibilities." *Fitzgerald*, 457 U.S. at 756.[7]

Second, as the indictment itself emphasizes, the actions of organizing slates of electors were ancillary and preparatory to the acts of communicating with the Vice President and other Members of Congress and urging them to exercise their official responsibilities a certain way— which are themselves core exercises of Presidential responsibility.

Acts that are intertwined with immune actions are themselves immune from liability. For example, it is widely accepted that "[a]bsolute prosecutorial immunity will ... attach to administrative or investigative acts necessary for a prosecutor to initiate or maintain the criminal prosecution." *Prince v. Hicks*, 198 F.3d 607, 612 (6th Cir. 1999) (quoting *Ireland v. Tunis*, 113 F.3d 1435, 1447 (6th Cir. 1997)); *see also, e.g., Guzman–Rivera v. Rivera–Cruz*, 55 F.3d 26, 29 (1st Cir. 1995) ("[A]bsolute immunity may attach even to ... administrative or investigative

---

[7] Nor were such actions unprecedented. Quite the opposite, at the time of the alleged conduct, the Electoral Count Act did not prohibit organizing contingent slates of electors, and such electors had been organized previously in the disputed elections of 1876 and 1960—including, in the former case, with the support of the sitting President. This was thus not a situation where "the President takes measures incompatible with the express or implied will of Congress," but a situation where the President was acting in an area of "independent Presidential responsibility." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

activities when these functions are necessary so that a prosecutor may fulfill his function as an officer of the court.") (quoting *Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484, 1490 (10th Cir. 1991)). "[T]he Supreme Court has recognized that some duties prior to the initiation of a prosecution are also protected. Preparing to initiate a prosecution may necessitate obtaining, reviewing and evaluating evidence; absolute immunity may attach when these functions are necessary so that a prosecutor may fulfill his function as an officer of the court." *Snell v. Tunnell*, 920 F.2d 673, 693 (10th Cir. 1990) (citing *Imbler*, 424 U.S. at 431 n.33). Thus, a prosecutor "who performs functions within the continuum of initiating and presenting a criminal case … ordinarily will be entitled to absolute immunity." *Id.* So too here. President Trump's alleged acts regarding the contingent slates of electors "perform[ed] within the continuum" of his other immune acts, *id.*, such as communicating with Congress, are also immune.

\* \* \*

For these reasons, the acts alleged in the indictment lie firmly within the "outer perimeter" of the President's official responsibility. Therefore, they cannot form the basis of criminal charges against President Trump.[8]

## CONCLUSION

The Court should dismiss the indictment, with prejudice, on grounds of Presidential immunity.

---

[8] The indictment also alleges that President Trump filed lawsuits challenging the election outcome. Doc. 1, ¶¶ 20, 30. Yet the indictment proclaims that it is not directly relying on such actions. Doc. 1, ¶ 3 (admitting that President Trump "was also entitled to formally challenge the results of the election through lawful and appropriate means, such as by seeking recounts or audits of the popular vote in states or *filing lawsuits challenging ballots and procedures*") (emphasis added). Accordingly, these are included only as acts in furtherance of the supposed conspiracy, which are immune from prosecution for the reasons just stated, regardless of whether such lawsuits were filed in a personal or official capacity. Moreover, the act of filing lawsuits alone, without more, is manifestly insufficient to support any charge in the indictment.

Dated: October 5, 2023

Respectfully submitted,

Todd Blanche, Esq. (PHV)
toddblanche@blanchelaw.com
BLANCHE LAW
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250

/s/John F. Lauro
John F. Lauro, Esq.
D.C. Bar No. 392830
jlauro@laurosinger.com
Gregory M. Singer, Esq. (PHV)
gsinger@laurosinger.com
Filzah I. Pavalon, Esq. (PHV)
fpavalon@laurosinger.com
LAURO & SINGER
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990
Counsel for President Trump

## CERTIFICATE OF CONFERRAL

Counsel for President Trump conferred with counsel for the prosecution, who advise the government opposes the relief requested herein.