UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.                                                                          Case No. 1:23-cr-257-TSC

DONALD J. TRUMP,

    Defendant.
_____/

**PRESIDENT TRUMP'S MOTION
FOR PRE-TRIAL RULE 17(c) SUBPOENAS
AND ACCOMPANYING MEMORANDUM OF LAW**

Pursuant to Fed. R. Crim. P. 17(c), President Donald J. Trump respectfully requests leave to issue the attached subpoenas *duces tecum* (the "Requested Subpoenas") for the pretrial production of records, addressed to the following: (1) the Archivist of the United States at the National Archives and Records Administration (NARA), (2) the Clerk of the House of Representatives, (3) the current Committee on House Administration, which is the successor entity to the January 6 Select Committee; (4) Richard Sauber, the Special Counsel to the President ; (5) Johnathan Meyer, the General Counsel of the Department of Homeland Security; (6) Representative Barry Loudermilk, U.S. House of Representatives; and (7) Representative Bennie Thompson, U.S. House of Representatives. The House Committee on Administration has identified these records as missing from the archived records of the January 6 Select Committee. By these subpoenas, President Trump seeks to retrieve certain missing records and uncover information about their disposition.

MEMORANDUM OF LAW

**I.     Background**

President Trump is charged with Conspiracy to Defraud the United States in violation of 18 U.S.C § 371, Conspiracy to Obstruct an Official Proceeding in violation of 18 U.S.C. § 1512(k), Obstruction of and Attempt to Obstruct an Official Proceeding in violation of 18 U.S.C. §§ 1512(c)(2) and 2, and Conspiracy Against Rights in violation of 18 U.S.C. § 241. (Doc. 1, (Indictment)).  These false allegations carry a focus on the certification of the 2020 presidential election and encompass the period between the election, held on November 3, 2020, and January 6, 2021.

As the Court is aware, a House of Representatives committee previously investigated the events of January 6, 2021. H.Res. 503, 117th Cong. (2021), (the "Select Committee").  The Select Committee compiled a large archive of information.[1]  Upon the dissolution of the Select Committee at the conclusion of the 117th Congress, applicable House Rules required the Select Committee to transfer its records to the Committee on House Administration for preservation and archiving.

According to a letter from Representative Barry Loudermilk, Chair of the Subcommittee on Oversight, however, the Select Committee did not transfer or archive numerous records (collectively, the "Missing Records").  *See* (Exhibit 1, Letter from The Honorable Barry Loudermilk, June 26, 2023).

---

[1] The Select Committee purportedly accumulated 4 terabytes of data during the investigation, but Rep. Loudermilk reported that his successor committee received only 2.5 terabytes.  *See* Andrew Mark Miller, *J6 Committee failed to preserve records, has no data on Capitol Hill security failures, GOP charges*, Fox News.com, August 8, 2023 (https://www.foxnews.com/politics/j6-committee-failed-to-preserve-records-has-no-data-on-capitol-hill-security-failures-gop-charges).

For example, "[t]he video recordings of transcribed interviews and depositions, which featured prominently during the Select Committee's hearings, were not archived or transferred to the Committee on House Administration." *Id*. at 1. In a response to Mr. Loudermilk's letter, the former Chair of the Select Committee, Representative Bennie Thompson, confirmed that—despite their plain relevance these and other records, (which Representative Thompson cryptically described as "temporary committee records") were not archived. *See* (Exhibit 2, Letter from The Honorable Bennie Thompson, July 7, 2023).[2]

Likewise, at the very end of its existence, the Select Committee "loan[ed]" other crucial records to "the White House Special Counsel and the Department of Homeland Security." (Exhibit 2, Letter from The Honorable Bennie Thompson, July 7, 2023). From the descriptions in the letters, these materials include important intelligence and other law enforcement information, records identifying witnesses, and other information the Select Committee deemed sensitive pursuant to agreements with the White House and DHS.

In truth, this was no "loan" and the Select Committee's failure to archive the materials was intentional—Representative Thompson provided the materials to the White House and DHS on Friday, December 30, 2022, knowing full well the Select Committee would dissolve the very next business day.[3] As planned, the Biden Administration did not return these documents prior to the dissolution of the Select Committee, and, as a result, the Select Committee did not "properly archive that material with the rest of its records." *Id*.

