**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:23-cr-00257-TSC |
| DONALD J. TRUMP, | |
| *Defendant*. | |

**PRESIDENT TRUMP'S OPPOSED MOTION FOR STAY PENDING APPEAL,
REQUEST FOR TEMPORARY ADMINISTRATIVE STAY,
<u>AND MEMORANDUM IN SUPPORT</u>**

## **INTRODUCTION**

No Court in American history has imposed a gag order on a criminal defendant who is campaigning for public office—least of all, on the leading candidate for President of the United States. This Court's Opinion and Order of October 17, 2023, Doc. 105 (the "Gag Order"), is the first of its kind. Given its extraordinary nature, one would expect an extraordinary and compelling justification for the Gag Order. But that is conspicuously absent. Instead, the Court generically states it must enter the Gag Order to prevent supposed "threats" and "harassment." This theory falters under even minimal scrutiny.

First, as the prosecution concedes, President Trump has not unlawfully threatened or harassed anyone. Doc. 103 at 10:4–6 (Oct. 16, 2023 H'rg. Tr., hereafter "Tr.") ("[T]he government's motion does not seem to allege that [President] Trump has actually violated any of his conditions of release or other federal law."). Thus, unsurprisingly, the prosecution presents no witness who says they feel threatened or harassed by President Trump. In fact, when asked at oral argument about evidence supporting this concern, the prosecution admitted "*of course this prejudice is speculative. We're not going to know if these witnesses are intimidated or if this threatening activity is intimidating other witnesses until folks testify at trial, and we may not even know*." Tr. at 62:18–21. The Court, likewise, cited no evidence on this point, made no specific findings, and declined to give any meaningful consideration to the prosecution's lack of proof. These are fatal omissions. A prior restraint cannot be based on speculation. Rather, the prosecution must demonstrate a "clear and present danger" to a compelling government interest. *United States v. Ford*, 830 F.2d 596, 600 (6th Cir. 1987).

Unable to justify the Gag Order based on President Trump's actions, the prosecution pivots to third parties, alleging that unnamed others, outside of President Trump's control, acted

improperly before this case began. Such concerns cannot justify the Gag Order. The Supreme Court has repeatedly explained that citizens of this country cannot be censored based on a fear of what others might do. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy . . . except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.").

Equally important, the prosecution submitted, and the Court considered, no evidence on the critical question of whether alternative, non-speech-restricting measures might be effective in advancing the asserted interest in protecting witnesses. This resulted in a breathtakingly overbroad Gag Order that, outside of a handful of narrow exceptions, prohibits any public comment regarding a wide and undefined set of individuals and subjects. In doing so, the Gag Order shields public officials in the highest echelons of government from criticism, including key political rivals.

At bottom, the Gag Order violates virtually every fundamental principle of our First Amendment jurisprudence. It imposes an overbroad, content-based prior restraint on the leading Presidential candidate's core political speech—notwithstanding the Supreme Court's instruction that First Amendment rights have their fullest and most urgent application precisely in the conduct of campaigns for political office. Likewise, by restricting President Trump's speech, the Gag Order eviscerates the rights of his *audiences*, including hundreds of millions of American citizens who the Court now forbids from listening to President Trump's thoughts on important issues.

Neither the prosecution nor the Court come close to justifying such restrictions. Instead, in a dizzying irony, the Gag Order lists a long line of Supreme Court cases protecting the civil rights of *criminal defendants* in hopes of silencing the criminal defendant in this case. This violation of the First Amendment is egregious and intolerable. Accordingly, pursuant to Rule 8(a)(1)(A) of the

Federal Rules of Appellate Procedure and this Court's Rules, the Court should immediately stay the Gag Order pending appeal.

## **FACTUAL BACKGROUND**

President Trump is the forty-fifth President of the United States and the leading candidate in the upcoming Presidential Election. He has dominating leads in the race for the Republican nomination, and he leads President Biden—the executive currently prosecuting him—in general election polling. President Trump's political speech reaches the largest audience in American history, including over 100 million followers on social media across several platforms and countless other citizens who listen to President Trump's messages in person, on television, the internet, newspapers, and other media.[1]

The prosecution filed the indictment in this matter on August 1, 2023. Doc. 1. As this case is pending, President Trump continues to campaign for President, and one of his core messages is that the prosecutions against him are part of an unconstitutional strategy to attack and silence the Biden Administration's chief political rival. To advance this message, President Trump has made many public statements criticizing individuals he believes are wrongly prosecuting him, including President Biden, Attorney General Garland, and Special Prosecutor Jack Smith and his team. This viewpoint—that the prosecution is politically motivated—is one shared by countless Americans.

On September 15, 2023, the prosecution filed a motion to impose a gag order on President Trump, seeking sweeping restrictions on President Trump's political speech. Doc. 57. In support, the prosecution made three principal arguments.

---

[1] For example, as of January 2023, President Trump had over 87 million followers on Twitter, 34 million on Facebook, 23 million on Instagram, almost 5 million on Truth Social, and 2.65 million on YouTube. *See Number of Followers of Donald Trump on Select Social Media Platforms as of January 2023*, STATISTA.COM, *at* https://www.statista.com/statistics/1336497/donald-trump-number-of-followers-selected-social-platforms/.

First, the prosecution claimed, in conclusory fashion, that silencing President Trump was necessary to prevent "prejudic[ing] the jury pool." *Id.* at 1. Second, that President Trump was allegedly "attempting … to undermine confidence in the criminal justice system and prejudice the jury pool through disparaging and inflammatory attacks on the citizens of this District, the Court, prosecutors, and prospective witnesses." *Id.* at 2. And third, that expansive content-based restrictions were somehow necessary to prevent threats and harassment to third parties. *Id.*

The Court declined to adopt the prosecution's first argument, relating to jury prejudice. For good reason, as the prosecution submitted no evidence that the jury pool has been actually affected by any of President Trump's statements. Likewise, the Court declined to credit the prosecution's amorphous, and constitutionally invalid, concern regarding "public confidence" in the prosecution or the Court.

Instead, in crafting the Gag Order, the Court looked to the prosecution's last argument, that witnesses, prosecutors, and court personnel have somehow been intimidated or harassed. However, in making this claim, the prosecution did not present any evidence that President Trump harassed or intimidated anyone. Rather, the prosecution relied exclusively on the allegation that third parties, with no relationship to President Trump, engaged improperly with political actors—most of whom had already been criticized by millions of people across the country before President Trump commented on them. *Id.* at 3-5.

