**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:23-cr-00257-TSC |
| DONALD J. TRUMP, | |
| *Defendant*. | |

**PRESIDENT TRUMP'S MOTION TO DISMISS THE INDICTMENT BASED ON
<u>CONSTITUTIONAL GROUNDS AND MEMORANDUM IN SUPPORT</u>**

## INTRODUCTION

The prosecution opens its indictment by stating that President Trump "had a right, like every American, to speak publicly about the election," including his deeply held view that there had been fraud and other irregularities "during the election and that he had won." Doc. 1 at ¶ 3 (Indictment). These points are not in dispute. Nonetheless, in an astonishing display of doublethink, the prosecution simultaneously claims that President Trump—simply by speaking his mind and petitioning for a redress of grievances—also somehow conspired to "defraud the United States," "oppress rights," and "obstruct an official proceeding." *Id*. at ¶ 5–6, 125–130. Attempting to explain this obvious contradiction, the prosecution argues that there was no "outcome-determinative fraud in the election" (whatever that means), *id*. at ¶ 2, and that President Trump supposedly knew this because some government officials "notified" him "that his claims were untrue," ¶ 11.

If there is any constant in our democratic system of governance, it is that the marketplace of ideas—not the mandates of government functionaries or partisan prosecutors—determines the scope of public debate. Countless millions believe, as President Trump consistently has and currently does, that fraud and irregularities pervaded the 2020 Presidential Election. As the indictment itself alleges, President Trump gave voice to these concerns and demanded that politicians in a position to restore integrity to our elections not just talk about the problem, but investigate and resolve it. *See id*. at ¶ 10(a) (state legislators and election officials) act); ¶ 10(b) (Vice President and other government officials); ¶ 10(c) (state officials); ¶ 10(d) (vice president); ¶ 10(e) (members of Congress).

The First Amendment embraces and encourages exactly this kind of behavior, and therefore states in the clearest of terms that "Congress shall make no law . . . abridging the freedom

of speech, . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I. The indictment, taken as true, violates this core principle as to each count. Accordingly, the Court should dismiss the indictment in its entirety.

Additionally, as the United States Senate has previously tried and acquitted President Trump for charges arising from the same course of conduct alleged in the indictment, the impeachment and double jeopardy clauses both bar retrial before this Court and require dismissal.

Finally, because of our country's longstanding tradition of forceful political advocacy regarding perceived fraud and irregularities in numerous Presidential elections, President Trump lacked fair notice that his advocacy in this instance could be criminalized. Thus, the Court should dismiss the indictment under the Due Process clause as well.

## ARGUMENT

"In ruling on a motion to dismiss for failure to state an offense, a district court is" typically "limited to reviewing the face of the indictment and, more specifically, the language used to charge the crimes." *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009). "When considering a motion to dismiss, the court must review the face of the indictment," and "the indictment must be viewed as a whole and the allegations must be accepted as true at this stage of the proceedings." *United States v. Weeks*, 636 F. Supp. 3d 117, 120 (D.D.C. 2022).

President Trump fully denies the allegations in the indictment which are referenced in this motion and memorandum. Rather, this memorandum sets forth the facts alleged in the indictment so that their legal sufficiency may be assessed for a motion to dismiss. *Id.*

**I.      The Indictment Should Be Dismissed Because It Seeks to Criminalize Core Political Speech and Advocacy Protected by the First Amendment.**

First and foremost, the indictment must be dismissed because it seeks to criminalize core political speech and advocacy that lies at the heart of the First Amendment.[1]

**A.      The Government May Not Prohibit Core Political Speech on Matters of Public Concern, Regardless of Its Supposed Truth or Falsity.**

In *United States v. Alvarez*, the Supreme Court reaffirmed the broad scope of the First Amendment, holding that it protects even the verifiably false claim that the speaker had been awarded the Congressional Medal of Honor. 567 U.S. 709, 729 (2012) (plurality opinion of Kennedy, J.); *id.* at 739 (Breyer, J., concurring in the judgment).

*Alvarez* produced multiple opinions, *see id.*, but on one key point, all nine Justices were unanimous: Under the First Amendment, the Government may not prohibit or criminalize speech on disputed social, political, and historical issues simply because the Government determines that some views are "true" and others are "false." *See id.* "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *Id.* at 723 (citing GEORGE ORWELL, NINETEEN EIGHTY–FOUR (1949) (Centennial ed. 2003)).

The four-Justice plurality opinion of Justice Kennedy was emphatic on this point, rejecting the notion that the "government [may] decree this speech [about receiving medals] to be a criminal offense, whether shouted from the rooftops or made in a barely audible whisper," as such an approach "would endorse government authority to compile a list of subjects about which false

---

[1] As explained in President Trump's Motion to Dismiss Based on Presidential Immunity, all acts charged in the indictment were performed within the "outer perimeter" of his official duties as President. Doc. 74, at 21-45. As explained in that Motion, and conceded in the Government's *Blassingame* amicus brief, the fact that President Trump's alleged actions were conducted within his official duties is fully consistent with those actions also involving the exercise of his First Amendment rights. *See, e.g., id.* at 26-27 ("[I]t is commonplace for a President's speech to have dual roles—both an official and personal character.").

statements are punishable. That governmental power has no clear limiting principle." *Id.* at 723.

Thus, disavowing "Oceania's Ministry of Truth," *id.*, Justice Kennedy rejected any rule that would

"give government a broad censorial power unprecedent in this Court's cases or in our

constitutional tradition. The mere potential for the exercise of that power casts a chill, a chill the

First Amendment cannot permit if free speech, thought, and discourse are likely to remain a

foundation of our freedom." *Id.* Instead,

> [t]he remedy for speech that is false is speech that is true. This is the ordinary course
> in a free society. The response to the unreasoned is the rational; to the uninformed,
> the enlightened; to the straightout lie, the simple truth.… The theory of our
> Constitution is "that the best test of truth is the power of the thought to get itself
> accepted in the competition of the market."… Freedom of speech and thought flows
> not from the beneficence of the state but from the inalienable rights of the person.
> And suppression of speech by the government can make exposure of falsity more
> difficult, not less so…. These ends are not well served when the government seeks
> to orchestrate public discussion through content-based mandates.

*Id.* at 727-28 (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)).

"Only a weak society needs government protection or intervention before it pursues its resolve to

preserve the truth. Truth needs neither handcuffs nor a badge for its vindication." *Id.* at 729.

