**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. 23-cr-257 (TSC)** |
| | * | |
| **DONALD J. TRUMP,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION TO STAY**

The Court has issued a narrow order (ECF No. 105, "Order") under Local Criminal Rule 57.7(c) that strikes a careful balance between the First Amendment rights of the defendant and the need to safeguard the integrity of the proceedings, including by protecting certain trial participants from intimidation, harassment, and threats. These narrow restrictions were needed, the Court found (*id.* at 2), because the defendant has a demonstrated history of using inflammatory language to target certain individuals in a way that "pose[s] a significant and immediate risk that (1) witnesses will be intimidated or otherwise unduly influenced by the prospect of being themselves targeted for harassment or threats; and (2) attorneys, public servants, and other court staff will themselves become targets for threats and harassment." The Order leaves the defendant entirely free (*id.* at 3) to assert his innocence, claim that his prosecution is politically motivated, criticize the platforms and policies of his political opponents, and level all manner of criticism at various institutions and individuals, including the incumbent president and the Department of Justice. But, like every other criminal defendant, what the defendant may not do is publicly target certain trial participants in order to "vilify and implicitly encourage violence against public servants" or to "launch a pretrial smear campaign against . . . foreseeable witnesses." ECF No. 103 at 83-84. Because such targeted "statements pose sufficiently grave threats to the integrity of the

proceedings that cannot be addressed by alternative means," ECF No. 105 at 2-3, the Court found the Order both necessary to advance a compelling interest and narrowly tailored, ECF No. 103 at 82.

The defendant has moved to stay that Order pending appeal, insisting that he is entitled to target trial participants.  ECF No. 110.  But because he has failed to show either a substantial likelihood of success on the merits, or that the public interest weighs in favor of a stay, the defendant's motion should be denied.  Moreover, based on the defendant's recent social media posts targeting a known witness in this case in an attempt to influence and intimidate him, the Court should lift the administrative stay and modify the defendant's conditions of release to prevent such harmful and prejudicial conduct.

## I.      Background

Local Criminal Rule 57.7(c) authorizes each judge in this district to issue a "special order" in "a widely publicized or sensational criminal case" that "govern[s] such matters as extrajudicial statements by parties, witnesses and attorneys likely to interfere with the rights of the accused to a fair trial by an impartial jury."  LCrR 57.7(c).  After indictment, the Government filed a motion (ECF No. 57) requesting such an order in light of the defendant's repeated efforts to target witnesses and trial participants with disparaging and inflammatory personal attacks.   The defendant opposed the Government's motion.  ECF No. 60.

At the hearing that followed, the Court reviewed numerous social media posts by the defendant, which fell "into roughly five categories": (1) "statements about the District of Columbia and its jury pool"; (2) "statements about the Biden administration or the Justice Department"; (3) "statements about Special Prosecutor Smith and his staff"; (4) "statements about judges and their staff"; and (5) "statements about political witnesses."  ECF No. 103 at 27.  In discussing these

examples and other hypotheticals, the Court emphasized (*id.* at 37) that "speech critical of the exercise of the state's power lies at the very center of the First Amendment," and should therefore be given the widest possible berth.  The Court noted (*id.* at 41), however, that "at some point a defendant's targeted disparagement of government officials can go from permissible criticism of those officials to encouraging harm against them."  As the Court explained (*id.* at 41, 60), targeted disparagement of this sort can pose a real danger even when it does not explicitly call for harassment or violence, as repeated attacks on a perceived adversary are often understood as a signal to act against that person—much like King Henry II's famous remark, in reference to Archbishop Thomas à Becket, "Will no one rid me of this meddlesome priest?" which resulted in Becket's murder.  *See, e.g.*, *United States v. Smallwood*, 365 F. Supp. 2d 689, 696 n.14 (E.D. Va. 2005) (explaining the idiom).  Such risks are far from speculative here, the Court found, given uncontradicted facts submitted by the Government showing that when the defendant "has singled out certain people in public statements in the past," it has "led to them being threatened and harassed."  ECF No. 103 at 66-67.[1]

To that end, the Court asked defense counsel why, in advancing the claim that his "prosecution is politically motivated," it was necessary for the defendant to use "derogatory labels" and "highly charged language" such as "thug" and "deranged," that "frankly risk[] a real possibility of violence."  *Id.* at 41-42, 44-45.  Likewise, the Court inquired why it was necessary for the defendant to advance his claim of judicial bias by attacking the Court as "a fraud dressed up as a

---

[1] Shortly after being assigned to the case, the Court itself received a racist death threat explicitly tied to the Court's role in presiding over the defendant's case.  *See United States v. Shry*, No. 4:23-cr-413, ECF No. 1 at 3 (Criminal Complaint) (S.D. Tex. Aug. 11, 2023) (caller stating, among other things, "'If Trump doesn't get elected in 2024, we are coming to kill you, so tread lightly, b***h. . . .  You will be targeted personally, publicly, your family, all of it.'").  This incident, like many of the others the Government cited, was widely publicized and surely well known to the defendant.

judge" and "a radical Obama hack," or to assert judicial bias in his ongoing civil trial in New York by posting to social media a photograph of a court staffer, accompanied by the false allegation that the staffer was Senator Schumer's "girlfriend." *Id.* at 50-51. The Court also asked why it would be acceptable for the defendant to say (hypothetically), in the course of criticizing his former Attorney General, that "Bill Barr should be executed for his many treasonous acts." *Id.*

In response, defense counsel acknowledged that, if he were asked by his client, he would advise against actions like these, since targeted disparagement does not "necessarily need to be made in the context of a court proceeding," *id.* at 70, and posting a court staffer's photograph to social media is "not something that should be done in the course of a . . . court proceeding," *id.* at 52.[2] Counsel illustrated the point by noting that he had raised the issue of judicial bias "very professionally and very appropriately . . . and very respectfully" through the recusal motion, without any targeted disparagement, thereby "represent[ing] [the] client zealously" while also adhering to counsel's duties as an officer of the court. *Id.* at 52-53. But counsel maintained that the Court could not constrain the defendant himself from saying these concededly unnecessary things. Instead, counsel proposed that the Court should merely ask defense counsel to "convey" to the defendant the Court's "instructions and admonition[s]" about what the Court "find[s

---

[2] Defense counsel also assured the Court that the defendant's post targeting the court staffer had been "dealt with" with by the court in New York. That assurance turned out to be mistaken. On October 20, 2023, the presiding judge in New York fined the defendant $5,000 for "blatant[ly] violat[ing]" the order in that case by leaving the photograph and false accusation on his campaign website. *See* Jonah Bromwich & Kate Christobek, *Trump Ordered to Pay $10,000 in New Punishment for Breaking Gag Order*, N.Y. Times (Oct. 25, 2023). Today, the defendant again violated the New York court's order when he stated that the judge had "a person who's very partisan alongside him, perhaps much more partisan than he is." After the defendant claimed unconvincingly under oath that he had not been commenting on the court's clerk, the judge found the defendant not to be credible and fined him $10,000. *See* New York Post, Trump fraud trial: Live updates from NYC courtroom, www.nypost.com/2023/10/24/news/trump-fraud-trial-live-updates-from-nyc-courtroom/.

acceptable," with "the expectation" that the defendant would then choose to "abide by [the Court's] instructions in that regard." *Id.* at 53-54. Counsel maintained, however, that so long as the defendant's comments could be characterized as addressing a topic of legitimate concern or public interest, the Court was powerless to place any limits whatsoever on the defendant's extrajudicial speech, beyond what is already prohibited by the criminal law, even for the purpose of protecting trial participants or ensuring the fairness and integrity of the trial. *See id.* at 24-25 (counsel stating, "I can't conceive of an order that would be lawful").

