**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. 23-cr-257 (TSC)** |
| | * | |
| **DONALD J. TRUMP,** | * | |
| | * | |
| **Defendant.** | * | |

**GOVERNMENT'S OMNIBUS OPPOSITION TO DEFENDANT'S MOTIONS TO
<u>DISMISS THE INDICTMENT ON STATUTORY AND CONSTITUTIONAL GROUNDS</u>**

# TABLE OF CONTENTS

I.    Introduction ........................................................................................................... 1

II.   Background ............................................................................................................ 1

III.  Legal Standard ...................................................................................................... 2

IV.   Argument .............................................................................................................. 3

    A.    The Defendant's Statutory Challenges Lack Merit. ................................. 4

        1.    The indictment adequately alleges a violation of 18 U.S.C. § 371 ............. 4

            a.    The indictment alleges deceit, trickery, or dishonest means. ......... 5

                i.    The defendant unsuccessfully attempts to recharacterize his false statements as permissible advocacy or expression of opinion to public officials. ....... 7

                ii.    The indictment alleges deceit in connection with the fraudulent electors. ............................................................ 11

                iii.    The defendant made false statements to the Vice President ........................................................................... 13

            b.    The indictment alleges obstruction, not political advocacy. ......... 14

            c.    The defendant's invocation of interpretative canons does not support dismissal .................................................................. 14

        2.    The indictment adequately alleges violations of 18 U.S.C. §§ 1512(k) and (c)(2). ................................................................. 17

            a.    The indictment alleges the defendant conspired to, attempted to, and did obstruct and impede the certification proceeding. ...... 17

            b.    The indictment alleges the defendant acted corruptly. ................. 21

        3.    The indictment adequately alleges a violation of 18 U.S.C. § 241 ........... 22

            a.    The indictment alleges a criminal agreement. ............................. 23

            b.    The indictment alleges the requisite *mens rea*. ............................ 23

    B.    The Defendant's Constitutional Challenges Lack Merit. ..................... 25

1.     The First Amendment does not protect the defendant's criminal conduct. .................................................................................... 26

    a.    The charges in the indictment do not criminalize protected speech. ........................................................................ 26

    b.    *Alvarez* confirms that the charges in the indictment do not offend the First Amendment. ........................................ 30

    c.    The indictment does not improperly restrict political speech or discriminate based on viewpoint. ............................... 32

2.     The fair notice doctrine does not provide a basis for dismissal. ............... 35

    a.    The defendant had fair notice that the charged conduct was unlawful. ................................................................. 35

    b.    The defendant's historical examples do not raise fair notice concerns. ................................................................ 40

3.     Neither the Impeachment Judgment Clause nor the Double Jeopardy Clause precludes criminal prosecution here. ............................ 47

    a.    Background .................................................................. 48

    b.    The Impeachment Judgment Clause does not preclude prosecution here. ......................................................... 49

        i.    The Impeachment Judgment Clause's text and history support criminal prosecution of an officer who has been impeached by the House but acquitted by the Senate. ........................................................... 50

        ii.    Structural considerations support that textual and historical conclusion. .............................................. 52

        iii.    The defendant's counterarguments lack merit. ................ 55

    c.    The Double Jeopardy Clause does not preclude prosecution here. ...................................................................... 57

        i.    The Double Jeopardy Clause does not apply because the penalty for congressional impeachment and conviction is civil, not criminal. ...................................... 58

ii.     The Double Jeopardy Clause would not bar prosecution here because the defendant's impeachment proceeding and criminal prosecution do not involve the same offense............................................ 60

iii.    The defendant's double-jeopardy claim is frivolous. ....... 62

V.    Conclusion ..................................................................................................... 64

# TABLE OF AUTHORITIES

**Cases**

*Abney v. United States,*
    431 U.S. 651 (1977)............................................................................................ 62

*Arthur Andersen LLP v. United States,*
    544 U.S. 696 (2005)............................................................................................ 22

*Blockburger v. United States,*
    284 U.S. 299 (1932)............................................................................................ 61

*Bolling v. Sharpe,*
    347 U.S. 497 (1954)............................................................................................ 38

*Bouie v. City of Columbia,*
    378 U.S. 347 (1964).................................................................................... 36, 37

*Bradley v. Fisher,*
    80 U.S. 335 (1871).............................................................................................. 57

*Brandenburg v. Ohio,*
    395 U.S. 444 (1969)............................................................................................ 61

*Bush v. Gore,*
    531 U.S. 98 (2000)................................................................... 25, 38, 43, 45

*Dennis v. Sparks,*
    449 U.S. 24 (1980)...................................................................................... 56, 57

*Dennis v. United States,*
    384 U.S. 855 (1966)................................................................................ 4, 10, 15

*Ex Parte Commonwealth of Virginia,*
    100 U.S. 339 (1879)............................................................................................ 57

*Giboney v. Empire Storage & Ice Co.,*
    336 U.S. 490 (1949).................................................................................... 27, 28

*Glasser v. United States,*
    315 U.S. 60 (1942)........................................................................................ 4, 37

*Haas v. Henkel,*
    216 U.S. 462 (1910).............................................................................................. 4

*Hammerschmidt v. United States,*
    265 U.S. 182 (1924)................................................................................ 4, 5, 15

*Hastings v. United States Senate*,
    716 F. Supp. 38 (D.D.C. 1989) .................................................................. 52, 53, 57

*Hudson v. United States*,
    522 U.S. 93 (1997) ..................................................................................... 58, 59, 60

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
    538 U.S. 600 (2003) ............................................................................................ 29

*Johnson v. Arteaga-Martinez*,
    142 S. Ct. 1827 (2022) ....................................................................................... 16

*Johnson v. Quander*,
    440 F.3d 489 (D.C. Cir. 2006) .................................................................... 58, 59

*Kelly v. United States*,
    140 S. Ct. 1565 (2020) ....................................................................................... 15

*Kennedy v. Mendoza-Martinez*,
    372 U.S. 144 (1965) ............................................................................................ 59

*Marinello v. United States*,
    138 S. Ct. 1101 (2018) ....................................................................................... 17

*McDonald v. Smith*,
    472 U.S. 479 (1985) ............................................................................................ 34

*McDonnell v. United States*,
    579 U.S. 550 (2016) ............................................................................................ 34

*Mireles v. Waco*,
    502 U.S. 9 (1991) ................................................................................................ 57

*Missouri v. Hunter*,
    459 U.S. 359 (1983) ............................................................................................ 60

*Muscarello v. United States*,
    524 U.S. 125 (1998) ............................................................................................ 16

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) ............................................................................................ 61

*Nat'l Org. for Women v. Operation Rescue*,
    37 F.3d 646 (D.C. Cir. 1994) ........................................................................... 27

*Neder v. United States*,
    527 U.S. 1 (1999) .................................................................... 8, 9, 13, 15

*Nixon v. United States*,
    506 U.S. 224 (1993) ........................................................................................ 56

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015) ........................................................................................ 32

*Pasquantino v. United States*,
    544 U.S. 349 (2005) .................................................................................. 8, 17

*Rice v. Paladin Enterprises, Inc.*,
    128 F.3d 233 (4th Cir. 1997) ......................................................................... 28

*Richardson v. United States*,
    468 U.S. 317 (1984) ........................................................................................ 62

*Rogers v. Tennessee*,
    532 U.S. 451 (2001) .................................................................................. 36, 37

*Spalding v. Vilas*,
    161 U.S. 483 (1896) ........................................................................................ 57

*Tanner v. United States*,
    483 U.S. 107 (1987) ......................................................................... 4, 5, 13, 15

*Thompson v. Trump*,
    590 F. Supp. 3d 46 (D.D.C. 2022) .......................................................... 55, 61

*Trump v. Vance*,
    140 S. Ct. 2412 (2020) ............................................................................ 55, 56

*United States ex rel. Schutte v. SuperValu Inc.*,
    598 U.S. 739 (2023) ........................................................................................ 13

*United States v. Abboud*,
    273 F.3d 763 (8th Cir. 2001) ......................................................................... 63

*United States v. Alvarez*,
    567 U.S. 709 (2012) .............................................................................. 30, 31, 32

*United States v. Amawi*,
    695 F.3d 457 (6th Cir. 2012) ......................................................................... 33

*United States v. Amrep Corp.*,
    560 F.2d 539 (2d Cir. 1977) .......................................................................... 32

*United States v. Arif*,
    897 F.3d 1 (1st Cir. 2018) .............................................................................. 10

*United States v. Atilla*,
   966 F.3d 118 (2d Cir. 2020)..................................................................... 4

*United States v. Ballestas*,
   795 F.3d 138 (D.C. Cir. 2015) ............................................................ 2, 22

*United States v. Bathgate*,
   246 U.S. 220 (1918).............................................................................. 40

*United States v. Black*,
   759 F.2d 71 (D.C. Cir. 1985) ................................................................ 63

*United States v. Bowdoin*,
   770 F. Supp. 2d 142 (D.D.C. 2011) ........................................................ 3

*United States v. Bozell*,
   No. 21-cr-216, 2022 WL 474144 (D.D.C. Feb. 16, 2022)...................... 29

*United States v. Bradberry*,
   517 F.2d 498 (7th Cir. 1975) ................................................................ 40

*United States v. Brock*,
   628 F.3d 85 (D.D.C. 2022) ................................................................... 22

*United States v. Bronstein*,
   849 F.3d 1101 (D.C. Cir. 2017) ........................................................... 16

*United States v. Caldwell*,
   989 F.2d 1056 (9th Cir. 1993), *overruled on other grounds by*
   *Neder v. United States*, 527 U.S. 1 (1999)............................................ 15

*United States v. Chavis*,
   461 F.3d 1201 (10th Cir. 2006) ........................................................... 10

*United States v. Claiborne*,
   727 F.2d 842 (9th Cir. 1984) ............................................................... 55

*United States v. Classic*,
   313 U.S. 299 (1941)...................................................... 25, 37, 38, 39

*United States v. Collins*,
   972 F.2d 1385 (5th Cir. 1992) ............................................................. 57

*United States v. Colton*,
   231 F.3d 890 (4th Cir. 2000) ................................................................. 7

*United States v. Concord Mgmt. & Consulting LLC*,
   347 F. Supp. 3d 38 (D.D.C. 2018) .................................... 5, 31, 33, 36

*United States v. Dixon,*
    509 U.S. 688 (1996) ........................................................................ 60, 62

*United States v. Dunbar,*
    611 F.2d 985 (5th Cir. 1980) (en banc) .......................................... 62

*United States v. Ehrlichman,*
    546 F.2d 910 (D.C. Cir. 1976) ........................................................ 24

*United States v. Feola,*
    420 U.S. 671 (1975) .......................................................................... 8

*United States v. Ferguson,*
    676 F.3d 260 (2d Cir. 2011) ............................................................ 10

*United States v. Fischer,*
    64 F.4th 329 (D.C. Cir. 2023) ............................................ 17, 19, 20, 22

*United States v. Freeman,*
    761 F.2d 549 (9th Cir. 1985) .......................................................... 33

*United States v. Gaudin,*
    515 U.S. 506 (1995) .......................................................................... 9

*United States v. Goldberg,*
    105 F.3d 770 (1st Cir. 1997) .......................................................... 15

*United States v. Guest,*
    383 U.S. 745 (1966) ........................................................................ 25

*United States v. Haldeman,*
    559 F.2d 31 (D.C. Cir. 1976) (en banc) .......................................... 10

*United States v. Hansen,*
    599 U.S. 762 (2023) .................................................................... 28, 30

*United States v. Hassan,*
    742 F.3d 104 (4th Cir. 2014) .......................................................... 33

*United States v. Hillie,*
    227 F. Supp. 3d 57 (D.D.C. 2017) .................................................... 3

*United States v. Hines,*
    689 F.2d 934 (10th Cir. 1982) ........................................................ 62

*United States v. Isaacs,*
    493 F.2d 1124 (7th Cir. 1974) ........................................................ 55

*United States v. Jacobsen*,
  466 U.S. 109 (1984) ................................................................................... 24

*United States v. Jimenez Recio*,
  537 U.S. 270 (2003) ..................................................................................... 8

*United States v. Johnson*,
  383 U.S. 169 (1966) ................................................................................... 10

*United States v. Kennedy*,
  714 F.3d 951 (6th Cir. 2013) .................................................................... 10

*United States v. Kurlemann*,
  736 F.3d 439 (6th Cir. 2013) ...................................................................... 7

*United States v. Lanier*,
  520 U.S. 259 (1997) ................................................................. 35, 37, 38, 40

*United States v. Leppo*,
  634 F.2d 101 (3d Cir. 1980) ...................................................................... 62

*United States v. Mackey*,
  --- F. Supp. 3d ----, 2023 WL 363595 (E.D.N.Y. Jan. 23, 2023) .............. 38, 39, 40

*United States v. Manton*,
  107 F.2d 834 (2d Cir. 1939) ...................................................................... 57

*United States v. McHugh*,
  583 F. Supp. 3d 1 (D.D.C. 2022) .............................................................. 36

*United States v. Montgomery*,
  578 F. Supp. 3d 54 (D.D.C. 2021) ............................................................ 17

*United States v. Mosley*,
  238 U.S. 383 (1915) ................................................................................... 39

*United States v. Nixon*,
  816 F.2d 1022 (5th Cir. 1987) .................................................................. 57

*United States v. O'Hagan*,
  521 U.S. 642 (1997) ..................................................................................... 7

*United States v. Olinger*,
  759 F.2d 1293 (7th Cir. 1985) .................................................................. 25

*United States v. Paulus*,
  894 F.3d 267 (6th Cir. 2018) .................................................................... 32

*United States v. Philip Morris USA Inc.*,
    566 F.3d 1095 (D.C. Cir. 2009) ........................................ 29

*United States v. Pleva*,
    66 F.2d 529 (2d Cir. 1933) ............................................. 39

*United States v. Price*,
    383 U.S. 787 (1966) .................................................. 36

*United States v. Purvis*,
    580 F.2d 853 (5th Cir. 1978) ...................................... 23, 24

*United States v. Rahman*,
    189 F.3d 88 (2d Cir. 1999) ........................................ 27, 33

*United States v. Reid*,
    533 F.2d 1255 (D.C. Cir. 1976) ....................................... 7

*United States v. Resendiz-Ponce*,
    549 U.S. 102 (2007) ............................................... 3, 22

*United States v. Robertson*,
    --- F.4th ----, 2023 WL 6932346 (D.C. Cir. Oct. 20, 2023) ........... 20, 21, 22

*United States v. Robertson*,
    588 F. Supp. 3d 114 (D.D.C. 2022) .................................... 29

*United States v. Rowlee*,
    899 F.2d 1275 (2d Cir. 1990) ........................................ 28

*United States v. Sayer*,
    748 F.3d 425 (1st Cir. 2014) ........................................ 27

*United States v. Saylor*,
    322 U.S. 385 (1944) .............................................. 39, 40

*United States v. Serrano*,
    856 F.3d 210 (2d Cir. 2017) ......................................... 63

*United States v. Shelby*,
    604 F.3d 881 (5th Cir. 2010) ........................................ 63

*United States v. Shotts*,
    145 F.3d 1289 (11th Cir. 1998) ...................................... 29

*United States v. Skurla*,
    126 F. Supp. 713 (W.D. Pa. 1954) .................................... 39

*United States v. Stevens*,
    559 U.S. 460 (2010) ................................................................................................... 27

*United States v. Thompson*,
    275 F. Supp. 3d 107 (D.D.C. 2017) ............................................................................ 8

*United States v. Thompson*,
    76 F.3d 442 (2d Cir. 1996)........................................................................................ 29

*United States v. Tobin*,
    No. 04-cr-216, 2005 WL 3199672 (D.N.H. Nov. 30, 2005) ................................... 38

*United States v. Townsley*,
    843 F.2d 1070 (8th Cir. 1988) .................................................................................. 39

*United States v. Turner*,
    720 F.3d 411 (2d Cir. 2013)...................................................................................... 33

*United States v. Ward*,
    448 U.S. 242 (1980)........................................................................................... 58, 59

*United States v. Weeks*,
    636 F. Supp. 3d 117 (D.D.C. 2022) ..................................................................... 3, 19

*United States v. Whitney*,
    229 F.3d 1296 (10th Cir. 2000) ................................................................................ 23

*United States v. Williams*,
    553 U.S. 285 (2008)................................................................................................... 28

*United States v. Williamson*,
    903 F.3d 124 (D.C. Cir. 2018) ......................................................................... 3, 21, 22

*United States v. Winstead*,
    74 F.3d 1313 (D.C. Cir. 1996) .................................................................................... 7

*Whitaker v. Thompson*,
    353 F.3d 947 (D.C. Cir. 2004) .................................................................................. 29

*Wilkins v. United States*,
    376 F.2d 552 (5th Cir. 1967) .................................................................................... 23

*Wisconsin v. Mitchell*,
    508 U.S. 476 (1993)................................................................................................... 29

*Yates v. Lansing*,
    5 Johns. 282 (N.Y. Sup. Ct. 1810), *aff'd,* 9 Johns. 395 (N.Y. 1811) ...................... 57

*Yates v. United States*,
  354 U.S. 298 (1957), *overruled on other grounds by*
  *Burks v. United States*, 437 U.S. 1 (1978) ............................................................ 15

