**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:23-cr-00257-TSC |
| DONALD J. TRUMP, | |
| *Defendant*. | |

**PRESIDENT DONALD J. TRUMP'S REPLY IN SUPPORT OF MOTION TO
<u>DISMISS BASED ON CONSTITUTIONAL GROUNDS</u>**

## INTRODUCTION

Election advocacy, including petitions to elected officials for the redress of election-related grievances, is a fundamental, time-honored tradition of our country. The First Amendment guarantees that the President—just like every other individual—may speak out on this subject and call Congress to action. Others are just as free to disagree and urge Congress to take a different course. That is how our country works, and why the Constitution prohibits the state from acting as "the arbiter of truth" on matters of public concern. *United States v. Alvarez*, 567 U.S. 709, 751-52 (2012) (Alito, J., dissenting). Yet that is exactly what the prosecution seeks. Rather than conceding, as it must, that election advocacy is one of the "broad areas in which any attempt by the state to penalize purportedly false speech would present a grave and unacceptable danger," *id*. at 751, the prosecution seeks to install itself as America's censor, with roving authority to criminally prosecute all who speak out against its approved narratives. The prosecution has no such mandate. Accordingly, the indictment is unconstitutional on its face and must be dismissed.

Additionally, even if the First Amendment permitted charges on this basis—which it emphatically does not—President Trump's acquittal before the United States Senate forecloses retrial before this Court, as do the Constitution's guarantees of due process and fair notice.

## I.       The First Amendment Bars the Prosecution in its Entirety

### A.       All Charges in the Indictment Rest Solely on Allegations of Core Political Speech and Advocacy.

Handwaving the First Amendment, the prosecution states that President Trump "had a right, like every American, to speak publicly about the [2020 presidential] election and even to claim, falsely, that there had been outcome-determinative fraud during the election and that he had won," but claims President Trump violated the law because he allegedly "did not stop there." Doc. 139 at 26 (quoting Doc. 1, ¶ 3).

Thus, the prosecution premises its entire case on the notion that President Trump did *more* than make supposedly "false[]" claims about the election's outcome. *See id.* But what "more" did President Trump do, according to the prosecution? He made *more* supposedly "false" claims about the outcome of the election—*i.e.*, "dozens of 'specific claims that there had been substantial fraud in certain states," and that "dead people had voted in Georgia." *Id.* (quoting Doc. 1, ¶¶ 11, 33). The prosecution generally asserts that "[t]he defendant … used those lies as the instruments of his four criminal offenses," and "the defendant used those knowingly false statements regarding specific facts to commit the crimes charged in the indictment." *Id.* at 26-27. But the prosecution does not identify any *conduct* involved in those crimes other than making, in their view, supposedly false statements about the election's outcome. *See id.* Thus, the indictment does not allege that the Defendant "used … lies" to commit crimes, *id.*—it alleges that he told (supposed) "lies" and those lies *are* the crimes. *See id.* Thus, the indictment does not charge speech in furtherance of a crime—it charges pure Speech Crimes.

The reason the prosecution does not identify any *non-speech* or *non-advocacy* conduct charged in the indictment is that there is none. Every charge in the indictment rests on core acts of political speech and advocacy that lie at the heart of the First Amendment. Likewise, all the factual allegations in the indictment pivot on the indictment's core theory—that President Trump allegedly engaged in "fraud" and "obstruction" by repeatedly contending, in public and to government officials, that the outcome of the 2020 Presidential election was tainted by fraud.

A comprehensive review of the indictment reveals that every operative allegation charges President Trump with engaging in acts of public speech and political advocacy about the election's outcome. First, the indictment alleges that President Trump made a long series of public statements about matters of enormous public concern—criticizing the administration of the 2020 federal

election, claiming that fraud and other irregularities tainted the outcome of the election in particular States, and making claims about the scope of the Vice President's constitutional authority in certifying the election. Doc. 1, ¶¶ 1, 11-12, 32-34, 37, 41-42, 46, 52, 99, 102, 104. These public statements include numerous postings on Twitter about these topics. *Id.* ¶¶ 22, 28, 44, 50, 87-88, 90(c), 96(a)-(c), 100(a)-(b), 111, 114, 116, 118. All these allegations center on the prosecution's core theory: that President Trump supposedly "spread lies that there had been outcome-determinative fraud in the election and that he had actually won." *Id.* ¶ 2.

Second, the indictment alleges that President Trump made statements to DOJ officials claiming that fraud and irregularities tainted the outcome of the election and urging them to act accordingly. *Id.* ¶¶ 10(c), 27, 29, 36, 45, 51, 70-74, 77, 80, 84. Again, every such allegation contends that President Trump, supposedly falsely, urged to such federal officials that there had been significant fraud or irregularities in the 2020 Presidential election. *See id.*

Third, the indictment alleges a series of communications to state officials claiming that fraud and/or irregularities had tainted the election outcomes in their states and urging them to act accordingly. Doc. 1, ¶¶ 10(a), 15-18, 21, 24, 26, 31, 35, 38-39, 43. As above, all these allegations center on the claim that President Trump stated, supposedly falsely, to these state officials that there had been significant fraud in the administration of the election in their states. *See id.*

Fourth, the indictment alleges a series of communications with the Vice President in his legislative capacity as President of the Senate, claiming that fraud and irregularities tainted the election's outcome and urging him to certify the election accordingly. Doc. 1, ¶¶ 10(d), 86-95, 90(a)-(d), 92-93, 95, 97, 101-102, 122. The indictment alleges attempts to make similar communications to other Members of Congress as well. *Id.* ¶¶ 115, 119(a)-(e). As with the DOJ and state officials, the indictment alleges that these statements by President Trump asserted that

there had been outcome-determinative fraud or irregularity in the election, and that was the basis on which he urged those officials to act.

