## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:23-cr-00257-TSC |
| DONALD J. TRUMP, | |
| *Defendant*. | |

## REPLY IN SUPPORT OF PRESIDENT DONALD J. TRUMP'S MOTION TO DISMISS THE INDICTMENT BASED ON STATUTORY GROUNDS

**INTRODUCTION**

According to the prosecution, robotically incanting the claim that President Donald J. Trump's statements about the 2020 Presidential Election "were false" and that he "knew that they were false" is sufficient to support its charges. Doc. 139, at 5.

The prosecution is wrong. Even taking the prosecution's preposterous allegations as true, President Trump's statements were not capable of "tricking" or "deceiving" anyone. Just the opposite, they were pure advocacy, reflecting only one of countless millions of opinions on the integrity of that election. President's Trump's listeners—including the sophisticated elected officials described in the indictment—were free to agree or disagree with President Trump's views, and the prosecution does not allege otherwise.

Nor could it. Unlike in other contexts, where obstruction-type charges are premised on allegedly false disclosures of private facts, everyone has the same ability to draw their own conclusions from publicly reported facts. The prosecution may not like or agree with President Trump's opinions, but our country has never countenanced the criminalization of political advocacy. For good reason, too. As the indictment itself recognizes, the 2020 Presidential Election was not some unknown issue. It was instead the subject of an "intense national atmosphere of mistrust and anger." Doc. 1, ¶ 2. Tens of millions of law-abiding, patriotic Americans, including President Trump, called on our elected officials to address reports of irregularities and fraud and protect our democracy. In the prosecution's view, the relevant statutes, that is 18 U.S.C. §§ 371, 1512, and 241, potentially criminalize every American who did so. That cannot be the case.

As explained herein, and in President Trump's underlying motion, basic cannons of statutory interpretation demonstrate that the relevant statutes do not proscribe President Trump's alleged conduct. *See, e.g.,* Doc. 114, at 15-19 (describing many such canons and their applicability

here). These include the canon of constitutional avoidance, *see Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988); the due process rule against statutory vagueness, *see, e.g., Skilling v. United States*, 561 U.S. 358, 402-03 (2010); the Supreme Court's clear-statement rules for statutory interpretations that violate principles of federalism and similar weighty principles, *see, e.g., Bond v. United States*, 572 U.S. 844, 857 (2014); *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022); and the rules of both lenity and restraint in the interpretation of criminal statutes, *see, e.g., Cleveland v. United States*, 531 U.S. 12, 25 (2000); *Dowling v. United States*, 473 U.S. 207, 214 (1985). The prosecution's interpretations repeatedly transgress these rules—adopting vague, sweeping, and overbroad interpretations of statutory language—and, on that basis, the Court should dismiss the indictment.

## ARGUMENT

### I.     Count I of the Indictment Must be Dismissed.

#### A.     The prosecution does not show the indictment alleges deceit, trickery, or dishonest means.

President Trump's alleged statements fall into three categories: statements about the 2020 Presidential Election; statements to the Vice President; and statements relating to alternate electors. Doc. 114, at 4-5. The prosecution does not dispute these categories. Addressing each in turn, the indictment fails to allege a plausible crime.

**Statements about the election:** The prosecution's argument (Doc. 139, at 7-11) that President Trump's purported statements about election fraud and irregularities were supposedly criminal underscores the immense, indefensible overbreadth of their interpretation of 18 U.S.C. § 371. Moreover, the prosecution ignores that "[w]e deal here not with an ordinary election, but with an election for the President of the United States." *Bush v. Gore*, 531 U.S. 98, 112 (2000) (Rehnquist, C.J., concurring).

Presidential elections are significant events in American political life, generating nationwide attention and focus and—where they are close or there appear to be irregularities— much discourse about the validity of the result that sometimes requires congressional resolution. Indeed, there is a long, storied history of Electoral College contests. *See*, *e.g.*, Doc. 114, at 29-31; Doc. 113, at 27-30. The 2020 Presidential election was no different.

President Trump, like "countless millions" others, raised concerns of fraud and irregularities, while looking at essentially the same information about the election. Doc. 114, at 5-6. But if the prosecution's theory of this case is correct—that petitioning elected officials for a redress of grievances can amount to obstruction if a prosecutor later decides the basis for the petition was "false"—then all of those tens of millions of people potentially committed federal crimes as well.

This cannot be the case. Publicly stating there were fraud and irregularities, and requesting the Congress act to resolve those issues—which again is common throughout our history—cannot be what Congress meant by "defraud[ing] the United States." 18 U.S.C. § 371. For example, if a local advocacy group posted a tweet saying their congressman should not vote to certify the presidential election, despite knowing that litigation challenges failed, then under the prosecution's theory, that group may have violated § 371, with its members becoming subject to a federal investigation to inquire into their mental state, knowledge, and associations. Such a position is absurd and contrary to the basic precepts of a free society.

As the prosecution says, "*[a]bsent additional information about the conduct and mental state* of the individuals in the defendant's hypothetical scenarios, they could not be prosecuted for violating Section 371." Doc. 139, at 11. The implication is that to get that information, investigation is necessary. Under the prosecution's misconceived legal theories, then, every public

statement a constituent makes to a member of Congress concerning a hotly debated topic is a license to open a federal criminal investigation into the person who made it—unless it is *indisputably* true. That, of course, contradicts the very nature of hotly debated topics, where the truth is, by definition, in dispute.

