# EXHIBIT I

Document re: Section 702 2021 Certification

Authorized for Public Release by ODNI

United States Foreign
Intelligence Surveillance Court

~~TOP SECRET//SI//NOFORN/FISA~~

APR 2 1 2022

UNITED STATES

Maura Peterson, Clerk of Court

FOREIGN INTELLIGENCE SURVEILLANCE COURT

WASHINGTON, D.C.



**MEMORANDUM OPINION AND ORDER**

The Foreign Intelligence Surveillance Court (FISC) today addresses the "Government's

Ex Parte Submission of Reauthorization Certifications and Related Procedures, Ex Parte

Submission of Amended Certifications, and Request for an Order Approving Such Certifications

and Amended Certifications," filed on October 18, 2021 ("October 18, 2021 Submission") and

the "Government's Ex Parte Submission of Amendments to DNI/AG 702(h) Certifications and

Related Procedures, Ex Parte Submission of Amendments to DNI/AG 702(h) and DNI/AG

~~TOP SECRET//SI//NOFORN/FISA~~

TOP SECRET//SI//NOFORN/FISA

702(g) Certifications, and Request for an Order Approving Such Amended Certifications," filed

on March 18, 2022 ("March 18, 2022 Submission"). (Collectively, the October 18, 2021 and

March 18, 2022 Submissions will be referred to herein as the "2021 Certification Submissions.")

The October 18, 2021 Submission, as amended by the March 18, 2022 Submission, is subject to

review under Section 702 of the Foreign Intelligence Surveillance Act (FISA) as amended,

codified at 50 U.S.C. § 1881a. The government's request for approval of the amended

certifications and related procedures is *granted* for the reasons stated in this Memorandum

Opinion and Order, subject to certain reporting and other requirements set forth at the end of this

document.

In addition to seeking authorization to continue forms of acquisition currently being

conducted under Section 702, the 2021 Certification Submission includes a new proposal for the

The Court first considers

issues presented by forms of acquisition currently being conducted under Section 702, and then

addresses

Specifically, Part I of this Opinion summarizes the government's submissions and the

procedural history of the Court's consideration of them. In Part II, the Court finds that the

certifications before it contain the elements required by Section 702(h). Part III addresses the

proposed targeting procedures and Part IV addresses the proposed minimization and querying

TOP SECRET//SI//NOFORN/FISA                                          Page 2

Authorized for Public Release by ODNI

TOP SECRET//SI//NOFORN/FISA

procedures. The Court finds that those procedures, as written, satisfy the requirements of the

statute. Notably, Part IV.D examines deficiencies in the querying practices of the Federal Bureau

of Investigation (FBI) and the government's responses to them, and concludes that the FBI's

querying and minimization procedures, as written and as likely to be implemented, satisfy

statutory requirements.

    In Part V, the Court evaluates the proposed procedures under the requirements of the

Fourth Amendment and finds them to be consistent with those requirements, as written and in

relation to current forms of Section 702 acquisition. The Court also finds that the FBI's querying

and minimization procedures are likely to be implemented in a manner consistent with the Fourth

Amendment. Part VI examines issues regarding implementation of, and compliance with,

Section 702 procedures (other than FBI querying issues previously addressed) and concludes that

the overall state of compliance and implementation permits a finding that the procedures, as they

are expected to be implemented, comport with statutory and Fourth Amendment requirements.

In Part VII, the Court evaluates ████████████████████████████████ and the

certification and targeting and minimization procedures pertaining to that proposal. The Court

finds that applicable statutory and Fourth Amendment requirements are met. Finally, in Part

VIII, the Court summarizes its disposition and imposes certain reporting and other requirements.

TOP SECRET//SI//NOFORN/FISA

Page 3

Authorized for Public Release by ODNI

TOP SECRET//SI//NOFORN//FISA

## I. THE GOVERNMENT'S SUBMISSIONS AND PROCEDURAL HISTORY

### A. The 2021 Certifications and 2022 Amendments

The October 18, 2021 Submission included ███ certifications executed by the Attorney

General (AG)[1] and the Director of National Intelligence (DNI) pursuant to Section 702: █████████

██████████████████████████████████████████

██████████████████████████████████████████

Each of those certifications (collectively referred to as "the 2021 Certifications") was

accompanied by:

(1) Supporting affidavits of the Director of the NSA, the Director of the FBI, the Director of the Central Intelligence Agency (CIA), and the Director of the National Counterterrorism Center (NCTC);

(2) Two sets of targeting procedures, which govern NSA and the FBI, respectively. The targeting procedures for NSA appear as Exhibit A to each certification, and those for the FBI appear as Exhibit C. The targeting procedures for each certification are identical;

(3) Four sets of minimization procedures, which govern NSA, the FBI, the CIA, and NCTC, respectively. The minimization procedures for NSA appear as Exhibit B to each certification, those for the FBI appear as Exhibit D, those for the CIA appear as Exhibit E, and those for NCTC appear as Exhibit G. (Exhibit F ██████████████ ████████████████ identifies the individuals or entities targeted under those certifications,████████████████████████████████████) The minimization procedures for each certification are identical; and

(4) Four sets of querying procedures, which govern NSA, the FBI, the CIA, and NCTC, respectively. The querying procedures for NSA appear as Exhibit H to each certification,

_____

[1] FISA defines "Attorney General" to include "the Attorney General of the United States (or Acting Attorney General), the Deputy Attorney General, or, upon the designation of the Attorney General, . . . the Assistant Attorney General for National Security." 50 U.S.C. § 1801(g).

TOP SECRET//SI//NOFORN//FISA

Authorized for Public Release on: [DATE]

Authorized for Public Release by ODNI

TOP SECRET//SI//NOFORN//FISA

those for the FBI appear as Exhibit I, those for the CIA appear as Exhibit J, and those for NCTC appear as Exhibit K. The querying procedures for each certification are identical.

The October 18, 2021 Submission also included an explanatory memorandum prepared by the Department of Justice ("October 18, 2021 Memorandum").

The October 18, 2021 Submission presented three particularly significant sets of issues. First were those presented ████████████████ In March 2021, the government had submitted ████████████ in the form of draft (or "read copy") proposed amendments to predecessor certifications ("the 2020 Certifications"). *See In re DNI/AG 702(h) Certification* ████████████ Amendment to DNI/AG 702 Certification ████ (read copy filed Mar. 30, 2021); Government's Ex Parte Submission of Amendment to DNI/AG 702(h) Certification and Related Procedures, and Request for an Order Approving Such Amended Certification (read copy filed Mar. 30, 2021) ("March 30, 2021 Memorandum"). That same day, the Court, "find[ing] that this case presents a novel or significant interpretation of law" within the meaning of 50 U.S.C. § 1803(i)(2)(A), appointed amicus curiae Laura K. Donohue, Esq. to aid in the Court's consideration ████████ *In re DNI/AG 702(h) Certification* ████████ Order Appointing Amicus Curiae (Mar. 30, 2021).

The amicus and the government timely filed their respective briefs on May 18 (opening amicus brief), June 1 (government's response brief), and June 16, 2021 (amicus reply brief). But before the Court was able to act on the proposed amendments, the government submitted the 2021 Certifications on October 18, 2021. The government included ████████ changes to NSA's targeting and minimization procedures in the October 18, 2021 Submission and

Authorized for Public Release on: [DATE]

TOP SECRET//SI//NOFORN/FISA

ꞏ incorporated by reference its March 30, 2021 Memorandum and June 1, 2021 brief regarding █████

████████████

On November 23, 2021, the Court re-appointed amicus Laura Donohue for further

briefing of the issues presented by ████████████ the context of these renewal

certifications and set out additional issues for briefing.[2]  The Court received further briefing from

the government and amicus on December 3, 2021, and December 13, 2021, respectively.  In

response to follow-up questions and concerns expressed by the Court, the government submitted

proposed revised procedures on February 2, 2022, including a draft affidavit from an NSA

official that described steps that NSA would take under its targeting procedures before

████████████ Government's Ex Parte Submission of Amendments to

DNI/AG 702(h) Certifications and Related Procedures, Ex Parte Submission of Amendments to

DNI/AG 702(h) and DNI/AG 702(g) Certifications, and Request for an Order Approving Such

Amended Certifications; Supplemental Description of Pre-Targeting Determinations, Declaration

of ████████ Proposed NSA Section 702 Targeting Procedures; and Proposed NSA

Section 702 Minimization Procedures (Feb. 2, 2022).  On February 18, at the Court's invitation,

the amicus filed a written assessment of the materials submitted by the government on February

2, 2022.  Amicus Curiae Written Assessment of Government's Feb. 2, 2022 Supplemental

Materials (Feb. 18, 2022) ("Amicus Assessment").

_____

[2]  By order dated December 8, 2021, the Court authorized the amicus to consult with Dr.
Wayne Chung regarding her duties in this case.  Dr. Chung has also been designated as eligible
to serve as an amicus pursuant to Section 1801(i)(1).  The able assistance of both Professor
Donohue and Dr. Chung is acknowledged and greatly appreciated.

TOP SECRET//SI//NOFORN/FISA                                    Page 6

TOP SECRET//SI//NOFORN//FISA

Second, the government proposed amendments to the FBI's querying procedures to clarify querying standards and address the FBI's pattern of conducting broad, suspicionless queries that violate the requirement that its queries of unminimized Section 702 information be reasonably likely to retrieve foreign intelligence information or evidence of a crime. In response to recently reported querying violations, the Court issued an Order on September 2, 2021, requiring the government to provide, among other things, a description of steps to improve FBI compliance with the querying standard and proposed revisions to affected procedures for Section 702 and other forms of FISA collection that "provide a full and explicit articulation of the requirements for querying." *See* Docket Nos. ███████████ Order in Response to Querying Violations at 14 (Sept. 2, 2021) ("Querying Violations Order").

On November 3, 2021, the government filed its Submission in Response to Court's Order in Response to Querying Violations. On December 16, 2021, the Court provided the government with additional questions concerning FBI queries of Section 702-acquired data. The government has continued to provide information responsive to the Court's questions as they relate to the proposed renewal certifications. Moreover, as discussed at pages 28-34 *infra*, compliance issues have continued to surface.

Third, the October 18, 2021 Submission included a new provision in NSA's querying procedures to ███████████████████████████████████████████████████████████████████████████ The Court questioned whether the proposed amendments

TOP SECRET//SI//NOFORN//FISA

comported with the Fourth Amendment and statutory minimization requirements. After extensive discussions with the Court on the issues presented, the government is no longer pursuing those amendments in the context of this renewal.

### B.    Extensions of Time for the Court's Consideration of the Certifications

The Court had 30 days from the date of the October 18, 2021 Submission to review and rule on it. *See* § 702(j)(1)(B). The Court may extend this period, however, "as necessary for good cause in a manner consistent with national security." *See* § 702(k)(2). On October 28, 2021, the government submitted a Motion for Order Extending Time Limit Pursuant to 50 U.S.C. § 1881a(k)(2) ("First Extension Motion"), proposing to extend through February 15, 2022, the Court's time to review the 2021 Certifications and issue an order regarding them. The government identified as good cause for such extension the time needed for it to respond to the Court's order on FBI querying violations, for the FBI to implement technological and training responses to those compliance problems, and for the Court to evaluate their sufficiency. *See* First Extension Motion at 9. The Court found that these circumstances constituted good cause and granted the requested extension on October 28, 2021.

On February 7, 2022, the government moved for a further extension through April 29, 2022, of the time for the Court's consideration of these certifications ("Second Extension Motion"). As grounds for the further extension, the government cited ongoing dialogue with the Court with regard to FBI querying practices and ███████████████ as well as its intention to submit additional material that may call for further input from the amicus. Second Extension

~~TOP SECRET//SI//NOFORN/FISA~~

Motion at 8.  The Court found that these circumstances constituted good cause and granted the requested extension on February 7, 2022.  By operation of Section 702(j)(5)(A)-(B), the 2020 Certifications and related procedures remained in effect during the extended period of consideration of the 2021 Certifications.

### C.    The 2022 Amendments

On March 18, 2022, the AG and DNI executed Amendments to each of the 2021 Certifications pursuant to Section 702(i)(1)(c).  *See* Amendment to DNI/AG 702(h) Certification

(collectively, the "2022 Amendments").  The March 18, 2022 Submission included the 2022 Amendments, affidavits in support of each amendment by the Director of NSA, a supporting declaration from NSA official ("Supplemental Description of Pre-Targeting Determinations"), and revised targeting, minimization, and querying procedures for the NSA, which replace Exhibits A, B, and H, respectively, to each of the initial 2021 Certifications.  That submission also included an explanatory memorandum prepared by DOJ ("March 18, 2022 Memorandum").  The March 18, 2022 Submission made further amendments to the NSA targeting and minimization procedures regarding and rescinded the changes to NSA's procedures regarding which the government intends to pursue in "a separate, later amendment to the 2021 Certifications."  March 18, 2022 Memorandum at 3.  As a result, the NSA querying procedures

TOP SECRET//SI//NOFORN/FISA

now before the Court are the same as those approved on November 18, 2020, as part of the

Court's review of the 2020 Certifications. *See* Docket Nos. █████████ Mem. Op. and

Order (Nov. 18, 2020) ("November 18, 2020 Opinion").

**D.    Subject Matter of the Certifications**

Each certification involves "the targeting of non-United States persons reasonably

believed to be located outside the United States to acquire foreign intelligence information."



The 2021 Certifications generally propose to continue acquisitions of foreign intelligence

information now being conducted under the 2020 Certifications.  The 2020 Certifications are also

█████████████████████████████ he same subjects as the corresponding 2021

TOP SECRET//SI//NOFORN/FISA                                              Page 10

~~TOP SECRET//SI//NOFORN//FISA~~

Certifications. The 2020 Certifications, in turn, generally renewed authorizations to acquire

foreign intelligence information under a series of Section 702 certifications that dates back to

2008. *See* Docket Nos.



Those

dockets, together with Docket Numbers                                        are

collectively referred to as "the Prior 702 Dockets."

The government also seeks approval of amendments to the certifications in the Prior 702

Dockets, such that NSA, the CIA, the FBI, and NCTC henceforward would apply the same

minimization and querying procedures to information obtained under prior certifications as they

would to information to be obtained under the 2021 Certifications. *See* October 18, 2021

Memorandum          March 18, 2022 Memorandum



## II.   REVIEW OF THE 2021 CERTIFICATIONS AND PRIOR CERTIFICATIONS, AS AMENDED

The Court must review a Section 702 certification "to determine whether [it] contains all

the required elements." § 702(j)(2)(A). Examination of the 2021 Certifications confirms that:

Authorized for Public Release on: [DATE]

TOP SECRET//SI//NOFORN//FISA



(1) they have been made under oath by the AG and the DNI, as required by
§ 702(h)(1)(A), *see*

(2) they contain the attestations required by § 702(h)(2)(A), *see*

(3) as required by § 702(h)(2)(B), they are accompanied by targeting procedures
and minimization procedures adopted in accordance with § 702(d) and (e),
respectively;

(4) they are supported by affidavits of appropriate national-security officials, as
described in § 702(h)(2)(C); and

(5) each certification includes an effective date in compliance with § 702(h)(2)(D)
– specifically, the certifications become effective on November 17, 2021, or the
date upon which the Court issues an order concerning the certifications under
§ 702(j)(3), whichever is later. *See*                         The Amended Certifications include an
effective date of the date upon which the Court issues an order concerning the
certifications, since they were executed after November 17, 2021. *See*

(The statement described in § 702(h)(2)(E) is not required because there was no
"exigent circumstances" determination under § 702(c)(2).)

The Court, accordingly, concludes that the 2021 Certifications contain all the required

statutory elements. Similarly, it has reviewed the certifications in the Prior 702 Dockets, as

amended by the 2021 Certifications, and finds that they also contain all the elements required by

the statute. Those amendments have the same effective dates as the 2021 Certifications. *See*

The Court now turns to the proposed targeting, querying, and minimization procedures.

The following discussion primarily focuses on changes to previously approved procedures, but

TOP SECRET//SI//NOFORN/FISA

the procedures as a whole must be consistent with statutory and constitutional requirements.

Some technical, conforming edits and other minor changes are not specifically discussed because

they raise no issues material to the Court's review.  Issue specific to ▮▮▮▮▮▮▮▮▮▮ are

addressed in Part VII below.

## III.    THE TARGETING PROCEDURES

Targeting procedures must be "reasonably designed" to "ensure that any acquisition

authorized under [§ 702(a)] is limited to targeting persons reasonably believed to be located

outside the United States" and to "prevent the intentional acquisition of any communication as to

which the sender and all intended recipients are known at the time of the acquisition to be located

in the United States."  § 702(d)(1); *see also* § 702(b)(1) (acquisitions "may not intentionally

target any person known at the time of acquisition to be located in the United States");

§ 702(b)(4) (acquisitions "may not intentionally acquire any communication as to which the

sender and all intended recipients are known at the time of acquisition to be located in the United

States").  Additionally, the government uses the targeting procedures to ensure that acquisitions

do "not intentionally target a United States person reasonably believed to be located outside the

United States."  § 702(b)(3).  Pursuant to § 702(j)(2)(B), the Court assesses whether the targeting

procedures satisfy those criteria.  It must also determine whether such procedures, along with the

querying and minimization procedures, are consistent with the requirements of the Fourth

Amendment.  *See* § 702(j)(3)(A)-(B).

TOP SECRET//SI//NOFORN/FISA                              Page 13

TOP SECRET//SI//NOFORN/FISA

### A. Background on Acquisition and Targeting Under Section 702

The government targets a person under Section 702 by tasking for acquisition one or more selectors (*e.g.*, identifiers for email or other electronic-communication accounts) associated with that person. Section 702 encompasses different forms of acquisition. The government may acquire information "upstream," as it transits the facilities of an Internet backbone carrier, as well as "downstream," from systems operated by providers of services ███████████████ Traditional telephone communications may also be acquired upstream . . . .

███████████████████████ Mem. Op. and Order at 11 (Oct. 18, 2018) (citation omitted)

("October 18, 2018 Opinion"), *aff'd in part, In re DNI/AG 702(h) Certifications*, 941 F.3d 547

(FISCR 2019) (per curiam).

NSA is the lead agency in making targeting decisions under Section 702. It may not task

a selector without first determining that the target is reasonably believed to be a non-U.S. person

outside the United States (a "foreignness determination"). In making such determinations, NSA

reviews certain categories of information about the proposed target and evaluates "the totality of

the circumstances based on the information available with respect to that person.███████████

███████████████████████████████████████ NSA

Targeting Procedures § I at 1. An NSA targeting decision must also be supported by a

"particularized and fact-based" assessment that "the target is expected to possess, receive, and/or

is likely to communicate foreign intelligence information" relevant to the subject matter of a

Section 702 certification. *Id.* at 4.

NSA is also required to conduct post-targeting analysis "to detect those occasions when a

person who when targeted was reasonably believed to be located outside the United States is

located in the United States." *Id.* § II at 6-7. This post-targeting analysis involves routinely

TOP SECRET//SI//NOFORN//FISA

comparing each tasked selector against independently-acquired information for indications that it

may be used in the United States, and examination of the content of communications obtained

through surveillance of a tasked selector for indications that the target is now in, or may enter,

the United States. *Id.* at 7-8. If NSA concludes that a target is in the United States or is a U.S.

person, or cannot resolve seemingly conflicting evidence on either point, it must terminate the

acquisition without delay. *Id.* § II at 8, § IV at 10.



NSA tasks selectors for ███████████████████████████████████████████

████████████████████████████████████ The FBI is responsible for ████████

██████████████████████████████████ and in that role is governed

by its targeting procedures. Under those procedures, the FBI may █████████████ for

selectors that have already been approved for tasking ████████████ by NSA under its

targeting procedures. *See* FBI Targeting Procedures § I.1. "Thus, the FBI Targeting Procedures

apply *in addition to* the NSA Targeting Procedures," ████████████████████████

*See* Docket No. ██████████ Mem. Op. at 20 (Sept. 4, 2008) ("September 4, 2008 Opinion").

NSA provides to the FBI an explanation of its prior foreignness determination for each

requested selector (or "Designated Account") for which NSA ████████████ request. *See*

FBI Targeting Procedures §§ I.1, I.2. The FBI, "in consultation with NSA, will review and

evaluate the sufficiency of" that determination. *Id.* § I.3. The FBI also runs certain checks of

information in its possession in the course of that review and evaluation. "Unless the FBI ██████

██████████████████ that the user of the Designated Account is a United States person or is

located inside of the United States, the FBI will ████████████████████████████

Authorized for Public Release on: [DATE]



TOP SECRET//SI//NOFORN/FISA

*Id.* § I.5. "If the FBI ███████████████████████ the Designated

Account is not appropriate for tasking . . ., the FBI will inform NSA" and will not ████

██████ that account unless and until it "determines that the Designated Account is in fact

appropriate for tasking." *Id.* § I.8.

**B.      NSA Targeting Procedures**

The only noteworthy changes proposed for NSA's Targeting Procedures relate to ████

███████████nd are discussed in Part VII below.

**C.      FBI Targeting Procedures**

No changes are proposed to the FBI's targeting procedures from those approved by the

Court in the context of the 2020 Certifications. The Court finds that those procedures, as written,

satisfy applicable statutory requirements.

**D.      Conclusion**

The FISC has previously found the current versions of the FBI and NSA's targeting

procedures to comply with statutory requirements. *See* November 18, 2020 Opinion at 11-12, 60.

For the reasons stated above and in the Court's opinions in the Prior 702 Dockets, the Court

concludes that, in relation to the forms of acquisition currently being conducted under the 2020

Certifications, the NSA Targeting Procedures and the FBI Targeting Procedures, as written, are

reasonably designed to: (1) ensure that any acquisition authorized under the 2021 Certifications

is limited to targeting persons reasonably believed to be located outside the United States, (2)

prevent the intentional acquisition of any communication as to which the sender and all intended

recipients are known at the time of the acquisition to be located in the United States, and (3)

TOP SECRET//SI//NOFORN/FISA                                        Page 16

TOP SECRET//SI//NOFORN/FISA

prevent U.S. persons from being targeted for acquisition. The first two of these findings are

required by Section 702(d)(1). The third finding is relevant to the Court's analysis of whether

these procedures are consistent with the requirements of the Fourth Amendment. *See* pages 58-

66 *infra*.

## IV.   THE MINIMIZATION PROCEDURES AND QUERYING PROCEDURES

Pursuant to § 702(j)(2)(C), the Court must also assess whether the minimization

procedures comply with specified statutory requirements. Section 702(e)(1) requires that the

procedures "meet the definition of minimization procedures under [50 U.S.C. § 1801(h) or

1821(4)]." That definition requires

> (1) specific procedures . . . that are reasonably designed in light of the purpose and
> technique of the particular surveillance [or physical search], to minimize the
> acquisition and retention, and prohibit the dissemination, of nonpublicly available
> information concerning unconsenting United States persons consistent with the
> need of the United States to obtain, produce, and disseminate foreign intelligence
> information;
>
> (2) procedures that require that nonpublicly available information, which is not
> foreign intelligence information, as defined in [50 U.S.C. § 1801(e)(1)], shall not
> be disseminated in a manner that identifies any United States person, without such
> person's consent, unless such person's identity is necessary to understand foreign
> intelligence information or assess its importance; [and]
>
> (3) notwithstanding paragraphs (1) and (2), procedures that allow for the retention
> and dissemination of information that is evidence of a crime which has been, is
> being, or is about to be committed and that is to be retained or disseminated for
> law enforcement purposes[.]

