# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

    v.

DONALD J. TRUMP,

       *Defendant*.

Case No. 1:23-cr-00257-TSC

**PRESIDENT DONALD J. TRUMP'S MOTION FOR AN ORDER REGARDING THE
SCOPE OF THE PROSECUTION TEAM
(REDACTED)**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

APPLICABLE LAW .............................................................................................................. 2

    I.    Prosecution Team Scope ............................................................................................. 3

    II.   The Prosecution's Affirmative Duty To Search ......................................................... 4

    III.  "Control" Under Rule 16 ............................................................................................. 4

    IV.  Case File Reviews ....................................................................................................... 5

    V.   Prudential Search Requests ......................................................................................... 5

BACKGROUND ..................................................................................................................... 6

    I.    President Trump's Discovery Letters .......................................................................... 6

    II.   The Prosecution Team .................................................................................................. 7

        A.    Special Counsel's Office ................................................................................. 8

        B.    United States Attorney's Office For The District of Columbia .............................. 9

        C.    United States Department of Justice ............................................................... 11

        D.    FBI's Washington Field Office ....................................................................... 14

        E.    U.S. Department Of Homeland Security ......................................................... 15

        F.    U.S. Department Of Defense .......................................................................... 17

        G.    Office Of The Director Of National Intelligence ............................................ 18

        H.    Central Intelligence Agency ........................................................................... 19

        I.    The January 6 Committee ............................................................................... 20

DISCUSSION ....................................................................................................................... 21

    I.    The Court Should Reject The Prosecution's Efforts To Avoid Discovery Obligations .... 21

    II.   Discovery Obligations Extend To DOJ Components And The USAO-DC ...................... 23

    III.  Discovery Obligations Extend To Agencies That Assisted The Prosecutors ................. 26

    IV.  Discovery Obligations Extend To The January 6 Committee's Records ....................... 28

CONCLUSION ..................................................................................................................... 30

## **INTRODUCTION**

President Donald J. Trump respectfully submits this motion, and the accompanying Classified Supplement, for an order requiring the Special Counsel's Office to comply with its discovery obligations under *Brady*, *Giglio*, Rule 16(a)(1)(E), and the Jencks Act with respect to all of the evidence that is in possession of the prosecution team.

The Special Counsel's Office hopes to rush this case to trial as part of a politically motivated strategy to undermine the Biden Administration's main, leading opponent in the 2024 Presidential Election. In doing so, the prosecution has ignored its fundamental discovery obligations and the Court's August 3, 2023 order to "produce all exculpatory evidence to the defendant pursuant to *Brady v. Maryland* and its progeny," including documents and information that are essential to President Trump's defense against the lies in the Indictment. While it is true that the prosecution has produced a significant volume of material, it has intentionally and unlawfully declined to search for other exculpatory documents that are in its actual or constructive possession, including materials held by the personnel and entities that have participated in and assisted with the investigations relating to the 2020 election and events on January 6, 2021.

Examples of this unethical strategy are myriad. For instance, President Trump has identified instances of prosecutors taking positions that are wholly inconsistent with the assertions of the Special Counsel's Office regarding January 6. In response, the Office has incredibly claimed that its discovery obligations do not reach the United States Department of Justice ("DOJ") components that worked on these investigations and related cases. Despite relying on information and evidence from agencies such as the Department of Homeland Security, the Defense Department, the Central Intelligence Agency, the Postal Inspection Service, and the Office of the Director of National Intelligence, the prosecution refuses to acknowledge any obligation to review

and produce discoverable information from those and other entities that the Office has already collaborated with in its investigation.   Likewise, notwithstanding close coordination with the House Committee Investigating the events of January 6, 2021 ("January 6 Committee") dating back to at least late 2021, and the Office's production of unclassified material from the Committee, the Office has failed to search for or produce exculpatory materials from the Committee's classified holdings.

Courts in this District and elsewhere have repeatedly rejected the types of limitations and restrictions that the Special Counsel's Office has sought to put on its discovery obligations. Through this motion, we respectfully seek relief from these unconstitutional circumstances, which are depriving President Trump of his right to prepare his defense and risk comprising the fairness of any trial that may be necessary.

## APPLICABLE LAW

Pursuant to Local Criminal Rule 5.1, as well as the authorities set forth in our separate motion to compel specific types of discovery, the prosecution's *Brady* obligation "applies regardless of whether the information would itself constitute admissible evidence."   Local Rule 5.1 specifies that the *Brady* obligation includes:

- "Information that is inconsistent with or tends to negate the defendant's guilt as to any element";

- "Information that tends to mitigate the charged offense(s)";

- "Information that tends to establish an articulated and legally cognizable defense theory";

- "Information that casts doubt on the credibility or accuracy of any evidence, including witness testimony"; and/or

- "Impeachment information."

Local Crim. R. 5.1(a)-(b).   Evidence within these categories must be produced "as soon as reasonably possible after its existence is known."  Local Crim. R. 5.1(a).  "[I]t is important to note that courts in this jurisdiction look with disfavor on narrow readings of the government's *Brady* obligations; it simply is insufficient for the government to offer 'niggling excuses' for its failure to provide potentially exculpatory evidence to the defendant.  *United States v. Ramirez*, 54 F. Supp. 2d 25, 33 (D.D.C. 1999) (quoting *United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988)).

Set forth below are the authorities governing the scope of the Special Counsel's obligations to collect, review, and produce material that is discoverable pursuant to *Brady*, *Giglio*, Rule 16(a)(1)(E), and the Jencks Act.

### I.    Prosecution Team Scope

For purposes of discovery obligations, "[t]he prosecution's possession or control extends not just to the prosecutor's own file, but evidence 'known to [any] others acting on the government's behalf in the case, including the police.'"  *United States v. Michel*, No. 19-cr-148, 2023 WL 7140001, at *1 (D.D.C. Mar. 22, 2023) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)); *see also* Local Crim. R. 5.1(e).  The scope of the prosecution team is "generally fact-intensive and best resolved on a case-by-case basis," but "[u]sually, the question turns on whether another entity actually contributed to the investigation by locating evidence or assisted in some other way," *id.* (cleaned up), or whether the entity was "closely aligned with the prosecution," *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992) (cleaned up).

> Prosecutors are encouraged to err on the side of inclusiveness when identifying the members of the prosecution team for discovery purposes.  Carefully considered efforts to locate discoverable information are more likely to avoid future litigation over *Brady* and *Giglio* issues and avoid surprises at trial.

Justice Manual § 9-5.002.

