IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | *   CRIMINAL NO. 23-cr-257 (TSC) |
| | * |
| DONALD J. TRUMP, | * |
| | * |
| Defendant. | * |
| | * |

**GOVERNMENT'S NOTICE PURSUANT TO FEDERAL RULE OF EVIDENCE 404(b)**

The Government will provide the defendant and the Court extensive advance notice of the intrinsic evidence it plans to introduce at trial, including through its exhibit and witness lists, motions in limine, and a detailed trial brief setting forth the Government's planned trial presentation. In an abundance of caution, the Government below notices evidence that, although intrinsic to the charged crimes, pre- or post-dates the charged criminal conspiracies. If the Court were to find that any part of the noticed evidence below is extrinsic, the evidence is also admissible under Federal Rule of Evidence 404(b), because the Government will offer it not to show the defendant's criminal propensity, but to establish his motive, intent, preparation, knowledge, absence of mistake, and common plan.

    **A.    Historical Evidence of the Defendant's Consistent Plan of Baselessly Claiming Election Fraud**

As set forth in the indictment, the defendant's criminal conspiracies relied on his knowingly false claims of election fraud. *See, e.g.*, ECF No. 1 at ¶ 2, 4. At trial, the Government will introduce a number of public statements by the defendant in advance of the charged conspiracies, claiming that there would be fraud in the 2020 presidential election. These statements sowed mistrust in the results of the presidential election and laid the foundation for the defendant's criminal efforts. In addition to this intrinsic evidence of false statements about the

2020 election, the Government will offer evidence reflecting the defendant's historical record of making such claims.  For example, as early as November 2012, the defendant issued a public tweet making baseless claims that voting machines had switched votes from then-candidate Romney to then-candidate Obama.  During the 2016 presidential campaign, the defendant claimed repeatedly, with no basis, that there was widespread voter fraud—including through public statements and tweets (for instance, on October 17, 2016, tweeting, "Of course there is large scale fraud happening on and before election day.  Why do Republican leaders deny what is going on?  So naive!").  The defendant's false claims about the 2012 and 2016 elections are admissible because they demonstrate the defendant's common plan of falsely blaming fraud for election results he does not like, as well as his motive, intent, and plan to obstruct the certification of the 2020 election results and illegitimately retain power.

    **B.**    **Historical Evidence of the Defendant's Common Plan to Refuse to Commit to a Peaceful Transition of Power**

To ensure the destabilizing impact of his widespread election fraud claims, in the run-up to the 2020 election, the defendant repeatedly refused to commit to a peaceful transition of presidential power if he lost the election.  The Government will offer proof of this refusal as intrinsic evidence of the defendant's criminal conspiracies because it shows his plan to remain in power at any cost—even in the face of potential violence.  For instance, at a September 23, 2020, news conference the defendant was asked whether, "win, lose or draw in this election," in light of "rioting in many cities across this country—red and—your so called red and blue states," he would "commit to making sure there is a peaceful transferal of power after the election."  The defendant responded, "Well, we're going to have to see what happens.  You know that.  I've been complaining very strongly about the ballots.  And the ballots are a disaster.  And, and--".  A reporter interrupted the defendant and repeated, "I understand that, but people are rioting; do you

commit to making sure there is a peaceful transferal of power?" The defendant responded, "I know. I know. We want to have—get rid of the ballots and you'll have a very trans—we'll have a very peaceful—there won't be a transfer, frankly; there'll be a continuation. The ballots are out of control. You know it."

Similarly, the Government will offer evidence that the defendant pursued the same strategy four years earlier, in 2016. In the presidential debate on October 19, 2016, the defendant was asked whether he would accept the results of that election, to which he responded that he would "look at it at the time." The debate moderator followed up, "There is a tradition in this country—in fact, one of the prides of this country—is the peaceful transition of power and that no matter how hard-fought a campaign is, that at the end of the campaign that the loser concedes to the winner . . . and that the country comes together in part for the good of the country. Are you saying you're not prepared now to commit to that principle?" The defendant responded, "What I'm saying is that I will tell you at the time. I'll keep you in suspense. OK?" The defendant's consistent refusal to commit to a peaceful transition of power, dating back to the 2016 presidential campaign, is admissible evidence of his plan to undermine the integrity of the presidential transition process when faced with the possibility of an election result that he would not like, as well as his motive, intent, and plan to interfere with the implementation of an election result with which he was not satisfied.

