## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 23-cr-257 (TSC) |
| | * | |
| v. | * | VIOLATIONS: |
| | * | |
| DONALD J. TRUMP, | * | Count 1: 18 U.S.C. § 371 |
| | * | (Conspiracy to Defraud the United |
| Defendant. | * | States) |
| | * | |
| | * | Count 2: 18 U.S.C. § 1512(k) |
| | * | (Conspiracy to Obstruct an Official |
| | * | Proceeding) |
| | * | |
| | * | Count 3: 18 U.S.C. §§ 1512(c)(2), 2 |
| | * | (Obstruction of and Attempt to |
| | * | Obstruct an Official Proceeding) |
| | * | |
| | * | Count 4: 18 U.S.C. § 241 |
| | * | (Conspiracy Against Rights) |
| | * | |

### SUPERSEDING INDICTMENT

The Grand Jury charges that, at all times material to this Superseding Indictment, on or about the dates and at the approximate times stated below:

### INTRODUCTION

1.     The Defendant, **DONALD J. TRUMP**, was a candidate for President of the United States in 2020.  He lost the 2020 presidential election.

2.     Despite having lost, the Defendant—who was also the incumbent President—was determined to remain in power.  So, for more than two months following election day on November 3, 2020, the Defendant spread lies that there had been outcome-determinative fraud in the election and that he had actually won.  These claims were false, and the Defendant knew that they were false.  But the Defendant used his Campaign to repeat and widely disseminate them

anyway—to make his knowingly false claims appear legitimate, create an intense national atmosphere of mistrust and anger, and erode public faith in the administration of the election.

3.     As a candidate and a citizen, the Defendant had a right, like every American, to speak publicly about the election and even to claim, falsely, that there had been outcome-determinative fraud during the election and that he had won.  He was also entitled to formally challenge the results of the election through lawful and appropriate means, such as by seeking recounts or audits of the popular vote in states or filing lawsuits challenging ballots and procedures.  Indeed, in many cases, the Defendant did pursue these methods of contesting the election results.  His efforts to change the outcome in any state through recounts, audits, or legal challenges were uniformly unsuccessful.

4.     Shortly after election day, the Defendant also pursued unlawful means of discounting legitimate votes and subverting the election results.  In so doing, the Defendant perpetrated three criminal conspiracies:

    a.     A conspiracy to defraud the United States by using dishonesty, fraud, and deceit to impair, obstruct, and defeat the lawful federal government function by which the results of the presidential election are collected, counted, and certified by the federal government, in violation of 18 U.S.C. § 371;

    b.     A conspiracy to corruptly obstruct and impede the January 6 congressional proceeding at which the collected results of the presidential election are counted and certified ("the certification proceeding"), in violation of 18 U.S.C. § 1512(k); and

    c.     A conspiracy against the right to vote and to have one's vote counted, in violation of 18 U.S.C. § 241.

Each of these conspiracies—which built on the widespread mistrust the Defendant was creating through pervasive and destabilizing lies about election fraud—targeted a bedrock function of the United States federal government: the nation's process of collecting, counting, and certifying the results of the presidential election ("the federal government function").

5.      In furtherance of these conspiracies, the Defendant tried—but failed—to enlist the Vice President, who was also the Defendant's running mate and, by virtue of the Constitution, the President of the Senate who plays a ceremonial role in the January 6 certification proceeding.

## COUNT ONE
### (Conspiracy to Defraud the United States—18 U.S.C. § 371)

6.      The allegations contained in paragraphs 1 through 5 of this Superseding Indictment are re-alleged and fully incorporated here by reference.

### The Conspiracy

7.      From on or about November 13, 2020, through on or about January 20, 2021, in the District of Columbia and elsewhere, the Defendant,

**DONALD J. TRUMP,**

did knowingly combine, conspire, confederate, and agree with co-conspirators, known and unknown to the Grand Jury, to defraud the United States by using dishonesty, fraud, and deceit to impair, obstruct, and defeat the lawful federal government function by which the results of the presidential election are collected, counted, and certified by the federal government.

### Purpose of the Conspiracy

8.      The purpose of the conspiracy was to overturn the legitimate results of the 2020 presidential election by using knowingly false claims of election fraud to obstruct the federal government function by which those results are collected, counted, and certified.

### The Defendant's Co-Conspirators

9.      The Defendant enlisted co-conspirators to assist him in his criminal efforts to overturn the legitimate results of the 2020 presidential election and retain power.  These co-conspirators included the following individuals, none of whom were government officials during the conspiracies and all of whom were acting in a private capacity:

a.   Co-Conspirator 1, a private attorney whom the Defendant put in charge of his campaign's litigation efforts and who was willing to spread knowingly false claims and pursue strategies that the Defendant's 2020 re-election campaign ("Campaign") attorneys would not.

b.   Co-Conspirator 2, a private attorney who devised and attempted to implement a strategy to leverage the Vice President's ceremonial role overseeing the certification proceeding to obstruct the certification of the presidential election.

c.   Co-Conspirator 3, a private attorney who made unfounded claims of election fraud that the Defendant embraced and publicly amplified.

d.   Co-Conspirator 5, a private attorney who assisted in devising and attempting to implement a plan to submit fraudulent slates of presidential electors to obstruct the certification proceeding.

e.   Co-Conspirator 6, a private political consultant who helped implement a plan to submit fraudulent slates of presidential electors to obstruct the certification proceeding.

### The Federal Government Function

10.   The federal government function by which the results of the election for President of the United States are collected, counted, and certified was established through the Constitution and the Electoral Count Act (ECA), a federal law enacted in 1887. The Constitution provided that individuals called electors select the president, and that each state determine for itself how to appoint the electors apportioned to it. Through state laws, each of the fifty states and the District of Columbia chose to select their electors based on the popular vote in the state. After election day, the ECA required each state to formally determine—or "ascertain"—the electors who would represent the state's voters by casting electoral votes on behalf of the candidate who had won the popular vote, and required the executive of each state to certify to the federal government the identities of those electors. Then, on a date set by the ECA, each state's ascertained electors were required to meet and collect the results of the presidential election—that is, to cast electoral votes based on their state's popular vote, and to send their electoral votes, along with the state executive's

certification that they were the state's legitimate electors, to the United States Congress to be counted and certified in an official proceeding. Finally, the Constitution and ECA required that on the sixth of January following election day, the Congress meet in a Joint Session for a certification proceeding, presided over by the Vice President as President of the Senate, to count the electoral votes, resolve any objections, and announce the result—thus certifying the winner of the presidential election as president-elect. This federal government function—from the point of ascertainment to the certification—is foundational to the United States' democratic process, and until 2021, had operated in a peaceful and orderly manner for more than 130 years.