---

[2] Rule VII of the Rules of the U.S. House of Representatives governs official House records, requiring committees and officers to transfer to the Clerk 1) any noncurrent records of committees and subcommittees, and 2) those created or acquired by House Officers and their staffs in the course of their official duties.

[3] December 30, 2022, was a Friday, Monday, January 2 was a federal holiday, and the 117th Congress ended on January 3, at noon.

Needless to say, there is significant overlap between the Select Committee's investigation and this case, and there is a strong likelihood that individuals discussed in the Missing Records could be called as trial witnesses. Indeed, the letters from the Select Committee transferring these records to the White House and DHS indicate how important the Select Committee considered these witnesses and records. *See* (Exhibit 3, Letter from the Select Committee to Richard A Sauber, Dec. 30, 2022 ("Sauber letter"); Exhibit 4, Letter from Select Committee to Jonathan Meyer, Dec. 30, 2022 ("Meyer letter")).

President Trump is fully entitled to seek the Missing Records by subpoena. It is also equally important to determine if these records have been lost, destroyed, or altered. The Requested Subpoenas are narrowly tailored to achieve these legitimate ends, which are fundamental to ensuring President Trump's right to a fair trial under the Fifth and Sixth Amendments. As the Missing Records are currently unavailable, the Requested Subpoenas would not be duplicative of any other records either publicly available or produced in discovery.

Accordingly, President Trump requests leave to serve the Requested Subpoenas, which include the narrowly tailored document requests listed below (the "Requested Records").[4] As these records may be maintained by more than one party, President Trump seeks leave to send a substantially similar subpoena to the seven likely custodians of the Requested Records: (1) the Archivist of the United States at the National Archives and Records Administration (NARA), (2) the Clerk of the House of Representatives, and (3) the current Committee on House Administration, which is the successor to the January 6 Select Committee; (4) Representative Barry Loudermilk, U.S. House of Representatives; (5) Representative Bennie Thompson, U.S.

---

[4] Although the discovery in this case is vast and the defense has not reviewed it in its entirety, the defense has a good faith belief that the government's Rule 16 discovery productions do not include the Requested Records.

House of Representatives; (6) the Special Counsel to the White House; and (7) the General Counsel of the Department of Homeland Security.[5]

The Requested Records include:

1. The Select Committee Missing Materials.[6]

2. Records and communications regarding methods, practices, instructions, litigation holds, and/or policies regarding transfer, retention, archiving, or destruction of the Select Committee Missing Materials.

3. Records and communications regarding the loss or destruction of the Select Committee Missing Materials.

4. Communications with the Department of Justice or other law enforcement agencies related to the Select Committee Missing Materials.

5. Records and communications relating to any accommodations or agreements with the Executive Branch, including the Department of Justice, Department of Homeland Security, and White House, regarding the Select Committee Missing Materials.

6. Any other documents, communications, or records in any way pertaining to the Missing Materials.

## II.  Applicable Law

Under Fed. R. Crim. P. 17(c), the Court "may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial." *United States v. Nixon*, 418 U.S. 683, 698 (1974). "Rule 17(c) implements the Sixth Amendment guarantee that an accused have compulsory process to secure evidence in his favor." *In re Martin Marietta Corp.*, 856 F.2d 619, 621 (4th Cir. 1988) (citation omitted); *see also*, e.g., *United States v. Tucker*, 249 F.R.D. 58, 65 (S.D.N.Y. 2008) ("Criminal defendants have the right to put before

---

[5] The Requested Subpoenas are attached to this Motion as Exhibit 5-11.

[6] The Requested Subpoenas define "Select Committee Missing Materials" in a limited manner to encompass the Missing Records discussed herein.

a jury evidence that might influence the determination of guilt. To effect that right, a defendant must have the ability to obtain that evidence." (internal citation and quotation omitted)).