The prosecution also did not submit any evidence that: (1) any member of its team has been threatened or harassed; (2) that any potential witness has actually felt threatened or harassed by President Trump's core political speech; (3) that President Trump made any public statement about any "court staff," other than the district judge herself; or (4) that any alleged threat, harassment, or

intimidation by third parties could not be addressed by means less restrictive than an expansive prior restraint on President Trump's speech. *See id.*

Nonetheless, on October 17, 2023, this Court entered the Gag Order against President Trump. Doc. 105. Among other things, the Gag Order prevents President Trump from making statements "that target … the Special Counsel prosecuting this case or his staff," or that "target … any reasonably foreseeable witness or the substance of their testimony." Doc. 105, at 3.

In entering the Gag Order, the Court relied heavily on the anticipated reactions of unidentified, independent third parties to President Trump's speech. The Court found that "when Defendant has publicly attacked individuals, including on matters related to this case, those individuals are consequently threatened and harassed." *Id.* at 2. But the Court cited no evidence that President Trump's statements—as distinct from the statements of millions of others—caused such alleged threats or harassment, let alone that the statements were directed to inciting imminent lawless action.

Notwithstanding the complete lack of evidence, the Court "f[ound] that [President Trump's] statements pose a significant and immediate risk that (1) witnesses will be intimidated or otherwise unduly influenced by the prospect of being themselves targeted for harassment or threats; and (2) attorneys, public servants, and other court staff will themselves become targets for threats and harassment." *Id.*

Based on these perfunctory findings, unsupported by evidence, the Court imposed sweeping restrictions on President Trump's core political speech:

> All interested parties in this matter, including the parties and their counsel, are prohibited from making any public statements, or directing others to make any public statements, that target (1) the Special Counsel prosecuting this case or his staff; (2) defense counsel or their staff; (3) any of this court's staff or other supporting personnel; or (4) any reasonably foreseeable witness or the substance of their testimony.

6

*Id.* at 3. The Court then entered a carve-out:

> This Order shall not be construed to prohibit Defendant from making statements criticizing the government generally, including the current administration or the Department of Justice; statements asserting that Defendant is innocent of the charges against him, or that his prosecution is politically motivated; or statements criticizing the campaign platforms or policies of Defendant's current political rivals, such as former Vice President Pence.

*Id.* President Trump immediately filed a notice of appeal. Doc. 106.

Despite the extraordinary breadth of these restrictions, the Court held, in conclusory fashion, that President Trump's "statements pose sufficiently grave threats to the integrity of these proceedings that cannot be addressed by alternative means, and it has tailored its order to meet the force of those threats." *Id.*

The Court did not explain, as it must, how nearly all public statements regarding hundreds of individuals and topics (sans three narrow carveouts) pose a "clear and present" danger to any compelling interest. Nor did the Court cite any evidence or provide any analysis to support its conclusion that less restrictive means were unavailable to address its perceived threats, and it did not address or consider any specific alternative means. The statements above were the sum total of the Court's findings regarding its constitutionally mandated task to narrowly tailor its order and exhaust all "alternative means" before gagging President Trump's speech. *Id.*

## LEGAL STANDARD

A motion for stay pending appeal is governed by four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). All four factors favor President Trump here.

**ARGUMENT**

As an initial matter, the Gag Order is an immediately appealable collateral order. Court orders restricting the freedom of expression for even "minimal" time periods impose *per se* irreparable injury. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.*" Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Gag Order, therefore, "fall[s] in that small class which finally determine claims of right separate from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *In re Rafferty*, 864 F.2d 151, 153 (D.C. Cir. 1988) (quoting *Cohen v. Beneficial Indus. Loan Corp*., 337 U.S. 541, 546 (1949)); *see also United States v. Brown*, 218 F.3d 415, 420 (5th Cir. 2000) and *Ford*, 830 F.2d at 598, both finding jurisdiction under collateral order doctrine to consider appeals by criminal defendant politicians contesting the validity of gag orders.

I.      **President Trump Is Likely to Succeed on the Merits Because the Gag Order Is Unsupported by Evidence and Violates the First Amendment's Most Basic Precepts.**

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641 (1994). The Gag Order violates these principles.

A.      **No Evidence Supports the Gag Order's Animating Concern of Preventing "Threats" and "Harassment" to Prosecutors, Court Staff, or Witnesses.**

The Gag Order cites no evidence supporting its findings of risks of harassment and witness intimidation, and the prosecution provided none. *See* Doc. 105, at 1-3. When defense counsel

pointed out at oral argument that "[t]he government had every opportunity to get affidavits from Mr. Barr, General Milley, or Mr. Raffensperger" (supposedly "intimidated" witnesses), the Court responded, "Why should they have to?" Oct. 16, 2023 Tr. ("Tr."), at 57. Then, when the Court asked the prosecution, "What is your response to Mr. Lauro's criticism that you didn't provide any affidavits from either Mr. Barr or General Milley?" the prosecution admitted, "*of course this prejudice is speculative*." Tr. 62.

Not only is the prosecution's argument "speculative," it is poor speculation at that. The witnesses that third parties listening to President Trump have supposedly intimidated—former Vice President Pence, former Attorney General Barr, and former Chairman of the Joint Chiefs of Staff Mark Milley—are extremely high-level public figures who have voluntarily entered the public arena and invited the cut and thrust of public debate by openly criticizing President Trump. Thus, the prosecution's speculation that these witnesses will be "intimidated" by President Trump's criticism is non-credible on its face.

In any event, basing an extraordinary gag order on a Presidential candidate based solely on the prosecution's "speculation," Tr. 62, is insupportable. In *Nebraska Press Association v. Stuart*, the Supreme Court emphasized "that prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights. . . . A prior restraint . . . has an immediate and irreversible sanction." 427 U.S. 539, 559 (1976).  "The damage can be particularly great when the prior restraint falls upon the communication of news and commentary on current events. Truthful reports of public judicial proceedings have been afforded special protection against subsequent punishment." *Id.* "For the same reasons the protection against prior restraint should have particular force as applied to reporting of criminal proceedings." *Id.*

Because of these First Amendment principles, the Court held that proponents of prior restraints on speech regarding pending criminal proceedings bear "the heavy burden of demonstrating, in advance of trial, that without prior restraint a fair trial will be denied." *Id.* at 569. The Supreme Court made clear that this "heavy burden" is typically an *evidentiary* burden. Focusing on "whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity," *id.* at 562, the Court held that the prior restraint was unjustifiable due to the lack of evidence to support a finding on that question: "We find little in the record that goes to another aspect of our task, determining whether measures short of an order restraining all publication would have insured the defendant a fair trial." *Id.* at 563. The lack of evidence was fatal to the prior restraint in that case: "There is no finding that alternative measures would not have protected [the defendant's] rights, and the Nebraska Supreme Court did no more than imply that such measures might not be adequate. Moreover, *the record is lacking in evidence to support such a finding*." *Id.* at 565 (emphasis added).