Justice Breyer's two-Justice concurrence in *Alvarez* likewise endorsed this same point,

quoting Justice Alito for the proposition that "there are broad areas in which any attempt by the

state to penalize purportedly false speech would present a grave and unacceptable danger of

suppressing truthful speech," which include "[l]aws restricting false statements about philosophy,

religion, history, the social sciences, the arts, and the like." *See id.* at 731-32 (Breyer, J., concurring

in the judgment). These topics—which are often the subject of vigorous public debate—rarely

have clear or verifiable answers (hence, the controversy), and therefore citizens must be given

"breathing room" to speak their minds without fear of, as here, being criminally prosecuted by

government officials that do not like what they have to say. *See id.* at 733.

Indeed, Justice Breyer concluded that "the threat of criminal prosecution for making a false statement can inhibit the speaker from making true statements, thereby 'chilling' a kind of speech that lies at the First Amendment's heart." *Id.* at 733. Justice Breyer further emphasized that criminalizing supposedly "false" statements on such not "easily verifiable," politically controversial topics "provides a weapon to a government broadly empowered to prosecute falsity without more. And those who are unpopular may fear that the government will use that weapon selectively…." *Id.* at 734; *see also id.* at 736 (emphasizing that "in political contexts, … the risk of censorious selectivity by prosecutors is … high"); *id.* at 738 ("In the political arena … criminal prosecution is particularly dangerous … and consequently can more easily result in censorship of speakers and their ideas.").[2]

Justice Alito's three-Justice dissent in *Alvarez*—the opinion *least* protective of speech in that case—endorsed the same conclusion. As noted above, Justice Alito's dissent recognized that

> there are broad areas in which *any attempt by the state to penalize purportedly false speech would present a grave and unacceptable danger of suppressing truthful speech*. Laws restricting false statements about *philosophy, religion, history, the social sciences, the arts, and other matters of public concern* would present such a threat. The point is not that there is no such thing as truth or falsity in these areas or that the truth is always impossible to ascertain, but rather that *it is perilous to permit the state to be the arbiter of truth*.

*United States v. Alvarez*, 567 U.S. 709, 751–52 (2012) (Alito, J., dissenting) (emphasis added). "Even where there is a wide scholarly consensus concerning a particular matter, the truth is served by allowing that consensus to be challenged without fear of reprisal. Today's accepted wisdom sometimes turns out to be mistaken." *Id.* at 752. "And in these contexts, 'even a false statement

---

[2] Although Justice Breyer suggested false statements concerning "easily verifiable facts" might be afforded less First Amendment protection, as discussed *infra*, questions of election integrity are by no means "easily verifiable," and are certainly unlike the statements in *Alvarez* regarding receipt of the Medal of Honor, which Justice Breyer nonetheless concluded were protected by the First Amendment.

may be deemed to make a valuable contribution to public debate, since it brings about 'the clearer perception and livelier impression of truth, produced by its collision with error.'" *Id.* (quoting *New York Times v. Sullivan*, 376 U.S. at 279 n.19 (quoting JOHN STUART MILL, ON LIBERTY 15 (R. McCallum ed. 1947))).

In addition, "[a]llowing the state to proscribe false statements in these areas also opens the door for the state to use its power for political ends," *id.*—a concern that is maximal in this case, where a sitting President's Administration is prosecuting his chief political opponent for supposedly making "false" claims challenging the validity of the sitting President's election. "If some false statements about historical events may be banned, how certain must it be that a statement is false before the ban may be upheld? And who should make that calculation?" *Id.* "While our cases prohibiting viewpoint discrimination would fetter the state's power to some degree, *the potential for abuse of power in these areas is simply too great*." *Id.* (emphasis added).

Thus, *Alvarez* reflects the Supreme Court's unanimous consensus that claims about widely disputed social, political, and historical questions—*i.e.*, "matters of public concern," *id.* at 752— are protected by the First Amendment, regardless of the Government's view on supposed "truth" or "falsity." In fact, as Justice Alito's discussion demonstrates, such claims are protected by the First Amendment *especially* when the Government deems them "false." *See id.* Thus, claims about the integrity of the 2020 Presidential election—including claims that the election was "rigged," "stolen," and/or tainted by outcome-determinative fraud—are fully protected by the First Amendment, regardless of the Government's view of their truth or falsity. Indeed, in such areas, "it is perilous to permit the state to be the arbiter of truth." *Id.* at 752 (Alito, J., dissenting).

This conclusion that the First Amendment fully protects opinions and claims on widely disputed political and historical issues—such as the integrity of the 2020 Presidential election—

draws further support from the most basic principles of the Supreme Court's First Amendment jurisprudence. Such claims constitute (1) core political speech, on (2) matters of enormous public concern, where suppressing the speech constitutes (3) forbidden viewpoint discrimination.

*Speech on matters of public concern.* "Speech on matters of public concern is at the heart of the First Amendment's protection. That is because speech concerning public affairs is more than self-expression; it is the essence of self-government. Accordingly, speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (cleaned up; citations omitted) (citing numerous cases). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id.* at 452-53. And Justice Alito's dissent in *Alvarez* explicitly stated that the areas where the First Amendment does not permit the criminalization of supposedly "false" statements can be summarized as those involving "matters of public concern." 567 U.S. at 751–52 (Alito, J., dissenting). Speech disputing the outcome of the 2020 election unquestionably constitutes speech on "matters of public concern." *See id.*

*Core political speech.* Indeed, such speech constitutes core political speech, and First Amendment protection is "at its zenith" when the government attempts to restrict "core political speech." *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 186–87 (1999); *see also Meyer v. Grant*, 486 U.S. 414, 425 (1988) (speech that "at the core of our electoral process and of the First Amendment freedoms—an area … where protection of robust discussion is at its zenith") (citations and quotations omitted). Such "core political speech" encompasses any "advocacy of a politically controversial viewpoint." *McIntyre v. Ohio Elec. Comm'n*, 514 U.S. 334, 347 (1995). "No form

8

of speech is entitled to greater constitutional protection than" core political speech. *Id.* This is especially true of speech relating to *elections*, since the First Amendment's "constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)).

  ***Viewpoint discrimination.*** Further, attempts to prohibit or criminalize claims on political disputes—such as the integrity and outcome of the 2020 Presidential election—inevitably target speech on the basis of viewpoint, which is the least tolerable of First Amendment violations. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* at 829. "Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*

  The fact that the indictment alleges that the speech at issue was supposedly, according to the prosecution, "false" makes no difference. Under the First Amendment, each individual American participating in a free marketplace of ideas—*not* the federal Government—decides for him or herself what is true and false on great disputed social and political questions. As noted above, "[o]ur constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *Alvarez*, 567 U.S. at 723. "Permitting the government to decree this [false] speech to be a criminal offense … would endorse government authority to compile a list of subjects about which false statements are punishable. That governmental power has no clear limiting principle." *Id.*

Thus, "falsity alone may not suffice to bring the speech outside the First Amendment." *Id.* at 719.