In the defendant's view, for example, because he is entitled to say that "this prosecution is politically motivated," it must also be acceptable for him to refer to the prosecutors as "deranged" "thugs," and to use his social media account to identify members of the prosecutor's family. *Id.* at 45-48. Because the defendant is entitled to raise "the issue of potential judicial bias," he must also be free to post a photograph of a court staffer and falsely allege that she is the "girlfriend" of a political adversary. *Id.* at 51-53. Because the defendant is entitled to say that "misconduct by a joint chief of staff is intolerable in a democratic society," he must also be free to post on social media that "in times gone by" the appropriate "punishment" for the Chairman of the Joint Chiefs of Staff "would have been DEATH!" *Id.* at 56, 59-60. Because the defendant is entitled to "comment on Bill Barr's activity as attorney general," or discuss whether he "might have a position in a future administration," he must also be free to call Barr "a slimy liar," and to suggest that he, too, should be "executed." *Id.* at 69-73. Defense counsel did not dispute that, when the defendant uses social media to target a perceived adversary in this manner, harassment, intimidation, and threats from third parties often follow. But he maintained (*id.* at 26, 60-61, 67-68) that, unless the defendant himself is delivering or inciting the threat, the Court was powerless to take prophylactic measures to prevent such harassment—and, in any event, some of the defendant's targets were

"tough-edged political people," *id.* at 74, who would not be deterred from testifying despite such intimidation and threats.

After hearing from the parties, the Court orally granted the Government's motion in part and denied it in part. *Id.* at 81-82.[3]  The Court explained that "[t]here is a compelling interest in the administration of justice and in protecting witnesses in this case, and it is possible to craft a narrowly tailored order to serve that interest." *Id.* at 82.[4]  Based on the Court's "review of past statements made by [the defendant] in particular, as well as the evidence that they have led to harassment and threats for the people he has targeted," the Court found that, in the absence of an order, "there is a real risk that witnesses may be intimidated or unduly influenced and that other potential witnesses may be reluctant to come forward lest they be subjected to the same harassment and intimidation." *Id.* at 84.  The Court further explained that because these narrow restrictions on extrajudicial statements were aimed at "language that presents a danger to the administration of justice," it would not impose any restrictions on two of the five categories of statements described above. *Id.* at 82-83.  Specifically, the Court declined to impose any additional restrictions on "statements regarding the District of Columbia or its jury pool," since "the *voir dire* process and cautionary jury instructions can filter out those statements' influence on the jury." *Id.* The Court likewise declined to impose any additional restrictions "on statements criticizing the government generally, including the Biden administration or the Justice Department, or statements

---

[3] The Court also denied the Government's separate request to impose "additional jury pool survey requirements." ECF No. 103 at 82.  That decision is not at issue in this motion to stay.

[4] At the beginning of the hearing, the Court noted that the parties disputed the applicable legal standard, with the Government advocating for the substantial-likelihood-of-material-prejudice standard from *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991), and the defendant advocating for a form of strict scrutiny that could only be satisfied by finding a clear and present danger to the administration of justice. ECF No. 103 at 6-7.  The Court declined to resolve this dispute because it intended for any order "to satisfy either test." *Id.* at 7-8.

communicating that [the defendant] believes this prosecution to be politically motivated." *Id.* at 83. Thus, the defendant "can certainly claim he's being unfairly prosecuted" and "may still vigorously seek public support as a presidential candidate, debate policies and people related to that candidacy, criticize the current administration, and assert his belief that this prosecution is politically motivated." *Id.* at 83-84. But, like every other criminal defendant, he does not have "carte blanche to vilify and implicitly encourage violence against public servants" and he may not "launch a pretrial smear campaign against participating government staff, their families, and foreseeable witnesses." *Id.* at 84-85. These narrow restrictions, the Court found, "are consistent with the rights secured by the First, Fifth, and Sixth Amendments, and . . . are both necessary and narrowly tailored to safeguard the integrity of these proceedings as well as to protect the safety of the people assisting with them." *Id.* at 85.

The Court issued its written Order (ECF No. 105) the following day. In it, the Court acknowledged its duty to "'take such steps by rule and regulation that will protect [its] processes from prejudicial outside interferences,'" explaining that, while "'[f]reedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice,'" it "'must not be allowed to divert the trial from the very purpose of a court system to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures.'" *Id.* at 1 (quoting *Sheppard v. Maxwell*, 384 U.S. 333, 350-51, 363 (1966)). The Court then found that "[i]n order to safeguard the integrity of these proceedings, it is necessary to impose certain restrictions on public statements by interested parties." *Id.* at 2. "Undisputed" evidence demonstrated that when the defendant "has publicly attacked individuals, including on matters related to this case, those individuals are consequently threatened and harassed," with such targeted attacks on trial participants continuing post-

indictment.  *Id.*  The defendant has made these targeted attacks, moreover, "to national audiences using language communicating not merely that he believes the process to be illegitimate, but also that particular individuals involved in it are liars, or 'thugs,' or deserve death."  *Id.*  The Court therefore found "that such statements pose a significant and immediate risk that (1) witnesses will be intimidated or otherwise unduly influenced by the prospect of being themselves targeted for harassment or threats; and (2) attorneys, public servants, and other court staff will themselves become targets for threats and harassment."  *Id.*  The Court further found there were no "alternative means" that could adequately address these "grave threats to the integrity of the proceedings."  *Id.* at 3.  In particular, alternative means "such as careful *voir dire*, jury sequestration, and cautionary jury instructions" could "remedy only some of the potential prejudices."  *Id.* at 1-2.  And "in the age of the Internet," the risk to an individual is "largely irreversible" once he or she "is publicly targeted" on social media, even if the "offending statement" is later removed.  *Id.*

The Court was cognizant (*id.* at 2-3) of the defendant's status as a presidential candidate, and therefore found it appropriate to leave him room to criticize his prosecution as politically motivated and to attack institutions (such as the Department of Justice) as well individuals who are not trial participants (such as the incumbent president).  The Court found, however, that, in keeping with basic principles of "equal justice under law," his "candidacy cannot excuse statements that would otherwise intolerably jeopardize these proceedings."  *Id.* at 3.