**Statutes, Rules, and Constitutional Provisions**

U.S. Const. amend. I ............................................................................................ 34

U.S. Const. amend. V ...................................................................................... 48, 59

U.S. Const. amend. XII ........................................................................................ 42

U.S. Const. art. I, § 3, cl. 6 .................................................................................. 49

U.S. Const. art. I, § 3, cl. 7 ...................................................................... 49, 50, 51

U.S. Const. art. II, § 4 .......................................................................................... 50

3 U.S.C. § 15 ........................................................................................................ 21

3 U.S.C. § 16 ........................................................................................................ 21

18 U.S.C. § 241 .............................................................................. 3, 22, 27, 61

18 U.S.C. § 242 .................................................................................................... 37

18 U.S.C. § 371 .......................................................................................... passim

18 U.S.C. § 1001 .................................................................................................. 16

18 U.S.C. § 1512 ........................................................................................ passim

18 U.S.C. § 2383 .......................................................................................... 49, 61

Fed. R. Crim. P. 12 ................................................................................................ 3

Fed. R. Crim. P. 7 .................................................................................................. 2

**Congressional Materials**

18 Cong. Rec. 30 (Dec. 7, 1886)........................................................................ 43

107 Cong. Rec. 289-90 (Jan. 6, 1961) ............................................................... 44

146 Cong. Rec. E2179-80 (daily ed. Dec. 13, 2000) ......................................... 45

147 Cong. Rec. 104-06 (Jan. 6, 2001) ............................................................... 45

151 Cong. Rec. 199 (Jan. 6, 2005)...................................................................... 45, 46, 47

163 Cong. Rec. H186-H189 (daily ed. Jan. 6, 2017) ..................................................... 46

167 Cong. Rec. H191-92 (daily ed. Jan. 13, 2021) .................................................... 48

167 Cong. Rec. S733-36 (daily ed. Feb. 13, 2021) ............................................... 49, 63

H.R. Res. 24, 117th Cong. (Jan. 11, 2021) ........................................................ 48, 61

*In re Impeachment of Former President Donald J. Trump*, Trial Memorandum of Donald
    J. Trump, S. Doc. 117-2 at 122-39 (Feb. 8, 2021) ................................................ 49

Sen. Thom Tillis, Tillis Statement on Impeachment Trial (Feb. 13, 2021) ................................. 54

**Other Authorities**

2 Joseph Story, *Commentaries on the Constitution of the United States* (1833) .......................... 52

2 The Documentary History of the Ratification of the Constitution (Merrill Jensen et al.,
    eds. 1976) ................................................................................. 51

9 Annals of Congress (1798) .............................................................................. 52

Bruce Ackerman & David Fontana, *How Jefferson Counted Himself In*, The Atlantic
    (Mar. 2004) ................................................................................. 41

CNN, Transcript of CNN's Town Hall with Former President Donald Trump (May 11,
    2023) ........................................................................................ 9

*Democrats Challenge Ohio Electoral Votes*, CNN.com (Jan. 6, 2005) ....................................... 46

John Copeland Nagle, *How Not to Count Votes*,
    104 Colum. L. Rev. 1732 (2004) ............................................................. 43

L. Kinvin Wroth, *Election Contests and the Electoral Vote*,
    65 Dick. L. Rev. 321 (1961) ................................................................. 44

Nathan L. Colvin & Edward B. Foley, *Lost Opportunity: Learning the Wrong Lessons
    from the Hayes-Tilden Dispute*, 79 Fordham L. Rev. 1043 (2010) ............................. 43

Rami Fakhouri, *The Most Dangerous Blot in Our Constitution: Retiring the Flawed
    Electoral College 'Contingent Procedure'*, 104 Nw. U. L. Rev. 705 (2010)....................... 42

Randolph D. Moss, *A Sitting President's Amenability to Indictment and Criminal
    Prosecution*, 24 Op. O.L.C. 222 (Oct. 16, 2000) ............................................. 56

Randolph D. Moss, *Whether a Former President May Be Indicted and Tried for the
    Same Offenses for Which He Was Impeached by the House and Acquitted by the
    Senate*, 24 Op. O.L.C. 110 (Aug. 18, 2000) ..............................................51-54, 59-60

Restatement (Second) of Torts (1977) .......................................................................... 13

Robert G. Dixon, Jr., *Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office* (Sept. 24, 1973) ........................... 56

*The Federalist No. 65* (Alexander Hamilton) (Clinton Rossiter ed., 1999) ........................... 53, 54

*The Federalist No. 69* (Alexander Hamilton) (Clinton Rossiter ed., 1999) ................................ 51

Theodore B. Olson, *The Supreme Court & the Presidency*, 9 Green Bag 2d 139 (2006) .................................................................................................... 43

## I.    Introduction

The indictment in this case charges the defendant, then the president, with perpetrating an unprecedented campaign of deceit to attack the very functioning of the federal government to collect, count, and certify votes; to obstruct the January 6 congressional proceeding at which the election results are certified; and to disenfranchise millions of voters—all in a concerted criminal effort to overturn the presidential election results and prevent the lawful transfer of power to his successor.  Because the defendant cannot mount meritorious challenges to the charges against him, his motions to dismiss the indictment on constitutional (ECF No. 113) and statutory (ECF No. 114) grounds rely instead on distortions and misrepresentations.  The defendant attempts to rewrite the indictment, claiming that it charges him with wholly innocuous, perhaps even admirable conduct—sharing his opinions about election fraud and seeking election integrity—when in fact it clearly describes the defendant's fraudulent use of knowingly false statements as weapons in furtherance of his criminal plans.  The defendant's motions cite cases that, upon examination, undermine his arguments rather than support them, and he improperly challenges the Government's anticipated trial evidence at this stage.  The defendant also claims that he could not have known his actions were criminal because, in the past, others who have questioned, challenged, or protested election results were not prosecuted.  But the defendant stands alone in American history for his alleged crimes.  No other president has engaged in conspiracy and obstruction to overturn valid election results and illegitimately retain power.  The indictment squarely charges the defendant for this conduct, and the defendant's constitutional and statutory challenges to it are meritless.  The defendant's motions (ECF Nos. 113 and 114) should be denied.

## II.    Background

A grand jury charged the defendant in a four-count indictment.  ECF No. 1.  Count One, which charges a conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, alleges

that the defendant, then a candidate seeking re-election to the presidency, conspired with, among others, several individuals outside the Executive Branch to "overturn the legitimate results of the 2020 presidential election by using knowingly false claims of election fraud to obstruct the federal government function by which those results are collected, counted, and certified."  ECF No. 1 at ¶¶ 1, 7, 8.   The indictment further alleges that the defendant aimed at accomplishing the conspiracy's objectives in five ways: using deceit toward state officials to subvert the legitimate election results in those states, *id.* ¶¶ 13-52; using deceit to organize fraudulent slates of electors in seven targeted states, and cause them to send false certificates to Congress, *id.* ¶¶ 53-69; leveraging the Department of Justice to use deceit to get state officials to replace the legitimate electoral slate with electors who would cast their votes for the defendant, *id.* ¶¶ 70-85; attempting to enlist the Vice President to fraudulently alter the election results during the certification proceeding on January 6, 2021, and directing supporters to the Capitol to obstruct the proceeding, *id.* ¶¶ 86-105; and exploiting the violence and chaos that transpired at the United States Capitol on January 6, 2021, *id.* ¶¶ 106-124.  Counts Two and Three, which incorporate allegations from Count One, charge conspiracy and substantive violations of 18 U.S.C. § 1512(c)(2) for corruptly obstructing the certification of the presidential election results on January 6, 2021.  *Id.* ¶¶ 125-28. Count Four, which likewise incorporates the allegations from Count One, alleges that the defendant conspired to violate one or more person's constitutional right to vote and have one's vote counted.  *Id.* ¶¶ 129-30.

## III.  Legal Standard

An indictment's main purpose is to inform the defendant of the nature of the accusation.  *United States v. Ballestas*, 795 F.3d 138, 148-49 (D.C. Cir. 2015).  Thus, an indictment need "only contain 'a plain, concise, and definite written statement of the essential facts constituting the offense charged.'"  *Id.* at 149 (quoting Fed. R. Crim. P. 7(c)).  "[P]arroting the

language of a federal criminal statute is often sufficient." *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018) (quoting *United States v. Resendiz-Ponce*, 549 U.S. 102, 109 (2007)). A defendant may move before trial to dismiss an indictment, or a count thereof, for "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). "When testing the sufficiency of the charges in an indictment, 'the indictment must be viewed as a whole and the allegations [therein] must be accepted as true.'" *United States v. Hillie*, 227 F. Supp. 3d 57, 71 (D.D.C. 2017) (quoting *United States v. Bowdoin*, 770 F. Supp. 2d 142, 145 (D.D.C. 2011)); *United States v. Weeks*, 636 F. Supp. 3d 117, 120 (D.D.C. 2022).

## IV.  Argument

Rather than challenging the indictment on its merits, the defendant's motions (ECF Nos. 113 and 114) attack the indictment by mischaracterizing its allegations, raising inapposite hypotheticals, and advancing arguments that are long on rhetoric but short on law. Stripped of those distractions, the defendant's statutory and constitutional claims are entirely meritless. The detailed allegations in the 45-page indictment are more than adequate to charge that the defendant conspired to defeat a federal government function through deceit and dishonest means, in violation of 18 U.S.C. § 371; corruptly conspired to, attempted to, and did obstruct an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and (k); and conspired to violate others' constitutional rights to vote and have their vote counted, in violation of 18 U.S.C. § 241. The allegations that the defendant sought to overturn the results of the 2020 presidential election by resorting to fraud, deceit, and corruption place his conduct well outside the protections afforded by the First Amendment and likewise put him fully on notice that his conduct was criminal and thus subject to prosecution. Finally, the defendant's prior acquittal in a Senate trial following his impeachment in the House does not foreclose this criminal prosecution, and his particular reliance on the Double Jeopardy Clause is frivolous. The Court should deny the defendant's motions.

A.       **The Defendant's Statutory Challenges Lack Merit.**

1.       **The indictment adequately alleges a violation of 18 U.S.C. § 371.**

The defendant argues (ECF No. 114 at 3-21) that the indictment fails to allege a conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, which makes it unlawful to conspire to obstruct a government function of the United States through deceit.  The government function alleged in the indictment—the process, grounded in the Twelfth Amendment and the Electoral Count Act, for collecting, counting, and certifying the results of the presidential election—plainly constitutes a federal government function protected against a conspiracy to defraud.  Indeed, the defendant does not dispute that this process is a federal government function for purposes of Section 371.  *Cf.* ECF No. 114 at 14-15 (arguing that the indictment fails to allege obstruction or interference, but not contesting that it alleges a federal government function).  Instead, the defendant argues that the indictment fails to allege that he intended to use deceit to obstruct that uncontested function.  He is wrong.

The general conspiracy statute makes it a crime "[i]f two or more persons conspire either to commit any offense against the United States, *or to defraud the United States, or any agency thereof in any manner or for any purpose*, and one or more of such persons do any act to effect the object of the conspiracy." 18 U.S.C. § 371 (emphasis added).  The italicized clause is known as the "defraud clause."  *See, e.g.*, *United States v. Atilla*, 966 F.3d 118, 130 (2d Cir. 2020). The Supreme Court has interpreted and upheld use of the defraud clause, either under Section 371 or a predecessor statute, for more than a century.  *See Tanner v. United States*, 483 U.S. 107, 128 (1987); *Dennis v. United States*, 384 U.S. 855, 861 (1966); *Glasser v. United States*, 315 U.S. 60, 66 (1942); *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924); *Haas v. Henkel*, 216 U.S. 462, 479 (1910).  Those cases establish that the defraud clause makes it a crime to conspire to "interfere with or obstruct" a "lawful governmental function[]" of the United States "by deceit,

craft or trickery, or at least by means that are dishonest." *Hammerschmidt*, 265 U.S. at 188.[1]  The Supreme Court has "stated repeatedly that the fraud covered by the statute reaches any conspiracy for the purpose of impairing, obstructing or defeating" a lawful governmental function of the United States.  *Tanner*, 483 U.S. at 128 (quotation marks omitted).  Although courts have divided the elements differently, all agree that to establish an unlawful conspiracy under the defraud clause the government must prove (1) the defendant "entered into an agreement, (2) to obstruct a lawful function of the government or an agency of the government, (3) by deceitful or dishonest means, and (4) at least one overt act was taken in furtherance of that conspiracy." *United States v. Concord Mgmt. & Consulting LLC*, 347 F. Supp. 3d 38, 46 (D.D.C. 2018) (quotation marks omitted).

### a.   The indictment alleges deceit, trickery, or dishonest means.

The indictment's allegations of deceit, trickery, or dishonest means[2] are numerous and clear.  As alleged in the indictment, the defendant "spread lies that there had been outcome-determinative fraud in the election," these statements "were false," and the defendant "knew that they were false."  ECF No. 1 at ¶ 2.  Similar allegations continue throughout the rest of the indictment.

To start, tracking the established elements of a defraud-clause conspiracy, the indictment alleges that the defendant did "knowingly combine, conspire, confederate, and agree with co-conspirators . . . to defraud the United States by using dishonesty, fraud, and deceit to impair, obstruct, and defeat the lawful federal government function by which the results of the presidential

---

[1] The defraud clause also makes it a crime to conspire to "cheat the government out of property or money." *Hammerschmidt*, 265 U.S. at 188.  The indictment does not charge property fraud.

[2] For purposes of brevity, this brief hereafter uses the term "deceit" to refer collectively to deceit, trickery, and dishonest means.

election are collected, counted, and certified by the federal government." ECF No. 1 at ¶ 6. The indictment explains that "[t]he purpose of the conspiracy was to overturn the legitimate results of the 2020 presidential election by using knowingly false claims of election fraud to obstruct the federal government function by which those results are collected, counted, and certified." *Id.* ¶ 7.

The indictment goes on to describe the false statements that undergirded the conspiracy, alleging that the defendant, his co-conspirators, and their agents "made knowingly false claims that there had been outcome-determinative fraud in the 2020 presidential election," including "dozens of specific claims that there had been substantial fraud in certain states, such as that large numbers of dead, non-resident, non-citizen, or otherwise ineligible voters had cast ballots, or that voting machines had changed votes for the Defendant to votes for Biden." *Id.* ¶ 11. "These claims were false," the indictment alleges, "and the Defendant knew that they were false." *Id.* The indictment provides examples of these false claims, *see id.* ¶ 12, including the defendant's statements that "36,000 non-citizens had voted in Arizona," *id.* ¶ 19; that "more than 10,300 dead people had voted in Georgia," *id.* ¶ 33; that there had been "an illicit dump of more than a hundred thousand ballots in Detroit," *id.* ¶ 41; that "there had been 205,000 more votes than voters in Pennsylvania," *id.* ¶ 46; that "there had been tens of thousands of unlawful votes in Wisconsin," *id.* ¶ 52; and that voting machines in various contested states had switched votes from the defendant to Biden, *id.* ¶ 12(f). The indictment identifies five ways in which the defendant and his co-conspirators used these lies to obstruct the federal government function by which the results of the presidential election were collected, counted, and certified. *Id.* ¶ 10; *see id.* ¶¶ 13-124.

These extensive allegations of knowingly false statements are more than sufficient to charge that the defendant used and intended to use deceit to obstruct the lawful federal government function that was the target of his conspiracy to defraud. The general principles regarding what

constitutes fraud are well established.  The touchstone of fraud is "deception," *United States v. O'Hagan*, 521 U.S. 642, 653 (1997), and "[f]raud has long been understood to include a broad[] range of deceptive conduct," *United States v. Kurlemann*, 736 F.3d 439, 446 (6th Cir. 2013); *accord United States v. Colton*, 231 F.3d 890, 897 (4th Cir. 2000).  Fraud "is as old as falsehood and as versable as human ingenuity." *United States v. Reid*, 533 F.2d 1255, 1264 (D.C. Cir. 1976) (quotation marks omitted).  The quintessential method of committing fraud is through knowingly false statements, as charged in the indictment. *See id.* at 1265 ("Of course, a material false statement contained in a document sent through the mails clearly constitutes a fraudulent misrepresentation and violation of the [mail fraud] statute."); *see, e.g.*, *United States v. Winstead*, 74 F.3d 1313, 1320 (D.C. Cir. 1996) (mail fraud based on false statements).  The indictment plainly alleges the use of deceit, and the Court need not look further than that to deny the defendant's motion to dismiss.

The defendant offers an array of arguments to avoid the clear allegations in the indictment. None withstands scrutiny.

### i.    The defendant unsuccessfully attempts to recharacterize his false statements as permissible advocacy or expression of opinion to public officials.

The defendant claims (ECF No. 114 at 5-6) that he is charged because he merely "expressed opinions" about fraud in the 2020 presidential election and engaged in "pure advocacy."  That claim mischaracterizes the allegations in the indictment, which describe the defendant's use of fraudulent, knowingly false election-fraud claims.  Knowing lies are neither opinions nor "pure advocacy," and in any event, the defendant could not use so-called advocacy as a cover for his scheme to obstruct a governmental function through deceit.  Knowing deceit aimed at defeating a lawful government function constitutes a violation of the defraud clause, notwithstanding his attempts to sanitize his conduct.