Fifth, the indictment alleges that President Trump was involved in efforts to organize and submit contingent slates of alternate electors from states where the outcome of the election was disputed. *Id.* ¶¶ 10(b), 53-69. According to the indictment, these contingent slates of electors were designed to allow the President, in his communications with the Vice President, to justify the exercise of the Vice President's authority to certify the election in Defendant's favor or delay its certification. *Id.* ¶¶ 10(b), 53. Once again, the basis for organizing what the indictment calls "fraudulent electors" was the asserted view that the actual electors were invalid because the election in their States had been tainted by fraud or irregularity.

Thus, every allegation in the indictment, including all counts charged, centers on the prosecution's theory that President Trump committed "fraud" or "obstruction" by repeatedly contending that there had been fraud in the election.

In short, despite acknowledging "[t]he Defendant had a right, like every American, to speak publicly about the election and even to claim, falsely, that there had been outcome-determinative fraud during the election and that he had won," Doc. 1, ¶ 3, the prosecution presents such statements as the only material acts of alleged wrongdoing. Thus, this case is not about what President Trump did, but what he said. *See, e.g.,* Doc. 1, ¶ 4 (alleging that all counts charge "conspiracies" that are "built on the widespread mistrust the Defendant was creating *through pervasive and destabilizing lies about election fraud*"); ¶ 7 (alleging that "[t]he purpose of the conspiracy was to overturn the legitimate results of the 2020 presidential election by *using knowingly false claims of election fraud* to obstruct the federal government function by which those results are collected, counted, and certified") (emphases added); *see also, e.g., id.* ¶¶ 1, 10(a),

11-12, 15-18, 21-22, 24, 26, 28, 31-35, 37-39, 41-43, 44, 46, 50 52, 87-88, 90(c), 96(a)-(c), 99, 100(a)-(b), 102, 104, 111, 114, 116, 118 (alleging supposedly "false" claims of election fraud as central to the supposed "conspiracy" involving President Trump).

### B.      Claims of Fraud in the 2020 Presidential Election Are Protected Speech.

President Trump's motion explained in detail that *United States v. Alvarez*, 567 U.S. 709 (2012), reflects the Supreme Court's unanimous consensus that the government may not criminalize supposedly "false statements about philosophy, religion, history, the social sciences, the arts, and *other matters of public concern*." *Id.* at 751 (Alito, J., dissenting) (emphasis added); *see also id.* at 731-32 (Breyer, J., concurring in the judgment) (same). In these areas, "it is perilous to permit the state to be the arbiter of truth," for "the potential for abuse of power in these areas is simply too great." *Id.* at 752 (Alito, J., dissenting). "In the political arena," when disputes arise about politically charged topics—which typically involve claims that are not "easily verifiable"— the threat of "criminal prosecution is particularly dangerous … and consequently can more easily result in censorship of speakers and their ideas." *Id.* at 732, 738 (Breyer, J., concurring in the judgment). "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *Id.* at 723 (plurality op. of Kennedy, J.) (citing George Orwell, NINETEEN EIGHTY-FOUR (1949) (Centennial ed. 2003)).

The prosecution does not meaningfully dispute this point. Instead, the prosecution contends that President Trump made not just general assertions, but "concrete, specific statements" about specific acts of fraud in individual states, and that these suffice to render his speech criminal. Doc. 139 at 32. The prosecution cites no authority for this supposed "specificity exemption" to *Alvarez*, and none exists. Claims about "philosophy, religion, history, the social sciences, the arts, and *other matters of public concern*," *id.* at 751 (Alito, J., dissenting) (emphasis added)—the prosecution

conveniently omits the italicized phrase—can be either general or specific, but they are all protected by the First Amendment.

The prosecution's attempt to carve out a "specificity exception" to the core political speech doctrine also runs afoul of *McDonnell v. United States*, 579 U.S. 550 (2016). As in *McDonnell*, "[i]n addition to being inconsistent with both text and precedent, the Government's expansive interpretation" of the charged statutes "would raise significant constitutional concerns." 579 U.S. at 574. Under the prosecution's view, any interaction between an elected official and his or her constituent where the constituent makes disputed claims on politically charged issues is the potential basis for a federal investigation and prosecution, provided that the government concludes that the claim was knowingly "false." The over-criminalization that would result from this interpretation is astonishing, and it is just what the Supreme Court rejected in *McDonnell*:

> But conscientious public officials arrange meetings for constituents, contact other officials on their behalf, and include them in events all the time. The basic compact underlying representative government *assumes* that public officials will hear from their constituents and act appropriately on their concerns…. The Government's position could cast a pall of potential prosecution over these relationships …. Officials might wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse.