The prosecution ignores this reality and instead seeks to misconstrue President Trump's motion to dismiss the indictment on statutory grounds. They allege that the motion is one about the success or failure of the alleged scheme, "materiality," or subjective intent.[1] *See* Doc. 139, at 8-10. But the prosecution's "legal interpretation is not confined to" this case. *McDonnell v. United States*, 579 U.S. 550, 576 (2016). There is no reason to license a theory of criminal liability that would authorize investigations into almost every attempt by a constituent to talk to a member of Congress—especially on controversial, disputed issues. *See* Doc. 114, at 7-8 (giving examples). Setting aside, for now, the constitutional issues (*see also infra* Argument § I. C), application of § 371 to President Trump's election claims casts the same "pall" over officials' relationship with their constituents that convinced the Supreme Court to read the federal bribery statute narrowly, *McDonnell*, 579 U.S. at 575; *see* Doc. 114, at 8, a point the prosecution does not address, *see* Doc. 139, at 34 n.14 (providing its only discussion of *McDonnell*).

So here, like in *McDonnell*, it is appropriate to read the defraud clause to exclude political advocacy on widely disputed issues—that is, advocacy that Congress vote a certain way—as it is neither "deceit" nor "trickery," but instead an underlying assumption of "[t]he basic compact

---

[1] In discussing intent, the prosecution cites (at 9-10) *Dennis v. United States*, 384 U.S. 855 (1966), to say that President Trump's actions were inappropriate to challenge election fraud and irregularities. That misstates *Dennis*. *Dennis* said that a conspiracy cannot be used to challenge the validity of a federal law. *See id.* at 865-67. In doing so, the Court drew a line between "appropriate and inappropriate ways to challenge acts of government . . . ." *Id.* at 867. President Trump's actions fall on the appropriate side of the line. What he did is what occurred in numerous other Electoral College disputes throughout our history. *See*, *e.g.*, Doc. 113, at 27-30.

underlying representative government ... ." *McDonnell*, 579 U.S. at 575.[2] Between the government's "meat axe" interpretation and President Trump's "scalpel" one, § 371 "should reasonably be taken to be the latter." *Id.* at 576 (quoting *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 412 (1999)).

That is especially so in light of 18 U.S.C. § 1001. Section 1001 criminalizes false statements to Congress, but only if they relate to "administrative matters," investigations, or reviews. § 1001(a), (c). That is, § 1001 works exactly how President Trump argues § 371 works: it exempts speech advocating that Congress do something even if that speech is allegedly "false, fictious, or fraudulent ... ." § 1001(a)(2). It would be anomalous to conclude that § 371 criminalizes the exact same conduct that § 1001—the statutory section that *directly addresses* supposedly false statements to Congress—explicitly exempts. The only sensible interpretation is that the specific § 1001 controls over the more general conspiracy statute. *See Strawberry v. Albright*, 111 F.3d 943, 947 (D.C. Cir. 1997) (per curiam).

The prosecution's abbreviated assertions are no answer. Its claim (at 16-17) that the two statutes just overlap ignores that their reading of § 371 would render the limitations on liability for false statements to Congress in § 1001(c) meaningless. That is, what § 1001(c) expressly authorizes, § 371—per the prosecution—makes a felony. That is not overlap; that is a direct conflict that reads a portion of § 1001(c) out of the law—which means the prosecution is ignoring § 371's "place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quotations omitted). Its claim (at 16) that President Trump supposedly could be charged under § 1001 because § 1001(c)(1) permits charges for falsities in "a document required

---

[2] For similar reasons, such speech is not the equivalent of obstructing or interfering with a lawful government function. *See* Doc. 114, at 14-15; *see infra* Argument § I.B. In either case, President Trump's statements about the election cannot support the criminal charge in Count I.

by law, rule, or regulation to be submitted to the Congress" is wrong for the reasons discussed above, and also beside the point—it is logically immaterial to the interpretative question of whether § 371 applies to the alleged conduct.

In any event, the cited portion of § 1001(c) applies the statute's prohibition to "administrative matters, including … a document required by law, rule, or regulation to be submitted to the Congress." The prosecution does not explain why the counting of electoral votes is an "administrative matter" within the meaning of § 1001(c)(1). It is not. The "document required" proviso involves "administrative matters," which the text indicates are matters like "a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services." Thus, the "document required" proviso relates to a document that involves substantially similar matters as those listed there—a straightforward application of *noscitur a sociis*, just as the Supreme Court applied in *McDonnell*, *see* 579 U.S. at 568-69—and so does not encompass the Electoral College ballots or count. That is nothing like "a claim for payment." § 1001(c)(1).

**Statements to the Vice President:** The prosecution does not meaningfully[3] argue that it can premise Count I on President Trump's legal claims about the authority the Vice President had with respect to certification. It instead argues that the statements are actionable because they "were undergirded by specific factual lies" about the election. Doc. 139, at 13. That rehashes the prosecution's argument that claims about the election should be actionable—which is wrong for

---

[3] The prosecution has a throwaway parenthetical saying that *Neder v. United States*, 527 U.S. 1 (1999), "suggest[ed] otherwise." Doc. 139, at 13. Not so. The cited portion of *Neder*, while acknowledging that certain aspects of common-law fraud are "incompatible" with the federal mail, wire, and bank fraud statutes, held that "a materiality requirement" is consistent with the statutes. *Neder*, 527 U.S. at 24-25. The prosecution does not say why the common-law rule that legal statements are not actionable fraud is inconsistent with § 371.

the reasons discussed above. It also ignores that many of the allegations do, indeed, rest on pure legal claims. *See* Doc. 1, ¶¶ 88, 96, 99, 100, 102-04.

      **Organizing alternative electors and statements to them:** The prosecution's argument (Doc. 139 at 11-13) about the organization and submission of contingent electors and statements is most notable for what it misses: That the plan to submit alternate electors "was openly discussed … and widely reported … ." Doc. 114, at 11.