§ 1801(h). The definition of "minimization procedures" at § 1821(4) is substantively identical to

the one at § 1801(h) (although § 1821(4)(A) refers to "the purposes . . . of the particular physical

search"). For simplicity, subsequent citations refer only to § 1801(h).

TOP SECRET//SI//NOFORN/FISA                              Page 17

TOP SECRET//SI//NOFORN/FISA

In applying these statutory requirements, the Court is mindful that Section 702 acquisitions target persons reasonably believed to be non-U.S. persons outside the United States. Although such targets may communicate with or about U.S. persons, Section 702 acquisitions, as a general matter, are less likely to acquire information about U.S. persons that is unrelated to the foreign intelligence purpose of the acquisition than, for example, electronic surveillance or physical search of a home or workplace within the United States that a target shares with U.S. persons. Different minimization protections, accordingly, may be appropriate for non-Section 702 collection directed at persons — especially U.S. persons — within the United States.

The AG, in consultation with the DNI, also must "adopt querying procedures consistent with the requirements of the fourth amendment . . . for information collected" pursuant to a Section 702 certification, *see* § 702(f)(1)(A), and must "ensure" that those procedures "include a technical procedure whereby a record is kept of each United States person query term used for a query." § 702(f)(1)(B). The FISC must determine whether querying procedures satisfy those requirements. *See* § 702(j)(3)(A)-(B).

Each agency's procedures make clear that the querying and minimization procedures are to be read and applied together. *See, e.g.*, NSA Querying Procedures § I ("These querying procedures should be read and applied in conjunction with [the separate] minimization procedures, and nothing in these procedures permits any actions that would otherwise be prohibited by those minimization procedures."); FBI Querying Procedures § I (same); NSA Minimization Procedures § I ("These minimization procedures apply in addition to separate querying procedures. . . . [They] should be read and applied in conjunction with those querying

TOP SECRET//SI//NOFORN/FISA                                   Page 18

TOP SECRET//SI//NOFORN/FISA

procedures, and nothing in these procedures permits any actions that would otherwise be

prohibited by those querying procedures."); FBI Minimization Procedures § I.A (same).  The

Court therefore will assess whether each agency's querying procedures, in conjunction with its

minimization procedures, satisfy § 1801(h).

## A.    Background on Section 702 Minimization and Querying

Each agency with access to "raw," or unminimized, information obtained under Section

702 (NSA, FBI, CIA, and NCTC) is governed by its own set of minimization procedures in

handling that information.  This opinion uses the terms "raw" and "unminimized"

interchangeably.  The NCTC Minimization Procedures define "raw" information as:

> section 702-acquired information that (i) is in the same or substantially the same
> format as when NSA or FBI acquired it, or (ii) has been processed only as
> necessary to render it into a form in which it can be evaluated to determine
> whether it reasonably appears to be foreign intelligence information or to be
> necessary to understand foreign intelligence information or assess its importance.

NCTC Minimization Procedures § A.3.d.

There are significant differences among the various sets of minimization procedures

based on factors such as the agencies' differing missions, legal and policy constraints, and

technical infrastructure, but they share several important features.  Regarding acquisition, NSA is

required to conduct acquisitions "in a manner designed, to the greatest extent reasonably feasible,

to minimize the acquisition of information not relevant to the authorized purpose of the

TOP SECRET//SI//NOFORN/FISA

acquisition." NSA Minimization Procedures § 4(a). The FBI must follow its targeting

procedures in conducting acquisitions. *See* FBI Minimization Procedures § II.A.1.[3]

> Post-acquisition, in broad outline, each agency's procedures:

- set criteria for the indefinite retention of information of or concerning United States persons and generally applicable timetables for destroying information that does not meet those criteria, *see* NSA Minimization Procedures § 4; FBI Minimization Procedures §§ III.C.1.b, III.D.4, III.E.4; CIA Minimization Procedures §§ 2, 3; NCTC Minimization Procedures §§ B.2, B.3;

- provide special rules for protecting attorney-client communications, *see* NSA Minimization Procedures § 5; FBI Minimization Procedures §§ III.D.5, III.E.6; CIA Minimization Procedures § 7.a; NCTC Minimization Procedures § C.5;

- set standards and procedures for disseminating information, *see* NSA Minimization Procedures §§ 8, 10; FBI Minimization Procedures § IV; CIA Minimization Procedures §§ 5, 7.c; NCTC Minimization Procedures § D; and

- prescribe procedures for obtaining technical or linguistic assistance from other agencies and/or from foreign governments, *see* NSA Minimization Procedures § 11(b); FBI Minimization Procedures § IV.D; CIA Minimization Procedures § 7.b; NCTC Minimization Procedures § D.5.

The minimization procedures also address situations in which the government reasonably

believed at the time of acquisition that the target was a non-U.S. person outside the United

States, but later learns that the target actually was a U.S. person or inside the United States. The

Court has concluded that the government is authorized to acquire such communications under

Section 702. *See* September 4, 2008 Opinion at 25-27. Nonetheless, the procedures of each

agency require destruction of information obtained under those circumstances, unless the head of

---

[3] As discussed above, NSA and the FBI are the only agencies that conduct Section 702 acquisitions, and the FBI applies its targeting procedures to, and acquires data for, only selectors that NSA has approved for tasking under its targeting procedures. *See* pages 14-15 *supra*.

TOP SECRET//SI//NOFORN/FISA                                              Page 20

**TOP SECRET//SI//NOFORN//FISA**

the agency authorizes its retention after making certain findings for the specific information to be

retained. *See* NSA Minimization Procedures § 4(d); FBI Minimization Procedures § III.A.3; CIA

Minimization Procedures § 8; NCTC Minimization Procedures § B.4.

Each agency's querying procedures contain recordkeeping requirements for the use of

U.S.-person query terms in response to § 702(f)(1)(B). *See* NSA Querying Procedures § IV.B;

FBI Querying Procedures § IV.B; CIA Querying Procedures § IV.B; NCTC Querying Procedures

§ IV.B. They permit investigative and analytical personnel at the CIA, NSA, and NCTC to

conduct queries of unminimized Section 702 information if the queries are reasonably likely to

return foreign intelligence information. *See* NSA Querying Procedures § IV.A; CIA Querying

Procedures § IV.A; NCTC Querying Procedures § IV.A. Their FBI counterparts may conduct

such queries if they are reasonably likely to return foreign intelligence information or evidence of

a crime. *See* FBI Querying Procedures § IV.A.

## B.     Global Change to Minimization Procedures to Ensure Compliance with Statutory Limitations on Dissemination

There is one substantive change that cuts across all four agencies' minimization

procedures, which is intended to clarify that disseminations must comply with 50 U.S.C.

§ 1801(h)(2). Section 1801(h)(2) specifies that minimization procedures must "require that

nonpublicly available information, which is not foreign intelligence information, as defined in

[50 U.S.C. § 1801(e)(1)], shall not be disseminated in a manner that identifies any United States

person, without such person's consent, unless such person's identity is necessary to understand

Authorized for Public Release on: [DATE]                                              FISC Memorandum Opinion and Order, April 21, 2022

**TOP SECRET//SI//NOFORN/FISA**

foreign intelligence information or assess its importance." Each set of minimization procedures

before the Court includes the following language:

> Nothing in these procedures authorizes the dissemination of non-publicly
> available information that identifies any United States person without such
> person's consent unless: (1) such person's identity is necessary to
> understand foreign intelligence information or assess its importance; (2)
> the information is foreign intelligence information as defined in 50 U.S.C.
> § 1801(e)(1); or (3) the information is evidence of a crime which has been,
> is being, or is about to be committed and that is to be disseminated for law
> enforcement purposes.

*See* NSA Minimization Procedures § 8; FBI Minimization Procedures § IV; CIA Minimization

Procedures § 5; NCTC Minimization Procedures § D.1. Adopting this language is a helpful

clarification of the dissemination rules.

### C.    NSA, CIA, and NCTC Querying Procedures

The October 18, 2021 Submission, as amended by the March 18, 2022 Submission, does

not propose any changes to the NSA, CIA, or NCTC querying procedures from those approved

by the Court in connection with the 2020 Certifications. *See* October 18, 2021 Memorandum at

2 n.2; March 18, 2022 Memorandum at 2-3. Nothing detracts from the Court's earlier findings

that these procedures as written are sufficient. Additional changes to the FBI Querying

Procedures, NSA Minimization Procedures, and CIA Minimization Procedures are discussed in

the following sections.

### D.    FBI Querying Procedures

The FBI Querying Procedures include new provisions adopted to address a pattern of

broad, suspicionless queries that are not reasonably likely to retrieve foreign intelligence

TOP SECRET//SI//NOFORN/FISA

information or evidence of crime.  In order to evaluate those provisions, it is necessary to

understand the historical pattern of non-compliant queries conducted by the FBI.

      1.    Background and Compliance History

     The FISC first approved a separate set of FBI querying procedures in 2019.  *See* Docket

Nos. ███████████ Mem. Op. and Order at 16-17 (Sept. 4, 2019) ("September 4, 2019

Opinion").  Previously, the standard for FBI queries of Section 702 information appeared in

FBI's minimization procedures, and provided that:  "To the extent reasonably feasible," FBI

personnel "must design" queries of unminimized Section 702 information "to find and extract

foreign intelligence information or evidence of a crime."  *See* October 18, 2018 Opinion at 67.

The government represented that this querying standard was practically equivalent to the one for

queries of raw information acquired under Titles I and III of FISA.  It characterized that standard

as

> a high one, having three elements: (1) a query cannot be "overly broad," but rather
> must be designed to extract foreign-intelligence information or evidence of crime;
> (2) it must "have an authorized purpose" and not be run for personal or improper
> reasons; and (3) there must be "a reasonable basis to expect [it] will return foreign
> intelligence information or evidence of a crime."

*Id.*  But the FBI querying procedures now in effect do not expressly include these three elements.

Rather, they provide that FBI queries of "unminimized contents or non-contents (including

metadata) acquired pursuant to Section 702 . . . must be reasonably likely to retrieve foreign

intelligence information, as defined by FISA, or evidence of a crime, unless otherwise

specifically excepted."  2020 FBI Querying Procedures § IV.A.1.

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN/FISA

The FBI frequently violated the three-part standard articulated by the government. In

October 2018, the Court concluded that "the FBI's repeated non-compliant queries of Section

702 information" precluded findings that its Section 702 querying and minimization procedures,

as implemented, satisfied the definition of "minimization procedures" at 50 U.S.C. § 1801(h) and

were reasonable under the Fourth Amendment. October 18, 2018 Opinion at 62. The Court

cited as a contributing factor in FBI's non-compliance a "lack of a common understanding within

FBI and [the National Security Division of the U.S. Department of Justice (NSD)] of what it

means for a query to be reasonably likely to return foreign-intelligence information or evidence

of crime." *Id*. at 77. The Court expected that a requirement to document the basis for believing

that a query using a U.S.-person query term satisfied the querying standard would help ensure

that the FBI personnel recalled and thoughtfully applied the standard before reviewing

unminimized Section 702-acquired contents retrieved by using U.S.-person query terms. *See id*.

at 92-93; *see also id*. at 96 ("The Court contemplates a brief statement of the query justification

— in many cases it should suffice to succinctly complete a sentence that starts 'This query is

reasonably likely to return foreign-intelligence information [or evidence of crime] because

. . . .'"). The Foreign Intelligence Surveillance Court of Review (FISCR) anticipated that such a

documentation requirement could have similar "potential benefits," though it stopped short of

requiring the government to adopt that particular measure. *In re DNI/AG 702(h) Certifications*,

941 F.3d, 547, 565 (FISCR 2019) (per curiam).

TOP SECRET//SI//NOFORN/FISA

Authorized for Public Release on: [DATE]

TOP SECRET//SI//NOFORN//FISA

Eventually, after the FISCR affirmed the FISC's decision in part, *see* 941 F.3d at 566, the

government revised these procedures to require FBI personnel to provide "a written statement of

facts showing that the query was reasonably likely to retrieve foreign intelligence information or

evidence of a crime" before reviewing the unminimized contents of Section 702-acquired

information retrieved using a U.S.-person query term, except when a FISC order is required by

Section 702(f)(2).[4] FBI Querying Procedures §§ IV.A.3, IV.B.4; September 4, 2019 Opinion at

8-9; Docket Nos. ████████████ Mem Op. and Order at 62 (Dec. 6, 2019) ("December 6,

2019 Opinion"). But the primary means of implementing this requirement was for FBI personnel

to select from a pre-set menu of broad, categorical justifications, instead of drafting a case-

specific explanation of why a particular query meets the standard. *See* November 18, 2020

Opinion at 44-47.

---

[4] Section 702(f)(2) requires the FBI to obtain approval from the FISC before accessing
the contents of communications acquired under Section 702 under the following circumstances:

   (1) such contents "were retrieved pursuant to a query made using a United States person
   query term,"

   (2) the query "was not designed to find and extract foreign intelligence information" and

   (3) the query was conducted "in connection with a predicated criminal investigation . . .
   that does not relate to the national security of the United States,"

   (4) unless "there is a reasonable belief that such contents could assist in mitigating or
   eliminating a threat to life or serious bodily harm."

§ 702(f)(2)(A), (E).

TOP SECRET//SI//NOFORN//FISA

Page 25

**TOP SECRET//SI//NOFORN/FISA**

In November 2020, the Court found "that the FBI's failure to properly apply its querying

standard . . . was more pervasive than was previously believed," but noted that most of those

queries "occurred prior to the implementation of the FBI's system changes and training"

regarding the documentation requirement. *See id.* at 39, 41. "In addition, the COVID-19

pandemic severely limited the government's ability to monitor the FBI's compliance" after those

systems changes and training had occurred. *Id.* at 41. Under those "unique circumstances," the

Court concluded that the improper queries did not undermine its prior determination that the

FBI's procedures, with implementation of the documentation requirement, met statutory and

Fourth Amendment requirements. *Id.*

Nonetheless, the government continued to report significant querying violations. On

September 2, 2021, the Court issued an order that questioned the effectiveness of the

documentation process in view of a recent series of non-compliant FBI queries. *See* Querying

Violations Order at 5. The Order focused on an apparent continued lack of a common

understanding of how to apply the querying standard, as evidenced by queries that NSD found to

have violated that standard, but that the FBI – sometimes at the management level – insisted were

proper. Specifically:[5]

- Between late 2016 and early 2020, the FBI's ⬛ regularly queried
  unminimized FISA information using identifiers of individuals listed in local

---

[5] Many of the examples in this discussion involve queries of information acquired under
provisions of FISA other than Section 702; however, as noted above, the government contends
that the standard for the FBI to query raw Section 702 information is essentially the same as for
queries of other categories of FISA information. Confusion or disagreement about what the
standard requires is therefore unlikely to be limited to one such category.

**TOP SECRET//SI//NOFORN/FISA**

TOP SECRET//SI//NOFORN/FISA

police homicide reports, including victims, next-of-kin, witnesses, and suspects. Supplemental notice of compliance incidents regarding the FBI's querying of raw FISA-acquired information at 1, 5-7 (May 21, 2021) ("May 21, 2021 Notice"). NSD found these queries to have violated the querying standard because there was no reasonable basis to expect they would return foreign intelligence or evidence of crime. *Id.* at 5. The FBI, however, maintained that querying FISA information using identifiers of the victims – simply because they were homicide victims – was reasonably likely to retrieve evidence of crime. *See id.* at 6; Notice of compliance incident regarding the FBI's querying of raw FISA-acquired information, including information acquired pursuant to Section 702 of FISA at 4-5 (May 28, 2021) ("May 28, 2021 Notice").

-     ██████████████████ ran a batch query of unminimized FISA information in June 2020, using identifiers of 133 individuals arrested "in connection with civil unrest and protests between approximately May 30, and June 18, 2020." The query was run to determine whether the FBI had "any counter-terrorism derogatory information on the arrestees," but without "any specific potential connections to terrorist related activity" known to those who conducted the queries. Preliminary Notice of compliance incidents regarding the FBI's querying of raw FISA-acquired information at 2 (April 26, 2021) ("April 26, 2021 Notice"). NSD assessed that the queries were not reasonably likely to retrieve foreign intelligence information or evidence of a crime. May 21, 2021 Notice at 8. The FBI, however, asserted that those queries were reasonably likely to retrieve evidence of a crime simply because they pertained to persons who had been arrested and therefore reasonably believed to have committed an offense. *Id.* The FBI further maintained that there was a "reasonable basis to believe these queries would return foreign intelligence" because ████████ information, not relied upon by the person who ran the queries, that suggested that ████████ ████ of a foreign power ████████ a message on behalf of ████████ ████ organization 'protesting' U.S. ████████ violence against African-Americans to various U.S. persons." *Id.* at 8-9.

-     During June 11-15, 2020, ████████████████ analyst conducted 656 queries of unminimized FISA information using identifiers ████████ in the United States who were ████████ thought to be of particular interest to the ██████████████████████ ████████ May 21, 2021 Notice at 3-4. The FBI regarded ████ as potential sources, and the analyst ran the queries to check for derogatory information without having reason to suspect that any would be found. *Id.* at 3. NSD concluded that these queries "were not reasonably likely to retrieve foreign

TOP SECRET//SI//NOFORN/FISA

**TOP SECRET//SI//NOFORN/FISA**

intelligence information or evidence of a crime." *Id.* The FBI took the contrary position, based on the individuals' █████████████████████████████ *Id.* at 3-4.

The government reported further querying violations at ████████████████[6] and

elsewhere. Since the Court issued the Querying Violations Order, the government has reported

additional, significant violations of the querying standard, including several relating to the

January 6, 2021 breach of the U.S. Capitol:

- An analyst ████████████████████ ran 13 queries of individuals suspected of involvement in the January 6, 2021 Capitol breach. The analyst said she ran the queries to determine whether these individuals had foreign ties, and indicated she had run "thousands of names within FBI systems in relation to the Capitol breach investigation" and did not remember why she ran these 13 queries on raw FISA information. NSD concluded the queries were not reasonably likely to retrieve foreign intelligence information or evidence of crime. Notice of compliance incident regarding the FBI's querying of raw FISA-acquired information, including information acquired pursuant to Section 702 of FISA at 3 (Dec. 1, 2021) ("December 1, 2021 Notice").

- ██████████ officer ran two queries for a person under investigation for assaulting a federal officer in connection with the Capitol breach. The officer could not recall why he queried raw FISA information, but FBI field office personnel participating in the query audit stated that the FBI viewed "the situation in general" at the time of the queries as a threat to national security. NSD

---

[6] *See, e.g.*, April 26, 2021 Notice at 2 (May 2020 queries "using variations of the names of two known political activist groups . . . involved in organized protests"); May 21, 2021 Notice at 2 (697 queries conducted during January-June 2020 using identifiers for persons scheduled to visit ████████); *id.* at 3 (June 2020 queries using identifiers for at least 790 cleared defense contractors from whom the FBI might request cooperation); *id.* at 4-5 (330 queries conducted in June 2020 using identifiers of employees ████████████ whom the FBI might want to recruit as sources). The foregoing queries ran against unminimized information acquired under Titles I, III, and V of FISA. *Id.* at 1; April 26, 2021 Notice at 1. During July-August 2020, additional queries regarding visitors ████████ were run against Section 702-acquired information. May 28, 2021 Notice at 1-3.

**TOP SECRET//SI//NOFORN/FISA**

Authorized for Public Release by ODNI

TOP SECRET//SI//NOFORN/FISA

assessed that these queries were not reasonably likely to retrieve foreign intelligence information or evidence of crime. *Id.* at 3-4.

- ████████████████████████████ conducted 360 queries in connection with domestic drug and gang investigations, domestic terrorism investigations, and the Capitol breach. ████████ provided no information to support a reasonable basis to believe foreign intelligence information or evidence of a crime would likely be returned. NSD assessed the queries did not meet the querying standard. *Id.* at 5-6.

- ████████████████████████ ran five queries of individuals involved in the Capitol breach after being instructed to provide a "full workup on terms related to Capitol Breach leads to verify whether individuals involved . . . were acting at the direction of a foreign power or a member of a foreign terrorist organization." *Id.* at 4. NSD assessed that the queries were not reasonably likely to retrieve foreign intelligence information or evidence of a crime from FISA information. *Id.*

- ████████████████████████ conducted three batch queries consisting of approximately 23,132 separate queries, using presumed U.S.-person query terms provided by ████████████████████████████████ that ████████████ was being used by a group involved in the January 6 Capitol breach. The queries were run against unminimized Section 702 information to find evidence of possible foreign influence, although the analyst conducting the queries had no indications of foreign influence related to the query terms used. NSD assessed there was no specific factual basis to believe the queries were reasonably likely to retrieve foreign intelligence information or evidence of crime from Section 702 information. No raw Section 702 information was accessed as a result of these queries. Notice of compliance incidents regarding the FBI's querying of raw FISA-acquired information, including information acquired pursuant to Section 702 of FISA at 6 (Dec. 30, 2021) ("December 30, 2021 Notice").

- ████████████████████████ conducted a batch query for over 19,000 donors to a congressional campaign. The analyst who ran the query advised that the campaign was a target of foreign influence, but NSD determined that only eight identifiers used in the query had sufficient ties to foreign influence activities to comply with the querying standard. *See* Notice of Compliance incidents regarding the FBI's querying of raw FISA-acquired information, including information acquired pursuant to Section 702 of FISA at 2 (Oct. 18, 2021).

TOP SECRET//SI//NOFORN/FISA

Authorized for Public Release on: [DATE]

TOP SECRET//SI//NOFORN//FISA

The FBI's Office of Internal Auditing (OIA) has uncovered similar querying violations.

The FBI established OIA in 2020 at the direction of the AG to augment internal compliance

functions regarding national security matters. *See* Memorandum from the Attorney General re:

Augmenting the Internal Compliance Functions of the FBI, August 31, 2020; Preliminary notice

of compliance incidents regarding the FBI's querying of raw FISA-acquired information,

including information acquired pursuant to Section 702 of FISA at 1 (Oct. 29, 2021) ("October

29, 2021 Notice"). In May 2021, OIA undertook an enterprise-wide audit of FISA queries in the

████████████████████████████████████████████████████████████[7] OIA's

audit examined more than 2,000 queries conducted between April 1, 2020, and March 31, 2021,

against raw FISA data, including Section 702 information.[8] FBI Decl. filed with the Gov't

Submission in Response to the Court's Order in Response to Querying Violations at ¶ 15 (Nov.

3, 2021) ("FBI Decl. Nov. 3, 2021"); Government's Submission in Response to the Court's

Questions Regarding FBI Queries at 10 (Jan. 19, 2022) ("Gov't Resp. Jan. 19, 2022"). Based on

an initial review of OIA's findings, NSD concluded that 286 queries were non-compliant.