## II.     The Prosecution's Affirmative Duty To Search

"[I]naction does not satisfy the government's *Brady* obligations." *United States v. Rowell*, 979 F.2d 248, 1992 WL 336989, at *2 (D.C. Cir. Nov. 13, 1992) (per curiam).  Thus, under *Brady*, prosecutors have an "affirmative duty" to "search possible sources of exculpatory information," which includes an obligation "to cause files to be searched that are not only maintained by the prosecutor's or investigative agency's office, but also by other branches of government closely aligned with the prosecution." *United States v. Safavian*, 233 F.R.D. 12, 17 (D.D.C. 2005) (cleaned up); *see also Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (describing the "duty to learn" of "the individual prosecutor").

"The government is obligated to disclose such favorable evidence even in the absence of a defense request." *United States v. Sutton*, 2022 WL 2383974, at *4 (D.D.C. July 1, 2022) (cleaned up).  "[B]ecause the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure." *United States v. Agurs*, 427 U.S. 97, 108 (1976).

## III.     "Control" Under Rule 16

"Rule 16 is a discovery rule designed to protect defendants by compelling the prosecution to turn over to the defense evidence material to the charges at issue." *Yates v. United States*, 574 U.S. 528, 539 (2015).  Evidence that is within the prosecution's "control" and "material to preparing the defense" is subject to disclosure under Rule 16(a)(1)(E)(i).

"The language and the spirit of the Rule are designed to provide to a criminal defendant, in the interest of fairness, the widest possible opportunity to inspect and receive such materials in the possession of the government as may aid him in presenting his side of the case." *United States v. Poindexter*, 727 F. Supp. 1470, 1473 (D.D.C. 1989).  "The 'control' prong of the Rule 16 test

4

generally focuses on the fairness to the defendants rather than the semantics of whether or not the prosecutors actually hold the evidence at the time that it should be produced." *United States v. Archbold-Manner*, 581 F. Supp. 2d 22, 24 (D.D.C. 2008) (citing *United States v. Libby*, 429 F. Supp. 2d 1, 5 (D.D.C. 2006)).   Untimely disclosure under Rule 16 constitutes "impermissible sandbagging." *United States v. Bikundi*, 926 F.3d 761, 782 (D.C. Cir. 2019).

### IV.   Case File Reviews

"It is the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all members of the prosecution team."   Justice Manual § 9-5.001; *see also United States v. Jain*, 2020 WL 6047812, at *4 (S.D.N.Y. Oct. 13, 2020) ("A more thorough review of the case file by the new case agent would have revealed the existence of the Devices sooner.").   "This search duty also extends to information prosecutors are required to disclose under Federal Rules of Criminal Procedure 16 and 26.2 and the Jencks Act."   Justice Manual § 9-5.002.

"The investigative agency's entire investigative file, including documents such as FBI Electronic Communications (ECs), inserts, emails, etc. should be reviewed for discoverable information."   Justice Manual § 9-5.002.   "[S]ubstantive case-related communications," which "may be memorialized in emails, memoranda, or notes," "should be reviewed carefully to determine whether all or part of a communication (or the information contained therein) should be disclosed."   *Id.*

### V.   Prudential Search Requests

Prosecutors routinely conduct Prudential Search Requests at agencies and components that may possess discoverable material—regardless of classification status—in response to defense requests.   *See, e.g.*, *United States v. Raymond*, No. 21-cr-380, 2023 WL 7611601, at *2 (D.D.C.

Nov. 14, 2023) ("The Government's prudential review uncovered a number of classified records that may qualify as *Brady*, *Giglio*, or Jencks material."); *United States v. Oseguera Gonzalez*, 507 F. Supp. 3d 137, 170 (D.D.C. 2020) (noting that the prosecution "has reviewed OFAC records related to the defendant to determine whether they contained any evidence that would be discoverable under Rule 16 or as impeachment or exculpatory material . . . includ[ing] classified and privileged material"); *United States v. Bagcho*, 151 F. Supp. 3d 60, 67 (D.D.C. 2015) (noting prosecution's pre-trial "search of agency records"); *United States v. Kim*, No. 10-cr-255, 2013 WL 3866542, at *3 (D.D.C. July 24, 2013) (noting that the prosecution "has searched for documents or information concerning any formal criminal investigation of unauthorized disclosures of national defense information" by potential alternate perpetrators); *see also United States v. Saab Moran*, No. 19-cr-20450, 2022 WL 4291417, at *3 (S.D. Fla. Sept. 15, 2022); *United States v. Kuciapinski*, No. 18-cr-429, 2022 WL 3081928, at *6 (D. Colo. Aug. 3, 2022); *United States v. Doe No. 2*, No. 98-cr-721, 2009 WL 10720338, at *3 (S.D. Fla. Oct. 23, 2009).

The Justice Manual describes the "*legally-mandated* scope" of these reviews and makes clear that classification status "shall have no effect" on "the prosecutor's *obligation*." Justice Manual § 9-90.210(B) (emphases added). The policy also provides that, "except as modified by CIPA, the prosecutor's *obligation* to produce to the defendant information found during that review is unaffected by the classified nature of that information." *Id.* (emphasis added).

## BACKGROUND

### I.    President Trump's Discovery Letters

President Trump served a classified discovery letter on the Special Counsel's Office on October 15, 2023, which is an exhibit to the Classified Supplement, and three unclassified letters on October 4, 2023, Ex. A; October 23, 2023, Ex. B; and November 15, 2023, Ex. C.

On October 24, the prosecution provided a cursory, one-page response to the October 15 Letter, which included the legally baseless position that the "prosecution team" is limited to "the Special Counsel's Office and law enforcement officers who are working on this case" and "does not include agencies and components whose personnel are not working on this case." Ex. D.

On November 3, 2023, the Special Counsel's Office responded to the October 23 Letter. Ex. E. The Office asserted that it "has proceeded consistently with the provisions of the Justice Manual," without explaining what that means. *Id.* at 5. The prosecutors also asserted that they "understand" their discovery obligations and "will comply" with them. *Id.* The letter identified "examples" of "certain" materials that are responsive to President Trump's requests, but did not confirm that all responsive materials had been produced. *E.g.*, *id.* at 2.

During a call on November 21, 2023, we conferred with the Special Counsel's Office regarding the discovery requests. On November 25, the Office provided a written response to our November 15 letter. Ex. F. The Office disclosed that the "law enforcement agencies that worked on the investigation leading to this case were the Federal Bureau of Investigation; the Department of Justice Office of the Inspector General (DOJ OIG); the National Archives Inspector General (NARA OIG); and the United States Postal Inspection Service (USPIS)." *Id.* at 1. Underscoring the need for this motion, the Office took the position, for the first time with respect to numerous discovery requests, that responsive materials were "not within the possession of the prosecution team." *Id.* at 2-4.