### C. Evidence of the Defendant and Co-Conspirators' Knowledge of the Unfavorable Election Results and Motive and Intent to Subvert Them

The indictment lists multiple examples of the defendant's efforts, during the charged conspiracies, to pressure state officials to change election results or appoint invalid electors in spite of the election results. *See, e.g.*, ECF No. 1 at ¶¶ 15, 24, 31, 35. The Government also plans to introduce evidence of an effort undertaken by an agent (and unindicted co-conspirator) of the

defendant who worked for his campaign ("the Campaign Employee") to, immediately following the election, obstruct the vote count. On November 4, 2020, the Campaign Employee exchanged a series of text messages with an attorney supporting the Campaign's election day operations at the TCF Center in Detroit, where votes were being counted; in the messages, the Campaign Employee encouraged rioting and other methods of obstruction when he learned that the vote count was trending in favor of the defendant's opponent. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ The Government will also show that around the time of these messages, an election official at the TCF Center observed that as Biden began to take the lead, a large number of untrained individuals flooded the TCF Center and began making illegitimate and aggressive challenges to the vote count. Thereafter, Trump made repeated false claims regarding election activities at the TCF Center, when in truth his agent was seeking to cause a riot to disrupt the count. This evidence is admissible to demonstrate that the defendant, his co-conspirators, and agents had knowledge that the defendant had lost the election, as well as their intent and motive to obstruct and overturn the legitimate results.

D.  **Pre- and Post-Conspiracy Evidence That the Defendant and Co-Conspirators Suppressed Proof Their Fraud Claims Were False and Retaliated Against Officials Who Undermined Their Criminal Plans**

The indictment provides evidence that the defendant repeatedly sidelined advisors and officials who told him or the public the truth about the election results, and who pushed back on his false claims. *See, e.g.*, ECF No. 1 at ¶¶ 11d, 13, 92. The Government will introduce additional evidence that this was the plan of the defendant and his co-conspirators, and that even after the charged conspiracies, they continued their efforts to stifle any dissent to their false claims of election fraud.

One such example is the effort by the defendant and Co-Conspirator 1, beginning during the charged conspiracies and stretching into the summer of 2021, to retaliate against the former Chief Counsel to the Republican National Committee (RNC) for publicly refuting the defendant and Co-Conspirator 1's lies about election fraud. ███████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████

The Government will also introduce post-conspiracy evidence of continued retaliation against the Chief Counsel for publicly speaking the truth about the falsity of the defendant's

claims—including the defendant, ███████████████████████████████

███████████████████████████████

Finally, in the summer of 2021, Co-Conspirator 1 took to Twitter to publicly attack the Chief Counsel over the same issue.

The defendant and his co-conspirators' and agents' aggression in stifling dissent against election fraud claims before, during, and after the charged conspiracies is admissible to demonstrate the defendant and his co-conspirators' knowledge that their fraud claims were false, to establish their plan for depicting their election lies as true, and to show their intent to silence anyone who refuted their false claims.

> E. **Pre- and Post-Conspiracy Evidence of the Defendant's Public Attacks on Individuals, Encouragement of Violence, and Knowledge of the Foreseeable Consequences**

As the Government has set forth at length in briefing related to the Court's Rule 57.7 Order, *see, e.g.*, ECF Nos. 57 and 64, the defendant has an established pattern of using public statements and social media posts to subject his perceived adversaries to threats and harassment. *See* ECF Nos. 57, 64, 120. The indictment includes examples of the defendant's targeting, including against his Vice President. *See* ECF No. 1 at ¶ 97. At trial, the Government will introduce evidence of this conduct—including the defendant's public endorsement and encouragement of violence—and further will elicit testimony from witnesses about the threats and harassment they received after the defendant targeted them in relation to the 2020 election.

The Government plans to introduce evidence from the period in advance of the charged conspiracies that demonstrates the defendant's encouragement of violence. For instance, in response to a question during the September 29, 2020, presidential debate asking him to denounce the extremist group the Proud Boys, the defendant instead spoke publicly to them and told them to

"stand back and stand by." Members of the group embraced the defendant's words as an endorsement and printed merchandise with them as a rallying cry. As discussed below, after the Proud Boys and other extremist groups participated in obstructing the congressional certification on January 6, the defendant made clear that they were acting consistent with his intent and direction in doing so.