### Manner and Means

11.    The Defendant's conspiracy to impair, obstruct, and defeat the federal government function through dishonesty, fraud, and deceit included the following manner and means:

a.    The Defendant and co-conspirators used knowingly false claims of election fraud to get state legislators and election officials to subvert the legitimate election results and change electoral votes for the Defendant's opponent, Joseph R. Biden, Jr., to electoral votes for the Defendant. That is, on the pretext of baseless fraud claims, the Defendant pushed officials in certain states to ignore the popular vote; disenfranchise millions of voters; dismiss legitimate electors; and ultimately, cause the ascertainment of and voting by illegitimate electors in favor of the Defendant.

b.    The Defendant and co-conspirators organized fraudulent slates of electors in seven targeted states (Arizona, Georgia, Michigan, Nevada, New Mexico, Pennsylvania, and Wisconsin), attempting to mimic the procedures that the legitimate electors were supposed to follow under the Constitution and other federal and state laws. This included causing the fraudulent electors to meet on the day appointed by federal law on which legitimate electors were to gather and cast their votes; cast fraudulent votes for the Defendant; and sign certificates falsely representing that they were legitimate electors. Some fraudulent electors were tricked into participating based on the understanding that their votes would be used only if the Defendant succeeded in outcome-determinative lawsuits within their state, which the Defendant never did. The Defendant and co-conspirators then caused these fraudulent electors to transmit their false certificates to the Vice President, in his capacity as President of the Senate, and other

government officials to be counted at the certification proceeding on January 6.

c.     The Defendant and co-conspirators attempted to enlist the Vice President, in his ceremonial role as President of the Senate at the January 6 certification proceeding to fraudulently alter the election results. First, using knowingly false claims of election fraud, the Defendant and co-conspirators attempted to convince the Vice President to use the Defendant's fraudulent electors, reject legitimate electoral votes, or send legitimate electoral votes to state legislatures for review rather than counting them. When that failed, on the morning of January 6, the Defendant and co-conspirators repeated knowingly false claims of election fraud to gathered supporters, falsely told them that the Vice President had the authority to and might alter the election results, and directed them to the Capitol to obstruct the certification proceeding and exert pressure on the Vice President to take the fraudulent actions he had previously refused.

d.     After it became public on the afternoon of January 6 that the Vice President, as President of the Senate, would not fraudulently alter the election results, a large and angry crowd—including many individuals whom the Defendant had deceived into believing the Vice President could and might change the election results—violently attacked the Capitol and halted the proceeding. As violence ensued, the Defendant and co-conspirators exploited the disruption by redoubling efforts to levy false claims of election fraud and convince Members of Congress to further delay the certification based on those claims.

## The Defendant's Knowledge of the Falsity of His Election Fraud Claims

12.     Throughout the conspiracies, the Defendant, co-conspirators, and their agents made knowingly false claims that there had been outcome-determinative fraud in the 2020 presidential election. These false claims were unsupported, objectively unreasonable, and ever-changing, and the Defendant and co-conspirators repeated them even after they were publicly disproven. These prolific lies about election fraud included dozens of specific claims that there had been substantial fraud in certain states, such as that large numbers of dead, non-resident, non-citizen, or otherwise ineligible voters had cast ballots, or that voting machines had changed votes for the Defendant to votes for Biden. These claims were false, and the Defendant knew that they were false.

13.     The Defendant was on notice that his claims were untrue.  He was told so by those most invested in his re-election, including his own running mate and his campaign staff.  Federal and state courts rejected every outcome-determinative post-election lawsuit filed by the Defendant, co-conspirators, and their allies.  State officials—including election directors and Secretaries of State in his own political party—issued public statements dispelling the Defendant's and co-conspirators' myth of widespread election fraud.  And on November 12, the National Association of Secretaries of State, the National Association of State Election Directors, and other organizations issued a statement on behalf of several coordinated entities, declaring the 2020 election to be "the most secure in American history" and that there was "no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised."

14.     The Defendant continued to make false claims nonetheless, with deliberate disregard for the truth, including through his Twitter account.  Throughout the conspiracies, although the Defendant sometimes used his Twitter account to communicate with the public, as President, about official actions and policies, he also regularly used it for personal purposes—including to spread knowingly false claims of election fraud, exhort his supporters to travel to Washington, D.C. on January 6, pressure the Vice President to misuse his ceremonial role in the certification proceeding, and leverage the events at the Capitol on January 6 to unlawfully retain power.

15.     The Defendant continued his lies through the day of the certification proceeding on January 6.  That morning, the Defendant gave a Campaign speech at a privately-funded, privately-organized political rally held on the Ellipse in Washington, D.C.  During the speech, the Defendant used many of the same unsupported, objectively unreasonable, and publicly disproven lies to exhort the gathered crowd to march to the Capitol.

### The Criminal Agreement and Acts to Effect the Object of the Conspiracy

16.    To effect the object of the conspiracy, the Defendant and co-conspirators committed one or more of the acts set forth below:

#### The Defendant's Use of Deceit to Get State Officials to
#### Subvert the Legitimate Election Results and Change Electoral Votes

17.    Shortly after election day—which fell on November 3, 2020—the Defendant launched his criminal scheme.  On November 13, the Defendant's Campaign attorneys conceded in court that he had lost the vote count in the state of Arizona—meaning, based on the assessment the Defendant's Campaign advisors had given him just a week earlier, the Defendant had lost the election.  So that day, the Defendant turned to Co-Conspirator 1, whom he announced on November 14 would spearhead his efforts going forward to challenge the election results.  From that point on, the Defendant and co-conspirators executed a strategy to use knowing deceit in the targeted states to impair, obstruct, and defeat the federal government function, including as described below.  The Defendant had no official responsibilities related to any state's certification of the election results.

*Arizona*

18.    On November 13, 2020, the Defendant had a conversation with his Campaign Manager, who informed him that a claim that had been circulating—that a substantial number of non-citizens had voted in Arizona—was false.

19.    On November 22, eight days before Arizona's Governor certified the ascertainment of the state's legitimate electors based on the popular vote, the Defendant and Co-Conspirator 1 called the Speaker of the Arizona House of Representatives and made knowingly false claims of election fraud aimed at interfering with the ascertainment of and voting by Arizona's electors, as follows:

a.     The Defendant and Co-Conspirator 1 falsely asserted, among other things, that a substantial number of non-citizens, non-residents, and dead people had voted fraudulently in Arizona.  The Arizona House Speaker asked Co-Conspirator 1 for evidence of the claims, which Co-Conspirator 1 did not have, but claimed he would provide.  Co-Conspirator 1 never did so.

b.     The Defendant and Co-Conspirator 1 asked the Arizona House Speaker to call the legislature into session to hold a hearing based on their claims of election fraud.  The Arizona House Speaker refused, stating that doing so would require a two-thirds vote of its members, and he would not allow it without actual evidence of fraud.

c.     The Defendant and Co-Conspirator 1 asked the Arizona House Speaker to use the legislature to circumvent the process by which legitimate electors would be ascertained for Biden based on the popular vote, and replace those electors with a new slate for the Defendant.  The Arizona House Speaker refused, responding that the suggestion was beyond anything he had ever heard or thought of as something within his authority.

20.     On December 1, Co-Conspirator 1 met with the Arizona House Speaker.  When the Arizona House Speaker again asked Co-Conspirator 1 for evidence of the outcome-determinative election fraud he and the Defendant had been claiming, Co-Conspirator 1 responded with words to the effect of, "We don't have the evidence, but we have lots of theories."