Indeed, a defendant's fundamental rights to confrontation, due process, and a fair trial compel access to documents that are "necessary to permit the defendant to raise a defense." *See Tucker*, 249 F.R.D. at 65; *United States v. King*, 194 F.R.D. 569, 585 (E.D. Va. 2000) ("There is a compelling interest in having 'every man's evidence' at a criminal trial . . . to the extent that it is relevant. The ability to impeach a key prosecution witness and to admit her statements into evidence to that end is a critically important component of a fair trial and is the *sine qua non* of a meaningful right to confrontation and cross-examination. These rights are secured to the Defendants by the Fifth and Sixth Amendments. And, society too has a compelling interest in assuring a fair trial and meaningful confrontation.") (citations omitted and emphasis added)); *United States v. Beckford*, 964 F. Supp. 1010, 1019 (E.D. Va. 1997) ("'*[t]he essential purpose of* [Rule 17(c)] is to implement the Sixth Amendment guarantee that an accused have compulsory process to secure evidence in the accused's favor.'" (emphasis in original) (quoting 25 Moore's Federal Practice § 617.08[l] at 617–21)).

The constitutional importance of Rule 17(c) is amplified by the asymmetries inherent in criminal prosecutions. *See Tucker*, 249 F.R.D. at 60:

> By the time the prosecution's attention is drawn to an individual, law enforcement has typically gathered substantial evidence relating to the alleged offense. The government's ability to gather evidence is further enhanced by the use of search and seizure, a mechanism not available to the defense. . . . Grand jury proceedings provide another significant avenue for the prosecution to gather evidence. . . . Before the grand jury, prosecutors have wide latitude to compel testimony and obtain documentary evidence without the restrictions imposed by the Federal Rules of Evidence and out of the presence of the defendant and her counsel.

In short, "[i]t is inherent in our criminal justice system that defendants will virtually always be outmatched in investigatory resources, funds, and time to prepare for litigation." *Id*. at 63.

Although there is no constitutional requirement that "criminal prosecution be equally matched," *id*., "the Constitution recognize[s] the awesome power of indictment and the virtually limitless resources of government investigators. [Thus], [m]uch of the Bill of Rights is designed to redress the advantage that inheres in a government prosecution." *Id*. at 64–65 (quoting *Wardius v. Oregon*, 412 U.S. 470, 480 (1973) (Douglas, J., concurring)).

In that same vein, the defense is entitled to know whether evidence has been lost. "It is axiomatic that criminal proceedings must comport with prevailing notions of fundamental fairness, which include what might loosely be called the area of constitutionally guaranteed access to evidence." *In re Al Baluchi*, 952 F.3d 363, 369 (D.C. Cir. 2020) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984); *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)) (internal quotation marks omitted).

Separate tests are applied to determine whether the government's failure to preserve evidence rises to the level of a due process violation in cases where material exculpatory evidence is not accessible, versus cases where "potentially useful" evidence is not accessible. *United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001) (citing *Trombetta*, 467 U.S. at 489; *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)); *see also United States v. Greenberg*, 835 F.3d 295, 303 (2d Cir. 2016) (A criminal defendant moving for dismissal on the basis of spoliation of the evidence must make a two-pronged showing that the evidence possessed exculpatory value "that was apparent before [it] was destroyed" and that it was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."). Penalties for spoliation of evidence in the criminal context vary but could include dismissal or an adverse inference. *See, e.g., United States v. Lanzon*, 639 F.3d 1293, 1302 (11th Cir. 2011) (assuming arguendo that the civil spoliation doctrine applies in the criminal context); *In re Al Baluchi*, 952

7

F.3d at 368–69 (in considering whether a September 11th defendant could delay the destruction of potential evidence, government argued defendant could seek "adverse inferences or other, alternative forms of relief that would potentially compensate him for the lost ability to obtain favorable evidence."); *United States v. Hood*, 615 F.3d 1293, 1301 (10th Cir. 2010) (assuming arguendo that it was error for the district court not to apply the civil standard governing the spoilation of evidence); *United States v. Mincy*, 2022 WL 17176398, at *9 (S.D. Ohio 2022) ("When considering the appropriate response to claims of spoilation in the criminal context, the Court may consider how much the lack of the evidence at issue will prejudice the defendant.").