So also here, "the record is lacking in evidence to support" a finding that President Trump's well-known use of rhetoric will intimidate or result in unknown third parties harassing any witness, prosecutor, or court personnel. *Id.* For this reason alone, the unprecedented Gag Order, resting on what the prosecution openly admits are "speculative" concerns, is unlikely to be upheld on appeal. Tr. 62.

**B.    The Gag Order Is a Content-Based Prior Restraint on Core Political Speech.**

In addition, the Gag Order violates a long series of First Amendment doctrines. First, it violates three of the First Amendment's most fundamental precepts at once: It is a (1) content-based (2) prior restraint on (3) core political speech.

10

"Speech on matters of public concern is at the heart of the First Amendment's protection. That is because speech concerning public affairs is more than self-expression; it is the essence of self-government. Accordingly, speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (cleaned up) (citing numerous cases). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id.* at 452-53.

Needless to say, the indictment herein is of enormous public concern and a central issue in the upcoming election. Thus, President Trump's opinions of the prosecution, the government officials pursuing him, and the witnesses against him are all core political statements entitled to the highest degree of deference. *See Ford*, 830 F.2d at 599 ("A criminal defendant awaiting trial in a controversial case has the full power of the government arrayed against him and the full spotlight of media attention focused upon him. The defendant's interest in replying to the charges and to the associated adverse publicity, thus, is at a peak.").

Indeed, President Trump's speech in support of his re-election campaign—which is inextricably intertwined with this prosecution and his defense—lies "at the core of our electoral process of the First Amendment freedoms—an area . . . where protection of robust discussion is at its zenith." *Meyer v. Grant*, 486 U.S. 414, 425 (1988) (citations and quotations omitted); *see also Buckley v. Am. Const. Law Found., Inc*., 525 U.S. 182, 186–87 (1999); *McIntyre v. Ohio Elec. Comm'n*, 514 U.S. 334, 347 (1995) ("[C]ore political speech" encompasses any "advocacy of a politically controversial viewpoint." "No form of speech is entitled to greater constitutional protection than" core political speech.).

Second, as a content-based restriction on President Trump's speech, the Gag Order is uniquely "obnoxious" to the First Amendment. *Hill v. Colorado*, 530 U.S. 703, 723 (2000). The "rationale of the general prohibition" against *content*-based regulation "is that content discrimination raises the specter that the Government may effectively drive certain ideas or *viewpoints* from the marketplace." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992) (emphasis added and quotation marks omitted).

Here, The Biden Administration seeks to bar President Trump from speaking because it does not want the public to hear what its opponent has to say. That is a quintessential violation of the First Amendment. If our freedom of speech is to mean anything, the Court cannot allow the prosecution to silence the leading Presidential candidate whose speech and message are politically threatening to the incumbent President.

Third, as noted above, prior restraints are "the most serious and least tolerable infringement on First Amendment rights." *Neb. Press Ass'n*, 427 U.S. at 559. A government restriction on speech whose "object . . . is not punishment but suppression" constitutes a *de facto* prior restraint. *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 703, 711–12 (1931). The Gag Order is a quintessential prior restraint.

### C.     The Gag Order Interferes with President Trump's Ability to Campaign for Public Office, Inflicting the Highest Levels of First Amendment Injury.

The First Amendment's "constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)). There can be no greater application of this principle than to a campaign for the Presidency, the highest office in the United States.

Previous cases addressing gag orders on criminal defendants have uniformly deferred to these "most urgent" First Amendment interests to decline to impose virtually *any* restriction on a political candidate's speech during an ongoing political campaign. In *United States v. Ford*, reversing a similar gag order, the Sixth Circuit emphasized the paramount importance of permitting a criminal defendant who was campaigning for public office to speak publicly about the case and criticize the prosecution against him in the most robust terms. 830 F.2d 596, 597 (6th Cir. 1987). The Sixth Circuit emphasized the importance of the "divisive political context of this case" as a compelling reason *not* to muzzle the defendant:

> The protection of political speech which concerned the court in *Near* [*v. Minnesota ex rel. Olson*] is at the core of the First Amendment. Here the defendant, a Democrat, a black congressman who represents a largely black constituency in Memphis, *is entitled to attack the alleged political motives of the Republican administration which he claims is persecuting him because of his political views and his race*. One may strongly disagree with the political view he expresses but have no doubt that he has the right to express his outrage. *He is entitled to fight the obvious damage to his political reputation in the press and in the court of public opinion, as well as in the courtroom and on the floor of Congress. He will soon be up for reelection. His opponents will attack him as an indicted felon*. He will be unable to respond in kind if the District Court's order remains in place. *He will be unable to inform his constituents of his point of view. And reciprocally, his constituents will have no access to the views of their congressman on this issue of undoubted public importance.*

*Id.* at 600–01 (emphases added). The very same reasoning applies here. Even commentators politically opposed to President Trump observe that the issues raised in this criminal case are "central to [Biden's] re-election argument."[2] A court order preventing President Trump from "targeting" (whatever that means, *see infra*) the prosecutors against him or witnesses to his case (some of whom are political opponents campaigning against him and/or writing books opposing him) through core political speech is intolerable. President Trump "will soon be up for reelection"

---

[2] Kevin Liptak, et al., *Trump's Third Indictment Is the Most Personal – and Trickiest – One for Biden*, CNN.COM (Aug. 2, 2023), available at https://www.cnn.com/2023/08/02/politics/joe-biden-donald-trump-indictment/index.html.

and "is entitled to fight the obvious damage to his political reputation in the press and in the court of public opinion." *Ford*, 830 F.2d at 601; *see also Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1043 (1991) ("A defense attorney may pursue lawful strategies to obtain dismissal of an indictment or reduction of charges, including an attempt to demonstrate in the court of public opinion that the client does not deserve to be tried.").

The Fifth Circuit in *Brown* applied virtually the same reasoning. 218 F.3d 415. In *Brown*, a gag order was imposed, but "the district court temporarily lifted the gag order in this case to avoid interfering with Brown's re-election campaign for [Louisiana] Insurance Commissioner." *Id.* at 419. Though the Fifth Circuit upheld a speech restriction *post-campaign*, it was essential to *Brown*'s reasoning that the district court had suspended its gag order on the defendant during the course of his political campaign, so that he "was able to answer, without hindrance, the charges of his opponents regarding his indictment throughout the race." *Id.* at 430. The Fifth Circuit reasoned that this suspension was necessary, as the gag order would have otherwise wrongly prevented Brown from being "able to answer, without hindrance, the charges of his opponents regarding his indictment throughout the race." *Id.* In reaching this conclusion, the Fifth Circuit acknowledged that "[t]he urgency of a campaign . . . may well require that a candidate, for the benefit of the electorate as well as himself, have absolute freedom to discuss his qualifications." *Id.*

The Gag Order here violates this guidance. It prevents President Trump from discussing core political themes that are central to his campaign message and prevents him from criticizing speakers who are openly criticizing him in campaign events, media appearances, public statements, and even books—such as former Attorney General Barr, General Milley, and former Vice President Pence. It blocks him from criticizing the Special Prosecutor, whom President Trump views as a key player in the political persecution against him. In fact, the Court repeatedly stated

that it would *not* give any consideration at all to the fact that President Trump is running a political campaign during this prosecution. *See, e.g.,* Tr. 83 ("I cannot imagine any other criminal case in which a defendant is permitted to call the prosecutor 'deranged' or 'a thug,' and I will not permit it here simply because the defendant is running a political campaign."); *see also* Tr. 17 (expressing doubt that "the fact that Mr. Trump is running for president and his corresponding need to speak freely somehow entitles him to make statements that would otherwise be" not permitted). This was error.