"Absent from those few categories where the law allows content-based regulation of speech is any general exception to the First Amendment for false statements. This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee." *Id.* at 718. "The erroneous statement is inevitable in free debate." *Id.* (quoting *New York Times v. Sullivan*, 376 U.S. 254, 271 (1964)).

***

The indictment therefore attempts to criminalize core political speech and political advocacy, which is categorically impermissible under the First Amendment. As the Supreme Court held in *Texas v. Johnson*, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (citing 14 cases for this proposition). "[I]t is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56 (1988) (quoting *FCC v. Pacifica Foundation*, 438 U.S. 726, 745-46 (1978)). "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).

The indictment here does not merely criminalize conduct with an incidental impact on protected speech; instead, it directly targets core protected speech and activity. For this reason, it is categorically invalid under the First Amendment. "Clearly, government has no power to restrict

10

such activity because of its message." *Grayned v. City of Rockford*, 408 U.S. 104, 115 (1972). That is precisely what the indictment attempts to do here.

For similar reasons, the indictment is invalid under any level of scrutiny. As noted above, the indictment imposes viewpoint-based restrictions on core political speech on matters of the highest public concern with extremely severe penalties, and thus if any scrutiny applies, it is the strictest form of scrutiny. Yet regardless, the prosecution cannot show any interest (let alone a compelling or substantial one) in punishing such First Amendment-protected activity. The prosecution has no valid interest in silencing disfavored viewpoints or preventing people from advocating such disfavored viewpoints to government officials. *See, e.g., United States v. Eichman*, 731 F. Supp. 1123, 1131 (D.D.C.), *aff'd*, 496 U.S. 310 (1990) ("However compelling the government may see its interests, they cannot justify restrictions on speech which shake the very cornerstone of the First Amendment."). Furthermore, no amount of tailoring can save such a restriction, because its entire impact is focused on punishing the exercise of core political speech. *See* Doc. 1; *see also, e.g., United States v. Popa*, 187 F.3d 672, 677 (D.C. Cir. 1999) ("Punishment of those who use the telephone to communicate a political message is obviously not 'essential to the furtherance of that [government] interest.'"). The indictment is precisely tailored to *violate* free-speech rights, not narrowly tailored to *avoid* violating them. *See id.* This is the antithesis of narrow tailoring.

Finally, if the indictment validly applies the language of the statute, that renders the statute both unconstitutional as applied and unconstitutional on its face, under the First Amendment overbreadth doctrine. Under the prosecution's interpretation, the statute sweeps in the criminalization of large amounts of "pure speech," and thus it suffers from "overbreadth" that is "not only … real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).

**B.**     **The First Amendment Protection for Opinions on Politically Charged Disputes Extends to Statements Advocating the Government to Act.**

Because the First Amendment confers absolute protection on public statements about hotly disputed social, political, and historical topics and other matters of public concern, including those which are supposedly "false," it confers the same protection on the same statements made in advocating for government officials to *act* on one's views. The First Amendment protects the right "to petition the Government for a redress of grievances" in the same clause as "the freedom of speech." U.S. CONST. amend. I. When it comes to what speech is protected, the right to petition is coextensive with the right to speak—a claim protected under the Amendment's right to "freedom of speech" is equally protected when the same claim is made while "petition[ing] the Government." *Id.* As the Supreme Court stated, "[t]he right to petition is cut from the same cloth as the other guarantees of that Amendment, and is an assurance of a particular freedom of expression." *McDonald v. Smith*, 472 U.S. 479, 482 (1985).

For this reason, in *McDonald*, the Supreme Court consulted the right to freedom of speech to determine what statements are protected when exercising the right to petition the government. *McDonald* concerned a libel lawsuit brought against a man who sent letters to President Reagan making allegedly libelous claims about a potential political appointee. 472 U.S. at 480-81. The libel defendant claimed that he had absolute immunity from libel suit because the allegedly libelous statements were made in the course of petitioning the Government. *Id.* at 481-82. The Supreme Court rejected this claim, holding instead that the scope of First Amendment protection for claims made while petitioning government officials is *coextensive* with the scope of First Amendment protection for public statements under the Free Speech Clause. *Id.* at 484-85. Because libel falls within a well-established First Amendment exception, libel made in statements to government officials is likewise unprotected under the Petition Clause of the First Amendment.

*Id.* at 485. In so holding, the Supreme Court made clear that the Free Speech Clause and the Petition Clause are on identical footing, establishing the same levels of protection for speech:

> To accept petitioner's claim of absolute immunity would elevate the Petition Clause to special First Amendment status. The Petition Clause, however, was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble. *These First Amendment rights are inseparable, and there is no sound basis for granting greater constitutional protection to statements made in a petition to the President than other First Amendment expressions.*

Id. at 485 (citations omitted) (emphasis added). The same logic applies here. Just as there is "no sound basis for granting *greater* protection to statements made in a petition … than other First Amendment expressions," *id.*, so also there is no sound basis for granting *lesser* constitutional protection to the same statements. After all, the Petition Clause reflects "the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble." *Id.* Thus, speech that is protected by the Free Speech Clause when made in a public forum retains its full protection when it is made to Government officials in the course of petitioning them to action. *See id.*

This conclusion draws further support from *McDonnell v. United States*, 579 U.S. 550 (2016). In *McDonnell*, the Government prosecuted the Governor of Virginia using an interpretation of the phrase "official act" in 18 U.S.C. § 201 that would have criminalized a broad range of ordinary political lobbying of public officials: "Section 201 prohibits *quid pro quo* corruption—the exchange of a thing of value for an 'official act.' In the Government's view, nearly anything a public official accepts—from a campaign contribution to lunch—counts as a *quid*; and nearly anything a public official does—from arranging a meeting to inviting a guest to an event— counts as a *quo*." *Id.* at 575. The Supreme Court unanimously held that "[i]n addition to being inconsistent with both text and precedent, the Government's expansive interpretation of 'official act' would raise significant constitutional concerns," *id.* at 574, precisely because it threatened to

criminalize a broad range of ordinary political activity done in furtherance of petitioning the Government under the First Amendment:

> [C]onscientious public officials arrange meetings for constituents, contact other officials on their behalf, and include them in events all the time. The basic compact underlying representative government *assumes* that public officials will hear from their constituents and act appropriately on their concerns…. The Government's position could cast a pall of potential prosecution over these relationships….. Officials might wonder whether they could respond to even the most commonplace requests for assistance, and *citizens with legitimate concerns might shrink from participating in democratic discourse*.