The Court therefore ordered that:

> All interested parties in this matter, including the parties and their counsel, are prohibited from making any public statements, or directing others to make any public statements, that target (1) the Special Counsel prosecuting this case or his staff; (2) defense counsel or their staff; (3) any of this court's staff or other supporting personnel; or (4) any reasonably foreseeable witness or the substance of their testimony.

*Id.* The Court added, however, that "[t]his Order shall not be construed to prohibit Defendant from making statements criticizing the government generally, including the current administration or the Department of Justice; statements asserting that Defendant is innocent of the charges against him, or that his prosecution is politically motivated; or statements criticizing the campaign platforms or policies of Defendant's current political rivals, such as former Vice President Pence." *Id.*

On October 20, 2023, the defendant moved (ECF No. 110) to stay the Order, and the Court granted an administrative stay pending resolution of that motion (Minute Order). In the few days since the administrative stay has been in place, the defendant has returned to the very sort of targeting that the Order prohibits, including attempting to intimidate and influence foreseeable witnesses, and commenting on the substance of their testimony. For example, on October 24, 2023, the defendant took to social media to respond to a news report claiming that his former Chief of Staff, identified in the indictment, had testified in exchange for a grant of immunity:



Today, in a courthouse press conference in New York, the defendant again commented on the Chief of Staff's credibility and anticipated testimony.[5]

## II.    Applicable Law

A stay pending appeal is "an intrusion into the ordinary processes of administration and judicial review and accordingly is not a matter of right." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (citation and quotation marks omitted).  A stay pending appeal is "extraordinary relief." *Citizens for Responsibility & Ethics in Wash. v. Fed. Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam) *("CREW")*.  A movant seeking a stay pending appeal bears the burden of demonstrating that a stay would be appropriate. *Nken*, 556 U.S. at 433-34.  A court considering whether to grant a stay pending appeal considers: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434.  The last two factors "merge when the Government is the opposing party." *Id.* at 435.

The first factor—likelihood of success on the merits—is the "most important," *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014), and will often be "determinative" in cases alleging a First Amendment violation, *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018).  With respect to that paramount factor, "[i]t is not enough that the chance of success on the merits [is] better than negligible." *Nken*, 556 U.S. at 434 (citation and quotation marks omitted). Rather, the likelihood of success on appeal must be "substantial." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977).  The

---

[5]    *See*   CSPAN,   https://www.c-span.org/video/?531393-1/president-trump-comments-speaker-election-mark-meadows-immunity-report.

failure to make this requisite showing is "arguably [a] fatal flaw for a stay application." *CREW*, 904 F.3d at 1019.  Moreover, "even if irreparable injury might otherwise result to the appellant," a stay "is not a matter of right" and remains an exceptional remedy.  *Nken*, 556 U.S. at 427 (quotations omitted).

## III.    Argument

The defendant's motion to stay the Court's narrowly tailored order under Local Criminal Rule 57.7(c) should be denied.  There has never been a criminal case in which a court has granted a defendant an unfettered right to try his case in the media, malign the presiding judge as a "fraud" and a "hack," attack the prosecutor as "deranged" and a "thug," and, after promising witnesses and others, "IF YOU GO AFTER ME, I'M COMING AFTER YOU," target specific witnesses with attacks on their character and credibility, even suggesting that one witness's actions warrant the "punishment" of "DEATH!"   The defendant nevertheless claims that the First Amendment, combined with his status as a presidential candidate, grants him an unfettered right to do these things, and more.  Indeed, he insists that the Court is powerless even to prevent him from posting photographs of court personnel, ECF No. 103 at 51-52, or publicly telling known witnesses that they should learn to keep their mouths shut, *id.* at 72.  The most the Court can do, he maintains, is either wait for harassment or violence to occur and then take remedial steps (*id.* at 79)—such as ordering the removal of a particular post (*id.* at 52) or, better yet from the defendant's perspective, delaying the trial date (*id.* at 20)—or ask defense counsel (*id.* at 54) to "convey" the Court's "instructions and admonition[s]" to the defendant, with "the expectation" that the defendant will choose to "abide by [the Court's] instructions in that regard."

The First Amendment does not require such an ineffectual approach to protecting the integrity and fairness of the trial.  To the contrary, the Court has both the authority and the duty to

prevent trial participants, including the defendant, from engaging in extrajudicial speech that poses a substantial likelihood of material prejudice.  The Court correctly entered such an order here.

The Order was based on appropriate factual findings grounded in the defendant's long and well-documented history of using his public platform to target disparaging and inflammatory comments at perceived adversaries, regardless of whether they are military generals, judges, election workers, or court staffers.  When the defendant does so, harassment, threats, and intimidation foreseeably and predictably follow.  These actions, particularly when directed against witnesses and trial participants, pose a grave threat to the very notion of a fair trial based on the facts and the law.  The Order is therefore aimed at serving the most compelling of governmental and societal interests.

The Court's Order is also narrowly tailored.  The Order placed no limitations whatsoever on the defendant's ability to proclaim his innocence, to allege that the prosecution is politically motivated, to attack institutions like the Department of Justice and the government generally, to criticize individuals who are not participants in the case, including the incumbent president, and to criticize the platforms and policies of political rivals, even when they are expected to be witnesses at this trial.  The Order is far narrower than the orders issued in similar cases, which often preclude any discussion of the case or any extrajudicial allegations of political motivation. It does not limit the defendant's ability to present a full defense in court or hinder his ability to run for office.  As the Court explained, the defendant's status as a political candidate does not give him "carte blanche to vilify and implicitly encourage violence against public servants" or "launch a pretrial smear campaign against . . . foreseeable witnesses."  ECF No. 103 at 83-84.  And, contrary to the defendant's assertions, the Court considered alternative means but rejected them as unworkable, at least with respect to certain categories.  Indeed, the Court rejected restrictions on

some statements because it found that alternative means were sufficient to mitigate the resulting harms.

Finally, the Order is sufficiently clear and does not suffer from vagueness problems.  The Order limits the defendant's ability to "target" certain trial participants—that is, to single them out as "the object of general abuse, scorn, derision or the like." *Oxford English Dictionary* 640 (target, n., sense 3.b); *see id.* at 642 (target, v., sense 2) ("To use (a person) as a target").  It does not limit the speech of non-parties, such as members of the public or the media.  And, through discovery, the defendant has ample information about who the foreseeable witnesses are, which is presumably why he has not raised any vagueness objection to his conditions of release, even though those conditions likewise restrict his ability to speak to any individual known to be a witness.

Taken together, the Court's Order was appropriate, and the defendant's appeal is unlikely to succeed on the merits.  And because the defendant cannot show that his constitutional rights have been violated, he cannot establish any of the other stay factors.   The motion should be denied.