The defendant also contends (ECF No. 114 at 5-6) that the indictment fails to allege deceit because his false statements would not have fooled the public officials at whom he aimed the statements. According to the defendant (*id.*), he was "one voice among countless millions," everyone had access to largely the same information, and the public officials he targeted were "some of the most informed politicians on the planet" and could come to their own conclusions. To the extent that the defendant argues that he cannot be held responsible because no one would have relied on his assertions of fraud, he is wrong; lack of success provides no defense to a charge of conspiracy to defraud, much less any basis to dismiss the charge. "The law of conspiracy identifies the agreement to engage in a criminal venture as an event of sufficient threat to social order to permit the imposition of criminal sanctions for the agreement alone, plus an overt act in pursuit of it," *United States v. Feola*, 420 U.S. 671, 694 (1975), regardless of whether "the object of the conspiracy be achieved," *United States v. Thompson*, 275 F. Supp. 3d 107, 111 (D.D.C. 2017). Were it otherwise, defendants captured en route to a bank robbery could not be charged with conspiracy because their crime did not succeed. Indeed, a conspiracy can be committed even if the object of the conspiracy is unattainable. *See United States v. Jimenez Recio*, 537 U.S. 270, 275 (2003). The federal fraud statutes similarly punish "the scheme, not its success," *Pasquantino v. United States*, 544 U.S. 349, 371 (2005) (quotation marks omitted), and the "common-law requirement[] of 'justifiable reliance' . . . [has] no place in the federal fraud statutes," *Neder v. United States*, 527 U.S. 1, 24-25 (1999). A defraud-clause conspiracy, like any conspiracy, is complete regardless of whether it succeeds or is likely to succeed in achieving its objective. Here, of course, as the indictment charges and history reflects, the defendant's scheme did obstruct the government function, and came dangerously close to overturning the valid results of the

presidential election.  In short, the indictment alleges a defraud-clause conspiracy, and the Court

need not look further.

Alternatively, if the defendant's argument is that his false claims were not material—

because his voice was just one "among countless millions" (ECF No. 114 at 5-6), and thus, he

suggests, his statements did not have "a natural tendency to influence" and were not "capable of

influencing[] the decisions of" the public officials to whom they were addressed, *Neder*, 527 U.S.

at 16 (quotation marks omitted)—he cannot raise it now.  Materiality is an issue of fact to be

addressed at trial, not on a motion to dismiss.  *United States v. Gaudin*, 515 U.S. 506, 522-23

(1995).  Moreover, any such defense will fail at trial.  As the sitting president, the defendant had

access to far more information than others in the country—he had the benefit of the full resources

of the federal government, including the top federal law enforcement officials at the Department

of Justice, the Director of National Intelligence, and experts on election security (ECF No. 1 at

¶ 11), all of whom were informing him that his claims of outcome determinative fraud were false—

and as a result of his role and access to this information his voice carried more weight, as indicated

by his boasts about the impact of his words.[3]  In any event, this is not a matter to be resolved in a

motion to dismiss.

The defendant also asserts that his statements were not deceptive because he genuinely

believed that "the election was stolen."  ECF No. 114 at 7.   But this, too, raises a matter for trial,

not a motion to dismiss.  Moreover, even if the defendant could supply admissible evidence of his

own personal belief that the election was "rigged" or "stolen," it would not license him to deploy

fraud and deceit to remedy what he perceived to be a wrong, and it would not provide a defense to

the charge.  Even where a defendant uses deceit to obstruct government functions that he thought

---

[3] *See* CNN, Transcript of CNN's Town Hall with Former President Donald Trump (May 11, 2023), https://www.cnn.com/2023/05/11/politics/transcript-cnn-town-hall-trump/index.html.

were unconstitutional, the Supreme Court has made clear that "a claim of unconstitutionality will not be heard to excuse a voluntary, deliberate and calculated course of fraud and deceit." *Dennis*, 384 U.S. at 867.  "One who elects such a course as a means of self-help may not escape the consequences by urging that his conduct be excused because the statute which he sought to evade is unconstitutional." *Id.*  There are "appropriate and inappropriate ways to challenge" perceived illegalities.  *Id.*  Just as the president of a company may be guilty of fraud for using knowingly false statements of facts to defraud investors, even if he subjectively believes that his company will eventually succeed, *see, e.g.*, *United States v. Arif*, 897 F.3d 1, 9-10 & n.9 (1st Cir. 2018); *United States v. Kennedy*, 714 F.3d 951, 958 (6th Cir. 2013); *United States v. Ferguson*, 676 F.3d 260, 280 (2d Cir. 2011); *United States v. Chavis*, 461 F.3d 1201, 1209 (10th Cir. 2006), the defendant may be guilty of using deceit to obstruct the government function by which the results of the presidential election are collected, counted, and certified, even if he provides evidence that he subjectively believed that the election was "rigged."

Finally, the hypotheticals posed by the defendant (ECF No. 114 at 7-8) do not call into question Section 371's scope or its application here.  A defraud-clause violation, as honed by years of judicial application, requires an agreement, identification of a specific function of the federal government, the intent to obstruct that function through deceit, and an overt act, and does not reach lobbying or other societally beneficial political behavior.  *See, e.g.*, *United States v. Haldeman*, 559 F.2d 31, 120-21 (D.C. Cir. 1976) (en banc) (per curiam) (conspiracy to obstruct the lawful function of the CIA by deceptively causing it to provide financial assistance to those involved in the Watergate break-in and to falsely dissuade the FBI from investigating); *United States v. Johnson*, 383 U.S. 169, 172, 184-85 (1966) (in exchange for "campaign contributions" and "legal fees," congressman conspired to defeat the lawful functions of the Department of Justice by urging

dismissal of pending indictments).  Absent additional information about the conduct and mental state of the individuals in the defendant's hypothetical scenarios, they could not be prosecuted for violating Section 371.  None of the defendant's proffered hypotheticals, for example, involve individuals acting with the demanding criminal intent that Section 371 (or the other statutes with which the defendant is charged) requires.  Stated otherwise, the detailed allegations in the indictment, which establish that the defendant used false statements to conspire, defraud, and obstruct, are not comparable to the defendant's vague hypotheticals.[4]

> ii.     **The indictment alleges deceit in connection with the fraudulent electors.**

The defendant contends (ECF No. 114 at 9-13) that the indictment fails to allege deceit in connection with the fraudulent electors because the defendant and co-conspirators did not attempt to present the fraudulent electors as the electoral slates certified by the states.  This argument, too, rests on recasting the actual allegations in the indictment, which make clear that this part of the conspiracy was, indeed, deceitful.  First, five of the slates of fraudulent elector certificates were false on their face: they asserted that the electors were duly elected when they were not, and the conspirators resisted the addition of language that would water down that facial (and false) claim of validity.  ECF No. 1 at ¶ 61.  Beyond the fraud on the face of the documents, the indictment contains ample allegations of deceit in the scheme to create and use the fraudulent elector slates.  *See, e.g.*, *id.* at ¶ 58 ("fake" votes); ¶ 62 ("fraudulent slates" used to supplant "legitimate slates"); ¶ 63 ("Certifying illegal votes"); and ¶ 64 (elector scheme propped up by litigation that was a "pretext").  Moreover, as the defendant has acknowledged elsewhere, "[t]he indictment clearly alleges that these actions were part and parcel of [the defendant's] alleged attempts to convince

---

[4] The three hypotheticals the defendant conjures up in his constitutional dismissal motion (*see* ECF No. 113 at 14) fail for the same reasons.

the Vice President and Members of Congress" to act in his favor.  ECF No. 74 at 42.  It was only

by presenting these fake ballots that the defendant could try to make it appear, falsely, that there

was a bona fide dispute about which electors should be counted.  ECF No. 1 at ¶¶ 53, 54(b).

And while the absence of any accompanying certificate of ascertainment might have

alerted some that the false elector slates did not represent the official elector slates approved by

the states, it does not follow, as the defendant suggests, that the use of the fake electoral slates was

lacking in deceit.  From start to finish, false claims of election fraud provided the rationale for the

fraudulent electors, making the fraudulent electors a vehicle for those false claims.  Co-

conspirators lied to some of the fraudulent electors, falsely telling them that their votes would be

used only if ongoing litigation changed the results in the defendant's favor.  ECF No. 1 at ¶¶ 56,

61, 62.  The defendant later tried to use the Department of Justice to send a letter to state officials

falsely stating that the Department had found problems that may have changed the outcome of the

election and urging state legislatures to convene in special sessions to choose the fraudulent

electors over the legitimate electors.  *Id.* ¶¶ 70-75.  And using the false claims of voter fraud, the

defendant and co-conspirators tried to convince the Vice President to accept the fraudulent electors

and reject the legitimate electoral votes.  *Id.* ¶¶ 86, 90.  The defendant's contention (ECF No. 114

at 11) that he merely tried to "*persuade* officials to consider alternate slates" overlooks that the

bases for this so-called persuasion were the knowingly false statements of voter fraud and that he

was not engaged in persuasion but instead, as the indictment alleges, in making false statements

that he repeatedly deployed.

The defendant also argues (ECF No. 114 at 12-13) that the lies to fraudulent electors to

induce some of them to participate in the sham process do not establish deceit for purposes of

alleging a violation of the defraud clause.  But under the defraud clause, the deceitful or dishonest

conduct may be directed at a third party, so long as the defendant is merely using the "third party to reach" the government function that is ultimately "the target of the fraud." *Tanner*, 483 U.S. at 129. Here, the lies to fraudulent electors were yet another form of deceit aimed at obstructing the government function of collecting, counting, and certifying the results of the election.

### iii. The defendant made false statements to the Vice President.

The defendant contends (ECF No. 114 at 8-9) that his statements to the Vice President about the Vice President's authority at the certification proceeding in Congress cannot establish his intent to deceive for purposes of the defraud clause because misrepresentations of law cannot constitute fraud. The defendant is correct that "many courts appear to have stated—as a general rule—that misrepresentations of law are not actionable at common law," *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 756 (2023), but that general rule does not apply or provide a defense to the charges here. Even if accepted as governing law in federal fraud cases, *see Neder*, 527 U.S. at 24-25 (suggesting otherwise), "the rule has significant limits on its own terms," *Schutte*, 598 U.S. at 756. For instance, "statements involving some legal analysis remain actionable if they 'carry with [them] by implication' an assertion about 'facts that justify' the speaker's statement." *Id.* (quoting Restatement (Second) of Torts § 545, cmt. c (1977)). Thus, even assuming some of the defendant's statements about the Vice President's authority could qualify as misrepresentations of law, such statements—for example, his statement that the Vice President had the "power to reject fraudulently chosen electors" from certain states, ECF No. 1 at ¶ 96(a)—were undergirded by specific factual lies, *e.g.*, that the Vice President could and should do so because outcome-determinative voter fraud took place in those states and there was a bona fide dispute about which slate of electors should be counted. Thus, even if the common-law rule on misrepresentations of law applied, the defendant's statements about and to the Vice President

are powerful evidence of fraud.  *See, e.g.*, *id.* ¶ 90 ("[I]n late December and early January, the Defendant repeated knowingly false claims of election fraud and directly pressured the Vice President to use his ceremonial role at the certification proceeding on January 6 to fraudulently overturn the results of the election[.]").

        **b.**    **The indictment alleges obstruction, not political advocacy.**

The defendant argues (ECF No. 114 at 14-15) that the allegations in the indictment consist solely of "political advocacy," not obstruction of a government function.  That argument fails because the indictment alleges not lobbying or political advocacy, but instead that the defendant engaged in a multifaceted conspiracy aimed at overturning the results of the presidential election by targeting deceit at the federal government function (which included the certification proceeding on January 6) by which votes are collected, counted, and certified.

        **c.**    **The defendant's invocation of interpretative canons does not support dismissal.**

The defendant's invocation (ECF No. 114 at 15-21) of "[s]everal principles of statutory interpretation" to justify his assertion that "the conduct alleged in the indictment does not fall within § 371 as a matter of law" is disingenuous.  Other than to ask that Section 371 be "narrowly" construed to ensure that it does not criminalize "vast swaths of ordinary political activity and First Amendment-protected speech," *id.* at 15 (capitalization altered), he does not focus on any statutory term and attempt to explain why it is vague or ambiguous, or offer any interpretation of what the statute should mean.  Indeed, the defendant agrees (*id.* at 3) regarding the essential elements of an offense under the defraud clause.

Those elements limit the scope of the defraud clause and ensure that it does not reach the sort of innocent conduct posited by the defendant, and thus no novel narrowing construction is necessary.  "The conspiracies criminalized by § 371 are defined not only by the nature of the injury

- 14 -

intended by the conspiracy, and the method used to effectuate the conspiracy, but also—and most importantly—by the *target* of the conspiracy." *Tanner*, 483 U.S. at 130. Because a defraud-clause conspiracy must be targeted at the United States or any agency thereof, it does not reach the vast array of private fraud potentially criminalized by other federal fraud statutes, or permit "federal prosecutors" to "set[] standards of disclosure and good government for local and state officials." *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (quotation marks omitted). Moreover, obstruction of the government function must be "a *purpose* or *object* of the conspiracy, and not merely a foreseeable consequence of the conspiratorial scheme." *United States v. Goldberg*, 105 F.3d 770, 773 (1st Cir. 1997) (citing *Dennis*, 384 U.S. at 861). Further, the defraud clause "is limited only to wrongs done 'by deceit, craft or trickery, or at least by means that are dishonest,'" and does not reach "[o]bstructing government functions in other ways—for example, by violence, robbery or advocacy of illegal action." *United States v. Caldwell*, 989 F.2d 1056, 1059 (9th Cir. 1993) (quoting *Hammerschmidt*, 265 U.S. at 188), *overruled on other grounds by Neder*, 527 U.S. at 8-9. The requirement of deceit, craft, trickery, or dishonest conduct—which flows from the statutory term "defraud"—also brings with it the fraud-related doctrine of materiality. *See Neder*, 527 U.S. at 20-25. Finally, the overt-act requirement provides another limitation, the function of which is "to manifest that the conspiracy is at work, and is neither a project still resting solely in the minds of the conspirators nor a fully completed operation no longer in existence." *Yates v. United States*, 354 U.S. 298, 334 (1957) (citation and quotation marks omitted), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978).

These requirements, taken together, confirm that Section 371 does not reach the sort of good-faith advocacy and lobbying that the defendant says should fall outside its scope. As such, there is no need to adopt some unspecified narrowing construction to avoid problems of "potential

overbreadth" (ECF No. 114 at 15-16) or "fatal vagueness" (*id.* at 17-18).  *See infra* p. 29 n.11 (discussing overbreadth); *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) ("[The vagueness] doctrine spurns attempts to save a statute from unconstitutional vagueness based on speculative tests detached from statutory elements that do not craft a principled and objective standard." (quotation marks omitted)).  Nor do the rules of lenity (ECF No. 114 at 18-19) or constitutional avoidance (*id.* at 16-17) have any relevance here.  *See Muscarello v. United States*, 524 U.S. 125, 138-39 (1998) ("The rule of lenity applies only if, after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended," such that "there is a grievous ambiguity or uncertainty in the statute." (ellipsis and quotation marks omitted)); *Johnson v. Arteaga-Martinez*, 142 S. Ct. 1827, 1833 (2022) ("[T]he canon of constitutional avoidance is only applicable where a statute has more than one plausible construction." (quotation marks omitted)).

Finally, the defendant offers a strained argument (ECF No. 114 at 19-21) that he was not and cannot be charged under the general false-statement statute, 18 U.S.C. § 1001, for his deceit aimed at a congressional proceeding, and therefore that he cannot be charged with any crime at all.  The argument fails on at least two grounds.  First, in a matter "within the jurisdiction of the legislative branch," Section 1001 does, in fact, apply to "a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch." 18 U.S.C. § 1001(c)(1).  But more fundamentally, the applicability or inapplicability of one statute (based on law or facts) does not govern the applicability of another well-established statute with entirely different language, scope, and elements.  "The Federal Criminal Code is replete with provisions that criminalize overlapping conduct," and [t]he mere fact that two federal criminal

statutes criminalize similar conduct says little about the scope of either." *Pasquantino*, 544 U.S. at 359.

### 2. The indictment adequately alleges violations of 18 U.S.C. §§ 1512(k) and (c)(2).

The indictment charges that the defendant corruptly obstructed and impeded an official proceeding, namely, Congress's certification of the presidential election, and conspired to do so. ECF No. 1 at ¶¶ 125-28. The defendant argues (ECF No. 114 at 21-27) that the indictment fails to allege that he engaged in any conduct that obstructed or impeded the certification proceeding or that he acted "corruptly." He is wrong again.

#### a. The indictment alleges the defendant conspired to, attempted to, and did obstruct and impede the certification proceeding.