*Id.* at 575 (emphasis in original). The same reasoning applies here. "[T]he Government's legal interpretation is not confined to cases involving" the facts alleged here, "and we cannot construe a criminal statute on the assumption that the Government will 'use it responsibly.'" *Id.* at 576 (quoting *United States v. Stevens*, 559 U.S. 460, 480 (2010)). The courts cannot "rely on the Government's discretion to protect against overzealous prosecutions," and thus "a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter." *Id.* (citations and quotation marks omitted).

### C.     The "Speech Integral to Criminal Conduct" Exception Does Not Apply.

The prosecution invokes the well-established First Amendment exception providing that "speech integral to criminal conduct" is not protected by the First Amendment. *Alvarez*, 567 U.S. at 717 (citing *Giboney v. Empire Storage & Ice Co*., 336 U.S. 490, 498 (1949)). But that exception does not apply here, where *all* the charged conduct constitutes First Amendment-protected speech. To fall within this exception, the speech in question must be "integral to" some criminal "conduct" that *is not itself a form of First Amendment-protected speech or expression*. *See Giboney*, 336 U.S. at 498 (holding that speech that was integral to organizing an unlawful picket designed to implement a restraint on trade was not protected by the First Amendment). Protected speech that is "integral to" other protected speech, or other protected activities like lobbying Members of Congress based on government-disfavored viewpoints, remains protected speech. *See, e.g., United States v. Petrovic*, 701 F.3d 849, 856 (8th Cir. 2012) (upholding the federal cyberstalking statute on the ground that it "is directed toward 'courses of conduct,' not speech, and the conduct it proscribes is not 'necessarily associated with speech'"); *United States v. Ackell*, No. 15-CR-123-01-JL, 2017 WL 2913452, at *10 (D.N.H. July 7, 2017), *aff'd*, 907 F.3d 67 (1st Cir. 2018) (recognizing that a "course of conduct" that was "comprised purely of protected speech" would be protected by the First Amendment). Otherwise, the exception would swallow the rule entirely.

For example, in *Afro-American Police League v. Fraternal Order of Police*, the court considered a civil rights conspiracy claim where the acts underlying the conspiracy—such as acts of pamphleteering by one union against another union—were plainly protected under the First Amendment. 553 F. Supp. 664, 674 (N.D. Ill. 1982). The latter union "attempt[ed] to attach culpability to [the first union's] act of pamphleteering" by arguing—just as the prosecution does here—that "any act in furtherance of the object of the conspiracy, even if that act is not unlawful,

is actionable." *Id.* The court rejected this argument because the entire alleged "conspiracy" rested on acts protected by the First Amendment:

> [N]o act has been committed by AAPL which would take their conduct outside the protection of the First Amendment…. The act of pamphleteering is one of the few modes of mass communication economically available to minority groups, and the activity is clearly protected by the First Amendment. A "conspiracy to exercise free speech" is an obvious oxymoron.

*Id.* The same logic applies here. "No act has been committed by [President Trump] which would take [his] conduct outside the protection of the First Amendment," *id.*, so the entire "conspiracy" charge is unconstitutional. In short, the indictment charges a "conspiracy to exercise free speech," which "is an obvious oxymoron." *Id.*

Contrary to the prosecution's argument, Doc. 139 at 30, *Alvarez* strongly supports President Trump on this very point. The prosecution argues that *Alvarez*'s plurality stated that "laws that 'protect the integrity of Government processes, quite apart from restricting false speech'" remain valid. *Id.* (quoting *Alvarez*, 567 U.S. at 721 (plurality op.)). In fact, *Alvarez* was referring to three specific kinds of "laws," *i.e.*, "[s]tatutes that prohibit falsely representing that one is speaking on behalf of the Government," "that prohibit impersonating a Government officer," and perjury. *Id.* Needless to say, the conduct alleged in the indictment bears no resemblance to those actions, precisely because they involve trickery and deceit, not ordinary political advocacy. Moreover, *Alvarez* emphasized that such conduct can be prohibited because those prohibitions "protect the integrity of Government processes, *quite apart from merely restricting false speech*." *Id.* (emphasis added). Thus, the indictment does not seek to punish President Trump's conduct "quite apart from merely restricting false speech," *id.*; it does the exact opposite. It punishes *only* First Amendment protected speech, including both public speech and protected advocacy to public officials. This is impermissible under the reasoning of *Alvarez* as well.

The prosecution further emphasizes this point when it contends that "[f]alsity is not a viewpoint." Doc. 139 at 33. Whatever the merits of this claim in other contexts, this statement is inapplicable to the widespread and unsettled disputes about the outcome of the 2020 Presidential election, which have no easily verifiable answer. *Alvarez*, 567 U.S. at 732, 738. Moreover, a law that criminalized speech questioning the outcome of the election, while permitting speech defending the outcome of that election, would involve obvious, and blatantly unconstitutional, viewpoint discrimination. *See, e.g., Matal v. Tam*, 582 U.S. 218, 243-44 (2017).

The prosecution's attempt to distinguish *McDonald v. Smith*, 472 U.S. 479 (1985), *see* Doc. 139 at 34, fails as well. *McDonald* held that claims about a judicial nominee's fitness made in a letter of advocacy to public officials were subject to the exact same standards of First Amendment protection that apply to the same statements made in a public forum. 472 U.S. at 485. The right to speak and the right to petition the government "are inseparable, and there is no sound basis for granting greater," or lesser, "constitutional protection to statements made in a petition to" a government official "than other First Amendment expression." *Id.* Because the claim that the 2020 election was stolen is protected by the First Amendment when it is made in a public speech, it is equally protected by the First Amendment when it is made to government officials in an act of petitioning or advocacy. *Id.*

### D.      On the Government's Interpretation, the Underlying Criminal Statutes Are Facially Invalid and Unconstitutionally Overbroad.