      An openly discussed, widely reported plan is the opposite of "deceit" or "trickery." Instead, it constitutes an "attempt[ ] to persuade," which is not criminal. *Id.* Since it cannot address that obvious point, the prosecution focuses on the picayune. For example, the prosecution writes a lot about the allegation that the electoral slates did not contain conditional language or were not consistent with the certification process under the relevant State law. *See* Doc. 139, at 11-12. But the lack of conditional language, or an attempt to follow State law as closely as possible, cannot—as a matter of law—change the undisputed fact that the publication about the so-called scheme made clear to *everyone* that the alternate electors were just that: alternates designed to provide a basis for an alternative certification based on the advocacy that the election should be certified differently. That is all the truer given that it is alleged that "*[u]nlike* those of the fraudulent electors, consistent with the ECA, the legitimate electors' signed certificates were annexed to the state executives' certificates of ascertainment … ." Doc. 1, ¶ 68 (emphasis added). So, far from "fraud on the face of the documents," Doc. 139, at 11, there was a clear difference distinguishing the two. That does not "recast[ ] the actual allegations … ." *Id.* It quotes directly from them, verbatim.

      Indeed, it is the prosecution that runs from its own allegations. It deflects from the differences between the two elector slates to talk about President Trump's claims about election fraud and irregularities, saying "[f]rom start to finish, false claims of election fraud provided the

rationale for the fraudulent electors, making the fraudulent electors a vehicle for those false claims." *See* Doc. 139, at 12. So, per the prosecution, the electors are a sideshow; what really gives rise to liability is President Trump's claims of election fraud and irregularities. But on the same page, the prosecution also says, "[i]t was *only* by presenting these fake ballots that the defendant could try to make it appear, falsely, that there was a bona fide dispute about which electors should be counted." *Id.* (emphasis added). That concedes the immateriality of every other theory of fraud. If the alternate electors were necessary to show a putatively false dispute, then the relevant trickery and deceit—for § 371 purposes—is the alternate electors, *i.e.*, a plan that was openly broadcast and discussed on national news media. Thus, as President Trump argues, his election claims are not fraud or obstruction but *advocacy*, and his legal claims about Vice President Pence's legal authority are matters of opinion. In all cases, the prosecution's inconsistent theories underscore that it does not have a viable § 371 claim.[4]

**B.     The prosecution does not grapple with the fact it alleges political advocacy, not obstruction.**

For similar reasons, President Trump's alleged speech and advocacy does not constitute a "means to interfere with or obstruct" a lawful government function under the most natural reading of § 371, *see Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924). *See* Doc. 114, at 14-15.

---

[4] So, too, for the prosecution's argument that President Trump or alleged "co-conspirators" made allegedly false claims about election fraud to the electors "to reach the government function that is ultimately the target of the fraud." Doc. 139, at 12-13 (quotations omitted). That reduces the prosecution's case solely to statements about election fraud and irregularities—and so allegations about organizing alternate electors fall out. The argument also fails on its own terms. The prosecution does not argue that the alternate electors relayed information to federal officials about election fraud—because it can't. *See* Doc. 114, at 13. Rather, the most the prosecution thinks the electors did was provide a way for "it [to] appear … that there was a bona fide dispute … ." Doc. 139, at 12. Again, that admits that the electors themselves did not communicate any fraudulent claims to federal officials, and really seeks to treat them "as 'the United States' for purposes of § 371." *Tanner v. United States*, 483 U.S. 107, 129 (1987). "This … argument must be rejected." *Id.*

The prosecution's one-paragraph argument (at 14) is another example of its failure to situate this case in the context of a nationwide, vigorously disputed presidential election; to grapple with the ramifications of effectively criminalizing speech to members of Congress on hot-topic issues; and to rebut the relevance of *McDonnell*.

> **C.      The prosecution's interpretation runs afoul of fundamental principles of statutory interpretation.**

The prosecution dismisses (Response, at 14) President Trump's invocation of well-established canons of interpretation as "disingenuous." On the contrary, the prosecution's statutory analysis is unpersuasive and ignores binding authority.

The prosecution claims that President Trump failed to "focus on any statutory term and attempt to explain why it is vague or ambiguous." Doc. 139, at 14. That is incorrect. President Trump focuses on a series of specific statutory terms and explains that, if the prosecution's meaning of those terms is adopted, they would be vague, ambiguous, overbroad, and likely unconstitutional. At base, the prosecution's flawed legal theory dangerously expands what constitutes a crime under § 371. *See* Doc. 114, at 3-15; *see also supra* Argument § I. A-B.

Thus, the clear-statement rules and other canons of interpretation clearly apply here. Moreover, the statutory context likewise calls for the application of canons of interpretation, including the clear-statement rules. "Whether a statutory term is unambiguous … does not turn solely on dictionary definitions of its component words." *Yates v. United States*, 574 U.S. 528, 537 (2015) (plurality opinion). "Rather, 'the plainness or ambiguity of statutory language is determined not only by reference to the language itself, but as well by the specific context in which that language is used, and the broader context of the statute as a whole.' " *Id.* (alterations omitted) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). Context includes clear-statement rules. They represent "background principles"—"certain unexpressed presumptions"—that "[p]art

of a fair reading of statutory text" considers. *Bond* , 572 U.S. at 857. Where, as here, those statements are implicated, "something more than a merely plausible textual basis for the" reading "is necessary." *West Virginia*, 142 S. Ct. at 2609.