---

[7] ████████ electronic and data storage system that contains raw FISA-acquired
information, including information acquired pursuant to Titles I, III, V, and VII of FISA." FBI
Decl. filed with the Gov't Submission in Response to the Court's Order in Response to Querying
Violations at 7 n.2 (Jan. 19, 2022). ████████ system that stores data from multiple FBI
datasets, including raw FISA-acquired information acquired pursuant to Titles I, III, V, and VII
of FISA, which allows users to query across various datasets ████████ through a single
sign-on and perform in-depth searches." *Id.* at 8 n.3. Section 702 falls within Title VII.

[8] These queries preceded modifications ████████ that became effective on June 29, 2021,
so that they ran against raw FISA-acquired information by default unless the user affirmatively
excluded such information from a query. *See* pages 37-38 *infra*.

TOP SECRET//SI//NOFORN//FISA

TOP SECRET//SI//NOFORN/FISA

October 29, 2021 Notice at 2.[9]  Those instances included additional queries for persons arrested

at or associated with civil unrest and protests or suspected of involvement in the January 6, 2021

Capitol breach.  When FBI personnel conducted these queries, they were not aware of any

potential connections between the query subjects and terrorist or other national security threats.

*Id.* at 4.  Several of these queries ran against Section 702-acquired information.  *Id.* at 5.[10]

Based on OIA's audit and NSD's follow-on examination, the government reported in

excess of 278,000 non-compliant FBI queries of raw FISA-acquired information.  Notice of

compliance incidents regarding the FBI's querying of raw FISA-acquired information, including

information acquired pursuant to Section 702 at 2 (Mar. 11, 2022) ("March 11, 2022 OIA

Update").  With regard to queries of Section 702 information particularly, the Court notes the

volume of non-compliant batch queries.  For example:

- Three queries run by ███████████████████ two of which related to
  predicated drug trafficking investigations and the third of which originated from
  ███████████████████████ There was no specific factual basis to
  believe foreign intelligence information or evidence of a crime would be
  retrieved.  *See id.* at 9.

- 122 queries run by ███████████████████████ using telephone
  numbers collected through legal process in a predicated domestic terrorism
  investigation, which NSD assessed to be not reasonably likely to return foreign
  intelligence information or evidence of a crime.  *Id.* at 10.

---

[9] NSD is investigating whether certain of those queries were subject to the FISC order
requirement of § 702(f)(2).  *Id.*

[10] NSD continues to investigate whether such queries retrieved Section 702-acquired
information that triggered the requirement to obtain a FISC order under § 702(f)(2) or fell within
the Court's reporting requirement (discussed at pages 44-46 *infra*) for certain evidence-of-crime
only queries.

TOP SECRET//SI//NOFORN/FISA

Page 31

TOP SECRET//SI//NOFORN/FISA

- 467 queries of the names and identifiers of cleared defense contractors ██████████ ████████████ NSD determined these queries were not reasonably likely to return foreign intelligence information or evidence of a crime because there was no specific information indicating that the named companies were being targeted by foreign adversaries. *Id*. at 8.

- 483 queries conducted by an employee ████████████████ ██████████ These queries were run using email addresses and ██████████ of visitors ████████████████████ Similar batch queries were run nearly every week for several years before they were discontinued in 2021. *Id*. at 22-23.



████████████████████████████████ *Id*. at 22.  NSD assessed that this information did not provide a specific factual basis to believe that foreign intelligence information or evidence of a crime was reasonably likely to be returned. *Id*. at 22-23.

Another set of violations relates ████████████████



████████████████ *Id*. at 22.  For 72 such queries, NSD concluded that the FBI analysts who conducted them "were not aware of why any specific individual ████████ was flagged ████████ *Id*.  NSD found ████████ request, in and of itself, to be insufficient to satisfy the querying standard and has advised ████████ ████████ queries of raw FISA-acquired information "should be conducted only where there is an additional, specific factual basis to believe that the terms queried are reasonably likely to retrieve foreign intelligence information or evidence of a crime." *Id*.

TOP SECRET//SI//NOFORN/FISA

Page 32

TOP SECRET//SI//NOFORN/FISA

Across the FBI, the government has reported queries of raw FISA-acquired information

as "part of routine baseline checks in order to determine whether there was any information

regarding the subject [of the query] in FBI holdings," without a specific factual basis to believe

the query was reasonably likely to return foreign intelligence information or evidence of crime.

*See, e.g., id.* at 16-21, 23 (examples include U.S. persons suspected of corresponding with

subjects of FBI domestic terrorism investigations, or suspected of involvement in domestic

terrorism; a person in possession of chemicals used to make explosives; persons who were

suspected of being racially-motivated violent extremists or who posted racially-motivated violent

materials on social media; a person suspected of purchasing a device to make a rifle fully

automatic; and subjects of a drug-trafficking case). NSD is continuing to investigate whether any

such U.S.-person queries returned raw Section 702 content information that was accessed by the

user. *Id.* at 17, 20 n.21.

Finally, the government has recently reported violations of Section 702(f)(2), which also

relate to the January 6 breach of the Capitol. Specifically:

- On June 11, 2021, the FBI queried unminimized Section 702-acquired
  information using the name of someone then believed to have been present at the
  breaching of the Capitol and who was the subject of an open predicated criminal
  investigation relating to that event. FBI personnel accessed contents information
  retrieved by the query without obtaining a FISC order under § 702(f)(2). The
  retrieved information was not used for any analytical, investigative or evidentiary
  purpose. *See* Quarterly Report Regarding Bulk Queries Conducted Within the
  FBI'       nd Notice of Compliance Incident Regarding the FBI's Querying of
  Raw Section 702-Acquired Information to Retrieve Evidence of a Crime at 4 (Oct.
  29, 2021) ("Fourth Quarterly Bulk Query Report").

- On January 17, 2021, an analyst conducted a query using an identifier for a
  presumed U.S. person thought to have been present at the January 6 Capitol

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN/FISA

breach. The analyst reviewed the contents of an email retrieved by the query, but
determined it was not pertinent and made no analytical, investigative or
evidentiary use of it. The query was conducted in response to a lead sent by
another field office, which had a predicated criminal investigation of a different
person's involvement in the Capitol breach. *See* Update to the Government's
March 2021 Report Concerning Section 702 Compliance Matters and Notice of
Compliance Incident Regarding the FBI's Querying of Raw Section 702-Acquired
Information to Retrieve Evidence of a Crime at 4 (Nov. 19, 2021). On the facts
provided, this query also appears to have violated the "reasonably likely to
retrieve" standard.

- Similar circumstances were reported for two other queries conducted in response
to a lead sent by a field office that had a predicated criminal investigation opened
relating to the breach of the U.S. Capitol. Those queries returned Section 702-
acquired contents, which were accessed but not used for any further analytical,
investigative or evidentiary purpose. NSD assessed that these queries were not
designed to find and extract foreign intelligence information, although each
person running the queries believed that the U.S. Capitol breach implicated
national security, and the field office that sent the leads also had a separate
predicated investigation concerning possible foreign malign influence of the
Capitol breach. *See* Update to the Government's September 2021 Report
Concerning Section 702 Compliance Matters and Notice of Compliance Incidents
at 4-5 n.4 (Mar. 11, 2022) ("March 11, 2022 OIA Update").[11]

2.   Steps to Address Non-Compliant Queries

The government seeks to improve FBI querying practices by revising the FBI's querying

procedures, modifying its systems, providing revised and expanded guidance on the querying

standard, augmenting training, and increasing auditing and oversight efforts. *See* Government's

---

[11] On April 19, 2022, NSD reported a Section 702(f)(2) violation at ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮ related to the January 6 Capitol breach. NSD has not yet advised whether any use was
made of the information improperly accessed. *See* Second Supplemental Notice of compliance
incidents regarding the FBI's query of raw FISA-acquired information, including information
acquired pursuant to Section 702 at 2-4 (Apr. 19, 2022).

TOP SECRET//SI//NOFORN/FISA

Authorized for Public Release by ODNI

<del>TOP SECRET//SI//NOFORN//FISA</del>

Submission in response to Court's Order in response to Querying Violations (Nov. 3, 2021);

March 11, 2022 OIA Update at 23.

a.    Revisions to Procedures

Section IV.A.1 of the FBI Querying Procedures reads as follows:

Each query of FBI systems containing unminimized contents or noncontents (including metadata) acquired pursuant to section 702 of the Act must be reasonably likely to retrieve foreign intelligence information, as defined by FISA, or evidence of a crime, unless otherwise specifically excepted in these procedures. *In order to meet this standard:*

*(a) the person conducting the query must have the purpose of retrieving foreign intelligence information or evidence of a crime;*

*(b) the person conducting the query must have a specific factual basis to believe that it is reasonably likely to retrieve foreign intelligence information or evidence of a crime; and*

*(c) the query must be reasonably tailored to retrieve foreign intelligence information or evidence of a crime without unnecessarily retrieving other information.*

The italicized text is new and codifies what NSD has previously represented to be the correct understanding of the "reasonably likely to retrieve" standard. In view of apparent disagreement and confusion regarding how to apply this standard, it is constructive for the procedures to lay out explicitly what it requires. The General Counsel of the FBI avers that the FBI "understands the concerns expressed by the Court" in the Querying Violations Order, "now agrees that the identified queries . . . do not meet the querying standard," and "is committed to ensuring that [those] concerns . . . are addressed." *See* FBI Decl. Nov. 3, 2021 ¶ 4.

<del>TOP SECRET//SI//NOFORN//FISA</del>

Page 35

TOP SECRET//SI//NOFORN/FISA

In addition, Section IV.A.3 of the FBI Querying Procedures now requires (with new text in italics):

> Prior to reviewing *or accessing* the unminimized contents of section 702 acquired information retrieved using a United States person query term, FBI personnel will provide a written statement of *the specific factual basis to believe* that the query was reasonably likely to retrieve foreign intelligence information or evidence of a crime.

The "specific factual basis" language responds to the Court's concerns regarding the efficacy of the FBI's previous reliance on users' selecting from a limited menu of broad justifications.

With these revisions, there are no real concerns about whether, *as written*, the querying provisions of the FBI's procedures comport with statutory minimization and Fourth Amendment requirements. The real concerns have always centered on the querying provisions *as likely to be implemented* by the FBI, in view of the repeated querying violations. The government's further steps to improve implementation are addressed below.

b.    Systems Modifications

The FBI reported it had modified its systems to require personnel to record the specific factual basis for a query using a U.S.-person query term before accessing contents information retrieved by such a query. *See* Gov't Resp. Jan. 19, 2022 at 34; FBI Decl. Nov. 3, 2021 ¶ 10. This change was implemented in ▮▮▮ as of October 28, 2021, and in ▮▮▮ [12] as of November

---

[12] ▮▮▮ a repository of intercepted Internet data traffic and other lawfully collected information — concerning activities that occur on targeted computing or communications devices." FBI Decl. Jan. 14, 2022 at 10 n.4. ▮▮▮ access control policy and process for running queries are different than the policies used ▮▮▮ In ▮▮▮ a user has access only to his/her own cases and must select the data to be searched prior to running a
(continued...)

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN/FISA

4, 2021. *See* FBI Decl. Nov. 3, 2021 ¶ 10 n.5. On February 10, 2022, Court staff requested

clarification regarding whether ▉ required users to provide a case-specific justification for

queries they identified as evidence-of-crime-only queries, that is, queries designed to return

evidence of crime, but not foreign intelligence information. The government advised that ▉

had not been changed to require a case-specific justification for evidence-of-crime-only queries,

but that the FBI would modify ▉ by the end of March 2022 to require users to enter a free-

text, case-specific justification for such queries before they can access or review raw contents

information returned by using a U.S.-person query term. *See* Response to the Court's February

10, 2022 Request for Additional Information Regarding FBI Queries at 3-4 (Mar. 1, 2022)

("Gov't Resp. Mar. 1, 2022"). Effective March 31, 2021, ▉ will not permit a user to access

any material retrieved by a query identified as a U.S.-person evidence-of-crime (EOC) only query

unless the user completes the following sentence: "This query is reasonably likely to retrieve

EOC because . . . ." Supplemental Response to the Court's February 10, 2022 Questions

Regarding FBI Queries at 2 (Apr. 12, 2022).

The FBI has also changed the default settings of systems used to query Section 702

information in an effort to facilitate compliance:

- Effective June 29, 2021, the FBI modified ▉ the "federated system . . . on
  which the vast majority of FBI queries of unminimized FISA-acquired
  information occur" – so that users "have to make an intentional decision to opt-in
  to running a query" of unminimized FISA information. FBI Decl. Nov. 3, 2021 ¶
  7; Gov't Resp. Nov. 3, 2021 at 10; Letter regarding FBI programmatic

———————————

[12](...continued)
query." FBI Decl. Nov. 3, 2021 ¶ 9 n.3.

TOP SECRET//SI//NOFORN/FISA

Authorized for Public Release by ODNI

TOP SECRET//SI//NOFORN//FISA

enhancements to facilitate compliance with applicable requirements regarding queries of FISA-acquired information at 2 (July 26, 2021) ("July 26, 2021 Letter"). Previously ▮▮▮▮ queries searched unminimized FISA information by default, which resulted in a number of non-compliant queries in which a user had not even meant to search FISA information.

- The FBI has also reconfigured ▮▮▮▮ so that it no longer runs queries against raw Section 702 information by default. As of August 2021, ▮▮▮▮ users must affirmatively chose to run a query against such information. Gov't Resp. Nov. 3, 2021 at 27.[13]

- The FBI has further reconfigured ▮▮▮▮ so that it no longer defaults to a negative answer in response to the question whether the user is conducting an "evidence-of-crime-only" query. Gov't Resp. Nov. 3, 2021 at 26-27; FBI Decl. Nov. 3, 2021 ¶ 9.[14] Users now must affirmatively indicate whether or not a query using a U.S.-person query term was conducted to retrieve only evidence of a crime before they may access and review information returned. Gov't Resp. Jan. 19, 2022 at 36-38. NSD assesses that the previous default presented a compliance risk that users would not affirmatively identify queries conducted solely to retrieve evidence of crime, which are responsive to FISC-ordered reporting obligations discussed at pages 44-46 *infra* and potentially subject to § 702(f)(2)'s requirement to obtain a FISC order before accessing contents retrieved by a query. Gov't Resp. Nov. 3, 2021 at 26.

When a query is identified as for evidence-of-crime-only, the user must choose from among four options: "Query not connected to a predicated criminal investigation;" "FISC Order pursuant to 702(f)(2) has been obtained;" "FISC Order Exception (only for threat to human life or serious bodily harm);" or "none of the above." *See* FBI Decl. Jan. 14, 2022 ¶ 16. If "none of

---

[13] The FBI also added a pop-up window to ▮▮▮▮ to alert users when a query will run against unminimized FISA-acquired information and requiring them to affirm that they understand the querying standard. FBI Decl. Nov. 3, 2021 ¶ 9.

[14] ▮▮▮▮ stores data from multiple FBI datasets, including ▮▮▮▮ users with ▮▮▮▮ccounts can access raw section 702-acquired information stored in ▮▮▮▮ Gov't Resp. Jan. 19, 2022 at 32 n.12. "When running a query ▮▮▮▮ including through the batch query tool, the user is automatically redirected to ▮▮▮▮ prior to gaining access to any raw FISA Section 702-acquired contents." FBI Decl. Jan. 14, 2022 ¶¶ 14-15.

TOP SECRET//SI//NOFORN//FISA

Page 38

**TOP SECRET//SI//NOFORN/FISA**

the above" is selected, the user is prevented from accessing contents returned by the query, in

furtherance of the restrictions imposed by § 702(f)(2). *Id.*; Gov't Resp. Jan. 19, 2022 at 36.

Finally, as of June 2021 ██████ requires users to state that they have received approval

from an FBI attorney to perform a "batch job" that includes 100 or more queries; in emergency

circumstances, however, attorney approval may be sought after a query is conducted. Gov't

Resp. Nov. 3, 2021 at 10-11; FBI Decl. Nov. 3, 2021 ¶ 11.

NSD acknowledges that one system ██████ "does not currently comport

with" the FBI's querying procedures because it lacks the capability to record U.S.-person queries

and document the justification for them. Gov't Resp. Nov. 3, 2021 at 24. It directs users to

create the required documentation on a separate SharePoint site, but there is a "systemic

compliance issue involving the failure" to do so. *Id.* at 23-24. The FBI is in the process of

terminating the transmittal of Section 702 information ██████ restricting access to

Section 702 information currently on that system, and ultimately removing all such information

from it. *Id.* at 24. As of October 27, 2021, access to unminimized Section 702-acquired

information in ██████ was restricted. FBI Decl. Jan. 14, 2022 ¶ 13. As of March 4, 2022,

the FBI had removed all such information from this system. Supplemental response to the

Government's Nov. 3, 2021 and Jan. 19, 2022 filings regarding FBI Queries at 2 (Apr. 18, 2022).

Although the benefits of articulating case-specific justifications are not yet proven, this

requirement, combined with the other described system changes, should reduce the number of

non-compliant queries. These records of why FBI personnel thought that a query was reasonably

**TOP SECRET//SI//NOFORN/FISA**

Page 39

Authorized for Public Release by ODNI

TOP SECRET//SI//NOFORN//FISA

likely to retrieve foreign intelligence information or evidence of a crime should also provide

useful information to inform training and oversight efforts, as discussed below.

In addition, requiring users to affirmatively choose to run a query against raw FISA

information should eliminate non-compliance stemming from inadvertent querying of such

information. There are preliminary indications that these systems changes are resulting in

substantial reductions in the number of U.S.-person queries of raw Section 702 information. The

government reported a total of approximately 79,848 U.S.-person and presumed U.S.-person

queries of unminimized Section 702 information conducted by the FBI during September-

November 2021. *See* Quarterly Report Concerning Compliance Matters Under Section 702 at

106 n.93 (March 18, 2022) ("March 2022 QR")[15] (correcting totals reported in four prior

quarterly reports); December 2021 QR at 115-16. That is roughly half the number conducted in

the three months prior (*i.e.*, 159,634 during June-August 2021) and represents a precipitous

decline from the over one million such queries reported for the March-May 2021 period and the

over two million reported for the prior three months. *See* March 2022 QR at 106 n.93. The only

apparent explanation for that decline is the modifications to ▮▮▮▮ as of June 29, 2021, and to

▮▮▮▮ as of August 26, 2021, that require users to affirmatively elect to run searches against

unminimized Section 702 information. Such a reduction in overall queries should, in and of

itself, result in many fewer violations. *See* FBI Decl. Nov. 3, 2021 ¶¶ 7-9; Gov't Resp. Nov. 3,

2021 at 10.

---

[15] Similarly titled quarterly reports on Section 702 compliance issues are cited in the form
"[month of filing] QR."

TOP SECRET//SI//NOFORN//FISA

Authorized for Public Release on: [DATE]

TOP SECRET//SI//NOFORN/FISA

Finally, eliminating the default recording of queries as not designed solely to retrieve

evidence of a crime should result in more accurate reporting and foster compliance with §

702(f)(2). But accurate categorization will still depend on the determinations of individual users,

and therefore on the effectiveness of the guidance and training they receive. The Court intends to

continue to closely monitor U.S.-person queries conducted for evidence-of-crime-only

purposes.[16]

### c.   Augmented Training and Oversight

At the direction of the Deputy Attorney General and in consultation with the Office of the

DNI (ODNI), NSD developed a "guidance document" on the querying standard for FBI

personnel. Gov't Resp. Nov. 3, 2021 at 11. In addition to addressing the three-part querying

standard, this document helpfully instructs that a query must be reasonably likely to retrieve

foreign intelligence information or evidence of a crime *from the FISA collection being queried*;

that in a batch query "each and every identifier queried must independently satisfy the querying

---

[16] In order to trigger § 702(f)(2)'s requirement to obtain a FISC order, "a query . . . using a United States person query term" must "not [be] designed to find and extract foreign intelligence information." § 702(f)(2)(A); *see also* § 702(f)(2)(F)(ii) (nothing in § 702(f)(2) "may be construed as . . . limiting the authority of the [FBI] to review, without a court order, the results of any query . . . that was reasonably designed to find and extract foreign intelligence information"). In evaluating whether a query was designed to find and extract foreign intelligence information under § 702(f)(2)(A), the government regards "the subjective purpose of the FBI user conducting the query" as "an important factor" that may, or may not, be dispositive. Gov't Resp. Jan. 19, 2022 at 20. The government also sees "objective facts and circumstances," such as "the type of investigation" and "how the information retrieved from the query may be related to the investigative activities of other FBI squads or personnel," as potentially relevant. *Id.* The Court does not need to parse these issues in order to make the findings required to approve the FBI's procedures in this proceeding. They can be addressed, to the extent necessary, in concrete cases involving implementation of, or compliance with, § 702(f)(2).

TOP SECRET//SI//NOFORN/FISA

Page 41

**TOP SECRET//SI//NOFORN/FISA**

standard;" and that queries to vet subjects "to determine if there is derogatory information about

them in FBI holdings" are likely to lack a "specific factual basis ... to believe [they are]

reasonably likely to retrieve foreign intelligence information or evidence of a crime from raw

FISA collection." *See* Transmittal of Query Guidance, Tab A ("FBI FISA Query Guidance") at

1-3, 6 (Dec. 3, 2021). It also provides examples of non-compliant queries based on actual

violations. *See id.* at 13 (queries on visitors to a military facility without additional justifying

information); 13-14 (queries on persons arrested "in connection with unrest and protests" to

determine whether the FBI had "derogatory information" regarding them that "related to

counterterrorism or malign foreign influence"). It also makes clear that, in NSD's estimation,

contact with a suspected international terrorist ▓▓▓▓▓▓▓▓▓▓▓▓ likely satisfies the

querying standard, absent particular reason to believe that the contact is innocent. *See id.* at 2-3,

10.

     The FBI is conducting additional training based on this document with a focus on

querying requirements and the systems changes discussed above. Gov't Resp. Nov. 3, 2021 at

12. On January 7, 2022, FBI executive management transmitted NSD's guidance document to

all FBI personnel who have access to raw FISA information and instructed them to complete the

new mandatory training by January 25, 2022. *See* Additional Update on Querying Training for

FBI Users with Access to Unminimized FISA-acquired information at 2 (Feb. 10, 2022). The

FBI has reported a 97.5% completion rate as of February 8, 2022, for personnel required to take

this training. *Id.* at 3. System access was revoked for users who did not complete it. *Id.* The

**TOP SECRET//SI//NOFORN/FISA**

TOP SECRET//SI/NOFORN/FISA

FBI also plans to conduct computer-based interactive training, with a pass/fail test, on an annual basis. FBI Decl. Nov. 3, 2021 ¶¶ 6, 13.