## II. The Prosecution Team

In this case, the discovery obligations of the Special Counsel's Office extend to all of the Office's personnel, components of the DOJ that participated in investigations relating to the 2020

election and January 6, 2021, federal agency components that participated in or assisted those investigations, and the records of the January 6 Committee.

### A. Special Counsel's Office

The prosecution team is not limited to attorneys at the Special Counsel's Office "working on this case." Ex. D.  Pursuant to Attorney General Garland's Order No. 5559-2022, the Special Counsel's Office has conducted broad investigations that gave rise to this case and to other lawless charges in the Southern District of Florida (the "Florida Case").  In accordance with that Order, the Special Counsel's Office did not silo its investigative activities or its personnel during the investigations, and it should not be permitted to do so now for purposes of discovery.

For example, the Special Counsel's Office used the same grand jury in this District for matters relating to both cases.  Assistant Special Counsel John Pellettieri has appeared on behalf of the Office in this case and in the Florida Case.  Senior Assistant Special Counsel ("SASC") Thomas Windom, who has entered a notice of appearance for the prosecution in this case, participated in at least 27 of the interviews described in discovery produced in the Southern District of Florida.  SASC Julie Edelstein, counsel of record in the Florida Case, participated in 29 of the interviews that have been produced in discovery in this case.  Jay Bratt, also counsel of record in the Florida Case and Counselor to the Special Counsel, participated in 10 of the interviews that have been produced in discovery in this case.  Notwithstanding the clear overlap of personnel and intermixed responsibilities, the Office has sought to artificially narrow its definition of the prosecution team to an unidentified subset of individuals who, apparently in its sole judgment, "are working on this case." Ex. D.  Not so.  As the entire Office has participated in this prosecution, both in fact and by General Garland's Order, the entire Office is subject to the prosecution's discovery obligations.

8

### B.  United States Attorney's Office For The District of Columbia

The prosecution team also includes personnel at the United States Attorney's Office for the District of Columbia ("USAO-DC") who participated in any investigation relating to the 2020 election or January 6, 2021, as well as files accessible by former USAO-DC personnel now or previously assisting the Special Counsel.

Prior to and in anticipation of the appointment of the Special Counsel, the USAO-DC played a leading role in the investigations that led to this case.  In November 2020, Deputy Special Counsel J.P. Cooney and SASC Molly Gaston, as prosecutors at the USAO-DC, wrote to Attorney General Barr that allegations of fraud relating to the 2020 election were "false."  Doc. 161-1. Consistent with the political bias reflected in that correspondence, in early 2021, Cooney "led" a group of prosecutors at USAO-DC who wanted to expand their investigations to target President Trump and his associates.  Doc. 116-1 at 5.

The USAO-DC prosecuted the first charges relating to January 6, which were announced on January 8, and that public- and court-facing role has continued to the present.[1]  On January 12, 2021, as Acting United States Attorney for the USAO-DC, Michael Sherwin led one of the first press conferences regarding the investigation.  *See* Doc. 116-1 at 4.  Immediately following Attorney General Garland's confirmation in March 2021, Sherwin briefed Garland on the status of the investigation.  *See* Doc. 116-1 at 2. As Sherwin left his post to return to Florida, he violated DOJ policy by participating in a *60 Minutes* interview regarding the investigation.  Doc. 116-1 at

---

[1] *See* Capitol Breach Investigation Resource Page, U.S. Dep't of Justice, https://www.justice.gov/usao-dc/capitol-breach-cases ("Every case is being prosecuted by the U.S. Attorney's Office for the District of Columbia.").

6-7.  The following day, the USO-DC's Chief of the Criminal Division notified Judge Mehta that Sherwin was the target of an investigation by DOJ's Office of Professional Responsibility.[2]

In November 2021, Matthew Graves was sworn in as Sherwin's replacement, and Graves immediately started pushing DOJ leadership to bring seditious conspiracy charges.  Doc. 116-1 at 8.  Around the same time in late 2021, SASC Windom arrived at the USAO-DC as a "transfer" from the United States Attorney's Office for the District of Maryland.  Doc. 116 at 9.  That same month, the FBI's Washington Field Office rejected grand jury subpoenas proposed by Windom because his plan "sounded eerily similar to the Cooney proposal that had been shot down in February [2021]," as well as a pitch by Windom to pursue so-called "fake electors."  *Id.*  Rather than recognizing the lack of evidentiary basis for grand jury proceedings, Windom "discreetly" asked the U.S. Postal Inspection Service if it "might help" with the biased project the FBI had declined to pursue.  *Id.*; *see also* Ex. F at 1 (confirming that Postal Inspection Service "worked on the investigation").

During the summer of 2022, Graves put Cooney in charge of the investigation at the USAO-DC.  Doc. 116-1 at 11.  In November 2022, Cooney, Windom, and "roughly 20 others" agreed to join the Special Counsel's Office.  *Id.*  The Order appointing the Special Counsel notes the ongoing responsibility of the USAO-DC for "currently pending" and "future investigations and prosecutions of individuals for offenses they committed while physically present on the Capitol grounds on January 6, 2021."  These responsibilities do not alter the fact that this case originated as a USAO-DC investigation, led by many of the same prosecutors now working at the Special Counsel's Office.

---

[2] Scott Pelley, *Inside the Prosecution of the Capitol Rioters*, 60 MINUTES (Mar. 22, 2021, 6:55 am), https://www.cbsnews.com/news/capitol-riot-investigation-sedition-charges-60-minutes-2021-03-21/.

Since the Order, the Special Counsel's Office has enjoyed constructive access to USAO-DC documents.  In an August 11, 2023 discovery letter, the Office wrote that the USAO-DC "maintains a separate database of materials comprising discovery in the criminal cases related to the breach of the United States Capitol on January 6, 2021." Ex. G at 6.  The letter stated that the "investigative team" in this case had "accessed certain materials within that database and has taken into its possession certain materials that the investigative team may rely upon or use at trial." *Id.* Given these alignments, there is no question that the USAO-DC is part of the prosecution team.

### C. United States Department of Justice

The prosecution team also includes the components within DOJ that participated in the investigation and deliberations relating to charging decisions: the Office of the Attorney General, the Office of the Deputy Attorney General, the National Security Division, the Public Integrity Section, and the Office of the Inspector General.

Current and former "senior leaders of the Justice Department" are likely witnesses in the case.  Indictment ¶ 11(b); *see also, e.g.*, *id.* ¶¶ 12(b)-(c), 12(f), 27.  The Indictment contains allegations regarding so-called "sham election crime investigations," *id.* ¶ 10(c), but these officials and members of DOJ's Public Integrity Section played key roles in suppressing investigations relating to widespread fraud in the 2020 election.  As one example, on November 8, 2020, ███

████████████████████████████████████████████████████████

█████████████████████████████████████████████████ Ex.