Long after the charged conduct, the defendant continued to falsely attack two Georgia election workers despite being on notice that his claims about them in 2020 were false and had subjected them to vile, racist, and violent threats and harassment. As set forth in the indictment, during the charged conspiracy, the defendant and his co-conspirators spread knowing lies about the election workers and inspired death threats against them. *See* ECF No. 1 at ¶¶ 26, 29, 31a. In late December 2022, the House Select Committee to Investigate the January 6th Attack on the U.S. Capitol published transcripts of its interviews with the election workers, in which the women provided graphic testimony about the threats and harassment they endured after the defendant and his agents falsely accused them. In apparent response, the defendant then doubled down and recommenced his attacks on the election workers in posts on Truth Social. He even zeroed in on one of the election workers, falsely writing that she was an election fraudster, a liar, and one of the "treacher[ous] . . . monsters" who stole the country, and that she would be in legal trouble.

The Government will introduce such evidence to further establish the defendant and his co-conspirators' plan of silencing, and intent to silence, those who spoke out against the defendant's false election fraud claims; the defendant's knowledge that his public attacks on officials—like those on his Vice President as described in the indictment—could foreseeably lead to threats, harassment, and violence; and the defendant's repeated choice to attack individuals with full knowledge of this effect. It also constitutes after-the-fact corroboration of the defendant's intent, because even after it was incontrovertibly clear that the defendant's public false claims

targeting individuals caused them harassment and threats, the defendant persisted—meaning that the jury may properly infer that he intended that result.  Finally, evidence of the defendant's encouragement of violence and the consequences of his public attacks is admissible to allow the jury to consider the credibility and motives of witnesses who may be the continuing victims of the defendant's attacks.

> F.   Post-Conspiracy Evidence of the Defendant's Steadfast Support and Endorsement of Rioters

As described in the Government's opposition to the defendant's motion to strike language from the indictment, ECF No. 140, the Government plans to introduce evidence at trial showing that in the years since the January 6 attack on the Capitol, the defendant has openly and proudly supported individuals who criminally participated in obstructing the congressional certification that day, including by suggesting that he will pardon them if re-elected, even as he has conceded that he had the ability to influence their actions during the attack.

Of particular note are the specific January 6 offenders whom the defendant has supported—namely, individuals convicted of some of the most serious crimes charged in relation to January 6, such as seditious conspiracy and violent assaults on police officers.  During a September 17, 2023, appearance on Meet the Press, for instance, the defendant said regarding Proud Boys leader Enrique Tarrio—who was convicted of seditious conspiracy—"I want to tell you, he and other people have been treated horribly."  The defendant then criticized the kinds of lengthy sentences received only by defendants who, like Tarrio, committed the most serious crimes on January 6.  Similarly, the defendant has chosen to publicly and vocally support the "January 6 Choir," a group of defendants held at the District of Columbia jail, many of whose criminal history and/or crimes on January 6 were so violent that their pretrial release would pose a danger to the public.  The defendant nonetheless has financially supported and celebrated these offenders—many of whom

assaulted law enforcement on January 6—by promoting and playing their recording of the National Anthem at political rallies and calling them "hostages."

Evidence of the defendant's post-conspiracy embrace of particularly violent and notorious rioters is admissible to establish the defendant's motive and intent on January 6—that he sent supporters, including groups like the Proud Boys, whom he knew were angry, and whom he now calls "patriots," to the Capitol to achieve the criminal objective of obstructing the congressional certification. In addition, his statements in this time period agreeing that he then held, and still holds, enormous influence over his supporters' actions is evidence of his knowledge and intent to obstruct the certification, as he chose not to exercise that influence to mitigate the violence on January 6. Perhaps most importantly, the defendant's embrace of January 6 rioters is evidence of his intent during the charged conspiracies, because it shows that these individuals acted as he directed them to act; indeed, this evidence shows that the rioters' disruption of the certification proceeding is exactly what the defendant intended on January 6. And finally, evidence of the defendant's statements regarding possible pardons for January 6 offenders is admissible to help the jury assess the credibility and motives of trial witnesses, because through such comments, the defendant is publicly signaling that the law does not apply to those who act at his urging regardless of the legality of their actions.

Respectfully submitted,

Jack Smith
Special Counsel

/s/Molly Gaston
Molly Gaston
Thomas P. Windom
Senior Assistant Special Counsels
950 Pennsylvania Avenue NW
Room B-206
Washington, D.C. 20530