21.     On December 4, the Arizona House Speaker issued a public statement that said, in part:

> No election is perfect, and if there were evidence of illegal votes or an improper count, then Arizona law provides a process to contest the election: a lawsuit under state law.  But the law does not authorize the Legislature to reverse the results of an election.
>
> As a conservative Republican, I don't like the results of the presidential election.  I voted for President Trump and worked hard to reelect him.  But I cannot and will not entertain a suggestion that we violate current law to change the outcome of a certified election.
>
> I and my fellow legislators swore an oath to support the U.S. Constitution and the constitution and laws of the state of Arizona.  It would violate that oath, the basic principles of republican government, and the rule of law if we attempted to nullify the

> people's vote based on unsupported theories of fraud.  Under the
> laws that we wrote and voted upon, Arizona voters choose who
> wins, and our system requires that their choice be respected.

22.     On the morning of January 4, 2021, Co-Conspirator 2 called the Arizona House

Speaker to urge him to use a majority of the legislature to decertify the state's legitimate electors.

Arizona's validly ascertained electors had voted three weeks earlier and sent their votes to

Congress, which was scheduled to count those votes in Biden's favor in just two days' time at the

January 6 certification proceeding.  When the Arizona House Speaker explained that state

investigations had uncovered no evidence of substantial fraud in the state, Co-Conspirator 2

conceded that he "[didn't] know enough about facts on the ground" in Arizona, but nonetheless

told the Arizona House Speaker to decertify and "let the courts sort it out."  The Arizona House

Speaker refused, stating that he would not "play with the oath" he had taken to uphold the United

States Constitution and Arizona law.

23.     In his Campaign speech on January 6, the Defendant publicly repeated the

knowingly false claim that 36,000 non-citizens had voted in Arizona.

*Georgia*

24.     As early as mid-November, the Defendant's Senior Campaign Advisor informed

the Defendant that his claims of a large number of dead voters in Georgia were untrue.

25.     On November 16, 2020, on the Defendant's behalf, his executive assistant sent Co-

Conspirator 3 and others a document containing bullet points critical of a certain voting machine

company, writing, "See attached – Please include as is, or almost as is, in lawsuit."   Co-

Conspirator 3 responded nine minutes later, writing, "IT MUST GO IN ALL SUITS IN GA AND

PA IMMEDIATELY WITH A FRAUD CLAIM THAT REQUIRES THE ENTIRE ELECTION

TO BE SET ASIDE in those states and machines impounded for non-partisan professional

inspection." On November 25, Co-Conspirator 3 filed a lawsuit against the Governor of Georgia falsely alleging "massive election fraud" accomplished through the voting machine company's election software and hardware. Before the lawsuit was even filed, the Defendant retweeted a post promoting it. Co-Conspirator 3's Georgia lawsuit was dismissed on December 7.

26.    On December 3, Co-Conspirator 1 orchestrated a presentation to a Judiciary Subcommittee of the Georgia State Senate, with the intention of misleading state senators into blocking the ascertainment of legitimate electors. During the presentation:

a.    A Campaign attorney and agent of the Defendant and Co-Conspirator 1 falsely claimed that more than 10,000 dead people voted in Georgia. That afternoon, a Senior Advisor to the Defendant told the Defendant's Chief of Staff through text messages, "Just an FYI. [A Campaign lawyer] and his team verified that the 10k+ supposed dead people voting in GA is not accurate. . . . It was alleged in [Co-Conspirator 1's] hearing today." The Senior Advisor clarified that he believed that the actual number was 12.

b.    Another agent of the Defendant and Co-Conspirator 1 played a misleading excerpt of a video recording of ballot-counting at State Farm Arena in Atlanta and insinuated that it showed election workers counting "suitcases" of illegal ballots.

c.    Co-Conspirator 2 encouraged the legislators to decertify the state's legitimate electors based on false allegations of election fraud.

27.    Also on December 3, the Defendant issued a Tweet amplifying the knowingly false claims made in Co-Conspirator 1's presentation in Georgia: "Wow! Blockbuster testimony taking place right now in Georgia. Ballot stuffing by Dems when Republicans were forced to leave the large counting room. Plenty more coming, but this alone leads to an easy win of the State!"

28.    On December 4, the Georgia Secretary of State's Chief Operating Officer debunked the claims made at Co-Conspirator 1's presentation the previous day, issuing a Tweet stating, "The 90 second video of election workers at State Farm arena, purporting to show fraud was watched in its entirety (hours) by @GaSecofState investigators. Shows normal ballot processing. Here is the

fact check on it." On December 7, he reiterated during a press conference that the claim that there had been misconduct at State Farm Arena was false.

29.    On December 8, the Defendant called the Georgia Attorney General to pressure him to support an election lawsuit filed in the Supreme Court by another state's attorney general, which sought to invalidate election results in certain targeted states like Pennsylvania. The Georgia Attorney General told the Defendant that officials had investigated various claims of election fraud in the state—including the State Farm Arena allegations—and were not seeing evidence to support them. The following day, represented by Co-Conspirator 2, the Defendant— not as President but in his capacity as a candidate for office—moved to intervene and join the state attorney general's lawsuit. And on December 11, the Supreme Court denied the suit.

30.    Also on December 8, a Senior Campaign Advisor—who spoke with the Defendant on a daily basis and had informed him on multiple occasions that various fraud claims were untrue—expressed frustration that many of Co-Conspirator 1 and his legal team's claims could not be substantiated. With respect to the persistent false claim regarding State Farm Arena, the Senior Campaign Advisor wrote in an email, "When our research and campaign legal team can't back up any of the claims made by our Elite Strike Force Legal Team, you can see why we're 0-32 on our cases. I'll obviously hustle to help on all fronts, but it's tough to own any of this when it's all just conspiracy shit beamed down from the mothership."

31.    On December 10, four days before Biden's validly ascertained electors were scheduled to cast votes and send them to Congress, Co-Conspirator 1 appeared at a hearing before the Georgia House of Representatives' Government Affairs Committee. Co-Conspirator 1 played the State Farm Arena video again, and falsely claimed that it showed "voter fraud right in front of people's eyes" and was "the tip of the iceberg." Then, he cited two election workers by name,

baselessly accused them of "quite obviously surreptitiously passing around USB ports as if they are vials of heroin or cocaine," and suggested that they were criminals whose "places of work, their homes, should have been searched for evidence of ballots, for evidence of USB ports, for evidence of voter fraud." Thereafter, the two election workers received numerous death threats.

32.     On December 31, the Defendant signed a verification affirming false election fraud allegations made on his behalf in a lawsuit filed in his capacity as a candidate for President against the Georgia Governor and Secretary of State. In advance of the filing, Co-Conspirator 2—who was advising the Defendant on the lawsuit—acknowledged in an email that he and the Defendant had, since signing a previous verification, "been made aware that some of the allegations (and evidence proffered by the experts) has been inaccurate" and that signing a new affirmation "with that knowledge (and incorporation by reference) would not be accurate." The Defendant and Co-Conspirator 2 caused the Defendant's signed verification to be filed nonetheless.