Thus, to obtain a Rule 17(c) subpoena, a defendant need only show that the material sought is: (1) relevant; (2) admissible; and (3) specific. *Nixon*, 418 U.S., at 700; *see also United States v. Farha,* No. 8:11-CR-115-T-30MAP, 2012 WL 12969785, at *1 (M.D. Fla. Mar. 28, 2012) ("In *United States v. Nixon*, the Supreme Court established three hurdles a party must overcome when seeking production under Rule 17(c)—relevancy, admissibility, and specificity."). Although "Rule 17(c) subpoena[s] may not be used for a 'general fishing expedition,'" *Tucker*, 249 F.R.D. at 65 (quoting *Nixon*, 418 U.S., at 700), they are a proper means for the defendant to obtain documents he intends to use at trial, *Bowman Dairy Co. v. United States*, 341 U.S. 214, 219–20 (1951). The decision to authorize a Rule 17(c) pre-trial subpoena is "committed to the sound discretion of the trial court." *Nixon*, 418 U.S., at 702.

### III.    Argument

The Requested Subpoenas are proper under *Nixon* because they seek relevant, admissible documents that are narrowly tailored to the issues in this case. *Id*.; Fed. R. Crim. P. 17(c). Further, because the Requested Records are critical to President Trump's expected trial defense, his

fundamental rights to confrontation, due process, and a fair trial require that he have access to those documents. Accordingly, the Requested Subpoenas should issue.

*A. The Requested Records are Relevant to President Trump's Defense*

Based on the description in the letters to the Special Counsel to the President and the General counsel for DHS, the missing video recordings and other records relate to Secret Service personnel and witnesses within the purview of the White House or Executive Department with direct and extensive knowledge of events around January 6, 2021.  Records of these likely trial witnesses are critical to the defense.  As the letters attest: "those personnel provided very important information for the Committee's investigation (Ex. 3, Sauber letter); and "it became clear that additional interviews of certain Secret Service agents and personnel would be necessary for multiple reasons." (Ex. 2, Meyer Letter).  The Meyer letter also discusses "substantial intelligence information" communicated to the White House and Secret Service related to January 6th.

Pursuant to a defendant's Sixth Amendment right to compulsory process, "the Court must enforce a defendant's subpoena for testimony or documents 'essential to the defense.'" *United States v. Ehrlichman*, 389 F. Supp. 95, 97 (D.D.C. 1974), *aff'd*, 546 F.2d 910 (D.C. Cir. 1976) (citing *United States v. Schneiderman*, 106 F.Supp. 731 (S.D.Cal.1952); *Washington v. State of Texas*, 388 U.S. 14 (1967); *United States v. De Stefano*, 476 F.2d 324, 330 (7th Cir. 1973)). "[S]uch process may even run to the Members of Congress." *Id*. (citing *United States v. Cooper*, 4 U.S. (4 Dall.) 341, 1 L.Ed. 859 (1800)).

Furthermore, recordings of interviews are critical evidence.  Impeachment of witnesses is "clearly material" to the defense. *Tucker*, 249 F.R.D. at 66. "The Constitution guarantees criminal defendants the right to confront their accusers, and the right to cross-examination has been held to be an essential purpose of the Confrontation Clause." *Id*. at 67.  "This right is meaningless if a

defendant is denied the reasonable opportunity to obtain material evidence that could be crucial to that cross-examination." *Id*.

The Requested Records are both relevant and "necessary to permit [Defendant] to raise a defense," *Tucker*, 249 F.R.D. at 65. Without these documents, President Trump cannot possibly have a fair trial. *Beckford*, 964 F. Supp. at 1019 ("[T]he right to compulsory process in aid of the defense case . . . is considered fundamental to the right to a fair trial."); *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: 'The United States wins its point whenever justice is done its citizens in the courts.'").

B. The Requested Subpoenas are Limited and Specific

The Requested Subpoenas seek limited categories of documents relating to two highly relevant topics—records that were not retained by the Select Committee and the ultimate disposition of those records. Far from a "general fishing expedition,'" *Tucker*, 249 F.R.D. at 65, the Requested Subpoenas concern only a specific issue and do not include documents related to any other aspect of the Select Committee's investigation or archived records. Moreover, there is a dispute within the House of Representatives over the disposition of these important records. The Requested Records were clearly important to the Select Committee's investigation and involved witnesses with direct knowledge of January 6 related events. *See* 2 Charles A. Wright, Fed. Prac. & Proc. Crim. § 275 (4th ed.) ("A subpoena that fails to describe any specific documents is too broad, but it is not necessary that the subpoena designate each particular paper desired. It is sufficient if kinds of documents are designated with reasonable particularity."). Finally, given the