### D.     The Gag Order Gives No Weight to the First Amendment Rights of President Trump's Audiences to Receive His Messages.

Under the First Amendment, violating the rights of a speaker inflicts an equal and reciprocal constitutional injury on the *listener*. "Freedom of speech presupposes a willing speaker. But where a speaker exists, . . . the protection afforded is to the communication, *to its source and to its recipients both*." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) (emphasis added) (collecting many cases); *see also, e.g., Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 390 (1969) ("It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount."); *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (recognizing the right to "speak and listen, and then ... speak and listen once more," as a "fundamental principle of the First Amendment"); *Missouri v. Biden*, -- F.4th --, No. 23-30445, 2023 WL 6425697, at *11 (5th Cir. Oct. 3, 2023) (holding that the "right to listen is 'reciprocal' to the ... right to speak" and "constitutes an independent basis" for relief). Thus, injuring President Trump's ability to speak injures the First Amendment rights of over 100 million Americans who listen to him, respond to him, and amplify his message.

Like the right to speak, this right of listeners to receive President Trump's message is at its peak in the context of a political campaign, especially for the Presidency. *See Susan B. Anthony*

*List*, 573 U.S. at 162. Both the Sixth Circuit in *Ford* and the Fifth Circuit in *Brown* recognized this paramount interest. In *Ford*, the court emphasized that, if Congressman Ford were silenced, "reciprocally, his constituents will have no access to the views of their congressman on this issue of undoubted public importance." 830 F.2d at 601. Likewise, the *Brown* court held that "[t]he urgency of a campaign … may well require that a candidate, *for the benefit of the electorate as well as himself*, have absolute freedom to discuss his qualifications." 218 F.3d at 430 (emphasis added).

The First Amendment interests of a Presidential candidate's audiences are especially pressing in the case of President Trump, who is unique as a former President, a front-running candidate for future Presidency, and the leader of a transformative political movement with an historical impact on American politics. As Justice Robert H. Jackson wrote, the President constitutes "a single head in whose choice the whole Nation has a part, making him the focus of public hopes and expectations. In drama, magnitude and finality his decisions so far overshadow any others that almost alone he fills the public eye and ear. No other personality in public life can begin to compete with him in access to the public mind through modern methods of communications." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 653 (1952) (Jackson, J., concurring). This is particularly true of President Trump, one of the most dominant and influential communicators in modern American history. Silencing President Trump's core political speech inflicts an incalculable First Amendment injury that directly impacts over 100 million Americans.[3]

---

[3] President Trump unquestionably has third-party standing to defend the rights of his audiences in this context. The Supreme Court is "quite forgiving" of third-party standing requirements "[w]ithin the context of the First Amendment." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). The First Amendment's overbreadth doctrine, for example, relieves the third-party plaintiff of the burden to show the usual "close relationship" and "hindrance" required by the third-party standing doctrine,

This Court gave no significant consideration to the First Amendment rights of President Trump's audiences. The Gag Order does not mention them, and the prosecution ignored them. At oral argument, when counsel for President Trump sought to assert these interests, the Court interrupted counsel and unfairly accused him of making speeches to "an audience other than me." Tr. 44 (Mr. Lauro: "And what the government is proposing here is an order not just directed against President Trump but *against the American electorate that wants to hear from President Trump under these circumstances*." The Court: "Mr. Lauro, no. I'm going to interrupt you. . . . Obviously, you have an audience other than me in mind."); *see also* Tr. 59-60 (Mr. Lauro: "And President Trump in the middle of a campaign is entitled to put the spotlight on it. The American people are entitled to understand that and understand the consequences of that." The Court: "No.").

In fact, both before issuance and in the two days since, the Gag Order has received widespread criticism on this very ground—including from political opponents and critics of President Trump who nevertheless defend his right to disseminate his messages to his audiences.

---

*id.*; instead, Article III injury is all that is required. *See id.*; *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1586 (2020) (Thomas, J., concurring) ("Litigants raising overbreadth challenges rarely satisfy either requirement ['close relationship' and 'hindrance'], but the Court nevertheless allows third-party standing.") (citing *Dombroski v. Pfister*, 380 U.S. 479, 487 (1965)); *N.J. Bankers Ass'n v. Att'y Gen.*, 49 F.4th 849, 860 (3d Cir. 2022) (noting that "the requirement that an impediment exist to the third party asserting his . . . own rights" does not apply when the challenged government action "substantially abridges the First Amendment rights of other parties not before the court"). Further, as the Supreme Court held in *Bantam Books Inc. v. Sullivan*, it is particularly important to allow third-party standing to vindicate First Amendment interests because "freedoms of expression … are vulnerable to gravely damaging yet barely visible encroachments" and must be protected by "the most rigorous procedural safeguards." 372 U.S. 58, 66 (1963); *see also id.* at 64 n.6 (upholding the third-party standing of book publishers to assert the rights of distributors because "[t]he distributor … is not likely to sustain sufficient economic injury to induce him to seek judicial vindication of his rights," whereas the seller has a "greater . . . stake" in vindicating those rights). In addition, the doctrine of third-party standing applies "when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Kowalski*, 543 U.S. at 130. Here, the interference and restriction of President Trump's First Amendment rights "would result indirectly in the violation of third parties' rights," *id.—i.e.*, the rights of his audiences to receive, respond to, and amplify his speech.