*Id.* at 575 (second emphasis added). So also here, permitting the prosecution to criminalize First Amendment-protected statements simply because they were made to government officials would violate "[t]he basic compact of representative government" and cause "citizens with legitimate concerns" to "shrink from participating in democratic discourse." *Id.* Consider any number of disfavored claims on a host of controversial topics, all deemed to be demonstrably "false" and "disinformation" by the Government at various times—such as claiming that masks do not stop the transmission of COVID-19, that vaccines do not stop the transmission of COVID-19, that COVID-19 originated from a lab in Wuhan, China, and that the 2020 Presidential election was stolen. Can the Government prosecute a citizen for attempting to "defraud the United States" by making supposedly "false" statements to government officials for (1) opposing mask mandates by telling legislators that they don't stop transmission, (2) opposing vaccine mandates by telling legislators that they don't stop transmission, and/or (3) urging the investigation of China by telling government officials that COVID-19 leaked from a lab? Under the First Amendment, the answer is "no"—and that absolutely applies to claims that the 2020 Presidential election was stolen as well.

**C.     The First Amendment Does Not Permit the Government to Prosecute a Citizen for Claiming That the 2020 Presidential Election Was Stolen.**

Thus, under the First Amendment, the prosecution cannot criminalize claims that the 2020 Presidential election was stolen; and it cannot, by prosecution, seek to impose its view on a disputed political question like the integrity of the 2020 Presidential election. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641 (1994). Neither the federal Executive Branch nor the Judicial Branch, both of which are bound by the First Amendment, may dictate that such claims are criminally "false."

Claims about the integrity of the 2020 Presidential election—including claims that the election was "rigged" and/or "stolen," or that fraud and irregularities tainted the outcome in certain States or across the Nation—implicate all the fundamental First Amendment principles discussed above. They constitute (1) core political speech (2) expressing a specific disfavored viewpoint (3) on matters of enormous public concern (4) that relate to a widely disputed historical, social, and political question (5) that is not readily verifiable or falsifiable. Thus, they lie at the heartland of the First Amendment's protection, and the federal government may not dictate whether such claims are true or false—nor prosecute the purveyors of the allegedly "false" views.

This is especially true because claims that the 2020 Presidential election was "rigged" or tainted by fraud and irregularity—unlike the libel claims at issue in *McDonald*, *see supra*—do not involve "easily verifiable facts." *Alvarez*, 567 U.S. at 732 (Breyer, J., concurring in the judgment). Such claims require the assessment of mountains of information from which each person will draw

competing inferences based on facts as well as their personal, deep-seated political views and presuppositions. They are not readily verifiable or falsifiable, they relate to politically charged issues, and people's assessment of them is deeply linked to their political predispositions and their trust in institutions, including governmental institutions. This is why Americans' opinions on these issues are profoundly divided, very much to this day. The First Amendment does not permit the prosecution to dictate what is "true" and what is "false" on such broad, vigorously disputed, politically charged questions—*especially* not in the context of a criminal prosecution that effectively seeks to criminalize a political *viewpoint* shared by over 100 million Americans.[3]

Many millions of reasonable people believe that the 2020 Presidential election was unfairly rigged against President Trump, and that fraud and other irregularities tainted the election results. There is abundant public evidence providing a reasonable basis for these opinions. What is critical is that how one interprets this evidence depends on one's deep-seated political views, including one's trust in government institutions and government officials, among others. Different people will draw different inferences from such public evidence based on their deep-seated political views—and that is exactly what the First Amendment permits—even celebrates.[4]

---

[3] Almost 40 percent of Americans, including almost 70 percent of Republicans, believe that the 2020 Presidential election was tainted by fraud or irregularity—a number that is increasing and has increased since 2020. *See, e.g.,* Jennifer Agiesta, et al*., CNN Poll: Percentage of Republicans Who Think Biden's 2020 Win Was Illegitimate Ticks Back Up Near 70%*, CNN (Aug. 3, 2023), at https://www.cnn.com/2023/08/03/politics/cnn-poll-republicans-think-2020-election-illegitimate/index.html. "The share of Republicans and Republican-leaning independents who believe that President Joe Biden's 2020 election win was not legitimate has ticked back up, according to a new CNN poll fielded throughout July. … 69% of Republicans and Republican-leaners say Biden's win was not legitimate, up from 63% earlier this year and through last fall…. Overall, 61% of Americans say Biden did legitimately win enough votes to win the presidency, and 38% believe that he did not. Among registered voters who say they cast a ballot for Trump in 2020, 75% say they have doubts about Biden's legitimacy." *Id.*

[4] *Compare, e.g.,* Mollie Hemingway, *Rigged: How the Media, Big Tech, and the Democrats Seized Our Elections* (Regnery 2021) (423-page book discussing changes to election procedures, flooding the system with absentee ballots, use of mail-in ballots without signature verification or other

This unconstitutional dynamic appears on the face of the indictment itself. The indictment repeatedly alleges that President Trump made "*knowingly* false claims of election fraud." Doc. 1, ¶ 7 (emphasis added). But in every case, the indictment's basis for the allegation that President Trump's claims were "knowingly" false is that *a member of the political establishment assured President Trump that they were false*. *See, e.g., id.* ¶¶ 11(a)-(h) (alleging that a series of government officials assured President Trump that his concerns about the election's integrity were unwarranted). Under the First Amendment, President Trump and his supporters are entitled to mistrust the word of such establishment-based government officials and draw their own inferences from the facts. And neither the federal Executive Branch (through the prosecution) nor the Judicial Branch (through this Court) may dictate what President Trump and others are required to believe, or *say*, about this hotly disputed political question.

The prosecution, of course, may come to its own conclusions about such matters. It may hold hearings and conduct investigations to try to establish its own view and convince others of them. It may insist that the opinions of others—including President Trump—are wrong, baseless, stupid—even false and malicious. But it may not require Americans to subscribe to its views or punish them for expressing and advocating for different views. To do so violates the First Amendment. Under the First Amendment, the question of whether the 2020 Presidential election

---

safeguards against fraud, widespread ballot harvesting, censorship by social-media platforms, private funding of election administration concentrated in Democratic precincts, exclusion of observers from vote-counting processes, and other developments to argue that the 2020 election was "rigged" against President Trump), *with* Molly Ball, *The Secret History of the Shadow Campaign That Saved the 2020 Election*, TIME (Feb. 4, 2021), at https://time.com/5936036/secret-2020-election-campaign/ (feature-length article discussing many of the same developments as Hemingway's book; describing "an extraordinary shadow effort" to influence the election against President Trump, made up of "a well-funded cabal of powerful people … working together behind the scenes to influence perceptions, change rules and laws, steer media coverage and control the flow of information"; and concluding that this "shadow effort" and "cabal" provide evidence that the 2020 election was one of the fairest in modern history).

was stolen from President Trump must be decided in "the free marketplace of ideas," not in criminal prosecutions. *Barr v. Am. Ass'n of Political Consultants, Inc*., 140 S. Ct. 2335, 2358 (2020) (Breyer, J., concurring in the judgment with respect to severability and dissenting in part).