## A.  The Defendant Has Not Demonstrated a Substantial Likelihood of Success on the Merits.

### 1.  The Court has the power to issue an order restricting extrajudicial speech of the defendant.

The "very purpose of a court system" is "to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures," with the jury's verdict "based on evidence received in open court, not from outside sources."  *Sheppard v. Maxwell*, 384 U.S. 333, 350-51 (1966) (quotations omitted).  When a party threatens to flout this "undeviating rule" by trying to influence the case "through the use of the meeting-hall, the radio, and the newspaper," *id.* (quotations omitted), rather than through evidence and legal argument, a court has the power to act.  Indeed, courts have an affirmative duty to "take such steps by rule and

regulation that will protect their processes from prejudicial outside interferences," and "[n]either prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function." *Id.* at 363.

A court's power includes the ability to impose narrowly tailored restrictions on extrajudicial speech. *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1075 (1991). In doing so, however, a court must strike a "constitutionally permissible balance" between the speaker's First Amendment rights and the public's "interest in fair trials." *Id.* "Although litigants do not surrender their First Amendment rights at the courthouse door, those rights may be subordinated to other interests that arise in this setting," *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 n.18 (1984), and "[f]ew, if any, interests under the Constitution are more fundamental than the right to a fair trial by impartial jurors," *Gentile*, 501 U.S. at 1075 (quotations omitted).

The applicable standard for striking the constitutionally permissible balance depends on whether the speaker is a "participant[] in the litigation," such as a defense attorney, or a "stranger[] to it," such as a newspaper covering the case. *Gentile*, 501 U.S. at 1072-73. In cases involving a trial participant, a court must find that the extrajudicial speech poses a "substantial likelihood of material prejudice" to the trial. *Id.* at 1075. In cases involving restrictions on a third party, like the news media, a court must find that there is "a clear and present danger of some serious substantive evil which [the restrictions] are designed to avert." *Id.* at 1069; *see Neb. Press Ass'n v. Stuart*, 427 U.S. 539 (1976).

The defendant asserts (ECF No. 110 at 2, 7) that the clear-and-present-danger test should apply here, relying on cases that preceded *Gentile*. But the Supreme Court's decision in *Gentile* "foreclosed the applicability of [the clear-and-present-danger] test[] to the regulation of speech by trial participants." *United States v. Brown*, 218 F.3d 415, 427 (5th Cir. 2000); *see Gentile*, 501

U.S. at 1072-73 (explaining that the "distinction between participants in the litigation and strangers to it is brought into sharp relief by" *Seattle Times*, which "unanimously held that a newspaper, which was itself a defendant in a libel action, could be restrained from publishing material about the plaintiffs and their supporters to which it had gained access through court-ordered discovery"); ECF No. 64 at 2-7 (collecting cases).  Notably, the defendant never engages with the majority opinion in *Gentile*, citing the case only once (ECF No. 110 at 14); and even then, he cites a portion of the opinion, 501 U.S. at 1043, joined by only four justices, while failing to disclose that he is relying on a non-controlling section of the decision.  *See Gentile*, 501 U.S. at 1032 (explaining that Part II of Justice Kennedy's opinion is "an opinion" rather than "the opinion of the Court").

The defendant's attempt to equate his right to extrajudicial speech to that of the press also fails on its own terms.  Criminal defendants, unlike the press, are subject to the jurisdiction and supervision of the court presiding over their case.  They are routinely subject to reasonable restraints on their liberty—including the standard release condition, entered here without objection (ECF No. 13), barring them from communicating with witnesses about the case without attorneys present—that generally could not be permissibly imposed on the public or the media.  *See United States v. Salerno*, 481 U.S. 739, 749 (1987) ("Even competent adults may face substantial liberty restrictions as a result of the operation of our criminal justice system.").  The contrary conclusion reached in the pre-*Gentile* case of *United States v. Ford*, rests on a single sentence stating, "We see no legitimate reasons for a lower threshold standard for individuals, including defendants, seeking to express themselves outside of court than for the press."  830 F.2d 596, 598 (6th Cir. 1987).  For that proposition, *Ford* cited *Pell v. Procunier*, 417 U.S. 817, 834-35 (1974), which explains that the First Amendment does not "impose[] upon government the affirmative duty to make available to journalists sources of information not available to members of the public

generally." *Id.* But the fact that the press and the public are treated equivalently for purposes of access to information does not suggest that a trial participant's right to make extrajudicial statements is equivalent to the press and public's right to comment on pending charges or a trial. To the contrary, a criminal defendant, like his attorney, is "privy to a wealth of information" provided in discovery that is unavailable to the general public or the media but particularly capable of jeopardizing a fair trial if disseminated. *Brown*, 218 F.3d at 428. And a criminal defendant has ample opportunity to comment on the trial through the judicial process itself—by filing motions, presenting evidence, making arguments—which is not afforded to the public or the media. Moreover, when the court's animating concern is "protect[ing] [its] processes from prejudicial outside interferences," *Sheppard*, 384 U.S. at 363, "there appears to be no reason, at least where lawyers and parties have each demonstrated a 'substantial likelihood' of making prejudicial comments outside the courtroom, to distinguish between the two groups for the purpose of evaluating a gag order directed at them both," *Brown*, 218 F.3d at 428.

The defendant resists this conclusion by arguing (ECF No. 110 at 20-23) that the right to a fair trial belongs only to him, and so he should be free to try use external influences to distort the trial in his favor. That claim should be rejected. The defendant again relies (*id.* at 22) largely on *Ford*, 830 F.2d at 600, but that portion of the opinion was not embraced by the other two members of the panel. *See Ford*, 830 F.2d at 603 (Krupansky, J., concurring) ("[E]xisting legal precedent defines the Sixth Amendment right to a fair and impartial trial as a right that inures not only to the sole benefit of a defendant, but rather one that inures equally to the state as the representative of the people."); *id.* at 606 (Nelson, J., concurring) ("The public's interests do not extend to allowing the official to engage in tortious conduct toward his accusors, of course . . . ."). The Supreme Court's decision in *Gentile*, which involved restrictions imposed on a defense attorney, forecloses

such a narrow conception of the right to a fair trial. *See Gentile*, 501 U.S. at 1075 (emphasizing the need to strike "a constitutionally permissible balance between the First Amendment rights of attorneys in pending cases and the State's interest in fair trials"). The defendant is therefore incorrect to suggest that he retains a constitutionally protected right to prejudice the trial in his favor. *See United States v. Lindh*, 198 F. Supp. 2d 739, 743 (E.D. Va. 2002) ("Defendant has no constitutional right to use the media to influence public opinion concerning his case so as to gain an advantage at trial. No such right inheres in either the Sixth Amendment right to a public trial, or the public's First Amendment right to a free press."); *United States v. Tijerina*, 412 F.2d 661, 667 (10th Cir. 1969) ("The public has an overriding interest that justice be done in a controversy between the government and individuals and has the right to demand and expect fair trials designed to end in just judgments. This objective may be thwarted unless an order against extrajudicial statements applies to all parties to a controversy. The concept of a fair trial applies both to the prosecution and the defense.").