Section 1512(c)(2) prohibits "all forms of corrupt obstruction of an official proceeding" other than the document destruction and evidence tampering "that is already covered" in Section 1512(c)(1). *United States v. Fischer*, 64 F.4th 329, 336 (D.C. Cir. 2023). Section 1512(c)(2) thus "encompasses all forms of obstructive conduct, including . . . efforts to stop Congress from certifying the results of the 2020 presidential election." *Id.* at 335. As the defendant acknowledges (ECF No. 114 at 22), the verbs Congress selected in Section 1512(c)(2) are "noncontroversial." *United States v. Montgomery*, 578 F. Supp. 3d 54, 70 (D.D.C. 2021). The words "'obstruct'" and "'impede'" naturally "refer to anything that 'blocks,' 'makes difficult,' or 'hinders.'" *Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018) (brackets omitted) (citing dictionaries). In *Fischer*, the court concluded that indictments that, in addition to charging three defendants with other crimes, alleged that each defendant "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding," and defining that proceeding as the certification of the electoral college vote, 64 F.4th at 333, sufficiently stated violations of Section 1512(c)(2) even in the absence of specific allegations describing each defendant's conduct, *id.* at 350.

- 17 -

The indictment here unmistakably alleges the *actus reus* element for a violation of Section 1512(c)(2).  Consistent with *Fischer*, the indictment tracks Section 1512(c)(2)'s statutory language and identifies the specific congressional proceeding—the certification of the electoral college vote—that the defendant is alleged to have obstructed.  *See* ECF No. 1 at ¶¶ 126, 128.  Moreover, the indictment is replete with allegations that the defendant conspired to obstruct, attempted to obstruct, and in fact obstructed the certification proceeding on January 6, 2021.  For example, the indictment describes the defendant's efforts to devise a plan to "marshal individuals" to serve as fraudulent slates of electors in several targeted states who would "make and send to the Vice President and Congress false certifications that they were legitimate electors."  *Id.* ¶ 53; *see id.* at ¶¶ 53-69 (describing plan in detail).  The defendant also sought to deceive state officials into undertaking efforts to derail the January 6 certification proceeding through direct overtures from him and his co-conspirators working outside the Executive Branch.  *See, e.g.*, *id.* ¶ 15 (defendant and Co-Conspirator 1 "made knowingly false claims of election fraud" to the Speaker of the Arizona House of Representatives designed to "interfer[e] with the ascertainment of and voting by Arizona's electors"); ¶¶ 31, 31(f)  (defendant in a phone call "lied to" the Georgia Secretary of State and "insinuated that the Georgia Secretary of State and his Counsel could be subject to criminal prosecution" if they failed to "find election fraud" as the defendant "demanded" in service of the defendant's effort to "induce" the Secretary of State "to alter Georgia's popular vote count and call into question the validity of the Biden electors' votes, which had been transmitted to Congress weeks before"); ¶ 38 (Co-Conspirator 1 "reiterat[ed]" an "unsupported claim of election fraud" in a text message to the Michigan House Speaker in an effort to get the Speaker "to assist in reversing the ascertainment of the legitimate Biden electors").  He sought the same result through a letter that was proposed by a co-conspirator within the Executive Branch that "contained

numerous knowingly false claims about the election and the Justice Department." *Id.* ¶ 75.  The defendant additionally used knowing false claims of election fraud to pressure and target the former Vice President to induce the Vice President to fraudulently alter the election results during the January 6 certification proceeding. *See id.* ¶¶ 86-104.  And on January 6, the defendant directed a large crowd of supporters, whom he knew to be "angry" based on his election fraud lies, to go to the Capitol and obstruct the proceeding. *See id.* ¶¶ 10(d), 98, 104.  The defendant likewise sought to exploit the violence that overtook the Capitol and caused the suspension of the certification proceeding on January 6, including by publicly attacking the Vice President 11 minutes after rioters had broken into the Capitol building; the Vice President had to be evacuated from the building one minute later, and rioters called the Vice President a "Traitor" and for him to be hanged. *See id.* ¶¶ 109-113.  Those allegations readily establish that the defendant conspired to, attempted to, and did obstruct and impede the certification proceeding.

The defendant's principal counterargument (ECF No. 114 at 23) mischaracterizes the indictment—thereby failing to accept the allegations as true, s*ee Weeks*, 636 F. Supp. 3d at 120— as focused solely on "lobbying" of state officials and Members of Congress.  That is flawed in at least three respects.  First, as the preceding paragraph makes evident, the indictment alleges not "lobbying" but instead a concerted effort to target knowingly false and fraudulent claims at government officials, and then seeking to exploit actions by a violent and chaotic mob, in order to defeat the certification proceeding.  Second, just as with Section 371, Section 1512(c)(2)'s *mens rea* requirement—that a defendant act "corruptly" when engaging in his obstructive conduct— prevents the statute "from sweeping up a great deal of conduct that has nothing to do with obstruction," including "lobbyists who know they advocate for morally wrongful causes." *Fischer*, 64 F.4th at 339.  Finally, any "concerns about constraining lobbying and advocacy are

not implicated in January 6 cases because the electoral-vote certification by Congress is not a policymaking exercise open to 'political jousting,'" but instead a "constitutionally scripted transition of presidential power, with an outcome determined by the results of a presidential election." *United States v. Robertson*, --- F.4th ---, 2023 WL 6932346, at *12 (D.C. Cir. Oct. 20, 2023) (quotation omitted).[5]  Relatedly, the defendant's ill-conceived hypothetical (ECF No. 114 at 23-24)—that advocacy efforts by an "activist" who "oppose[d] COVID vaccine mandates" (but does not appear to have acted with criminal intent) would amount to felony obstruction—has no relationship to the allegations in this case.    It is common ground between the parties that "the legitimate efforts of lobbyists and protestors to influence policymaking or to express political views," *Robertson*, 2023 WL 6932346, at * 12, would not violate Section 1512(c)(2).[6]

The indictment would likewise suffice under a narrower conception of Section 1512(c)(2)'s *actus reus* element—which *Fischer* rejected—that focused on tampering with records.  *See* ECF No. 114 at 21.  The certification proceeding that the defendant and his co-conspirators are alleged to have obstructed is required under the Electoral Count Act, which specifies procedures that rely on specific core records: certificates of votes from each State.  The President of the Senate opens the certificates "in the alphabetical order of the States," and calls for objections, which must be in

---

[5] The defendant's cursory suggestion (ECF No. 114 at 23) that several interpretative canons militate in favor of his cramped reading of Section 1512(c)(2) lacks merit.  Not only did *Fischer* reject the reading he advocates; it also explained how statutory canons, including those on which he relies, do not support that reading.  *See* 64 F.4th at 345-46 (discussing *ejusdem generis* and *noscitur a sociis* canons); *id.* at 348-50 (discussing anti-surplusage and mousehole canons); *id.* at 350 (discussing lenity and restraint).

[6] Indeed, as the defendant correctly notes (ECF No. 114 at 22 n.4), by foregoing any prosecution theory based on "influence," the indictment undoubtedly does not reach lobbying efforts.

writing.  3 U.S.C. § 15.[7]  After the two Houses resolve any objections, the votes are counted with the aid of four tellers.  *Id.*  Congress may not recess until "the count of electoral votes" is "completed" and the "result declared."  *Id.* § 16.  When the count is completed and the winner declared, a record of the votes is entered on the "Journals of the two Houses."  *Id.* § 15.  Preventing the Members of Congress from validating the state certificates constitutes evidence-focused obstruction and thus would violate Section 1512(c)(2) even on a narrower view of the statute's scope.  That is particularly true where, as here, the criminal conduct included falsifying electoral certificates and transmitting them to Congress.  *See* ECF No. 1 at ¶¶ 53-69.

### b.  The indictment alleges the defendant acted corruptly.

The defendant's claim that the indictment fails to allege that he acted corruptly (ECF No. 114 at 24-27) is patently incorrect.  The indictment charges that the defendant conspired "to *corruptly* obstruct and impede," ECF No. 1 at ¶ 126 (emphasis added), and that he "attempted to, and did, *corruptly* obstruct and impede," the certification proceeding, *id.* ¶ 128 (emphasis added). Alleging a violation of Section 1512(c)(2)'s *mens rea* element by tracking the statutory language disposes of the defendant's claim that the indictment failed to allege that he acted with corrupt intent.  *See United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018).

The defendant's additional challenges to the "corruptly" element are both premature and flawed.  The defendant discusses the D.C. Circuit's recent decision in *Robertson* at length, but that decision reviewed the evidence after a trial and concluded that ample evidence established the defendant acted "corruptly."  2023 WL 6932346, at *9 ("The evidence presented at Robertson's trial was undoubtedly sufficient to prove that he acted 'corruptly.'").  *Robertson* does not alter the

---

[7] Citations to the Electoral Count Act are to the provisions operative between November 2020 and January 2021.

long-standing rule that, in order to inform the defendant of the nature of the accusation as required under Rule 7 of the Federal Rules of Criminal Procedure, *see Ballestas*, 795 F.3d at 148-49, "parroting the language of a federal criminal statute is often sufficient," *Williamson*, 903 F.3d at 130 (quoting *United States v. Resendiz-Ponce*, 549 U.S. 102, 109 (2007)); *cf. United States v. Brock*, 628 F.3d 85, 93 (D.D.C. 2022) (noting that a defendant is not entitled through an indictment or a bill of particulars to a "preview" of the "government's evidence or theory of the case") (quotation marks omitted).  Thus, while relevant to jury instructions, *Robertson*'s interpretation of "corruptly" is not relevant to the defendant's dismissal motion.

Moreover, *Robertson* demonstrates that "there are multiple ways to prove" that the defendant "acted 'corruptly.'" 2023 WL 6932346, at *8.  The alternatives include "using independently unlawful, felonious means," *id.* at *9, and acting with a "corrupt purpose," *id.* at *11, which includes acting "with an intent to procure an unlawful benefit," *Fischer*, 64 F.4th at 352 (Walker, J., concurring) (quotation marks omitted), such as "secur[ing] . . . the presidency," *id.* at 356 n.5, and acting dishonestly, *Arthur Andersen LLP v. United States,* 544 U.S. 696, 706-07 (2005); *see Robertson*, 2023 WL 6932346, at *12 (noting that "dishonesty" or "seeking a benefit for oneself or another" is not necessary but "may be sufficient to prove corrupt intent"). The proof at trial will establish corrupt intent under the definitions in *Robertson*.  Contrary to the defendant's speculation about prosecutions that might reach political advocacy and lobbying (ECF No. 114 at 26-27), proceeding on a corrupt means or corrupt purpose theory will "ensure[] that [Section] 1512(c)(2) does not penalize innocent efforts to obstruct an official proceeding, including by engaging in constitutionally protected expression." *Robertson*, 2023 WL 6932346, at *17.

### 3.     The indictment adequately alleges a violation of 18 U.S.C. § 241.

Count Four of the indictment charges a conspiracy to deprive one or more persons of their right to vote and to have their votes counted, in violation of 18 U.S.C. § 241.  As relevant here, the

defendant advances two claims.  First, he claims that the indictment does not allege an agreement to commit an unlawful act.  Second, he argues that the indictment fails to charge the necessary specific intent.  Each argument fails.[8]

### a.    The indictment alleges a criminal agreement.

The defendant first contends (ECF No. 114 at 28) that the indictment contains "[n]o agreement to commit an unlawful act."  That claim is flatly contradicted by the indictment, which alleges in Count Four a conspiracy to violate the rights and privileges secured by the Constitution and laws of the United States of one or more persons, that is, the right to vote and to have one's vote counted.  ECF No. 1 at ¶ 130.  The count incorporates dozens of factual allegations laying out how the defendant and his co-conspirators carried out their criminal agreement, including that they "pursued unlawful means of discounting legitimate votes and subverting the election results."  *Id.* ¶¶ 4, 129.  The indictment is more than sufficient to inform the defendant of the nature of the charge.[9]

### b.    The indictment alleges the requisite *mens rea*.

The defendant next claims (ECF No. 114 at 32) that Count Four "fail[s] to allege" that the defendant acted with "specific intent" and "acted to accomplish a governmental purpose."  He relies exclusively on a fifty-year-old case from the Fifth Circuit, *Wilkins v. United States,* 376 F.2d 552, 562 (5th Cir. 1967), but fails to recognize that a subsequent Fifth Circuit case, *United States v. Purvis*, 580 F.2d 853, 856 (5th Cir. 1978), clarified *Wilkins* and directly contradicts his argument.  While the Government must prove at trial that the defendant had the specific intent to

---

[8] The defendant's fair notice challenge to Section 241 is addressed *infra* pp. 37-40.

[9]  The defendant's suggestion (ECF No. 114 at 28) that a violation of Section 241 requires proof of an overt act is incorrect.  *See United States v. Whitney*, 229 F.3d 1296, 1301 (10th Cir. 2000).  In any event, the indictment is replete with overt acts.

deprive one or more persons of a constitutional right, there is no requirement that the indictment contain these particular words.  *See Purvis*, 580 F.2d at 857 ("the law does not compel a ritual of words").  It is sufficient if the indictment tracks the statutory language and identifies the constitutional right at issue, *id.* at 857-88, as the allegation of a conspiracy itself "incorporates willfulness and specific intent," *id.* at 859.  Here, the indictment tracks the language of the statute and provides a detailed factual predicate for the charge.  *See id*. at 857.  Additionally, the indictment directly identifies the rights at issue—"the right to vote or to have one's vote counted"—rights the defendant has conceded are fundamental.  ECF No. 114 at 29.  That is more than sufficient for purposes of pleading a violation of Section 241.

Further, relying on *United States v. Ehrlichman*, 546 F.2d 910 (D.C. Cir. 1976), the defendant contends that the Government must prove that the defendant "acted to accomplish a governmental purpose."  ECF No. 114 at 32.  Putting aside that he is again raising a trial issue, the defendant's reliance on *Ehrlichman* is misplaced.  *Ehrlichman* does not rest on a distinction between government and private purposes of the conspirators, as the defendant suggests.  The defendant in that case was convicted under Section 241 of conspiring to break into a psychiatrist's office.  546 F.2d at 914.  The right infringed by the conspiracy was the psychiatrist's Fourth Amendment rights, *id*. at 928 (Leventhal, J., concurring), and the passage the defendant focuses on stands for the unremarkable proposition that the Fourth Amendment protects only against unreasonable searches and seizures undertaken by the government.  *Id.* ("It is a civil rights conspiracy in violation of [§ 241] . . . if they enter his office in their capacity as government agents without proper authorization to secure information for an ostensible government purpose."); *see also United States v. Jacobsen*, 466 U.S. 109, 113 (1984) ("This Court has also consistently construed this [Fourth Amendment] protection as proscribing only governmental action[.]").

However, because the right to vote in a presidential election is directly protected under the Constitution, *see Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam); *see also infra* pp. 38-40, a Section 241 charge of conspiring to interfere in the free exercise of that right requires no proof of government involvement.  *See United States v. Classic*, 313 U.S. 299, 321 (1941) ("the right to vote in a congressional election is a right secured by the Constitution, and that a conspiracy to prevent the citizen from voting or to prevent the official count of his ballot when cast, is a conspiracy to injure and oppress the citizen in the free exercise of a right secured by the Constitution within the meaning of [Section 241's predecessor]").  Count Four is therefore sufficiently pleaded.[10]

### B.    The Defendant's Constitutional Challenges Lack Merit.

Repeating much of what he advances in his statutory challenges (*see* ECF No. 114), the defendant separately contends (ECF No. 113 at 4-18, 25-31) that dismissal is appropriate because the indictment violates the First Amendment and constitutional principles of fair notice.  And repeating much of what he advanced in his motion to dismiss on presidential immunity grounds

---

[10] Even if the right alleged to have been infringed is viewed as a violation of the Equal Protection and Due Process Clauses, the defendant, as president, was indisputably at times a government actor, even if he was also acting at times in his capacity as a candidate.  *See Classic,* 313 U.S. at 326 ("Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law.").  Moreover, it is well established that when the object of a Section 241 conspiracy is to violate a right that protects against action by the government, whether it is the Fourth Amendment or the Equal Protection Clause of the Fourteenth Amendment, not all co-conspirators need be government actors.  *United States v. Olinger*, 759 F.2d 1293, 1304 (7th Cir. 1985) ("Nor is it essential that the state official be a party defendant; it is sufficient if the proof involves 'a charge of active connivance by agents of the State' in the wrongful acts done in furtherance of the conspiracy; that will meet the test of state action, as required under the rule enunciated in [*United States v. Guest,* 383 U.S. 745 (1966)]").  In *Guest*, the Court denied defendants' motion to dismiss a Section 241 indictment alleging an Equal Protection violation, finding that because the indictment alleged state involvement, how the government would prove the violation was a matter for trial.  383 U.S. at 756.  The same analysis applies here.

(ECF No. 74 at 11-13, 16-17), the defendant contends (ECF No. 113 at 18-25) that his acquittal in the United States Senate following his impeachment in the United States House of Representatives precludes his criminal prosecution in this case, including on double-jeopardy grounds.  Those contentions fail.

> **1.      The First Amendment does not protect the defendant's criminal conduct.**

The defendant argues (ECF No. 113 at 4-18) that the First Amendment requires dismissal of the indictment.  The First Amendment does not protect fraudulent speech or speech otherwise integral to criminal conduct, particularly crimes that attack the integrity and proper function of government processes.  The defendant's arguments are based on an inaccurate and self-serving characterization of the charges, and his motion should be denied.

> **a.      The charges in the indictment do not criminalize protected speech.**

As the indictment recognizes, the defendant "had a right, like every American, to speak publicly about the [2020 presidential] election and even to claim, falsely, that there had been outcome-determinative fraud during the election and that he had won."  ECF No. 1 at ¶ 3.  Had the defendant done no more, his statements pertaining to political matters of public importance would have remained protected under the First Amendment, even if false.