The First Amendment problems with the prosecution's novel and unprecedented theory of criminal liability extend, not just to the indictment, but to the underlying criminal statutes charged therein. If the prosecution is correct and those statutes criminalize acts of core political speech and advocacy, as charged in this case, those statutes are facially unconstitutional under the First Amendment. Any statute that criminalizes core political speech is invalid, at least as applied, where

the criminalization of protected speech is "not only … real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). As discussed above, the prosecution's interpretation of these statutes entails that they criminalize a wide range of perfectly ordinary acts of public speech and petitioning the government. *See id.* The prosecution, therefore, renders its own statutes invalid by seeking to extend them to President Trump's speech.

## II.   The Impeachment Judgment Clause and Principles of Double Jeopardy Bar the Prosecution of President Trump After His Acquittal by the Senate.

Both the Impeachment Judgment Clause and related principles of double jeopardy foreclose the criminal prosecution of a President who has been tried and acquitted by the Senate.

### A.   Impeachment Judgment Clause.

#### 1.   The plain meaning of the Impeachment Judgment Clause governs.

The prosecution claims that "[t]he Impeachment Judgment Clause's text and history support criminal prosecution here," Doc. 139 at 50, but it provides no analysis of the text. *See id.* Instead, the prosecution merely block-quotes the text of the Clause and then asserts, without further analysis, that the Clause merely "makes clear that criminal prosecution … may follow such a conviction by the Senate." *Id.* On the prosecution's view, therefore, the phrase "the Party *convicted*" actually means that *both* the "Party convicted" *and* the "Party acquitted"—*and*, for that matter, the "Party who was never impeached at all." As a matter of plain meaning, the prosecution's interpretation makes no sense. Obviously, an *acquittal* by the Senate is more likely than a Senate conviction to foreclose future prosecution. Thus, if the Framers had wished to clarify that impeachment and trial in the Senate would have no impact on future prosecution *regardless of the trial's outcome*, one would expect them to state that the "Party *impeached* shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to law." But they did

not. Instead, the Constitution specifies that only the "Party *convicted* shall nevertheless be liable and subject to" criminal prosecution. U.S. Const. art. I, § 3, cl. 7 (emphasis added).

Proving this point, if the Framers wished to specify that *only* the "Party convicted" could be prosecuted, and *not* the "Party acquitted," the actual phrasing of the Clause is the most ordinary and natural way to do so. The longstanding canon of interpretation *expressio unius est exclusio alterius* (or the "negative-inference canon") reflects "the principle that specification of the one implies exclusion of the other *validly describes how people express themselves and understand verbal expression*." Scalia & Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, § 10, p. 107 (2012) (emphasis added). "When a car dealer promises a low financing rate to 'purchasers with good credit,' it is entirely clear that the rate is *not* available to purchasers with spotty credit." *Id.* (emphasis added). So also here, when the Constitution provides that "the Party convicted" in the Senate may be subject to criminal prosecution, "it is entirely clear that" the Party acquitted in a Senate trial "is *not*" subject to criminal prosecution for official acts. *Id.* This is true because the phrase "the Party convicted" "can reasonably be thought to be an expression of *all* that shares in the grant or prohibition involved." *Id.* (emphasis added). Because there are only two possible outcomes from a Senate trial—conviction or acquittal—specifying the implications of only *one* outcome strongly implies that those implications do *not* apply to the other outcome. *See id.*

For these reasons, the "plain implication" of the phrase "Party convicted" "is that criminal prosecution … is a consequence that can come about only after the Senate's judgment…." *Trump v. Vance*, 140 S. Ct. 2412, 2444 (2020) (Alito, J., dissenting).[1]

---

[1] The prosecution attempts to dismiss Justice Alito's observation by arguing that he was addressing the amenability of a sitting President to prosecution. Doc. 139, at 56. But the logic of his argument is that prosecution may only come *after* Senate conviction, which applies equally to sitting and former Presidents. Moreover, Justice Alito's observation also reflects the plain text of the Constitution, which draws no distinction between current and former officeholders on this point.

## 2.      Historical sources reinforce the Clause's plain meaning.

Because the Clause's meaning is clear, there is no need to consult historical sources to resolve any ambiguity. But even if there were, the most authoritative and persuasive historical sources confirm the Clause's plain meaning.