Thus, the need to apply constitutional avoidance. *See* Doc. 114, at 15-17. To reiterate, the prosecution's claim is that it can investigate the conduct and mental state of *every individual* who does not make an immediately verifiable statement to a member of Congress to determine if they engaged in conspiracy to defraud the United States. *See supra* Argument §I.A. That is because, it says, *every* statement anyone makes to a member of Congress that is not immediately verifiable is potentially an attempt to defraud the United States. *Id.* The First Amendment issues with this novel theory of prosecution are obvious and alarming. To interpret a federal criminal statute to make everyone who speaks to a member of Congress on a public issue a potential target of a federal investigation into their conduct or mental state has a clear, coercive effect on speech, even if no prosecution results in some cases. *See*, *e.g.*, *Dombrowski v. Pfister*, 380 U.S. 479, 487-89 (1965) (outlining "the chilling effect on free expression of prosecutions initiated and threatened"); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230-31 (7th Cir. 2015) (noting threats from public officials can violate the First Amendment). A visit from the FBI about a Twitter or Facebook post about election fraud or about a call to a U.S. Senator about whether he votes to certify the election will inevitably "stop[ ] the circulation" of such speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963). Moreover, it will discourage association with organizations that make such speech, since membership may be sufficient to establish liability—which is yet another First Amendment issue. *See*, *e.g.*, *NAACP v. Button*, 371 U.S. 415, 430-31 (1963) (discussing the cases establishing that the First Amendment "protect[s] certain forms of orderly group activity"). The court "cannot turn a blind eye to the First Amendment implications" of such a power—and, by extension, the

prosecution's interpretation of § 371 which would give the federal government that power. *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 (3d Cir. 2001).

And that is before addressing the vagueness issues with the prosecution's interpretation. *See* Doc. 114, at 17-18. There are, to be sure, other elements of § 371 liability—but they do not fix the vagueness issue inherent in criminalizing public advocacy based on subjective metrics of veracity. *Contra* Doc. 139, at 14-15. Consider, for example, a group of voters who lobby members of Congress to vote a certain way. They are a group of people who direct their acts at the United States to affect congressional voting, which is undoubtedly an official act under the government's reading of § 371. On the prosecution's interpretation, any such lobbying would be fraught with criminal exposure. Pushing a controversial or minority position, for example, could be construed as a "falsehood"—or it might not. A "good faith" standard, which is what the prosecution seems to advocate (though it does not say whether the standard is subjective or objective), *see* Doc. 139, at 15, is meaningless in this context because it "vests virtually complete discretion in the hands of the police to determine" whether any particular statement is made in good faith. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). It opens the door to the same intrusive investigations and possible prosecutions and to the same overbroad coverage that the prosecution, by attempting to limit the reach of the law's scope, implicitly concedes is problematic.

All that proves is that the prosecution *must* read § 371 to be a largely indeterminate statute that covers, or at least likely covers, a broad area of core First Amendment speech in order to justify Count I. *See* Doc. 114, at 15-17. Exempting such speech—by concluding that it does not constitute deceit and does not constitute "obstructing" or "interfering with" a government function—fixes those issues. Moreover, it is consistent with the law's text. Nothing in § 371 compels criminalizing speech on a major political issue directed at democratically elected bodies

11

like state legislatures and Congress. Nor was that likely Congress's intent. The law protects the federal government, "'which exists for the purpose of administering itself in the interests of the public.'" *McNally v. United States*, 483 U.S. 350, 358 n.8 (1987) (quoting *Curley v. United States*, 130 F. 1, 8 (1st Cir. 1904)), *overruled by statute*. Necessary for government administration— indeed, an assumption of the "compact underlying representative government"—is communication between public officials and constituents. *McDonnell*, 579 U.S. at 575. To read § 371 to reach President Trump's election speech necessarily reads it to reach those communications, and so undermines, instead of protects, a core function of the federal government. The better path is to "construe it narrowly." *United States v. Tuohey*, 867 F.2d 534, 537 (9th Cir. 1989).

The novelty of the prosecution's argument also cuts against it. Section 371 has been on the books in basically the same form since at least 1867. *See United States v. Gradwell*, 243 U.S. 476, 481 (1917). Since that time, there have been numerous Electoral College contests—including the incredibly turbulent 1876 contest, *see*, *e.g.*, Doc. 113, at 27-30—but, to President Trump's knowledge, no § 371 charges related to those contests. The prosecution certainly supplies none. To the contrary, the Supreme Court held in *Gradwell* that the law does not apply "to the conduct of elections." 243 U.S. at 481. *Gradwell*, to be sure, involved congressional elections. *See id.* at 480. But its reasoning that "it would be a strained and unreasonable construction to apply to … elections" the federal conspiracy statute, "originally a law for the protection of the revenue," *id.* at 485, applies precisely to presidential elections as well.

*Gradwell* thus controls and is fatal to Count I. But even if it did not, the fact the Supreme Court has shown a historical hesitancy to extend § 371 to the electoral context—on top of the numerous cases in which there has been an Electoral College dispute and no § 371 charges, or even

a suggestion that they should be brought—strongly militates against the prosecution's novel extension of the law to allegations in the indictment. The historical practice of permitting claims of election fraud and irregularities to be heard and then settled by state legislatures or Congress has "liquidate[d] and settle[d] the meaning of" § 371 in this context. *Chiafolo v. Washington*, 140 S. Ct. 2316, 2326 (2020) (quotations omitted). It does not apply.

## II.     The Prosecution Has Not Shown that Counts II and III Allege Violations of 18 U.S.C. §§ 1512(k) or (c)(2).

### A.     The indictment fails to allege that President Trump had the requisite *actus reus*.

The prosecution agrees that "the legitimate efforts of lobbyists and protestors to influence policymaking or to express political views would not violate Section 1512(c)(2)." Doc. 139, at 20 (quoting *United States v. Robertson*, --- F.4th ---, 2023 WL 8010264, at *12 (D.C. Cir. Oct. 20, 2023)) (internal citation and quotation marks omitted). The prosecution also acknowledges that it did not charge President Trump with improperly attempting to influence an official proceeding. *Id.* at 20 n.6. Yet the prosecution relies entirely on allegations of obstructing and impeding an official proceeding that would criminalize ordinary—and lawful—lobbying and political advocacy. The prosecution relies exclusively on *Robertson* to dismiss (at 19-20) its infringement on lobbying and political advocacy. But *Robertson* does not apply. That case involved only the "corrupt" element of § 1512(c)(2), and then only as to the sufficiency of the evidence. *Robertson*, 2023 WL 8010264, at *4, *8. It did not address all other elements of the charge, including whether the *Robertson* defendant attempted to or did obstruct or impede an official proceeding. *Id.* at *4. *Robertson* thus does not govern President Trump's challenges to the other required elements of §§ 1512(c)(2) and (k).