The FBI also plans to conduct a trends analysis on an ongoing basis "by reviewing the results of NSD query audits and FBI internal query audits to determine if additional training, guidance, or system changes are needed to ensure compliance with the querying standard." *Id.* ¶ 16. OIA plans to perform additional enterprise-wide query audits in 2022 and early 2023. Docket No ████████ Decl. of Mark J. Gerber, Assistant Director, FBI, in Support of the Government's Supplemental Response to the Court's Order Dated Dec. 17, 2019 and Corrected Opinion and Order Dated Mar. 5, 2020; and Partial Response to the Court's Order Dated Apr. 3, 2020 at 5 (Apr. 15, 2022). Finally, the Deputy Attorney General recently directed the FBI to designate a senior executive in the Office of the Associate Deputy Director for oversight and compliance issues, which the FBI expects to accomplish before the end of the year. *See* Gov't Resp. Nov. 3, 2021 at 14-15; FBI Decl. Jan. 14, 2022 ¶ 9.

After a pandemic-related suspension of onsite reviews, NSD resumed query audits on a remote basis in February 2021. Gov't Resp. Nov. 3, 2021 at 14. During these audits, NSD discussed and reinforced the querying standard with the FBI personnel being audited. *Id.* NSD has now resumed onsite query reviews, with plans to travel to approximately 18 field offices in the first half of 2022. Gov't Resp. Jan. 19, 2022 at 9, 42-45. To assess the effectiveness of recent measures, NSD will focus on specific categories, including batch query approvals, queries

TOP SECRET//SI/NOFORN/FISA

TOP SECRET//SI//NOFORN/FISA

determined to lack a proper justification, recording queries as conducted solely to retrieve

evidence of crime, and application of the U.S.-person presumptions. *See id.* at 42-45.[17]

### 3.    Reporting of Evidence-Of-Crime-Only Queries

The FISC first imposed a reporting requirement regarding evidence-of-crime-only queries

in November 2015. *See* Docket Nos. ▮▮▮▮▮▮▮ Mem. Op. and Order at 78 (Nov. 6,

2015) ("November 6, 2015 Opinion"). On that occasion, the Court's approval of minimization

procedures that permitted the FBI to conduct evidence-of-crime-only queries using U.S.-person

query terms relied in part on the government's assessment that "FBI queries designed to elicit

evidence of crimes unrelated to foreign intelligence rarely, if ever, produce responsive results"

from Section 702 information. *See id.* at 44. The Court imposed the reporting requirement to

confirm the continued accuracy of that assessment. *Id.* at 78.

Currently, the government must report on a quarterly basis

each instance in which FBI personnel accessed unminimized Section 702-acquired
contents information that was returned by a query that used a U.S.-person query
term and was not designed to find and extract foreign intelligence information.
The report should include a detailed description of the information at issue and the
manner in which it has been or will be used for analytical, investigative, or

---

[17] NSD recently reported the results of its audit ▮▮▮▮▮▮▮▮▮ in which it
reviewed 138 queries of FISA information conducted ▮▮▮ as part of three batch queries. *See*
Notice of compliance incidents regarding querying of raw FISA-acquired information, including
information acquired pursuant to Section 702 of FISA, identified during a NSD review of the
▮▮▮▮▮▮▮ at 1-2 (Mar. 31, 2022). NSD identified 25 non-compliant queries, seven
of which were misidentified as involving U.S.-person query terms. Eight other queries lacked a
specific factual basis to believe they were reasonably likely to return foreign intelligence
information or evidence of a crime from FISA datasets. *Id.* at 2-4. NSD also met with field
office personnel to discuss the results of the audit and delivered in-person training on the
querying rules. *Id.* at 4.

TOP SECRET//SI//NOFORN/FISA

Document re: Section 702 2021 Certification
Authorized for Public Release by ODNI

~~TOP SECRET//SI//NOFORN/FISA~~

> evidentiary purposes.  It shall also identify the query terms used to elicit the information and provide the FBI's basis for concluding that the query was consistent with applicable procedures. This report shall also include: 1) the number of U.S.-Person queries run by the FBI against Section 702-acquired information, and 2) the number of such queries in which the documented justifications indicated an evidence-of-crime-only purpose.

November 18, 2020 Opinion at 63.  Queries for which the government files an application with the FISC under § 702(f)(2) need not be included in this quarterly reporting, *id.*; however, the government has never submitted such an application.

In the last three quarterly reports, the number of queries identified by the persons who conducted them as solely to return evidence of crime purposes has increased, with 122 queries reported for December 2021-February 2022; 88 queries for September-November 2021, and 25 queries for June-August 2021.  *See* March 2022 QR at 106; December 2021 QR at 116; September 2021 QR at 102.  This increase may result from the new requirement that users affirmatively state whether or not a query is for evidence-of-crime-only purposes.[18]  The total number of evidence-of-crime-only queries using U.S.-person query terms is likely much higher, but only queries that resulted in FBI personnel accessing content information acquired under Section 702 are subject to the reporting requirement.  *See* Gov't Resp. Jan. 19, 2022 at 27.

---

[18] The government is still investigating the 122 queries from December 2021-February 2022 to determine, for example, whether the user also had a foreign intelligence purpose when conducting the query.  *See* March 2022 QR at 106 n.94.  For prior reporting periods, such investigation has resulted in fewer queries being assessed to have used a U.S.-person query term and to have been conducted solely to return evidence of crime.  For example, out of the 88 queries initially reported for September-November 2021, only four were ultimately assessed to have fallen within the reporting requirement.  *See id.* at 140-41.  The others were assessed to have been conducted, at least in part, to return foreign intelligence information, not to have involved U.S.-person query terms, or both.  *See id.* at 139-41.

~~TOP SECRET//SI//NOFORN/FISA~~

Authorized for Public Release on: [DATE]

TOP SECRET//SI//NOFORN/FISA

The government has also described an automated process, implemented in September 2020, that compiles a list of all queries marked as conducted solely to retrieve evidence of a crime for which responsive Section 702-acquired information is accessed or reviewed. *See* FBI Decl. Jan. 14, 2022 at 7-9. Each day, this list (called a "Search Audit Report") is emailed to an FBI attorney for evaluation. *Id.* at 8. This process is used to identify potential violations of § 702(f)(2) and has reportedly given the FBI "the ability to identify and review all queries marked [as U.S.-person, evidence-of-crime-only] queries to satisfy the Court's reporting requirements." *Id.* at 8-9. It also appears to be a potentially useful tool for early detection of compliance problems and to facilitate close-in-time remedial training when appropriate, though it is "only effective if users know when to identify their queries" as evidence-of-crime-only. *See* Gov't Resp. Jan. 19, 2022 at 39-40.

The Court is cautiously optimistic that system changes, together with augmented training and continued auditing, will result in more accurate reporting. The Court carries forward these reporting requirements, with modifications to reflect the government's explanation of the FBI's process to document evidence-of-crime-only queries. *See* pages 123-24 *infra*.

4.      Recordkeeping Requirements for U.S.-Person Query Terms

Section 702(f)(1)(b) requires that a record be kept of each U.S.-person query term used for a query. Implementation of § 702(f)(2) and reporting regarding evidence-of-crime-only queries also require the FBI to accurately record use of U.S.-person query terms.

The FBI's querying procedures require it to maintain a "record of each United States person query term used for a query of unminimized content or noncontent information acquired

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN/FISA

pursuant to section 702." *See* FBI Querying Procedures § IV.B. They also set out presumptions

for determining whether a person whose status is unknown is a U.S. person, including a

presumption that someone in the United States is a U.S. person, absent specific indication to the

contrary. *Id.* § III.B.

    A number of reported non-compliant queries have involved failure to accurately report

use of U.S.-person query terms. For instance, a review of queries conducted between October 1,

2020, and March 31, 2021, revealed 473 non-compliant queries conducted by eight users; 390 of

those queries involved U.S.-person query terms that were not identified as such. *See* Notice of

compliance incidents regarding the FBI's querying of raw FISA-acquired information, including

information acquired pursuant to Section 702 of FISA at 2 (Dec. 1, 2021). ████████████

████████ conducted 360 queries in support of various criminal matters against Section 702-

acquired information because it was ██████ practice to run queries in ████ against all

available information, regardless of whether there was a reasonable basis to believe they would

likely retrieve foreign intelligence information or evidence of crime. All of those 360 identifiers

were improperly recorded as non-U.S. person or "other" because their citizenship was not known

████████ *Id.* at 6. NSD requested that ██████ receive refresher training. *Id.* Other reported

incidents have involved failure to record use of U.S.-person query terms, sometimes due to

misapplication of presumptions regarding U.S.-person status. *See id.* at 4-7 (97 queries

conducted in three FBI field offices violated the querying standard; 27 of them involved failure to

record use of U.S.-person query terms).

TOP SECRET//SI//NOFORN/FISA

Authorized for Public Release on: [DATE]

TOP SECRET//SI//NOFORN/FISA

███████████████████████████ misidentified 265 queries between May 2020 and

February 2021 as not involving U.S.-person query terms. The user told NSD that he always

recorded queries as not involving U.S.-person query terms even if the facts indicated otherwise,

*e.g.*, identifiers for local businesses and mosques. The user was retrained the same day he was

interviewed by NSD. *See* Notice of compliance incidents regarding FBI querying of raw FISA-

acquired information, including information acquired pursuant to Section 702 of FISA at 3 (Oct.

18, 2021) ("October 18, 2021 Notice"). A different user ████████ inaccurately recorded that

50 queries, conducted between December 2019 and February 2021, did not involve U.S.-person

query terms. *Id.* at 4.[19]

NSD's review of query logs has identified similar recordkeeping errors in the context of

batch queries. For example, two batch jobs consisting of approximately 68,183 query terms were

recorded as pertaining exclusively to non-U.S. persons, even though many pertained to known or

presumed U.S. persons. *See* Notice of compliance incidents regarding the FBI's querying of raw

FISA-acquired information, including information acquired pursuant to Section 702 of FISA at

8-9 (Dec. 30, 2021) ("December 30, 2021 Notice").[20]

---

[19] There are also instances in which query terms have been misidentified as U.S.-person
query terms. *See, e.g., id.* (80 queries using ████ product numbers); Notice of compliance
incidents regarding FBI querying of raw FISA-acquired information, including information
acquired pursuant to Section 702 of FISA at 3 (Oct. 26, 2021) (approximately 49 queries using
product numbers); October 29, 2021 Notice at 3 (56 queries using ████ product numbers and 68
queries using FBI case numbers).

[20] *See also* March 11, 2022 OIA Update at 8-13 nn.10, 11, 13, 15-16 (approximately 76
non-compliant individual queries that were part of 15 larger batch jobs that were incorrectly
labeled as containing exclusively non-U.S. person query terms, when these queries should have
(continued...)

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN/FISA

When detected, NSD has promptly sought to remediate such errors with training. *See,*

*e.g.,* March 11, 2022 OIA Update at 14-15. NSD's guidance document also provides instructions

on applying the U.S.-person presumptions in the FBI's querying procedures. *Id.* at 16. The

enhanced training undertaken by the FBI and NSD, reinforced by continued oversight reviews,

should improve understanding of those presumptions.

In sum, the Court is encouraged by the amendments to the FBI's querying procedures and

the substantial efforts to improve FBI querying practices, including heightened documentation

requirements, several systems changes, and enhanced guidance, training, and oversight measures.

There are preliminary indications that some of these measures are having the desired effect.

Relying on these improvements, the Court finds that the FBI's querying procedures, as likely to

be implemented in conjunction with its minimization procedures, are consistent with statutory

minimization requirements. Nonetheless, compliance problems with the FBI's querying of

Section 702 information have proven to be persistent and widespread. If they are not

substantially mitigated by these recent measures, it may become necessary to consider other

responses, such as substantially limiting the number of FBI personnel with access to

unminimized Section 702 information.

---

[20](...continued)
been recorded as using U.S.-person query terms based on information known at the time of the
query); December 30, 2021 Notice at 4 ▮▮▮▮▮▮▮▮ conducted three batch jobs totaling
22,532 separate queries, consisting of 8,217 unique domain names of known or presumed U.S.
persons who had been the targets of cyber attacks; the queries were improperly recorded as
involving non-U.S. person query terms).

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN/FISA

## E.    NSA and CIA Minimization Procedures

A set of equivalent amendments are proposed for provisions of the minimization

procedures for the NSA and CIA that address technical or linguistic assistance from foreign

governments.  Also for review is a new provision of the NSA's minimization procedures

pertaining to response to, and remediation of, the improper tasking of selectors.

### 1.    Assistance From Foreign Governments

The minimization procedures for CIA and NSA permit those agencies to share

unminimized Section 702 information with foreign government agencies to obtain technical or

linguistic assistance required to exploit such information.  There are strict limitations on how

such information is handled:  Only foreign government personnel providing the required

assistance may access the information; they may make no other use or disclosure of the

information, or keep any permanent record of it; and they are required to return or destroy it once

the assistance is completed.  *See* CIA Minimization Procedures § 7(c)(3); NSA Minimization

Procedures § 11(b).

In referring to such transmittal to foreign governments, the amendments use the terms

"disclosure," "disclose," and "disclosed," in place of "dissemination," "disseminate," and

"disseminated," which are used in the version of these provisions now in effect.  Dissemination

can be a consequential term in the minimization context.  Section 1801(h)(1) requires "specific

procedures . . . that are reasonably designed" to "prohibit the dissemination" of private

information concerning U.S. persons, "consistent with the need of the United States to obtain,

produce, and disseminate foreign intelligence information."  And Section 1801(h)(2) requires

TOP SECRET//SI//NOFORN/FISA

Authorized for Public Release by ODNI

TOP SECRET//SI//NOFORN/FISA

minimization procedures to prohibit dissemination of private information "in a manner that identifies any United States person, unless such person's identity is necessary to understand foreign intelligence information or assess its importance" or the information in question is foreign intelligence information as defined at Section 1801(e)(1).

Notwithstanding the prior use of the term, the government contends that transmittal of such information is not a "dissemination" because of the above-discussed restrictions on use and access and the requirement that foreign government personnel return or destroy it after providing the assistance required. October 18, 2021 Memorandum at 12.[21]  The government also notes that the amendments conform these provisions to similar ones in procedures for FBI and NCTC, which use the "disclosure" terminology. *Id.* (citing Docket Nos. ███████ Mem. Op. and Order at 16-18 (Aug. 26, 2014) (discussing a similar FBI provision)).  But the corresponding provisions for FBI and NCTC concern technical or linguistic assistance *from other federal agencies*, not foreign governments, *id.* (citing FBI Minimization Procedures § IV.D and NCTC Minimization Procedures § D.5).

On the other hand, the change is really one of terminology rather than substantive effect. The procedures currently in effect allow the CIA and NSA to "disseminate" unminimized Section 702 information to foreign governments to obtain required technical and linguistic

---

[21]  The legislative history provides some support for the government's contention, at least in certain circumstances. *See* H.R. Rep. No. 95-1283, pt.1 at 57 ("Because minimization is only required with respect to information concerning U.S. persons, where communications are encoded or otherwise not processed, so that the contents of the communication are unknown, there is no requirement to minimize the acquisition, retention, or dissemination of such communications until their contents are known.").

TOP SECRET//SI//NOFORN/FISA

Authorized for Public Release on: [DATE]

TOP SECRET//SI//NOFORN/FISA

assistance, subject to the same restrictions that apply to what the amended procedures refer to as "disclosure."

The provisions in question apply to information that, because of its "technical or linguistic content," requires assistance from a foreign partner "in determining [its] meaning or significance," CIA Minimization Procedures § 7.c.3; NSA Minimization Procedures § 11(b), and confine the use and retention of such information by the foreign recipients to what is needed to provide that assistance. Accordingly, the Court finds that these provisions comport with Section 1801(h)(1), even if it assumed *arguendo* that transmittal of the information constitutes a "dissemination." Additionally, under Section 1801(h)(2), it can be argued that the provision of such information to assisting foreign governments is not a dissemination "in a manner that identifies any United States person" – until the required assistance is obtained, any U.S.-person identities within the information are presumably unidentifiable. In any case, the transmittal of such information is "necessary to understand foreign intelligence information or assess its importance" and therefore permissible under Section 1801(h)(2), even if it is assumed to involve a dissemination in a manner that identifies a U.S. person.

2.    Responding to Improper Taskings

In addition to those changes, a new provision at Section 4(f) of the NSA Minimization Procedures addresses delays in responding to and remediating the improper tasking of selectors. In order to evaluate this provision, it is useful to place it in the context of compliance problems that prompted the Court to direct the government to consider revising the NSA's procedures in

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN//FISA

this regard. *See* Docket No. ███████ Order Regarding NSA Tasking Errors (Apr. 2, 2021);

███████ Order (Aug. 12, 2021) ("August 12, 2021 Order").



Between November 28, 2017, and May 9, 2018, however, NSA tasked for acquisition ██ selectors under that certification, based on ███████████████████████████████████ Report in Response to the Court's Order Dated Apr. 2, 2021 at 2 (June 21, 2021) ("June 21, 2021 Report"). In February and April 2018, as part of its regular review of selectors tasked by NSA, NSD raised concerns that the activities of such persons were too attenuated from the authorized purpose of acquisitions under ███████████████ *See* June 2018 QR at 30-31; September 2018 QR at 26-27; March 2019 QR at 11.

In May 2018, NSD told NSA that the tasking of four other facilities used by persons ███████████████████████ had been improper. *See* June 21, 2021 Report at 4 n.4. NSA promptly detasked them. *Id.* At that time, NSD "had not determined that all taskings based on a user's involvement ███████████████████████████ were improper, but "out of an abundance of caution" NSA also detasked in May 2018 the ██ facilities mentioned above (except those that had already been detasked for other reasons). *Id.* at

TOP SECRET//SI//NOFORN//FISA

TOP SECRET//SI//NOFORN/FISA

4. But NSA continued to issue reports containing information acquired from tasking the ███

facilities until June 20, 2018. *See id.* at 15-16.

In August 2018, NSD advised NSA that these ███ taskings had been improper. *Id.* at 5. In

November 2018, "NSD reiterated to NSA that NSD and ODNI had determined that the ███

facilities had been tasked in error because there was an insufficient connection to ███████

███████████ and that tasking facilities under ██████████████

█████████████ based solely on ██████████████████████

███████████████████ would constitute compliance incidents." *Id.* at 5, 18. Later in

November 2018, "NSD further advised NSA that collection resulting from prior taskings where

the users lacked sufficient connection ██████████████ must be purged and any

reports issued must be recalled." *Id.* at 5. But NSA did not then take any steps to purge

information acquired from these ███ taskings. *Id.* at 6. Finally, in September 2020, October

2020, and January 2021, NSA placed identifiers for this information on its Master Purge List

(MPL) ██████████████████████████████████████████

██████████████████ *Id.* at 21; October 18, 2018 Opinion at 129. In February 2021, NSA

finally commenced destruction of this improperly acquired information by putting these

identifiers in "purge state." *See* June 21, 2021 Report at 21.

There were also delays in NSA's recall of intelligence reports that contained such

information. NSA did not recall most of the 242 reports it initially identified until January 2021.

June 21, 2021 Report at 16-17. NSA used incorrect purge parameters in some of its initial efforts

to identify reports for recall. *See* Docket No. ████████ Report in Response to the Court's

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN//FISA

Order Dated Aug. 12, 2021 at 6-7 (Sept. 10, 2021) ("September 10, 2021 Report"). In June

2021, NSA issued recall notices for additional reports. *Id.* Further efforts were required to

remove reports from a system maintained by the Defense Intelligence Agency (DIA) and

accessible to analysts throughout the Intelligence Community (IC). *See id.* at 8-9; Docket No.

█████████ Supp. Report in Response to the Court's Order Dated Aug. 12, 2021 at 5-6, 8-9

(Nov. 10, 2021) ("November 10, 2021 Report"); December 2021 QR at 150. Due to a coding

error, NSA improperly retained some reports on a back-up server until December 2021.

Preliminary Notice of a Compliance Incident Regarding the NSA's Retention of Reports Subject

to Recall that Contained Information Acquired Pursuant to FISA (Dec. 30, 2021).

In the August 12, 2021 Order, the Court directed that, when the government requests

approval of Section 702 certifications and related procedures, it

> should address what additional measures may guard against similar improper
> taskings and delayed remedial responses, with specific consideration of revising
> targeting and minimization procedures to (i) explicitly require prompt destruction
> of information acquired under any improper tasking; (ii) restrict or prohibit
> dissemination of information obtained from a tasking, the propriety of which is in
> question, unless and until a conclusive determination that the facility was properly
> tasked is made; and (iii) establish deadlines for meeting destruction requirements
> and recalling reports for FISA-compliance reasons.

August 12, 2021 Order at 3-4.

Section 4(f) was adopted in response. It requires NSD to promptly review NSA's

documentation of the basis for NSA's taskings and NSA must cooperate in that review. NSA

Minimization Procedures § 4(f)(1). Once NSD notifies NSA and ODNI in writing of an

assessment "that the basis for tasking [a] selector may be insufficient,"

TOP SECRET//SI//NOFORN//FISA

TOP SECRET//SI//NOFORN//FISA

NSA shall promptly, and not later than 10 business days, initiate the process to (1) identify all information acquired from the tasking of that selector and reporting of such information and (2) place the identifiers for that information on the [MPL] . . . as they are identified to limit further use or dissemination of that information.

§ 4(f)(1)-(2).  NSA must complete that process within 90 calendar days of receiving written notification of such an assessment.  § 4(f)(2).  If for any reason it is unable to do so, the circumstances must be reported promptly to the FISC.  *Id.*

Once a written notification is made under Section 4(f)(1), NSD and ODNI, with the cooperation of NSA, "shall make a final determination regarding the propriety of the tasking as expeditiously as practical."  § 4(f)(3).  NSD shall promptly report to the FISC any instance in which a final determination is not made within 60 calendar days.  *Id.*  Upon written notification of a *final* determination by NSD and ODNI of an improper tasking, NSA must destroy information acquired from the tasking and revise or recall disseminations that contain such information.  § 4(f)(4).[22]  NSA has 30 calendar days – from the time that it has *both* received such a final determination *and* completed the process under Section 4(f)(2) "to identify and limit

---

[22] Conversely, if NSD and ODNI finally determine that the tasking in question was proper, NSA may remove the pertinent identifiers from the MPL and retain and use the information in accordance with other provisions of the NSA Minimization Procedures.  § 4(f)(5).

TOP SECRET//SI//NOFORN//FISA

TOP SECRET//SI//NOFORN/FISA

the use of all information" acquired by the tasking – to complete those steps.  § 4(f)(4).  At this

stage also, failure to meet the applicable deadline must be reported to the FISC promptly.  *Id.*

The government contends that it is not feasible for NSA to begin to destroy any

information acquired from an improper tasking until the identifiers for all information acquired

by it have been put on the MPL.  October 18, 2021 Memorandum at 9.

These new procedures should guard against protracted delays like those described above.

As long as the government complies with the reporting requirements triggered by failure to meet

one of the deadlines, the Court will be able to examine the causes of any delay, and potentially

resolve them.[23]  The one important action that is not subject to a deadline is NSD's preliminary

determination under Section 4(f)(1) that the basis for a tasking may have been insufficient

(though NSD is required to promptly review tasking determinations).  Because of the preliminary

---

[23] For example, it appears that disagreement between NSA and NSD regarding the extent
to which NSA was authorized to acquire information about ▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓ may have contributed to the above-described delays.  *See*
August 12, 2021 Order at 2 (discussing unsuccessful effort by NSA to persuade NSD to reverse
its determination that the ▓▓▓▓▓▓ taskings were improper).