H at SCO-12279975. ██████████████████████████████████

████████████████████████████████████████████████████████

███████ *Id.*  The following day, Attorney General Barr removed the consultation requirement that the Director had relied on in an effort to suppress the investigation.  After the Director

resigned,[3] on November 12, 2020, Cooney and Gaston sent the above-described letter to Attorney General Barr, declaring without basis, and contrary to facts that were emerging, that claims of fraud were "false."  Doc. 161-1.

Subsequent to the letter from Cooney and Gaston, █████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████ Ex. I at SCO-

12265809. ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████ *Id.* at SCO-12265807. ██████████████████████████

████████████████████████████████████████████████████████████████

████████████████████ *Id.*

Beginning in January 2021, personnel from DOJ's National Security Division joined the USAO-DC in prosecuting cases related to January 6.[4] ███████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

Ex. J; *see also* Ex. F at 1 (noting that "DOJ OIG" is an agency that "worked on the investigation").

---

[3] Bill Chappell, *Head Of DOJ's Election Crimes Unit Steps Down After Barr OKs Election Inquiries*, NPR (Nov. 10, 2020, 11:18 am), https://www.npr.org/sections/live-updates-2020-election-results/2020/11/10/933395215/head-of-doj-s-election-crimes-unit-steps-down-after-barr-oks-election-inquiries.

[4] Press Release, U.S. Dep't of Justice, Three Individuals Affiliated With the Oath Keepers Indicted in Federal Court for Conspiracy to Obstruct Congress on Jan. 6, 2021 (Jan. 27, 2021), https://www.justice.gov/opa/pr/three-individuals-affiliated-oath-keepers-indicted-federal-court-conspiracy-obstruct.

In February 2021, "[t]he National Archives inspector general's office asked the Justice Department's election crimes branch," which is a part of the Public Integrity Section, "to consider investigating the seemingly coordinated effort in swing states." Doc. 116-1 at 6; *see also* Ex. F at 1 (noting that "NARA OIG" is an agency that "worked on the investigation"). "Citing its prosecutors' discretion, the department told the Archives it would not pursue the topic, according to two people with knowledge of the decision." Doc. 116-1 at 6. Also in February 2021, the Acting Deputy Attorney General explained that he "receive[d] daily updates on the Capitol case investigation, at least daily."[5] DOJ leadership participated in discussions regarding Cooney's proposal to "trace who had financed the false claims of a stolen election." Doc. 116-1 at 5. Specifically, Sherwin briefed Matt Axelrod, who had been selected by President Biden to "run" DOJ "until Garland and Monaco could be confirmed," on Cooney's inappropriate proposal. *Id.* at 5; *see also id.* at 6 ("All who assembled for the late February [2021] meeting were in agreement, with Axelrod making the final call: Cooney's plan would not go forward.").

High-level DOJ participation in the investigation continued after Attorney General Garland took over in March 2021. Just "[h]ours after he was sworn in," Garland "and his deputies" were briefed on the investigation relating to January 6. *Id.* at 1; *see also id.* (referring to "Sherwin's 11-page presentation to Garland on March 11, 2021"). During the summer of 2021, Garland and Deputy Attorney General Lisa Monaco continued to receive "briefing materials" relating to the investigation. *Id.* at 7; *see also id.* at 8 (noting that leadership from the USAO-DC "relayed to Monaco's office" plans for a "new investigative unit"). The Office of the Attorney General and the Office of the Deputy Attorney General participated in the deliberations over whether to bring

---

[5] Press Release, U.S. Dep't of Justice, Acting Deputy Attorney General John Carlin Delivers Remarks on Domestic Terrorism (Feb. 26, 2021), https://www.justice.gov/opa/speech/acting-deputy-attorney-general-john-carlin-delivers-remarks-domestic-terrorism.

seditious conspiracy charges against Stewart Rhodes, with Garland getting "deep into the weeds." *Id.* at 9; *see also id.* at 8 (describing "debate among some officials inside Monaco's and Garland's offices about the risk of sedition charges being overturned on appeal"). Sherwin later told the *Washington Post* that he "heard from a close Justice Department ally that Garland and his deputies . . . felt boxed into the seditious conspiracy charges — or to tough questions if they didn't bring them." *Id.* at 7.

By at least late 2021, Matthew Olsen, the new Assistant Attorney General for National Security, "pressed to take on a role in the Jan. 6 casework." *Id.* at 8. Olsen argued to Monaco and other "senior Justice Department Officials" that "an effort to block the peaceful transfer of power was squarely in the vein of what the national security division should be focused on." *Id.* Olsen also "agreed" with Graves, who had recently been confirmed as the U.S. Attorney for the USAO-DC, about seditious conspiracy charges. *Id.*; *id.* at 9 ("In late December [2021], amid that wave of criticism, Olsen briefed the attorney general that he had reached a decision on the sedition question."). As further evidence of close coordination between DOJ and the USAO-DC, in April 2022, the Assistant Attorney General for the Criminal Division and the U.S. Attorney for the District of Columbia sent a letter to the January 6 Committee stating that some of the Committee's interviews were "relevant to a criminal investigation we are conducting."[6]

### D. FBI's Washington Field Office

The FBI's Washington Field Office ("FBI-WFO") is part of the prosecution team because its personnel are potential witnesses, and they have assisted the relevant investigations since their inception.

---

[6] Glenn Thrush and Luke Broadwater, *Justice Dept. Is Said to Request Transcripts From Jan. 6 Committee*, N.Y. TIMES (May 17, 2022), https://www.nytimes.com/2022/05/17/us/politics/jan-6-committee-transcripts.html.

On January 2, 2021, ████████████████████████████████████████ ████████████████████████ Ex. K at SCO-00767425. ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████ *Id.* at SCO-00767426 (emphasis in original).  By at least January 3, ████████ ████████████████████████████████████████████████ *See* Ex. L at SCO-00756152-54.

In late 2021, Mike D'Antuono, the Assistant Director in Charge of the FBI-WFO, gave SASC Windom "full access" to the FBI's "trove of evidence about Oath Keeper and Proud Boy extremists involved in the riot."  Doc. 116-1 at 9.   In April 2022, the FBI opened a formal investigation targeting President Trump, apparently without acknowledging in internal files that the agents were targeting President Trump.  *See id*. at 10 ("[Director] Wray signed off on the authorization opening a criminal investigation . . . . [S]ome of the ex-president's advisers and his reelection campaign were identified as the focus of the bureau's probe, but not [President] Trump.").