33.     On January 2, four days before Congress's certification proceeding, the Defendant, his Chief of Staff—who sometimes handled private and Campaign-related logistics for the Defendant—and private attorneys involved in the lawsuit against Georgia's Secretary of State called the Secretary of State. During the call, the Defendant lied to the Georgia Secretary of State to induce him to alter Georgia's popular vote count and call into question the validity of the Biden electors' votes, which had been transmitted to Congress weeks before, including as follows:

  a.     The Defendant raised allegations regarding the State Farm Arena video and repeatedly disparaged one of the same election workers that Co-Conspirator 1 had maligned on December 10, using her name almost twenty times and falsely referring to her as "a professional vote scammer and hustler." In response, the Georgia Secretary of State refuted this: "You're talking about the State Farm video. And I think it's extremely unfortunate that [Co-Conspirator 1] or his people, they sliced and diced that video and took it out of context." When the Georgia Secretary of State then offered a link to a video that would disprove Co-Conspirator 1's claims, the

Defendant responded, "I don't care about a link, I don't need it. I have a much, [Georgia Secretary of State], I have a much better link."

b.    The Defendant asked about rumors that paper ballots cast in the election were being destroyed, and the Georgia Secretary of State's Counsel explained to him that the claim had been investigated and was not true.

c.    The Defendant claimed that 5,000 dead people voted in Georgia, causing the Georgia Secretary of State to respond, "Well, Mr. President, the challenge that you have is the data you have is wrong. . . . The actual number were two. Two. Two people that were dead that voted. And so [your information]'s wrong, that was two."

d.    The Defendant claimed that thousands of out-of-state voters had cast ballots in Georgia's election, which the Georgia Secretary of State's Counsel refuted, explaining, "We've been going through each of those as well, and those numbers that we got, that [Defendant's counsel] was just saying, they're not accurate. Every one we've been through are people that lived in Georgia, moved to a different state, but then moved back to Georgia legitimately . . . they moved back in years ago. This was not like something just before the election."

e.    In response to multiple other of the Defendant's allegations, the Georgia Secretary of State's Counsel told the Defendant that the Georgia Bureau of Investigation was examining all such claims and finding no merit to them.

f.    The Defendant said that he needed to "find" 11,780 votes, and insinuated that the Georgia Secretary of State and his Counsel could be subject to criminal prosecution if they failed to find election fraud as he demanded, stating, "And you are going to find that they are—which is totally illegal— it's, it's, it's more illegal for you than it is for them because you know what they did and you're not reporting it. That's a criminal, you know, that's a criminal offense. And you know, you can't let that happen. That's a big risk to you and to [the Georgia Secretary of State's Counsel], your lawyer."

34.    The next day, on January 3, the Defendant falsely claimed that the Georgia Secretary of State had not addressed the Defendant's allegations, publicly stating that the Georgia Secretary of State "was unwilling, or unable, to answer questions such as the 'ballots under table' scam, ballot destruction, out of state 'voters', dead voters, and more. He has no clue!"

35.     In his Campaign speech on January 6, the Defendant publicly repeated the knowingly false insinuation that more than 10,300 dead people had voted in Georgia.

*Michigan*

36.     On November 20, 2020, after outreach by the Chairwoman of the Republican National Committee (RNC), and just three days before Michigan's Governor signed a certificate of ascertainment notifying the federal government that, based on the popular vote, Biden's electors were to represent Michigan's voters, the Defendant held a meeting in the Oval Office with the Speaker of the Michigan House of Representatives and the Majority Leader of the Michigan Senate.   The Defendant included in the meeting by phone the RNC Chairwoman, who joined only briefly, and Co-Conspirator 1.   The Defendant and Co-Conspirator 1 raised false fraud claims, including of an illegitimate vote dump in Detroit.   In response, the Michigan Senate Majority Leader told the Defendant that he had lost Michigan not because of fraud, but because the Defendant had underperformed with certain voter populations in the state.   Upon leaving their meeting, the Michigan House Speaker and Michigan Senate Majority Leader issued a statement reiterating this:

> The Senate and House Oversight Committees are actively engaged in a thorough review of Michigan's elections process and we have faith in the committee process to provide greater transparency and accountability to our citizens.   We have not yet been made aware of any information that would change the outcome of the election in Michigan and as legislative leaders, we will follow the law and follow the normal process regarding Michigan's electors, just as we have said throughout this election.

37.     On December 4, Co-Conspirator 1 sent a text message to the Michigan House Speaker reiterating his unsupported claim of election fraud and attempting to get the Michigan House Speaker to assist in reversing the ascertainment of the legitimate Biden electors, stating, "Looks like Georgia may well hold some factual hearings and change the certification under ArtII

sec 1 cl 2 of the Constitution.  As [Co-Conspirator 2] explained they don't just have the right to do it but the obligation. . . . Help me get this done in Michigan."

38.     Similarly, on December 7, despite still having established no fraud in Michigan, Co-Conspirator 1 sent a text intended for the Michigan Senate Majority Leader: "So I need you to pass a joint resolution from the Michigan legislature that states that, * the election is in dispute, * there's an ongoing investigation by the Legislature, and * the Electors sent by Governor Whitmer are not the official Electors of the State of Michigan and do not fall within the Safe Harbor deadline of Dec 8 under Michigan law."

39.     On December 14—the day that electors in states across the country were required to vote and submit their votes to Congress—the Michigan House Speaker and Michigan Senate Majority Leader announced that, contrary to the Defendant's requests, they would not decertify the legitimate election results or electors in Michigan.  The Michigan Senate Majority Leader's public statement included, "[W]e have not received evidence of fraud on a scale that would change the outcome of the election in Michigan."  The Michigan House Speaker's public statement read, in part:

> We've diligently examined these reports of fraud to the best of our ability. . . .
>
> . . . I fought hard for President Trump. Nobody wanted him to win more than me.  I think he's done an incredible job.  But I love our republic, too.  I can't fathom risking our norms, traditions and institutions to pass a resolution retroactively changing the electors for Trump, simply because some think there may have been enough widespread fraud to give him the win.  That's unprecedented for good reason.  And that's why there is not enough support in the House to cast a new slate of electors.  I fear we'd lose our country forever.  This truly would bring mutually assured destruction for every future election in regards to the Electoral College.  And I can't stand for that.  I won't.

40.     In his Campaign speech on January 6, 2021, the Defendant publicly repeated his knowingly false claim regarding an illicit dump of more than a hundred thousand ballots in Detroit.

*Pennsylvania*

41.     On November 11, 2020, the Defendant publicly maligned a Philadelphia City Commissioner for stating on the news that there was no evidence of widespread fraud in Philadelphia.   As a result, the Philadelphia City Commissioner and his family received death threats.

42.     On November 25, the day after Pennsylvania's Governor signed a certificate of ascertainment and thus certified to the federal government that Biden's electors were the legitimate electors for the state, Co-Conspirator 1 orchestrated an event at a hotel in Gettysburg attended by state legislators.   Co-Conspirator 1 falsely claimed that Pennsylvania had issued 1.8 million absentee ballots and received 2.5 million in return.   In the days thereafter, a Campaign staffer wrote internally that Co-Conspirator 1's allegation was "just wrong" and "[t]here's no way to defend it." The Deputy Campaign Manager responded, "We have been saying this for a while.   It's very frustrating."

43.     On December 6, after four Republican leaders of the Pennsylvania legislature issued a public statement that the General Assembly lacked the authority to overturn the popular vote and appoint its own slate of electors, and that doing so would violate the state Election Code and Constitution, the Defendant re-tweeted a post labeling the legislators cowards.

44.     In his Campaign speech on January 6, 2021, the Defendant publicly repeated his knowingly false claim that there had been 205,000 more votes than voters in Pennsylvania.