10

limited subject matter requested, Respondents should have little trouble locating responsive documents or confirming they have no such documents, and in any event, retain the right to raise any objections with the Court. *See* Fed. R. Crim. P. 17(c); *Nixon*, 418 U.S. at 699–700.[7]

### C.  The Requested Records are Admissible

Materials in the possession of the government actors may be reached by subpoena under Rule 17(c) as long as they are evidentiary. *Bowman Dairy Co. v. United States*, 341 U.S. 214, 219 (1951).  The materials subpoenaed need not actually be used in evidence. *Id*.  It is only required that a good-faith effort be made to obtain evidence. *Id*. at 220.  "[A]ny document or other materials, admissible as evidence, obtained by the Government by solicitation or voluntarily from third persons is subject to subpoena." *Id*. at 221.

One feature of the evidence identified in the Meyer letter is that it could be used to show notice to White House personnel regarding the events of January 6th.  The Indictment directly alleges that President Trump "directed [supporters] to the Capitol to obstruct the certification proceeding…" so the knowledge and intent of President Trump and others is plainly relevant. (Doc. 1, Ind. ¶10(d)). These records could be offered for the non-hearsay purpose of demonstrating a witness or party's state of mind, F.R.E. 801(c)(2).  Of course, they are also impeachment

---

[7] Due to the importance of these documents and the likelihood that they will lead to the discovery of additional witnesses or evidence, pretrial production is necessary to allow Defendants adequate time to review the records and respond accordingly. *See United States v. Tomison*, 969 F. Supp. 587, 593 (E.D. Cal. 1997) ("In cases . . . where evidence relevant to guilt or punishment is in a third party's possession and is too massive for the defendant to adequately review unless obtained prior to trial, pre–trial production through Rule 17(c) is necessary to preserve the defendant's constitutional right to obtain and effectively use such evidence at trial."); *see also Bowman Dairy Co.*, 341 U.S. at 220 (Rule 17(c)'s "chief innovation was to expedite [criminal] trial[s] by providing a time and place before trial for the inspection of the subpoenaed materials."). It also goes without saying that such documents could be requested via a trial subpoena; in which case Defendants may be required to request an adjournment to review and respond to the documents, causing unnecessary delays.

materials, to the extent the government intends to call witnesses from the Secret Service or White House on its behalf. *See United States v. Silverman*, 745 F.2d 1386, 1397 (11th Cir. 1984) (rule 17(c) subpoena proper where requested documents "possessed evidentiary potential for impeachment purposes.").[8]

## CONCLUSION

For the foregoing reasons, President Trump respectfully requests that the Court grant counsel leave to issue the attached subpoenas *duces tecum* and require the production of records within two weeks of service of the subpoena on the subpoenaed party.

### Certificate of Conference

Counsel for President Trump has conferred with the prosecution. The prosecution does not take a position at this time and will respond after an opportunity to consider the motion in full.

Dated: October 11, 2023  
Todd Blanche, Esq. (PHV)  
toddblanche@blanchelaw.com  
BLANCHE LAW  
99 Wall St., Suite 4460  
New York, NY 10005  
(212) 716-1250  

Respectfully submitted,  
/s/*John F. Lauro*  
John F. Lauro, Esq.  
D.C. Bar No. 392830  
jlauro@laurosinger.com  
Gregory M. Singer, Esq. (PHV)  
gsinger@laurosinger.com  
Filzah I. Pavalon, Esq. (PHV)  
fpavalon@laurosinger.com  
LAURO & SINGER  
400 N. Tampa St., 15th Floor  
Tampa, FL 33602  
(813) 222-8990  
Counsel for President Trump  

---

[8] *See also Tucker*, 249 F.R.D. at 67 ("The Constitution guarantees criminal defendants the right to confront their accusers, and the right to cross-examination has been held to be an essential purpose of the Confrontation Clause. This right is meaningless if a defendant is denied the reasonable opportunity to obtain material evidence that could be crucial to that cross-examination.").