*See, e.g.,* The Editors, *The Trump Gag Order Goes Too Far*, NATIONAL REVIEW (Oct. 18, 2023) ("Not only is free speech his right — it is the right of voters in the forthcoming primary and general elections to hear it before choosing the nation's next president."); Andrew McCarthy, *The Trump Gag Order Is Judicial Overkill*, NATIONAL REVIEW (Oct. 17, 2021) ("He'd have that right even if he wasn't a political candidate; the fact that he is one heightens the court's duty to minimize the intrusion of judicial process on the electoral process."); Isaac Arnsdorf et al., *In Trump Cases, Experts Say Defendant's Rhetoric Will Be Hard To Police*, WASHINGTON POST (Aug. 23, 2023) (quoting Barbara McQuade, a University of Michigan law professor and former U.S. attorney, as stating, "Any judge would be very reluctant to jail a candidate for president, not only to protect the candidate's First Amendment rights, but to permit voters access to the defendant's statements as they decide how to cast their ballots . . ."); Jason Willick, *Go Ahead, Silence Donald Trump*, WASHINGTON POST (Sept. 19, 2023) ("[A] gag order against Trump would represent 'the first time that a federal judge imposed meaningful limits on the statements and freedom of a major presidential candidate.' Not only that, but it also would represent the first time an incumbent administration has imposed a limit on the freedom of an opposing candidate to *criticize the administration he is trying to replace*.").

The refusal to consider the First Amendment rights of over 100 million Americans entails that the Gag Order is unlikely to withstand scrutiny on appeal.

### E.   The Gag Order Imposes an Impermissible Heckler's Veto on President Trump Without Any Evidence of a Heckler.

The Gag Order's animating concern is the fear that President Trump's criticisms of the prosecutors, witnesses, and court staff might inspire unspecified, independent *third parties* to direct "threats" or "harassment" to those criticized by President Trump. This is the central justification stated in the Gag Order itself. *See* Doc. 105, at 2. And the Court repeatedly emphasized

this concern during oral argument on the motion. *See, e.g.,* Tr. 41 ("[A] defendant's targeted disparagement of government officials can go from permissible criticism of those officials to encouraging harm against them. 'Will no one rid me of this meddlesome priest' comes to mind."); Tr. 44-45 (Court suggesting that President Trump's use of the word "thug" to describe prosecutors "frankly risks a real possibility of violence"); Tr. 59-60, 62, 68, 79 (similar). Like the prosecution's other concerns, these concerns about acts of "harassment" from third parties are "speculative." Tr. 62 (Government attorney: "of course this prejudice is speculative").

The Court did not hold, and the prosecution does not contend, that any of President Trump's public statements constitute "fighting words" or incitement to imminent lawless action. *See, e.g., Counterman v. Colorado*, 600 U.S. 66, 73 (2023) (noting that "incitement—statements directed at producing imminent lawless action, and likely to do so," is not protected by the First Amendment) (cleaned up) (quoting *Brandenburg*, 395 U.S. at 447). Nor could they. Accordingly, the Gag Order restricts First Amendment-protected speech based on a speculative *reaction* to that speech by independent third parties. *See* Doc. 105, at 2.

This is a quintessential heckler's veto, which is anathema to the First Amendment. "Participants in an orderly demonstration in a public place are not chargeable with the danger, unprovoked except by the fact of the constitutionally protected demonstration itself, that their critics might react with disorder or violence." *Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966) (opinion of Fortas, J.). Where the evidence "showed no more than that the opinions which [the speakers] were peaceably expressing were sufficiently opposed to the views of the majority of the community to attract a crowd and necessitate police protection," the Supreme Court held that the anticipated reaction of the audience—even if unruly or violent—could not justify silencing the speaker: "[T]he compelling answer is that constitutional rights may not be denied simply because

of hostility to their assertion or exercise." *Cox v. Louisiana*, 379 U.S. 536, 551 (1965) (cleaned up)

(citing *Edwards v. South Carolina*, 372 U.S. 229, 237 (1963), and *Watson v. City of Memphis*, 373

U.S. 526, 535 (1963)); *see also, e.g., Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134-

35 (1992) ("Speech cannot be . . . punished or banned, simply because it might offend a hostile

mob."); *Collin v. Chicago Park Dist.*, 460 F.2d 746, 754 (7th Cir. 1972) ("As to the possibility of

there being hostile audience members causing violence, the law is quite clear that such

considerations are impermissible in determining whether to grant permits" to speak). Even if

unidentified third parties might react to President Trump's statements with "disorder and

violence," *Brown*, 383 U.S. at 133 n.1—which no evidence supports—that "fact" alone cannot

justify a prior restraint.

### F.   The Gag Order Relies on Supreme Court Cases Protecting Criminal Defendants' Civil Rights to Silence the Criminal Defendant Here.

To support the Gag Order, the Court cited two cases: *Sheppard v. Maxwell*, 384 U.S. 333

(1966), and *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984). Doc. 105, at 1. These cases,

however, justify restrictions on speech about criminal proceedings for the purpose of protecting

the *criminal defendant's* right to a fair trial under the Sixth Amendment and the Due Process

Clause. *Sheppard* focused entirely on protecting the rights of the criminal defendant. It addressed

how to balance the free-speech rights of *others* to avoid violating the *defendant's* fundamental

right to a fair trial. *Sheppard* concerned "the trial judge's failure to protect Sheppard sufficiently

from the massive, pervasive and prejudicial publicity that attended his prosecution." 384 U.S. at

335. It decried prejudicial communications from prosecutors to the media and the carnival-like

atmosphere of media pervading the trial as invading the defendant's Sixth Amendment and Due

Process rights. *Id.* at 338-348. It "insisted that *no one be punished for a crime* without 'a charge

fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement, and

tyrannical power.'" *Id.* at 350 (quoting *Chambers v. State of Florida*, 309 U.S. 227, 236-237 (1940)). It held that "the presence of the press at judicial proceedings must be limited when it is apparent that *the accused* might otherwise be prejudiced or disadvantaged." *Id.* at 358 (emphasis added). It emphasized that the trial court should have protected "the accused," *id.*, by controlling the *government's* communications with the media: "the judge should have further sought to alleviate this problem by imposing control over the statements made to the news media by counsel, witnesses, and *especially the Coroner and police officers*," *id.* at 360 (emphasis added). The dominating concern was to protect *Sheppard*'s right to a fair trial: "*Sheppard's right to a trial free from outside interference* would have been given added protection without corresponding curtailment of the news media." *Id.* at 362 (emphasis added). "Due process requires that *the accused* receive a trial by an impartial jury free from outside influences. . . . [T]he trial courts must take strong measures to ensure that the balance is never weighed against *the accused*." *Id.* (emphasis added).