For the foregoing reasons, the indictment violates the First Amendment *in toto*. It should be dismissed with prejudice.

## II. President Trump's Acquittal by the U.S. Senate Bars Criminal Prosecution for Offenses Arising from the Same Course of Conduct.

The indictment must be dismissed because President Trump was impeached, tried by the Senate, and *acquitted* on articles of impeachment that arise from the same course of conduct as the criminal indictment. Under our system of separated powers, the Executive Branch lacks authority to second-guess the decision of the Legislative Branch on an issue that lies within the Legislative Branch's exclusive purview. The Constitution's plain text, structural principles of separation of powers, our history and tradition, and principles of Double Jeopardy bar the Executive Branch from seeking to re-charge and re-try a President who has already been impeached and acquitted in a trial before the U.S. Senate.

### A. The text of the Constitution bars the prosecution of a President who has been tried and *acquitted* by the Senate.

The text of the Constitution straightforwardly provides that only a "Party *convicted*" by the Senate may be charged by "Indictment, Trial, Judgment and Punishment"—not a party *acquitted*. As the Senate acquitted President Trump, the prosecution may not re-try him in this Court.

To be removed from office, the President must be convicted by trial in the Senate, which has exclusive authority under the Constitution for such trials: "The Senate shall have the sole Power to try all Impeachments. … And no Person shall be convicted without the Concurrence of two thirds of the Members present." U.S. CONST. art. I, § 3, cl. 6. "Judgment in Cases of

Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but *the Party convicted* shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." U.S. CONST. art. I, § 3, cl. 7 (emphasis added).

Because the Constitution specifies that only "the Party *convicted*" by trial in the Senate may be "liable and subject to Indictment, Trial, Judgment and Punishment," *id.*, it presupposes that a President who is *not* convicted may *not* be subject to criminal prosecution. *Id.* As Justice Alito notes, "[t]he plain implication" of the phrase "the Party convicted" in this Clause "is that criminal prosecution, like removal from the Presidency and disqualification from other offices, is a consequence *that can come about only after the Senate's judgment*, not during or prior to the Senate trial." *Trump v. Vance*, 140 S. Ct. 2412, 2444 (2020) (Alito, J., dissenting) (emphasis added). "This was how Hamilton explained the impeachment provisions in the Federalist Papers. He wrote that a President may 'be impeached, tried, and, upon conviction ... would *afterwards* be liable to prosecution and punishment in the ordinary course of law.'" *Id.* (quoting THE FEDERALIST No. 69, p. 416 (C. Rossiter ed. 1961) (emphasis added)); *see also* THE FEDERALIST No. 77, at 464 (A. Hamilton) (a President is "at all times liable to impeachment, trial, [and] dismission from office," but any other punishment must come only "by *subsequent* prosecution in the common course of law") (emphasis added).

Justice Alito's interpretation of the Clause is well-founded. The longstanding canon of interpretation *expressio unius est exclusio alterius* (or the "negative-inference canon") reflects "the principle that specification of the one implies exclusion of the other validly describes how people express themselves and understand verbal expression." SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, § 10, p. 107 (2012). "When a car dealer promises a low

financing rate to 'purchasers with good credit,' it is entirely clear that the rate is *not* available to purchasers with spotty credit." *Id.* So also here, when the Constitution provides that "the Party convicted" in the Senate may be subject to criminal prosecution, "it is entirely clear that" the Party *acquitted* in a Senate trial "is *not*" subject to criminal prosecution for official acts. *Id.* This is true because the phrase "the Party convicted" "can reasonably be thought to be an expression of *all* that shares in the grant or prohibition involved." *Id.* Because there are only two possible outcomes from a Senate trial—conviction or acquittal—specifying the implications of only *one* outcome clearly means that those implications do *not* apply to the other outcome. *See id.*

This interpretation reflects the original public meaning of the impeachment clauses. "James Wilson—who had participated in the Philadelphia Convention at which the document was drafted—explained that, although the President … is amenable to [the laws] in his private character as a citizen, and *in his public character by impeachment*.'" *Clinton v. Jones*, 520 U.S. 681, 696 (1997) (emphasis added) (quoting 2 J. ELLIOT, DEBATES ON THE FEDERAL CONSTITUTION 480 (2d ed. 1863) (cleaned up). "With respect to acts taken in his 'public character'—that is, official acts— the President may be disciplined principally by impeachment…." *Id.*

In addition, in Federalist No. 43, James Madison indicated that concerns about politically motivated prosecutions led to the adoption of the definition of "treason" in Article III, Section 3, Clause 1 of the Constitution:

> As treason may be committed against the United States, the authority of the United States ought to be enabled to punish it; but as *new fangled and artificial treasons, have been the great engines, by which violent factions, the natural offspring of free governments, have usually wreaked their alternate malignity on each other*, the [Constitutional] convention have with great judgment opposed a barrier to this peculiar danger, by inserting a constitutional definition of the crime, fixing the proof necessary for conviction of it, and restraining the congress, even in punishing it, from extending the consequences of guilt beyond the person of its author.

THE FEDERALIST No. 47 (Madison) (emphasis added). In Federalist No. 65, Alexander Hamilton explained that the Constitution entrusted impeachment trials to the Senate because the risk of politically motivated criminal trials, which would inevitably be tainted by factionalism and partisanship, was too great in the courts, including even the Supreme Court:

> A well constituted court for the trial of impeachments, is an object not more to be desired than difficult to be obtained in a government wholly elective. The subjects of its jurisdiction are those offenses which proceed from the misconduct of public men, or in other words from the abuse or violation of some public trust. They are of a nature which may with peculiar propriety be denominated POLITICAL, as they relate chiefly to injuries done immediately to the society itself. *The prosecution of them, for this reason, will seldom fail to agitate the passions of the whole community, and to divide it into parties, more or less friendly or inimical, to the accused*. In many cases, it will connect itself with the pre-existing factions, and will inlist all their animosities, partialities, influence and interest on one side, or on the other; and in such cases there will always be the greatest danger, that the decision will be regulated more by the compar[a]tive strength of parties than by the real demonstrations of innocence or guilt.

THE FEDERALIST No. 65 (Hamilton) (emphasis added). Hamilton went on to argue that even the Supreme Court should not handle prosecutions of major political figures: "The awful discretion, which a court of impeachments must necessarily have, to doom to honor or to infamy the most confidential and the most distinguished characters of the community, *forbids the commitment of the trust to a small number of persons*. These considerations seem alone sufficient to authorise a conclusion, that the Supreme Court would have been an improper substitute for the Senate, as a court of impeachments." *Id.* (emphasis added).