It is therefore clear that the Court had the authority to issue an order restricting the defendant's extrajudicial speech. And while the Constitution requires only a finding of a substantial likelihood of material prejudice, the Court found that the Order satisfies even the defendant's proffered standard (ECF No. 103 at 7-8), because it is narrowly tailored to advance a compelling interest (*id.* at 82-83).

### 2. The Order entered here was necessary and appropriate.

#### a. The Court correctly found that an order under Local Criminal Rule 57.7(c) was necessary to advance compelling interests.

The Court correctly found that an order under Local Criminal Rule 57.7(c) was necessary to advance the compelling interests of ensuring a fair trial free from outside influence and untainted by harassment, intimidation, and threats directed towards witnesses and other trial participants.

The Court's Order was premised on three well-supported factual findings.[6]  First, the defendant has a long history of using his social media account and public statements to target perceived adversaries by singling them out and using inflammatory and disparaging language that "vilif[ies] and implicitly encourage[s] violence against" them.  ECF No. 103 at 84.  Second, when the defendant does so, harassment, threats, and intimidation reliably follow.  ECF No. 105 at 2.  Third, such harassment, threats, and intimidation "pose a significant and immediate risk that (1) witnesses will be intimidated or otherwise unduly influenced by the prospect of being themselves targeted for harassment or threats; and (2) attorneys, public servants, and other court staff will themselves become targets for threats and harassment."  *Id.*

The defendant does not meaningfully dispute the accuracy of any of these findings.  Instead, he first argues (ECF No. 110 at 8-10) that they lacked adequate evidentiary support.  But the Government's uncontradicted filings (ECF No. 57 at 2-13; ECF No. 64 at 9-12) documented a long history of targeted tweets as well as a litany of individuals who have described (sometimes in sworn testimony) the repeated and foreseeable effects of his targeting.  *E.g.*, ECF No. 57 at 3 (quoting congressional testimony stating, "After the President tweeted at me by name, calling me out the way he did, the threats became much more specific, much more graphic, and included not just me by name but included members of my family by name, their ages, our address, pictures of our home.  Just every bit of detail you could imagine.  That was what changed with that tweet.");  *id.* at 5 (quoting congressional testimony stating, "[W]hen someone as powerful as the President

---

[6] Although the Court of Appeals will review the propriety and scope of the Order *de novo*, it will review questions of "historical fact" such as these for clear error.  *See Thompson v. Hebdon*, 7 F.4th 811, 819 (9th Cir. 2021); *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018); *Green v. Haskell Cnty. Bd. of Comm'rs*, 568 F.3d 784, 796 (10th Cir. 2009); *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002).

of the United States eggs on a mob, that mob will come.").[7]  As the Court explained, these citations

to public statements and testimony were "[u]ndisputed," ECF No. 105 at 2, and there was no need

to submit the same material as part of an affidavit, ECF No. 103 at 57.  *Cf. United States v. Smith*,

79 F.3d 1208, 1210 (D.C. Cir. 1996) (per curiam) (holding that the parties may proceed by proffer

at a detention hearing).   The factual findings here were adequately supported and readily

distinguish this case from *Ford*.  *Cf. Ford*, 830 F.2d at 597 (noting that the order was issued *sua*

*sponte*); *id.* at 603 (Krupansky, J., concurring) (noting the absence of factual findings).  And the

defendant will not be able to demonstrate that they are clearly erroneous on appeal.

The defendant further maintains that, despite being a party to this case, his extrajudicial

speech cannot be restricted unless the speech itself is independently criminal, either because it

constitutes a direct threat or harassment, or because it incites criminal conduct by others.  In his

view, the likelihood that a "third party" might choose to engage in harassment, threats, or violence

as a result of the defendant's words can never authorize an order under Rule 57.7(c).  *See* ECF No.

103 at 67 (dismissing these concerns as "totally irrelevant").  This argument is of a piece with the

pattern that lies at the heart of the Court's Order.  As the Court explained (*id.* at 41, 60, 84), the

defendant does not need to *explicitly* incite harassment or violence in his public statements,

---

[7] The Government's submissions, while extensive, did not purport to be a comprehensive account of every occasion when the defendant's public targeting of perceived adversaries has resulted in threats, harassment, or intimidation.  The public record is replete with other examples. *See, e.g.*, *United States v. Taranto*, No. 1:23-cr-229, ECF No. 27 at 4-6 (D.D.C. Sep. 12, 2023) (affirming detention order for Taranto and explaining that, after "'former President Trump posted what he claimed was the address of Former President Barack Obama' on Truth Social," Taranto— who had previously entered the Capitol on January 6, 2021—reposted the address, along with a separate post stating, "'See you in hell, Podesta's and Obama's'" [sic], and then proceeded, heavily armed, to the area the defendant had identified as President Obama's address, while livestreaming himself talking about "getting a 'shot' and an 'angle,'" adding, "'See, First Amendment, just say First Amendment, free speech'") (quoting *Taranto*, ECF No. 20).

because he well knows that, by publicly targeting perceived adversaries with inflammatory language, he can maintain a plausible deniability while ensuring the desired results. The indictment notes, for example, that "[w]hen the Vice President refused to agree to the Defendant's request that he obstruct the certification, the Defendant grew frustrated and told the Vice President that the Defendant would have to publicly criticize him," which caused the Vice President's Chief of Staff sufficient concern that he "alerted the head of the Vice President's Secret Service detail." ECF No. 1 at ¶ 97. The defendant knows the effect of his targeting and seeks to use it to his strategic advantage while simultaneously disclaiming any responsibility for the very acts he causes.[8] And while the precise timing and manner of the resulting harassment, intimidation, or violence is, by the defendant's own design, inherently "speculative" (ECF No. 103 at 62), what matters for present purposes is that everyone—the defendant, his "over 100 million followers" (ECF No. 110 at 4), and the people targeted—knows of the dynamic, which creates a "significant and immediate risk that (1) witnesses will be intimidated or otherwise unduly influenced by the prospect of being themselves targeted for harassment or threats; and (2) attorneys, public servants, and other court staff will themselves become targets for threats and harassment." ECF No. 105 at 2. Contrary to the defendant's suggestions (ECF No. 110 at 18-20), this dynamic is the opposite

---

[8] In a recently published recording, one of the defendant's supporters described this well-known dynamic, stating, "'Trump says, "Would you go and tell that guy over there to steal for me?" And so he can say, "I never told the guy to steal." And things like that is how Trump gets away with it.'" *See* Ben Protess, et al., *A President, a Billionaire and Questions About Access to National Security*, N.Y. Times (Oct. 22, 2023); *see also Donald Trump Spills Secrets*, 60 Minutes Australia (playing audio recording in which the same supporter says that the defendant "knows exactly what to say and what not to say so that he avoids jail, but gets so close to it that it looks to everyone like he's breaking the law. Like, he won't go up to someone and say, 'I want you to kill someone.' He'll say, he'll send someone, to tell someone, to kill someone."), *available at* https://www.youtube.com/watch?v=AVFT-2k8eWQ at 7:03.

of a "heckler's veto," as the Court's concern was not the violent *disagreement* of the audience, but rather the clear pattern of a portion of the audience *agreeing* with the defendant's implicit wishes.