But the defendant did not stop there.  He instead made dozens of "specific claims that there had been substantial fraud in certain states, such as that large numbers of dead, non-resident, non-citizen, or otherwise ineligible voters had cast ballots, or that voting machines had changed votes for the Defendant to votes for Biden."  ECF No. 1 at ¶ 11.  He falsely stated, for example, that "more than 10,300 dead people had voted in Georgia."  *Id.* ¶ 33.  Those were factual claims that were verifiably false, and the defendant "knew that they were false."  *Id.* ¶ 2.  The defendant then used those lies as the instruments of his four criminal offenses: conspiring to fraudulently obstruct

the federal function for collecting, counting, and certifying the results of the presidential election, in violation of 18 U.S.C. § 371 (Count 1); corruptly obstructing and conspiring to obstruct Congress's certification of the election results, in violation of 18 U.S.C. §§ 1512(c)(2) and (k) (Counts 2 and 3); and conspiring to deprive citizens of their constitutional right to have their votes counted, in violation of 18 U.S.C. § 241 (Count 4).  The defendant's "knowingly false statements were integral to his criminal plans to defeat the federal government function, obstruct the certification, and interfere with others' right to vote and have their votes counted."  *Id.* ¶ 12.

Because the defendant used those knowingly false statements regarding specific facts to commit the crimes charged in the indictment, they were not protected by the First Amendment.  Speech used to commit "fraud" and speech that is otherwise "integral to criminal conduct" is not protected under the First Amendment.  *United States v. Stevens*, 559 U.S. 460, 468-69 (2010) (listing categories of speech that are unprotected, including "speech integral to criminal conduct.").  For that reason, the First Amendment has never been thought to foreclose the prosecution of long-established crimes—such as conspiracy, fraud, bribery, extortion, blackmail, or aiding and abetting—that are committed wholly or in part through speech.  *See, e.g.*, *Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646, 656 (D.C. Cir. 1994) ("That 'aiding and abetting' of an illegal act may be carried out through speech is no bar to its illegality."); *United States v. Sayer*, 748 F.3d 425, 434 (1st Cir. 2014) (listing perjury, bribery, extortion and threats, and conspiracy as examples of offenses where speech itself is the vehicle of the crime); *United States v. Rahman*, 189 F.3d 88, 117 (2d Cir. 1999) (per curiam) ("Numerous crimes under the federal criminal code are, or can be, committed by speech alone.").  "[T]he constitutional freedom for speech" does not "extend[] its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute."  *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949).  It "has never been

deemed an abridgment of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id.* at 502. Put simply, using speech as a means to commit a crime does not shield that crime from prosecution. *See, e.g.*, *Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 244 (4th Cir. 1997) (explaining that the First Amendment does not foreclose the government from proscribing "countless" crimes, including extortion, blackmail, threats, perjury, solicitation, and conspiracy). The defendant's comments about the virtues of the First Amendment, over which there is no dispute, do nothing to unsettle this line of unbroken precedent.

Any speech that the defendant used to carry out the conspiracy, fraud, and obstruction crimes charged in the indictment is categorically excluded from the protections of the First Amendment. The "long established criminal proscription[] . . . against conspiracy. . . criminalize[s] speech" that is "undeserving of First Amendment protection." *United States v. Williams*, 553 U.S. 285, 298 (2008). Speech used to carry out "agreements and conspiracies deemed injurious to society" is quintessential speech integral to criminal conduct. *Giboney*, 336 U.S. at 502. "Speech intended to bring about a particular unlawful act has no social value; therefore, it is unprotected." *United States v. Hansen*, 599 U.S. 762, 783 (2023); *see id.* (concluding that if a proscription against solicitation or aiding-and-abetting "reaches *any* speech, it stretches no further than speech integral to unlawful conduct"). Accordingly, insofar as the defendant used speech to commit the charged conspiracies aimed at defrauding the United States, corruptly obstructing official proceedings, and unlawfully depriving citizens of their constitutional rights, that speech was unprotected under the First Amendment. A conspiracy is "not protected by the First Amendment merely because, in part, it may have involved the use of language." *United States v. Rowlee*, 899 F.2d 1275, 1278 (2d Cir. 1990) (conspiracy to defraud the United

States, in violation of 18 U.S.C. § 371).  Were it otherwise, the prosecution would be unable to

prove that a defendant in a robbery case told the victim to "give me all your money" or that a drug

trafficker told his buyer what the price would be.  That is clearly not the law.  Moreover, speech

used to commit a conspiracy to defraud the United States is further unprotected because "the First

Amendment does not shield fraud."  *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538

U.S. 600, 612 (2003); *see United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1123-24 (D.C.

Cir. 2009) (per curiam) ("Of course, it is well settled that the First Amendment does not protect

fraud.").  And the prohibition on corruptly obstructing an official proceeding likewise does not

proscribe protected speech.  *United States v. Bozell*, No. 21-cr-216, 2022 WL 474144, at *7

(D.D.C. Feb. 16, 2022) (opinion in January 6 case citing similar decisions by "several other

judges"); *see United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998); *United States v.

Thompson*, 76 F.3d 442, 452 (2d Cir. 1996).

Finally, not only does the First Amendment not limit or foreclose the conspiracy, fraud,

and obstruction charges in the indictment; it does not limit the evidence at trial.  The defendant's

speech may serve as evidence "to establish the elements of a crime or to prove motive or intent."

*Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993).  The First Amendment allows the "use of speech

to infer intent, which in turn renders an otherwise permissible act unlawful."  *Whitaker v.

Thompson*, 353 F.3d 947, 953 (D.C. Cir. 2004); *see United States v. Robertson*, 588 F. Supp. 3d

114, 124 (D.D.C. 2022) (finding no "First Amendment concerns in the government's use of [the

defendant's] statements to show intent").[11]

---

[11] The defendant argues in passing (ECF No. 113 at 11) that "the statute" is unconstitutionally overbroad and therefore facially invalid.  "[I]nvalidation for overbreadth is strong medicine that is not to be casually employed," and "[t]o justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially

**b.** *Alvarez* **confirms that the charges in the indictment do not offend the First Amendment.**

The defendant devotes many pages (ECF No. 113 at 4-10, 15) to discussing the Supreme Court's decision in *United States v. Alvarez*, 567 U.S. 709 (2012), but *Alvarez* undermines the defendant's argument and confirms that the conspiracy, fraud, and obstruction charges in the indictment are entirely permissible under the First Amendment.

*Alvarez* held that the Stolen Valor Act, which made it a crime for anyone to falsely represent that he or she had been awarded a military medal or decoration, was facially invalid under the First Amendment.  567 U.S. at 715-16; *see id.* at 730 (Breyer, J., concurring).  In a plurality opinion, Justice Kennedy contrasted the Stolen Valor Act, which "target[ed] falsity and nothing more," with laws that "implicate fraud or speech integral to criminal conduct," which prohibit false statements in connection with some "other legally cognizable harm."  567 U.S. at 719-21.  In language that has direct application to the charges here, the plurality opinion specifically identified as permissible under the First Amendment laws that "protect the integrity of Government processes, quite apart from merely restricting false speech," such as perjury, prohibitions on false statements to government officials, and prohibitions on falsely representing that one is speaking on behalf of the government.  *Id.* at 720-21.  The plurality opinion further confirmed that "[w]here false claims are made to effect a fraud," the government "may restrict speech without affronting the First Amendment."  *Id.* at 723.  Justice Breyer's concurrence similarly contrasted statutes like the Stolen Valor Act that "simply prohibit without limitation the

---

disproportionate to the statute's lawful sweep." *Hansen*, 599 U.S. at 770 (quotation marks omitted).  The defendant does not attempt to make this showing; he does not even cite the relevant statutes, let alone evaluate what they "cover[]," a necessary component of overbreadth analysis. *Id.*  In any event, the defendant could not demonstrate overbreadth even if he tried.  The statutes charged in the indictment have been on the books for decades and repeatedly enforced without questions as to the validity of the prosecutions under the First Amendment.

telling of a lie" with narrower, valid statutes that apply to "a subset of lies where specific harm is more likely to occur." *Id.* at 736; *see id.* at 734-36.  As an example of one of these narrower, valid statutes, Justice Breyer specifically mentioned fraud statutes, which "typically require proof of a misrepresentation that is material," and statutes "forbidding lying to a government official," which "are typically limited to circumstances where a lie is likely to work particular and specific harm by interfering with the functioning of a government department." *Id.* at 734-35.  In other words, the government may protect its processes and functions against fraud and corruption carried out through lies.

The statutes charged in the indictment are precisely the sorts of laws that the plurality and concurring opinions in *Alvarez* identified as permissible restrictions on false speech, in contrast to the invalid Stolen Valor Act.  The conspiracy, fraud, and obstruction offenses charged in the indictment "implicate fraud or speech integral to criminal conduct," and they "protect the integrity of Government processes, quite apart from merely restricting false speech."  567 U.S. at 721 (plurality opinion).  *Alvarez* thus forecloses a First Amendment challenge to the indictment.  *See*, *e.g.*, *Concord Mgmt. & Consulting LLC*, 347 F. Supp. 3d at 56 (denying motion to dismiss Section 371 charges after *Alvarez*).

The defendant nonetheless erroneously contends that *Alvarez* supports dismissal.  He relies (ECF No. 113 at 4, 7) on statements in the concurring and dissenting opinions that hypothetical laws "restricting false statements about philosophy, religion, history, the social sciences, the arts, and other matters of public concern would present" a "grave and unacceptable danger of suppressing truthful speech."  567 U.S. at 751 (Alito, J., dissenting); *see id.* at 731-32 (Breyer, J., concurring).  But the statutes charged in this case do not impose restrictions anything like the hypothetical laws mentioned in *Alvarez*.  Nonetheless, the defendant suggests (ECF No. 113 at 7-

8, 12, 15-17) that his statements about the 2020 election are like those hypothesized in *Alvarez* because he gave his "opinion" about what he describes as a "widely disputed historical, social, and political question." *Id.* at 15.[12]   The indictment belies that assertion, showing that the defendant's lies concerned not "philosophy, religion, history, the social sciences, the arts," and the like, 567 U.S. at 751 (Alito, J., dissenting), but instead concrete, specific statements that he knew were false, *see, e.g.*, ECF No. 1 at ¶ 19 ("36,000 non-citizens had voted in Arizona"), ¶ 33 ("more than 10,300 dead people had voted in Georgia"), ¶ 41 ("an illicit dump of more than a hundred thousand ballots in Detroit"), ¶ 46 ("there had been 205,000 more votes than voters in Pennsylvania"); ¶ 52 ("there had been tens of thousands of unlawful votes in Wisconsin").   Moreover, those false statements, unlike the hypothetical false statements mentioned in the *Alvarez* dissent and concurrence, were used to conspire, defraud, and obstruct.   Nor is there any basis for the defendant's suggestion (ECF No. 113 at 17) that proving he committed fraud through false statements would be akin to "dictat[ing]" what he is "required to believe."

        **c.   The indictment does not improperly restrict political speech or discriminate based on viewpoint.**

Starting from the faulty premise that he made only statements about political matters of public concern entitled to "absolute protection" (ECF No. 113 at 12), the defendant contends (*id.*

---

[12] Although the defendant is not charged with merely expressing his opinion on matters of public concern, he is wrong to suggest that statements of opinion may never be false.   "The expression of an opinion not honestly entertained is a factual misrepresentation."   *United States v. Amrep Corp.*, 560 F.2d 539, 543-44 (2d Cir. 1977).   Statements of opinion "may trigger liability for fraud when they are not honestly held by their maker, or when the speaker knows of facts that are fundamentally incompatible with his opinion."   *United States v. Paulus*, 894 F.3d 267, 275 (6th Cir. 2018).   "[T]he expression of an opinion may carry with it an implied assertion, not only that the speaker knows no facts which would preclude such an opinion, but that he does know facts which justify it."   *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 191 (2015) (quotation marks omitted).

at 7-11, 15-16) that the indictment should be dismissed as impermissible viewpoint discrimination. That argument is without merit.

The First Amendment's prohibition of viewpoint discrimination does not foreclose the Government from charging the defendant, or any other defendant, for committing crimes through false statements.  Falsity is not a viewpoint.  If it were, any statute that prohibits fraud, false statements, or the like would be invalid on its face.  Nor does the indictment discriminate against the defendant based on viewpoint merely because he is charged with committing fraud using false statements about the 2020 election.

That many of the defendant's statements about the 2020 election were related to political matters of public concern does not insulate his false and fraudulent statements from the application of the criminal law.  It has long been established that "[w]ords alone may constitute a criminal offense, even if they spring from the anterior motive to effect political or social change."  *United States v. Freeman*, 761 F.2d 549, 551 (9th Cir. 1985).  "Notwithstanding that political speech and religious exercise are among the activities most jealously guarded by the First Amendment, one is not immunized from prosecution for . . . speech-based offenses merely because one commits them through the medium of political speech or religious preaching."  *Rahman*, 189 F.3d at 116-17; *see United States v. Turner*, 720 F.3d 411, 420-21 (2d Cir. 2013) (true threat unprotected speech even though it pertained to political matters); *United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012) ("Forming an agreement to engage in criminal activities—in contrast with simply talking about religious or political beliefs—is not protected speech."); *United States v. Hassan*, 742 F.3d 104, 127-28 (4th Cir. 2014) (same); *Concord Mgmt. & Consulting LLC*, 347 F. Supp. 3d at 56 (rejecting claim that charge of conspiracy to defraud the United States infringed on free-speech rights because the defendant engaged in political speech).

The defendant invokes (ECF No. 113 at 12-13) the Supreme Court's decision in *McDonald v. Smith*, 472 U.S. 479 (1985), to argue that his conversations with government officials were protected under the Petition Clause of the First Amendment,[13] but that case in fact confirms that speech is not immune from the application of criminal law simply because it concerns a matter of public importance. The petitioner in *McDonald* had sent a letter to multiple federal officials, including President Ronald Reagan, that allegedly contained false allegations of illegal and unethical conduct by the respondent, who at the time was under consideration for a position as a United States Attorney. *Id.* at 480-81. Rejecting the petitioner's claim of absolute immunity under the Petition Clause, the Court held that the Petition Clause afforded the petitioner the same amount of protection as the Speech Clause and therefore he could be held liable for defamation, which lacks First Amendment protection. *Id.* at 482-85. It made no difference that the letters addressed "matters of public importance," namely the "qualifications of a candidate for United States Attorney." *Id.* at 486 (Brennan, J., concurring). Likewise, there is no basis here to treat fraudulent statements or statements integral to criminal conduct any differently simply because the statements pertain to matters of public importance.[14]

---

[13] The Petition Clause provides a constitutional right to "petition the Government for a redress of grievances." U.S. Const. amend. I.

[14] Although the defendant cites and briefly discusses (ECF No. 113 at 13-14) *McDonnell v. United States*, 579 U.S. 550 (2016), that case lends no support to his First Amendment (or any other) claim. In that case, the Supreme Court defined the statutory term "official act" as used in federal bribery statutes applicable to public officials, with which the defendant is not charged. The Court adopted a narrow construction in part to avoid constitutional problems, identifying a substantial concern that a broader interpretation would "cast a pall of potential prosecution over" the normal relationships between officials and constituents that are an important part of our form of representative government. *Id.* at 574-75. The Court did not mention the First Amendment in its opinion, and the opinion provides no support for the defendant's claim that the First Amendment provides him with a right to commit fraud.

### 2.   The fair notice doctrine does not provide a basis for dismissal.

The defendant contends (ECF No. 113 at 25-31) that the indictment should be dismissed "for violation of the fair notice requirement of the Due Process Clause."  In doing so, he asserts that there is "a long history in our Nation" of presidential elections involving facts purportedly similar to the 2020 presidential election, specifically invoking (*id.* at 25) the elections of "1800, 1824, 1876, 1960, 2000, 2004, and 2016."  He then asserts (*id.*) that his conduct was "fully consistent with" and "inspired by" those examples, adding that because none of those events resulted in criminal prosecutions it would violate his due process rights to convict him here.  The defendant's fraudulent and corrupt conduct as charged in the indictment stands in sharp contrast with the historical examples he cites, and neither history nor law provide a basis to dismiss the charges on fair-notice grounds.

The umbrella term "fair notice" (also sometimes called "fair warning") is embodied in "three related manifestations": (1) "the vagueness doctrine"; (2) "the rule of lenity";[15] and (3) the rule that when a court applies "a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope," that novel construction may not be applied retroactively.  *United States v. Lanier*, 520 U.S. 259, 266 (1997).  "In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."  *Id.* at 267.  None of these manifestations of "fair notice" undermines the charges in the indictment.

####    a.   The defendant had fair notice that the charged conduct was unlawful.

Although the defendant briefly gestures at vagueness concerns (ECF No. 113 at 26-27), he

---

[15] The rule of lenity has no application here, *see supra* p. 16, and the defendant advances no separate lenity challenge as part of his fair notice claim.

does not actually contend that any of the statutes charged here are void for vagueness.  Nor could

he.  *See, e.g.*, *Concord Mgmt. & Consulting LLC*, 347 F. Supp. 3d at 59-60 ("[C]ourts have

repeatedly rejected vagueness challenges to § 371 as applied to conspiracies, like this one, to

impair lawful government functions."); *United States v. McHugh*, 583 F. Supp. 3d 1, 20-21

(D.D.C. 2022) (rejecting various vagueness challenges to § 1512(c)(2)); *United States v. Price*,

383 U.S. 787, 806 n.20 (1966) ("This Court has rejected the argument that the constitutionality of

[§] 241 may be affected by undue vagueness of coverage.").