Take, for instance, Hamilton's comments in Federalist No. 69. The prosecution cites this source, Doc. 139 at 51, but selectively omits language that contradicts its argument. Federalist No. 69 states: "The President of the United States would be liable to be impeached, tried, and, upon conviction of treason, bribery, or other high crimes or misdemeanors, removed from office; and would *afterwards* be liable to prosecution and punishment in the ordinary course of law." THE FEDERALIST NO. 69 (emphasis added), https://avalon.law.yale.edu/18th_century/fed69.asp. Thus, Hamilton asserted that impeachment and conviction were necessary prerequisites to criminal prosecution, which would come only "afterwards." *Id.*

Second, the prosecution cites Federalist No. 65, Doc. 139 at 53, 54, but once again, In Federalist No. 65, Hamilton wrote: "The punishment which may be the consequence of conviction upon impeachment, is not to terminate the chastisement of the offender. *After* having been sentenced to a perpetual ostracism from the esteem and confidence, and honors and emoluments of his country, he will still be liable to prosecution and punishment in the ordinary course of law." THE FEDERALIST NO. 65 (emphasis added), *at* https://avalon.law.yale.edu/18th_century/fed65.asp. Again, as in Federalist No. 69, Hamilton emphasizes the criminal prosecution of the President is something that occurs only "[a]fter" conviction by the Senate. *Id.*

Hamilton further reinforced this point in Federalist No. 77, which the prosecution ignores. In Federalist No. 77, Hamilton wrote that the President is "at all times liable to impeachment, trial, dismission from office, incapacity to serve in any other, and to forfeiture of life and estate by

*subsequent* prosecution in the common course of law." THE FEDERALIST NO. 77 (emphasis added), *at* https://avalon.law.yale.edu/18th_century/fed77.asp. In each passage, therefore, Hamilton makes clear that prosecution of the President could occur only "after," "afterwards," and "subsequent" to Senate conviction.

Other historical sources agree. In *Marbury v. Madison*, Charles Lee—Attorney General of the United States under Presidents Washington and John Adams—"declare[d] it to be my opinion, grounded on a comprehensive view of the subject, that the President is not amenable to any court of judicature for the exercise of his high functions, but is responsible only in the mode pointed out in the constitution," *i.e.*, impeachment by the House and trial by the Senate. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 149 (1803). Chief Justice Marshall agreed: "By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country *in his political character*, and to his own conscience." *Marbury*, 5 U.S. (1 Cranch) at 165-66 (emphasis added).

The historical sources on which the prosecution relies, Doc. 139 at 51-52, do not undermine this consensus. Unlike Hamilton's and Madison's arguments in The Federalist, none of these sources were in wide circulation at the time the Constitution was adopted, so they are far less likely to reflect the objective public meaning and national understanding of the Clause at the time of its adoption. James Wilson's brief comment at the North Carolina ratifying convention referred to the potential prosecution of U.S. Senators, not Presidents, so it is inapposite here and is governed by a separate constitutional provision, the Speech and Debate Clause. *See* Doc. 139 at 51 (quoting 2 *The Documentary History of the Ratification of the Constitution* 492 (Merrill Jensen et al., eds. 1976)). As noted above, James Wilson's views on the specific question at issue here—*i.e.*, the impeachment or prosecution of the *President*—appear a few pages earlier in the same book, as

13

quoted by the Supreme Court in *Clinton v. Jones*: "[F]ar from being above the laws, [the President] is amenable to them in his private character as a citizen, and *in his public character by impeachment*." *Clinton*, 520 U.S. at 696 (quoting 2 J. Elliot, Debates on the Federal Constitution 480 (2d ed. 1863)) (emphasis added).

Edmund Pendleton's views (cited at Doc. 139 at 51) were expressed in a private letter to James Madison, and thus can be viewed as the opinions of but one man. Pendleton expresses his view in the context of criticizing the very concept of impeachment by Congress as inappropriate and more fitting for the judicial branch—"I do not see any material reason for having taken this trial [*i.e.*, impeachment proceedings] out of the judiciary course," and "[t]he mode of prosecution [*i.e.*, impeachment] as generally practiced, is not a favorite with me." *See Letter of Edmund Pendleton to James Madison* (1787), *at* https://www.digitalhistory.uh.edu/disp_textbook.cfm?smtID=3&psid=178. So it is no surprise that he adopts the minority, counter-textual view that the judicial branch retains the authority over criminal prosecutions, since his whole point in the letter is to suggest that even impeachments should have been lodged in the judicial branch in the first place. *See id.*

Representative Dana's comments in 1798, *see* Doc. 139 at 51-52, likewise reflect the views of a single Representative over a decade after the Constitution was ratified, and they were addressing an entirely different topic—*i.e.*, whether the underlying offense for the impeachment proceeding must itself be a crime. *See* 5 Annals of Congress 2475 (Dec. 1798), *at* https://memory.loc.gov/ammem/amlaw/lwaclink.html#anchor5.

Finally, the prosecution misreads Justice Story's comments by, once again, selectively quoting them. Justice Story commented that, because the direct consequences of impeachment include only removal from office and disqualification, it was necessary for the Constitution to

contain a "provision … that the common tribunals of justice should be at liberty to entertain jurisdiction of the offence." 2 Joseph Story, *Commentaries on the Constitution of the United States* § 782 (1833). "Otherwise, it might be a matter of extreme doubt whether … a second trial for the same offence could be had, either after an acquittal or a conviction, in the court of impeachments." *Id.* In sum, Justice Story stated that it made sense for the Constitution to contain a provision specifying the consequences of conviction after impeachment for future criminal prosecution to avoid the "extreme doubt" about whether criminal prosecution could follow. *Id.* The Constitution does so, of course, by specifying in the Impeachment Judgment Clause that the "Party *convicted*" may be impeached. As Justice Story's own logic indicates, *see id.*, its failure to authorize prosecution for the "Party *acquitted*" raises, at the very least, "extreme doubt" that an acquitted party may be prosecuted. *Id.*