The prosecution does not dispute the "noncontroversial" dictionary definitions for "obstruct" or "impede." Doc. 139, at 17. But to obstruct or impede by blocking or hindering

"suggest[s] an object—the [defendant] must hinder a particular person or thing." *Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018). The prosecution relies heavily (at 17) on *Fischer*, but that case considered whether § 1512(c)(2) applied to "assaultive conduct, committed in furtherance of an attempt to stop Congress from performing a constitutionally required duty." *United States v. Fischer*, 64 F.4th 329, 332 (D.C. Cir. 2023). Those facts are not alleged here. The indictment fails to allege any potentially criminal actions by President Trump that obstructed or impeded an official proceeding, and the prosecution's strained attempts to do so raise the same fair notice issues that render the other counts defective. An examination of the prosecution's allegations shows that they fail as a matter of law.

**Alternative electors**. The prosecution first points (at 18) to its alternative-electors theory. But as explained in President Trump's motion to dismiss on the basis of presidential immunity, allegations that President Trump directed or approved other individuals to organize contingent slates of electors in disputed States fall within the President's official responsibilities. Doc. 74, at 42-45. In addition, alternative slates of electors were contemplated under the Electoral Count Act in effect during the 2020 election. As Justice Stevens explained in *Bush v. Gore*, the Electoral Count Act "merely provide[s] rules of decision for Congress to follow when selecting among conflicting slates of electors." *Bush*, 531 U.S. at 127 (Stevens, J., dissenting). This is consistent with multiple historic examples in contested presidential elections. Doc. 114, at 30-31. Indeed, Justice Stevens even cited the multiple slates of electors that Hawaii submitted to Congress following the 1960 election. *Bush*, 531 U.S. at 127 (Stevens, J., dissenting).

The legality of alternative electors is further confirmed by subsequent congressional action. According to a fact sheet by a co-sponsor of the legislation, Congress has since revised the Electoral Count Act to "replace ambiguous provisions of the 19th century law," including

removing "*the potential for multiple state officials to send Congress competing slates*." Senator Susan Collins, *Electoral Count Reform Act of 2022*, at https://www.collins.senate.gov/imo/media/doc/one-pager_on_electoral_count_reform_act.pdf (emphasis added). "[W]hen Congress alters the words of a statute, it must intend to change the statute's meaning." *United States v. Wilson*, 503 U.S. 329, 336 (1992) (citation omitted).

Thus, as a matter of law, the indictment's allegations relating to alternative electors fail to allege that President Trump obstructed or impeded an official proceeding, or attempted to do so, in violation of §§ 1512(k) or (c)(2).

**State official contacts**. The prosecution next argues (at 18) that President Trump's communications with state officials were unlawful. But as explained in President Trump's motion to dismiss on the basis of presidential immunity, allegations that President Trump communicated with state officials about the administration of a federal election in their State and urged them to exercise their official duties constitutes another core exercise of Presidential responsibility. Doc. 74, at 35-39. The Department of Justice even recently acknowledged that communicating with state officials about their exercise of official duties with respect to a federal election falls within the scope of the President's official duties: "Such speech is an important traditional function of the Presidency, and it would offend the constitutional separation-of-powers principles recognized in *Nixon* [*v. Fitzgerald*] for courts to superintend the President's speech to his constituents and *to other officeholders* … merely because it concerns the conduct of a coordinate Branch *or an entity outside the federal government*." Doc. 74-1, Br. for U.S. as Amicus Curiae *in Blassingame v. Trump*, Nos. 22-5069, 22-7030, 22-7031, at 12 (D.C. Cir. filed March 2, 2023) (citing *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 665 (D.C. Cir. 2006)) (emphases added).

Far from obstructing a "constitutionally scripted" process, the law and history provide for lobbying and advocacy surrounding the electoral certification process. This lobbying and advocacy may be directed at state officials. In a post-election challenge, the Supreme Court ruled that a state legislature could "take back the power to appoint electors." *Bush*, 531 U.S. at 104. Indeed, when it comes to electors, "there is no doubt of the right of the legislature to resume the power at any time, for it can neither be taken away nor abdicated." *McPherson v. Blacker*, 146 U.S. 1, 35 (1892) (quoting S. Rep. No. 395, 43d Cong., 1st Sess., 9 (1874)).

The prosecution specifically takes issue with allegedly false statements in these conversations with state officials. Doc. 139, at 18 ("made knowingly false claims," "in a phone call 'lied to,'" "unsupported claim of election fraud"). While President Trump denies those allegations, they fail as a matter of law even if they are accepted as true. Numerous courts have struck down laws that prohibit false political statements. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 476 (6th Cir. 2016) (citing cases). As the Washington Supreme Court has said, the claim that "the State possesses an independent right to determine truth and falsity in political debate" is "a proposition fundamentally at odds with the principles embodied in the First Amendment." *Rickert v. State, Pub. Disclosure Comm'n*, 168 P.3d 826, 829 (Wash. 2007) (quotation omitted). "[E]very person must be his own watchman for truth, because the forefathers did not trust any government to separate the truth from the false for us." *Id.* (internal quotation omitted).[5] Thus, as a matter of law, the indictment's allegations relating to contacts with state

---

[5] *See also United States v. Alvarez*, 567 U.S. 709, 718 (2012) (noting there is no "general exception to the First Amendment for false statements"); Domenico Montanaro, *The truth in political advertising: 'You're allowed to lie,'* NPR (Mar. 17, 2022), https://www.npr.org/2022/03/17/1087047638/the-truth-in-political-advertising-youre-allowed-to-lie; Craig Kopp, *Why can candidates lie? Because the Constitution says they can*, THE LEGAL EXAMINER (Aug. 3, 2020), https://www.legalexaminer.com/politics/why-can-candidates-lie-because-the-constitution-says-they-can/.

officials fail to allege that President Trump obstructed or impeded an official proceeding in violation of §§ 1512(k) or (c)(2).