TOP SECRET//SI//NOFORN/FISA

### TOP SECRET//SI//NOFORN//FISA

nature of such assessments and the low bar established for making them – that the basis for a

tasking "may be insufficient," § 4(f)(1) – the Court expects NSD to act expeditiously when

warranted, so that steps are taken to protect the affected information from further use or

dissemination until a final determination is made.

      **F.**    **Conclusion**

      For the reasons stated herein and in the Court's opinions in the Prior 702 Dockets, the

Court concludes that, as written, the proposed minimization procedures for the FBI, NSA, CIA,

and NCTC, in conjunction with the querying procedures for those agencies, satisfy the definition

of minimization procedures at 50 U.S.C. § 1801(h); and that those querying procedures, as

written, satisfy the requirements of Section 702(f)(1).

## V.    FOURTH AMENDMENT REQUIREMENTS

      The Court must also assess whether the proposed targeting, minimization, and querying

procedures are consistent with the requirements of the Fourth Amendment. *See* § 702(j)(3)(A)-

(B). That Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects,
> against unreasonable searches and seizures, shall not be violated, and no Warrants
> shall issue, but upon probable cause, supported by Oath or affirmation, and
> particularly describing the place to be searched, and the persons or things to be
> seized.

"The touchstone of the Fourth Amendment is reasonableness." *In re Certified Question of Law*,

858 F.3d 591, 604 (FISCR 2016) (per curiam) ("*In re Certified Question*"). Although "[t]he

warrant requirement is generally a tolerable proxy for 'reasonableness' when the government is

seeking to unearth evidence of criminal wrongdoing, . . . it fails properly to balance the interests

### TOP SECRET//SI//NOFORN//FISA

Authorized for Public Release on: [DATE]

TOP SECRET//SI//NOFORN/FISA

at stake when the government is instead seeking to preserve and protect the nation's security

from foreign threat." *Id.* at 593. A warrant is therefore not required to conduct surveillance "to

obtain foreign intelligence for national security purposes . . . directed against foreign powers or

agents of foreign powers reasonably believed to be located outside the United States." *In re

Directives Pursuant to Section 105B of FISA*, 551 F.3d 1004, 1012 (FISCR 2008) ("*In re

Directives*").

    The FISC has repeatedly reached the same conclusion regarding Section 702 acquisitions.

*See, e.g.*, Docket Nos. ██████████ Mem. Op. and Order at 36-37 (Nov. 6, 2015)

("November 6, 2015, Opinion"); Sept. 4, 2008 Opinion at 34-36. In addition, all three United

States Circuit Courts of Appeals to consider the issue have held that the incidental collection of a

U.S. person's communications under Section 702 does not require a warrant and is reasonable

under the Fourth Amendment. *See United States v. Muhtorov*, 20 F.4th 558, 594-606 (10th Cir.

2021); *United States v. Hasbajrami*, 945 F.3d 641, 661-68 (2d Cir. 2019); *United States v.

Mohamud*, 843 F.3d 420, 438-44 (9th Cir. 2016).[24]

    In prior reviews, and consistent with its statutory responsibility to determine whether "the

targeting, minimization, and querying procedures" are "consistent with . . . the fourth

amendment," § 702(j)(3)(A)-(B), the Court has assessed the reasonableness of Section 702

procedures as a whole. *See, e.g.*, December 6, 2019 Opinion at 60 (concluding that "in

--------

    [24] The Tenth Circuit in *Muhtorov* also found that the FISC's review of Section 702
certifications and procedures is consistent with Article III's "case-or-controversy" requirement
and the corollary prohibition on advisory opinions. *See* 20 F.4th at 606-18; *see also Mohamud*,
843 F.3d at 444 n.28 (finding that FISC opinions under Section 702 are not advisory).

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN/FISA

combination, the proposed targeting, minimization, and querying procedures will adequately

guard against error and abuse, taking into account the individual and governmental interests at

stake"); November 6, 2015 Opinion at 39 (assessing "the combined effect" of the targeting and

minimization procedures).  Under the applicable totality-of-circumstances approach, the Court

must balance "'the degree to which [governmental action] intrudes upon an individual's

privacy'" against "'the degree to which it is needed for the promotion of legitimate governmental

interests.'"  *In re Certified Question*, 858 F.3d at 604-05 (quoting *Wyoming v. Houghton*, 526

U.S. 295, 300 (1999)).  "The more important the government's interest, the greater the intrusion

that may be constitutionally tolerated."  *In re Directives*, 551 F.3d at 1012.

Acquiring "foreign intelligence with an eye toward safeguarding the nation's security

serves . . . a particularly intense interest."  *In re Certified Question*, 858 F.3d at 606 (internal

quotation marks omitted).  For that reason, "the government's investigative interest in cases

arising under FISA is at the highest level and weighs heavily in the constitutional balancing

process."  *Id.* at 608.  The targeting procedures help ensure that Section 702 taskings are focused

on acquiring  authorized forms of foreign intelligence information.  *See* NSA Targeting

Procedures § I at 4 (before tasking, NSA must make a "particularized and fact-based" assessment

that the proposed "target is expected to possess, receive, and/or is likely to communicate foreign

intelligence information concerning a foreign power or foreign territory authorized for targeting"

under a Section 702 certification).

Turning to intrusion on Fourth Amendment-protected privacy interests, the foreign focus

of Section 702 targeting serves to cabin such intrusion to some degree.  The Court has found that

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN/FISA

the targeting procedures, as written, are reasonably designed to limit acquisitions to targeting

persons reasonably believed to be non-United States persons located outside the United States.

*See* pages 16-17 *supra*. Such persons are not within the ambit of Fourth Amendment protection.

*See, e.g.*, November 6, 2015 Opinion at 38; September 4, 2008 Opinion at 37 (citing *United

States v. Verdugo-Urquidez*, 494 U.S. 259, 274-75 (1990)).

Notwithstanding this foreign-directed targeting, the extent to which Section 702

acquisitions involve U.S. persons should be understood to be substantial in the aggregate. The

government tasks a large number of selectors for acquisition under Section 702. *See* DNI Annual

Statistical Transparency Report Regarding the Intelligence Community's Use of National

Security Surveillance Authorities at 16 (April 2021) (reporting an estimated number of 202,723

Section 702 targets in 2020). Although not separately quantified, there is presumably a

significant number of acquisitions that implicate Fourth Amendment-protected interests, *e.g.*,

when a communication between a U.S. person and a Section 702 target is intercepted.

The government can reduce the Fourth Amendment intrusiveness of such acquisitions by

restricting use and disclosure of the U.S.-person information acquired. *See In re Certified

Question*, 858 F.3d at 609-10. Here, the Court has found that each agency's minimization and

querying procedures satisfy the statutory minimization requirements, *see* pages 17-58 *supra*,

including that they "are reasonably designed . . . to minimize the acquisition and retention, and

prohibit the dissemination" of private U.S.-person information, "consistent with the need of the

United States to obtain, produce, and disseminate foreign intelligence information" and that they

require that private information "which is not foreign intelligence information, as defined in [§

TOP SECRET//SI//NOFORN/FISA

Page 61

Authorized for Public Release by ODNI

TOP SECRET//SI//NOFORN//FISA

1801(e)(1)], shall not be disseminated in a manner that identifies any United States person, without such person's consent, unless such person's identity is necessary to understand foreign intelligence information or assess its importance." § 1801(h)(1)-(2).  Such protections can weigh considerably – even decisively – in assessing reasonableness under the Fourth Amendment.

> If the protections that are in place for individual privacy interests are sufficient in light of the governmental interest at stake, the constitutional scales will tilt in favor of upholding the government's actions.  If, however, those protections are insufficient to alleviate the risks of government error and abuse, the scales will tip toward a finding of unconstitutionality.

*In re Directives*, 551 F.3d at 1012.

Protections relating to use of U.S.-person query terms are particularly significant in the FISC's Fourth Amendment review.  "When the government queries Section 702 data to identify and examine information about a particular U.S. person, . . . it typically has an investigative or analytical interest regarding that person, who necessarily was not a target" of Section 702 acquisition.  October 18, 2018 Opinion at 65.  Such queries can also result in a further, post-acquisition "intrusion into the privacy of such U.S. persons, who may have enjoyed the protection of anonymity until information concerning them was retrieved" by a query.  *Id.* at 65-66 (internal quotation marks omitted).  Additional Fourth Amendment concerns can arise when the FBI uses U.S.-person query terms to identify evidence of crimes that are unrelated to national security threats.  Even though there is an exception to the Fourth Amendment's warrant requirement for surveillance "conducted to obtain foreign intelligence for national security purposes and . . . directed against foreign powers or agents of foreign powers reasonably believed to be located outside the United States," that exception "might not apply in everyday criminal

TOP SECRET//SI//NOFORN//FISA

Authorized for Public Release on: [DATE]

TOP SECRET//SI//NOFORN/FISA

investigations unrelated to national security and foreign intelligence needs." *In re DNI/AG*

*702(h) Certifications*, 941 F.3d at 559 (footnote and internal quotation marks omitted).

In 2018, after the enactment of the querying provisions in Section 702(f), *see* FISA

Amendments Reauthorization Act of 2017 ("Reauthorization Act") § 101, Pub. L. No. 115-118,

132 Stat. 3 (2018), the FISC entertained amici arguments that it should regard queries as distinct

Fourth Amendment searches. *See* October 18, 2018 Opinion at 85-88. The Court declined to do

for the following reasons.[25] First, although the querying requirements introduced by the

Reauthorization Act "reflect congressional views on the reasonableness of querying practices and

strongly suggest congressional recognition that Fourth Amendment concerns are implicated" by

Section 702 queries, they "expand *statutory* protections, not the scope of what constitutes an

independent search under the Fourth Amendment." October 18, 2018 Opinion at 87.

The Court was also unpersuaded that cases cited by the amici established that "queries of

Section 702 information [must] be considered distinct Fourth Amendment events." *Id.* Some of

those cases "involved property voluntarily provided to law enforcement by a third party and

subsequent law-enforcement searches that exceeded the scope of the prior examination by that

third party." *Id.* (distinguishing *Walter v. United States*, 447 U.S. 649 (1980), *United States v.*

*Runyan*, 275 F.3d 449 (5th Cir. 2001), and *United States v. Bowman*, 215 F.3d 951 (9th Cir.

2001)). Amici also relied on *Riley v. California*, 573 U.S. 373 (2014) (warrant required to search

cell phone lawfully seized as incident to an arrest) and *Carpenter v. United States*, 138 S. Ct.

---

[25] The FISC previously entertained similar arguments from an amicus in 2015 and
reached the same conclusion. November 6, 2015 Opinion at 40-41.

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN/FISA

2206 (2018) (acquisition from a third party of cell-site records revelatory of a person's location

constituted a Fourth Amendment search).  The Court found that these precedents were not

"instructive" regarding "the government's examination of information lawfully acquired under a

statutory framework that requires a judicial determination that the totality of attendant

circumstances, including the government's acquisition, retention, use, and dissemination of such

information, is reasonable under the Fourth Amendment."  October 18, 2018 Opinion at 87-88.

Of course, this choice of analytical framework did not leave the Court's Fourth

Amendment review toothless: under the totality-of-circumstances approach discussed above, the

Court found the FBI's querying and minimization procedures to be inconsistent with Fourth

Amendment requirements because the FBI would likely conduct broad, suspicionless queries.

*See id.* at 88-92.[26]

In 2019, the Second Circuit held that querying Section 702 information, at least when

designed to retrieve information about particular U.S. persons, should be regarded as "a separate

Fourth Amendment event that, in itself, must be reasonable."  *Hasbajrami*, 945 F.3d at 670.[27]  In

---

[26] On appeal, the FISCR did not reach whether the FBI's procedures were consistent with
the Fourth Amendment.  *In re DNI/AG 702(h) Certifications*, 941 F.3d at 563.  It did, however,
provide guidance to the government and the FISC regarding further consideration of the issue.
*Id.* at 563-65.  It also observed that the enactment of § 702(f)(2) was apparently addressed at
"compliance with the Fourth Amendment" and "designed to avert any constitutional challenge to
the FBI's conduct" regarding certain types of U.S.-person queries.  *Id.* at 559-60.  The FISCR did
not, however, suggest that U.S.-person queries should be analyzed as separate Fourth
Amendment searches.

[27] The district court in the *Mohamud* case, calling it a "very close question," reached the
contrary conclusion, *i.e.*, that a query of lawfully collected Section 702 information using a U.S.-
person identifier is "not a separate search."  *United States v. Mohamud*, No. 3:10-cr-475-KI-1,

(continued...)

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN/FISA

so doing, the Second Circuit relied on a number of the cases considered by the FISC in 2018.

*See id.* at 670-72 (discussing *Riley*, *Runyan*, *Mulder*, and *Carpenter*).  It also noted the "vast

body of information" acquired and available for querying under Section 702, which "may make it

easier to target wide-ranging information about a given United States person." *Id.* at 671-72.

Permitting

> that information to be accessed indiscriminately, for domestic law enforcement
> purposes, without any reason to believe that the individual is involved in any
> criminal activity . . . or even that any information about the person is likely to be
> in the database, just to see if there is anything incriminating in any conversations
> that might happen to be there, would be at odds with the bedrock Fourth
> Amendment concept that law enforcement agents may not invade the privacy of
> individuals without some objective reason to believe that evidence of crime will
> be found.

*Id.* at 672.  The October 18, 2018 Opinion expressed similar concerns:

> The goal of the Fourth Amendment is to protect individuals from arbitrary
> government intrusions on their privacy.  The FBI's use of unjustified queries
> squarely implicates that purpose: the FBI searched for, and presumably examined
> when found, private communications of particular U.S. persons on arbitrary
> grounds such as their living near an investigative subject or working in a hotel
> frequented by an investigative subject.

October 18, 2018 Opinion at 89 (citations omitted).

The Second Circuit took the additional step of "[t]reating querying as a Fourth

Amendment event" to provide "a backstop to protect the privacy interests of United States

persons and ensure that they are not being improperly targeted" by unjustified queries.  945 F.3d

_____

²⁷(...continued)
2014 WL 2866749 at *26 (D. Or. June 24, 2014), *aff'd*, 843 F.3d 420 (9th Cir. 2016).  The Ninth
Circuit did not reach that issue on appeal.

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN//FISA

at 672. This Court respectfully adheres to the view that those objectives are properly served, at

least in the context of the FISC's review of procedures under § 702(j)(3)(A)-(B), by examining

the reasonableness of such procedures as a whole.

The Court has carefully considered how the proposed procedures protect private U.S.-

person information from unjustified intrusion and misuse. It concludes that, in combination, the

proposed targeting, minimization, and querying procedures, as written, adequately guard against

error and abuse, taking into account the individual and governmental interests at stake. The

Court accordingly finds that targeting, minimization, and querying procedures, as written, are

consistent with the requirements of the Fourth Amendment, insofar as they relate to the proposed

forms of acquisition other than ███████████████████

The Court also finds that the FBI's minimization and querying procedures, as likely to be

implemented, are consistent with Fourth Amendment requirements. That finding, as well as the

finding that those procedures satisfy statutory minimization requirements, *see* page 49 *supra*,

depends on the Court's evaluation of the likely efficacy of efforts to improve FBI querying

practices. *See* pages 34-44, 46-49 *supra*. The Court is well aware that fundamental

misunderstandings of querying requirements have been evident within the FBI since 2018. *See*

October 18, 2018 Opinion at 69, 77 (citing a lack of common understanding between FBI and

NSD about the meaning and application of the querying standard); Querying Violations Order at

13-14 (describing problems in September 2021 as "substantial and persistent" and "likely to

remain intractable as long as the FBI and NSD lack a shared, reasonable understanding of the

querying standard"). In view of that history, the government should carefully monitor the

TOP SECRET//SI//NOFORN//FISA

TOP SECRET//SI//NOFORN/FISA

effectiveness of the measures it has adopted and be proactive in implementing additional ones if

problems persist.

Perfect implementation is unrealistic and "some potential for error is not a sufficient

reason" to invalidate procedures as unreasonable. *In re Directives*, 551 F.3d at 1015.

Nevertheless, if the scope and pervasiveness of FBI querying violations were to continue

unabated, they would present greater statutory and Fourth Amendment difficulties in the future.

There is a point at which it would be untenable to base findings of sufficiency on long promised,

but still unrealized, improvements in how the FBI queries Section 702 information.

Issues regarding implementation of the other sets of procedures are addressed in Part VI

immediately below.

## VI.    IMPLEMENTATION AND COMPLIANCE ISSUES

FISC review of the sufficiency of Section 702 procedures is not limited to the procedures

as written, but also encompasses how they are likely to be implemented. *See, e.g.*, October 18,

2018 Opinion at 68. How an agency implements existing procedures "can be relevant to

determining whether proposed procedures comply with FISA's requirements," "to the extent that

they serve as indicia of how proposed procedures will be implemented in the future." *In re*

*DNI/AG 702(h) Certifications*, 941 F.3d at 564.

### A.    NSA Querying Issues

Under NSA's querying procedures,

[a]ny United States person query term used to identify and select unminimized
section 702-acquired content must first be approved by NSA's Office of General
Counsel.  NSA personnel seeking such an approval must provide a statement of

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN/FISA

facts establishing that the use of any such identifier as a selection term is
reasonably likely to retrieve foreign intelligence information.

NSA Querying Procedures § IV.A. NSA may approve the use of a U.S.-person query term to

query unminimized content information for up to one year, with the possibility of renewals for up

to one year. *Id.* Any use of a U.S.-person query term to query unminimized non-content

metadata "must be accompanied by a statement of facts showing that the use of [the] query term

is reasonably likely to retrieve foreign intelligence information." *Id.*[28]

NSA's use of a querying tool ███████████ has sometimes resulted in violations of these

requirements. ████████ assists analysts in making foreignness determinations regarding facilities

proposed for tasking under Section 702. It enables "queries across multiple datasets, which may

include information, including content, acquired pursuant to multiple FISA authorities, including

Section 702." Preliminary Notice of Possible Compliance Incidents Regarding Improper Queries

at 3 (Feb. 5, 2021) ("Feb. 5, 2021 Notice").

████████ does not just execute queries using identifiers entered by NSA analysts. It also

employs an "enrichment process" to discover within NSA systems other identifiers that are used

by the same person, or associated with the same communications facility, as the "seed identifier"

initially entered by an analyst. *See* Supplemental Notice of Compliance Incidents Regarding

---

[28] These procedures define "query" to mean "the use of one or more terms to retrieve the
unminimized contents or noncontents (including metadata) of section 702-acquired information
that is located in an NSA system," but exclude from that definition circumstances where a user
"does not receive unminimized section 702-acquired information in response to the query either
because the user has not been granted access to" such information or because the user "has
limited the query such that it cannot retrieve" such information. § III.A.

TOP SECRET//SI//NOFORN/FISA

Page 68

TOP SECRET//SI//NOFORN/FISA

Improper Queries at 3-4 (Mar. 28, 2022) ("March 28, 2022 Notice"); NSA OIG Evaluation of

United States Person Identifiers Used to Query FISA Section 702 Data EV-19-0001, ii n.2, 17

n.43 (Sept. 29, 2021) ("OIG Sept. 2021 Rept.").[29] ████████████ runs queries using

identifiers discovered through this enrichment process, as well as the initial seed identifier.

    In order to avoid running queries that use known U.S.-person identifiers that have not

been approved as U.S.-person query terms, ████████████ checks a "defeat list" of

known U.S.-person identifiers drawn from NSA's ████████████████████

████████[31] systems.  March 28, 2022 Notice at 3.  If the seed identifier is not found on the

defeat list, ████████████ executes queries using both the seed identifier and any other

identifiers correlated with that seed identifier discovered through the enrichment process.  *Id.* at

4.

    These processes have sometimes resulted in violations of the requirements for using U.S.-

person query terms.  For example, ████████ enrichment process has discovered identifiers

otherwise known by NSA to pertain to U.S. persons when their corresponding seed identifiers

were not known to do so at the time of the query (and therefore presumably did not appear on the

---

[29] To the extent this enrichment process interacts with raw Section 702 information, it appears to be a type of process regarding which the government has undertaken to provide additional information, as discussed at pages 79-80 *infra*.

[30] ████████████████ NSA system used, in part, to prevent the tasking and unintentional querying of facilities known to be used by United States persons."  *See* December 2017 QR at 68 n.21.

[31] ████████ NSA's primary repository for reference target knowledge" in which analysts can manage and collaborate on target knowledge.  *See* OIG Sept. 2021 Rept. at 19 n.52.

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN/FISA

defeat list). Queries using these U.S.-person identifiers were run automatically, without the approvals required for use of U.S.-person query terms. *Id.* at 7. In a separate incident, a seed identifier otherwise known by NSA to pertain to a U.S. person was not blocked by the defeat list and ██████ discovered and ran queries using ten other identifiers associated with the U.S. person. *Id.* at 6. NSA is unable to determine if this seed identifier was on the defeat list at the time of the query because the list is continuously updated. *Id.*

After completing its investigation of ██████ related compliance problems, which were initially uncovered by the NSA Office of Inspector General (NSA OIG),[32] the government identified improper queries using 18 U.S.-person identifiers that resulted from ██████ enrichment process and assessed that other improper U.S.-person queries also likely occurred. *See* March 28, 2022 Notice at 5.[33]

To address these compliance issues, the government is "currently developing a plan to enrich the identifiers on the defeat list to include their correlated identifiers." *See* March 28, 2022 Notice at 8. Augmenting the defeat list in this fashion should result in blocking ██████ queries of known U.S.-person identifiers that ██████ enrichment process associates with a

---

[32] *See* Feb. 5, 2021 Notice at 2-3; OIG Sept. 2021 Rept.

[33] The government separately reported 77 queries using 55 U.S.-person identifiers, discovered through the same OIG investigation, that had not been properly approved as U.S.-person query terms. *See* Notice of a Compliance Incident Regarding Improper United States Person Queries at 2 (May 21, 2021). The government also discovered queries using 35 U.S.-person identifiers between January 2019 and March 2019 that were conducted after their approvals were no longer valid. *See* Final Notice of Compliance Incidents Regarding Improper United States Person Queries at 2 (Nov. 23, 2021). These incidents appear to have involved human error, rather than a systems problem, and were addressed through training.

TOP SECRET//SI//NOFORN/FISA

Page 70

TOP SECRET//SI//NOFORN/FISA

seed identifier. *Id.* at 9. The government also reports that these efforts should help prevent

automated queries of other U.S.-person identifiers discovered through the enrichment process.