### E.  U.S. Department Of Homeland Security

For similar reasons, the U.S. Department of Homeland Security ("DHS") is part of the prosecution team, including the United States Secret Service ("USSS") and the Cybersecurity and Infrastructure Security Agency ("CISA").

Not surprisingly, at least two courts in this District have already concluded that the USSS is part of the prosecution team in cases relating to January 6.  *See United States v. Bingert Sturgeon*, Nos. 1:21-cr-91-1&2, 2023 WL 3203092, at *4 (D.D.C. May 2, 2023) ("Because of the USSS's extensive involvement as a law enforcement agency in the events of January 6 and its extensive

cooperation with the U.S. Attorney's office in gathering evidence for this case, the government is not categorically excused from all *Brady* and Rule 16 obligations related to evidence in the possession of the USSS.") (citing *United States v. Sheppard*, No. 21-cr-203, 2022 WL 17978837, at *10-11 (D.D.C. Dec. 28, 2022)). ████████████████████████████████████████

████████████████████████████████████████████ Ex. G at 6; *see also*

Doc. 119 at 2-3 ("[T]he Government obtained and produced records from . . . the Secret Service.").

Moreover, as described in DHS's 2020 Strategic Plan, DHS participated in security efforts relating to the 2020 election, including an "Election Task Force," a "Countering Foreign Influence Task Force," and an "Election Security Initiative" within CISA.[7]  CISA coordinated these efforts with DHS's Office of Intelligence and Analysis, which is part of the Intelligence Community, and the FBI. ████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████ *See* Ex. M at SCO-06615566.

In addition, in the Indictment, the Special Counsel's Office credited and relied upon the judgment of a former CISA Director, as well as the November 2020 "Joint Statement from Elections Infrastructure Government Coordinating Council & the Election Infrastructure Sector Coordinating Executive Committees" (the "CISA Election Statement").[8]  *See* Indictment ¶ 11(d).

---

[7] Cybersecurity & Infrastructure Sec. Agency, U.S. Dep't of Homeland Sec., #Protect2020 Strategic Plan (Feb. 2020), *available at* https://www.cisa.gov/sites/default/files/publications/ESI%2520Strategic%2520Plan_FINAL%25202.7.20%2520508.pdf

[8] Press Release, Cybersecurity & Infrastructure Sec. Agency, U.S. Dep't of Homeland Sec., Joint Statement from Elections Infrastructure Government Coordinating Council & the Election Infrastructure Sector Coordinating Executive Committees (Nov. 12, 2020), https://www.cisa.gov/news-events/news/joint-statement-elections-infrastructure-government-coordinating-council-election.

DHS also joined a March 2021 joint report on foreign interference (the "2020 Election DOJ-DHS Report").[9] 

Ex. N.

Finally, DHS participated in security efforts relating to anticipated protests at the Capitol on January 6.

Ex. O.  On January 6, the Acting Attorney General announced that "[f]rom the outset" DOJ had "been working in close coordination with," among other agencies, DHS.[10]  A Senate report regarding January 6 identified "critical breakdowns involving several federal agencies," including DHS, that contributed to the events that day.[11]  The report also noted that neither DHS nor the FBI "fully complied with the Committees' request for information on the events of January 6."[12]

### F.  U.S. Department Of Defense

Components of the U.S. Department of Defense ("DOD") that have assisted the investigation are also part of the prosecution team.

---

[9] Press Release, U.S. Dep't of Homeland Sec., Joint Statement from the Departments of Justice and Homeland Security Assessing the Impact of Foreign Interference During the 2020 U.S. Elections (Mar. 16, 2021), https://www.dhs.gov/news/2021/03/16/joint-statement-departments-justice-and-homeland-security-assessing-impact-foreign.

[10] Press Release, U.S. Dep't of Justice, Acting Attorney General Jeffrey A. Rosen Regarding the Overrunning of the U.S. Capitol Building (Jan. 6, 2021), https://www.justice.gov/opa/pr/acting-attorney-general-jeffrey-rosen-regarding-overrunning-us-capitol-building.

[11] Staff Report, Examining the U.S. Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6, Committees on Homeland Sec. & Governmental Affairs and Rules & Admin. at 1 (2021), *available at* www.rules.senate.gov/download/hsgac-rules-jan-6-report.

[12] *Id.* at 5.

On January 6, the U.S. Capitol Police and the D.C. Metropolitan Police Department "pleaded with DOD officials for immediate assistance" from the D.C. National Guard.[13] According to General Mark Milley, President Trump had previously directed the Acting Secretary of Defense to "ensure sufficient National Guard or Soldiers would be there to make sure it was a safe event," and the Acting Secretary responded, "We've got a plan and we've got it covered."[14] On the afternoon of January 6, the Acting Secretary approved a request for assistance from the Capitol Police. "Miscommunication and confusion during response preparations, demonstrated by conflicting records about who authorized deployment and at what time, contributed to the delayed deployment" of the National Guard.[15] "DOD officials cited lessons learned from the summer 2020 as guiding its decision-making for January 6."[16]

In addition to DOD's role on January 6, as discussed in the Classified Supplement, the agency also provided some materials to the Special Counsel's Office and is currently conducting a classification review relating to those materials. *See* Doc. 65 at 5 (referring to a "761-page document obtained from the Department of Defense, the majority of which is not classified," and "a 12-page document currently undergoing classification review by the Department of Defense").

### G.  Office Of The Director Of National Intelligence

---

[13] *Id*. at 3.

[14] Inspector General, U.S. Dep't of Defense, Review Of The DOD's Role, Responsibilities, And Actions To Prepare For And Respond To The Protests And Its Aftermath At The U.S. Capitol Campus On January 6, 2021, at 31 (Nov. 16, 2021), https://media.defense.gov/2021/Nov/19/2002896088/-1/-1/1/DODIG-2022-039%20V2%20508.pdf.

[15] Staff Report, Examining the U.S. Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6, Committees on Homeland Sec. & Governmental Affairs and Rules & Admin. at 4 (2021), *available at* www.rules.senate.gov/download/hsgac-rules-jan-6-report.

[16] *Id*. at 7.

The Office of the Director of National Intelligence ("ODNI") is part of the prosecution team because of its assistance to the investigation and direct role in the Special Counsel's allegations.