*Wisconsin*

45.      On November 29, 2020, a recount in Wisconsin that the Defendant's Campaign had petitioned and paid for did not change the election result, and in fact increased the Defendant's margin of defeat.

46.      On December 14, the Wisconsin Supreme Court rejected an election challenge by the Campaign.  One Justice wrote, "[N]othing in this case casts any legitimate doubt that the people of Wisconsin lawfully chose Vice President Biden and Senator Harris to be the next leaders of our great country."

47.      On December 21, as a result of the state Supreme Court's decision, the Wisconsin Governor—who had signed a certificate of ascertainment on November 30 identifying Biden's electors as the state's legitimate electors—signed a certificate of final determination in which he recognized that the state Supreme Court had resolved a controversy regarding the appointment of Biden's electors, and confirmed that Biden had received the highest number of votes in the state and that his electors were the state's legitimate electors.

48.      That same day, in response to the court decision that had prompted the Wisconsin Governor to sign a certificate of final determination, the Defendant issued a Tweet repeating his knowingly false claim of election fraud and demanding that the Wisconsin legislature overturn the election results that had led to the ascertainment of Biden's electors as the legitimate electors.

49.      In his Campaign speech on January 6, 2021, the Defendant publicly repeated knowingly false claims that there had been tens of thousands of unlawful votes in Wisconsin.

<u>The Defendant's Use of Dishonesty, Fraud, and Deceit to Organize Fraudulent Slates of Electors and Cause Them to Transmit False Certificates to Congress</u>

50.      As the Defendant's attempts to obstruct the electoral vote through deceit of state officials met with repeated failure, beginning in early December 2020, he and co-conspirators

developed a new plan: to marshal individuals who would have served as the Defendant's electors, had he won the popular vote, in seven targeted states—Arizona, Georgia, Michigan, Nevada, New Mexico, Pennsylvania, and Wisconsin—and cause those individuals to make and send to the Vice President and Congress false certifications that they were legitimate electors. Under the plan, the submission of these fraudulent slates would create a fake controversy at the certification proceeding and position the Vice President—presiding on January 6 as President of the Senate— to supplant legitimate electors with the Defendant's fake electors and certify the Defendant as president. The Defendant had no official responsibilities related to the convening of legitimate electors or their signing and mailing of their certificates of vote.

51.     The plan capitalized on ideas presented in memoranda drafted by Co-Conspirator 5, an attorney who was assisting the Defendant's Campaign with legal efforts related to a recount in Wisconsin. The memoranda evolved over time from a legal strategy to preserve the Defendant's rights to a corrupt plan to subvert the federal government function by stopping Biden electors' votes from being counted and certified, as follows:

a.     The November 18 Memorandum ("Wisconsin Memo") advocated that, because of the ongoing recount in Wisconsin, the Defendant's electors there should meet and cast votes on December 14—the date the ECA required appointed electors to vote—to preserve the alternative of the Defendant's Wisconsin elector slate in the event the Defendant ultimately prevailed in the state.

b.     The December 6 Memorandum ("Fraudulent Elector Memo") marked a sharp departure from Co-Conspirator 5's Wisconsin Memo, advocating that the alternate electors originally conceived of to preserve rights in Wisconsin instead be used in a number of states as fraudulent electors to prevent Biden from receiving the 270 electoral votes necessary to secure the presidency on January 6. The Fraudulent Elector Memo suggested that the Defendant's electors in six purportedly "contested" states (Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin) should meet and mimic as best as possible the actions of the legitimate Biden electors, and that on January 6, the Vice President should open and count the fraudulent votes, setting up a

fake controversy that would derail the proper certification of Biden as president-elect.

    c.    The December 9 Memorandum ("Fraudulent Elector Instructions") consisted of Co-Conspirator 5's instructions on how fraudulent electors could mimic legitimate electors in Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin. Co-Conspirator 5 noted that in some states, it would be virtually impossible for the fraudulent electors to successfully take the same steps as the legitimate electors because state law required formal participation in the process by state officials, or access to official resources.

52.    The plan began in early December, and ultimately, the conspirators and the Defendant's Campaign took the Wisconsin Memo and expanded it to any state that the Defendant claimed was "contested"—even New Mexico, which the Defendant had lost by more than ten percent of the popular vote. This expansion was forecast by emails the Defendant's Chief of Staff sent on December 6, forwarding the Wisconsin Memo to Campaign staff and writing, "We just need to have someone coordinating the electors for states."

53.    On December 6, the Defendant and Co-Conspirator 2 called the RNC Chairwoman to ensure that the plan was in motion. During the call, Co-Conspirator 2 told the RNC Chairwoman that it was important for the RNC to help the Defendant's Campaign gather electors in targeted states, and falsely represented to her that such electors' votes would be used only if ongoing litigation in one of the states changed the results in the Defendant's favor. After the RNC Chairwoman consulted the Campaign and heard that work on gathering electors was underway, she called and reported this information to the Defendant, who responded approvingly.

54.    On December 7, Co-Conspirator 1 received the Wisconsin Memo and the Fraudulent Elector Memo. Co-Conspirator 1 spoke with Co-Conspirator 6 regarding attorneys who could assist in the fraudulent elector effort in the targeted states, and he received from Co-

Conspirator 6 an email identifying attorneys in Arizona, Georgia, Michigan, Nevada, New Mexico, Pennsylvania, and Wisconsin.

55.   The next day, on December 8, Co-Conspirator 5 called the Arizona attorney on Co-Conspirator 6's list.  In an email after the call, the Arizona attorney recounted his conversation with Co-Conspirator 5 as follows:

> I just talked to the gentleman who did that memo, [Co-Conspirator 5].  His idea is basically that all of us (GA, WI, AZ, PA, etc.) have our electors send in their votes (even though the votes aren't legal under federal law -- because they're not signed by the Governor); so that members of Congress can fight about whether they should be counted on January 6th.  (They could potentially argue that they're not bound by federal law because they're Congress and make the law, etc.)  Kind of wild/creative -- I'm happy to discuss.  My comment to him was that I guess there's no harm in it, (legally at least) -- i.e. we would just be sending in "fake" electoral votes to Pence so that "someone" in Congress can make an objection when they start counting votes, and start arguing that the "fake" votes should be counted.

56.   At Co-Conspirator 1's direction, on December 10, Co-Conspirator 5 sent to points of contact in all targeted states except Wisconsin (which had already received his memos) and New Mexico a streamlined version of the Wisconsin Memo—which did not reveal the intended fraudulent use of the Defendant's electors—and the Fraudulent Elector Instructions, along with fraudulent elector certificates that he had drafted.

57.   The next day, on December 11, through Co-Conspirator 5, Co-Conspirator 1 suggested that the Arizona lawyer file a petition for certiorari in the Supreme Court as a pretext to claim that litigation was pending in the state, to provide cover for the convening and voting of the Defendant's fraudulent electors there.  Co-Conspirator 5 explained that Co-Conspirator 1 had heard from a state official and state provisional elector that "it could appear **treasonous** for the AZ electors to vote on Monday if there is no pending court proceeding . . . ."