*Seattle Times*, though it concerned a restriction on civil discovery, emphasized the same point—that restrictions on free speech relating to criminal cases are designed to protect the rights of the *accused*. There, the Court stated: "For instance, on several occasions this Court has approved restriction on the communications of trial participants where necessary *to ensure a fair trial for a criminal defendant*." 467 U.S. at 32 n.18 (citing *Nebraska Press Ass'n*, 427 U.S. at 563). And *Nebraska Press Association*, which *Seattle Times* cited for this point, is even more emphatic; it repeatedly emphasizes that the only thing warranting restrictions on free-speech rights in the criminal process are the Sixth Amendment and Due Process rights of the *criminal defendant*. *See Nebraska Press Ass'n*, 427 U.S. at 551 ("In essence, the right to jury trial guarantees to the *criminally accused* a fair trial by a panel of impartial, 'indifferent' jurors.") (citation omitted); *id.*

("[W]hen the case is a 'sensational' one tensions develop between *the right of the accused* to trial by an impartial jury and the rights guaranteed others by the First Amendment."); *id.* at 552 ("In *Sheppard v. Maxwell*, the Court focused sharply on the impact of pretrial publicity and a trial court's duty to protect *the defendant's* constitutional right to a fair trial."); *id.* at 553 ("Due process requires that *the accused* receive a trial by an impartial jury free from outside influences."); *id.* at 555 (a trial judge's actions "may well determine whether *the defendant* receives a trial consistent with the requirements of due process"); *id.* at 556 (addressing "restrictive orders entered to protect *a defendant's* right to a fair and impartial jury") (all emphases added). *Nebraska Press Association* properly framed the question as the conflict between the *accused*'s Sixth Amendment rights and the First Amendment rights of others, especially news media: "The authors of the Bill of Rights did not undertake to assign priorities as between First Amendment and Sixth Amendment rights, ranking one as superior to the other. In this case, the petitioners would have us declare the right of *an accused* subordinate to their right to publish in all circumstances." *Id.* at 561.

For these reasons, in *Ford*, the Sixth Circuit categorically rejected attempts to muzzle the *defendant* based on cases protecting the *defendant*'s civil rights:

> It is true that permitting an indicted defendant like Ford to defend himself publicly may result in overall publicity that is somewhat more favorable to the defendant than would occur when all participants are silenced. This does not result in an "unfair" trial for the government, however. *It is the individual defendant to whom the Sixth Amendment guarantees a fair trial.* It is the public to whom the First Amendment guarantees reasonable access to criminal proceedings. *And it is individuals, not the government, to whom First Amendment interests attach.* To the extent that publicity is a disadvantage for the government, the government must tolerate it. The government is our servant, not our master.

830 F.2d at 600 (emphasis added). This logic applies with special force here, where President Trump faces trial in a venue that is already heavily tilted against him. In the most recent election,

District of Columbia residents voted against President Trump in overwhelming margins.[4] The District of Columbia has been subject to pervasive media coverage of the events of January 6, 2021, which the Special Counsel has outrageously linked with this indictment, even though President Trump is not charged with any legal responsibility for those events. President Trump's indictment and the progress of this case have been subject to wall-to-wall media coverage in the District of Columbia, which has been overwhelmingly negative for President Trump, and driven, in substantial part, by apparent leaks from the prosecution. Not surprisingly, polls indicate that almost *two thirds* of D.C. residents have pre-judged President Trump's guilt—a number that is "well above the national average."[5]  In these circumstances, the notion—rejected by the Court— that extraordinary restrictions on *President Trump*'s speech are necessary to ensure that *the prosecution* can get a fair trial in the District of Columbia is meritless to say the least.

### G.   The Gag Order Restricts Statements About Public Figures, Who Are Entitled to Minimal Protection from Public Criticism Under the First Amendment.

The Gag Order shields from *any* criticism high-level public officials and public figures. Doc. 105, at 3. These include the Special Prosecutor and his team, senior government officials who have volunteered to prosecute one of the highest-profile criminal cases in American history, and thus have "thrust" themselves "into the vortex of this public issue." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974). These also include possible witnesses against President Trump, such as Vice President Pence, Attorney General Barr, and General Milley, who are avowed political opponents of President Trump from the very highest echelons of government—all of whom have

---

[4]  *See, e.g.,* Washington, D.C. Presidential Results, POLITICO (Jan. 6, 2021), *at* https://www.politico.com/2020-election/results/washington-dc/ (reporting that 93 percent of voters in the District of Columbia voted against President Trump).

[5]  Ankush Khardori, *Some Free Legal Advice for Donald Trump, From the Jury Experts*, POLITICO (Oct. 13, 2023), *at* https://www.politico.com/news/magazine/2023/10/13/trump-jurors-dc-trial-00121184 (noting that "[a] recent poll found that 64 percent of D.C. residents believe Trump is guilty — well above the national average").

publicly criticized President Trump for years, including writing whole books about him to profit from their public criticism. *Id.*

Criticism of such public officials lies "at the very center of the constitutionally protected area of free discussion" and so such criticisms "must be free, lest criticism of government itself be penalized." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966). Likewise, the Special Prosecutor and his team are public officials, subject to criticism in a free society. The Ninth Circuit, for example, has said that the discussion of an individual's "activities as a prosecutor" renders him a public official. *Crane v. Ariz. Republic*, 972 F.2d 1511, 1525 (9th Cir. 1991). Likewise, the head of a federal task force is a public official. *See id.* at 1524. The Minnesota Supreme Court has held that a county attorney is a public official. *Diesen v. Hessburg*, 455 N.W.2d 446, 450 (Minn. 1990). And the Georgia Supreme Court held that a county's public defender for misdemeanor crimes is a public official. *ACLU, Inc. v. Zeh*, 864 S.E.2d 422, 437-38 (Ga. 2021). Even an assistant state's attorney is likely a public official that courts may not shield from criticism. *Mandel v. Bos. Phoenix, Inc.*, 456 F.3d 198, 206 (1st Cir. 2006) (noting the dearth of authority but concluding that "[w]hat little case law there is suggests that such a person might be a public official").

### H.   Prior Restraints Must Be Clear and Specific, and the Gag Order Is Unconstitutionally Vague.

The Gag Order suffers from another fatal defect—unconstitutional vagueness. The Supreme Court imposes exacting standards of clarity on prior restraints, because they are "the most serious and the least tolerable infringement on First Amendment rights," and "one of the most extraordinary remedies known to our jurisprudence." *Nebraska Press Ass'n*, 427 U.S. at 559, 562. In holding that the gag order at issue in *Nebraska Press Association* was "too vague and too broad to survive the scrutiny we have given to restraints on First Amendment rights," *id.* at 568, the Supreme Court cited a series of cases applying the strictest possible scrutiny to questions of

vagueness in speech restrictions. *See, e.g., Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 620 (1976) ("The general test of vagueness applies with particular force in review of laws dealing with speech. Stricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech.") (modifications omitted); *Buckley v. Valeo*, 424 U.S. 1, 77 (1976) ("Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal. . . . Where First Amendment rights are involved, an even 'greater degree of specificity' is required."); *NAACP v. Button*, 371 U.S. 415, 432 (1963) ("[S]tandards of permissible statutory vagueness are strict in the area of free expression.") (all cited in *Nebraska Press Ass'n*, 427 U.S. at 568).