In addition, treating impeachment as the exclusive remedy for alleged crimes committed in office is consistent with the Supreme Court's immunity decisions as to other sensitive officials, such as federal judges. The Supreme Court has held that judges are absolutely immune from civil liability and criminal prosecution for their official acts, and that the sole remedy is impeachment: "But for malice or corruption in their action whilst exercising their judicial functions within the general scope of their jurisdiction, *the judges of these courts can only be reached by public*

*prosecution in the form of impeachment*, or in such other form as may be specially prescribed."
*Bradley v. Fisher*, 80 U.S. 335, 354 (1871) (emphasis added).

In *Nixon v. Fitzgerald*, the Supreme Court reinforced this conclusion by emphasizing that the proper remedy against a President for official misfeasance is "the threat of impeachment," not criminal prosecution:

> A rule of absolute immunity for the President will not leave the Nation without sufficient protection against misconduct on the part of the Chief Executive. There remains the constitutional remedy of impeachment. In addition, there are formal and informal checks on Presidential action…. The President is subjected to constant scrutiny by the press. Vigilant oversight by Congress also may serve to deter Presidential abuses of office, as well as to make credible the threat of impeachment. Other incentives to avoid misconduct may include a desire to earn reelection, the need to maintain prestige as an element of Presidential influence, and a President's traditional concern for his historical stature.

*Nixon v. Fitzgerald*, 457 U.S. 731, 757 (1982). *See also, e.g., Bradley v. Fisher*, 80 U.S. 335, 354 (1871) ("But for malice or corruption in their action whilst exercising their judicial functions within the general scope of their jurisdiction, the judges of these courts [i.e., Article III courts] can only be reached by public prosecution in the form of impeachment, or in such other form as may be specially prescribed.").

Here, President Trump is not a "Party convicted" in an impeachment trial by the Senate. U.S. CONST. art. I, § 3, cl. 7. In January 2021, he was impeached by the House on articles arising from the same course of conduct at issue in the indictment. H. RES. 24 (117th Cong. 1st Sess.), *at* https://www.congress.gov/bill/117th-congress/house-resolution/24/text. Among other things, the articles of impeachment charged that President Trump "repeatedly issued false statements asserting that the Presidential election results were the product of widespread fraud and should not be accepted by the American people or certified by State or Federal officials;" made "false claims" in a speech on January 6; engaged in "prior efforts to subvert and obstruct the certification of the results of the 2020 Presidential election," including through a phone call to the Georgia secretary

of state; and "threatened the integrity of the democratic system." *Id.* The indictment here rests on the very same alleged facts. President Trump was acquitted of these charges after trial in the Senate. He is thus not a "Party convicted" under Article I, Section 3, Clause 7, and he is not subject to "Indictment, Trial, Judgment and Punishment" for the same course of conduct. U.S. CONST. art. I, § 3, cl. 7.

In sum, under the Constitution, the Executive Branch—including the prosecution—lacks authority to second-guess the determination of acquittal made by the United States Senate, the body to which the Constitution explicitly entrusts this authority. To do so violates the Impeachment Clause and the principles of separation of powers, by unlawfully encroaching on authority exclusively vested in Congress. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585-89 (1952). "The Founders of this Nation entrusted the [impeachment] power to the Congress alone in both good and bad times." *Id.* at 589.

### B.   The Prosecution Is Barred by Principles of Double Jeopardy.

Applying principles of double jeopardy leads to the same conclusion. The Fifth Amendment states, "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. The Clause prevents the same sovereign from subjecting a defendant to multiple, sequential charges based on the same operative facts or the same course of conduct. *See, e.g., United States v. Coughlin*, 610 F.3d 89, 95 (D.C. Cir. 2010) (holding that "a prong of double jeopardy analysis known as 'issue preclusion' … bars the government from prosecuting a defendant on a charge that depends on facts that a previous acquittal on a different charge necessarily decided in the defendant's favor"). Under those principles, the prosecution cannot proceed against President Trump for conduct of which he was acquitted by the Senate.

The fact that different branches of the federal government are at issue makes no difference. "In applying the dual sovereignty doctrine, then, the crucial determination is whether the two entities that seek successively to prosecute a defendant for the same course of conduct can be termed separate sovereigns. This determination turns on whether the two entities draw their authority to punish the offender from distinct sources of power." *Heath v. Alabama*, 474 U.S. 82, 88 (1985). With respect to the federal government and the States, there are distinct sovereignties: "The States are no less sovereign with respect to each other than they are with respect to the Federal Government. Their powers to undertake criminal prosecutions derive from separate and independent sources of power and authority originally belonging to them before admission to the Union and preserved to them by the Tenth Amendment." *Id.* at 89. The same is not true, however, with respect to different branches of the federal government, all of which derive their power from the same source—the U.S. Constitution. *See id.* Thus, the Executive and Judicial Branches cannot seek to place President Trump in jeopardy for conduct of which the Legislative Branch has absolved him—all three Branches are co-equal parts of the same "sovereign" deriving their "power and authority" from the same "source[]." *Id.*

The government—through Congress—already put President Trump on trial once, placing him in jeopardy for an alleged criminal offense arising from the same course of conduct alleged in the indictment.[5] Having failed to obtain a conviction, President Trump's acquittal in the United States Senate must stand, and the prosecution may not seek a retrial in this forum.

---

[5] *See* U.S. CONST. art. III, § 2, cl. 3 (referring to impeachment trials as trials for crimes – "[t]he Trial of all Crimes, except in Cases of Impeachment, shall be by Jury. . .").

### III.   The Indictment Violates the Fair Notice Doctrine of the Due Process Clause.

The indictment charges President Trump with crimes arising from his political advocacy on matters of public concern made in the middle of a disputed Presidential campaign and election. President Trump's actions were inspired by and fully consistent with examples from many similar contested election disputes in our Nation's history. There is a long history in our Nation—dating back to 1800 and encompassing elections in 1800, 1824, 1876, 1960, 2000, 2004, and 2016, among many others—of disputing the outcome of close Presidential elections, publicly claiming that election results were tainted by fraud, filing legal actions to challenge election results, lobbying Congress to certify disputed election results in one side's favor or the other, and organizing alternate, contingent slates of electors to assist in such efforts. In other words, all the chief alleged acts charged in the indictment have a long historical pedigree in American electoral history, and they have long been decided in the political arena. President Trump is the first person to face criminal charges for such core political behavior as disputing the outcome of an election. He is charged, moreover, under statutes that facially have nothing to do with his alleged conduct, and whose language the Special Prosecutor stretches beyond recognition. *See* President Trump's Motion to Dismiss Based on Statutory Grounds (filed separately) ("Statutory Mot."). As a result, President Trump could not possibly have received fair notice that his conduct was supposedly criminal when he performed it. The indictment should be dismissed with prejudice for violation of the fair notice requirement of the Due Process Clause.