It is true, as the defendant insists, that some of the individuals he has targeted and plans to continue targeting are current or former high-ranking public officials who, after becoming the defendant's targets, may be granted increased protection from the Marshals Service or the Secret Service, thereby mitigating the likelihood that any threats will be carried out. But the defendant's threats have never been *limited* to such figures and have always included people like election workers and court personnel who have little ability to avail themselves of similar protections. There are numerous witnesses in this category, and without the Court's Order there is an immediate risk that their testimony could be influenced or deterred by the defendant's documented pattern of targeting. The Court was therefore correct to find that an order under Rule 57.7(c) was necessary.

### b. *The Order is narrowly tailored.*

The Court's Order is also narrowly tailored. In most cases involving restrictions on extrajudicial speech, the order at issue has imposed a blanket prohibition on extrajudicial statements, subject only to narrow carve-outs. *See Ford*, 830 F.2d at 598 (citing "the broad 'no discussion-of-the-case' order"); *id.* at 605 (Nelson, J., concurring) (noting that the order "would prevent Mr. Ford from calling a press conference in Memphis and announcing, to take a purely hypothetical example, that he has decided to oppose any increase in the minimum wage because of the adverse effect such an increase would have on the employment opportunities of black teenagers in his district"); *Brown*, 218 F.3d at 418-19 (noting that "[t]he order provides that '[s]tatements or information intended to influence public opinion regarding the merits of this case are specifically designated as information which could prejudice a party'"); *United States v. Manafort*, 897 F.3d 340, 342 (D.C. Cir. 2018) (describing district court finding that the defendant

had arguably violated the 57.7(c) order by contributing to an op-ed in a foreign newspaper discussing the facts of the case).  In other cases, courts have expressly precluded defendants from making any extrajudicial statement "that imparts the message that Defendants have been subject to an improper, selective or vindictive prosecution," since "the issue of selective prosecution is one of law not fact," and such public statements risk biasing the jury pool.  *United States v. Fieger*, No. 07-cr-20414, 2008 WL 659767, at *3, *6 (E.D. Mich. Mar. 11, 2008); *see United States v. Scrushy*, No. 03-cr-530, 2004 WL 848221, at *6 (N.D. Ala. Apr. 13, 2004) (directing trial participants to "remove from their existing webpages within seven days of this order extrajudicial comments, allegations of prosecutorial misconduct, and information concerning matters disclosed during the course of criminal discovery in this case").

The Order here is far different and reflects the Court's narrow tailoring.  Rather than placing all discussion of the case presumptively off-limits, the Order prohibits only "public statements, that target (1) the Special Counsel prosecuting this case or his staff; (2) defense counsel or their staff; (3) any of this court's staff or other supporting personnel; or (4) any reasonably foreseeable witness or the substance of their testimony."  ECF No. 105 at 3.  By contrast, the Order explicitly does not prohibit the defendant "from making statements criticizing the government generally, including the current administration or the Department of Justice; statements asserting that Defendant is innocent of the charges against him, or that his prosecution is politically motivated; or statements criticizing the campaign platforms or policies of Defendant's current political rivals, such as former Vice President Pence."  *Id.*

It is instructive to examine the scope of the Order in light of the things the defendant claims he needs to be able to say to defend himself and run for office.  For example, on the day before the hearing, the defendant posted to social media that the government was seeking "to silence me,

through the use of a powerful GAG ORDER, making it impossible for me to criticize those who are doing the silencing, namely Crooked Joe Biden, and his corrupt and weaponized DOJ & FBI."[9] The Order, however, leaves him entirely free to do those things.  He can criticize the incumbent president and the Department of Justice.  Indeed, he freely did so while the Order was in effect.[10]

During the hearing, defense counsel identified a number things that the defendant must be allowed to say, including that "this is a politically motivated prosecution" (ECF No. 103 at 18); that "he's being treated unfairly" (*id.*); that "the Department of Justice is acting unlawfully" (*id.*); that "there are deep problems in this city that need to be addressed that haven't been addressed by the Biden administration" (*id.* at 29-30); that "this is a politically biased prosecution by a politically biased prosecutor" (*id.* at 47); that there may be an "issue of potential judicial bias" (*id.* at 52-53); and that "misconduct by a joint chief of staff is intolerable in a democratic society" (*id.* at 59).  He must also be allowed to "describe what he would like in an attorney general, and in particular compare how Attorney General Barr conducted himself with what kind of attorney general he would like" (*id.* at 64); and comment on "what a vice president should be, what an attorney general should be, what a secretary of state in a state should be and what a member of the joint chiefs of staff should be" (*id.* at 74-75).  Again, the Order leaves him entirely free to say all of these things.

In his motion to stay, the defendant quotes (ECF No. 110 at 13) a lengthy passage from *Ford* emphasizing that the defendant must be entitled to "attack the alleged political motives of the . . . administration which he claims is persecuting him"; "fight the obvious damage to his

---

[9] https://truthsocial.com/@realDonaldTrump/111242571403804808.

[10] *See, e.g.*, https://truthsocial.com/@realDonaldTrump/111250043067355175 (Oct. 17, 2023) ("Crooked Joe Biden told the DOJ to Indict TRUMP hoping that it would help him in his campaign against me and the Republicans.  In other words, he indicted his Political Opponent.  They are now called the Biden Indictments, and nothing like this has ever happened in the USA before!").

political reputation in the press and in the court of public opinion"; and "inform his constituents of his point of view." *Ford*, 830 F.2d at 600-01.  The defendant can do all of these things and more.  As such, the defendant has not remotely been "silenced."  *Id.* at 600.

The only thing he cannot do is target certain individuals connected to the case.  And as defense counsel conceded (ECF No. 103 at 70) during the hearing, targeting of the sort prohibited by the Order does not "necessarily need to be made in the context of a court proceeding."   Indeed, the litigation of the recusal motion illustrates the point.  The defendant was certainly entitled to move for the Court's recusal and marshal any facts and law necessary to explain why he believed the Court could not give him a fair trial.  Defense counsel did so, as he noted, "very professionally and very appropriately," while also representing his client "zealously."  *Id.* at 52-53.  The Government responded with its own facts and arguments, and the Court resolved the motion in a reasoned opinion, which the defendant may appeal after a final judgment, if warranted.  In the meantime, the defendant himself is free to describe those proceedings to his followers.  That is how the system is supposed to work, and how it has worked in the case of every other defendant, including those who are running for office.