Moreover, nothing in this case implicates the manifestation of fair-notice that bars

retroactive application of a novel judicial construction of a statute.  The defendant suggests (ECF

No. 113 at 25-27) that if the Court were to find that the conduct alleged in the indictment fits within

the charged offenses, such a finding would be tantamount to "an unforeseeable and retroactive

judicial expansion of statutory language that appears narrow and precise on its face," *Rogers v.

Tennessee*, 532 U.S. 451, 457 (2001), analogous to the prosecutions at issue in *Bouie v. City of

Columbia*, 378 U.S. 347, 354 (1964).  There, South Carolina courts had upheld the convictions of

civil rights demonstrators engaged in lunch-counter sit-ins, who were found guilty of criminal

trespass under a statute that—on its face and throughout nearly a century of judicial

interpretation—applied only to those who illegally entered land after receiving notice of

prohibition from the owner, and not to those who, like the defendants, remained somewhere after

being asked to leave.  *Bouie*, 378 U.S. at 355-57.  The Supreme Court reversed, explaining that

the state courts' expansion of the statute was so "unexpected and indefensible by reference to the

law which had been expressed prior to the conduct in issue" that Due Process precluded it from

having "retroactive effect."  *Id.* at 354 (quotation marks omitted); *see Rogers*, 532 U.S. at 457.

That principle has no bearing on this case.  Nothing about the face of the charged statutes

or their prior judicial constructions suggests that the defendant's conduct fell outside their scope. To the contrary, the statutes plainly prohibit conspiring to defeat a government function through deceit, trickery, or dishonest means, *see Glasser*, 315 U.S. at 66; conspiring and attempting to corruptly obstruct an official proceeding, *see* 18 U.S.C. § 1512(c)(2); and conspiring to violate the right of voters to have their votes lawfully counted, *see Classic*, 313 U.S. at 314, and the conduct alleged in the indictment here falls within the plain language of the charged offenses, *see supra* pp. 4-17 (Count One); pp. 17-22 (Counts Two and Three); pp. 22-25 (Count Four).   Simply applying the facts alleged in the indictment to the well-established statutory elements would not require any sort of novel judicial construction, much less one that would be "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Rogers*, 532 U.S. at 457 (quoting *Bouie*, 378 U.S. at 354).   Rather, each of the statutes, "either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."  *Lanier*, 520 U.S. at 267.

The defendant's more targeted attack (ECF No. 114 at 28-31) on Section 241 fares no better.  He relies principally on *Lanier* but misapplies the test for fair notice set out in that case. The defendant in *Lanier* was convicted under 18 U.S.C. § 242, which criminalizes violations of constitutional rights under color of law, for sexually assaulting five women while serving as a state judge.   520 U.S. at 261.   The court of appeals vacated the conviction on the ground that the defendant lacked fair notice that his conduct violated a constitutional right because no Supreme Court decision with "fundamentally similar" facts existed.   *Id*.   The Supreme Court reversed, concluding both that fair notice could be provided by decisions from all federal courts, and that the proper fair-notice inquiry asked whether the "[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that

right." *Id*. at 268-70 (quotation marks omitted).   Under *Lanier*, therefore, a defendant needs to have fair notice that the constitutional right exists, not that the precise conduct he pursues violates that right.

Prior cases readily supply such fair notice here.   Following *Lanier,* courts confronted with fair notice challenges in Section 241 cases involving voting rights have reviewed prior court decisions not in a search of a fact pattern that matches what the defendant is alleged to have done, but instead to assess whether the right is sufficiently defined such that the defendant has fair notice that interfering with the right falls within the statute.   *See United States v. Mackey*, --- F. Supp. 3d ---, 2023 WL 363595, at *11 (E.D.N.Y. Jan. 23, 2023) (providing extensive analysis of Section 241 notice challenge to a charge of interfering with a presidential election and finding that "§ 241's fair warning doctrine focuses most centrally on the *right* that has been violated—in this case, the right to vote.") (emphasis in original); *United States v. Tobin*, No. 04-cr-216, 2005 WL 3199672, at *2 (D.N.H. Nov. 30, 2005) ("Here, the constitutional right at issue is fundamental—the right to vote.").   Although the defendant quotes only a portion of the relevant language, he acknowledges, as he must, that voting in a presidential election is a fundamental right under the Constitution. ECF No. 114 at 29 (citing *Bush*, 531 U.S. at 104); *see also Classic*, 313 U.S. at 314 (when state makes primary "an integral part of the procedure for the popular choice of Congressman," it becomes "a right established and guaranteed by the Constitution.").   The states have chosen statewide election as the means to select their presidential electors, and therefore the Constitution protects the right to vote in a presidential election, both directly and under the Equal Protection Clause of the Fourteenth Amendment, including as incorporated into the Due Process Clause of the Fifth Amendment.   *Bolling v. Sharpe,* 347 U.S. 497, 498 (1954).   Section 241 prohibits conspiracies to injure that uncontested right.

Moreover, a long line of prosecutions for interfering with voting rights provided fair notice to the defendant that his conduct, as alleged in the indictment, falls squarely within the heartland of that statute.[16]  The indictment alleges various ways that the defendant and his co-conspirators sought, through fraud and deceit, to violate the rights of voters by setting aside the legitimate outcome of the state's election and discarding legitimate voter and electoral ballots.  As set forth in detail in *Mackey,* 2023 WL 363595, at *11-14, for over a century Section 241 cases have involved efforts to suppress legitimate ballots or change the outcome of elections.  *See, e.g., United States v. Mosley*, 238 U.S. 383, 385 (1915) (election board officials charged with conspiring to discard legitimate ballots); *United States v. Pleva*, 66 F.2d 529, 530 (2d Cir. 1933) (board of elections inspectors charged with falsely tabulating ballots to favor certain candidates; convictions reversed on separate jury grounds); *Classic*, 313 U.S. at 321 ("a conspiracy to prevent the citizen from voting or to prevent the official count of his ballot when cast, is a conspiracy to injure and oppress the citizen in the free exercise of a right secured by the Constitution within the meaning of [the predecessor statute to § 241]"); *United States v. Saylor*, 322 U.S. 385, 386 (1944) (election officers charged with interfering with ballots); *United States v. Skurla*, 126 F. Supp. 713, 715 (W.D. Pa. 1954) (defendants charged with various acts of interference with ballots); *United States v. Townsley*, 843 F.2d 1070, 1073-75 (8th Cir. 1988) (scheme to discard certain absentee ballots). These cases—as well as other voting rights prosecutions—demonstrate that while interference with voting rights can take any number of forms, it is well established that acts to interfere with ballots or to attempt to alter vote outcomes through fraud and deceit fall squarely within Section

---

[16] While the defendant concedes that the right to vote is clearly established, he describes (ECF No. 114 at 29) his conduct as "contesting an election through lawful means, including by public statements, court challenges, or alternate slates of electors."  That description mischaracterizes the indictment.

241, providing the defendant with fair notice.

The defendant's misplaced reliance on *United States v. Bathgate*, 246 U.S. 220 (1918), and *United States v. Bradberry*, 517 F.2d 498 (7th Cir. 1975), does not undercut this conclusion.  As explained in *Mackey*, 2023 WL 363595, at *12 & n.10, *Bathgate* held that Section 241 did not extend to bribing voters, because Congress had repealed a nearby statutory provision that addressed bribery, and protected only the personal right to vote, which the voters in *Bathgate* had exercised.  246 U.S. at 226-27.  But the relevant part of *Bathgate* was abrogated by *Saylor*, 322 U.S. at 389, and *Bradberry* is likewise inapposite, as it held not that there was a problem with the charge in the case, but rather with the proof at trial: while the Government charged a conspiracy to interfere in a federal election, it proved only vote fraud in a state and local election.  517 F.2d at 500 ("The offense charged in the indictment was not proved.").  In sum, the defendant had fair notice that his conduct, as alleged in the indictment, was a violation of Section 241.

> **b.**   **The defendant's historical examples do not raise fair notice concerns.**

The defendant's attempt (ECF No. 113 at 25) to avoid this conclusion by pointing to "a long history" of purportedly similar conduct in past elections, claiming that the absence of prosecutions stemming from these elections somehow precludes him from having "fair notice" of the charges here, fails in at least two respects.  First, the absence of prior prosecutions is not equivalent to a line of judicial precedent treating the conduct at issue as non-criminal, and the concept of "fair notice" does not require "the extreme level of factual specificity," *Lanier*, 520 U.S. at 268, that the defendant envisions.  Second, the defendant's invocation of history fails on its own terms.[17]  As set forth below, even a brief review of the seven elections the defendant cites

---

[17]  At this stage of the proceedings, what might have "inspired" (ECF No. 113 at 25) the defendant's actions is irrelevant.  The issue of the defendant's intent is a matter for trial, and

demonstrates just how dissimilar, and historically aberrant, the defendant's conduct was in this case.

The 1800 Election.  In the election of 1800 (*see* ECF No. 113 at 25, 29, 31; ECF No. 114 at 30, 31), Thomas Jefferson—the sitting vice-president and a presidential candidate—was presiding over the joint session when he observed that Georgia's envelope contained only a single sheet of paper, which was a technically defective electoral ballot "written on the back of the certificate of ascertainment."  *See* Bruce Ackerman & David Fontana, *How Jefferson Counted Himself In*, The Atlantic (Mar. 2004).  Despite these technical defects, Jefferson counted the votes, which were four each for himself and Aaron Burr.  *Id.*  By all accounts, Jefferson's decision furthered the will of the voters and the actions of the electors: newspaper articles "had consistently placed Georgia in the Republican—that is, Jeffersonian—column in their reports of election results"; the "members of Georgia's congressional delegation—two of whom were Federalists—were present" and raised no objection, as they surely would have done had "they believed their state's votes had been placed in the wrong column"; and more recent investigation has confirmed "that the defects in the state's ballot were merely the result of frontier lawyering," leaving "no doubt that the electors intended to vote for the Republican ticket."  *Id.*  Jefferson's decision to count the ballot despite its technical defects was also consistent with his conviction, expressed to James Madison in 1796, that ignoring the "choice of the people substantially expressed" would risk "the phaenomenon of a Pseudo-president."  *Id.*  That the Vice President, in an age before mass communication, had to rely on news reports and the absence of objections to ensure that he was accurately counting the votes from the duly appointed electors does not remotely suggest that the

---

whether his intent was informed by any historical examples would require, at the very least, evidence that the defendant was aware of them.

Vice President has unilateral authority to reject the votes from the duly appointed electors and accept fraudulent electoral votes that, as the defendant acknowledges elsewhere (ECF No. 114 at 9-10), plainly lacked any state backing.  Such a course would have resulted in electing what Jefferson referred to as a "Pseudo-president."

The 1824 Election.  In the election of 1824 (*see* ECF No. 113 at 25, 29-30, 31), four presidential candidates received electoral votes, with Andrew Jackson receiving 99 votes; John Quincy Adams receiving 84 votes; William H. Crawford receiving 41 votes; and Henry Clay receiving 37 votes.  Because no candidate received "a majority of the whole number of Electors appointed," the election was sent to the House to choose the president from among the top three candidates.  U.S. Const. amend. XII.  Clay, who was disqualified from consideration based on his fourth-place finish, eventually supported Adams, who was elected.  *See* Rami Fakhouri, *The Most Dangerous Blot in Our Constitution: Retiring the Flawed Electoral College 'Contingent Procedure'*, 104 Nw. U. L. Rev. 705, 719-20 (2010).  Adams later appointed Clay as Secretary of State.  *Id.*  And while Clay "vehemently denied" the rumor that he had bargained away his support in exchange for the appointment, Jackson described the rumored Adams-Clay agreement as a "corrupt bargain."  *Id.*  Although the defendant claims that both the election of 1824 and 2020 involved "lobb[ying]" by one of the presidential candidates (ECF No. 113 at 29-30), that generalized and superficial similarity masks crucial distinctions, including that the 1824 election genuinely failed to produce an electoral college winner, resulting in a constitutionally mandated resolution by the House.  No evidence suggests that any candidate engaged in corrupt and fraudulent conduct to obstruct an accurate count of the electoral votes.

The 1876 Election.  In the election of 1876 (*see* ECF No. 113 at 25, 29, 31; ECF No. 114 at 30), three Reconstruction-era southern states sent competing slates of electors to Congress, with

Oregon also sending competing slates for one of its votes.  *See Bush*, 531 U.S. at 155 (Breyer, J., dissenting); Nathan L. Colvin & Edward B. Foley, *Lost Opportunity: Learning the Wrong Lessons from the Hayes-Tilden Dispute*, 79 Fordham L. Rev. 1043, 1045-46 (2010).  In Florida, for example, the "state canvassing board declared" that Rutherford B. Hayes had "won the state by 924 votes"—but the electors for Samuel Tilden quickly filed suit and "'obtained a ruling from a state trial court that they'" were in fact the rightful electors.  *See* John Copeland Nagle, *How Not to Count Votes*, 104 Colum. L. Rev. 1732, 1741-42 (2004).  In all, 20 electoral votes were in dispute, enough to sway the outcome.  *Id.*  To resolve the dispute, Congress established an Electoral Commission composed of five senators, five representatives, and five Supreme Court justices.  *Id.* at 1743-44.  The Commission ultimately voted 8-7 to award all 20 disputed electoral votes to Hayes, making him the victor.  *Id.* at 1747.  The Electoral Count Act was enacted ten years later "for the explicit purpose . . . of preventing a repetition of 'the year of disgrace, 1876,' in which a 'cabal had determined to debauch the Electoral College.'"  Theodore B. Olson, *The Supreme Court & the Presidency*, 9 Green Bag 2d 139, 145 (2006) (quoting 18 Cong. Rec. 30 (Dec. 7, 1886) (remarks of Rep. Caldwell)) (internal punctuation omitted).  That a Reconstruction-era election produced a dispute over which electors were duly appointed—triggering "a true crisis," Colvin & Foley, *supra*, at 1046, that prompted enactment of the Electoral Count Act—does not remotely imply that, under the Electoral Count Act, a candidate can rely on a slate of fraudulent electors lacking any state imprimatur to discount the votes of the duly appointed electors and generate the illusion of a crisis.

The 1960 Election.  In the election of 1960 (*see* ECF No. 113 at 25, 29, 31; ECF No. 114 at 30, 31), which was Hawaii's first election as a state, the initial vote count there indicated that Richard Nixon had narrowly defeated John F. Kennedy "by a mere 141 votes out of some 184,000

cast."   L. Kinvin Wroth, *Election Contests and the Electoral Vote*, 65 Dick. L. Rev. 321, 341 (1961).  While a court-ordered recount was underway, and with the outcome still hanging in the balance, slates of electors for both candidates met, voted, and sent their ballots to Congress, with the acting governor's certificate of ascertainment accompanying the ballot of the Nixon electors, in accordance with the then-controlling official count.  *Id.*; *see* 107 Cong. Rec. 289 (Jan. 6, 1961) (noting first certificate of ascertainment, dated Nov. 28, 1960, reflecting 141-vote lead for Nixon). On December 30, 1960, the court overseeing the recount formally found that Kennedy "had prevailed by 115 votes."   Wroth, *supra*, at 341.   On January 4, 1961, the acting governor "forwarded to the Administrator of General Services a copy of the court decree and his revised certificate, validating" the Kennedy electors as the ones who were duly appointed.  *Id.*; *see* 107 Cong. Rec. 289 (Jan. 6, 1961) (noting court judgment and second certificate of ascertainment, dated Jan. 4, 1961, reflecting 115-vote victory for Kennedy).  After considering these documents, Vice President Nixon, presiding over the joint session, found that the second certificate of ascertainment, "properly and legally portrays the facts with respect to the electors chosen by the people of Hawaii at the election for President and Vice President held on November 8, 1960."  107 Cong. Rec. 290 (Jan. 6, 1961).  Without objection, he therefore "instruct[ed] the tellers . . . to count the votes" in the acting governor's second certificate of ascertainment, awarding Hawaii's votes to Kennedy.  *Id.*   The fact that the 1960 election involved a state revising its certificate of ascertainment to reflect the outcome of a court-supervised recount in no way implies that a candidate may corruptly submit a fraudulent slate of electors and endeavor to have the Vice President treat it as valid when it lacks any state-backed legitimacy and all legal challenges to the election have been rejected in court.