> **3.    The Impeachment Judgment Clause embodies structural protections for the Presidency that are deliberately rooted in *political* processes.**

The prosecution invokes the Constitution's "structure," but it presents no argument actually relying on that structure. Instead, it makes *policy* arguments that do not cite any original sources, but are drawn entirely from the 2000 O.L.C. opinion on this topic, which was drafted 212 years after the Constitution's ratification. Doc. 139 at 52-54. In this argument, the prosecution contends that impeachment and criminal prosecution "serve entirely distinct goals," that a "Senate impeachment trial may reflect a technical or procedural determination rather than a factual conclusion," and that "partisan loyalties or popular sentiment might influence the Senate's decision to convict or acquit." *Id.* In each case, the prosecution argues, as a *policy* matter, that criminal prosecution should be treated as independent from impeachment and a Senate trial, because the Senate trial might not result in the acquittal of a President whose political enemies deem him guilty. *See id.*

15

This argument flips the Constitution's structure on its head. The Impeachment Judgment Clause, and all related Impeachment Clauses, provide the President with critical *structural protections* from attacks by his political enemies. *See* U.S. Const. art. I, § 3, cl. 7. The requirements of impeachment by the House and conviction by two-thirds of the Senate, *id.*, ensure that the President cannot be removed from office—and subsequently prosecuted and imprisoned—without a widespread *political consensus* in favor of that result. The fact that "partisan loyalties or popular sentiment might influence the Senate's decision," or that the Senate's decision might rest on "a technical or procedural determination rather than a factual conclusion," Doc. 138 at 53-54, is a *feature*, not a bug, of that system. The Impeachment Judgment Clause ensures that the momentous step of removing the Chief Executive from office and sending him to prison cannot be achieved unless a widespread political consensus—reflecting two-thirds of U.S. Senators from across the Nation—supports and explicitly authorizes that goal. That is a critical structural protection reflected in the Constitution's separation of powers. To allow federal prosecutors to circumvent this judgment by prosecuting an acquitted President would utterly defeat this critical structural protection. *See* U.S. CONST. art. I, § 3, cl. 7.

That is why the Supreme Court has repeatedly emphasized that the Constitutionally established *political* checks like impeachment and Senate trial, not criminal prosecution, provide the remedy for a President accused of criminal wrongdoing. As the Supreme Court stated in *Fitzgerald*, political checks like "the credible threat of impeachment" and "[v]igilant oversight by Congress" keep abuse of Presidential authority in check, not the threat of prosecution:

> A rule of absolute immunity for the President will not leave the Nation without sufficient protection against misconduct on the part of the Chief Executive. *There remains the constitutional remedy of impeachment*. In addition, there are formal and informal checks on Presidential action…. The President is subjected to constant scrutiny by the press. Vigilant oversight by Congress also may serve to deter Presidential abuses of office, as well as to make credible the threat of impeachment. Other incentives to avoid misconduct

> may include a desire to earn reelection, the need to maintain prestige as an element of
> Presidential influence, and a President's traditional concern for his historical stature.

*Nixon v. Fitzgerald*, 457 U.S. 731, 757 (1982). The structural protection of the Constitution

provides that a President "is amenable … in his public character by impeachment," and that "[w]ith

respect to acts taken in his 'public character'—that is, official acts—the President may be

disciplined principally by impeachment." *Clinton v. Jones*, 520 U.S. 681, 696 (1997) (quoting 2 J.

Elliot, Debates on the Federal Constitution 480 (2d ed. 1863)).

    To support its "structural" argument, the prosecution twice cites Alexander Hamilton's

statements in Federalist No. 65. Doc. 139 at 52-53, 54. Hamilton's writing, however, directly

contradicts the prosecution's argument. In Federalist No. 65, Hamilton argued that, precisely

*because* the "prosecution" of a President "will seldom fail to agitate the passions of the whole

community, and to divide it into parties, more or less friendly or inimical, to the accused," it should

*not* be entrusted to a court, but should be assigned only to a "POLITICAL" body—the U.S. Senate:

> A well constituted court for the trial of impeachments, is an object not more to be desired
> than difficult to be obtained in a government wholly elective. The subjects of its jurisdiction
> are those offenses which proceed from the misconduct of public men, or in other words
> from the abuse or violation of some public trust. They are of a nature which may with
> peculiar propriety be denominated POLITICAL, as they relate chiefly to injuries done
> immediately to the society itself. *The prosecution of them, for this reason, will seldom fail
> to agitate the passions of the whole community, and to divide it into parties, more or less
> friendly or inimical, to the accused*. In many cases, it will connect itself with the pre-
> existing factions, and will inlist all their animosities, partialities, influence and interest on
> one side, or on the other; and in such cases there will always be the greatest danger, that
> the decision will be regulated more by the compar[a]tive strength of parties than by the real
> demonstrations of innocence or guilt.

THE FEDERALIST No. 65 (Hamilton) (emphasis added). Hamilton went on to argue that even the

Supreme Court should not handle the trial of a President: "The awful discretion, which a court of

impeachments must necessarily have, to doom to honor or to infamy the most confidential and the

most distinguished characters of the community, *forbids the commitment of the trust to a small*

*number of persons*. These considerations seem alone sufficient to authorise a conclusion, that the *Supreme Court would have been an improper substitute for the Senate*, as a court of impeachments." *Id.* (emphasis added).