**January 6**. The prosecution next repeats its false claim that President Trump "directed a large crowd of supporters, whom he knew to be 'angry' based on his election fraud lies, to go to the Capitol and obstruct the proceeding." Doc. 139, at 19. But the indictment does not charge President Trump with any responsibility for the events of January 6, and rightly so. As set forth in detail in Doc. 156, President Trump encouraged the crowd marching to the Capitol to "peacefully and patriotically make your voices heard" and to "cheer on our brave senators and congressmen and women."[6] President Trump made clear that he expected to watch the electoral certification proceedings take place as planned that day. *Id.* And President Trump repeatedly denounced destruction of monuments and other symbols of American democracy, and he reminded the crowd that criminal penalties he signed into law for such actions. *Id.*

As the indictment itself alleges, the crowd gathered at the Capitol *before* President Trump finished speaking. Doc. 1, ¶ 107. The crowd already at the Capitol "broke through barriers cordoning off the Capitol grounds and advanced on the building" while President Trump was speaking. *See id.* The indictment does not mention that the 1,200 people who entered the Capitol was less than 1% the size of the crowd gathered to listen to President Trump, and that at least 99% of the crowd gathered to listen to President Trump did not enter the Capitol. William M. Arkin, *Exclusive: Classified Documents Reveal the Number of January 6 Protestors*, NEWSWEEK (Dec.

---

[6] *Read Trump's Jan. 6 Speech, A Key Part of Impeachment Trial*, NPR (Feb. 10, 2021), https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

23, 2021), https://www.newsweek.com/exclusive-classified-documents-reveal-number-january-6-protestors-1661296.[7]

Thus, as a matter of law, the indictment's allegations relating to January 6 fail to allege that President Trump obstructed or impeded an official proceeding in violation of §§ 1512(k) or (c)(2).

**Vice President Pence**. The prosecution finally raises allegations relating to lobbying of Vice President Pence. Doc. 139, at 19. As explained in President Trump's motion to dismiss on the basis of presidential immunity, allegations that President Trump directly communicated with the Vice President in his legislative role as President of the Senate were central to his official responsibilities. Doc. 74, at 40. This is consistent with multiple historic examples in contested presidential elections. Doc. 114, at 30-31; *see also* Doc. 74, at 42. Significantly, the prosecution does not address the argument that lobbying Congress to act in a certain way presupposes that Congress *will* conduct an official proceeding, and it seeks to persuade Congress to act in a certain way during that official proceeding. Doc. 114, at 23. Such lobbying is *participation* in the official process, not obstruction of it.

The legality of communicating with the Vice President about the Electoral Count Act is further confirmed by subsequent congressional action. According to a fact sheet by a co-sponsor of the legislation, Congress has since revised the Electoral Count Act to "replace ambiguous provisions of the 19th century law," including "[a]ffirmatively stat[ing] that the constitutional role of the Vice President, as the president officer of the joint meeting of Congress, is solely ministerial and that he or she does not have any power to solely determine, accept, reject, or otherwise adjudicate disputes over electors." Sen. Susan Collins, *Electoral Count Reform Act of 2022*, *at*

---

[7] *See also* William M. Arkin, *Donald Trump Didn't Run the January 6 Riot. So Why Did It Happen?*, NEWSWEEK (Jan. 6, 2022), https://www.newsweek.com/donald-trump-didnt-run-january-6-riot-so-why-did-it-happen-1661335.

https://www.collins.senate.gov/imo/media/doc/one-pager_on_electoral_count_reform_act.pdf.

This entails the recognition that such matters were not specified before, or at least not clearly so.

"When Congress acts to amend a statute, we presume it intends its amendment to have real and

substantial effect." *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995) (citations omitted).

Thus, as a matter of law, the indictment's allegations relating to Vice President Pence fail

to allege that President Trump obstructed or impeded an official proceeding in violation of

§§ 1512(k) or (c)(2).

**B.     The indictment fails to allege that President Trump had the requisite *mens rea*.**

The prosecution raises only a meager, three-paragraph defense of the indictment's

allegations about President Trump's *mens rea*. Doc. 139, at 21-22. In essence, the prosecution's

argument is that it has not attempted to criminalize lawful conduct because parroting the statute's

use of "corruptly" is sufficient until trial. *Id.*

Well-established precedent repudiates this approach. "It is an elementary principle of

criminal pleading, that where the definition of an offence, whether it be at common law or by

statute, includes generic terms, it is not sufficient that the indictment shall charge the offence in

the same generic terms as in the definition; but it must state the species—it must descend to

particulars." *United States v. Cruikshank*, 92 U.S. 542, 558 (1875) (internal quotation and citation

omitted). "[F]acts are to be stated, not conclusions of law alone. A crime is made up of acts and

intent; and these must be set forth in the indictment, with reasonable particularity of time, place,

and circumstances." *Id.* "Thus, an indictment that mirrors the exact language of a criminal statute

may nevertheless be dismissed as constitutionally deficient if it is not framed to apprise the

defendant 'with reasonable certainty[ ] of the nature of the accusation against him[.]'" *United*

*States v. Hillie*, 227 F. Supp. 3d 57, 72 (D.D.C. 2017) (quoting *United States v. Nance*, 533 F.2d

699, 701 (D.C. Cir. 1976)). Even the *Williamson* case repeatedly cited by the prosecution

acknowledges this. *United States v. Williamson*, 903 F.3d 124, 131 (D.C. Cir. 2018) ("It is true that, while parroting the statutory language is 'often sufficient,' that is not invariably so.").