*Id.*

There is reason to expect that these efforts should improve compliance by more

effectively avoiding automatic querying of known U.S.-person identifiers without proper

approval. The Court expects to be updated on the status of relevant systems changes. After

assessing the scope of current problems and efforts to address them, the Court concludes that

these ███████ related compliance issues do not preclude a finding that NSA querying and

minimization procedures, as likely to be implemented, are consistent with statutory and Fourth

Amendment requirements, insofar as they relate ████████████████████████████████

### B.    Implementation of FBI Targeting Procedures

The FBI Targeting Procedures require NSA, when requesting FBI to ████████████████

████████████████ a Designated Account, to provide FBI with identifying information for the

account. *See* FBI Targeting Procedures § I.2. In November 2020, the Court considered a

potential form of non-compliance involving NSA's not consistently providing identifying

information to the FBI in support ██████████████████████ from accounts that had

already been subject to one or more such requests ("refresh requests"). The Court noted that a

refresh request should be treated as a new request under the FBI Targeting Procedures, and that it

would continue to monitor the implementation of information-sharing requirements to evaluate

whether they adequately protect against targeting U.S. persons or persons in the United States.

*See* November 18, 2020 Opinion at 37-38.

TOP SECRET//SI//NOFORN/FISA

Page 71

TOP SECRET//SI//NOFORN/FISA

The government reports that since November 2020, NSA, CIA, and FBI have updated

systems, procedures, and training to ensure that a refresh request is supported by identifying

information ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ that is deemed reliable and became known to an agency since the time of a

previous request for the same account. *See* Update Regarding Implementation of the FBI Section

702 Targeting Procedures at 2-3 (Oct. 20, 2021). These updates provide reason to expect that the

relevant provisions of the targeting procedures will be applied properly. Although a handful of

other incidents have been reported involving NSA not providing the FBI with certain required

information, they either pre-dated or followed closely on the heels of the above-noted updates.

*See* Semiannual Report of the Attorney General Concerning Acquisitions Under Section 702 of

FISA at 98-100 (Mar. 11, 2022).

Relatedly, the government has advised that

the FBI is aware of situations ▮▮▮▮▮▮▮▮▮▮ information initially provided
by the FBI to NSA has not been included when NSA sent the FBI ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ request for approval. In such cases, the government has
determined that the FBI ▮▮▮▮▮▮▮▮▮▮▮▮ a Designated
Account following the FBI's completion of the required checks using both the
information provided by NSA and that originally was identified by the FBI, rather
than wait for NSA to provide the FBI with the information originally identified by
the FBI.

October 18, 2021 Memorandum at 27-28. That is sensible when FBI personnel are confident that

they know what NSA has omitted and can properly factor it into their assessment ▮▮▮▮▮▮

request. But that may not always be the case. NSA should be as forthcoming as possible in

providing reliable target information, even when it originated with the FBI. On balance,

TOP SECRET//SI//NOFORN/FISA

Page 72

TOP SECRET//SI//NOFORN/FISA

however, in view of the implementation updates noted above, the Court finds that the FBI

Targeting Procedures as likely to be implemented meet statutory and Fourth Amendment

requirements.

## C.   **Failure to Purge Recalled Reports**

In March 2019, the government reported that NCTC had failed to purge several recalled

NSA reports containing FISA-acquired information. *See* Preliminary Notice of Compliance

Incident Regarding Incomplete Purges of Data Acquired Pursuant to FISA (Mar. 13, 2019).

Following an ODNI data call regarding the recall of reports, the government assessed that the

CIA and NSA also had systems that did not purge reports for FISA-compliance reasons. *See*

Docket Nos ███████████ Report in Response to Order Dated Oct. 3, 2019 at 4-7 (Nov. 4,

2019). In response, the ODNI revised its DNI IC policy memorandum on recalling intelligence

products to add a new category to notify recipients that a product has been recalled for a FISA-

compliance reason and must be removed with steps taken to prevent its further use or disclosure.

*See* Docket Nos ███████████ Report in Response to Mem. Op. and Order Dated Dec. 6,

2019 at 5 (Feb. 28, 2020). The revised IC policy memorandum ("ICPM 200(01)") also directed

all IC elements to revise their internal regulations to implement the procedures mandated therein.

*See id.* at 6.

In response to a reporting requirement imposed by the Court in November 18, 2020, *see*

Opinion at 56-58, 65, the government has filed five updates regarding implementation of the

revised ODNI policy. *See* Supplemental Report in Response to the Court's Memorandum

Opinion and Order Dated November 18, 2020, Feb. 17, 2022 ("February 17, 2022 Supplemental

TOP SECRET//SI//NOFORN/FISA

Page 73

TOP SECRET//SI//NOFORN//FISA

Report") (earlier reports were filed on March 1, 2021, May 28, 2021, August 27, 2021, and

November 18, 2021). These reports have detailed steady progress in the form of system changes,

internal policy standards and training, and interagency coordination.

For example, NSD discovered that the Defense Intelligence Agency (DIA) had retained a

potentially "significant number" of recalled NSA reports, including some recalled for FISA-

compliance reasons, as a result of DIA not being aware that NSA was using a communication

channel ██████████████ to send recall notices. August 27, 2021 Supplemental Report at

12-13 n.10; Preliminary Notice of a Compliance Incident Regarding Retention of Data Acquired

Pursuant to FISA at 3 (Aug. 20, 2021). DIA then searched for and located 262 reports containing

information acquired by non-compliant Section 702 taskings that were being retained in a DIA

database that is accessible IC-wide. *See* Supplemental Report in Response to the Court's Order

Dated August 12, 2021at 8-9 ████████ Nov. 10, 2021). These reports have since been

removed. The government further reported that, as of September 1, 2021, DIA was routinely

identifying all incoming FISA-compliance recall requests and removing recalled reports from all

DIA systems. *See* Supplemental Notice of a Compliance Incident Regarding Retention of Data

Acquired Pursuant to FISA at 4 (Jan. 25, 2022); February 17, 2022 Supplemental Report at 13-

14. This incident, however, indicates a need for continued coordination among IC elements

regarding the interagency recall processes. *See* November 18, 2021 Supplemental Report at 14;

*see also* February 17, 2022 Supplemental Report at 8 n.5.

In February 2022, the government advised that NSA, CIA, FBI and NCTC continue to

coordinate and develop their policies and procedures to identify and handle disseminated

TOP SECRET//SI//NOFORN//FISA

TOP SECRET//SI//NOFORN//FISA

analytical products derived from reports recalled for FISA-compliance reasons, and have

completed most of their work to implement the revised ODNI policy. The government commits

to continue to provide progress updates to the Court, but given the few remaining steps to be

taken, plans to provide the next update by February 17, 2023, instead of on a quarterly basis.

February 17, 2022 Supplemental Report at 15. The Court finds this approach reasonable and

incorporates it into the reporting requirements set out at the end of this Opinion.

### D.     Update on User Activity Monitoring Activities

Each agency's minimization procedures include a provision regarding the retention and

use of Section 702 information captured through processes that monitor employee activities to

detect insider threats (collectively referred to as "user activity monitoring" or "UAM"). Such

activities are exempt from the definition of "query" in the agencies' respective querying

procedures. *See* FBI Querying Procedures § III.A, NSA Querying Procedures § III.A, CIA

Querying Procedures § III.A. When it first approved these provisions in December 2019, the

Court noted that changes in the scope or functioning of UAM activities could affect the factual

bases for such approval and ordered the government to update its descriptions of UAM systems

and processes employed by the FBI, CIA, and NSA no later than March 26, 2021, *i.e.*, two years

from the government's prior UAM submissions. *See* December 6, 2019 Opinion at 35, 41.

In particular, the Court required these updates to describe:

(1) the nature and scope of UAM activities being conducted, the user activities
subjected to monitoring, and the types of information being captured; (2) the
repositories in which UAM data resides, and the access restrictions and controls in
place to limit access to such repositories; (3) the authorized purpose for which
such data may be accessed; and (4) the number and types of personnel who have

TOP SECRET//SI//NOFORN//FISA

Authorized for Public Release on: [DATE]                          FISC Memorandum Opinion and Order, April 21, 2022

**TOP SECRET//SI//NOFORN/FISA**

access to UAM data, and the training required for such personnel to obtain such access.

*Id.* at 82-83. The Court also required an updated assessment of the amount of unminimized Section 702-acquired information stored in the UAM repositories of each agency, the agency's experience with finding such information in its UAM repositories, and any other relevant considerations. *See id.* at 83; November 18, 2020 Opinion at 66 (retaining this requirement).

On March 26, 2021, the government filed an update on each agency's UAM activities.[34] No agency identified any instances of unminimized FISA-acquired information having been captured by a UAM tool, and each agency continues to assess that only a small amount of unminimized Section 702-acquired information is likely to be contained in their respective UAM repositories. *See* at FBI UAM Update March 26, 2021 at 10-11; CIA/NCTC UAM Update March 26, 2021 at 12, 14; NSA UAM Update March 26, 2021 at 10.

NSA reported no changes to its UAM systems and procedures. NSA UAM Update March 26, 2021 at 7-9. CIA advised that it has increased the number of personnel who have access to UAM data ▨▨▨▨▨▨ due to an increase in the number of systems monitored. CIA/NCTC UAM Update March 26, 2021 at 13. Access to CIA UAM repositories continues to

---

[34] Specifically, the government filed an update for the FBI, one for the CIA and NCTC, and one for NSA, each of which was titled "Government's Updated Description of the [agency name] Insider Threat and Routine Employee Monitoring Activities and Assessed Implications for the FISA Standard Minimization and Querying Procedures." The respective reports are cited herein as "FBI UAM Update March 26, 2021," "CIA/NCTC UAM Update March 26, 2021," and "NSA UAM Update March 26, 2021."

**TOP SECRET//SI//NOFORN/FISA**

TOP SECRET//SI//NOFORN/FISA

be restricted to authorized personnel for UAM purposes and interactions with the data is logged

and available for audit. CIA/NCTC Update March 26, 2021 at 13-14.

The FBI's update notes that the UAM activities subject to monitoring have not changed

███████████████████████████████ FBI UAM Update March 26, 2021 at 8 n.4.

Although access to the FBI UAM tool has been expanded to include, among others, Office of

General Counsel personnel, the policies and procedures for access have not changed. *Id.* at 9-10.

At present there are approximately ████ personnel authorized to access the UAM tool. *Id.* at

11. Each is required to complete FISA training prior to gaining access. The policies and

procedures used by other insider threat program stakeholders to request access to UAM data have

also not changed. *Id.* at 8-13.

Based on the information provided, the government appears to be appropriately limiting

access to UAM data and is otherwise adhering to the restrictions and controls in place for

repositories of such data. The Court sees no basis to depart from its prior conclusion that the

agencies' UAM-related practices do not preclude a finding that their querying and minimization

procedures, as implemented, are consistent with statutory and Fourth Amendment requirements.

### E.   **Other Incidents**

The government has identified a number of other incidents of non-compliance with the

applicable procedures since the November 18, 2020 Opinion. These include, for example,

delayed detasking of selectors as a result of human error, staffing issues, poor interagency

communication or misunderstanding of the rules. *See, e.g.,* December 2021 QR at 30-57

(reporting ██ NSA detasking errors). Notices filed over the last year indicate that NSA continues

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN//FISA

to experience problems of varying magnitude with the over-retention of Section 702-acquired

information on its many systems, including failures to completely delete data subject to a purge

requirement. *See, e.g., id.* at 129-31, 133-34; March 2022 QR at 66-67. Also recurring are NSA

queries of Section 702-acquired information using U.S.-person identifiers that had not been

properly approved. Many of those incidents are attributed to a failure to perform the appropriate

checks to determine the "foreignness" of a proposed target. Personnel are routinely being

reminded of the query requirements. *See, e.g.,* March 2022 QR at 63-65.

In addition to the instances of non-compliance discussed in preceding sections of this

Opinion, the Court has considered the nature and frequency of other incidents reported since the

November 18, 2020 Opinion and finds the steps taken by the government to address them and

prevent similar occurrences to be reasonable. Only two further circumstances merit specific

discussion here.

      1.   NSA's Retention of Content Used as Query Terms

In May 2021, NSA advised NSD that it is retaining, as part of query audit records, ████████

████ acquired pursuant to various FISA authorities that have been used as query terms,

without regard to otherwise applicable destruction requirements. *See* Preliminary Notice of a

Potential Compliance Incident Regarding the Unauthorized Retention of Information Acquired

Pursuant to FISA and Notice of Deviation Pursuant to NSA's Section 702 Minimization

Procedures at 2 (Oct. 15, 2021) ("October 15, 2021 Deviation Notice"). NSA also advised that

these query audit records are only accessible for oversight purposes. *Id.* NSA's querying

procedures require it to maintain records of each U.S.-person query term used for at least five

TOP SECRET//SI//NOFORN//FISA

TOP SECRET//SI//NOFORN/FISA

years. *See* NSA Section 702 Querying Procedures § IV.B.(1)(a), (3).  As a general matter, access

to records of other query terms should facilitate oversight efforts also.

Section 2(b)(5) of the NSA Minimization Procedures provides that "[s]hould NSA

determine it is necessary to deviate from an aspect of these procedures to perform lawful

oversight functions . . ., NSA shall consult with NSD and ODNI prior to conducting such an

activity.  NSD shall promptly report the deviation to the FISC."  The government assessed that

such a deviation is appropriate to retain ████████████ used as query terms to facilitate

auditing of queries, which is a lawful oversight function.  *See* October 15, 2021 Deviation Notice

at 3.  The Court finds that the NSA's retention of query audit records to date has been reasonable

under the circumstances; it expects, however, to be updated regarding the length of the applicable

retention period.[35]

2.    NSA's Automated Processing Activities

Issues regarding NSA's automated processing of data arose in the context of proposed

revisions to its querying procedures ████████████

The government described an automated process of comparing ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████  The Court, through its staff, expressed concern that the process used

████████████  might involve a "query" of raw Section 702 information, as defined at

-------

[35] NSA initially took the position that the records in question should be retained for 30
years, but NSA and NSD are now considering a shorter period.  *See id.* at 3 n.4.

TOP SECRET//SI//NOFORN/FISA

Page 79

TOP SECRET//SI//NOFORN/FISA

Section III.A of the NSA Querying Procedures, that is not reasonably likely to retrieve foreign

intelligence information. Following further discussions concerning whether similar automated

processes might involve queries under that definition, the government omitted from the final

NSA procedures now pending before the Court any provisions related to such ███████████

        The government has, however, committed to provide the Court with additional

information and analysis concerning how NSA's automated processes interact with Section 702

information. *See* Government's Proposal Regarding Reports to the FISC Pertaining to NSA's

Automated Processing Activities That Use Unminimized Section 702-Acquired Data at 4 (March

28, 2022). By July 21, 2022, the government proposes to submit a factual description of the

various categories of processing activities that interact with raw Section 702 information,

including examples to illustrate the scope of each category, and to describe the parameters of

such processing and the controls in place to ensure compliance with NSA's minimization and

querying procedures. By August 19, 2022, the government proposes to submit a legal analysis of

such processing activities, including whether they comport with statutory requirements and

NSA's procedures, and to offer any proposed amendments to NSA's querying and minimization

procedures. *Id.* at 4-5. The timeline proposed by the government appears reasonable, provided

that it does not delay the ordinary reporting to the Court of any non-compliance discovered.

And, to the extent non-compliance with applicable procedures is identified, the government

should consider and address options other than amending the procedures to authorize what they

now prohibit.

TOP SECRET//SI//NOFORN/FISA

Page 80

TOP SECRET//SI//NOFORN//FISA

* * *

After considering the overall state of implementation of the current targeting, querying,

and minimization procedures, the Court finds that the proposed procedures, as reasonably

expected to be implemented, comply with applicable statutory and Fourth Amendment

requirements, insofar as they relate to forms of Section 702 acquisition

████████████ The Court addresses issues presented by that proposal next.

**VII.**  ████████████████████████████

    **A.**  <u>Background</u>

The government's proposal is for NSA to

TOP SECRET//SI//NOFORN//FISA

Authorized for Public Release on: [DATE]

~~TOP SECRET//SI//NOFORN/FISA~~

*Id.* In a declaration filed with the 2022 Amendments, NSA official ██████████ further

explained the basis for NSA's assessment that the targets are non-United States persons located

outside the United States:

~~TOP SECRET//SI//NOFORN/FISA~~

TOP SECRET//SI//NOFORN//FISA



TOP SECRET//SI//NOFORN//FISA

Page 83

Document re: Section 702 2021 Certification

Authorized for Public Release by ODNI

TOP SECRET//SI//NOFORN/FISA



TOP SECRET//SI//NOFORN/FISA

Page 84

Document re: Section 702 2021 Certification

Authorized for Public Release by ODNI

TOP SECRET//SI//NOFORN/FISA



TOP SECRET//SI//NOFORN/FISA

Authorized for Public Release on: [DATE]



**C.** ███████████████ **Form of Section 702 Acquisition**

Amicus presents three arguments in support of the conclusion ███████████ uch as

those described above cannot be authorized under Section 702. The Court examines each of

them below.[39]

      1.    Acquisition o ████████████████████ Under Section 702

First, amicus argues that, properly interpreted, Section 702 is confine ███████████

████████████████████████████████████████████

██████████████████ *See* Reply Brief of Amicus Curiae at 5 (June 16, 2021) ("Amicus

Reply Brief"). Section 702 acquisitions previously proposed by the government and authorized

by the FISC have generally been ██████████████████████████████████

████████████████████████ Consistent with that prior implementation, Section

702 has been discussed in terms ████████████████████████████████

████████████████████████████████████████████

_____

[38] The government takes the position that "acquisition [o ████████████████████

████████████████████████████████████ *Id.* at 11.

[39] When certifications and procedures have presented issues regarding the permissible
scope of acquisitions under Section 702, the FISC has addressed them as part of its review under
Section 702(j)(1)-(3). *See* October 18, 2018 Opinion at 18–45 (analyzing whether proposed
forms of acquisition complied with Section 702(b)(5)).

TOP SECRET//SI//NOFORN//FISA

Page 86

TOP SECRET//SI//NOFORN/FISA

But this case is the

first to present the question whether Section 702 can be used to

The starting point in considering that question is the text

of the statute, the plain meaning of which must be given effect if "the disposition required by the

text is not absurd." *Lamie v. U.S. Trustee,* 540 U.S. 526, 534 (2004) (internal quotation marks

omitted).

a.     Acquisitions Authorized Under Section 702(a)

The government's authority to acquire information pursuant to Section 702 flows from

Section 702(a), which is titled "Authorization" and states:

> Notwithstanding any other provision of law, upon the issuance of an order
> in accordance with subsection (j)(3) or a determination under subsection (c)(2),
> the Attorney General and the Director of National Intelligence may authorize
> jointly, for a period of up to 1 year from the effective date of the authorization, the
> targeting of persons reasonably believed to be located outside the United States to
> acquire foreign intelligence information.

This provision limits what acquisitions may be authorized in two ways: 1) the target of the

acquisition must be a person reasonably believed to be located outside the United States; and 2)

the purpose of the targeting must be to acquire foreign intelligence information.[40]  "Foreign

_____

[40] *See also* Section 702(h)(2)(A)(v) (requiring the AG and DNI to certify that a significant
purpose of the acquisition is to obtain foreign intelligence information).  There is every reason to
expect                                    ill acquire foreign intelligence information.  *See* pages
119-20 *infra.*

TOP SECRET//SI//NOFORN/FISA

**TOP SECRET//SI//NOFORN/FISA**

intelligence information" is defined in terms of the national security-related purposes to which

the government may put information. *See* 50 U.S.C. § 1801(e), made applicable to Title VII of

FISA by § 1881(a). There is nothing in that definition that suggests foreign intelligence

information ███████████████████████████████████████████ Accordingly, the

authorizing language of Section 702 provides no basis for limiting Section 702 acquisitions to

████████████████████████

        b.     Limitations on Acquisitions Under Section 702(b)

Section 702(b) imposes six further limitations on acquisitions authorized under Section

702(a). The first two limitations track Section 702(a) by providing that such acquisitions may

not intentionally target any person known to be located in the United States, and may not do so

indirectly by intentionally targeting a person reasonably believed to be outside the United States

"if the purpose . . . is to target a particular, known person reasonably believed to be in the United

States." Section 702(b)(1)-(2). Under the third limitation, an acquisition may not intentionally

target a U.S. person reasonably believed to be located outside of the United States. Section

702(b)(3). These limitations do not distinguish between ██████████████████████████

████████████████████████

The next two limitations are addressed ██████████████████████ An

acquisition authorized under Section 702(a): (1) may not intentionally acquire a communication

if, at the time of acquisition, the sender and all intended recipients are known to be in the United

States, Section 702(b)(4); and (2) may not intentionally acquire communications that contain a

**TOP SECRET//SI//NOFORN/FISA**

TOP SECRET//SI//NOFORN/FISA

reference to, but are not to or from, a Section 702 target (commonly referred to as "abouts"

communications), subject to an exception that does not apply here. Section 702(b)(5).

Finally, under the sixth limitation, an acquisition authorized under Section 702(a) must be

"conducted in a manner consistent with" the Fourth Amendment. Section 702(b)(6).

Examined separately or as a whole, the Section 702(b) limitations do not exclude ███████

███████████████ from acquisitions that may be authorized under the broad language

of Section 702(a). Thus, the provisions of Section 702 where one would first look for a

limitation on what ███████████████ be acquired do not support the one posited by

amicus.

But the inquiry does not end there. The Court has "a duty to construe statutes, not

isolated provisions," *Graham County Soil & Water Conservation Dist. v. United States ex rel.*

*Wilson*, 559 U.S. 280, 289 (2010) (internal quotation marks omitted), and "the words of a statute

must be read in their context and with a view to their place in the overall statutory scheme."

*Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (internal quotation marks omitted).

Amicus's argument relies significantly on two additional provisions of Section 702: (1) the

requirement in Section 702(h)(2)(A)(vi) that acquisitions involve obtaining foreign intelligence

information from or with the assistance of an electronic communication service provider (ECSP);

and (2) the provisions regulating queries in Section 702(f).

TOP SECRET//SI//NOFORN/FISA

c.    From or With the Assistance of an ECSP Under Section
      702(h)(2)(A)(vi)

A Section 702 certification must "attest that . . . the acquisition involves obtaining foreign

intelligence information from or with the assistance of an [ECSP]." Section 702(h)(2)(A)(vi).

The definition of "electronic communication service provider" is quite broad;[41] however, there

are clearly many entities that are not ECSPs but that could provide, or assist the government in

acquiring, foreign intelligence information about a valid Section 702 target. For example, an

airline might possess information about a target's flight reservations that could constitute foreign

intelligence information. But because the airline is not an ECSP, Section 702 could not be used

to authorize acquisition of that information from the airline. In that way, Section

702(h)(2)(A)(vi) limits what information can be authorized for acquisition under Section 702(a).

Amicus would go a step further and infe ███████████████████████████████

███████████████████ Brief of Amicus Curiae at 27-28 (May 18, 2021) ("Amicus Brief").

---

[41] The term "electronic communication service provider" means

(A) a telecommunications carrier, as that term is defined in section 153 of Title
47;
(B) a provider of electronic communication service, as that term is defined in
section 2510 of Title 18;
(C) a provider of remote computing service, as that term is defined in section
2711 of Title 18;
(D) any other communication service provider who has access to wire or
electronic communications either as such communications are transmitted or as
such communications are stored; or
(E) an officer, employee, or agent of an entity described in subparagraph (A), (B),
(C), or (D).