In early January 2021, a former Director of National Intelligence ("DNI") and his staff facilitated a classified briefing to "Co-Conspirator 4" regarding intelligence assessments of the 2020 election that are central to the prosecution's theory of the case.  *See* Indictment ¶ 83.  In the Indictment, the prosecution claims that the DNI "disabused" President Trump regarding certain matters.  *Id.* ¶ 11(c).  Yet, like the CISA Election Statement, the Special Counsel's Office has adopted some of the conclusions of the National Intelligence Council's assessment titled "Foreign Threats to the 2020 US Federal Elections" (the "2020 Election ICA").[17]  The National Intelligence Counsel is part of ODNI.[18]

ODNI also assisted in the investigation that led to this case, as discussed in the Classified Supplement.  ████████████████████████████████████████
████████████████████████████ Ex. M at SCO-06615568 ███████████████████
████████████████

### H.  Central Intelligence Agency

For the reasons stated in the Classified Supplement, the CIA's assistance to the Special Counsel's Office—in this case and in the Florida Case—merits inclusion on the prosecution team.

---

[17] National Intelligence Counsel, Intelligence Community Assessment: Foreign Threats to the 2020 US Federal Elections (unclassified version) (Mar. 10, 2021), *available at* https://www.dni.gov/files/ODNI/documents/assessments/ICA-declass-16MAR21.pdf.

[18] National Intelligence Council (NIC), Office of the Dir. of Nat'l Intelligence, https://www.dni.gov/index.php/who-we-are/organizations/mission-integration/nic/nic-who-we-are (last visited Nov. 27, 2023).

### I.   The January 6 Committee[19]

Prosecutors investigating January 6 and President Trump coordinated and were closely aligned with the January 6 Committee.  Records maintained by the Committee are within the constructive possession of the prosecution team.

During the "fall and winter" of 2021, Timothy Heaphy, the lead investigator for the January 6 Committee "[p]rivately . . . alerted prosecutors in the D.C. U.S. attorney's office to a few details his team had uncovered."  Doc. 116-1 at 9.  The USAO-DC subsequently acted as the Committee's enforcer.  For example, in November 2021, prosecutors from that office charged Stephen Bannon with criminal contempt relating to one of the Committee's subpoenas.[20]  Cooney and Gaston were part of the team that prosecuted Bannon.

In April 2022—in an apparent effort to conceal the extent of the coordination between DOJ and the January 6 Committee—leadership from DOJ's Criminal Division and USAO-DC sent a letter to Heaphy with a "broad request" for interview transcripts.[21]  Based on self-serving leaks from DOJ that were subsequently contradicted by the *Washington Post*, *see* Doc. 116-1, the *New York Times* asserted inaccurately that "[g]enerally, investigators working on the two inquiries have

---

[19] Upon the dissolution of the January 6 Committee at the conclusion of the 117th Congress, applicable House Rules required the January 6 to transfer its records to the Committee on House Administration for preservation and archiving.  Doc. 99 at 2.

[20] Press Release, U.S. Dep't of Justice, Stephen K. Bannon Indicted for Contempt of Congress (Nov. 12, 2021), https://www.justice.gov/opa/pr/stephen-k-bannon-indicted-contempt-congress.  The USAO-DC also prosecuted Peter Navarro for similar offenses relating to the Select Committee.  Press Release, U.S. Dep't of Justice, Peter Navarro Indicted for Contempt of Congress (Jun. 3, 2022), https://www.justice.gov/usao-dc/pr/peter-navarro-indicted-contempt-congress.

[21] Glenn Thrush and Luke Broadwater, *Justice Dept. Is Said to Request Transcripts From Jan. 6 Committee*, N.Y. TIMES (May 17, 2022), *available at* https://www.nytimes.com/2022/05/17/us/politics/jan-6-committee-transcripts.html.

not been sharing information."[22]  At some point, the Committee started to engage in a "negotiation" with DOJ's Criminal Division and USAO-DC, "in which the panel was hoping that prosecutors would turn over evidence in exchange for [interview] transcripts."[23]

A deal was obviously struck, but the terms have not yet been disclosed.  At the August 11, 2023 status conference, the Special Counsel's Office referenced "nonpublic items that the House Select Committee provided to the government including transcripts of witness interviews . . . ." Doc. 29 at 45; *see also* Doc. 119 at 3.

## DISCUSSION

### I.    The Court Should Reject The Prosecution's Efforts To Avoid Discovery Obligations

"Criminal discovery is not a game.  It is integral to the quest for truth and the fair adjudication of guilt or innocence."  *Taylor v. Illinois*, 484 U.S. 400, 419 (1988) (Brennan, J., dissenting).  "[A] prosecutor may not sandbag a defendant by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial."  *United States v. Marshall*, 132 F.3d 63, 69 (D.C. Cir. 1998) (cleaned up); *see also United States v. Bhutani*, 175 F.3d 572, 577 (7th Cir. 1999) ("The government cannot with its right hand say it has nothing while its left hand holds what is of value.") (cleaned up).

---

[22] *Id*.

[23] *Id*.  Transcripts maintained by the Select Committee were also the subject of a June 26, 2023 letter from Rep. Barry Loudermilk, Chairman of the Committee on House Administration, Subcommittee on Oversight, who observed that the Select Committee had failed to archive and preserve correspondence relating to certain transcripts of interviews by the Committee.  *See* Doc. 99-1; *see also* Doc. 99-2 at 1 n.1 ("[T]he Select Committee did not archive temporary committee records that were not elevated by the Committee's actions, such as use in hearings or official publications, or those that did not further its investigative activities.").

The concept of the "prosecution team" includes several overlapping concepts that bear on the scope of the discovery obligations of the Special Counsel's Office:

- materials within the prosecution's "possession or control," *Michel*, 2023 WL 7140001, at *1;

- materials at agencies that "contributed to the investigation," *id.*;

- materials at agencies "closely aligned with the prosecution," *Brooks*, 966 F.2d at 1503;

- prosecutors' "affirmative duty" to search for exculpatory evidence, *Safavian*, 233 F.R.D. at 17; Local Crim. R. 5.1(e), including through case-file reviews, Justice Manual § 9-5.002, and "legally-mandated" Prudential Search Requests, Justice Manual § 9-90.210(B); and

- collecting material evidence in the "interest of fairness" under Rule 16, *Poindexter*, 727 F. Supp. at 1473.

In contrast to those authorities, the Special Counsel's Office contends that the prosecution team in this case is limited to "prosecutors of the Special Counsel's Office and law enforcement officers who are working on this case." Ex. D at 1. This ridiculously narrow definition is contrary to law and has already been rejected by courts in this District. *E.g.*, *Bingert Sturgeon*, 2023 WL 3203092, at *3 (rejecting prosecution's "more restrictive standard . . . that in order to be considered an arm of the government for purposes of this case, the USSS would need to be the law enforcement agency that *investigated* the charged crimes, which was in fact the FBI").