58.     To manage the plan in Pennsylvania, on December 12, Co-Conspirator 1, Co-Conspirator 5, and Co-Conspirator 6 participated in a conference call organized by the Defendant's Campaign with the Defendant's electors in that state.  When the Defendant's electors expressed concern about signing certificates representing themselves as legitimate electors, Co-Conspirator 1 falsely assured them that their certificates would be used only if the Defendant succeeded in litigation.  Subsequently, Co-Conspirator 6 circulated proposed conditional language to that effect for potential inclusion in the fraudulent elector certificates.  A Campaign official cautioned not to offer the conditional language to other states because "[t]he other States are signing what he prepared – if it gets out we changed the language for PA it could snowball."  In some cases, the Defendant's electors refused to participate in the plan.

59.     On December 13, Co-Conspirator 5 sent Co-Conspirator 1 an email memorandum that further confirmed that the conspirators' plan was not to use the fraudulent electors only in the circumstance that the Defendant's litigation was successful in one of the targeted states—instead, the plan was to falsely present the fraudulent slates as an alternative to the legitimate slates at Congress's certification proceeding.

60.     On the same day, the Defendant asked the Senior Campaign Advisor for an update on "what was going on" with the elector plan and directed him to "put out [a] statement on electors."  As a result, Co-Conspirator 1 directed the Senior Campaign Advisor to join a conference call with him, Co-Conspirator 6, and others.  When the Senior Campaign Advisor related these developments in text messages to the Deputy Campaign Manager, a Senior Advisor to the Defendant, and a Campaign staffer, the Deputy Campaign Manager responded, "Here's the thing the way this has morphed it's a crazy play so I don't know who wants to put their name on it."  The Senior Advisor wrote, "Certifying illegal votes."  In turn, the participants in the group text

message refused to have a statement regarding electors attributed to their names because none of them could "stand by it."

61.     Also on December 13, at a Campaign staffer's request, Co-Conspirator 5 drafted and sent fraudulent elector certificates for the Defendant's electors in New Mexico, which had not previously been among the targeted states, and where there was no pending litigation on the Defendant's behalf.  The next day, the Defendant's Campaign filed an election challenge suit in New Mexico at 11:54 a.m., six minutes before the noon deadline for the electors' votes, as a pretext so that there was pending litigation there at the time the fraudulent electors voted.

62.     On December 14, the legitimate electors of all 50 states and the District of Columbia met in their respective jurisdictions to formally cast their votes for president, resulting in a total of 232 electoral votes for the Defendant and 306 for Biden.  The legitimate electoral votes that Biden won in the states that the Defendant targeted, and the Defendant's margin of defeat, were as follows: Arizona (11 electoral votes; 10,457 votes), Georgia (16 electoral votes; 11,779 votes), Michigan (16 electoral votes; 154,188 votes), Nevada (6 electoral votes; 33,596 votes), New Mexico (5 electoral votes; 99,720 votes), Pennsylvania (20 electoral votes; 80,555 votes), and Wisconsin (10 electoral votes; 20,682 votes).

63.     On the same day, at the direction of the Defendant and Co-Conspirator 1, fraudulent electors convened sham proceedings in the seven targeted states to cast fraudulent electoral ballots in favor of the Defendant.  In some states, in order to satisfy legal requirements set forth for legitimate electors under state law, state officials were enlisted to provide the fraudulent electors access to state capitol buildings so that they could gather and vote there.  In many cases, however, as Co-Conspirator 5 had predicted in the Fraudulent Elector Instructions, the fraudulent electors were unable to satisfy the legal requirements.

64.     Nonetheless, as directed in the Fraudulent Elector Instructions, shortly after the fraudulent electors met on December 14, the targeted states' fraudulent elector certificates were mailed to the President of the Senate, the Archivist of the United States, and others. The Defendant and co-conspirators ultimately used the certificates of these fraudulent electors to deceitfully target the government function, and did so contrary to how fraudulent electors were told they would be used.

65.     Unlike those of the fraudulent electors, consistent with the ECA, the legitimate electors' signed certificates were annexed to the state executives' certificates of ascertainment before being sent to the President of the Senate and others.

66.     That evening, at 6:26 p.m., the RNC Chairwoman forwarded to the Defendant, through his executive assistant, an email titled, "Electors Recap – Final," which represented that in "Six Contested States"—Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin— the Defendant's electors had voted in parallel to Biden's electors. The Defendant's executive assistant responded, "It's in front of him!"

### The Defendant's Attempts to Enlist the Vice President to Fraudulently Alter the Election Results at the January 6 Certification Proceeding

67.     As the January 6 congressional certification proceeding approached and his other efforts to impair, obstruct, and defeat the federal government function failed, the Defendant sought to enlist the Vice President to assist in the plan to use his role as President of the Senate to fraudulently alter the election results. The Defendant had no official responsibilities related to the certification proceeding, but he did have a personal interest as a candidate in being named the winner of the election. All of the conversations between the Defendant and Vice President described below focused on the Defendant maintaining power. When his efforts to use the Vice President's role as President of the Senate failed, the Defendant attempted to use a crowd of

supporters that he had gathered in Washington, D.C. to pressure the Vice President to fraudulently alter the election results.

68.     On December 19, 2020, after cultivating widespread anger and resentment for weeks with his knowingly false claims of election fraud, the Defendant urged his supporters to travel to Washington on the day of the certification proceeding, tweeting, "Big protest in D.C. on January 6th. Be there, will be wild!" Throughout late December and early January, the Defendant repeatedly urged his supporters to come to Washington for January 6.

69.     On December 23, the Defendant re-tweeted a memo titled "Operation 'PENCE' CARD," which falsely asserted that the Vice President could, among other things, unilaterally disqualify legitimate electors from six targeted states.

70.     On the same day, Co-Conspirator 2 circulated a two-page memorandum outlining a plan for the Vice President to unlawfully declare the Defendant the certified winner of the presidential election.  Just two months earlier, on October 11, Co-Conspirator 2 had taken the opposite position, writing that neither the Constitution nor the ECA provided the Vice President discretion in the counting of electoral votes, or permitted him to "make the determination on his own."

71.     On December 25, when the Vice President called the Defendant to wish him a Merry Christmas, the Defendant quickly turned the conversation to January 6 and his request that the Vice President, as President of the Senate, reject electoral votes that day.  The Vice President pushed back, telling the Defendant, as the Vice President already had in previous conversations, "You know I don't think I have the authority to change the outcome."

72.     On January 1, the Defendant called the Vice President and berated him because he had learned that the Vice President had opposed a lawsuit seeking a judicial decision that, at the

certification, the Vice President had the authority to reject or return votes to the states under the Constitution. The Vice President responded that he thought there was no constitutional basis for such authority and that it was improper. In response, the Defendant told the Vice President, "You're too honest." Within hours of the conversation, the Defendant reminded his supporters to meet in Washington before the certification proceeding, tweeting, "The BIG Protest Rally in Washington, D.C., will take place at 11.00 A.M. on January 6th. Locational details to follow. StopTheSteal!"

73.    On January 3, the Defendant again told the Vice President that at the certification proceeding, the Vice President had the absolute right to reject electoral votes and the ability to overturn the election. The Vice President responded that he had no such authority, and that a federal appeals court had rejected the lawsuit making that claim the previous day.

74.    On January 3, Co-Conspirator 2 circulated a second memorandum that included a new plan under which, contrary to the ECA, the Vice President would send the elector slates to the state legislatures to determine which slate to count.