Under these heightened standards, the Gag Order is unconstitutionally vague in multiple respects. First, the central operative verb in the prohibition, "target," is vague. *See* Doc. 105, at 3 (prohibiting "the parties and their counsel . . . from making any public statements . . . that *target*" a series of persons). The verb "target" has a wide range of possible meanings in this context. To "target" means "to make a target of," whereas the noun "target" may mean "a mark to shoot at," "something or someone marked for attack," "a goal to be achieved," "an object of ridicule or criticism," or "something or someone to be affected by an action or development," among several other meanings. *Target*, Merriam-Webster Online, at https://www.merriam-webster.com/dictionary/target. Thus, public statements that "target" the listed persons could include (1) *any* statement that refers to them in any way (*i.e.*, any "mark to shoot at"), *id.*; (2) any statements that "attack" them in any way—where the question whether a statement "attacks" someone raises its own vagueness problems, *id.*; (3) any statement that subjects any person to "ridicule or criticism" of any kind, *id.*—where again, the question whether a statement constitutes "ridicule" or "criticism" raises its own host of vagueness problems; and/or (4) any statement that

might "affect" a person in any way (*i.e.*, "someone to be affected by an action"), *id.*; among many other possible meanings. This is textbook vagueness. *Compare, e.g., Nebraska Press Ass'n*, 427 U.S. at 568 (holding that the word "implicative" in a pretrial gag order was unconstitutionally vague). Moreover, under the Supreme Court's exacting vagueness scrutiny, the Court must *not* presume that a narrower meaning was intended—which entails that the Gag Order is also unconstitutionally overbroad, as it must be construed to prevent *any* statement of *any* kind referring to any of these people in any way. *See Button*, 371 U.S. at 432 ("If the line drawn by the decree between the permitted and prohibited activities of the NAACP, its members and lawyers is an ambiguous one, *we will not presume that the statute curtails constitutionally protected activity as little as possible*. For standards of permissible statutory vagueness are strict in the area of free expression.") (emphasis added).

The Gag Order suffers from other vagueness problems as well. It applies to all "interested parties," which (it clearly implies) include parties *in addition to* "the parties and their counsel." Doc. 105, at 3 ("All interested parties in this matter, including the parties and their counsel, are prohibited. . . ."). An "interested" party is one "affected or involved" by the proceedings. *Interested*, Merriam-Webster Online, *at* https://www.merriam-webster.com/dictionary/interested (defining "interested" as "being affected or involved: *interested* parties"). Thus, the Gag Order might apply to everyone "affected" by or "involved" in the case—which could possibly include the media covering it, the potential witnesses, the prosecutors, the Department of Justice, President Trump's attorneys in other cases, the Trump campaign, the Biden campaign, and virtually every American voter.

Likewise, the Gag Order's reference to "any reasonably foreseeable witness" and "the substance of their testimony" is incurably vague. The discovery in this case comprises over 10

million pages, and the prosecution has not disclosed a witness list. It is anyone's guess which witnesses may be "reasonably foreseeable" at this stage. Unless and until the witnesses are called, President Trump will have to guess what the "substance of their testimony" may involve—but the Gag Order binds him *now*. The vagueness doctrine prevents the Court from enforcing these standards *ex post*, with the benefit of hindsight, or imposing the Court's standardless judgment as to which witnesses are "reasonably foreseeable" after the fact. Instead, when it comes to the Gag Order's scope, "men of common intelligence must necessarily guess at its meaning," rendering it fatally vague. *Hynes*, 425 U.S. at 620 (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391 (1926)).

The Gag Order's carve-outs exacerbate the vagueness problems by imposing new layers of confusion upon the Order. Doc. 105, at 3. The carve-outs seem to authorize "criticizing the government generally, including the current administration or the Department of Justice," but that does not seem to include criticizing the most relevant figure of the Department of Justice, *i.e.*, Jack Smith. *Id.* The carve-outs supposedly allow President Trump to state "that his prosecution is politically motivated," but the Gag Order prevents him from "targeting" the specific actors *involved* in his prosecution, so it prevents him from giving any specific or detailed *justification* for this claim. *Id.* Where claiming that the prosecution is politically motivated ends, and "targeting" the prosecutors against President Trump begins, is anyone's guess. The carve-outs apparently authorize "statements criticizing the platforms or policies of . . . former Vice President Pence," *id.*, but the "platforms or policies" of candidates like Pence (and Biden) are deeply intertwined with their views on *election integrity*, with specific reference to the 2020 election. When does criticism of Mike Pence's "platforms or policies" become a statement "that target[s] . . . the substance of [his] testimony," *id.*, when questions about the integrity of the 2020 election are "central" to the

27

2024 Presidential campaign? Liptak, *supra*. Persons of ordinary intelligence must guess at the answers to these questions.

Again, attempting to adopt a narrowing construction of the Gag Order's staggeringly broad, vague language cannot cure it. *Button*, 371 U.S. at 432. Therefore, the Court should stay its application pending appeal.

**I.      The Gag Order Gives No Meaningful Consideration to the Availability of Less Restrictive Means to Protect the Judicial Process.**

Finally, the Gag Order gives no meaningful consideration to alternative, less restrictive measures, including a narrower order. Doc. 105, at 1-3. The prosecution submitted no evidence on the efficacy of such alternative measures, and the Court made no specific findings on them. *See id.* Indeed, the Court failed to provide any explanation for why the specific, extraordinarily broad, scope of the Gag Order was required to serve the asserted interest, and why no narrower formulation would suffice.

This was error. "It is axiomatic that the limitation on First Amendment freedoms must be 'no greater than is essential to the protection of the particular governmental interest involved.'" *Brown*, 218 F.3d at 429 (quoting *Procunier v. Martinez*, 416 U.S. 396 (1974)); *see also Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984) (considering "whether the limitation of First Amendment freedoms is no greater than is necessary or essential to the protection of the particular governmental interest involved").

Thus, the Supreme Court cases addressing such restraints repeatedly emphasize the necessity of considering alternative means, including non-speech-restrictive means. For example, to the extent a restriction is intended to protect the defendant's right to a fair trial (which, again, is a right belonging to the defendant), numerous options are available. The Supreme Court in *Sheppard* emphasized that a lower court's failure to consider these other options is error:

"Sheppard was not granted a change of venue to a locale away from where the publicity originated; nor was his jury sequestered. . . . On the contrary, the Sheppard jurors . . . were allowed to go their separate ways outside of the courtroom, without adequate directions not to read or listen to anything concerning the case." 384 U.S. at 352–53. The trial judge in *Sheppard* erred in failing to adopt (or even consider) such alternatives: "Since he viewed the news media as his target, the judge never considered other means that are often utilized to reduce the appearance of prejudicial material and to protect the jury from outside influence. We conclude that these procedures would have been sufficient to guarantee Sheppard a fair trial." *Id.* at 358. Thus, "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity. In addition, sequestration of the jury was something the judge should have raised *sua sponte* with counsel. If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered." *Id.* at 363.