"[A] criminal statute must give fair warning of the conduct it makes a crime." *Bouie v. City of Columbia*, 378 U.S. 347, 350–51 (1964). "The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Harriss*, 347 U.S. 612, 617 (1954). The Supreme Court has compared the "fair

warning" standard to the "clearly established" standard applied to civil cases under § 1983 or *Bivens* cases. *United States v. Lanier*, 520 U.S. 259, 271–72 (1997). To be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

 The fair-notice requirement cannot be satisfied by post-conduct judicial interpretation of the statutes at issue. "If the Fourteenth Amendment is violated when a person is required 'to speculate as to the meaning of penal statutes,' … or to 'guess at (the statute's) meaning and differ as to its application,' … the violation is that much greater when, because the uncertainty as to the statute's meaning is itself not revealed until the court's decision, a person is not even afforded an opportunity to engage in such speculation before committing the act in question." *Bouie*, 378 U.S. at 352 (citations omitted). "There can be no doubt that a deprivation of the right of fair warning can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." *Id.*; *see also Rogers v. Tennessee*, 532 U.S. 451, 457 (2001) ("Deprivation of the right to fair warning … can result both from vague statutory language and from an unforeseeable and retroactive judicial expansion of statutory language that appears narrow and precise on its face."); *Karem v. Trump*, 960 F.3d 656, 666 (D.C. Cir. 2020) ("Although courts routinely 'clarify the law and apply that clarification to past behavior,' 'the principle of fair warning requires that novel standards announced in adjudications must not be given retroactive effect ... where they are unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue[.]'") (alterations and citations omitted).

 This principle of fair notice has special force here, where the lack of fair notice directly implicates First Amendment rights. *See supra* Part I. "The general test of vagueness applies with

particular force in review of laws dealing with speech. Stricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech….” *Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 620 (1976)) (modifications omitted); *see also, e.g., Buckley v. Valeo*, 424 U.S. 1, 77 (1976) (“Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal…. Where First Amendment rights are involved, an even ‘greater degree of specificity’ is required.”); *NAACP v. Button*, 371 U.S. 415, 432 (1963) (“[S]tandards of permissible statutory vagueness are strict in the area of free expression.”); *Nebraska Press Ass’n v. Stuart*, 427 U.S. 539, 568 (1976).

Here, President Trump’s alleged conduct—publicly and politically disputing the outcome of the election, attempting to convince Congress to act, and allegedly organizing alternate slates of electors—falls outside the plain language of the charged statutes, as discussed in President Trump’s Motion to Dismiss Based on Statutory Grounds, filed separately. *See* Statutory Mot. No court has ever applied these statutes to similar conduct. And the statutes’ meaning cannot be expanded by judicial re-interpretation after the fact without violating the Due Process Clause’s fair-notice requirement.

The extensive history of disputing elections in our Nation further demonstrates that none of these statutes provide fair notice that the alleged conduct is criminal. As for public statements and claims that the Presidential election was rigged and fraudulent, such claims have been a staple of American political discourse for decades. As one commentator has quipped, “If questioning the results of a presidential election were a crime, as many have asserted in the wake of the controversial 2020 election and its aftermath, then much of the Democratic Party and media establishment should have been indicted for their behavior following the 2016 election. In fact, the

27

last time Democrats fully accepted the legitimacy of a presidential election they lost was in 1988."

Hemingway, *supra*, at vii.[6] Democratic members of Congress have voted to refuse to certify

electors after the elections of 2004 and 2016, and there have been extensive attempts to submit

alternate electors and dispute the outcome of Republican Presidential victories in recent decades.[7]

---

[6] *See, e.g.,* Ari Berman, *Hillary Clinton on Trump's Election: "There Are Lots of Questions about Its Legitimacy"*, Mother Jones (Nov. 17, 2017), *at* https://www.motherjones.com/politics/2017/11/hillary-clinton-on-trumps-election-there-are-lots-of-questions-about-its-legitimacy/ ("A year after her defeat by Donald Trump in the 2016 presidential election, Hillary Clinton says 'there are lots of questions about its legitimacy'…"); *"I Would Be Your President": Clinton Blames Russia, FBI Chief for 2016 Election Loss*, National Post (May 2, 2017), *at* https://nationalpost.com/news/world/i-would-be-your-president-clinton-blames-russia-fbi-chief-for-2016-election-loss (noting Clinton "declaring herself 'part of the resistance' to Donald Trump's presidency" as an "activist citizen"); Dan Mangan, *Democratic Party Files Suit Alleging Russia, the Trump Campaign, and WikiLeaks Conspired to Disrupt the 2016 Election*, CNBC (Apr. 20, 2018), *at* https://www.cnbc.com/2018/04/20/democratic-party-files-suit-alleging-russia-the-trump-campaign-and-wikileaks-conspired-to-disrupt-the-2016-election-report.html ("The Democratic Party on Friday sued President Donald Trump's presidential campaign, the Russian government and the Wikileaks group, claiming a broad illegal conspiracy to help Trump win the 2016 election."); Rachael Revesz, *Computer Scientists Say They Have Strong Evidence Election Was Rigged against Clinton in Three Key States*, Independent (Nov. 23, 2016), *at* https://www.independent.co.uk/news/world/americas/wisconsin-michigan-pennsylvania-election-hillary-clinton-hacked-manipulated-donald-trump-swing-states-scientists-lawyers-a7433091.html ("A group of renowned computer scientists and lawyers have urged Hillary Clinton to challenge the election results in three key states after they gathered 'evidence' to suggest the election results were potentially manipulated."); *see also* Dan Merica, *Clinton Opens Door to Questioning Legitimacy of 2016 Election*, CNN.com (Sept. 18, 2017), *at* https://www.cnn.com/2017/09/18/politics/hillary-clinton-russia-2016-election/index.html; Sean Davis, *Nearly Half of Democrats Think the 2016 Election Was "Rigged"*, The Federalist (Nov. 18, 2016), *at* https://thefederalist.com/2016/11/18/nearly-half-democrats-think-election-rigged/.