What the defendant is fighting for here, however, is the right to go far beyond these sorts of measures so that he can continue using disparaging and inflammatory language that would never be put in a court filing, like "fraud," "hack," and "thug."  His failure to explain why such language is necessary only supports the inference that his objections to the Order do not stem from a legitimate concern with informing the public about his positions (which he is free to do), but rather with retaining his ability to target his perceived adversaries in a way that will foreseeably subject them to harassment, intimidation, and threat.  The First Amendment—particularly when balanced

against the bedrock values of a fair trial unaffected by external influence—does not grant him free rein to do so.

The defendant relatedly seeks (ECF No. 110 at 15-18) to invoke the rights of his followers to receive his message.[11]  But again, his followers can hear his views on a vast range of issues, including criticisms of this prosecution.  As illustrated by the defendant's social media posts in the days following the issuance of the Court's Order, the defendant was in no way hampered from disseminating his views to his followers.[12]

The defendant also contends (ECF No 110 at 28-30) that the Order is not narrowly tailored because the Court purportedly failed to consider alternative measures.  But the Court explained (ECF No. 105 at 2-3) that "alternative measures such as careful *voir dire*, jury sequestration, and cautionary jury instructions" could "remedy only some of the potential prejudices" that the Order

---

[11] The defendant did not invoke these interests in his response to the Government's motion for an order under Local Criminal Rule 57.7(c).  And while the defendant claims to have invoked these interests at the hearing, only to have been unfairly interrupted by the Court (ECF No. 110 at 17), his citations mischaracterize the record.  For example, he asserts (*id.*) that the Court interrupted him in response to his statement, "And what the government is proposing here is an order not just directed against President Trump but against the American electorate that wants to hear from President Trump under these circumstances."  The Court did not, in fact, interject in response to that point.  *See* ECF No. 103 at 44.  Rather, it was only several sentences later, after defense counsel returned to his oft-repeated talking point that "[t]his is the first time we've had a sitting administration prosecute a political opponent" that the Court responded, "I'm going to interrupt you. . . .  You have said that.  You have said it repeatedly.  I have heard it." *Id.*  Likewise, the defendant asserts (ECF No. 110 at 17) that, when counsel said, "The American people are entitled to understand that and understand the consequences of that," the Court simply responded, "No." The Court did no such thing.  After defense counsel's comment, the Court asked why the defendant "is entitled to suggest that an appropriate punishment would be death."  ECF No. 103 at 59-60.  When defense counsel invoked the First Amendment in response, the Court said, "No.  As part of that.  But again, the First Amendment protections must yield to the administration of justice and the protection of witnesses." *Id.*

[12] Between the time the Order was orally imposed and the time it was administratively stayed, the defendant posted roughly 182 times to Truth Social.

was designed to avoid.  Indeed, the Court declined to impose any restrictions on "statements regarding the District of Columbia or its jury pool" because it was "confident that the voir dire process and cautionary jury instructions can filter out those statements' influence on the jury." ECF No. 103 at 83.  The Court likewise considered and rejected the possibility of using after-the-fact removal orders, explaining that, "in the age of the Internet[,] once an individual is publicly targeted, even revoking the offending statement may not abate the subsequent threats, harassment, or other intimidating effects."  ECF No. 105 at 2.  Additional alternative measures, such as a continuance or change of venue, would be inadequate, and would only create a perverse incentive for the defendant to ramp up his targeting in order to gain the very relief that he otherwise requests.

### c.   The Order is not vague.

The Order also provides ample clarity to give the defendant "fair notice" and "sufficient warning" to "conduct [himself] so as to avoid that which is forbidden."  *United States v. Bronstein*, 849 F.3d 1101, 1104, 1106-07 (D.C. Cir. 2017) (quotations omitted) (rejecting vagueness challenge to a statute making it unlawful to "make a harangue or oration . . . in the Supreme Court Building or grounds"); *see ACLU v. Wash. Metro. Area Transit Auth.*, 303 F. Supp. 3d 11, 27 (D.D.C. 2018) ("A speech regulation is unconstitutionally vague when it is not 'clear enough to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.'" (quoting *Bryant v. Gates*, 532 F.3d 888, 893 (D.C. Cir. 2008)).

The vagueness doctrine is not offended by a term that "requires a person to conform his conduct to an imprecise but comprehensible normative standard, whose satisfaction may vary depending upon whom you ask." *Bronstein*, 849 F.3d at 1107 (quotations omitted).  Indeed, "the vagueness doctrine does not doubt the constitutionality of laws that call for the application of a qualitative standard to real-world conduct; the law is full of instances where a man's fate depends

on his estimating rightly some matter of degree." *Id.* at 1108 (cleaned up); *see Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) ("[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."). "Rather, a statute is unconstitutionally vague if, applying the rules for interpreting legal texts, its meaning specifies no standard of conduct at all." *Bronstein*, 849 F.3d at 1107 (cleaned up). "Accordingly, when the vagueness doctrine assesses a legal term's meaning to ordinary people, it is assessing meaning with the elementary rule of statutory interpretation: Words receive their plain, obvious and common sense meaning, unless context furnishes some ground to control, qualify, or enlarge it." *Id.* at 1108 (quotations omitted). The operative terms in the Court's Order easily satisfy that standard.

The defendant first challenges (ECF No. 110 at 25-26) the term "target," cataloging various dictionary definitions of the term. "But we are interpreting [an Order], not restating a dictionary," and "[o]ur search here is not for every facet of [the applicable terms], but their meaning within the [Order] at issue." *Bronstein*, 849 F.3d at 1108. And in context, it is clear that the Order uses the word "target" to mean singling out a trial participant as "the object of general abuse, scorn, derision or the like." *Oxford English Dictionary* at 640 (target, n., sense 3.b); *see id.* at 642 (target, v., sense 2) ("To use (a person) as a target"). As the Court's discussion throughout the hearing and in the Order confirms, the prohibition on "targeting" is directed at attacking individuals with "language that presents a danger to the administration of justice." ECF No. 103 at 82; *see* ECF No. 105 at 2 ("Defendant has made those statements to national audiences using language communicating not merely that he believes the process to be illegitimate, but also that particular individuals involved in it are liars, or 'thugs,' or deserve death."). The defendant avers (ECF No. 110 at 27) that he needs to be able to lay out a "specific or detailed *justification* for" his claim that

the prosecution is politically motivated, and that he needs to be able to discuss his political opponents' "platforms or policies" to the extent that they are "deeply intertwined with their views on *election integrity*."   But the Court's prohibition on targeting does not place any limits on offering specific and detailed justifications, discussing platforms or policies, or advancing any of the forms of rational argumentation that he claims it is necessary to make.   To the contrary, it limits only the sort of fact-free, disparaging, inflammatory, *ad hominem* attacks that, as the defendant knows, tend to provoke harassment, threats, and intimidation from his followers.   The mere fact that this standard may, in some circumstances, present close cases does not render the Order unconstitutionally vague.   *Bronstein*, 849 F.3d at 1107-08; *see United States v. Williams*, 553 U.S. 285, 305-06 (2008) (rejecting as a "basic mistake" the belief that "the mere fact that close cases can be envisioned renders a statute vague," since "[c]lose cases can be imagined under virtually any statute").