The 2000 Election.  In the election of 2000 (*see* ECF No. 113 at 25, 30, 31; ECF No. 114

at 29, 31), the initial vote count showed that George W. Bush won Florida by a margin of 1,784 over Al Gore. *See Bush*, 531 U.S. at 100-01. That narrow margin triggered an "automatic machine recount, . . . the results of which showed Governor Bush still winning the race but by a diminished margin." *Id.* at 101. Gore "then sought manual recounts" in several counties, which the Supreme Court eventually halted, finding that "the use of standardless manual recounts" violated the Equal Protection Clause. *Id.* at 101-03. On December 13, 2000, the day after *Bush v. Gore* was decided, Rep. Patsy T. Mink, from Hawaii, described the ruling as "most unfortunate" and argued, unsuccessfully, that "[t]he precedent" of Hawaii's 1960 electoral votes established a better approach for completing a court-supervised recount and certifying the results before the joint session. 146 Cong. Rec. E2179-80 (daily ed. Dec. 13, 2000). When the electoral votes from Florida were counted on January 6, 2001, several representatives sought to object, but Vice President Gore, presiding over the joint session, overruled each objection. 147 Cong. Rec. 104-06 (Jan. 6, 2001). The defendant contends that, because the Supreme Court, in *Bush v. Gore*, "indicated that the parties had taken an appropriate route to resolve the dispute," ECF No. 114 at 29, it follows that his chosen route was somehow also appropriate. But the candidates in the 2000 election litigated their disputes in court and then abided by the results, in accordance with the rule of law. By contrast, after courts rejected the defendant's efforts to change the outcome of the election, he persisted in his efforts to fraudulently and corruptly obstruct the certification of the duly elected winner.

The 2004 Election. Following the election of 2004 (*see* ECF No. 113 at 25, 28), Rep. Stephanie Tubbs Jones of Ohio raised an objection, signed by Sen. Barbara Boxer, to the counting of Ohio's electoral votes at the joint session. 151 Cong. Rec. 199 (Jan. 6, 2005).[18] When Congress

---

[18] As the sources cited by the defendant note (ECF No. 113 at 28 n.7), "Sen. John Kerry,

went to separate session, Rep. Jones explained, "This objection does not have at its root the hope or even the hint of overturning the victory of the President; but it is a necessary, timely, and appropriate opportunity to review and remedy the most precious process in our democracy," the right to vote. *Id.* After the separate sessions ended, Ohio's elector votes were counted for President Bush. This self-styled protest vote by a member of Congress was not remotely analogous to an attempt from outside Congress to corruptly obstruct the certification process through fraud.

The 2016 Election. Following the election of 2016 (*see* ECF No. 113 at 25, 27, 28), several representatives attempted to object to the counting of electoral votes for the defendant at the joint session. 163 Cong. Rec. H186-H189 (daily ed. Jan. 6, 2017). Each time, Vice President Biden, who was presiding over the joint session, refused to entertain the objection. *E.g.*, *id.* at H186 ("The VICE PRESIDENT: There is no debate. There is no debate. . . . It is over."). Again, nothing about those unsuccessful protest votes by members of Congress is analogous to an attempt from outside Congress to corruptly obstruct the certification process through fraud.

Taken together, these historical examples stand for several unremarkable propositions, none of which support the defendant's motion to dismiss. There have been times, as in 1800, 1876, and 1960, when genuine questions have arisen over which slate of electors from a particular state has been duly appointed. On one occasion, Thomas Jefferson accurately concluded that Georgia's electoral ballot (which included a certificate of ascertainment) was genuine; on another occasion, Richard Nixon accurately concluded that Hawaii's second certificate of ascertainment—issued after the recount was completed, but prior to the joint session—correctly reflected the state's lawful

---

the Democratic nominee for president, released a letter Wednesday saying he would not take part in the protest. 'Our legal teams on the ground have found no evidence that would change the outcome of the election,' Kerry said." *See Democrats Challenge Ohio Electoral Votes*, CNN.com (Jan. 6, 2005), at https://www.cnn.com/2005/ALLPOLITICS/01/06/electoral.vote.1718/.

final allocation of electoral votes; and on one occasion, in 1876, Congress resorted to an independent commission (whose failure spawned the Electoral Count Act) when faced with competing state-backed electoral slates.  There have also been times, as in 1824, when the failure of any candidate to obtain a majority of electoral votes has thrown the election to the House of Representatives.  And there have been times, as in 2000, 2004, and 2016, when those dissatisfied with the results have sought to raise objections to the electoral vote count, resulting in either the objections being overruled or, in one case, a brief adjournment designed as an Ohio-focused protest vote without "the hope or even the hint of overturning the victory of the President."  151 Cong. Rec. 199 (Jan. 6, 2005).  Notably absent from any of these historical episodes, however, is any attempt by any person to use fraud and deceit to obstruct or defeat the governmental function that would result in the certification of the lawful winner of a presidential election.  The existence throughout history of legitimate electoral disputes does not validate the defendant's corrupt and dishonest actions any more than the existence of legitimate investment offers validates the creation of a criminal Ponzi scheme.  The Court should reject the defendant's claim that these fundamentally dissimilar historical examples somehow robbed him of "fair notice" that his scheme could be criminal.

> ### 3.  Neither the Impeachment Judgment Clause nor the Double Jeopardy Clause precludes criminal prosecution here.

The defendant argues (ECF No. 113 at 18-24) that the Impeachment Judgement Clause and the Double Jeopardy Clause foreclose his criminal prosecution in this case because of his impeachment by the House followed by his acquittal by the Senate.  Those arguments are entirely meritless.

The text and history of the Impeachment Judgment Clause demonstrate that it was intended to limit congressional sanction for impeachment to removal and disqualification from office, not

to create a double-jeopardy prohibition that protected an impeached but not convicted officer from criminal prosecution. Structural considerations—including the special function of impeachment within the constitutional separation of powers and the distinction between impeachment verdicts and criminal verdicts—reinforce the conclusion that the Impeachment Judgment Clause permits prosecution of a former president impeached by the House but acquitted by the Senate.

Nor is the prosecution here barred by the Double Jeopardy Clause, which states that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Because the only remedies available in the impeachment proceedings were removal and disqualification, the defendant was never previously placed in jeopardy of life or limb, so the Double Jeopardy Clause is entirely inapplicable. And even if the Clause did apply, the criminal prosecution in this case does not charge the same offense as was at issue in the defendant's impeachment trial in February 2021. The defendant's double-jeopardy claim is frivolous, and the Court should so find in denying the defendant's motion.

### a.       Background

Five days after the attack on the United States Capitol on January 6, 2021, the United States House of Representatives adopted a single-article resolution to impeach the defendant for high crimes and misdemeanors. H.R. Res. 24, 117th Cong. (Jan. 11, 2021) ("Impeachment Resolution"). Specifically, the Impeachment Resolution alleged that the defendant violated his "constitutional oath faithfully to execute the office of President of the United States . . . by inciting violence against the Government of the United States." *Id.* at 3. Two days after adopting the Impeachment Resolution, the House voted to impeach the defendant. 167 Cong. Rec. H191-92 (daily ed. Jan. 13, 2021).

The Impeachment Resolution moved to an impeachment trial in the Senate after the defendant's term in office had ended, with the Chief Justice presiding. *See* U.S. Const. art. I, § 3,

cl. 6.  The only two possible remedies available in that proceeding were "removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States," U.S. Const. art. I, § 3, cl. 7—not imprisonment, supervised release, or a fine.  In his trial memorandum in the Senate, the defendant advanced two principal arguments.  First, he contended that the Senate lacked jurisdiction to conduct an impeachment trial for a former president.  *See In re Impeachment of Former President Donald J. Trump*, Trial Memorandum of Donald J. Trump, S. Doc. 117-2 at 122-39 (Feb. 8, 2021) ("Impeachment Trial Memorandum").  Second, the defendant argued that the First Amendment protected his speech at the Ellipse on January 6.  *Id.* at 146-75.  On February 13, 2021, 57 Senators voted to convict, and 43 Senators voted to acquit, 167 Cong. Rec. S733 (daily ed. Feb. 13, 2021), which resulted in an acquittal in light of the constitutional requirement of a two-thirds majority to convict at a Senate impeachment trial, *see* U.S. Const. art. I, § 3, cl. 6.

On August 1, 2023, a grand jury charged the defendant with the four offenses described above.  Each offense includes a potential term of imprisonment, supervised release, and a fine.  The indictment did not charge the defendant with an incitement offense.  *See, e.g.*, 18 U.S.C. § 2383 (criminal prohibition for inciting, assisting, or engaging in any "rebellion or insurrection against the authority of the United States").

     **b.** **The Impeachment Judgment Clause does not preclude prosecution here.**

The Impeachment Judgment Clause's text and history demonstrate that its two-fold aim was to limit the potential punishments that Congress could impose following impeachment and conviction while also ensuring that a former federal officer does not escape accountability for criminal wrongdoing.  Understood within the Constitution's structure, the Impeachment Judgment

Clause permits criminal prosecution where, as here, a defendant has been impeached by the House but not convicted by the Senate.

> ### i. The Impeachment Judgment Clause's text and history support criminal prosecution of an officer who has been impeached by the House but acquitted by the Senate.

The defendant first contends (ECF No. 113 at 18-23) that constitutional text bars his criminal prosecution following his impeachment by the House of Representatives and acquittal at a Senate trial. That contention misreads the constitutional text and misapprehends the relevant history.

The Constitution provides for a president's removal through "impeachment for, and conviction of, treason, bribery, or other high crimes and misdemeanors." U.S. Const. art. II, § 4 (capitalization altered). The Constitution's Impeachment Judgment Clause specifies limitations on the consequences that the Senate may impose after a conviction, and makes clear that criminal prosecution—indictment, trial, and sentencing—may follow such a conviction by the Senate:

> Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law.

U.S. Const. art. I, § 3, cl. 7.

The Impeachment Judgment Clause's two parts reflect its related objectives. The first clause—which limits "Judgment in Cases of Impeachment" to removal and disqualification, U.S. Const. art. I, § 3, cl. 7—empowers Congress to impose a political sanction for removal without enabling the Legislative Branch to exact criminal punishment.[19] The second clause—which

---

[19] Clarifying that Congress could not exact criminal penalties following impeachment distinguished the American approach from Britain, where Parliament could impose "a wide array of criminal penalties, including fines, imprisonment, and even execution." Randolph D. Moss,

"nevertheless" subjects the officer in question to "Indictment, Trial, Judgment and Punishment, according to Law," U.S. Const. art. I, § 3, cl. 7—clarifies that, although Congress may not criminally prosecute, the officer in question, including a former president, is "liable to prosecution and punishment in the ordinary course of law."  *The Federalist No. 69*, at 384 (Alexander Hamilton) (Clinton Rossiter ed., 1999).  Read together, those two clauses constrain the range of potential sanctions available to Congress following impeachment but place no corresponding limits beyond those prescribed "according to Law" on post-impeachment criminal prosecution.

That straightforward textual reading of the Impeachment Judgment Clause finds ample historical support.  For example, James Wilson, a participant at the Constitutional convention and later a Supreme Court Justice, responded in the 1787 Pennsylvania ratifying convention to the argument that the Senate would be unlikely to impeach and remove through Senate conviction fellow Senators by observing that, "Though they may not be convicted on impeachment before the Senate, they may be tried by their country; and if their criminality is established, the law will punish."  2 *The Documentary History of the Ratification of the Constitution* 492 (Merrill Jensen et al., eds. 1976).  Similarly, Edward Pendleton, who served as President of the Virginia Supreme Court and the Virginia ratifying convention, observed in a letter to James Madison that the impeachment power "is in the hands of the House of Representatives, who will not use it in the case Supposed, or if they do, and meet the obstruction, may yet resort to the courts of Justice, as an Acquital [sic] would not bar that remedy."  *See id.* at 1773 (Letter from Edmund Pendleton to James Madison, Oct. 8, 1787).  And that view was likewise shared by Representative Samuel

---

*Whether a Former President May Be Indicted and Tried for the Same Offenses for Which He Was Impeached by the House and Acquitted by the Senate*, 24 Op. O.L.C. 110, 120 (Aug. 18, 2000); *see id.* at 117 ("Breaking with English practice, in which the House of Lords could impose regular criminal punishments up to death, the framers provided that the Senate could do no more than remove an offender from office and disqualify him from future federal officeholding.").

Dana, a participant in the first federal impeachment trial—of Senator William Blount of Tennessee in 1798—who observed that an impeachment conviction "has no connexion with punishment or crime, as, whether a person tried under an impeachment be found guilty or acquitted, he is still liable to a prosecution at common law."  9 Annals of Congress 2475 (1798).  Finally, Justice Joseph Story in his canonical treatise on the Constitution explained that the Constitution separated an impeachment trial (with its exclusive remedies of removal and disqualification) from a trial "in the common tribunals of justice" to ensure that "a second trial for the same offence could be had, either after an acquittal, or a conviction in the court of impeachments."  2 Joseph Story, *Commentaries on the Constitution of the United States* §§ 780-81 (1833).  Otherwise, "if no such second trial could be had, then the grossest official offenders might escape without any substantial punishment, even for crimes, which would subject their fellow citizens to capital punishment."  *Id.* at § 781.

ii.  **Structural considerations support that textual and historical conclusion.**

Three structural considerations bolster the textual and historical evidence demonstrating that the Impeachment Judgment Clause does not bar the criminal prosecution of a former president acquitted at a Senate trial.  *See* Randolph D. Moss, *Whether a Former President May Be Indicted and Tried for the Same Offenses for Which He Was Impeached by the House and Acquitted by the Senate*, 24 Op. O.L.C. 110, 130-34 (Aug. 18, 2000) ("OLC Op.").

First, "[i]mpeachment and criminal prosecution serve entirely distinct goals."  *Id.* at 130; *see Hastings v. United States Senate*, 716 F. Supp. 38, 42 (D.D.C. 1989) (Impeachment Judgment Clause reflects the "separate and different roles for the executive's power of prosecution and the legislature's impeachment powers").  Impeachment provides Congress with a political check on the Executive Branch to address through removal the "misconduct of public men" for "injuries

done immediately to the society itself." *The Federalist No. 65*, at 364.  The Constitution's limitation of Congress's sanction to removal and disqualification reflects the view that "the national legislature is not to be trusted with dispensing criminal punishments, sanctions aimed not at protecting the integrity of the government's operations but at penalizing individuals by taking away their life, liberty, or property."  OLC Op. at 130.  By contrast, the Executive Branch is constitutionally entrusted with the "power of prosecution," *Hastings*, 716 F. Supp. at 42, to enforce the violation of congressionally passed penal statutes.  Neither branch's independent action, however, can "effectively prevent," *id.*, the other branch from acting.

Second, acquittal in a Senate impeachment trial may reflect a technical or procedural determination rather than a factual conclusion that the official in question did not commit the alleged acts.  OLC Op. at 131.  That is true of the defendant's impeachment proceedings.  As the Government has noted elsewhere (ECF No. 109 at 14-15), at least 31 of the 43 Senators who voted to acquit the defendant explained that their decision to do so rested in whole or in part on their agreement with the defendant's argument that the Senate lacked jurisdiction to try him because he was no longer in office.[20]  Several Senators who voted against conviction on jurisdictional grounds emphasized the defendant's criminal responsibility for the events of January 6.  *See, e.g.*, 167 Cong. Rec. S736 (daily ed. Feb. 13, 2021) (Sen. McConnell) (explaining that his vote was based on the view that the Senate lacked jurisdiction and stating that the defendant "is still liable for everything he did while he was in office, "as an ordinary citizen" and that, "We have a criminal justice system in this country. We have civil litigation, and former presidents are not immune from

---

[20] *See* Statements on February 13, 2021, from Senators Barrasso, Blunt, Boozman, Braun, Cornyn, Cramer, Crapo, Daines, Ernst, Fisher, Grassley, Hoeven, Hyde-Smith, Inhofe, Kennedy, Lankford, Lee, Lummis, McConnell, Moore, Moran, Portman, Risch, Rounds, Rubio, Shelby, Sullivan, Thune, Tillis, Tuberville, and Wicker.

being held accountable by either one."); Sen. Thom Tillis, Tillis Statement on Impeachment Trial (Feb. 13, 2021)[21] ("An impeachment trial is not the best or only way to hold a former elected official accountable for their actions. The ultimate accountability is through our criminal justice system where political passions are checked and due process is constitutionally mandated. No president is above the law or immune from criminal prosecution, and that includes former President Trump.").  Those votes and statements make clear that Senators were not adjudicating the defendant's factual guilt, but rather relying on a technical judgment about the scope of the Senate's jurisdiction and a "political judgment" about what constitutes "high crimes and misdemeanors" and whether removal and disqualification best serve the country "at a particular moment in our nation's history."  OLC Op. at 132-33.  The defendant's criminal prosecution thus does not "second-guess" (ECF No. 113 at 23) the Senate on a question of criminal liability.

Third, allowing a Senate acquittal to bar future criminal prosecution would undermine the framers' endeavor to address the "concern that partisan loyalties or popular sentiment might influence the Senate's decision to convict or acquit."  OLC Op. at 133.  As the defendant observes, impeachment proceedings may "agitate the passions of the whole community" and "divide it into parties, more or less friendly or inimical" (ECF No. 113 at 21 (quoting *The Federalist No. 65*, at 365) (emphasis omitted)).  Because the framers recognized that "partisanship and transitory political passions" could induce the Senate to convict or to acquit, OLC Op. at 134, they decoupled the judgment at an impeachment trial from criminal prosecution to prevent those passions from dictating any subsequent criminal proceedings.  *See id.* ("Just as the possibility of partisan convictions helps explain the limitation on impeachment punishments and the lifting of the double

---

[21] https://www.tillis.senate.gov/2021/2/tillis-statement-on-impeachment trial.

jeopardy bar for Senate convictions, so the possibility of partisan acquittals supports the lifting of the double jeopardy bar for Senate acquittals.").