Moreover, James Madison reinforced this structural concern in Federalist No. 47, where he cautioned against those "new fangled and artificial treasons," which "have been the great engines, by which violent factions, the natural offspring of free governments, have usually wreaked their alternate malignity on each other." THE FEDERALIST No. 47 (Madison). By requiring a widespread political consensus within the U.S. Senate—the historical "cooling saucer" of the Republic— before a President can be criminally prosecuted, the Impeachment Judgment Clause protects Presidents from being harassed by any of thousands of local prosecutors charging them with such "new fangled and artificial treasons." *Id.*

**B.      Principles of Double Jeopardy Yield the Same Conclusion.**

In his motion to dismiss, President Trump argued that "President Trump's acquittal by the U.S. Senate bars criminal prosecution" on similar charges under the Impeachment Judgment Clause and "principles of double jeopardy." Doc. 113 at 18. The prosecution argues that "principles of double jeopardy" do not apply, because an impeachment proceeding does not impose criminal penalties, and because the *Blockburger* test is not satisfied. Doc. 139 at 58-62.

The prosecution's response on this point attacks a straw man. The preclusion of future prosecution rooted in the Impeachment Judgment Clause is not identical to the pure doctrine of double jeopardy embedded in the Double Jeopardy Clause. Thus, one would not expect double jeopardy doctrines to simply transplant wholesale into the context of the Impeachment Judgment Clause, and President Trump does not contend that they do. Instead, the Impeachment Judgment Clause presents a specific, closely analogous case to criminal double jeopardy, which draws on the

18

principles of the Double Jeopardy Clause but adopts them in the unique context of the impeachment, removal, and subsequent prosecution of public officers. *See* U.S. Const. art. I, § 3, cl. 7. That is why President Trump contends that "principles of Double Jeopardy"—which, though closely analogous, are not identical to those in ordinary criminal cases—foreclose the future prosecution of a President for conduct of which the U.S. Senate has acquitted him. Doc. 113 at 23-24. In fact, the prosecution *itself* argues that the Impeachment Judgment Clause addresses "the principle of double jeopardy." Doc. 139 at 55 (quoting *United States v. Claiborne*, 727 F.2d 842, 846 (9th Cir. 1984)).

When this argument is properly understood, the prosecution's objections to it are implausible. The question whether impeachment trials impose criminal penalties is beside the point, because the preclusive force of an impeachment acquittal arises from the text of the Impeachment Judgment Clause itself, not just from the Double Jeopardy Clause's prohibition against being "subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Only the "Party convicted" in a Senate trial may be subject to criminal prosecution and punishment. That is true even if the Senate trial does not involve "jeopardy of life or limb." *Id.* amend. V. Likewise, the *Blockburger* test is an interpretation of the phrase "the same offence" in the Fifth Amendment—it does not elucidate the phrase "Party convicted" in the Impeachment Judgment Clause. The prosecution's objections, therefore, are beside the point.

Most fundamentally, the Impeachment Judgment Clause and the related principles of Double Jeopardy instruct that "the Executive Branch—including the prosecution—lacks authority to second-guess the determination of acquittal made by the United States Senate, the body to which the Constitution explicitly entrusts this authority." Doc. 113 at 23. Once the U.S. Senate has determined, through a politically accountable procedure, that the President's conduct does not

warrant the lesser penalties of removal and disqualification, the Executive Branch cannot then seek to impose the graver penalties of imprisonment or death for the same conduct. To do so violates the Impeachment Judgment Clause, the Double Jeopardy Clause, and the separation of powers, by allowing the Special Counsel to encroach on an area exclusively reserved for the Legislative Branch. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585-89 (1952). The prosecution has no answer to this fundamental point.

## III. The Indictment Violates Due Process Principles of Fair Notice.

### A. President Trump Did Not Have Fair Notice That Political Speech Is a Crime.

President Trump addresses the prosecution's argument (Doc. 139 at 37-40) about whether he had fair notice about the charges in Count 4 (18 U.S.C. § 241) in greater depth in his Reply in Support of the Motion to Dismiss on Statutory Grounds, which is incorporated by reference herein.

As argued in President Trump's Motion to Dismiss on Constitutional Grounds, these fair-notice problems afflict the entire indictment, and the Court should dismiss the indictment in its entirety. And the principal reason is on page one of the prosecution's brief: President Trump, the prosecution proclaims, "stands alone in American history for his alleged crimes." Doc. 139 at 1. That admits the novelty of the prosecution's criminal theories—and such unprecedented novelty is antithetical to constitutional requirements of fair notice.

The prosecution does not dispute that there have been many challenges to the counting of electoral votes, and zero federal prosecutions or even suggestions that such challenges are criminal. That the charged conduct is in the same category as those historical examples indicates that no one "reasonably underst[ood]" that 18 U.S.C. §§ 241, 371, or 1512 "proscribed" that conduct. *United States v. Harriss*, 347 U.S. 612, 617 (1954). Based on the historical evidence, application of those statutes to the alleged conduct would indeed be "an unforeseeable and retroactive judicial expansion of" them. *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964). *Contra* Doc. 139 at 36.