Here, "corruptly" is "the very core of criminality" under the statute and "central to every prosecution under the statute." *Russell v. United States*, 369 U.S. 749, 764 (1962). This is evident by the opinions in *Fischer* and *Robertson*, and by the prosecution's numerous arguments that an appropriate interpretation of "corruptly" will protect against unconstitutional overreach. Doc. 139, at 19, 21-22. "Where guilt depends so crucially upon such a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute." *Russell*, 369 U.S. at 764. Under *Cruikshank* and *Russell*, the interpretation of "corruptly" is directly relevant to President Trump's motion to dismiss and renders the indictment deficient because it simply repeats the language of the statute.

Despite the central importance of "corruptly," the prosecution seeks to hide until trial how President Trump supposedly proceeded on a corrupt means—using independently unlawful, felonious means—or a corrupt purpose. Doc. 139, at 22. The prosecution baldly asserts that its prosecution will "ensure that [Section] 1512(c)(2) does not penalize innocent efforts to obstruct an official proceeding, including by engaging in constitutionally protected expression." *Id.* (quoting *Robertson*, 2023 WL 6932346, at *17). But the prosecution cannot simply say so. They must *plead* so in the indictment. By failing to plead any facts to allege that President Trump acted "corruptly" or demonstrate that it does not capture innocent, lawful political activity, the indictment fails as a matter of law and must be dismissed.

## III.   The Prosecution Has Not Shown that Count IV States a Violation of 18 U.S.C. § 241.

### A.   President Trump lacked fair notice.

The prosecution fails to show that President Trump had fair notice that contesting the Electoral College count in the way alleged in the indictment violated 18 U.S.C. § 241. As discussed

in his Reply in Support of Motion to Dismiss on Constitutional Grounds, the prosecution's admission that this is a historic prosecution (that it "stands alone," Doc. 139, at 1) fatally undermines its fair notice argument. Affirming that is the prosecution's attempt to shirk its duty to prove that the conduct alleged in the violation gave rise to the criminal liability alleged.

It is no different for the prosecution's defense of what it says is the "more targeted attack on Section 241." Doc. 139, at 37. No one disputes that the due process requirement of "fair warning" in the context of § 241 requires that the constitutional right the defendant is alleged to have conspired to deprive is "clearly established" as that phrase is used in the qualified immunity context. *United States v. Lanier*, 520 U.S. 259, 270-71 (1997); *see also United States v. Mackey*, 652 F. Supp. 3d 309, 331 (E.D.N.Y. 2023). That, the prosecution incorrectly says, requires only that the defendant have "fair notice that the constitutional right exists." Doc. 139, at 38. He does not need to know "that the precise conduct [at issue] he pursues violates that right." *Id.* The prosecution thus bases § 241 liability on whether there was a constitutional deprivation and not whether "existing law … placed the constitutionality of the [defendant's] conduct beyond debate." *Contra District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotation marks omitted).

That mode of analysis is familiar to failed § 1983 plaintiffs, as it is one the Supreme Court has "repeatedly told courts not to" engage in. *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam). That is because "in a sense any action that violates" a constitutional provision "violates a clearly established right." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Thus, the prosecution's test would turn *Lanier*'s fair warning rule "into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* Instead, the test requires analogizing the allegedly criminal conduct to past violations. Only then are "'the contours of the right violated … sufficiently clear [so] that a reasonable official would understand that *what he is*

*doing* violates that right.' " *Lanier*, 520 U.S. at 270 (emphasis added) (alterations omitted) (quoting *Anderson*, 483 U.S. at 640)). So the prosecution cannot say that "Section 241 prohibits conspiracies to injure" the constitutional right to vote and be done. *Contra* Doc. 138, at 38.[8]

Yet that is what it does. The prosecution points to no case involving the Electoral College count and its key players: state legislatures and Congress. Historically, those were the entities to whom claims that certain electoral votes should not be counted were directed—all without a whiff of criminality or unconstitutionality. *See*, *e.g.*, Doc. 113, at 27-30. That proves President Trump's argument.

The prosecution's error also reflects its persistent failure to recognize that "[w]e deal here not with an ordinary election, but with an election for the President of the United States." *Bush*, 531 U.S. at 112 (Rehnquist, C.J., concurring). "The right to vote in presidential elections under Article II inheres not in citizens but in states." *Att'y Gen. of Territory of Guam v. United States*, 738 F.2d 1017, 1019 (9th Cir. 1984). So "the state legislature's power to select the manner for appointing electors is plenary." *Bush*, 531 U.S. at 104. While States have chosen elections as that manner, they "can take back the power," *id.*, "at any time," *McPherson*, 146 U.S. at 35 (quotations omitted). And Congress's—including here the Vice President, *see* U.S. Const. Art. I, § 3, cl.4— decision to count electoral votes or not is thus an acceptance or rejection of "the expression of the voice of the state." *McPherson*, 146 U.S. at 26. Congress can exercise that power to choose alternative slates of electors—as it did in 1876, *see*, *e.g.*, Doc. 114, at 30, and as implied by the existence of a safe harbor provision in the Electoral Count Act, *see* 3 U.S.C. § 5. A State's exercise

---

[8] Tracking the clearly established requirement in the qualified immunity context, it is the prosecution's burden to show that the conduct underlying the indictment would deprive voters of their constitutional right to vote. *See*, *e.g.*, *Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015).