50 U.S.C. § 1881(b)(4).

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN/FISA

But that is more than Section 702(h)(2)(A)(vi) states or fairly implies. Frequently, even

typically,  But not necessarily. The FISC already has recognized that the

government may acquire                                    from an ECSP under Section 702.

"[I]t is conceivable that some small amount of account information i

October 18, 2018 Opinion at 33. The information proposed for acquisition

                                                                          discussed

in that prior opinion. But the                             is irrelevant under the language of

Section 702(h)(2)(A)(vi). If a type of acquisition involves obtaining foreign intelligence

information from or with the assistance of an ECSP, then it is consistent with Section

702(h)(2)(A)(vi). As discussed at pages 107-09 *infra*                  n this case involves

acquiring foreign intelligence information with the assistance of an ECSP.

> d.   Querying Provisions at Section 702(f)

Section 702(f)(1)(A) requires the AG, in consultation with the DNI, to adopt querying

procedures "for *information* collected pursuant to an authorization" under Section 702(a)

(emphasis added). Those procedures must be consistent with Fourth Amendment requirements

and "include a technical procedure whereby a record is kept of each United States person query

term used for a query." Section 702(f)(1)(A)-(B). A "query" is defined as "the use of one or

more terms to retrieve the unminimized *contents or noncontents located in electronic and data

storage systems of communications of or concerning United States persons* obtained through

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN/FISA

acquisitions authorized" under Section 702(a). Section 702(f)(3)(B) (emphasis added). As

discussed at note 4 on page 25 *supra*, the FBI is required, under narrowly delineated

circumstances, to obtain an order from the FISC before accessing "the *contents of*

*communications*" retrieved by a query of un-minimized Section 702 information conducted in

support of a predicated criminal investigation that is unrelated to national security. Section

702(f)(2)(A) (emphasis added). The evident aim of these provisions is to provide additional

protection for certain queries that implicate U.S.-person information.

Amicus notes the extent to which the querying provisions discussed above, as well as

certain reporting requirements relating to queries, *see* 50 U.S.C. § 1873(b)(2)(B)-(C), refer to

"communications" as having been acquired pursuant to Section 702. Amicus Reply Brief at 8-

10, 19-20.[42] By their terms, these provisions do not address searches run only against █████████

█████████████ data, even if they use U.S.-person identifiers and are conducted in support of

criminal investigations unrelated to national security. From the fact that Congress ████████████

█████████████████████████████████████████████████████ amicus would infer

that it only authorized ██████████████████████████████ But that inference runs

counter to the plain meaning of the authorization language at Section 702(a), which is unaltered

by Section 702(f). And the Court does not see anything "absurd," *Lamie*, 540 U.S. at 534, in

applying each provision by its own terms, with the result that the requirements of Section 702(f)

---

[42] Although, as the reference to "information" in Section 702(f)(1)(A) demonstrates, the
practice is not uniform. *See also* Section 702(f)(2)(F)(i)-(ii) (referring to querying "of
information acquired under [Section 702(a)]").

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN//FISA

e.     Legislative History

Finally, amicus's argument relies heavily on legislative history. *See* Amicus Brief at 33-

65. Because the Court has not identified a pertinent ambiguity in the statutory text, it is not

necessary to advert to legislative history. *See, e.g.*, *Whitfield v. United States*, 543 U.S. 209, 215

(2005). Nonetheless, it is appropriate to explain why the cited legislative history does not carry

the day.

Amicus has marshaled impressive evidence from floor statements, committee reports, and

other documentation that legislators did not

under Section 702 at the time of the FISA Amendments Act and the Reauthorization Act.

Rather, it seems clear that

But in evaluating a new – even expansive – application of a statute, the essential question is not

what, if anything, legislators thought or said about it at the time of enactment. It is whether the

_____

43

A court would not ordinarily interpret later-enacted provisions
directed at one topic (searching data already acquired) as implicitly narrowing the scope of
previously enacted provisions that govern a different topic (scope of data that may be acquired).
*Cf. Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1753 (2020) (Congress "does not alter
the fundamental details of a regulatory scheme in vague terms or ancillary provisions") (internal
quotation marks omitted).

TOP SECRET//SI//NOFORN//FISA

Page 93

TOP SECRET//SI//NOFORN//FISA

enacted language, fairly read, contemplates that application. "Even if Congress did not foresee

all of the applications of the statute, that is no reason not to give the statutory text a fair reading."

*Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1143 (2018); *accord Lewis v. City of*

*Chicago*, 560 U.S. 205, 215 (2010) ("It is not for us to rewrite the statute so that it covers only

what we think is necessary to achieve what we think Congress really intended."); *Lockhart v.*

*United States*, 546 U.S. 142, 146 (2005) ("The fact that Congress may not have foreseen all of

the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to

its plain meaning.") (internal quotation marks omitted). In particular, the legislative history's

silence regarding a proposed application of a statute "cannot override the words of the statute."

*Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495 n.13 (1985). Accordingly, the legislative

history adduced by the amicus does not justify departure from the plain meaning of Section

702.[44]

In short, Section 702(a) provides the government broad authority to target persons outside

the United States to acquire foreign intelligence information. None of the limitations in Section

702(b) prohibit the government from targeting non-U.S. persons abroad █████████████████

█████████████████████████

_____

[44] The government notes that █████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████ "Where Congress includes limiting language
in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the
limitation was not intended." *Russello v. United States*, 464 U.S. 16, 23-24 (1983). Because,
however, the enacted text is clearer than the reasons that the limiting language was omitted, the
Court does not afford much weight to this omission.

TOP SECRET//SI//NOFORN//FISA

Authorized for Public Release by ODNI

TOP SECRET//SI//NOFORN/FISA

████████████████████████ involve obtaining foreign intelligence information with the

assistance of an ECSP.  Section 702(f) regulates how the government may conduct searches of

communications after they have been acquired, but does not limit the scope of permissible

acquisition under Section 702.  Accordingly, the Court finds ████████████ as such, are

not excluded from authorization under Section 702.

    2.    <u>Use of Section 702 to</u> ████████████████

Amicus also argues that the government is required to proceed under ████████

*See* Amicus Brief at 69-89; Amicus Assessment at 15-17.  The Court disagrees.

The FISC has often authorized ████████

████████ Amicus notes similarities

between t███████

concludes that the government's only legal option is to proceed under ████████ rather than

Section 702.  Amicus Brief at 70-81.  Specifically, amicus suggests that the government proceed

under ████████

Amicus Brief at 81-89.

This argument is unavailing because, even assuming *arguendo*

TOP SECRET//SI//NOFORN/FISA

Page 95

Document re: Section 702 2021 Certification

Authorized for Public Release by ODNI

TOP SECRET//SI//NOFORN//FISA

██████████████ the government can still choose to proceed under Section 702 if it satisfies

the requirements stated therein.  Indeed, the contrary view – that authorization under Section 702

is categorically unavailable ███████████████████████████████████████████████

███████████████ is inconsistent with the purpose and historical implementation of Section 702.

Congress enacted Section 702 partly in response to perceptions that technological

changes had subjected new forms of acquisition to ██████████████████████████

████████████████████████████████████████████████████████████

"First enacted in 2008, Section 702 was intended to address some of FISA's perceived

limitations." *Hasbajrami*, 945 F.3d at 650.  Notably, "Section 702 does not require a probable

cause determination before undertaking surveillance," nor does it require the government to

specify "the nature and location of each of the particular facilities or places at which the

electronic surveillance will occur." *Id.* at 651 (internal quotation marks omitted).  But if Section

702 does not provide ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

In practice, Section 702 was not interpreted so narrowly.  "The government transitioned

. . . some portion of the collection . . . that had been occurring under individual FISA orders to

directives issued" under Section 702's short-lived predecessor, the Protect America Act.  PCLOB

─────────────

[45] These concerns arose largely regarding agents of international terrorist groups, who
were not amenable to targeting under the above-referenced certification process under §§
1802(a)(1) and 1822(a)(1).

TOP SECRET//SI//NOFORN//FISA

Page 96

Authorized for Public Release on: [DATE]

FISC Memorandum Opinion and Order, April 21, 2022

TOP SECRET//SI//NOFORN/FISA

Report at 19.[46]  "After passage of the FISA Amendments Act, the government transitioned the

collection activities that had been conducted under the Protect America Act to Section 702."  *Id.*

at 20.

More importantly, amicus's interpretation is not supported by the text of FISA.  Section

702's authorization language states:  *"Notwithstanding any other provision of law*, . . . the

Attorney General and the Director of National Intelligence may authorize jointly . . . the targeting

of persons reasonably believed to be located outside the United States to acquire foreign

intelligence information."  Section 702(a) (emphasis added).  The use of a "notwithstanding"

clause signals legislative intent that the provisions of that clause override conflicting provisions

of any other section.  *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993); *see also Liberty

Maritime Corp. v. United States*, 928 F.2d 413, 416 (D.C. Cir. 1991) (interpreting clause

beginning "Notwithstanding any other provision of law ..." to override other sections of the same

statute); *Bank of New England Old Colony, N.A. v. Clark*, 986 F.2d 600, 604 (1st Cir. 1993)

(similar language described as "manifesting a clear intent to override any conflicting statutes in

existence").  Thus, Section 702(a), by its terms, overrides any requirements for other forms of

authorization that another statutory provision might otherwise impose.

---

[46]  The Protect America Act, Pub. L. 110-55, 121 Stat. 552 (2007), was enacted in August
2007 as "a temporary measure."  PCLOB Report at 19.

TOP SECRET//SI//NOFORN/FISA



With regard to

To be sure, FISA includes

But that provision

*includes*, rather than *excludes*, Section 702 as a means of authorization.[48]  It therefore does not

support amicus's position.

_____

[47]  A provision

[48]  "[T]he procedures

appear within chapter 36 of Title 50 of the United States Code.

**TOP SECRET//SI//NOFORN/FISA**

Page 98

TOP SECRET//SI//NOFORN/FISA

Finally, amicus notes that ███████████████████████████████

██████████████████████████████████████████████ Amicus

would draw the negative implication that Section 702, unlike Section 703, is not a means of

authorizing ██████████████ and invokes the canon *expressio unius est exclusio alterius* in

that effort. Amicus Brief at 81.

> The force of any negative implication, however, depends on context. We have
> long held that the *expressio unius* canon does not apply unless it is fair to suppose
> that Congress considered the unnamed possibility and meant to say no to it, and
> that the canon can be overcome by contrary indications that adopting a particular
> rule or statute was probably not meant to signal [an] exclusion.

*Marx v. General Revenue Corp.*, 568 U.S. 371, 381 (2013) (internal quotation marks and

citations omitted). Here, the context refutes any negative implication █████████████

████████████ outside what may be authorized under Section 702. Amicus's suggested

implication fails because the relevant provisions do not expressly list items in an "associated

group or series," which is what justifies an inference that an item not mentioned was excluded by

deliberate choice. *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003). And as noted

above ████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Accordingly, the Court concludes that, if an acquisition may be authorized in accordance

with the terms of Section 702, authorization pursuant to Section 702 is sufficient, ██████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN//FISA

3.    The Limitations at Section 702(b)(4)-(5)

Finally, amicus argue ███████████████████████████ will involve acquisition of ████████████████████████████████████████████ ontrary to the limitations at Section 702(b)(4) and (b)(5), respectively.

Under Section 702(b)(4), an acquisition authorized under Section 702(a) "may not intentionally acquire any communications as to which the sender and all intended recipients are known at the time of the acquisition to be located in the United States." Amicus argues that the proposed ███████████████████████████████████████ *see* pages 85-86 *supra*, violates this prohibition. In amicus's view, such ███████████████

███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████

███████████████████████████████████████ Thus, amicus concludes, ███████████

███████████████████████████████████████████████ t the time of acquisition. Amicus Reply Brief at 11-16.

The Court does not find this argument persuasive. Taking for granted that amicus correctly identifies the ███████████████

███████████████████████████████████████ Section 702(b). Section 702(a) provides a means of authorizing "the targeting of persons reasonably believed to be located outside the

TOP SECRET//SI//NOFORN//FISA

Page 100

TOP SECRET//SI//NOFORN//FISA



United States to acquire foreign intelligence information." ████████████████████

████████████████ constitute the foreign intelligence information to be

acquired pursuant to this proposed authorization, and there is no reason to expect that ████

████████████████ will be domestic communications.

████████████████████████████████ irrelevant

for purposes of Section 702(b)(4).[49]

The contrary interpretation advanced by amicus produces illogical results.  It is by no

means clear why Congress would choose to █████████████████████ it is

authorized to acquire, or why the ██████████████████████

████████████████ the United States.  And the anomalies arising from

amicus's interpretation are not confined █████████  Suppose that, pursuant to a

directive served under Section 702(h).█████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

---

[49] The definitions of "acquire" and "acquisition" support this understanding.  *See*
Webster's II New College Dictionary 10 (2001) (defining "acquire" as "1. To gain possession or
control of: Get . . . 2. To come to have" and "acquisition" as "1. The act of acquiring. 2.
Something acquired"); Black's Law Dictionary 26 (9th ed. 2009) (defining "acquire" as "To gain
possession or control of; to get or obtain" and "acquisition" as "1. The gaining of possession or
control over something . . . 2. Something acquired")

TOP SECRET//SI//NOFORN//FISA

Page 101

TOP SECRET//SI//NOFORN/FISA

Of course, no such problems arise on the understanding that the communications to and from the targeted account constitute information acquired by the acquisition authorized under Section 702(a), while the ████████████████████ does not.[50]

Amicus makes a similar argument regarding Section 702(b)(5), which provides (subject to an exception not applicable to this case) that an acquisition authorized under Section 702(a) "may not intentionally acquire communications that contain a reference to, but are not to or from, a target of an acquisition authorized under [Section 702(a)]." Amicus Reply Brief at 16-17; Amicus Assessment at 17-19. This argument fails for the same reasons stated above in the Section 702(b)(4) context. ████████████████████ acquisition of which is authorized under Section 702(a), ████████████████████ [51]

Having concluded that there is no general or structural impediment ████████ under Section 702, the Court next examines the pertinent certification and procedures.

_____

[50] Section 702(d)(1)(B) requires the targeting procedures to be reasonably designed to "prevent the intentional acquisition of any communication as to which the sender and all intended recipients are known at the time of the acquisition to be located in the United States." Based on the foregoing analysis, the Court does not regard ████████████████████

[51] To the extent that ████████████████████ constitutes communications, ████████████████████ NSA will treat them as such under its minimization procedures. *See* pages 116-17 *infra*. If there is a domestic communication or an abouts communication ████████ NSA must handle it in accordance with applicable minimization restrictions, which require abouts communications to be destroyed upon recognition in all cases. *See* NSA Minimization Procedures §§ 4(c)(3), 6; page 117 *infra*.

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN/FISA

**D.**    **Certification** ███████████████████████

For the reasons discussed below, the Court finds that Certification ████ contains all

the required elements insofar as it relates to ███████████████

The Court reviews the government's certifications to determine whether they contain all

the required elements.  Section 702(j)(2)(A).  The Court has already found that the 2021

Certifications have been made under oath by the AG and the DNI and that they contain the

attestations required by Section 702(h)(2)(A).  *See* pages 11-12 *supra*.  In the context of

Certification ████ those attestations are made for the ███████████████[52]  The

attestation under Section 702(h)(2)(A)(vi) that the acquisition involves obtaining foreign

intelligence information from or with the assistance of an ECSP presents particular issues

███████████████████████

In proceedings under Section 702(j), the Court typically has limited information about

particular acquisitions. ████████████████████████████

██████████████████████████████████████████

████████████  *See* Section 702(h)(4).  In this case, however, the government's

submissions provide considerable detail about ████████████████████

████████████████████  *See* March 30, 2021 Memorandum at 3.  In

---

[52] *See* DNI/AG 702(h) Certification ████████ (certification made "based on the
representations made" in the supporting affidavit of the Director of the NSA); Affidavit of the
Director of the NSA supporting DNI/AG 702(h) Certification ████████ describing
███████████████████ Substantially the same language appears in the amendment to this
certification and its accompanying affidavit.  *See* Amendment to DNI/AG 702(h) Certification
████████ DIRNSA Affidavit for Amendment to Certification ████████████

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN/FISA

particular, the government provided its analysis as to why, in its view, ███████████

█████████ with the assistance" of an ECSP, as attested to in the certification. *Id.* at 21-23.

The Court appointed the amicus to brief this issue. Docket No. ████████ Order Appointing

Amicus Curiae at 3 (Mar. 30, 2021).

At the outset, the Court considers what form of review it should conduct regarding this

attestation. The Supreme Court has stated that judicial review of executive action will not be cut

off unless there is persuasive reason to believe that such was the purpose of Congress. *Gutierrez*

*de Martinez v. Lamagno*, 515 U.S. 417, 424 (1995). Accordingly, where the language of the

statute was reasonably susceptible to different interpretations regarding judicial review, the Court

applied the presumption "that executive determinations generally are subject to judicial review

and that mechanical judgments are not the kind federal courts are set up to render." *Id.* at 434.

*Martinez* involved unusual circumstances that weighed in favor of judicial review. The

Attorney General, whose delegee had made the certification at issue, supported judicial review

because the certifying Department of Justice official had a compelling interest to make the

certification. If accepted, moreover, the certification would dispose of the entire case, leaving the

plaintiffs with no recourse. *See id.* at 424, 427-29.

TOP SECRET//SI//NOFORN/FISA

TOP SECRET//SI//NOFORN//FISA

In other contexts, courts have applied limited review to certifications by executive branch officials[53] or even declined to review the basis for them at all.[54]  Certifications of relevance to an ongoing criminal investigation in support of pen register/trap-and-trace applications under 18 U.S.C. § 3122 are not substantively examined.[55]  In the FISA context, some courts have emphasized the deference to be shown to certifications made under 50 U.S.C. § 1804(a)(6) in support of electronic surveillance applications under Title I of FISA.[56]  The FISCR, on the other hand, has acknowledged circumstances in which a FISC judge may probe the basis of a certification under § 1804(a)(6)(B) that a significant purpose of the surveillance is to obtain foreign intelligence information: "if the FISA court has reason to doubt that the government has

---

[53] *Impounded,* 117 F.3d 730, 735-36 (3d Cir. 1997) (court had jurisdiction to review a certification under 18 U.S.C. § 5032 only for technical defects, for whether a crime is one of violence, and for whether the certification was made in bad faith or for improper purposes).

[54] *See United States v. Al-Hamdi*, 356 F.3d 564, 572 (4th Cir. 2004) (traditional view in cases involving diplomatic immunity and the Article II power to send and receive ambassadors is not one of judicial review).

[55] *See United States v. Fregoso*, 60 F.3d 1314, 1320 (8th Cir. 1995) (judicial role in approving use of trap and trace devices is "ministerial in nature"); *In re Application of the United States for an Order (1) Authorizing the Use of a Pen Register and Trap and Trace Device and (2) Authorizing Release of Subscriber Info. and/or Cell-Site Info.*, 396 F. Supp. 2d 294, 304 (E.D.N.Y. 2005) (Orenstein, M.J.) ("a prosecutor need only certify that the information to be obtained via pen/trap devices is relevant . . . and a court must thereupon grant the request") (internal quotation marks omitted).

[56] *See United States v. Osmakac*, 868 F.3d 937, 953 (11th Cir. 2017) (certifications are subject only to minimal scrutiny) (internal quotation marks omitted); *United States v. Mohammad*, 339 F.Supp. 3d 724, 736 (N.D. Ohio 2018) (certification "presumed valid and subjected only to minimal scrutiny"); *United States v. Huang*, 15 F.Supp. 3d 1131, 1140 (D.N.M. 2014) (judge "is not to second-guess the executive branch official's certification") (internal quotation marks omitted); *United States v. Sherifi*, 793 F.Supp. 2d 751, 760 (E.D.N.C. 2011) (according "a presumption of validity" to certifications).

TOP SECRET//SI//NOFORN//FISA

Page 105

TOP SECRET//SI//NOFORN/FISA

any real non-prosecutorial purpose in seeking foreign intelligence information it can demand

further inquiry into the certifying officer's purpose." *In re Sealed Case*, 310 F.3d 717, 736

(FISCR 2002) (per curiam). But *Sealed Case* involved electronic surveillance of a U.S.-person

target. *Id.* at 720. As the FISCR noted, the standard for reviewing a certification made in

support of an application for a Title I electronic surveillance order depends on whether the target

is a U.S. person. *See id.* at 723-24. In order to grant such an application for a U.S.-person target,

a FISC judge must find that the certification is "not clearly erroneous on the basis of the

statement made under [§ 1804(a)(7)(E)[57]] and any other information furnished under

[§ 1804(d)[58]]." § 1805(a)(4). For targets who are not U.S. persons, the required judicial finding

is merely that the application "contains all statements and certifications required by [§ 1804]."

*Id.* Because the statute prescribes a different form of review for certifications for targets who are

not U.S. persons, there is reason to believe that the type of review described in *Sealed Case*

applies only when the target is a U.S. person.

    In this proceeding, Section 702(j)(2)(A) directs the Court simply to review the

certification "to determine whether [it] contains all the required elements." The AG and DNI are

not required to state their basis for making any of the required attestations. They are, however,

---

[57] There is no provision at § 1804(a)(7)(E). The intended reference evidently is to § 1804(a)(6)(E), which requires the certifying official to include "a statement of the basis for the certification that" "the information sought is the type of foreign intelligence information designated" and "such information cannot reasonably be obtained by normal investigative techniques."

[58] The intended reference evidently is to § 1804(c), which states that a FISC judge "may require the applicant to furnish such other information as may be necessary to make the determinations required by [§ 1805]."

TOP SECRET//SI//NOFORN/FISA

Document re: Section 702 2021 Certification                                    Authorized for Public Release by ODNI

~~TOP SECRET//SI//NOFORN//FISA~~

required to submit to the FISC the "written certification and any supporting affidavit." Section

702(h)(1)(A).  In contrast, the Court reviews the targeting, minimization, and querying

procedures "to assess whether" they meet specified statutory requirements, Section 702(j)(2)(B)-

(D), and must find that they "are consistent with [those] requirements . . . and with the fourth

amendment" in order to issue an approval order.  Section 702(j)(3)(A).  These differences

indicate that, under Section 702(j), the Court is expected, at most, to conduct a deferential review

of the attestations, including the one required by Section 702(h)(2)(A)(vi).

     With that understanding, the Court turns to the attestation.

     It seems clear that the providers ███████████████████ described herein are

ECSPs under the definition set out in note 41 at page 90 *supra* and amicus has not argued to the

contrary.  The government submits that, in order to implement ████████████ NSA needs

those providers to:



The government claims that all of these activities constitute assistance from an ECSP.  *Id.* at 22-

23.