In light of the prosecution's constitutionally and ethically infirm view of what is required, the Court should not accept at face value the prosecutors' assertions that they "understand," "will comply," and "will continue to meet" the Office's discovery obligations. Ex. E at 5; Ex. F at 2; Doc. 65 at 13; *see also United States v. Naegele*, 468 F. Supp. 2d 150, 152 n.2 (D.D.C. 2007) ("[N]ow that the Court realizes that its view of *Brady* and the government's have not been consistent for many years, it no longer accepts conclusory assertions by the Department of Justice that it 'understands' its *Brady* obligations and 'will comply' or 'has complied' with them.").

## II.     Discovery Obligations Extend To DOJ Components And The USAO-DC

The prosecution team is not limited to the attorneys who have entered notices of appearance in this case.  *See* Ex. D at 1.  The prosecution team includes all attorneys and "staff" working for the Special Counsel, 28 C.F.R. § 600.5, in connection with Order No. 5559-2022.  *See Giglio v. United States*, 405 U.S. 150, 154 (1972) ("The prosecutor's office is an entity and as such it is the spokesman for the Government."); *United States v. Dimas*, 3 F.3d 1015, 1018 n.1 (7th Cir. 1993) ("Knowledge of *Brady* material may be imputed between prosecutors in the same office.").

The Office claims to have "proceeded consistently" with the Justice Manual, Ex. E at 5, but in order to make good on that undertaking the prosecutors must conduct case file reviews at the USAO-DC and the DOJ components that participated in the investigation: the Office of the Attorney General, the Office of the Deputy Attorney General, the National Security Division, the Public Integrity Section, and the Office of the Inspector General.  *See* Justice Manual § 9-5.002; *see also In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887, 896 (D.C. Cir. 1999) (reasoning that *Brady* obligations include "files of the FBI and DEA which, like the U.S. Attorney's Office, are *components of* [*DOJ*]") (emphasis added).

President Trump cannot predict all of the different types of discoverable material in those files, but there are strong indications that some discoverable material exists.  For example, the Special Counsel's Office should not be permitted to present testimony from "senior leaders of the Justice Department" without reviewing their electronic communications for materials that are subject to the Jencks Act and *Giglio*.  Indictment ¶ 11(b).  The Office has accessed "hard copy files, in storage, of the Office of the Attorney General in the prior administration," but emails and electronic records appear to be missing from the productions.  Ex. E at 3.  In this regard, the "duty to search flows straight from the nature of the files."  *Brooks*, 966 F.2d at 1503.  There is "no need

23

to explain why that duty applied as to the government's key witness[es]." *Id.* (citing *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980)).

The prosecution's recent—and weak—arguments regarding the relevance of January 6 serve as another example. The USAO-DC was responsible for the relevant investigations prior to November 2022, several of the prosecutors worked there, and the discovery includes interviews that those same prosecutors and others conducted on behalf of the USAO-DC. *See* Justice Manual § 9-5.002 (relevant "factors" include "[w]hether the prosecutor and the agency . . . shared resources related to investigating the case" and "[w]hether the agency played an active role in the prosecution, including . . . interviewing witnesses, developing prosecutorial strategy, [or] participating in targeting discussions"). Thus, the USAO-DC is "closely aligned with the prosecution," and "the bureaucratic boundary [is] too weak to limit the duty" of the Special Counsel's Office to identify and produce documents and information that are inconsistent with the Office's theory of the case. *Brooks*, 966 F.2d at 1503; *see also Strickler v. Greene*, 527 U.S. 263, 275 n.12 (1999) (reasoning that the "prosecutor is responsible for any favorable evidence known to the others acting on the government's behalf in the case, including the police" in a separate jurisdiction).

Based on public statements from attorneys on behalf of the USAO-DC that are inconsistent with the Special Counsel's theory of January 6, it is a virtual certainty that there are similar non-public documents and private communications relating to this issue that are also subject to *Brady* and Rule 16(a)(1)(E). Seeking to avoid that obligation, the prosecution's November 25 letter again directed our attention to a "a separate database of materials comprising discovery in criminal cases related to the breach of the Capitol on January 6, 2021." Ex. F at 3; *see also* Ex. G at 6. Like SASC Windom's "full access to the FBI's trove of evidence about Oath Keeper and Proud Boy

24

extremists involved in the riot," Doc. 116-1 at 9, the Office's conceded access to the USAO-DC's database further supports President Trump's position that the USAO-DC is part of the prosecution team.

However, it is not enough for the prosecution to offer the defense access to materials produced in those cases. "The government cannot meet its *Brady* obligations by providing [the defendant] with access to 600,000 documents and then claiming that [the defendant] should have been able to find the exculpatory information in the haystack." *United States v. Hsia*, 24 F. Supp. 2d 14, 29-30 (D.D.C. 1998). In *United States v. Saffarinia*, the court relied on *Hsia* and agreed with the defense that "the government's *Brady* obligations require it to identify any known *Brady* material to the extent that the government knows of any such material in its production of approximately 3.5 million pages of documents." 424 F. Supp. 3d 46, 86 (D.D.C. 2020); *see also United States v. Singhal*, 876 F. Supp. 2d 82, 104 (D.D.C. 2012) (directing prosecutors to disclose the "identity (by Bates number) of the specific witness statements and documents" that are "producible as Rule 16(a)(1)(E)(i) documents material to preparing the defense, regardless of whether those documents are inculpatory or exculpatory"). The discovery in this case dwarfs that at issue in *Hsia* and *Saffarinia*, and the prosecution must identify information that is subject to *Brady* by doing more than pointing to another huge database. *See United States v. Iverson*, 648 F.2d 737, 739 (D.C. Cir. 1981) (holding that "the primary obligation for the disclosure of matters which are essentially in the prosecutorial domain lies with the government").

Finally, because the Special Counsel's incorrect theory of President Trump's "responsibility" for events on January 6, 2021 is materially different from positions on that issue taken in other cases, it is insufficient for the prosecutors here to rely on case-file reviews and discovery determinations by prosecutors in those other cases. The Office apparently wishes to

present evidence relating to violence on January 6, and it must conduct its own case-file reviews that are calibrated based on current disclosure obligations and defense arguments.