75.    On January 4, the Defendant held a meeting with Co-Conspirator 2, the Vice President, the Vice President's Chief of Staff, and the Vice President's Counsel. The Defendant's White House Counsel did not attend.

76.    During the meeting, as reflected in the Vice President's contemporaneous notes, the Defendant made knowingly false claims of election fraud, including, "Bottom line—won every state by 100,000s of votes" and "We won every state." The Defendant and Co-Conspirator 2 then asked the Vice President to either unilaterally reject the legitimate electors from the seven targeted states, or send the question of which slate was legitimate to the targeted states' legislatures. When the Vice President challenged Co-Conspirator 2 on whether the proposal to return the question to

the states was defensible, Co-Conspirator 2 responded, "Well, nobody's tested it before." The Vice President then told the Defendant, "Did you hear that? Even your own counsel is not saying I have that authority." The Defendant responded, "That's okay, I prefer the other suggestion" of the Vice President rejecting the electors unilaterally.

77.     Also on January 4, when Co-Conspirator 2 acknowledged to the Senior Advisor that no court would support his proposal, the Senior Advisor told Co-Conspirator 2, "[Y]ou're going to cause riots in the streets." Co-Conspirator 2 responded that there had previously been points in the nation's history where violence was necessary to protect the republic.

78.     On the morning of January 5, at the Defendant's direction, the Vice President's Chief of Staff and the Vice President's Counsel met again with Co-Conspirator 2. Co-Conspirator 2 now advocated that the Vice President do what the Defendant had said he preferred the day before: unilaterally reject electors from the targeted states. During this meeting, Co-Conspirator 2 privately acknowledged to the Vice President's Counsel that he hoped to prevent judicial review of his proposal because he understood that it would be unanimously rejected by the Supreme Court. The Vice President's Counsel expressed to Co-Conspirator 2 that following through with the proposal would result in a "disastrous situation" where the election might "have to be decided in the streets."

79.     That same day, the Defendant encouraged supporters to travel to Washington on January 6, and he set the false expectation that the Vice President had the authority to and might use his ceremonial role as President of the Senate at the certification proceeding to reverse the election outcome in the Defendant's favor, including issuing the following Tweets:

      a.     At 11:06 a.m., "The Vice President has the power to reject fraudulently chosen electors." This was within 40 minutes of the Defendant's earlier reminder, "See you in D.C."

b.    At 5:43 p.m., "I will be speaking at the SAVE AMERICA RALLY tomorrow on the Ellipse at 11AM Eastern. Arrive early — doors open at 7AM Eastern. BIG CROWDS!"

80.    Also on January 5, the Defendant met alone with the Vice President. When the Vice President refused to agree to the Defendant's request that he use his position as President of the Senate to obstruct the certification, the Defendant grew frustrated and told the Vice President that the Defendant would have to publicly criticize him. Upon learning of this, the Vice President's Chief of Staff was concerned for the Vice President's safety and alerted the head of the Vice President's Secret Service detail.

81.    That night, the Defendant approved and caused the Defendant's Campaign to issue a public statement that the Defendant knew, from his meeting with the Vice President only hours earlier, was false: "The Vice President and I are in total agreement that the Vice President has the power to act."

82.    On January 6, starting in the early morning hours, the Defendant again turned to knowingly false statements aimed at pressuring the Vice President to fraudulently alter the election outcome, and raised publicly the false expectation that the Vice President might do so:

a.    At 1:00 a.m., the Defendant issued a Tweet that falsely claimed, "If Vice President @Mike_Pence comes through for us, we will win the Presidency. Many States want to decertify the mistake they made in certifying incorrect & even fraudulent numbers in a process NOT approved by their State Legislatures (which it must be). Mike can send it back!"

b.    At 8:17 a.m., the Defendant issued a Tweet that falsely stated, "States want to correct their votes, which they now know were based on irregularities and fraud, plus corrupt process never received legislative approval. All Mike Pence has to do is send them back to the States, AND WE WIN. Do it Mike, this is a time for extreme courage!"

83.    On the morning of January 6, an agent of the Defendant contacted a United States Senator to ask him to hand-deliver documents to the Vice President. The agent then facilitated the

receipt by the Senator's staff of the fraudulent certificates signed by the Defendant's fraudulent electors in Michigan and Wisconsin, which were believed not to have been delivered to the Vice President or Archivist by mail. When one of the Senator's staffers contacted a staffer for the Vice President by text message to arrange for delivery of what the Senator's staffer had been told were "[a]lternate slate[s] of electors for MI and WI because archivist didn't receive them," the Vice President's staffer rejected them.

84.     At 11:15 a.m., the Defendant called the Vice President and again pressured him to fraudulently reject or return Biden's legitimate electoral votes. The Vice President again refused. Immediately after the call, the Defendant decided to single out the Vice President in public remarks he would make within the hour, reinserting language that he had personally drafted earlier that morning—falsely claiming that the Vice President had authority to send electoral votes to the states—but that advisors had previously successfully advocated be removed.

85.     Earlier that morning, the Defendant had selected Co-Conspirator 2 to join Co-Conspirator 1 in giving public remarks before his own. When they did so, based on knowingly false election fraud claims, Co-Conspirator 1 and Co-Conspirator 2 intensified pressure on the Vice President to fraudulently obstruct the certification proceeding:

    a.     Co-Conspirator 1 told the crowd that the Vice President could "cast [the ECA] aside" and unilaterally "decide on the validity of these crooked ballots[.]" He also lied when he claimed to "have letters from five legislatures begging us" to send elector slates to the legislatures for review, and called for "trial by combat."

    b.     Co-Conspirator 2 told the crowd, "[A]ll we are demanding of Vice President Pence is this afternoon at one o'clock he let the legislatures of the state look into this so we get to the bottom of it and the American people know whether we have control of the direction of our government or not. We no longer live in a self-governing republic if we can't get the answer to this question."

86.    Next, beginning at 11:56 a.m., the Defendant made multiple knowingly false statements integral to his criminal plans to defeat the federal government function, obstruct the certification, and interfere with others' right to vote and have their votes counted.  The Defendant repeated false claims of election fraud, gave false hope that the Vice President might change the election outcome, and directed the crowd in front of him to go to the Capitol as a means to obstruct the certification and pressure the Vice President to fraudulently obstruct the certification.  The Defendant's knowingly false statements for these purposes included:

> a.    The Defendant falsely claimed that, based on fraud, the Vice President could use his position as President of the Senate to alter the outcome of the election results, stating:
>
>> I hope Mike is going to do the right thing.  I hope so. I hope so.
>>
>> Because if Mike Pence does the right thing, we win the election.  All he has to do—all, this is, this is from the number one, or certainly one of the top, Constitutional lawyers in our country—he has the absolute right to do it.  We're supposed to protect our country, support our country, support our Constitution, and protect our Constitution.
>>
>> States want to revote.  The states got defrauded. They were given false information.  They voted on it.  Now they want to recertify.  They want it back. All Vice President Pence has to do is send it back to the states to recertify and we become president and you are the happiest people.
>
> b.    After the Defendant falsely stated that the Pennsylvania legislature wanted "to recertify their votes.  They want to recertify.  But the only way that can happen is if Mike Pence agrees to send it back," the crowd began to chant, "Send it back."
>
> c.    The Defendant also said that regular rules no longer applied, stating, "And fraud breaks up everything, doesn't it?  When you catch somebody in a fraud, you're allowed to go by very different rules."

d.     The Defendant specifically referenced the process by which electoral votes are counted during the proceeding, including by stating, "We have come to demand that Congress do the right thing and only count the electors who have been lawfully slated, lawfully slated."

e.     Finally, after exhorting that "we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore," the Defendant directed the people in front of him to head to the Capitol, suggested he was going with them, and told them to give Members of Congress "the kind of pride and boldness that they need to take back our country."