*Nebraska Press Association*, likewise, placed heavy emphasis on the necessity of considering such less speech-restrictive measures. 427 U.S. at 562 (considering "whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity"). As noted above, *Nebraska Press Association* emphasized the importance of evidence and specific findings of fact to support the trial court's conclusions on this very point: "We find little in the record that goes to another aspect of our task, determining whether measures short of an order retraining all publication would have insured the defendant a fair trial. . . . [T]he trial court made no express findings to that effect; the Nebraska Supreme Court referred to the issue only by implication." *Id.* at 563. Citing *Sheppard*, the Supreme Court emphasized the wide range of alternative measures:

> Most of the alternatives to prior restraint of publication in these circumstances were discussed with obvious approval in *Sheppard v. Maxwell*: (a) change of trial venue to a

place less exposed to the intense publicity. . .; (b) postponement of the trial to allow public attention to subside; (c) searching questioning of prospective jurors . . . to screen out those with fixed opinions as to guilt or innocence; (d) the use of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court. Sequestration of jurors is, of course, always available. Although that measure insulates jurors only after they are sworn, it also enhances the likelihood of dissipating the impact of pretrial publicity and emphasizes the elements of the jurors' oaths.

*Id.* at 563–64. The failure to consider, receive evidence on, and make findings relating to such alternative measures was fatal to the trial court's gag order: "There is no finding that alternative measures would not have protected [defendant's] rights. . . . Moreover, the record is lacking in evidence to support such a finding." *Id.* at 565; *see also Ford*, 830 F.2d at 600.

Here, the Gag Order gave no specific consideration of such alternative measures such as (1) change of venue, (2) postponement of trial, (3) searching voir dire, (4) clear jury instructions, and (5) jury sequestration, among other possibilities. Doc. 105, at 1-3. No evidence was cited, none was presented, and no findings were made. *Id.* In fact, at oral argument, the Court expressed its unwillingness to consider such alternative measures in this context. *Sheppard* held that the *principal* method of addressing pretrial publicity, and by far the least restrictive, is granting a continuance of the trial: "[W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should *continue the case until the threat abates*." 384 U.S. at 362–63 (emphasis added); *see also Nebraska Press Ass'n*, 427 U.S. at 564 (raising "postponement of the trial to allow public attention to subside" as an alternative means).

Yet when President Trump's counsel proposed this very alternative, the Court categorically refused to consider it: "This trial will not yield to the election cycle and we're not revisiting the trial date." Tr. 20-21. Nor did the Court meaningfully consider any other means that would be less restrictive of President Trump's core political speech. This was error.

**II.      The Remaining Equitable Factors Overwhelmingly Favor a Stay Pending Appeal.**

Given President Trump's likelihood of success under the First Amendment, *see supra* Part I, the other equitable factors—concerning irreparable injury to President Trump, the balancing of harms, and the public interest—overwhelmingly favor a stay pending appeal.

First, President Trump's irreparable injury is established beyond doubt. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Therefore, a showing of likelihood of success on a First Amendment claim necessarily establishes irreparable injury. *Phelps–Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) (concluding that if the movant "can establish a sufficient likelihood of success on the merits of her First Amendment claim, she will also have established irreparable harm as the result of the deprivation").

As for the balancing of harms and the public interest, "[i]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013). Furthermore, the balance of hardships and public interest "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), and "it is always in the public interest to prevent violation of a party's constitutional rights," *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001). As a result, the demonstration of an ongoing violation of First Amendment rights dictates that a stay should be entered. *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) ("[I]n First Amendment cases, only one question generally matters to the outcome: Have the plaintiffs shown a likelihood of success on the merits of their First Amendment claim?") (citing *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 482 (6th Cir. 2020)).

Here, President Trump is likely to prevail on appeal in his claim that the Gag Order violates his First Amendment rights. This showing necessitates that (1) President Trump will suffer

irreparable injury absent a stay, (2) the prosecution will suffer no cognizable injury from a stay because it has no valid interest in violating President Trump's First Amendment rights, and (3) the public interest overwhelmingly favors a stay vindicating President Trump's First Amendment rights—*especially* where the First Amendment right to *listen* of over 100 million Americans is also at stake. The Court should grant a stay pending appeal.

## CONCLUSION

For the reasons stated, the Court should stay the Gag Order, Doc. 105, pending the conclusion of all appellate proceedings challenging it. The Court should also immediately enter a temporary administrative stay to remain in effect pending ruling by this Court and (if necessary) the Court of Appeals and/or the Supreme Court on President Trump's motion(s) for stay pending appeal. *See, e.g., In re Sealed Case No. 99-3091*, 192 F.3d 995, 998-99 (D.C. Cir. 1999) (per curiam); *In re Sealed Case*, 148 F.3d 1079, 1080 (D.C. Cir. 1998) (per curiam); *United States v. Ford Motor Co.*, 574 F.2d 534, 538 (D.C. Cir. 1978) (all granting such administrative stays); *In re Abbott*, 800 F. App'x 296, 298 (5th Cir. 2020) ("Entering temporary administrative stays so that a panel may consider expedited briefing in emergency cases is a routine practice in our court.").

If the Court does not enter a temporary administrative stay to permit orderly consideration of this and any subsequent stay motion(s), President Trump respectfully requests that this Court issue its ruling on this stay motion by Tuesday, October 24, 2023, after which President Trump intends to seek an emergency stay from the U.S. Court of Appeals for the D.C. Circuit. Such expedited consideration is highly warranted in a case raising First Amendment questions of enormous consequence. *See Elrod*, 427 U.S. at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

## CERTIFICATE OF CONFERRAL

Counsel for President Trump conferred with counsel for the prosecution, who advise the government opposes the relief requested herein.

Dated: October 20, 2023                     Respectfully submitted,

Todd Blanche, Esq. (PHV)                    */s/John F. Lauro*
toddblanche@blanchelaw.com                  John F. Lauro, Esq.
Emil Bove, Esq. (PHV)                       D.C. Bar No. 392830
Emil.Bove@blanchelaw.com                    jlauro@laurosinger.com
BLANCHE LAW                                 Gregory M. Singer, Esq. (PHV)
99 Wall St., Suite 4460                     gsinger@laurosinger.com
New York, NY 10005                          Filzah I. Pavalon, Esq. (PHV)
(212) 716-1250                              fpavalon@laurosinger.com
                                            LAURO & SINGER
                                            400 N. Tampa St., 15th Floor
                                            Tampa, FL 33602
                                            (813) 222-8990
                                            *Counsel for President Trump*