[7] Bob Franken, *Democrats Challenge Certification of Florida Bush-Gore Election Results*, CNN.com (Nov. 16, 2000), *at* http://www.cnn.com/2000/LAW/11/16/certification.update.02.pol/index.html (noting "Florida Democrats and Al Gore presidential campaign…challenging the certification of election results in the state contested state); Jill Zuckman, et al., *Black Caucus Can't Block the Final Tally*, Chicago Tribune (Jan. 7, 2001), *at* https://www.chicagotribune.com/news/ct-xpm-2001-01-07-0101070449-story.html ("members of the Congressional Black Caucus on Saturday tried to stop the formal recording of the Electoral College tally during a joint session of Congress… lawmakers who supported [Democrat Al Gore] for president objected vociferously to the proceedings. One after another, the representatives rose to prevent the electoral votes from Florida from being counted."); Ted Barrett, *Democrats Challenge Ohio Electoral Votes*, CNN.com (Jan. 6, 2005), *at* https://www.cnn.com/2005/ALLPOLITICS/01/06/electoral.vote.1718/ ("Alleging widespread

Additional historic precedent in close and contested elections supports the lawfulness of the actions alleged in the indictment. For example, in the disputed elections of both 1876 and 1960, competing slates of electors were sent to Congress. William Josephson & Beverly J. Ross, *Repairing the Electoral College*, 22 J. LEGIS. 145, 156-57, 166 (1996); *see also* 146 CONG. REC. E2180 (daily ed. Dec. 13, 2000) (statement of Rep. Mink) ("Based on the earlier certified results [in Hawaii in 1960], the Republican electors met and cast their three votes for Nixon. The Democratic electors also met and cast their votes for Kennedy *even though they did not have a certificate of election from the State*.") (emphasis added). In 1800, Vice President Jefferson unilaterally made the decision to accept questionable electoral votes from Georgia that favored him. Bruce Ackerman and David Fontana, *How Jefferson Counted Himself In*, THE ATLANTIC (Mar. 2004), *at* https://www.theatlantic.com/magazine/archive/2004/03/how-jefferson-counted-himself-in/302888/. In 1824, when his disputed election with Andrew Jackson was decided in the House of Representatives, President John Quincy Adams successfully lobbied the House to decide the election in his favor—even though Jackson far exceeded his totals in both the popular vote and electoral college—so successfully, in fact, that Jackson's supporters accused him of striking a

---

'irregularities' on Election Day, a group of Democrats in Congress objected Thursday to the counting of Ohio's 20 electoral votes, delaying the official certification of the 2004 presidential election results."); Brenna Williams, *11 Times VP Biden Was Interrupted during Trump's Electoral Vote Certification*, CNN.com (Jan. 6, 2017), *at* https://www.cnn.com/2017/01/06/politics/electoral-college-vote-count-objections/index.html ("During the course of the certification, House Democrats tried to object to electoral votes from multiples states" claiming, *inter alia*, "electors were not lawfully certified"); Rachael Revesz, *Computer Scientists Say They Have Strong Evidence Election Was Rigged against Clinton in Three Key States*, Independent (Nov. 23, 2016), *at* https://www.independent.co.uk/news/world/americas/wisconsin-michigan-pennsylvania-election-hillary-clinton-hacked-manipulated-donald-trump-swing-states-scientists-lawyers-a7433091.html ("So far, six electoral college voters said they would not vote for Mr Trump. Meanwhile more than 4.5 million people have signed a petition for more electoral college delegates to defy the instructions given to them in their state.").

"corrupt bargain" with House Speaker Henry Clay, whom Adams soon appointed Secretary of State. And in 1960, Vice President Nixon—himself a candidate—decided which competing slate of electors to accept from Hawaii. Herb Jackson, *What Happens When a State Can't Decide on its Electors*, ROLL CALL (Oct. 26, 2020), *at* https://rollcall.com/2020/10/26/we-the-people-what-happens-when-a-state-cant-decide-on-its-electors/; *see also* 146 CONG. REC. E2180 (daily ed. Dec. 13, 2000) (statement of Rep. Mink) ("Vice President Nixon, sitting as the presiding officer of the joint convention of the two Houses, suggested that the electors named in the certificate of the Governor dated January 4, 1961 be considered the lawful electors from Hawaii. There was no objection to the Vice President's suggestion . . ."). In the 2000 election contest, three Supreme Court justices pointed to the Hawaii situation in 1960 to emphasize that competing slates of electors could be submitted to Congress and that Congress could make the decision on which slate to accept:

> But, as I have already noted, those provisions [of the Electoral Count Act] merely provide rules of decision *for Congress to follow when selecting among conflicting slates of electors*. They do not prohibit a State from counting what the majority concedes to be legal votes until a bona fide winner is determined. Indeed, in 1960, *Hawaii appointed two slates of electors and Congress chose to count* the one appointed on January 4, 1961, well after the Title 3 deadlines.

*Bush*, 531 U.S. 98, 127 (2000) (Stevens, J., dissenting) (internal citations omitted) (emphasis added). In addition, the actions charged in the indictment against President Trump were consistent with the provisions of the then-current version of the Electoral Count Act, as it then provided before its recent revisions. 3 U.S.C. § 15 (2020). Indeed, the very fact that Congress decided to amend the Electoral Count Act at all demonstrates that it did not prohibit (let alone criminalize) mechanisms such as alternate electors or lobbying the Vice President, all of which further proves that this criminal prosecution violates the fair notice provisions of the Due Process Clause.

At the time of the allegations in the indictment, the only relevant judicial precedent, from 2000, treated post-election challenges as lawful and included a dissent arguing that competing elector slates could be submitted to Congress for Congress to decide which to accept. Furthermore, the actions listed in the Indictment had been performed in 1800, 1824, 1876, and 1960, among others, without any suggestion they were criminal. Scores of people have been involved in similar conduct over the years of American history, and none has faced criminal prosecution. On these facts, at best, "men of common intelligence must necessarily guess" if President Trump's conduct violated the statute, and the charges thus violate the Due Process Clause. *Hynes*, 425 U.S. at 620 (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391 (1926)).

## **CONCLUSION**

The Court should dismiss the indictment with prejudice.

Dated: October 23, 2023                        Respectfully submitted,

Todd Blanche, Esq. (PHV)                       */s/John F. Lauro*
toddblanche@blanchelaw.com                     John F. Lauro, Esq.
Emil Bove, Esq. (PHV)                          D.C. Bar No. 392830
Emil.Bove@blanchelaw.com                       jlauro@laurosinger.com
BLANCHE LAW                                     Gregory M. Singer, Esq. (PHV)
99 Wall St., Suite 4460                         gsinger@laurosinger.com
New York, NY 10005                             Filzah I. Pavalon, Esq. (PHV)
(212) 716-1250                                 fpavalon@laurosinger.com
                                               LAURO & SINGER
                                               400 N. Tampa St., 15th Floor
                                               Tampa, FL 33602
                                               (813) 222-8990
                                               *Counsel for President Trump*