The defendant next challenges (ECF No. 110 at 26) the phrase "all interested parties," contending that it could encompass "the media covering [the case]" and "virtually every American voter."   No plausible interpretation encompasses this broad reading.   An "interested party" is "anyone who both is directly interested in a lawsuit and has a right to control the proceedings, make a defense, or appeal from an adverse judgment."   *Black's Law Dictionary* (party, sense 2; interested party).   The Order thus restricts the defendant, his attorneys and their staff, and members of the Special Counsel's Office.

The defendant further complains (ECF No. 110 at 26-27) that he cannot know who the "reasonably foreseeable" witnesses are, or what the "substance of their testimony" might be.   But the defendant's release conditions (ECF No. 13) likewise preclude him from communicating with witnesses about the facts of the case outside the presence of counsel, and he has not raised any

- 28 -

vagueness objections to that condition.  Rightly so, since the discovery includes a list of potential witnesses along with any testimony or statements they have given.  A reasonable person in the defendant's position has fair notice of who the foreseeable witnesses are and what the substance of their testimony will be.

\* \* \*

In sum, the Court had an ample factual basis to issue the Order, and the Order is both narrowly tailored and sufficiently clear to provide the defendant with fair notice.  He has therefore failed to show that his challenge to the Order is likely to succeed on the merits.

### B.  The Other Factors Weigh Against a Stay.

The other factors likewise counsel against a stay.  *See Archdiocese of Wash.*, 897 F.3d at 334 (considering remaining factors in tandem).  While it is true that "the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," the "deprivation of constitutional rights constitutes irreparable injury only to the extent such deprivation is shown to be likely." *Id.* (quotations omitted).  Where, as here "there is no showing of a likelihood of success on the merits," there can be no showing of irreparable injury.  *Id.* Likewise, "the strength of the [defendant's] showing on public interest rises and falls with the strength of [his] showing on likelihood of success on the merits." *Id.* at 335.  Although "[t]he public interest favors the protection of constitutional rights," the defendant "would need to show a likelihood of violation of [his] constitutional rights, and [he] has not done so." *Id.*

The public interest also weighs against a stay for other reasons.  As noted, "[f]ew, if any, interests under the Constitution are more fundamental than the right to a fair trial by impartial jurors, and an outcome affected by extrajudicial statements would violate that fundamental right." *Gentile*, 501 U.S. at 1075.  The very purpose of the Order is to safeguard that fundamental right,

which not only protects the interests of the defendant but also the interests of the government and society in general.   *See id.*; *Tijerina*, 412 F.2d at 667.   In addition, the Court found that the Order was necessary to mitigate the "grave" and "largely irreversible" risk that the defendant's acts of public targeting would result in intimidation, harassment, or threats towards members of the public.   ECF No. 105 at 2-3.   Staying the Order would allow those risks to continue unabated, contrary to the public interest.

### C.  The Court Should Immediately Lift the Administrative Stay and Modify the Defendant's Conditions of Release.

The defendant's continued targeting of witnesses and repeated violations of a similar order in New York during the brief interval while the Order has been administratively stayed, *see supra* at 9 (describing Oct. 20, 2023 post), not only illustrate the risks of suspending the Court's appropriate order; they demonstrate why the Court should lift the administrative stay and modify the defendant's conditions of release to protect witnesses from his attacks.   Yesterday, within hours of a news report about the purported testimony in this case of the defendant's former Chief of Staff, the defendant issued multiple prejudicial and threatening Truth Social posts to influence and intimidate the Chief of Staff and comment publicly on the subject of his testimony.[13]   The defendant's targeting included insinuating that if the reporting were true, the Chief of Staff had lied and had been coerced, and the defendant sent a clear public message to the Chief of Staff, intended to intimidate him:  "Some people would make that deal [to testify upon immunity], but they are weaklings and cowards, and so bad for the future [of] our Failing Nation.  I don't think that [Chief of Staff] is one of them, but who really knows?"[14]

---

[13] See https://truthsocial.com/@realDonaldTrump/posts/111293136072462799; https://truthsocial.com/@realDonaldTrump/posts/111293117150329703.

[14] *See* https://truthsocial.com/@realDonaldTrump/posts/111293117150329703.

Just as the defendants in *Brown* took advantage of that court's suspension of its order prohibiting certain extrajudicial statements to publicly release evidence and prejudice the jury pool, *see* ECF No. 64 at 8, here the defendant has capitalized on the Court's administrative stay to, among other prejudicial conduct, send an unmistakable and threatening message to a foreseeable witness in this case.  Unless the Court lifts the administrative stay, the defendant will not stop his harmful and prejudicial attacks.  In addition, to the extent that the defendant's public message—directed to the Chief of Staff, with knowledge that it would reach him—is not already covered by his release conditions, it is an intentional end-run around them.  *See* ECF No. 13 ¶ 7(t) ("The defendant shall not communicate about the facts of the case with any individual known to the defendant to be a witness, except through counsel or in the presence of counsel.").  Accordingly, the Court should modify the defendant's conditions of release by making compliance with the Order a condition or by clarifying that the existing condition barring communication with witnesses about the facts of the case includes indirect messages to witnesses made publicly on social media or in speeches.[15]  *See United States v. Stone*, No. 1:19-cr-18, ECF No. 43 (D.D.C. Feb. 22, 2019) (incorporating compliance with 57.7(c) order as a condition of release).  By doing so, the Court will have at its disposal the compliance measures available under 18 U.S.C. § 3148 in addition to those available as a contempt penalty for violating the Order.  Otherwise, without

---

[15] Section 3142 provides that the Court "may at any time amend the order to impose additional or different conditions of release," *id.* § 3142(c)(3), and that release orders must "include a written statement that sets forth all the conditions to which the release is subject, in a manner sufficiently clear and specific to serve as a guide for the person's conduct." *Id.* § 3142(h)(1). Here, the Court has sufficient evidence before it to make a finding that the modified condition "is reasonably necessary to . . . assure the safety of any other person and the community," *id.* § 3142(c)(1)(B)(xiv), and that the resulting "combination of conditions" is the "least restrictive" combination that "will reasonably assure . . . the safety of any other person and the community," *id.* § 3142(c)(1)(B). *See Manafort*, 897 F.3d at 344-45; *United States v. Pickel*, 500 F. App'x 771, 772 (10th Cir. 2012).

the Court's intervention, the defendant will continue to threaten the integrity of these proceedings and put trial participants at risk.

**IV.      Conclusion**

The defendant's motion to stay should be denied.   The Court should also lift the administrative stay and modify the conditions of release.

Respectfully submitted,

JACK SMITH
Special Counsel

By:      /s/Molly Gaston
Molly Gaston
Thomas P. Windom
Senior Assistant Special Counsels
950 Pennsylvania Avenue NW
Room B-206
Washington, D.C. 20530