### iii. The defendant's counterarguments lack merit.

The defendant's counterarguments fail. First, as noted in the Government's response to the defendant's motion to dismiss on presidential immunity grounds, ECF No. 109 at 13-14, the defendant's reliance (ECF No. 113 at 19-20) on an asserted negative implication—that the phrase "Party convicted" in the Impeachment Judgment Clause requires that an officer be both impeached and convicted before that officer may face criminal prosecution—is misplaced. The prior portion of the Clause specifies the permissible consequences for a party convicted by the Senate. The portion of the Clause on which the defendant relies then makes clear that such a party is subject to criminal prosecution. The text does not speak to acquittal at all. Moreover, the asserted negative implication cannot overcome the historical evidence and structural considerations indicating that the Impeachment Judgment Clause was intended to limit congressional sanctions for impeachment to removal and disqualification from office, not to preclude the prosecution of an impeached but not convicted officer. *See United States v. Claiborne*, 727 F.2d 842, 846 (9th Cir. 1984) (per curiam) (Impeachment Judgment Clause "was intended 'to assure that after impeachment a trial on criminal charges is not foreclosed by the principle of double jeopardy'") (quoting *United States v. Isaacs*, 493 F.2d 1124, 1142 (7th Cir. 1974) (per curiam)); *Thompson v. Trump*, 590 F. Supp. 3d 46, 86-87 (D.D.C. 2022).

Likewise misplaced is the defendant's reliance (ECF No. 113 at 19) on Justice Alito's dissenting opinion in *Trump v. Vance*, 140 S. Ct. 2412 (2020), because even taking that dissenting view on its own terms, it lends no support to the defendant's argument. As Justice Alito noted, *Vance* concerned "whether the Constitution imposes restrictions on a State's deployment of its criminal law enforcement powers"—and specifically, the issuance of a subpoena—"against a

sitting President." *Id.* at 2439-40 (Alito, J., dissenting).  In setting out his view that a state should

have to satisfy a higher standard to justify a criminal subpoena to a sitting president, Justice Alito

emphasized that the impeachment provisions suggest that a sitting president "may not be

prosecuted while in office," *id.* at 2444, a position long accepted by the Department of Justice, *see*

*generally* Randolph D. Moss, *A Sitting President's Amenability to Indictment and Criminal*

*Prosecution*, 24 Op. O.L.C. 222 (Oct. 16, 2000); Robert G. Dixon, Jr., *Amenability of the*

*President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office*

(Sept. 24, 1973).  When referring to the Impeachment Judgment Clause, therefore, Justice Alito

was making the point—not in dispute in this case—that a sitting president may not face prosecution

"during or prior to the Senate [impeachment] trial."  *Vance*, 140 S. Ct. at 2444 (Alito, J.,

dissenting).  Understood in that context, Justice Alito's observation that criminal prosecution of a

president "is a consequence that can come about only after the Senate's judgment," *id.*, simply

reflects his (and the Government's) view that a sitting president is not subject to criminal

prosecution.

Finally, the defendant's invocation (ECF No. 113 at 21-22) of judicial immunity repeats

the same misstatement of the law that he advanced when seeking dismissal on presidential

immunity grounds.  *See* ECF No. 74 at 17-18*; see also* ECF No. 109 at 23-27 (addressing the

defendant's argument).  Although judges, like former presidents, are absolutely immune from civil

damages for official conduct while in office, they are "subject to criminal prosecutions as are other

citizens." *Dennis v. Sparks*, 449 U.S. 24, 31 (1980); *see* ECF No. 109 at 23-27 (explaining the

parallel between judges, who have absolute civil immunity for official conduct but are subject to

criminal prosecution, and former presidents).  Judges have thus faced criminal prosecution before

impeachment, *see Nixon v. United States*, 506 U.S. 224, 226-27 (1993) (federal judge convicted

for making false statements after which Congress instituted impeachment proceedings, which then resulted in his impeachment); *United States v. Nixon*, 816 F.2d 1022, 1031 (5th Cir. 1987) (affirming perjury conviction of same federal judge); *Hastings*, 716 F. Supp. at 41 (rejecting judge-defendant's argument that his acquittal at a criminal trial precluded his impeachment), and in the absence of impeachment proceedings, *see United States v. Collins*, 972 F.2d 1385, 1392-94, 1415 (5th Cir. 1992) (affirming bribery, obstruction of justice, and conspiracy convictions of federal judge who accepted bribes in exchange for agreeing to impose a lenient sentence and resigned before impeachment proceedings began); *United States v. Manton*, 107 F.2d 834, 838, 850 (2d Cir. 1939) (conviction after resignation in the absence of impeachment).  The single line in the Supreme Court's decision in *Bradley v. Fisher*, 80 U.S. 335, 354 (1871), a civil case that the defendant twice cites (ECF No. 113 at 21-22), suggesting that a judge may "only be reached by public prosecution in the form of impeachment, or in such other form as may be specially prescribed," does not— given the express mention of other forms, such as criminal laws, that may be prescribed—imply that judges are immune from criminal prosecution, as subsequent Supreme Court decisions have confirmed.  *See Dennis*, 449 U.S. at 31; *Mireles v. Waco*, 502 U.S. 9, 9, 10 n.1 (1991) (per curiam); *Ex Parte Commonwealth of Virginia*, 100 U.S. 339, 348 (1879).[22]  The same is true for the defendant.

### c.   The Double Jeopardy Clause does not preclude prosecution here.

The defendant separately argues (ECF No. 113 at 23-24) that the Double Jeopardy Clause precludes his criminal prosecution in light of the acquittal at his Senate impeachment trial because

---

[22] Nor does the reference in *Spalding v. Vilas*, 161 U.S. 483, 494 (1896), to "indictment" aid the defendant's argument.  *Spalding* was a civil case, and that portion of that decision was citing a state case from 1810.  *See Yates v. Lansing*, 5 Johns. 282 (N.Y. Sup. Ct. 1810), *aff'd,* 9 Johns. 395 (N.Y. 1811).

both Congress and the Executive Branch are part of the same sovereign, and Congress has already "absolved him" (*id.* at 24) of any criminal conduct.  That argument fails for at least two reasons.  First, the defendant does not explain how removal and disqualification from office amounts to a criminal sanction so as to put him jeopardy.  Second, even assuming that Congress and the Executive Branch are the same sovereign, given that the article of impeachment alleged incitement, the defendant offers no plausible argument that he was acquitted in the Senate of the same offenses charged in the indictment.  The Court should reject the defendant's double-jeopardy claim and find expressly that it is frivolous.

> ### i.     The Double Jeopardy Clause does not apply because the penalty for congressional impeachment and conviction is civil, not criminal.

The defendant's double-jeopardy claim fails because the penalty following impeachment—removal and disqualification from office—is not criminal.  The Double Jeopardy Clause does not preclude the imposition of any penalty "that could, in common parlance, be described as punishment"; instead, it guards only against "imposition of multiple *criminal* punishments for the same offense." *Hudson v. United States*, 522 U.S. 93, 99 (1997) (quotation marks omitted).  To determine whether a penalty—typically as set out in a law enacted by a legislature—is criminal or civil proceeds in two steps.  First, courts assess whether the legislature, "in establishing the penalizing mechanism, indicated either expressly or impliedly a preference" for labelling the penalty as civil or criminal. *United States v. Ward*, 448 U.S. 242, 248 (1980); *cf. Johnson v. Quander*, 440 F.3d 489, 501 (D.C. Cir. 2006) (assessing whether the purpose of a District of Columbia law directing the collection of DNA was "punitive").  Second, even where the legislature intended to enact a civil penalty, courts must determine whether that penalty is nonetheless "so punitive either in purpose or effect . . . as to transform what was clearly intended as a civil remedy into a criminal penalty." *Hudson*, 522 U.S. at 99 (brackets and quotation marks

omitted).  The Supreme Court in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1965), set out

seven factors as "useful guideposts," *Hudson*, 522 U.S. at 99, to determine whether a nominally

civil penalty is criminal: (1) "[w]hether the sanction involves an affirmative disability or restraint";

(2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play

only on a finding of *scienter*"; (4) "whether its operation will promote the traditional aims of

punishment—retribution and deterrence"; (5) "whether the behavior to which it applies is already

a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable

for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned."  372

U.S. at 168-69; *see Johnson*, 440 F.3d at 502-03 (applying *Mendoza-Martinez* factors and

concluding that DNA collection statute was punitive in "neither purpose nor effect").  "'[O]nly the

clearest proof' will suffice to override legislative intent and transform what has been denominated

a civil remedy into a criminal penalty."  *Hudson*, 522 U.S. at 100 (quoting *Ward*, 448 U.S. at 249).

The defendant cannot come close to showing that removal and disqualification from office

is a criminal penalty.  First, the historical evidence above showing that the framers intended that

Congress could not impose the type of criminal sanctions following impeachment that the British

Parliament could exact, *see supra* p. 50 n.19, indicates that the framers did not intend to create a

criminal sanction.  Indeed, the framers initially considered adopting language in the Constitution

that provided that "No person shall be subject, except in cases of impeachment, to more than one

punishment or one trial for the same offence."  U.S. Const. amend. V; *see* OLC Op. at 134.  But

the framers deleted the reference to impeachment when they added the phrase "life or limb,"

suggesting that they found it superfluous because impeachment clearly risked neither life nor limb.

*See id.* at 134-35.  That history underscores the common-sense intuition that being terminated

from, or prevented from obtaining, a job is qualitatively different than facing a prison term or execution.

Second, even if that were not so, the *Mendoza-Martinez* factors overwhelmingly support a finding that removal and disqualification from office does not constitute a criminal penalty.  *See* OLC Op. at 139-48 (applying *Mendoza-Martinez* factors to removal and disqualification following impeachment).  Removal and disqualification from office impose no disability or restraint on liberty, *see id.* at 139-42; they are not treated as punishment, but instead as "remedial goals," *id.* at 143; the framers' rejection of language that would have permitted impeachment for "'maladministration'" tends to show that "scienter is a necessary element for an impeachable offense," *id.* at 145; the mere fact that impeachment presents a deterrent effect "is insufficient to render" it criminal because deterrence "serve[s] civil as well as criminal goals," *Hudson*, 522 U.S. at 105 (quotation marks omitted); sanctions that the Senate may impose are not "already" criminal; and the sixth and seventh factors, which concern "the ultimate question of legislative (or drafters' and ratifiers') purpose," OLC Op. at 146, indicate that removal and disqualification were not excessive, but instead "deftly tailored" not to "reach beyond the exact sphere of the misconduct and thus the threat: federal office."  *Id.* at 147

> **ii.      The Double Jeopardy Clause would not bar prosecution here because the defendant's impeachment proceeding and criminal prosecution do not involve the same offense.**

Even if the Double Jeopardy Clause applied, it would not bar the defendant's prosecution. The Clause protects against multiple punishments for the same offense.  *See Missouri v. Hunter*, 459 U.S. 359, 365-66 (1983).  But the Double Jeopardy Clause "is not implicated simply because a criminal charge involves 'essentially the same conduct' for which a defendant has previously been punished." *Hudson*, 522 U.S. at 107 (Stevens, J., concurring) (citing *United States v. Dixon*, 509 U.S. 688, 696, 704 (1996)).  Instead, whether two offenses are the same for double-jeopardy

purposes requires ascertaining whether each requires proof of an element that the other does not. *See Blockburger v. United States*, 284 U.S. 299, 304 (1932).  It is not enough that there may be some overlap between the conduct charged in each case.

Any double-jeopardy claim here—which, notably, the defendant entirely fails to spell out—would founder in light of these principles.  The single article of impeachment alleged a violation of "Incitement of Insurrection," Impeachment Resolution at 2 (capitalization altered), and charged that the defendant had "incit[ed] violence against the Government of the United States," *id.* at 3.  The most analogous federal statute is 18 U.S.C. § 2383, which prohibits "incit[ing] . . . any rebellion or insurrection against the authority of the United States or the laws thereof."  A violation of Section 2383 would require proof that the violence at the Capitol on January 6, 2021, constituted an "insurrection against the authority of the United States or the laws thereof" and that the defendant incited that insurrection.  Incitement, in turn, requires proof that the speaker's words were both directed to "producing imminent lawless action" and "likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927-28 (1982); *see also Thompson*, 590 F. Supp. 3d at 112 (incitement includes three elements: "that '(1) the speaker subjectively intended incitement; (2) in context, the words used were likely to produce imminent, lawless action; and (3) the words used by the speaker objectively encouraged and urged and provoked imminent action'") (emphasis omitted).  None of the offenses charged here—18 U.S.C. § 371, 18 U.S.C. §§ 1512(c)(2) and (k), and 18 U.S.C. § 241—has as an element any of the required elements for an incitement offense.  And the elements of the charged offenses—*e.g.*, defeating a federal government function through deceit under Section 371, obstruction of an "official proceeding" under Section 1512, and deprivation of rights under Section 241—are nowhere to be found in the elements of a violation

of Section 2383 or any other potential incitement offense.  Moreover, the mere fact that some of the conduct on which the Impeachment Resolution relied is related to conduct alleged in the indictment does not implicate the Double Jeopardy Clause.  *See Dixon*, 509 U.S. at 696.

### iii.        The defendant's double-jeopardy claim is frivolous.

The denial of a motion to dismiss on double-jeopardy grounds is typically subject to interlocutory appeal.  *See Abney v. United States*, 431 U.S. 651, 662 (1977).  At the same time, the Supreme Court recognized that because such an approach "may encourage some defendants to engage in dilatory appeals," courts of appeals could "establish summary procedures and calendars to weed out frivolous claims of former jeopardy."  *Id.* at 662 n.8; *see Richardson v. United States*, 468 U.S. 317, 322 (1984) (indicating that "the appealability of a double jeopardy claim depends upon its being at least 'colorable,' . . . and that 'frivolous claims of former jeopardy' may be weeded out by summary procedures"); *id.* at 326 & n.6 (noting that a "colorable claim . . . presupposes that there is some possible validity").  Following the Supreme Court's decision in *Abney*, courts of appeals developed procedures for identifying and disposing of frivolous double-jeopardy claims without divesting the trial court of jurisdiction and delaying proceedings.  *See, e.g.*, *United States v. Dunbar*, 611 F.2d 985, 988 (5th Cir. 1980) (en banc) ("Henceforth, the district courts, in any denial of a double jeopardy motion, should make written findings determining whether the motion is frivolous or nonfrivolous.  If the claim is found to be frivolous, the filing of a notice of appeal by the defendant shall not divest the district court of jurisdiction over the case. If nonfrivolous, of course, the trial cannot proceed until a determination is made of the merits of an appeal."); *accord United States v. Leppo*, 634 F.2d 101, 105 (3d Cir. 1980); *United States v. Hines*, 689 F.2d 934, 937 (10th Cir. 1982).  Thus, courts have concluded that double-jeopardy claims are frivolous or not sufficiently colorable to confer jurisdiction for an interlocutory appeal where a defendant's conviction from a first trial was "set aside for reasons unrelated to the

sufficiency of the evidence against him," namely, because the district court had granted a new trial based on instructional error, *United States v. Serrano*, 856 F.3d 210, 214 (2d Cir. 2017); where a defendant's argument was squarely foreclosed by existing precedent and the defendant failed to "cite any intervening change or correction in the law," *United States v. Shelby*, 604 F.3d 881, 887 (5th Cir. 2010) (per curiam); or where defendants were "sentenced within the statutorily authorized range for their previous convictions and the totality of the circumstances do not suggest that there has been only a single conspiracy or that jeopardy previously attached," *United States v. Abboud*, 273 F.3d 763, 769 (8th Cir. 2001). In *United States v. Black*, 759 F.2d 71 (D.C. Cir. 1985) (per curiam), the D.C. Circuit alluded to the procedure for weeding out frivolous double-jeopardy claims when it acknowledged that it "must grant a stay unless appellant's claim of violation of the double jeopardy clause is 'wholly lacking in merit.'" *Id.* at 73. Because the movant there had made "no adequate response to the district court's comprehensive opinion" and the D.C. Circuit found "the reasoning in that opinion entirely persuasive," the court denied the stay. *Id.*

Consistent with the procedure described above, the Court should conclude in written findings that the defendant's double-jeopardy claim is wholly without merit. The defendant does not even argue that removal and disqualification constitute criminal penalties sufficient to implicate the Double Jeopardy Clause. *See Abboud*, 273 F.3d at 766 ("A colorable claim requires a showing of previous jeopardy and the threat of repeated jeopardy."). He also offers no remotely viable claim that the incitement allegation that formed the basis of the Impeachment Resolution constitutes the same offense as any of the offenses charged in this case. The defendant's wholly meritless double-jeopardy claim should not, therefore, divest this Court of jurisdiction in a manner that risks delaying the trial.

## V.    Conclusion

The defendant's motions to dismiss on statutory and constitutional grounds should be denied.

Respectfully submitted,

JACK SMITH
Special Counsel

By:    /s/ James I. Pearce
James I. Pearce
John M. Pellettieri
Assistant Special Counsels
Molly Gaston
Thomas P. Windom
Senior Assistant Special Counsels
950 Pennsylvania Avenue NW
Room B-206
Washington, D.C. 20530