In short, President Trump is not asking for an "'extreme level of factual specificity.'" *Contra id.*
40 (quoting *United States v. Lanier*, 520 U.S. 259, 268 (1997)). He is asking for evidence that his
conduct clearly violated federal law.

Instead, the prosecution flips the analysis on its head. The prosecution says (at 40) that "the
absence of prior prosecutions is not equivalent to a line of judicial precedent treating the conduct
at issue as non-criminal." But the test is not whether a court said President Trump's conduct was
*not* criminal; the test is whether a court (or, to be sure, the statutes themselves) clearly said it was.
*See Lanier*, 520 U.S. at 267. Furthermore, because fair notice standards track the clearly-
established prong of qualified immunity, *see id.* at 271-72, it was the prosecution's "burden to
show that," *Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015). That is, the
prosecution needed to provide examples where similar conduct was found criminal, or at least fell
clearly within the statutes' proscriptions. It has not done so. The most specific argument the
prosecution offers is its discussion (at 37-40) of § 241. But as President Trump's Reply in Support
of the Motion to Dismiss on Statutory Grounds shows, that argument is meritless. The prosecution
is therefore correct in only one aspect: This case "stands alone." And that admission cuts to the
heart of the Due Process Clause's fair-notice requirement.

To be clear, however, the prosecution's discussion (at 41-46) of historical Electoral College
disputes misses the point: that disputes about the electoral vote happened repeatedly in American
history, and that many people—including Supreme Court Justices—believed Congress had the
final say in what electors were counted. *See* Doc. 113 at 30 (making this point, citing *Bush v. Gore*,
531 U.S. 98, 127 (2000) (Stevens, J., dissenting)). Indeed, the prosecution even admits that
Congress *ignored* a state-court decision in awarding all twenty electoral votes to Rutherford B.

Hayes during the disputed 1876 election. *See* Doc. 139 at 43. Thus, the cases are not "dissimilar," *id.* at 41, in the ways that matter.

Indeed, the prosecution's attempts to distinguish the 2000, 2004, and 2016 contests likewise make President Trump's case. In each case, Democrats objected to the electoral count. *See* Doc. 139 at 44-46. If sustained, those objections would have switched votes. The prosecution argues that those objections ultimately did not affect the end result. *See id.* at 47 (noting the objections were "overruled" or were protest votes "without the hope or even the hint of overturning the victory of the President") (quotations omitted). But neither did any of the conduct alleged in the indictment. The prosecution also claims some type of good intention or good faith on the objectors' part. *See id.* at 47 (referencing the lack of "fraud and deceit" in those episodes). But, except for the 2004 contest, *see* Doc. 139 at 45-46, it has no evidence for that. To the contrary, the objectors meant "to prevent the electors votes from … being counted," claimed that the "electors were not lawfully certified," and attempted to convince electors not to vote for President Trump. Doc. 113 at 28-29 n.7 (quotations omitted). Regardless, the prosecution's undertheorized standard means the difference between a crime and an innocent protest depends on an unknown mix of culpability and degree of success. That cannot "provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," and it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

The prosecution also misses the relevance of the 2016 Electoral College contest. During that contest, three electors in Washington "pledged to support Hillary Clinton in the Electoral College." *Chiafolo v. Washington*, 140 S. Ct. 2316, 2322 (2020). But "they decided to cast their ballots for someone else" to "encourage other electors—particularly those from States Donald Trump had carried—to follow their example." *Id.* They were, as news sources indicated, part of a

cabal seeking to stop "Trump from taking the White House" despite his electoral victory. Kyle Cheney, *Lessig, Lawyers to Offer Support to Anti-Trump Electors*, Politico (Dec. 5, 2016);[2] *see also* Doc. 113 at 29 n.7 (discussing the conspiracy). That is indistinguishable from this case. Yet nothing indicates those electors, or anyone else, faced federal charges or that such charges were even contemplated.

The prosecution, to be sure, claims (at 37) that "applying the facts alleged in the indictment to the well-established statutory elements would not require any sort of novel judicial construction." That incorporates the prosecution's statutory arguments, *see* Doc. 139 at 37, which fail for the reasons set out in the Reply in Support of the Motion to Dismiss on Statutory Grounds. But the historical analysis President Trump provides bolsters his point. It provides "a regular course of practice [that] liquidate[s] [and] settle[s] the meaning of" the underlying statutes, *Chiafalo*, 591 U.S. at 2326 (quotations omitted), and settles it against reading them as covering the charged conduct—or, at the least, shows that the statutes do not plainly cover the conduct alleged in the indictment.

## CONCLUSION

The indictment should be dismissed with prejudice.

---

[2] *Available at* https://www.politico.com/story/2016/12/larry-lessig-electors-trump-232231.

Dated: November 22, 2023

Respectfully submitted,

Todd Blanche, Esq. (PHV)
toddblanche@blanchelaw.com
Emil Bove, Esq. (PHV)
Emil.Bove@blanchelaw.com
BLANCHE LAW
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250

/s/ John F. Lauro
John F. Lauro, Esq.
D.C. Bar No. 392830
jlauro@laurosinger.com
Gregory M. Singer, Esq. (PHV)
gsinger@laurosinger.com
Filzah I. Pavalon, Esq. (PHV)
fpavalon@laurosinger.com
LAURO & SINGER
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990

*Counsel for President Trump*