of its power to select electors or Congress's power to reject a State's electors is not (or, at least, is not obviously—which is what matters under the relevant legal standard) an Equal Protection violation of the voter's right to vote. *See McPherson*, 146 U.S. at 39 (the Fourteenth Amendment did "not [] radically change the whole theory of the relations of the state and federal governments to each other, and of both governments to the people.") (citation omitted); *see also* Doc. 114, at 29. Put another way, urging States or Congress to use their power to select or to count electors does not affect the "fundamental" right to vote because it does not arbitrarily "value one person's vote over that of another," *Bush*, 531 U.S. at 104-05, or restrict the exercise of that right; rather, it encourages the States and Congress to exercise their constitutional prerogatives a certain way. It follows that President Trump lacked fair notice that attempting to influence those entities to exercise their power a certain way could possibly violate the Constitution.[9]

That is especially so in light of the fact the Constitution "gives the States far-reaching authority over presidential electors." *Chiafolo*, 140 S.Ct. at 2324. The Constitution thus creates, as to electors, a particular "relation between federal and state" responsibilities that requires a "clear statement" from Congress before a federal law can be read to alter it. *United States v. Bass*, 404 U.S. 336, 349 (1971). That, to be sure, does not minimize the "uniquely important national interest" in presidential elections, *Anderson v. Celebrezze*, 460 U.S. 780, 794-95 (1983), or the President's role in guarding that interest, *see* Doc. 74, at 35-39. But it does mean that a generally worded federal criminal law does not reach conduct pertaining solely to the selection and counting

---

[9] That President Trump's actions involved entities who constitutionally have power to pick alternative electors, and were addressed to guarding against election fraud, underscores the fact he was acting within the outer perimeter of his constitutional duty and is entitled to immunity. *See* Doc. 74, at 27-45. He respected the States' role in the process, but also worked to vindicate the "uniquely important national interest" in presidential elections. *Anderson v. Celebrezze*, 460 U.S. 780, 794-95 (1983).

of electors. To do so risks displacing "the public policy" of the States vis-à-vis their electors absent a clear statement that Congress intended that result. *Bond*, 572 U.S. at 865 (quotations omitted). That strongly suggests § 241 has no application in the context of electoral count disputes. But at a very minimum, it highlights the lack of notice that President Trump had that his conduct was potentially criminal: Ordinary principles of statutory interpretation indicate that § 241 does not reach this conduct.

It thus makes sense that the cases the prosecution cites (at 39) are factually and legally distinct. Factually, those cases involve attempts to alter ballots or the popular vote count—actions that are different in kind and not alleged here. Legally, those cases involved congressional elections and so did not present the Equal Protection issue in the context of a presidential election.[10] Indeed, the constitutional right to vote in those cases rested at least partly, if not solely, on the constitutional provisions for electing members of Congress. *See United States v. Classic*, 313 U.S. 299, 323, 329 (1941). They are thus limited to congressional elections—and thus do not provide "fair notice to the defendant that his conduct," which relates to a presidential election, "falls squarely within the heartland of" § 241. *Contra* Doc. 139, at 39.

The prosecution thus argues for "a new application of an old law . . . ." *Gradwell*, 243 U.S. at 486. Indeed, it admits as much. That "the defendant stands alone in American history for his alleged crimes" means this prosecution does as well. Doc. 139, at 1. But all that means is that there was no precedent warning President Trump that his conduct might be criminal—and so constitutional fair warning is lacking. Count IV should be dismissed.

---

[10] While presidential electors were on the ballot in *United States v. Pleva*, 66 F.2d 529 (2d Cir. 1933), so too were members of Congress. *Id.* at 530. The court did not parse the two out, and consistent with the argument here, the convictions there could hang solely on the presence of congressional representatives on the ballot.

**B.     The prosecution fails to undermine President Trump's other arguments.**

Because President Trump sought to convince state legislatures and Congress to choose electors, he did not violate anyone's right to vote or have his vote counted, and so the indictment fails to allege an agreement to commit an unlawful act, *see* Doc. 114, at 27-28; *contra* Doc. 139, at 23, or a specific intent to violate a constitutional right, *see* Doc. 114, at 32; *contra* Doc. 139, at 23-24. The prosecution misses the point when it says (at 25) that a "Section 241 charge of conspiring to interfere in the free exercise of that right requires no proof of government involvement." That is not President Trump's argument. His argument is that the prosecution must show he "acted to accomplish a governmental purpose." Doc. 114, at 32. Government involvement is not the same thing as governmental purpose—and the prosecution does not say why the two are equal.

Proving the strength of President Trump's argument is the prosecution's waffling. It says (at 25 n.10) President Trump "as president, was indisputably *at times* a government actor, even if he was also acting *at times* in his capacity as a candidate." Further specifics (*i.e.*, at what times he was which) are absent because the prosecution recognizes the box it is in. President Trump receives immunity for his presidential acts and his private acts do not violate the Constitution. *See* Doc. 114, at 33. The prosecution's resort to a "Schrodinger's president" argument concedes that Count IV is fatally flawed and cannot be rescued by arguing it involves factual issues to be determined at trial. *Contra* Doc. 139, at 23, 24.

## CONCLUSION

The indictment should be dismissed with prejudice.

Dated: November 22, 2023                  Respectfully submitted,

                                          */s/ John F. Lauro*
Todd Blanche, Esq. (PHV)                  John F. Lauro, Esq.
toddblanche@blanchelaw.com                D.C. Bar No. 392830
Emil Bove, Esq. (PHV)                     jlauro@laurosinger.com
Emil.Bove@blanchelaw.com                  Gregory M. Singer, Esq. (PHV)
BLANCHE LAW                               gsinger@laurosinger.com
99 Wall St., Suite 4460                   Filzah I. Pavalon, Esq. (PHV)
New York, NY 10005                        fpavalon@laurosinger.com
(212) 716-1250                            LAURO & SINGER
                                          400 N. Tampa St., 15th Floor
                                          Tampa, FL 33602
                                          (813) 222-8990

                                          *Counsel for President Trump*