Authoriz                    ]                         FISC Memorandum Opinion and Order, April 21, 2022

TOP SECRET//SI//NOFORN/FISA

Because the statute does not define "assistance" for purposes of Section 702,[59] we look to

its ordinary meaning, which is "[t]he act of assisting," "[h]elp," "aid." Webster's II New College

Dictionary at 68 (2001).[60] The assistance of an ECSP under Section 702 is obtained pursuant to a

written directive from the AG and DNI that may require the ECSP to "immediately provide the

Government with all *information, facilities, or assistance* necessary to accomplish the acquisition

in a manner that will protect the secrecy of the acquisition and produce a minimum of

interference with the services that such electronic communication service provider is providing to

the target of the acquisition." Section 702(i)(1)(A) (emphasis added). This difference in

wording raises the question whether the provision of "information" or "facilities," as described in

Section 702(i)(1)(A), should be understood as a form of "assistance," as the latter term is used in

_____

[59] The Title VIII definition is clearly limited to Title VIII: "*In this subchapter* ... [t]he term 'assistance' means…." 50 U.S.C. § 1885 (emphasis added). That definition appears in Title 50, chapter 36, subchapter VII of the United States Code, *i.e.*, the subchapter in which Title VIII is codified. Title VII of FISA, including Section 702, is codified in subchapter VI.

The government incorrectly claims that the FISC previously "indicated that reading the definition of 'assistance' from Title VIII into Title VII is the proper approach." Government's Response Brief at 13 (June 1, 2021) ("Gov't Resp. Brief"). In the opinion cited by the government, the Court concluded ███████████████████████████████ ████████████████████████████████ Section 702(b)(5). October 18, 2018 Opinion at 41. In the course of examining "the broader statutory scheme" relating to that issue, the Court noted that the definition of "assistance" in Title VIII includes the provision of "information (including communication contents, communication records, or other information relating to a customer or communication." *Id.* at 37, 39 (internal quotation marks and emphasis omitted). The Court did not state or fairly imply that Title VIII's definition of "assistance" should be read into Title VII.

[60] "Assist" is defined as "[t]o aid," "[t]o give aid or support." *Id.*

TOP SECRET//SI//NOFORN/FISA

~~TOP SECRET//SI//NOFORN/FISA~~

Section 702(h)(2)(vi), or whether "information" or "facilities" should be construed to have some application that the term "assistance" does not.[61]

But we need not resolve that issue today. Applying the deferential form of review warranted for this issue, the Court finds that at least some of what ███████ providers will render – specifically ██████████████████████████████████████████████ – involves "assistance" ████ and is more aptly described in that manner than as the provision of "information" or "facilities," exclusive of "assistance."[62]

**E.  Targeting Procedures Relating to** ███████████████████████████████

The government has proposed ████████████████████████████████ to be used for ████████████████ in addition to those used for other forms of Section 702 acquisition. NSA Targeting Procedures § VI; March 30, 2021 Memorandum at 13-16. Provisions of NSA's

---

[61] *See, e.g.*, *Carcieri v. Salazar*, 555 U.S. 379, 391 (2009) (court is "obliged, to give effect, if possible, to every word Congress used") (internal quotation marks omitted).

[62] Amicus argues that such a finding will undermine the rule of law. *See* Amicus Brief at 103-06; Amicus Reply Brief at 39-41. Any acquisition conducted under Section 702(a) must be conducted in a manner consistent with the statutory requirements, including the targeting and minimization procedures, and with the Fourth Amendment. Section 702(b), (c)(1)(A). Pursuant to Section 702(i)(4), an ECSP served with a directive can petition the FISC to modify it or set it aside, and a judge may grant the petition upon finding "that the directive does not meet the requirements of [Section 702], or is otherwise unlawful." Section 702(i)(4)(C). And in this case ████████ providers will provide forms of assistance that they are in a position to provide because of their operation as ECSPs ██████████████████████████████ this Opinion does not stand for the proposition that an ECSP may be compelled to provide assistance of a type that is unrelated to their operation as an ECSP, *e.g.* ████████████████████████

~~TOP SECRET//SI//NOFORN/FISA~~

Page 109

TOP SECRET//SI//NOFORN//FISA

targeting procedures on topics such as documentation, compliance, and oversight apply equally

███████████████ NSA Targeting Procedures § VI.[63]

The Court considers whether the NSA Targeting Procedures are "reasonably designed" to

ensure that acquisitions from ████████████ are "limited to targeting persons reasonably

believed to be located outside the United States" and to "prevent the intentional acquisition of

any communication as to which the sender and all intended recipients are known at the time of

the acquisition to be located in the United States." § 702(j)(2)(B). As noted at page 13 *supra*,

the Court also assesses whether they are reasonably designed to avoid the intentional targeting of

U.S. persons reasonably believed to be located outside the United States, which is relevant to the

Court's evaluation of the procedures under the Fourth Amendment.



Importantly, the government identifies the ████████████████████████

be tasked ████████████████ March 30, 2021 Memorandum at 7 n.6. Therefore ████████

████████ will be considered ████████████████ Accordingly, before tasking it for

████████ under Section 702, NSA "must determine ████████████████ are non-

United States persons reasonably believed to be located outside the United States." Gov't Resp.

Dec. 3, 2021 at 1-2.

Before tasking ████████████████████ NSA will also conduct a

"technical analysis" ████████████████ which may occur in two parts. NSA Targeting

Procedures § VI.A; March 30, 2021 Memorandum at 14. First, NSA may

─────────────────────
[63] ████████████████████████████████████████████

TOP SECRET//SI//NOFORN//FISA

Page 110

Document re: Section 702 2021 Certification                                          Authorized for Public Release by ODNI

<del>TOP SECRET//SI//NOFORN/FISA</del>



conduct research to understand, among other things,

outside the United States, where such

NSA Targeting Procedures § VI.A. Such research may draw on open source information, U.S.

Government reporting or information from relevant service providers. *See* Gov't Resp. Dec. 3,

2021 at 2-3. Second, NSA may

The government initially intended to include, as part of the pre-tasking

*Id.* After the amicus raised concerns about that aspect of the pre-tasking review, *see* Reply of

Amicus Curiae to Gov't Resp. to Court Order at 41-42 (Dec. 13, 2021), the government revised

NSA's targeting procedures to preclude

<del>TOP SECRET//SI//NOFORN/FISA</del>

Page 111

TOP SECRET//SI//NOFORN/FISA



NSA Targeting Procedures § VI.A. Also, as noted at

page 81 *supra*, NSA has not and will not acquire

Based on these understandings, the

Court does not share the concerns expressed by amicus, *see* Amicus Assessment at 8-11, that this

In addition, "NSA will consider the circumstances that led to NSA's identification of the

intended targets," such as, among other things,

NSA Targeting Procedures § VI.A.

NSA has

assessed that

in

TOP SECRET//SI//NOFORN/FISA

Page 112

TOP SECRET//SI//NOFORN//FISA



██████ outside of the United States.  March 30, 2021 Memorandum at 7.  NSA has not

identified any U.S.-person communications ████████████████████

████████████████████████████ *See id.*; *see also* Supplemental

Description of Pre-Targeting Determinations at 9████████████████

██████████████████████████ NSA also has no

information that any ████████████ located within the United States,

Supplemental Description of Pre-Targeting Determinations at 7, and NSA believes

████████████████████████

March 30, 2021 Memorandum at 7-8.  Based on the foregoing, the Court understands that NSA

currently has no reason to believe that ████████████████ inside the United States

or is a U.S. person.[64]

    Post-tasking, NSA will review ████████████████████

████████████ determine whether: (1) there are indications that ███

"has entered or intends to enter the United States, or is a United States person;" (2) ████

████████████████████████ are and continue] to

████ the intended target(s);" and (3) ████████ "otherwise remain appropriate for

─────────────

[64] ████████████████████████████████

TOP SECRET//SI//NOFORN//FISA

TOP SECRET//SI//NOFORN//FISA

tasking, to include verification that such ████ ████████ are not ████████████████ a United States person or persons located in the United States." NSA Targeting Procedures § VI.B.[65]  Post-tasking review may also include analysis of "████████████████████████████ inside the United States or who are a United States person."

NSA Targeting Procedures § VI.B. ████████████ is the facility tasked ████████ NSA must detask – *i.e.*, cease acquisitions from ████████ "without delay" if it discovers during post-tasking review "any information . . . indicating ████████████ Gov't Resp. Dec. 3, 2021 at 6-7.

Post-targeting analysis is of particular importance ████████████ *See* Supplemental Description of Pre-Targeting Determinations at 7-8 n.5 ████████████

---

[65] ████████████

TOP SECRET//SI//NOFORN//FISA

Page 114

Authorized for Public Release by ODNI



~~TOP SECRET//SI//NOFORN/FISA~~

There is no indication

entering the United States,

The government represents that this post-tasking review will encompass information

Gov't

Resp. Dec. 3, 2021 at 6 (emphasis added).  But information about the location or U.S.-person

status of a ███ user may also be acquired by ███████████

Indeed,

the government acknowledges the relevance of information from those sources by adverting to

them in describing the steps to be taken *before* ████████     *See* pages 111-12 *supra*.

Accordingly, the Court directs that NSA's post-tasking review shall include periodic examination

of information recently obtained from those sources.

Based on the foregoing, the Court finds that the NSA Targeting Procedures, as they relate

████████████████ are reasonably designed to ensure that acquisitions are limited to

targeting persons reasonably believed to be located outside of the United States and to prevent

intentional acquisition of domestic communications, as well as to prevent intentional targeting of

U.S. persons reasonably believed to be located outside the United States.

~~TOP SECRET//SI//NOFORN/FISA~~

Page 115

TOP SECRET//SI//NOFORN/FISA

**F.** **Minimization Procedures Relating** ███████████████

The government proposed three changes to the NSA Minimization Procedures related to ████████████████████████[66] The Court reviews them to determine whether these procedures meet the statutory definition of minimization procedures, *see* page 17 *supra*, as they relate to the ████████████

First, the NSA Minimization Procedures incorporate the same █████████████ ██████ the NSA Targeting Procedures.  NSA Minimization Procedures § 3(d); NSA Targeting Procedures § VI at 11 n.5.  Second, █████████████████████████ does not meet generally applicable retention standards and that is known to contain information of or concerning U.S. persons "will be destroyed upon recognition."  NSA Minimization Procedures § 4(c)(1).  Otherwise, information █████████████████ may not be retained for longer than five years from the expiration date of the applicable certification, "unless NSA specifically determines that ███████████ acquired information meets the retention standards in these procedures."  *Id.*  The general effect of that provision is to apply ████████ █████████████████████ he same retention and destruction rules that apply to information acquired by ████████████████████ *Id.*  The Court has found that the NSA Minimization Procedures, in combination with the NSA Querying Procedures, meet the statutory definition of minimization procedures regarding those more familiar forms of Section 702

---

[66] The FBI, CIA, and NCTC ███████████████████████ here is no need to modify their minimization procedures in that regard.  *See* March 30, 2021 Memorandum at 2 n.1.

TOP SECRET//SI//NOFORN/FISA

Page 116

TOP SECRET//SI//NOFORN//FISA

acquisition. *See* page 58 *supra*. Because little, if any, U.S.-person information is reasonably

expected to be acquired from ███████████████,[67] the Court readily finds that these

retention and destruction rules are sufficient in this new context.

The third change is prompted by the varied nature of information likely to be acquired by



NSA analysts will categorize them as

foreign or domestic communications, which are subject to different requirements. NSA

Minimization Procedures § 4(b)(3).

The procedures also recognize that the ████████████████████

████████████████ *See id.* § 4(b)(3) at 5 n.1.

███████████████████████████████████

███████████████████████████ *a.*; § 4(c)(3).

———————————————

[67] NSA has no information indicating that █████████████████████

███████████████████████████████████ *See* Supplemental

Description of Pre-Targeting Determinations at 8-9; March 30, 2021 Memorandum at 4-7.

TOP SECRET//SI//NOFORN//FISA                                    Page 117

Document re: Section 702 2021 Certification

Authorized for Public Release by ODNI

TOP SECRET//SI//NOFORN//FISA

It is therefore sensible that the procedures generally subject such information to the

rules for foreign communications, rather than domestic ones.  And

*See* § 702(b)(5) (an acquisition under Section 702 "may not

intentionally acquire *communications* that contain a reference to, but are not to or from, a target")

(emphasis added); October 18, 2018 Opinion at 33 (concluding that

In sum, the NSA Minimization Procedures, as they relate to

are consistent with the statutory requirements.

## G.   Review Under the Fourth Amendment

Finally, the Court addresses whether NSA's targeting, minimization, and querying

procedures are consistent with the requirements of the Fourth Amendment insofar as they relate

*See* § 702(j)(3)(A)-(B).

As discussed above                       are believed to be non-U.S. persons located outside

the United States.  *See* pages 81-82, 84 *supra*.                                    are believed

to be located outside the United States and

*See* pages 81-82 *supra*.

TOP SECRET//SI//NOFORN//FISA

Page 118

Document re: Section 702 2021 Certification                                                Authorized for Public Release by ODNI

TOP SECRET//SI//NOFORN//FISA

*See* page 83 *supra.*  Under the described circumstances, it is

questionable ███████████████████ will involve a Fourth Amendment search or seizure at

all.  *See, e.g., Verdugo-Urquidez*, 494 U.S. at 274-75 (Fourth Amendment did not apply to U.S.

agents' search and seizure of property in Mexico owned by a Mexican citizen and resident with

no voluntary attachment to the United States); *United States v. Rojas*, 812 F.3d 382, 397-98 (5th

Cir. 2016) (Fourth Amendment did not apply to wiretaps conducted in Colombia that intercepted

communications of citizens and residents of Colombia who lacked a significant voluntary

connection to the United States, even if U.S. agents participated in the wiretaps).

Even assuming that the Fourth Amendment applies, the proposed procedures, insofar as

they relate to ████████████ are consistent with Fourth Amendment requirements.  To the

(likely limited) extent that this operation intrudes on Fourth Amendment-protected interests, such

intrusion is ameliorated by the protections of NSA's minimization and querying procedures.

Finally, in assessing reasonableness under the Fourth Amendment, any intrusion on protected

interests must be balanced against the government's heightened interest in acquiring information

important to national security.  *See* page 60 *supra.*

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████ that has

"been critical to informing policy makers and protecting U.S. national security by providing

unique information ███████████████████████████████████

TOP SECRET//SI//NOFORN//FISA                                        Page 119

TOP SECRET//SI//NOFORN/FISA

███████████████████████████████████████████████

███████████████████████████████     March 30, 2021 Memorandum at 6.

The Court finds that NSA's targeting, minimization, and querying procedures are

consistent with the Fourth Amendment insofar as they relate to ██████████████

proposed in this case.  That conclusion, however, rests in significant part on the Court's

understanding of █████████████████████████████████████████████

█████████████████████████████     For that reason, the Court is requiring prompt

reporting in the event of certain changed or unanticipated circumstances.  Specifically, the

government shall provide to the Court a written description of any of the following occurrences:



(a) NSA comes to believe that (i)

(b) NSA comes to believe

(c) NSA comes to believe that U.S.-person information

Such descriptions shall be submitted within 10 days of the applicable occurrence and describe the

government's response thereto and assess any statutory or Fourth Amendment issues presented.

TOP SECRET//SI//NOFORN/FISA                    Page 120

~~TOP SECRET//SI//NOFORN//FISA~~

## VIII.  CONCLUSION

For the foregoing reasons, the Court finds that:

(1) The 2021 Certifications, as amended, as well as the certifications in the Prior 702

Dockets, as thereby amended, contain all the required statutory elements;

(2) The targeting procedures for acquisitions conducted pursuant to the 2021

Certifications are consistent with the requirements of Section 702(d) and of the Fourth

Amendment;

(3) With respect to information acquired under the 2021 Certifications, the minimization

procedures and querying procedures are consistent with the requirements of Section 702(e) and

Section 702(f)(1), respectively, and of the Fourth Amendment;

(4) With respect to information acquired under the certifications in the Prior 702 Dockets,

as amended, the minimization procedures (including, as referenced therein, the requirements of

the respective agencies' querying procedures) are consistent with the requirements of Section

702(e) and of the Fourth Amendment; and

(5) The querying procedures approved for use in connection with DNI/AG 702(h)

Certification ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ are consistent with the requirements of Section

702(f)(1) and of the Fourth Amendment.  (The Court does not make an equivalent finding

regarding the other certifications in the Prior 702 Dockets because Section 702(f) only applies

TOP SECRET//SI//NOFORN/FISA

"with respect to certifications submitted under [Section 702(h)] . . . after January 1, 2018."

Reauthorization Act § 101(a)(2).); and, accordingly,

IT IS HEREBY ORDERED AS FOLLOWS:

(1) The government's submissions are approved, as set out below:

a. The 2021 Certifications, as amended, and the certifications in the Prior 702 Dockets, as amended, are approved;

b. The use of the targeting procedures for acquisitions conducted pursuant to the 2021 Certifications is approved;

c. With respect to information acquired under the 2021 Certifications, the use of the minimization procedures and querying procedures is approved; and

d. With respect to information acquired under the certifications in the Prior 702 Dockets, the use of the minimization procedures (including, as referenced therein, the requirements of the respective agencies' querying procedures) is approved;

(2) Separate orders memorializing the dispositions described above are being issued contemporaneously herewith pursuant to Section 702(j)(3)(A);

(3) The government shall adhere to the following requirements (prospectively, the government need not comply with reporting requirements imposed by FISC opinions and orders in the Prior 702 Dockets, except as reiterated below):



a. Raw information obtained by NSA's ██████████████████ under Section 702, ███████████████████████████████████████ shall not be provided to the FBI, the CIA, or NCTC unless it is done pursuant to revised minimization

TOP SECRET//SI//NOFORN/FISA                                    Page 122

Document re: Section 702 2021 Certification

Authorized for Public Release by ODNI

TOP SECRET//SI//NOFORN/FISA

procedures that are adopted by the AG and DNI and submitted to the FISC for review in conformance with Section 702;

b. On or before December 31 of each calendar year, the government shall submit a written report to the FISC: (a) describing all administrative-, civil-, or criminal-litigation matters necessitating preservation by the FBI, NSA, CIA, or NCTC of Section 702-acquired information that would otherwise be subject to destruction, including the docket number and court or agency in which such litigation matter is pending; (b) describing the Section 702-acquired information preserved for each such litigation matter; and (c) describing the status of each such litigation matter;

c. The government shall promptly submit a written report describing each instance in which an agency invokes the provision of its minimization or querying procedures providing an exemption for responding to congressional mandates, as discussed in Part IV.D.3 of the October 18, 2018 Opinion. Each such report shall describe the circumstances of the deviation from the procedures and identify the specific mandate on which the deviation was based;

d. The government shall submit in each quarterly report on Section 702 compliance matters a report of each instance in which FBI personnel accessed unminimized Section 702-acquired contents information that the user identified as a Query ONLY for evidence of crime. Except for queries for which an application is filed with the Court pursuant to Section 702(f)(2), the report shall include the FBI's basis for concluding that the query was consistent with applicable procedures. This report shall also include: (i) the number of U.S.-person queries

TOP SECRET//SI//NOFORN/FISA

Authoriz                    ]                    FISC Memorandum Opinion and Order, April 21, 2022

TOP SECRET//SI//NOFORN/FISA

run by the FBI against Section 702-acquired information; (ii) the number of such queries

identified by the user as evidence-of-crime-only queries; (iii) the number of instances in which

users of █████ stated that they had received approval from an FBI attorney to perform a "batch

job" that includes 100 or more queries; and (iv) the number of instances in which users of █████

did not receive prior approval from an FBI attorney for such a "batch job" due to emergency

circumstances;

e.   The government shall continue to submit reports to the Court on a quarterly

basis on its use █████████████████ under Section 702.  This report shall: (i) describe



(ii) explain how the government is ensuring that it will only acquire

communications to or from a Section 702 target █████████████████; and (iii)

describe methods the government is using to monitor compliance with the abouts limitation █████

█████████████ and report on the results of such monitoring;

f.   No later than ten days after tasking for upstream collection under Section 702 a



he government shall submit a

notice to the Court.  This notice shall: (i) describe █████████████ (ii) explain how █████

█████████████ will comply with the abouts limitation; and (iii) describe steps that

will be taken during the course of the proposed acquisition to ensure that █████████████

█████ is only acquiring communications to or from authorized Section 702 targets;

TOP SECRET//SI//NOFORN/FISA                                Page 124

Authorized for Public Release by ODNI

TOP SECRET//SI//NOFORN//FISA

     g. On or before December 31 of each calendar year, the government shall submit in writing a report to the Court containing the following information: (i) the number of Section 702-acquired products disseminated or disclosed to the National Center for Missing and Exploited Children (NCMEC); and (ii) the number of disseminations or disclosures by the NCMEC to other law-enforcement entities of Section 702-acquired information;

     h. Prior to implementing changes to policies or practices concerning (i) the release of Section 702-acquired information from the NCMEC to Interpol's International Child Sexual Exploitation database or (ii) approval to use Section 702-acquired information disseminated to the NCMEC in any proceeding, the government shall make a written submission to the Court describing such changes and explaining why implementing them would be consistent with applicable minimization procedures and statutory minimization requirements;

     i. The government shall submit an update by February 17, 2023, specifying, as applicable: (i) steps taken or to be taken by the FBI, NSA, CIA, and NCTC to coordinate their policies and procedures to identify and handle disseminated analytical reports derived from FISA-compliance recalled reports, and to verify receipt of notice of reports recalled for FISA-compliance reasons; (ii) ODNI guidance regarding the definition of the term "disseminated intelligence products" as used in ICOM 200(01); and (iii) steps taken or to be taken to facilitate a consistent application among the FBI, NSA, CIA, and NCTC of the FISA-compliance recall category;

     j. The requirement to provide an update to each agency's user activity monitoring (UAM) submission that appears on pages 82-83 of the December 6, 2019 Opinion shall remain in

TOP SECRET//SI//NOFORN//FISA        Page 125

TOP SECRET//SI//NOFORN/FISA

effect, with the next report due in March 2023 and subsequent reports due at two-year intervals

thereafter;

k. No later than ten days after the NCTC Director delegates authority to any group

chief or official within the Directorate of Identity Intelligence to make the determination required

under NCTC Minimization Procedures § D.3.b., the government shall submit a notice to the

Court. This notice shall: (i) identify the individual to whom the delegation was made; (ii)

describe the duties of such individual; and (iii) explain the reason(s) for the delegation to such

individual and the scope and duration of the delegation;

l. For ████████████ authorized herein, NSA's post-tasking review shall

include periodic examination of information recently obtained from ████████████



m. The government shall provide to the Court a written description of any of the

following occurrences:

(a) NSA comes to believe that ████████████

(b) NSA comes to believe ████████████

(c) NSA comes to believe ████████████

TOP SECRET//SI//NOFORN/FISA                                      Page 126

Authorized for Public Release by ODNI

TOP SECRET//SI//NOFORN/FISA

Such descriptions shall be submitted within 10 days of the applicable occurrence and describe the

government's response thereto and assess any statutory or Fourth Amendment issues presented.

ENTERED this 21ˢᵗ day of April, 2022.

RUDOLPH CONTRERAS
Presiding Judge, United States Foreign
Intelligence Surveillance Court

I, ▮▮▮▮▮ Chief Deputy Clerk,
FISC, certify that this document is a true
and correct copy of the original.

Authoriz ▮▮▮▮▮▮▮▮▮▮ ]

TOP SECRET//SI//NOFORN/FISA