### III.     Discovery Obligations Extend To Agencies That Assisted The Prosecutors

The Special Counsel's Office must also collect and disclose documents and information that are subject to *Brady*, *Giglio*, Rule 16(a)(1)(E), and the Jencks Act from agencies whose personnel are likely trial witnesses or that assisted the investigations relating to the 2020 election and January 6: FBI-WFO, DHS (including the Secret Service and CISA), ODNI, the CIA, the Defense Department, DOJ's Office of the Inspector General, and the Postal Inspection Service. *Compare* Ex. D at 1 ("The prosecution team consists of . . . law enforcement officers who are working on this case."), *with* Ex. F at 1 (conceding that some but not all of these agencies "worked on the investigation").   Further, because the Office's discovery obligations are dramatically different than in congressional investigations, ███████████████████████████

██████████████████████████████████████████████████████████

███████████████████   *See* Ex. M at SCO-06615569-70.   ███████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████   *See id.*

These reviews are part of the prosecution's "affirmative duty" to "search possible sources of exculpatory information."   *Safavian*, 233 F.R.D. at 17; *see also, e.g.*, *id.* at 15 ("As with their *Brady* obligations, this personal responsibility of the Justice Department cannot be evaded by claiming lack of control over the files or procedures of other executive branch agencies.") (cleaned up); *United States v. Karake*, 281 F. Supp. 2d 302, 309 (D.D.C. 2003) (ordering prosecutors to "disclose any evidence it has, or *can obtain by good faith efforts*," relating to potential defense motion) (emphasis added).   The reviews are also required based on the agencies' "extensive

involvement . . . in the events of January 6" and "extensive cooperation" with the USAO-DC and the Special Counsel's Office. *Bingert Sturgeon*, 2023 WL 3203092, at *4; *see also Michel*, 2023 WL 7140001, at *1 (reasoning that scope of prosecution team "[u]sually . . . turns on whether another entity actually contributed to the investigation by locating evidence or assisted in some other way") (cleaned up).

The coordination and sharing between the Special Counsel's Office and these agencies "suggests that the government declining to search for and produce potentially material documents . . . would clearly conflict with the purpose and spirit of the rules governing discovery in criminal cases." *Sheppard*, 2022 WL 17978837, at *11 (cleaned up); *see also Archbold-Manner*, 581 F. Supp. 2d at 24 ("The fact that the evidence was originally seized by Colombian authorities is insufficient for the government to avoid Rule 16."). In *Libby*, the court held that the prosecution team included the Office of the Vice President and the CIA because the Special Counsel's Office had "sought and received a variety of documents" from those agencies, which were "closely aligned with the prosecution." 429 F. Supp. 2d at 11. The court held that it "would clearly conflict with the purpose and spirit of the rules governing discovery in criminal cases" to

> permit the Office of Special Counsel access to a plethora of documents from the OVP and CIA, which are likely essential to the prosecution of this case, but leave other documents with these entities that are purportedly beyond the Special Counsel's reach, but which are nonetheless material to the preparation of the defense.

*Id.* *Libby* involved one of "several courts [that] have noted that a prosecutor who has had access to documents in other agencies in the course of his investigation cannot avoid his discovery obligations by selectively leaving the materials with the agency once he has reviewed them." *Poindexter*, 727 F. Supp. at 1478.

The prosecutors in *Oseguera Gonzalez* recognized a similar obligation. There, in a case involving alleged violations of the Foreign Narcotics Kingpin Act investigated by the Drug

Enforcement Administration, the prosecutors reviewed records at the Treasury Department's Office of Foreign Assets Control.  507 F. Supp. 3d at 170.  The prosecutors did so

> to determine whether they contained any evidence that would be discoverable under Rule 16 or as impeachment or exculpatory material . . . including classified and privileged material to the extent that they exist . . . and . . . produced documents to the defendant in discovery that the government obtained through that review.

*Id.* at 170 (cleaned up).

"[B]urdensomeness," "logistical difficulty," and "concerns about confidentiality and the privacy rights of others" do not "trump the right of one charged with a crime to present a fair defense."  *United States v. O'Keefe*, No. 06-cr-249, 2007 WL 1239204, at *2 (D.D.C. Apr. 27, 2007).  In *O'Keefe*, the court ordered the prosecutors to search seven consular facilities at cities in Canada and Mexico for evidence that was material to defenses relating to visa applications.  *Id*. at *3.  The court required the searches to cover the files of "consulate secretaries and non-U.S. citizen employees," and to include "memoranda, letters, e-mails, faxes and other correspondence."  *Id.* The reviews were undoubtedly onerous, but nevertheless necessary to ensure a just result.  So too here.

## IV.    Discovery Obligations Extend To The January 6 Committee's Records

The Special Counsel's Office has produced to President Trump hundreds of thousands of pages of unclassified records from the Select Committee.  This is not surprising in light of the evidence of coordination with the Committee that predates the appointment of the Special Counsel.  *See* Doc. 116-1 at 9.  However, what is surprising—and impermissible—is that, despite the Office's extensive access to the Committee's records, it has not produced any classified materials from those holdings.

In November 2021, General Mark Milley told the Committee: "[W]e have a boatload of documentary stuff . . . both classified and unclassified stuff.  And I will make sure that you get

whatever we have.  And it's a lot."[24]  General Milley is an example of a likely prosecution witness who turned over documents to the Select Committee—including classified materials—that are subject to, at minimum, the Jencks Act and *Giglio*.   Moreover, Appendix 4 to the Select Committee's Report is derived from classified information relating to foreign influence in the 2020 election.  Although the Select Committee Report is subject to the same confirmation bias as the Special Counsel's Indictment in this case, Appendix 4 includes evidence that is favorable to President Trump because, *inter alia*, it acknowledges that "foreign actors . . . attempt[ed] to influence the American political climate during and after the 2020 Presidential election."[25] (*Compare* Select Comm. Report at 806, *with* Indictment ¶ 2 (alleging that President Trump "create[d] an intense national atmosphere of mistrust and anger")).

---

[24] Transcript, Interview of General Mark A. Milley, Select Committee to Investigate the January 6th Attack on the United States Capitol at 10 (Nov. 17, 2021), *available at* https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL0000034620/pdf/GPO-J6-TRANSCRIPT-CTRL0000034620.pdf.

[25] Final Report of Select Committee to Investigate the January 6th Attack on the United States Capitol, H.R. Rep. No. 117-663, at 806 (2022) ("Select Comm. Report"), *available at* https://www.govinfo.gov/content/pkg/GPO-J6-REPORT/pdf/GPO-J6-REPORT.pdf.

## **CONCLUSION**

For the foregoing reasons, President Trump respectfully submits that the Court should enter an order defining the scope of the prosecution team for purposes of the Special Counsel's discovery obligations in this case.  In the alternative, the Court should hold a classified hearing to address any factual disputes relating to these issues.

Dated: November 27, 2023

John F. Lauro, Esq.
D.C. Bar No. 392830
jlauro@laurosinger.com
Gregory M. Singer, Esq. (PHV)
gsinger@laurosinger.com
LAURO & SINGER
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990

*Counsel for President Donald J. Trump*

Respectfully submitted,

*/s/ Todd Blanche*
Todd Blanche, Esq. (PHV)
ToddBlanche@blanchelaw.com
Emil Bove, Esq. (PHV)
Emil.Bove@blanchelaw.com
BLANCHE LAW PLLC
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250