87.     During and after the Defendant's remarks, thousands of people marched toward the Capitol.

### The Defendant's Exploitation of the Violence and Chaos at the Capitol

88.     Shortly before 1:00 p.m., the Vice President issued a public statement explaining that his role as President of the Senate at the certification proceeding did not include "unilateral authority to determine which electoral votes should be counted and which should not."

89.     Before the Defendant had finished speaking, a crowd began to gather at the Capitol.

90.     On the floor of the House of Representatives, the Vice President, in his role as President of the Senate, began the certification proceeding. At approximately 1:11 p.m., the Vice President opened the certificates of vote and certificates of ascertainment that the legitimate electors for the state of Arizona had mailed to Washington, consistent with the ECA. After a Congressman and Senator lodged an objection to Arizona's certificates, the House and Senate retired to their separate chambers to debate the objection.

91.     A mass of people—including individuals who had traveled to Washington and to the Capitol at the Defendant's direction—broke through barriers cordoning off the Capitol grounds and advanced on the building, including by violently attacking law enforcement officers trying to secure it.

92.     Beginning around 1:30 p.m., the Defendant, who had returned to the White House after concluding his remarks, settled in the dining room off of the Oval Office.  He spent much of the afternoon reviewing Twitter on his phone, while the television in the dining room showed live events at the Capitol.

93.     At 2:13 p.m., after more than an hour of steady, violent advancement, the crowd at the Capitol broke into the building, and forced the Senate to recess.  At approximately 2:20 p.m., the official proceeding having been interrupted, staffers evacuating from the Senate carried with them the legitimate electors' certificates of vote and their governors' certificates of ascertainment. The House also was forced to recess.

94.     At 2:24 p.m., the Defendant personally, without assistance, issued a Tweet intended to further delay and obstruct the certification: "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify.  USA demands the truth!"

95.     One minute later, at 2:25 p.m., the United States Secret Service was forced to evacuate the Vice President to a secure location.

96.     At the Capitol, throughout the afternoon, members of the crowd chanted, "Hang Mike Pence!"; "Where is Pence?  Bring him out!"; and "Traitor Pence!"

97.     On the evening of January 6, the Defendant and Co-Conspirator 1 attempted to exploit the violence and chaos at the Capitol by having Co-Conspirator 1 call lawmakers to convince them, based on knowingly false claims of election fraud, to delay the certification proceeding in which the Defendant had no official role, including:

      a.      From 6:59 p.m. through 7:22 p.m., Co-Conspirator 1 placed calls to five United States Senators and one United States Representative.

b.    Co-Conspirator 6 attempted to confirm phone numbers for six United States Senators whom the Defendant had directed Co-Conspirator 1 to call and attempt to enlist in further delaying the certification.

c.    In one of the calls, Co-Conspirator 1 left a voicemail intended for a United States Senator that said, "We need you, our Republican friends, to try to just slow it down so we can get these legislatures to get more information to you. And I know they're reconvening at eight tonight but the only strategy we can follow is to object to numerous states and raise issues so that we get ourselves into tomorrow—ideally until the end of tomorrow."

d.    In another message intended for another United States Senator, Co-Conspirator 1 repeated knowingly false allegations of election fraud, including that the vote counts certified by the states to Congress were incorrect and that the governors who had certified knew they were incorrect; that "illegal immigrants" had voted in substantial numbers in Arizona; and that "Georgia gave you a number in which 65,000 people who were underage voted." Co-Conspirator 1 also claimed that the Vice President's actions had been surprising and asked the Senator to "object to every state and kind of spread this out a little bit like a filibuster[.]"

98.    The attack on the Capitol obstructed and delayed the certification for approximately six hours, until the Senate and House of Representatives came back into session separately at 8:06 p.m. and 9:02 p.m., respectively, and came together in a Joint Session at 11:35 p.m.

99.    At 11:44 p.m., Co-Conspirator 2 emailed the Vice President's Counsel advocating that the Vice President violate the law and seek further delay of the certification. Co-Conspirator 2 wrote, "I implore you to consider one more relatively minor violation [of the ECA] and adjourn for 10 days to allow the legislatures to finish their investigations, as well as to allow a full forensic audit of the massive amount of illegal activity that has occurred here."

100.    At 3:41 a.m. on January 7, as President of the Senate, the Vice President announced the certified results of the 2020 presidential election in favor of Biden.

(In violation of Title 18, United States Code, Section 371)

- 33 -

## COUNT TWO
### (Conspiracy to Obstruct an Official Proceeding—18 U.S.C. § 1512(k))

101.    The allegations contained in paragraphs 1 through 5 and 9 through 100 of this Superseding Indictment are re-alleged and fully incorporated here by reference.

102.    From on or about November 13, 2020, through on or about January 7, 2021, in the District of Columbia and elsewhere, the Defendant,

**DONALD J. TRUMP,**

did knowingly combine, conspire, confederate, and agree with co-conspirators, known and unknown to the Grand Jury, to corruptly obstruct and impede an official proceeding, that is, the certification of the electoral vote, in violation of Title 18, United States Code, Section 1512(c)(2).

(In violation of Title 18, United States Code, Section 1512(k))

## COUNT THREE
### (Obstruction of, and Attempt to Obstruct, an Official
### Proceeding—18 U.S.C. §§ 1512(c)(2), 2)

103.     The allegations contained in paragraphs 1 through 5 and 9 through 100 of this Superseding Indictment are re-alleged and fully incorporated here by reference.

104.     From on or about November 13, 2020, through on or about January 7, 2021, in the District of Columbia and elsewhere, the Defendant,

**DONALD J. TRUMP,**

attempted to, and did, corruptly obstruct and impede an official proceeding, that is, the certification of the electoral vote.

(In violation of Title 18, United States Code, Sections 1512(c)(2), 2)

## COUNT FOUR
### (Conspiracy Against Rights—18 U.S.C. § 241)

105.    The allegations contained in paragraphs 1 through 5 and 9 through 100 of this Superseding Indictment are re-alleged and fully incorporated here by reference.

106.    From on or about November 13, 2020, through on or about January 20, 2021, in the District of Columbia and elsewhere, the Defendant,

**DONALD J. TRUMP,**

did knowingly combine, conspire, confederate, and agree with co-conspirators, known and unknown to the Grand Jury, to injure, oppress, threaten, and intimidate one or more persons in the free exercise and enjoyment of a right and privilege secured to them by the Constitution and laws of the United States—that is, the right to vote, and to have one's vote counted.

(In violation of Title 18, United States Code, Section 241)

A TRUE BILL

_____

FOREPERSON

_____

JACK SMITH
SPECIAL COUNSEL
UNITED STATES DEPARTMENT OF JUSTICE